IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

_____

SUSAN NEESE, M.D., *et al.*,

     Plaintiffs,

v.

XAVIER BECERRA, *et al.*,

     Defendants.

Civil Action No. 2:21-cv-163-Z

**DEFENDANTS' MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT**

CHAD E. MEACHAM
UNITED STATES ATTORNEY

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:    214-659-8626
Facsimile:    214-659-8807
brian.stoltz@usdoj.gov

BRIAN M. BOYNTON
Acting Assistant Attorney General

MICHELLE R. BENNETT
Assistant Branch Director

Christopher D. Dodge
Jordan L. Von Bokern (D.C. Bar # 1032962)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20005
Tel: (202) 305-7919
Email: Jordan.L.Von.Bokern2@usdoj.gov

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

BACKGROUND .........................................................................................................................2

    I.     Section 1557 And Title IX's Prohibition Of Discrimination On The Basis Of
          Sex .............................................................................................................................

    II.    The Supreme Court's Decision In *Bostock v. Clayton County* ..............................3

    III.   The Department Of Health And Human Services' Notification ...................................4

    IV.   Plaintiffs And This Litigation .....................................................................................5

LEGAL STANDARDS ...............................................................................................................7

ARGUMENT ..............................................................................................................................7

    I.     The First Amended Complaint Should Be Dismissed Under Rule 12(b)(1)
          Because Plaintiffs Lack Standing And Their Challenge Is Unripe ..........................7

          A.     Plaintiffs lack standing to challenge the Notification because any
                harm to them is speculative and their desired remedy would not
                redress it. ........................................................................................................7

          B.     The challenge to the Notification is not ripe for review. ...............................13

    II.    Subject Matter Jurisdiction Is Further Lacking Because Plaintiffs Fail To
          Challenge Final Agency Action For Which No Other Adequate Remedy Is
          Available ...................................................................................................................16

          A.     The Notification does not qualify as final agency action because it has
                no binding legal effect on the Plaintiffs. ......................................................17

          B.     Section 1557 and Title IX provide an adequate, and exclusive,
                alternative remedy to Plaintiffs. ....................................................................20

    III.   The First Amended Complaint Fails To State A Claim Upon Which Relief
          Can Be Granted .......................................................................................................23

          A.     The Notification is in accordance with *Bostock* and Title IX. .......................23

          B.     Plaintiffs' challenge to the Notification misreads *Bostock* .............................25

          C.     The Declaratory Judgment Act does not create a cause of action and
                Plaintiffs' claim under it must be dismissed. .................................................29

CONCLUSION ...........................................................................................................................29

i

# TABLE OF AUTHORITIES

**CASES**

*Abbott Labs. v. Gardner,*
   387 U.S. 136 (1967) ................................................................................................. 14

*Adams v. Sch. Bd. of St. Johns Cty.,*
   968 F.3d 1286 (11th Cir. 2020) ............................................................................... 25

*Aetna Life Ins. Co. of Hartford, Conn. v. Haworth,*
   300 U.S. 227 (1937) ................................................................................................. 29

*Aluminum Co. of Am. v. United States,*
   790 F.2d 938 (D.C. Cir. 1986) ................................................................................ 19

*Am. Tort Reform Ass'n v. OSHA,*
   738 F.3d 387 (D.C. Cir. 2013) ................................................................................ 18

*Arpaio v. Obama,*
   797 F.3d 11 (D.C. Cir. 2015) .................................................................................. 11

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ................................................................................................... 7

*Ass'n of Am. Med. Colleges v. United States,*
   34 F. Supp. 2d 1187 (C.D. Cal. 1998) ................................................................... 21

*AT&T Co. v. EEOC,*
   270 F.3d 973 (D.C. Cir. 2001) ................................................................................ 19

*B. P. J. v. W. Va. State Bd. of Educ.,*
   No. 2:21-CV-00316, 2021 WL 3081883 (S.D. W. Va. July 21, 2021) .................... 25

*Barber v. Bryant,*
   860 F.3d 345 (5th Cir. 2017) ..................................................................................... 8

*Bauer v. Texas,*
   341 F.3d 352 (5th Cir. 2003) .................................................................................. 7, 8

*Bd. of Educ. of the Highland Local Sch. Dist. v. Dep't of Educ.,*
   208 F. Supp. 3d 850 (S.D. Ohio 2016) .............................................................. 22, 23

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ................................................................................................... 7

*Bostock v. Clayton County,*
   140 S. Ct. 1731 (2020) ...................................................................................... passim

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) ..................................................................................... 20

*Bruni v. Hughs*,
    468 F. Supp. 3d 817 (S.D. Tex. 2020) .......................................................... 11

*C.P. v. Blue Cross Blue Shield of Ill.*,
    No. 3:20-CV-06145-RJB, 2021 WL 1758896 (W.D. Wash. May 4, 2021) ........... 25

*Cannon v. Univ. of Chi.*,
    441 U.S. 677 (1979) ..................................................................................... 24

*Carson v. Fed. Nat'l Mortg. Ass'n*,
    No. SA-11-CA-925-H, 2012 WL 13029757 (W.D. Tex. Jan. 26, 2012) .............. 29

*Cent. and S. W. Servs., Inc. v. EPA*,
    220 F.3d 683 (5th Cir. 2000) ....................................................................... 16

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ..................................................................................... 19

*Christensen v. Harris County*,
    529 U.S. 576 (2000) ................................................................................ 12, 13

*Citizens for Responsibility & Ethics in Wash. v. DOJ*,
    846 F.3d 1235 (D.C. Cir. 2017) .................................................................... 20

*Clapper v. Amnesty Int'l*,
    568 U.S. 398 (2013) ............................................................................ 7, 8, 10

*Crane v. Johnson*,
    783 F.3d 244 (5th Cir. 2015) ......................................................................... 8

*CSX Transp., Inc. v. Surface Transp. Bd.*,
    774 F.3d 25 (D.C. Cir. 2014) ....................................................................... 19

*Ctr. for Auto Safety v. NHTSA*,
    452 F.3d 798 (D.C. Cir. 2006) ..................................................................... 19

*Doe v. Univ. of Scranton*,
    No. 3:19-CV-01486, 2020 WL 5993766 n.61 (M.D. Pa. Oct. 9, 2020) ............. 25

*Elgin v. Dep't of Treasury*,
    567 U.S. 1 (2012) ........................................................................................ 22

*Env't Integrity Project v. United States Env't Prot. Agency*,
    969 F.3d 529 (5th Cir. 2020) ................................................................. 13, 19

*Franklin v. Gwinnett Cnty. Pub. Sch.*,
    503 U.S. 60 (1992) ................................................................................................ 24

*Garcia v. Vilsack*,
    563 F.3d 519 (D.C. Cir. 2009) ............................................................................. 21

*Gen. Fin. Cop. v. FTC*,
    700 F.2d 366 (7th Cir. 1983) ................................................................................ 23

*Grimm v. Gloucester Cty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ........................................................................... 24, 25

*Hammons v. Univ. of Md. Med. Sys. Corp.*,
    No. CV DKC 20-2088, 2021 WL 3190492 (D. Md. July 28, 2021) .................. 25, 28

*Harris Cty., Tex. v. MERSCORP Inc.*,
    791 F.3d 545 (5th Cir. 2015) ................................................................................ 29

*Hinojosa v. Horn*,
    896 F.3d 305 (5th Cir. 2018) ........................................................................... 20, 21

*Home Builders Ass'n of Miss., Inc. v. City of Madison*,
    143 F.3d 1006 (5th Cir. 1998) ................................................................................ 7

*Indep. Equip. Dealers Ass'n v. EPA*,
    372 F.3d 420 (D.C. Cir. 2004) ............................................................................. 19

*Koenke v. Saint Joseph's Univ.*,
    No. CV 19-4731, 2021 WL 75778 (E.D. Pa. Jan. 8, 2021) .................................. 25

*Lakoski v. James*,
    66 F.3d 751 (5th Cir. 1995) .................................................................................. 24

*Leatherwood v. Houston Post Co.*,
    59 F.3d 533 (5th Cir. 1995) .................................................................................. 24

*Longshoremen v. Boyd*,
    347 U.S. 222 (1954) .............................................................................................. 16

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................... 7, 12

*Luminant Generation Co. v. EPA*,
    757 F.3d 439 (5th Cir. 2014) ........................................................................... 19, 20

*Machete Prods., L.L.C. v. Page*,
    809 F.3d 281 (5th Cir. 2015) .................................................................................. 7

*Martinez v. Pompeo*,
    977 F.3d 457 (5th Cir. 2020) .................................................. 20

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) .................................................. 13

*Meritor Sav. Bank, FSB v. Vinson*,
    477 U.S. 57 (1986) .................................................. 24

*Miss. State Dem. Party v. Barbour*,
    529 F.3d 538 (5th Cir. 2008) .................................................. 13

*NAACP v. Meese*,
    615 F. Supp. 200 (D.D.C. 1985) .................................................. 21

*Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*,
    979 F.2d 227 (D.C. Cir. 1992) .................................................. 18

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) .................................................. 19

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003) .................................................. 14, 15

*New Jersey Hosp. Ass'n v. United States*,
    23 F. Supp. 2d 497 (D.N.J. 1998) .................................................. 21

*Okpalobi v. Foster*,
    244 F.3d 405 (5th Cir. 2001) .................................................. 29

*Pacific Gas & Electric Co. v. FPC*,
    506 F.2d 33 (D.C. Cir. 1974) .................................................. 12, 18

*Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.*,
    847 F.2d 1168 (5th Cir. 1988) .................................................. 12, 18, 19

*Peoples Nat. Bank v. Off. of Comptroller of Currency*,
    362 F.3d 333 (5th Cir. 2004) .................................................. 20

*Princeton Univ. v. Schmid*,
    455 U.S. 100 (1982) .................................................. 14

*Prof'ls & Patients for Customized Care v. Shalala*,
    56 F.3d 592 (5th Cir. 1995) .................................................. 18

*Rochester Tel. Corp. v. United States*,
    307 U.S. 125 (1939) .................................................. 20

*Sch. Dist. of City of Saginaw v. Dep't of Health, Ed., & Welfare,*
    431 F. Supp. 147 (E.D. Mich. 1977) ...................................................................... 23

*Schilling v. Rogers,*
    363 U.S. 666 (1960) ............................................................................................... 29

*Shalala v. Guernsey Mem'l Hosp.,*
    514 U.S. 87 (1995) ................................................................................................. 18

*Sierra Club v. Peterson,*
    228 F.3d 559 (5th Cir. 2000) ................................................................................. 17

*Skelly Oil Co. v. Phillips Petroleum Co.,*
    339 U.S. 667 (1950) ............................................................................................... 29

*Taylor v. Cohen,*
    405 F.2d 277 (4th Cir. 1968) ................................................................................. 23

*Temple Univ. of Commonwealth Sys. of Higher Educ. ex rel. v. Brown,*
    No. CIV. A. 00-CV-1063, 2001 WL 185535 (E.D. Pa. Feb. 23, 2001) ................... 21

*Tex. Health & Hum. Servs. Comm'n,*
    166 F. Supp. 3d ..................................................................................................... 29

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) ................................................................................. 17

*Texas v. United States,*
    497 F.3d 491 (5th Cir. 2007) ................................................................................. 14

*Texas v. United States,*
    523 U.S. 296 (1998) ................................................................................... 13, 15, 16

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ............................................................................................... 22

*Town of Sanford v. United States,*
    140 F.3d 20 (1st Cir. 1998) ................................................................................... 20

*Trump v. New York,*
    141 S. Ct. 530 (2020) ................................................................................... 8, 9, 13

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
    136 S. Ct. 1807 (2016) ........................................................................................... 17

*U.S. Steel Corp. v. Fri,*
    364 F. Supp. 1013 (N.D. Ind. 1973) ..................................................................... 21

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) ........................................................................................... 12

*Veldhoen v. U.S. Coast Guard*,
    35 F.3d 222 (5th Cir. 1994) ............................................................................... 19

*Warth v. Seldin*,
    422 U.S. 490 (1975) ........................................................................................... 13

## STATUTES

5 U.S.C. § 704 ........................................................................................................ 17, 23

5 U.S.C. § 706 ........................................................................................................ 23, 26

20 U.S.C. § 1681 ............................................................................................... 2, 23, 24

20 U.S.C. § 1682 ........................................................................................................ 3, 21

28 U.S.C. § 2201 ............................................................................................................. 29

42 U.S.C. § 2000bb .......................................................................................................... 5

42 U.S.C. § 2000e-2 .................................................................................................... 3, 23

42 U.S.C. § 18116 .................................................................................................. passim

## RULES

Federal Rule of Civil Procedure 5(b)(2) ...................................................................... 31

## REGULATIONS

45 C.F.R. § 92.5(a) ............................................................................................................ 2

45 C.F.R. §§ 80.6-80.8 ................................................................................................. 3, 21

## OTHER MATERIALS

Exec. Order 13988 ............................................................................................................. 4

## **INTRODUCTION**

Federal law prohibits discrimination on the basis of sex in federally funded health programs or activities. *See* 42 U.S.C. § 18116(a) (incorporating, *inter alia*, Title IX's prohibition of discrimination on the basis of sex, 20 U.S.C. § 1681(a), into federal health care law under § 1557 of the Affordable Care Act). The Supreme Court recently interpreted Title VII's parallel prohibition on discrimination "because of . . . sex" to bar discrimination on the basis of sexual orientation and gender identity. *See Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). As the Court explained, it is "*impossible*" to discriminate against a person for being gay or transgender "without discriminating against that individual based on sex." *Id.* at 1741 (emphasis added).

Consistent with the Supreme Court's holding in *Bostock*, the Department of Health and Human Services ("HHS") announced that it would interpret § 1557 and Title IX's prohibition of discrimination on the basis of sex to include discrimination because of sexual orientation and gender identity. As HHS explained, this interpretation is consistent with the Supreme Court's construction of substantively identical language under Title VII in *Bostock*, as well as subsequent federal court decisions and guidance from the Department of Justice applying *Bostock* to Title IX. But HHS also made clear that, while its statutory interpretation of § 1557 and Title IX would be guided by *Bostock*, its announcement "did not determine the outcome of any particular case or set of facts." First Amended Compl., Ex. A at 1, ECF No. 11-1 ("Notification"). Nor could it—mere policy statements and interpretive rules have no legal force apart from the underlying statutes or rules they seek to clarify.

Plaintiffs—two physicians in Texas, and one in California—allege that HHS has misread *Bostock* and that it "remains perfectly legal after *Bostock* to 'discriminate' against homosexual or transgender individuals, so long as one does not engage in 'sex' discrimination when doing so." First Amended Compl. ("FAC") ¶ 20, ECF No. 11. That is not correct, but the Court need not reach Plaintiffs' misinterpretation of *Bostock* because their argument is strictly academic. Plaintiffs fail to plead any injury because they do not, and cannot, allege that HHS has or will imminently enforce the prohibition against sex discrimination against them. Further still, Plaintiffs do not allege that they engage in any practice or conduct likely to place them at risk of enforcement, which means they lack

standing.  Plaintiffs' claims are unripe for the same reasons.  Even if they could allege an adequate injury, their First Amended Complaint fails to identify any available form of redress—no enforcement proceeding against them exists to be enjoined.  Plaintiffs instead ask this Court to simply validate their own intellectual disagreement with HHS's announced statutory interpretation.  But federal courts do not give advisory opinions to resolve such abstract quarrels.

Even setting aside the many Article III deficiencies with the First Amended Complaint, subject-matter jurisdiction is still lacking under the APA both because Plaintiffs fail to challenge final agency action and also because Congress has already provided them an adequate, and exclusive, remedy for any real dispute with HHS; namely, an administrative process with *de novo* judicial review. That process permits Plaintiffs to raise their statutory arguments against a concrete set of facts, rather than in the abstract manner they do here.  The Court should therefore dismiss the First Amended Complaint for lack of jurisdiction.

Finally, even if jurisdiction exists, the Notification goes no further than *Bostock* and existing interpretations of Title IX permit.   Plaintiffs' claims are premised on a misreading of the Supreme Court's decision in *Bostock* and they therefore fail to plausibly allege the Notification is contrary to law.

<u>**BACKGROUND**</u>

**I.**    **Section 1557 And Title IX's Prohibition Of Discrimination On The Basis Of Sex**

Section 1557 states that no individual shall be "excluded from participation in, be denied the benefits of, or be subjected to discrimination under" any federally funded health program or activity on the grounds in several long-standing civil rights laws, including Title IX of the Education Amendments of 1972.  42 U.S.C. § 18116(a) (citing 20 U.S.C. § 1681).  Title IX, in turn, prohibits discrimination "on the basis of sex."  20 U.S.C. § 1681(a).  Section 1557 thus provides that "an individual shall not [on the basis of sex] be excluded from participation in, be denied the benefits of, or be subjected to discrimination" in federally funded health programs and activities.  42 U.S.C. § 18116(a).

Section 1557 also incorporates the "enforcement mechanisms provided for and available under" the civil rights laws it cites, including Title IX.  42 U.S.C. § 18116(a); *see also* 45 C.F.R. § 92.5(a).

These enforcement mechanisms, including Title IX's, permit an enforcing agency—here, HHS and its Office for Civil Rights ("OCR")—to terminate, or refuse to grant, federal funds to entities that discriminate on the basis of sex. *See, e.g.*, 20 U.S.C. § 1682; *see also* 45 C.F.R. §§ 80.6-80.8. But the enforcing agency must take several steps before withholding federal funds. First, it must "advise[] the appropriate person or persons of the failure to comply with the requirement" not to discriminate because of sex and "determine[] that compliance cannot be secured by voluntary means." *Id.* If the party does not voluntarily comply, HHS may withhold funding only after "there has been an express finding on the record, after opportunity for hearing, of a failure to comply" with Title IX. *Id.* The agency then must inform the appropriate Congressional committees of the grounds for its action. *Id.* A party aggrieved by this administrative process may obtain "judicial review as may otherwise be provided by law" or "in accordance with chapter 7 of Title 5," *i.e.*, the APA. *Id.* § 1683; *see id.* § 1682 (further providing for enforcement "by any other means authorized by law").

## II.     The Supreme Court's Decision In *Bostock v. Clayton County*

In *Bostock* and its accompanying cases, two gay men and a transgender woman alleged that, because of their sexual orientation and gender identity, respectively, their employers discriminated against them the basis of sex in violation of Title VII. *See* 140 S. Ct. at 1737–38. The Supreme Court was thus tasked with "determin[ing] the ordinary public meaning of Title VII's command that it is 'unlawful'" for an employer to discriminate against an individual "because of such individual's . . . sex." *Id.* at 1738 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Court assumed that the term "sex" "refer[red] only to biological distinctions between male and female." *Id.* at 1739. It next explained that the statute's use of the term "because of" permitted a broad "standard of but-for causation." *Id.* (citation omitted). In other words, "[s]o long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law." *Id.* And the Court further explained that the "focus" of this but-for inquiry "should be on individuals, not groups." *Id.* at 1740 (citing § 2000e-2(a)(1)). These conclusions yielded a "straightforward rule": "An employer violates Title VII when it intentionally fires an individual employee based on sex." *Id.* at 1741. "[P]ut differently, if changing the employee's sex would have yielded a different choice by the employer[,] a statutory violation has occurred." *Id.*

Applying that rule to the gay and transgender claimants, the Court concluded "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741. To explain its conclusion, the Court offered the hypothetical of two otherwise identical employees, one male and one female, "both of whom are attracted to men." *Id.* "If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or action it tolerates in his female colleague." *Id.* The Court also considered the example of two employees—"a transgender person who was identified as a male at birth but who now identifies as a female" and "an otherwise identical employee who was identified as female at birth." *Id.* If "the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as a female at birth," then the employer has discriminated because of sex. *Id.* at 1741–42.

In evaluating what it meant to "discriminate against" a person, the Court stressed the individualized nature of the inquiry, explaining that Title VII does *not* "focus on differential treatment between the two sexes as groups." *Bostock*, 140 S. Ct. at 1741. Instead, the "statute works to protect individuals of both sexes from discrimination, and does so equally." *Id.* Thus, an "employer musters no better a defense by responding that it is equally happy to fire male *and* female employees who are homosexual or transgender." *Id.* at 1742.

## III.   The Department Of Health And Human Services' Notification

On January 20, 2021, President Biden ordered agencies to review their interpretations of sex-discrimination laws in view of *Bostock*. *See* Exec. Order 13988, 86 Fed. Reg. 7023. Subsequently, on May 10, 2021, HHS issued a document titled *Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972*. *See* Notification. The Notification explained that it was intended to "inform the public" that "consistent with the Supreme Court's decision in *Bostock* and Title IX," HHS "will interpret and enforce Section 1557's prohibition on discrimination on the basis of sex to include: (1) discrimination on the basis of sexual orientation; and (2) discrimination on the basis of gender identity." *Id.* at 1. The Notification did not further refine the meaning or scope of discrimination on the basis of sexual orientation or gender identity,

nor did it provide examples of such impermissible conduct in the Title IX or § 1557 context. Instead it states that while the "interpretation will guide OCR in processing complaints and conducting investigations, [it] does not itself determine the outcome in any particular case or set of facts." *Id.* Indeed, the Notification does not say *anything* about enforcement proceedings in any particular case.

To further explain its interpretation of § 1557 and Title IX, the Notification noted that the Supreme Court's decision in *Bostock* held that "the plain meaning of 'because of sex' in Title VII' necessarily included discrimination because of sexual orientation and gender identity." Notification at 2 (citing *Bostock*, 141 S. Ct. at 1753–54). It observed that several federal courts had since concluded that the plain language of Title IX—which bars discrimination "on the basis of sex"—must be read similarly. *Id.* at 2–3. And, further, the Notification cited an interagency memorandum from the Civil Rights Division of the United States Department of Justice concluding that the reasoning of *Bostock* applies with equal force to Title IX. *Id.* Finally, the Notification states that OCR "will comply with the Religious Freedom Restoration Act (42 U.S.C. § 2000bb *et seq.*) and all other legal requirements," including several court orders concerning HHS rulemaking under § 1557. *See* Notification at 3–4.

## IV. Plaintiffs And This Litigation

Plaintiffs in this lawsuit are three physicians—Susan Neese, M.D. and James Hurly M.D., based in Texas, and Jeffrey Barke, M.D., based in California. *See* FAC ¶¶ 3–5. Dr. Neese and Dr. Hurly have "views on transgenderism [that] are nuanced." *Id.* ¶¶ 22, 27. Dr. Neese and Dr. Barke are "unwilling to prescribe hormone therapy to minors" or to "provide referrals to minors seeking a sex-change operation," while Dr. Hurly does not identify any treatment he is unwilling to engage in. FAC ¶¶ 23, 31. No Plaintiff alleges that a minor patient of theirs has ever sought "hormone therapy" or a "referral [for] a sex-change operation," though Dr. Neese and Dr. Barke speculate that, in the future, they will "encounter minor transgender patients who will request hormone therapy and referrals for sex-change operations that [they are] unwilling to provide." *Id.* ¶¶ 25, 33. All three plaintiffs claim they have treated transgender patients in the past and "expect[] to continue doing so in the future." *Id.* ¶¶ 25, 29, 33. All three Plaintiffs predict they will have transgender patients who "will deny or dispute their need for preventive care that corresponds to their biological sex," and that the plaintiffs will

"provide care to these individuals in a manner consistent with [the doctor's] ethical beliefs." *Id.* The only allegation that a patient has previously denied or disputed their need for preventive care in that fashion is a single anecdote from Dr. Hurly, stating that he shared a prostate cancer diagnosis with a "biological male patient … [who] identified as a woman and insisted that he could not have a prostate." *Id.* ¶ 27. The plaintiffs allege that the Notification injures each of them by creating "*in terrorem* effects on each of the plaintiffs— who can only wonder whether they or their practices will lose federal money if they ever refuse to provide gender-affirming care to a transgender patient." *Id.* ¶ 34. They also claim to be injured because the Notification "is entitled to *Skidmore* deference" that will "make it more difficult for medical professionals who lose their federal funding over transgender issues to challenge that decision." *Id.* ¶ 35. No Plaintiff alleges that they have views on sexual orientation that impact their medical practices.

Plaintiffs filed this lawsuit on August 25, 2021, alleging that the Notification's interpretation of § 1557 exceeds the bounds of the statutory text and *Bostock*. *See generally* Compl. ¶¶ 7–19, ECF No. 1. After Defendants filed a motion to dismiss raising merits and jurisdictional challenges, Plaintiffs filed a First Amended Complaint adding a California doctor as a plaintiff and adding some details relating to the plaintiff doctors' concerns, but the claims remain unchanged. At its core, the First Amended Complaint alleges that "*Bostock* does not prohibit employers from discriminating on account of sexual orientation or gender identity, so long as they do not engage in 'sex' discrimination when doing so." FAC ¶ 13; *see also id.* ¶ 20. The First Amended Complaint purports to illustrate this principally through a series of scenarios involving hypothetical employers and healthcare providers engaged in discrimination based on sexual orientation or gender identity that purportedly is not sex discrimination. *See, e.g., id.* ¶ 14 (describing unnamed "employer" engaging in discrimination against bisexual people); *id.* ¶ 15 (describing "[a]n employer" who refuses to hire "any person … who takes testosterone supplements … [or] who has undergone surgery to modify their genitals"). With respect to healthcare providers specifically, the First Amended Complaint asks the Court to "[c]onsider] a health-care provider who refuses to prescribe testosterone hormones to a biological woman who wishes to appear as a man," *id.* ¶ 17; to "consider a health-care provider who refuses to refer a

biological man for a sex-change operation," *id.* ¶ 18; and to "consider a health-care provider who refuses to prescribe Truvada or PrEP drugs to homosexual men," *id.* ¶ 19. The First Amended Complaint does not allege that the plaintiffs engage in such practices. *See id.* ¶¶ 21–33. Instead, the First Amended Complaint states only that Dr. Neese and Dr. Barke are "unwilling to prescribe hormone therapy to minors" or to "provide referrals to minors seeking a sex-change operation," and that all three plaintiffs generally will "provide care … in a manner consistent with [the doctor's] ethical beliefs." *Id.* ¶¶ 25, 29, 33.

## LEGAL STANDARDS

Rule 12(b)(1) requires dismissal of a complaint where the court "lacks the statutory or constitutional power to adjudicate the case[,]" *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation omitted), including for lack of standing, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). For its part, Rule 12(b)(6) requires dismissal of complaints that "fail[] to state a claim upon which relief can be granted." A plaintiff must allege sufficient "facts to state a claim to relief that is plausible on its face" and which, taken as true, "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). The Court does not need to accept a plaintiff's legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

I.    **The First Amended Complaint Should Be Dismissed Under Rule 12(b)(1) Because Plaintiffs Lack Standing And Their Challenge Is Unripe**

A.    **Plaintiffs lack standing to challenge the Notification because any harm to them is speculative and their desired remedy would not redress it.**

To establish standing under Article III, a plaintiff must allege that it has suffered a concrete injury, or that such an injury is "imminent" or "certainly impending." *See Clapper v. Amnesty Int'l*, 568 U.S. 398, 409 (2013). Where, as here, Plaintiffs seek only injunctive or declaratory relief, they cannot establish standing on the basis of alleged past injury alone. *Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003). Instead, Plaintiffs must show an injury with "continuing, present adverse effects," or "substantial likelihood that [they] will suffer injury in the future." *Id.*; *see also Machete Prods., L.L.C. v. Page*, 809 F.3d 281, 288 (5th Cir. 2015) (plaintiff must show a "real and immediate threat" of similar

injury in the future (citation omitted)).

Here, Plaintiffs have not alleged a past injury with "continuing, present adverse effects," *Bauer*, 341 F.3d at 358, because they have not alleged they have already suffered any "concrete, particularized," or "actual" injury. *Clapper*, 568 U.S. at 409. Apparently in response to Defendants' making this point in their Motion to Dismiss—ECF No. 8 at 6–7—Plaintiffs have added a new argument in their First Amended Complaint that the Notification inflicted "immediate, present-day injury" by creating "*in terrorem* effects"—essentially, that Plaintiffs are harmed because they will "wonder" how HHS will interpret § 1557 in particular factual scenarios going forward. FAC ¶ 34. But, for the fear of future injury to give standing, a plaintiff still must show that it has suffered harm because of a fear of future injury that is itself "certainly impending." *Clapper*, 568 U.S. at 416. In other words, despite the new label, Plaintiffs still must make the same showing as for any other theory for injunctive relief based on potential future injury. For such a threatened future injury to provide standing, it "must be certainly impending," and "[a]llegations of *possible* future injury are not sufficient." *Crane v. Johnson*, 783 F.3d 244, 251–52 (5th Cir. 2015) (quoting *Clapper*, 133 S. Ct. at 1147). Such standing cannot be based on a "speculative chain of possibilities." *Barber v. Bryant*, 860 F.3d 345, 357 (5th Cir. 2017).

Here, Plaintiffs' theory of future harm is doubly deficient, because it relies on two forms of speculation. First, Plaintiffs point to the Notification's general statements on the impermissibility of discrimination because of sexual orientation and gender identity, yet they provide no basis to conclude that HHS will treat particular practices and factual scenarios as prohibited discrimination in future enforcement proceedings; indeed, the Notification says just the opposite. And second, Plaintiffs do not adequately allege that any of their own practices put them at risk of an enforcement proceeding; instead, they recount abstract hypotheticals and anecdotes about the medical treatment of gay and transgender individuals, and they speculate that they might one day have patients seeking treatment Plaintiffs would prefer not to provide. Both shortcomings are individually fatal to their challenge.

On the first point, Plaintiffs have not alleged how OCR will apply the Notification's reasoning to particular factual situations. Plaintiffs cannot rely on a theory of standing that is dependent on speculation and future contingencies regarding how an agency will apply a challenged policy. *See Trump*

*v. New York*, 141 S. Ct. 530, 534 (2020).   In *Trump*, the Supreme Court considered plaintiffs'
constitutional challenge to a Presidential Memorandum concerning the census that declared a policy
of excluding "'from the apportionment base [noncitizens] who are not in a lawful immigration status.'"
*Id.*   The Court found that the plaintiffs' theory of standing was "riddled with contingencies and
speculation that impede judicial review."  *Id.* at 535.   Although the President had stated his policy in
plain terms, it was not then clear how the policy would be put into practice, "let alone" whether it
would be put into practice "in a manner substantially likely to harm any of the plaintiffs here."  *Id.* at
535.   As the Court explained, "the Government's eventual action will reflect both legal and practical
constraints, making any prediction about future injury just that—a prediction."  *Id.* at 536.

The same analysis applies with equal force here.  The Notification states only that HHS
considers § 1557 to prohibit discrimination on the basis of sexual orientation and gender identity, but
does not say what types of practices and what legal theories will trigger enforcement proceedings in
the future.  To the contrary, the Notification states that it "does not itself determine the outcome in
any particular case or set of facts."  Notification at 1.  General statements regarding prohibited
discrimination leave unresolved many case-by-case questions about the scope of such prohibitions;
the Notification does not purport to prospectively resolve those questions here, and Plaintiffs have
identified no such statements from HHS.  Instead, they principally list hypotheticals speculating about
what activities OCR might find to constitute prohibited discrimination in future actions. The
Notification does not address any of those hypotheticals, which are "riddled with contingencies and
speculation" regarding HHS's future actions in hypothesized proceedings. *Trump*, 141 S. Ct. at 535.

Plaintiffs identify several of their own policies in their First Amended Complaint, but they still
fail to allege or make any showing that HHS will consider those practices to be violations of § 1557
under the theories of sexual-orientation or gender-identity discrimination. Two plaintiffs assert that
they are "unwilling to prescribe hormone therapy to minors" or to "provide referrals to minors seeking
a sex-change operation." FAC ¶¶ 23, 31. But Plaintiffs have not stated, nor provided factual allegations
plausibly claiming, that the effect of the Notification will be to prohibit those two policies. The same
is true for their vague implication that the Notification means they cannot provide care to individuals

"who will deny or dispute their need for health care that corresponds to their biological sex," *id.* ¶¶ 25, 29, 33—if Plaintiffs believe the Notification will prevent them from informing a transgender patient with a prostate that the patient has prostate cancer, they have not alleged how. And they cannot prove standing by alleging that the fear of such a future interpretation will cause them to inflict injury on themselves now by changing their practices in ways they disfavor. Plaintiffs cannot circumvent the need for "certainly impending" future injury by inflicting injury on themselves due to a fear of future injury unless that future injury itself is "certainly impending." *Clapper*, 568 U.S. at 416. So, regardless of whether Plaintiffs present their alleged injury as one they are currently suffering or want to avoid suffering, it relies on finding that OCR will determine that particular practices violate those prohibitions—an inquiry that will necessarily entail resolving subsidiary factual and legal questions, and thus an injury too speculative to be "certainly impending."

But even if Plaintiffs had adequately alleged that the Notification necessarily means the agency will treat certain practices as conclusively constituting sexual orientation or gender identity discrimination, Plaintiffs have not adequately alleged that such a prohibition would injure them, because they have not alleged a sufficient likelihood that they would engage in such prohibited practices. Dr. Neese and Dr. Barke allege that they are "unwilling to prescribe hormone therapy to minors" or to "provide referrals to minors seeking a sex-change operation," FAC ¶¶ 23, 31, but neither Plaintiff alleges that they have *ever* encountered a minor patient seeking such treatment. Only Dr. Neese alleges any past experience with prescribing hormone treatment for transgender patients at all, and then only by vaguely claiming to have had an unspecified number of transgender patients in the past and to have "on occasion" prescribed hormone therapy for them, *id.* ¶ 22; she makes no claim that she has ever had a minor transgender patient seek hormone therapy or a surgical referral at all, that it is a regular part of her practice, that she has ever been asked to "provide referrals [for] a sex-change operation," or that she has ever declined to provide any treatment or referral to a minor, all of which would be crucial for assessing her conclusory allegation that she "is likely to encounter minor transgender patients who will request hormone therapy and referrals for sex-change operations that she is unwilling to provide." FAC ¶ 25. This Court should reject that factually unmoored speculation

about a hypothetical future patient. *See, e.g.*, *Bruni v. Hughs*, 468 F. Supp. 3d 817, 824 (S.D. Tex. 2020) ("At the pleading stage, when considering 'any chain of allegations for standing purposes,' the Court may 'reject as overly speculative those links which are predictions of future events.'" (quoting *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015)).

The same deficiencies exist for Dr. Barke, whose allegations mirror Dr. Neese's except that he never alleges he has ever had a transgender patient seek hormone therapy, depriving him of even that inadequate factual allegation. And for Dr. Hurly, unlike Dr. Neese and Dr. Barke, he does not allege that there is any treatment or referral he would refuse to any patient. Even if HHS were to interpret § 1557 to require doctors to prescribe hormone therapy to minor transgender patients and to provide referrals for sex-change operations to minor patients regardless of the circumstances, no plaintiff has alleged facts sufficient to show it is certainly impending they will face such a scenario. And of course, as discussed above, even such an interpretation of § 1557 would raise antecedent and subsidiary questions in individual cases regarding whether particular refusals constitute a violation—Plaintiffs do not allege, for example, that they believe the Notification means a doctor must prescribe hormone therapy to every patient who comes through their door.

The First Amended Complaint lacks any other factual allegations relating to Plaintiffs' practices or policies that they fear would run afoul of § 1557's prohibition on gender-identity discrimination. All three make only a vague assertion that they will encounter patients who "will deny or dispute their need for health care that corresponds to their biological sex," and that they "intend[] to provide care to these individuals in a manner consistent with [their] ethical beliefs." FAC ¶¶ 25, 29, 33. Plaintiffs do not state what those allegations mean, or how they demonstrate that Plaintiffs have policies they believe may violate § 1557's prohibition on gender-identity discrimination. It is possible those allegations relate to Dr. Hurly's anecdote regarding a transgender patient with prostate cancer who resisted the diagnosis, *id.* ¶ 27, and the other Plaintiffs' vague statements that they would recommend cervical cancer screenings and prostate cancer screenings where physiologically appropriate regardless of a patient's gender identity. *Id.* ¶¶ 24, 32. But absent is any explanation or factual allegation that such a policy would be considered discrimination. If Plaintiffs believe the

Notification means they cannot recommend a prostate cancer screening for a transgender patient with a prostate, they have not explicitly claimed nor plausibly alleged that assertion. And, as with Dr. Neese's and Dr. Barke's policies discussed above, Plaintiffs have not plausibly alleged a likelihood they will encounter transgender patients who demand Plaintiffs not recommend physiologically appropriate screenings inconsistent with the patient's gender identity.

In short, Plaintiffs have alleged neither a founded nor an unfounded fear regarding the application of § 1557 to any of their own actions, and thus have alleged no more than an academic interest in the Notification. Federal courts do not serve as debating societies to consider such points. *See Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). Plaintiffs offer only speculation about how OCR's future actions might treat hypothetical practices that Plaintiffs do not claim to engage in. That is insufficient to sustain this case.

Plaintiffs have also failed to allege traceability because they have not identified an injury attributable to the Notification or an injury that would be redressed by vacating the Notification. Plaintiffs must plausibly allege an injury that is fairly traceable to the challenged action and that it is "likely, as opposed to merely speculative, that the[ir] injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (citation omitted). But even if Plaintiffs had identified a way in which they faced a certainly impending future harm, they have not identified a form of relief available in this case that will benefit them because their quarrel is with *Bostock* and the statute itself, not with the Notification. They request relief that would treat the Notification, which is an unreviewable agency statement of policy, as a legislative rule that can be revoked and rendered nugatory—they ask that the Court "hold unlawful and set aside" the statement of policy, and enjoin HHS "from using or enforcing" that statement of policy. FAC ¶¶ 50(b)-(c). But the Notification, being only a statement of policy, is not binding on anyone and carries no legal force; if an agency attempts to enforce an interpretation embodied in a statement of policy, it "must be prepared to support the policy just as if the policy statement had never been issued." *Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.*, 847 F.2d 1168, 1175 (5th Cir. 1988) (quoting *Pacific Gas & Electric Co. v. FPC*, 506 F.2d 33, 38–39 (D.C. Cir. 1974)); *see also Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("[I]nterpretations

contained in policy statements, agency manuals, and enforcement guidelines … lack the force of law [and] do not warrant *Chevron*-style deference."). That is also why the Notification does not inflict present-day injury, as Plaintiffs claim, by creating an entitlement to *Skidmore* deference should the Notification be invoked in a future proceeding. FAC ¶ 35. In such a scenario, if any party attempted to rely on the Notification, a court would be bound to agree with the Notification only to the extent the court is persuaded by it. *Id.*; *see also Env't Integrity Project v. United States Env't Prot. Agency*, 969 F.3d 529, 540 (5th Cir. 2020). If a later court invokes the Notification in deciding the scope of § 1557, it will be because the Court was persuaded the Notification is correct, not because the Notification tied its hands.

In short, the presence or absence of the Notification has no effect on the legal rights and obligations of Plaintiffs. Instead, the Notification reflects HHS's judgment that the text of § 1557 itself prohibits discrimination on the basis of sexual orientation and gender identity, and that prohibition will exist regardless of whether it is embodied in a statement of policy. Vacating the Notification and requiring HHS to forgo any invocation of it in future proceedings would accomplish nothing for Plaintiffs because HHS could still decide to bring enforcement proceedings under the theory that § 1557 prohibits discrimination on the basis of sexual orientation and gender identity. And such an argument would carry no more legal weight in the presence of the Notification than in the absence of it, making clear that revoking the Notification would not redress any alleged injury.

**B.     The challenge to the Notification is not ripe for review.**

This Court should further dismiss Plaintiffs' claims because this challenge is not yet ripe. A claim is not ripe if it depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump*, 141 S. Ct. at 535 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). Standing and ripeness are "[t]wo related doctrines of justiciability," "each originating in the case-or-controversy requirement of Article III." *Id.* Although they are different doctrines, they "bear[] close affinity" in asking "'whether the harm asserted has matured sufficiently to warrant judicial intervention.'" *Miss. State Dem. Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975)); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8

(2007) (recognizing that in some cases "standing and ripeness boil down to the same question").  But they are distinct inquiries, and even if Plaintiffs have standing, their claims are still unripe.

For an agency action to be ripe for challenge, this Court must apply "a two-part test, balancing 'the fitness of the issues for judicial decision' with 'the hardship to the parties of withholding court consideration.'"  *Huawei Techs. USA, Inc. v. Fed. Commc'ns Comm'n*, 2 F.4th 421, 434 (5th Cir. 2021) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).  Both factors weigh against Plaintiffs here.

First, Plaintiffs' claims are not fit for judicial review.  Their challenge raises non-legal questions about future enforcement under § 1557 that require factual development to meaningfully review.  Their claims are presently too vague and abstract to review without further factual development.  Three prerequisites are necessary before an agency action is fit for judicial review: (1) "the questions presented are 'purely legal one[s]'"; (2) the challenged action is "final agency action"; and (3) "further factual development would not 'significantly advance [the court's] ability to deal with the legal issues presented.'"  *Texas v. United States*, 497 F.3d 491, 498 (5th Cir. 2007) (alterations in original) (quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003)).  Even assuming the Notification is a final agency action—but see *infra* § II.A—the Notification is still not fit for review because the Court would necessarily need to resolve non-legal questions about HHS's future enforcement of § 1557 that would require further factual development here.  As discussed in the standing analysis above, Plaintiffs merely speculate about how HHS might interpret § 1557 in future factual scenarios with respect to discrimination based on gender identity and sexual orientation, without even alleging facts to show that Plaintiffs' own actions would ever run up against such interpretations.  Simply put, Plaintiffs seek an advisory opinion from the Court about whether various practices they or other doctors might engage in are lawful, which is not a permissible basis for a challenge.  *Princeton Univ. v. Schmid*, 455 U.S. 100, 102 (1982) ("We do not sit to . . . give advisory opinions about issues as to which there are not adverse parties before us.").

The Supreme Court has denied challenges as unripe where the theory of the case preceded any certainty regarding how the challenged laws might actually be applied.  For example, in *National Park Hospitality Association v. Department of Interior*, 538 U.S. 803 (2003), the "purely legal" question at

**Defendants' Motion to Dismiss – Page 14**

issue centered on whether the Contract Disputes Act of 1978 was applicable to concessions contracts. But the Court still held that the need for factual development made the dispute unripe because there might be some subsets of contracts for which the answer would be different, and because even the facial challenge in that case relied on factual questions about different types of contracts. *Id.* at 812. The same is true here—even if it is a purely legal question whether § 1557 prohibits discrimination on the basis of sexual orientation and gender identity, there remain substantial questions regarding whether particular policies and actions fall within those categories based on differing factual scenarios. *Cf. Bostock.*, 140 S. Ct. at 1753 ("Whether other policies and practices might or might not qualify as unlawful discrimination or find justifications under other provisions of Title VII are questions for future cases, not these."). Indeed, Plaintiffs do not dispute that at least *some* discrimination on the basis of sexual orientation and gender identity constitutes sex discrimination. *See, e.g.*, FAC ¶ 13. Although Plaintiffs misread *Bostock* in arguing that it permits purportedly sex-neutral discrimination on the basis of sexual orientation or gender identity, Defendants agree that the application of § 1557 to claims of sexual orientation or gender identity discrimination depends on case-by-case factual development for which this pre-enforcement challenge is premature.

Plaintiffs' claims here are analogous to the case in *Texas v. United States*, 523 U.S. 296 (1998), another challenge the Court held was not ripe. Texas had amended its Education Code to permit the state to impose a range of sanctions on school districts that were not meeting standards, including appointing a special master or a management team to oversee the district's operation, which would displace the authority of the elected school board. *Id.* at 299. Texas sought a declaratory judgment that the provision of the Education Code authorizing those two sanctions was not required to go through pre-clearance under the Voting Rights Act. *Id.* The Court held that the claim for declaratory judgment was not ripe. Texas essentially sought a holding that "under no circumstances can the imposition of these sanctions constitute a change affecting voting" that would be subject to the pre-clearance requirement, and the Court lacked "sufficient confidence in [their] powers of imagination to affirm such a negative." *Id.* at 301. Instead, the Court held that "operation of the statute is better grasped when viewed in light of a particular application" because "[d]etermination of the scope . . . of

legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function." *Id.* (quoting *Longshoremen v. Boyd*, 347 U.S. 222, 224 (1954)). Again, the same is true here. Rather than attempt to prospectively set forth all the circumstances in which § 1557 prohibits discrimination on the basis of sexual orientation and gender identity, or all the circumstances that would qualify as such discrimination, this Court should wait until it is presented with a concrete dispute involving HHS's application of the statute to a specific set of facts.

As weighed against that unfitness for review, there is no reason to consider this claim ripe because of any speculative "hardship to the parties of withholding court consideration." *Huawei Techs.*, 2 F.4th at 434. There is no hardship to Plaintiffs in withholding review. Their only allegation of harm is the assertion that the Plaintiffs are afraid because they do not know what is prohibited under § 1557's prohibitions on gender-identity and sexual-orientation discrimination—a fear that would exist in the absence of the Notification as well. They have not identified any practice they engage in—or might engage in—that is imperiled by the Notification itself. Such a speculative hardship is insufficient to justify overriding the prematurity and speculation that makes this case unfit for judicial review. For example, when the EPA issued a final rule governing the disposal of certain chemicals but stated that the statute authorizing the rule did not permit preemption of state laws on the same subject matter, the Fifth Circuit rejected as unripe a challenge to that statement of non-preemption. *Cent. and S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 690 (5th Cir. 2000). Because the plaintiff in that case had "identified no State or local regulations that it contends [the statute] should preempt," nor offered any evidence of hardship, the claim was unripe. *Id.* The same is true here—Plaintiffs have not shown that any practice of theirs is threatened, and they offer no explanation of what hardship they will suffer in the absence of this litigation. Their claims are therefore not ripe for review.

## II. Subject Matter Jurisdiction Is Further Lacking Because Plaintiffs Fail To Challenge Final Agency Action For Which No Other Adequate Remedy Is Available

Plaintiffs also fail to meet the APA's jurisdictional requirements. Where, as here, Plaintiffs raise claims under the general provisions of the APA, the statute permits them to challenge only "final

agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. But the First Amended Complaint fails to meet either of § 704's requirements. *First*, it fails to challenge *final* agency action. *Second*, Plaintiffs have an adequate, and exclusive, remedy under § 1557—the administrative and judicial review provisions enacted by Congress. Plaintiffs' failure to comply with § 704 deprives the Court of jurisdiction over their claims. *E.g.*, *Texas v. EEOC*, 933 F.3d 433, 440–41 n.8 (5th Cir. 2019).

### A.   The Notification does not qualify as final agency action because it has no binding legal effect on the Plaintiffs.

The First Amended Complaint nowhere alleges that the Notification qualifies as final agency action under the APA. Nor could it. As an interpretive rule and general statement of policy, the Notification has no legal force against Plaintiffs in any prospective enforcement proceeding. Instead the Notification merely alerts the public at large that HHS will read § 1557 and Title IX's prohibition of discrimination "on the basis of sex" in the same manner the Supreme Court in *Bostock* read Title VII's similar prohibition on discrimination "because of . . . sex." 140 S. Ct. at 1738 (quoting 42 U.S.C. § 2000e-2(a)(1)). Plaintiffs plainly disagree with that interpretation, but the APA does not permit them to launch the "programmatic challenge[]" they raise here against HHS's anti-discrimination policies. *Sierra Club v. Peterson*, 228 F.3d 559, 566 (5th Cir. 2000) (en banc) (citing *Lujan*, 497 U.S. at 891). Regardless of their convictions, Plaintiffs "cannot seek wholesale improvement" of HHS's policy "by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Id.* (quoting *Lujan*, 497 U.S. at 891).

"[T]wo conditions . . . generally must be satisfied for agency action to be 'final' under the APA. First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (quotation marks omitted).

The Notification does not qualify as final agency action, at minimum, because it does not determine Plaintiffs' rights and obligations. It merely "inform[s] the public that" HHS "will interpret

and enforce § 1557's prohibition on discrimination on the basis of sex" in a manner "consistent with the Supreme Court's decision in *Bostock* and Title IX." Notification at 1–2 (internal footnotes omitted). Such "interpretive rules or statements of policy generally do not qualify [as final agency action] because they are not 'finally determinative of the issues or rights to which they are addressed.'" *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) (citing Edwards, Elliott, & Levy, Federal Standards of Review 157 (2d ed. 2013)) (citation omitted). Indeed, the Notification itself explains that while its "interpretation will guide OCR in processing complaints and conducting investigations, [it] does not itself determine the outcome in any particular case or set of facts." Notification at 1.

Similarly, the Notification supplies no legal authority that could be used against Plaintiffs because "[i]nterpretive rules do not . . . have the force and effect of law and are not accorded that weight in the adjudicatory process." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 88 (1995). Instead they "are used to advise the public how an agency will apply its regulations in certain circumstances." *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 601–02 (5th Cir. 1995). Plaintiffs' legal obligations do not stem from the Notification; they come from § 1557 and Title IX, as well as any relevant judicial construction of those statutes' text, such as the Supreme Court's interpretation of similar language in *Bostock*. The Notification only "reminds parties of existing statutory duties, [and] merely tracks the statutory requirements and thus simply explain[s] something the statute already required." *Id.* at 602 (quoting *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 237 (D.C. Cir. 1992)) (cleaned up). It therefore "provides guidance on an old problem"—the scope of sex discrimination under § 1557 and Title IX. *Id.* But "[t]he agency cannot apply or rely upon [the Notification] as law because a general statement of policy only announces what the agency seeks to establish as policy." *Panhandle Producers*, 847 F.2d at 1174–75 (quoting *Pacific Gas & Elec. Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974)).

Indeed, to best illustrate how the Notification is not final agency action, imagine that HHS had never issued it at all. The agency could still interpret and enforce the phrase "on the basis of sex" to include discrimination based on sexual orientation and gender identity to the degree permitted by

the statutory text and the reasoning of *Bostock*. *Cf. Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). If the agency exceeded its statutory ambit in any particular adjudication, the subject of that action would, naturally, have the opportunity to challenge the agency's authority. *See infra* § II.B. Thus, as explained, if HHS ever asserts the Notification's interpretation in a proceeding, "it must be prepared to support the policy just as if the policy statement had never been issued." *Panhandle Producers*, 847 F.2d at 1174; *see also Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) (Kavanaugh, J.) (same); *Env't Integrity Project v. United States Env't Prot. Agency*, 969 F.3d 529, 540 (5th Cir. 2020) (agency policy statements do not receive *Chevron* deference and have only the power to persuade). But it is too soon to judge whether HHS has properly applied its interpretation of the law to the necessarily fact-specific circumstances of any particular case. "An attack on the authority of an agency to conduct an investigation does not obviate the final agency action requirement." *Veldhoen v. U.S. Coast Guard*, 35 F.3d 222, 225–26 (5th Cir. 1994) (citing *Aluminum Co. of Am. v. United States,* 790 F.2d 938, 942 (D.C. Cir. 1986) (Scalia, J.)). If HHS ever "interprets the law in an adjudication, a party can challenge that interpretation as being inconsistent with the agency's organic statute, or with its regulations." *CSX Transp., Inc. v. Surface Transp. Bd.*, 774 F.3d 25, 33 (D.C. Cir. 2014). But "[i]n all such cases . . . if the contested agency action takes place during the course of an adjudication, judicial review comes only at the conclusion of the proceedings." *Id.*

To the extent Plaintiffs argue the Notification constitutes final agency action because they must now allegedly conform their behavior to HHS's view of the law (*e.g.*, FAC ¶¶ 34–35), that argument has long been rejected. The fact that the Notification broadly expresses HHS's view on the "legality" of certain conduct—namely, the scope of discrimination "on the basis of sex"—"does not change the character of the [Notification] from a policy statement to a binding rule." *Ctr. for Auto Safety v. NHTSA*, 452 F.3d 798, 808 (D.C. Cir. 2006). Rather, "the case law is clear that [courts] lack authority to review claims under the APA 'where an agency merely expresses its view of what the law requires of a party, even if that view is adverse to that party.'" *Id.* (quoting *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.)); *see also Luminant Generation Co. v. EPA*, 757 F.3d 439, 442 n.7 (5th Cir. 2014) (same); *AT&T Co. v. EEOC*, 270 F.3d 973, 975 (D.C. Cir. 2001)

(same).  That is precisely what HHS did here—it shared its interpretation of longstanding statutory text in view of new Supreme Court authority interpreting substantially similar language.  Plaintiffs' disagreement with that interpretation "does not [] itself adversely affect complainant[s] but only affects [their] rights adversely on the contingency of future administrative action."  *Peoples Nat. Bank v. Off. of Comptroller of Currency*, 362 F.3d 333, 337 (5th Cir. 2004) (quoting *Rochester Tel. Corp. v. United States,* 307 U.S. 125, 130 (1939)) (explaining such action is a "non-final agency order"); *see also Luminant*, 757 F.3d at 442 (concluding notice was not final agency action because it did not "determine [plaintiff's] rights or obligations" and "no legal consequences flow from the issuance of the notice").  Any such future enforcement action against Plaintiffs is, as the First Amended Complaint reveals, wholly conjectural, and Plaintiffs have therefore failed to identify the necessary final agency action for their APA challenge.

### B.   Section 1557 and Title IX provide an adequate, and exclusive, alternative remedy to Plaintiffs.

Section 704 also "limits the APA to the review of those agency actions which otherwise lack an 'adequate remedy in a court.'" *Hinojosa v. Horn*, 896 F.3d 305, 310 (5th Cir. 2018) (citing *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988)).  Plaintiffs possess an adequate alternative remedy here—they may defend against any future enforcement of § 1557 under the express administrative and judicial review provisions provided by Congress.  *See* 42 U.S.C. § 18116(a).

"The adequacy of the [alternative] relief available need not provide an identical review that the APA would provide, so long as the alternative remedy offers the 'same genre' of relief." *Hinojosa*, 896 F.3d at 310 (quoting *Citizens for Responsibility & Ethics in Wash. v. DOJ*, 846 F.3d 1235, 1245 (D.C. Cir. 2017)).  Thus, a "legal remedy is not inadequate for purposes of the APA because it is procedurally inconvenient for a given plaintiff." *Martinez v. Pompeo*, 977 F.3d 457, 460 (5th Cir. 2020) (quoting *Town of Sanford v. United States*, 140 F.3d 20, 23 (1st Cir. 1998)).  "At a minimum, the alternative remedy must provide the petitioner 'specific procedures' by which the agency action can receive judicial review or some equivalent." *Hinojosa*, 896 F.3d at 310 (citing *Bowen*, 487 U.S. at 903)).  Alternative relief is "adequate" under § 704 if it, for example, "affords an opportunity for *de novo* district-court review" of

agency action. *Garcia v. Vilsack*, 563 F.3d 519, 522–23 (D.C. Cir. 2009).

Section 1557 sets out "specific procedures" for review of any enforcement proceeding by HHS, *Hinojosa*, 896 F.3d at 310, including guaranteeing the "opportunity for *de novo* district-court review" of any such enforcement, *Garcia*, 563 F.3d at 522–23. Section 1557 incorporates the "enforcement mechanisms provided for and available under," *inter alia*, Title IX. 42 U.S.C. § 18116(a). Title IX, like the other statutes incorporated into § 1557, sets out provisions to enforce its prohibition on discrimination "on the basis of sex." *See* 20 U.S.C. §§ 1682–83; *see also* 45 C.F.R. § 80.6–80.8 (Title VI regulations, incorporated by reference into the Title IX regulations at 45 C.F.R. § 86.71). Title IX's enforcement provisions permit agencies to withhold federal funding to entities discriminating on the basis of sex but only after "there has been an express finding on the record, after opportunity for hearing, of a failure to comply" with the title. 20 U.S.C. § 1682. And these enforcement provisions further require the agency to first advise the subject about their lack of compliance and then "determine[] that compliance cannot be secured by voluntary means." *Id.* To the extent a person is aggrieved by agency enforcement under Title IX's enforcement provisions, Title IX grants "judicial review as may otherwise be provided by law" or, alternatively, "judicial review of such action in accordance with chapter 7 of Title 5," *i.e.* the APA. *Id.* § 1683.

Section 1557 thus "provides a direct and guaranteed path to judicial review." *Hinojosa*, 896 F.3d at 312. Plaintiffs therefore "almost by definition . . . have an adequate remedy in a court." *NAACP v. Meese*, 615 F. Supp. 200, 203 (D.D.C. 1985) (explaining that defending against a government motion is a "far more appropriate, far more logical remedy than a lawsuit here seeking injunctive relief"); *see also Temple Univ. of Commonwealth Sys. of Higher Educ. ex rel. v. Brown*, No. CIV. A. 00-CV-1063, 2001 WL 185535, at *7 (E.D. Pa. Feb. 23, 2001) (concluding plaintiff possessed alternative remedy precluding review under § 704 because it could "defend any . . . charges should the government choose to pursue them"); *New Jersey Hosp. Ass'n v. United States*, 23 F. Supp. 2d 497, 501 (D.N.J. 1998) ("the ability and opportunity to raise a defense" to an action is "an adequate remedy in a court"); *Ass'n of Am. Med. Colleges v. United States*, 34 F. Supp. 2d 1187, 1193 (C.D. Cal. 1998) (similar); *U.S. Steel Corp. v. Fri*, 364 F. Supp. 1013, 1018–19 (N.D. Ind. 1973) (similar). At least one district court,

after reviewing Title IX's administrative scheme, concluded that it deprived the court of jurisdiction over a pre-enforcement APA claim under § 704. *See Bd. of Educ. of the Highland Local Sch. Dist. v. Dep't of Educ.*, 208 F. Supp. 3d 850, 860–64 (S.D. Ohio 2016).

Further still, this procedure for adjudicative proceedings, followed by judicial review, reflects Congress's desire to preclude pre-enforcement judicial review of Plaintiffs' claims. Where it is "fairly discernable" that an elaborate statutory review scheme was intended to create an exclusive remedy, parallel jurisdiction outside that scheme is precluded. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 216 (1994); *see also Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012). In *Thunder Basin*, the Supreme Court held that a statute providing for administrative proceedings followed by judicial review foreclosed a parallel challenge to an agency's statutory interpretation. *See Thunder Basin*, 510 U.S. at 207–08. There, a mine operator challenged an agency's interpretation of a statute that would potentially form the basis for an enforcement action against it. *Id.* at 216. Confronted with a review process remarkably similar to those incorporated into § 1557, the Court held that Congress's intent to preclude pre-enforcement judicial review was "fairly discernible in the statutory scheme" under the Mine Act. *Id.* at 207.

Like here, no action had yet been taken against the plaintiff in *Thunder Basin*. And like here, the claims "turn[ed] on a question of statutory interpretation." *Thunder Basin*, 510 U.S. at 216. Here, just as in *Thunder Basin*, "[n]othing in the language and structure of the Act or its legislative history suggests that Congress intended to allow [regulated parties] to evade the statutory-review process by enjoining the [agency] from commencing enforcement proceedings" based on the challenged interpretation. *Id.* And like in *Thunder Basin*, a procedural scheme that "applies to all violations of the Act and its regulations" provides the opportunity for judicial review. *Id.* at 209.

As in *Thunder Basin*, this Court does not have jurisdiction to consider Plaintiffs' anticipatory challenge to the interpretation of § 1557. By providing for administrative review, followed by judicial review, Congress intended to preclude pre-enforcement injunctive relief. Plaintiffs style their complaint as merely challenging the statutory interpretation announced in the Notification, but the same was true in *Thunder Basin*. 510 U.S. at 205 (describing plaintiff's pre-enforcement "challenge [to] the [agency's] interpretation of" a statute). This Court should therefore join others that have refused

to allow funding recipients to circumvent the civil rights laws' administrative processes.  *See, e.g., Taylor v. Cohen*, 405 F.2d 277 (4th Cir. 1968) (*en banc*); *Sch. Dist. of City of Saginaw v. Dep't of Health, Ed., & Welfare*, 431 F. Supp. 147 (E.D. Mich. 1977); *Highland Local Sch. Dist.*, 208 F. Supp. 3d at 862; *cf. Gen. Fin. Cop. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983) ("You may not bypass the specific method that Congress has provided for reviewing adverse agency action simply by suing the agency in federal district court . . . the specific statutory method, if adequate, is exclusive." (citing 5 U.S.C. § 704)). Section 1557's provisions do not merely provide Plaintiffs an adequate remedy, they supply Plaintiffs their exclusive remedy to any dispute over HHS's interpretation of § 1557.

## III.   The First Amended Complaint Fails To State A Claim Upon Which Relief Can Be Granted

Plaintiffs assert two claims: (1) a violation of § 706(2)(A) of the APA and (2) a claim under the Declaratory Judgment Act.  *See* FAC ¶¶ 44–49.  But Plaintiffs fail to plausibly plead either claim.

### A.   The Notification is in accordance with *Bostock* and Title IX.

Plaintiffs cannot plausibly allege that the Notification is "not in accordance with the law."  5 U.S.C. § 706(2)(A); *see also* FAC ¶¶ 44–46.  The Notification explains that "consistent with the Supreme Court's decision in *Bostock* and Title IX," HHS "will interpret and enforce Section 1557's prohibition on discrimination on the basis of sex to include: (1) discrimination on the basis of sexual orientation; and (2) discrimination on the basis of gender identity."  Notification at 1.  Read in view of *Bostock*, a health care provider discriminates on the basis of sex when it discriminates against someone because of their sexual orientation or their gender identity because it is "impossible to discriminate against a person" on those grounds "without discriminating against that individual based on sex."  *Bostock*, 140 S. Ct. at 1741.  The Notification therefore goes no further than permitted by Congress's statute and the Supreme Court's interpretation of substantially similar text in *Bostock*.

The reasoning in *Bostock* maps neatly onto Title IX given the two titles' similar language, structure, and purpose.  To be sure, Title IX bars discrimination "on the basis of" sex rather than "because of" sex, as in Title VII.  *Compare* 20 U.S.C. § 1681(a) *with* 42 U.S.C. § 2000e-2(a)(1)).  But the two pieces of text mean the same thing and courts read them in parallel.  Indeed, the Supreme Court

itself in *Bostock* repeatedly used the term "on the basis of" interchangeably with "because of" when discussing Title VII. *E.g.*, 140 S. Ct. at 1737 ("There, in Title VII, Congress outlawed discrimination in the workplace *on the basis of* race, color, religion, sex, or national origin." (emphasis added)); *id.* at 1738 (similar); *id.* at 1745 (similar); *id.* at 1753 (similar); *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986) ("[W]hen a supervisor sexually harasses a subordinate *because of* the subordinate's sex, that supervisor 'discriminate[s]' *on the basis of* sex." (emphases added)); *cf. Leatherwood v. Houston Post Co.*, 59 F.3d 533, 536 (5th Cir. 1995) ("We have observed that the term '*because of* disability' refers to discrimination because of or *on the basis of* a physical or mental condition . . . ." (emphases added)). Plaintiffs do not suggest any disparate meaning between the two phrases, nor could they.

The interchangeability of the two phrases is consistent with the Fifth Circuit's own holding that "the prohibitions of discrimination on the basis of sex of Title IX and Title VII are the same." *Lakoski v. James*, 66 F.3d 751, 757 (5th Cir. 1995) (collecting cases and explaining that "Title IX's proscription of sex discrimination . . . does not differ from Title VII's"); *see also Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75 (1992). Both § 1557 and Title IX, like Title VII, also make clear that they are focused on discrimination against individuals, rather than discrimination against groups of people. *See* 42 U.S.C. § 18116(a) (explaining "an individual shall not" be discriminated against); *id.* § 18116(b) (discussing remedies "available to individuals aggrieved" under, *inter alia*, Title IX); 20 U.S.C. § 1681(a) (explaining no "person[s]" shall be discriminated against on the basis of sex); *see also Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979) (stating that, in enacting Title IX, Congress "wanted to provide *individual citizens* effective protection against those [discriminatory] practices" (emphasis added)).

In view of the congruence between the two titles, many courts have already concluded that *Bostock*'s interpretation of Title VII applies to Title IX. The Fourth Circuit, for example, concluded that discriminating against a person for being transgender is discrimination "on the basis of sex" under Title IX because "the discriminator is necessarily referring to the individual's sex to determine incongruence between sex and gender, making sex a but-for cause for the discriminator's actions." *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020) (citing *Bostock*, 140 S. Ct. at 1741–42). The Supreme Court, months before this lawsuit was filed, declined to revisit the Fourth Circuit's

decision, which the Fourth Circuit itself likewise declined to reconsider *en banc*. *See* 976 F.3d 399 (2020) (denying rehearing *en banc*); 141 S. Ct. 2878 (2021) (denying petition for *certiorari*).[1]

Numerous district courts have likewise applied *Bostock* to Title IX, including as incorporated into § 1557, against specific sets of facts. *See, e.g.*, *B. P. J. v. W. Va. State Bd. of Educ.*, No. 2:21-CV-00316, 2021 WL 3081883, at *7 (S.D. W. Va. July 21, 2021) (finding it "clear" that transgender student was excluded from school athletics "on the basis of her sex" (citing *Grimm*, 972 F.3d at 616; *Bostock*, 140 S. Ct. at 1741)); *C.P. v. Blue Cross Blue Shield of Ill.*, No. 3:20-CV-06145-RJB, 2021 WL 1758896, at *4 (W.D. Wash. May 4, 2021) ("It would be logically inconsistent with *Bostock* to find that Title IX permits discrimination for being transgender." (citing *Bostock*, 140 S. Ct. at 1734)); *Koenke v. Saint Joseph's Univ.*, No. CV 19-4731, 2021 WL 75778, at *2 (E.D. Pa. Jan. 8, 2021) ("Thus, Title IX's prohibition on sex discrimination constitutes a prohibition on sexual orientation discrimination." (citing *Bostock*, 140 S. Ct. at 1731)); *Doe v. Univ. of Scranton*, No. 3:19-CV-01486, 2020 WL 5993766, at *5 n.61 (M.D. Pa. Oct. 9, 2020) (finding "persuasive" plaintiff's argument that sexual orientation claims are actionable under Title IX post-*Bostock* (collecting cases)). One district court decision even characterized the Notification as effectively redundant and "beside the point," because "*Bostock* already made clear that the position stated in HHS's interpretation was already binding law." *See Hammons v. Univ. of Md. Med. Sys. Corp.*, No. CV DKC 20-2088, 2021 WL 3190492, at *17 (D. Md. July 28, 2021). As these courts have recognized, the Notification says nothing about Title IX that the Supreme Court has not already said in the parallel context of Title VII. It is therefore firmly in accordance with law.

### B.    Plaintiffs' challenge to the Notification misreads *Bostock*.

---

[1] An Eleventh Circuit panel also applied *Bostock* to Title IX in the context of a sex discrimination claim by a transgender student, explaining *Bostock*'s "reasoning applies with the same force to Title IX's equally broad prohibitions on sex discrimination." *Adams v. Sch. Bd. of St. Johns Cty.*, 968 F.3d 1286, 1305 (11th Cir. 2020) (explaining that "[b]oth titles . . . employ a 'but-for causation standard,' which *Bostock* found critical to its expansive interpretation of sex discrimination"). The panel later vacated its opinion and resolved the case on constitutional grounds. *See* 3 F.4th 1299 (11th Cir. 2021) (vacating opinion and "not reach[ing] the Title IX question"). The Eleventh Circuit has since voted to hear the case *en banc*, vacating the later opinion as well. *See* 9 F.4th 1369 (11th Cir. 2021) (granting rehearing *en banc*). While the original panel opinion has been vacated, it illustrates the appropriate manner for reviewing Title IX disputes—applying a concrete claim and specific set of facts to the law.

Against all this, Plaintiffs do not even dispute that some sexual orientation and gender identity discrimination claims are actionable under § 1557.  Instead they vaguely contend that the Notification extends beyond the scope of the holding in *Bostock* because it "remains perfectly legal after *Bostock* to 'discriminate' against homosexual or transgender individuals, so long as one does not engage in 'sex' discrimination when doing so."  FAC ¶ 20.  But that argument is puzzling and untenable in view of the Supreme Court's conclusion that it is "*impossible*" to discriminate against a person for being gay or transgender "without discriminating against that individual based on sex."  *Bostock*, 140 S. Ct. at 1741 (emphasis added).  The Supreme Court reached this conclusion not by redefining the term "sex"— indeed, it employed a definition of the term seemingly identical to Plaintiffs'—but by reasoning that "sex is a but-for cause" of *any* discrimination based on sexual orientation or gender identity.  *Id.*

Unable to offer a coherent reading of Title IX or § 1557 in view of *Bostock*, Plaintiffs instead offer a series of abstract hypotheticals that they allege show how one may permissibly discriminate based on sexual orientation or gender identity without engaging in impermissible sex discrimination. *E.g.*, FAC. ¶¶ 14–15, 18–19.  As explained, these hypotheticals mostly just reinforce why Plaintiffs lack standing and final agency action for their unripe claims—Plaintiffs do not allege they are likely to engage in these hypothetical scenarios anytime soon (or ever), or that HHS is likely to pursue enforcement actions against them based on such conduct, or even that HHS views such acts as violating § 1557.  *See supra* §§ I, II.A.  But the hypotheticals also show that Plaintiffs misread *Bostock*, recycling arguments the Supreme Court already rejected and inverting the decision's individualized but-for discrimination test into one that broadly compares groups of people—precisely the approach the *Bostock* Court declined to adopt.  Because Plaintiffs cannot explain how the Notification, which itself notes the individualized nature of every case, exceeds HHS's statutory authority, their First Amended Complaint fails to plausibly show that the Notification is "not in accordance with the law." 5 U.S.C. § 706(2)(A).

Plaintiffs begin their attack on the Notification's statutory interpretation by observing that none of the civil rights statutes incorporated into § 1557 mentions the terms "sexual orientation" or "gender identity."  FAC ¶ 9.  True enough.  But the Supreme Court swiftly dispatched that very

argument in *Bostock*, explaining that "Title VII prohibits all forms of discrimination because of sex, however they manifest themselves or whatever other labels might attach to them." *Bostock*, 140 S. Ct. at 1747. For example, it is no longer disputed that "sexual harassment" and "motherhood discrimination" are sex-based discrimination despite those terms appearing nowhere in Title VII. *Id.*

Plaintiffs next try to read a broad discriminatory safe harbor into *Bostock* by arguing that the decision "makes clear that an employer does *not* violate Title VII if it fires an employee for conduct or personal attributes that it would not tolerate in an employee of the opposite biological sex." FAC ¶ 12 (citing *Bostock*, 140 S. Ct. at 1742) (emphasis in original); *see also id.* ¶¶ 15, 20. *Bostock* says no such thing. In fact, the decision *expressly* rejects that view, stressing that Title VII does *not* "focus on differential treatment between the two sexes as groups." *Bostock*, 140 S. Ct. at 1741 (explaining it is no defense "for an employer to say it discriminates against both men and women because of sex").

Imagine that an employer or health care provider discriminates against a man for his same-sex attraction. Plaintiffs' reading says that no actionable sex discrimination occurs if the employer or health care provider *also* "would not tolerate [same-sex attraction] in an employee of the opposite biological sex," *i.e.*, a woman attracted to other women. FAC ¶ 12. But that is plainly wrong because the "statute works to protect individuals of both sexes from discrimination, and does so equally." *Bostock*, 141 S. Ct. at 1741. Thus, an "employer musters no better a defense by responding that it is equally happy to fire male *and* female employees who are homosexual or transgender." *Id.* at 1742. Instead "each instance of discriminating against an individual employee because of that individual's sex" is a statutory violation. *Id.* at 1742. "So just as an employer who fires both Hannah and Bob for failing to fulfill traditional sex stereotypes doubles rather than eliminates Title VII liability, an employer who fires both Hannah and Bob for being gay or transgender does the same." *Id.* at 1742–43. Plaintiffs therefore severely misread *Bostock* in arguing that it permits sexual orientation and gender identity discrimination provided such discrimination is equally levied against both men and women. *See id.* at 1741 (explaining "the law's focus on individuals rather than groups").

Plaintiffs then offer their list of hypotheticals but each suffers from two critical flaws. *First*, each uses the flawed group-based framework urged by Plaintiffs above. Take their first hypothetical—

Plaintiffs contend that under *Bostock* an employer does not discriminate against bisexual people "so long as the employer regards bisexual behavior or orientation as equally unacceptable in a man or woman."  FAC ¶ 14.  Plaintiffs fail to explain this claim's relevance, but they are also wrong—*Bostock* rejected the argument that no violation occurs when an employer is "equally happy to fire male *and* female employees" because of same-sex attraction.  *Bostock*, 140 S. Ct. at 1742.  Each remaining hypothetical employs this group-contra-group tactic, but "Title VII's plain terms and [Supreme Court] precedents don't care if an employer treats men and women comparable as groups."  *Id.* at 1748.

 *Second*, and most critically, the Notification says *nothing* about how Plaintiffs' hypotheticals or their own alleged policies—employment policies relating to bisexuality, testosterone supplements, and gender-transition surgery; and, in the healthcare context, decisions about prescribing testosterone supplements and pre-exposure prophylaxis medications, prescribing hormone therapy to minors, or referring patients for gender-transition procedures—would be resolved.  Instead the Notification merely restates *Bostock*'s holding that sex discrimination also prohibits discrimination based on sexual orientation and gender identity.  *See e.g.*, *Hammons*, 2021 WL 3190492, at *17.  If Plaintiffs believe that a restatement of *Bostock* compels a particular outcome in any of their hypotheticals or asserted practices, then their quarrel is with *Bostock* and the text of Title IX, not the Notification.  If, on the other hand, Plaintiffs believe these practices are *permitted* under *Bostock*, then they have no grievance with the Notification, which does not speak to their scenarios and instead says only that HHS will read § 1557 to bar sexual orientation and gender identity discrimination "consistent with the Supreme Court's decision in *Bostock* and Title IX."  Notification at 1.

 In sum, Plaintiffs cannot explain how the Notification exceeds HHS's statutory authority in view of *Bostock*.  Their hypotheticals—none of which are discussed in the Notification—purport to show "permissible" sexual orientation or gender identity discrimination that does not qualify as discrimination on the basis of sex, thus purportedly foiling HHS's statutory interpretation.  But they do no such thing because, at this stage, there is no way of knowing whether such fictional policies, or the policies Plaintiffs allege they do have, in factual context actually *discriminate* "on the basis of" sexual orientation or gender identity.

C.      **The Declaratory Judgment Act does not create a cause of action and Plaintiffs' claim under it must be dismissed.**

Plaintiffs purport to bring their second claim—styled as a Declaratory Judgment Act claim—"under 28 U.S.C. § 2201." FAC ¶ 49. But the Supreme Court long ago explained that § 2201 of the Declaratory Judgment Act merely "enlarged the range of remedies in the federal courts but did not extend their jurisdiction." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950); *accord Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 239–40 (1937) (explaining "the operation of the Declaratory Judgment Act is procedural only" and reflects Congress's exercise of its power to provide remedies and define procedure for Article III cases and controversies). Accordingly, "the law makes clear that—although the Declaratory Judgment Act provides a *remedy* different from an injunction— it does not provide an additional cause of action with respect to the underlying claim." *Okpalobi v. Foster,* 244 F.3d 405, 423 n.31 (5th Cir. 2001); *see also Harris Cty., Tex. v. MERSCORP Inc.*, 791 F.3d 545, 552 (5th Cir. 2015) (explaining the Act "does not create a federal cause of action.").

To be sure, plaintiffs may "obtain relief under the Declaratory Judgment Act," but to do so they "must first identify a cause of action under some other law." *Tex. Health & Hum. Servs. Comm'n*, 166 F. Supp. 3d at 712. Even if Plaintiffs had adequately pled their APA claim, the Declaratory Judgment Act speaks only to the form of relief available for the APA claim and "carries [them] no further." *Schilling v. Rogers*, 363 U.S. 666, 677 (1960); *Okpalobi*, 244 F.3d at 423 n.31. Accordingly, "the Court must dismiss the claim for a declaratory judgment." *Carson v. Fed. Nat'l Mortg. Ass'n*, No. SA-11-CA-925-H, 2012 WL 13029757, at *2 (W.D. Tex. Jan. 26, 2012) (explaining that where "the request for a declaratory judgment adds nothing to the existing suit, and is merely duplicative of the substantive claims already at issue, the request for a declaratory judgment need not be entertained").

## <u>CONCLUSION</u>

For the foregoing reasons, the First Amended Complaint should be dismissed in its entirety under Rule 12(b)(1) or, alternatively, Rule 12(b)(6).

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

MICHELLE BENNETT
Assistant Branch Director

*/s/ Jordan L. Von Bokern*
Christopher D. Dodge
Jordan L. Von Bokern (D.C. Bar # 1032962)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20005
Telephone: (202) 305-7919
Fax: (202) 616-8460
Email: Jordan.L.Von.Bokern2@usdoj.gov

CHAD E. MEACHAM
UNITED STATES ATTORNEY

*/s/ Brian W. Stoltz*
Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:      214-659-8626
Facsimile:       214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendants

## CERTIFICATE OF SERVICE

On December 14, 2021, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Jordan L. Von Bokern
Jordan L. Von Bokern
Trial Attorney
United States Department of Justice