UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

|  |  |
|---|---|
| **Susan Neese, M.D**; **James Hurly, M.D.**; and **Jeffrey Barke, M.D.**, on behalf of themselves and others similarly situated,<br><br>                   Plaintiffs,<br><br>v.<br><br>**Xavier Becerra**, in his official capacity as Secretary of Health and Human Services; **United States of America**,<br><br>                   Defendants. | Case No. 2:21-cv-00163-Z |

**BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS

Table of contents ...................................................................................................i

Table of authorities .............................................................................................ii

I.   The plaintiffs have alleged Article III standing to seek relief against Secretary Becerra....................................................................................................1

    1.   The threats conveyed in the Secretary's notification inflict injury in fact on the plaintiffs ...........................................................................................2

        a.   The notification as written presents a "credible threat" that the Secretary will take enforcement action against the plaintiffs unless they change their behavior.................................................................................................3

        b.   The Plaintiffs Are Not Required To Wait Until A Transgender Patient Requests Medical Care That They Are Unwilling To Provide.................9

    2.   The injuries caused by the Secretary's threats are fairly traceable to the Secretary and are likely to be redressed by a favorable decision from this court ...................................................................................................12

II.   The plaintiffs' claims are ripe ...............................................................14

III.   The Secretary's notification is final agency action, and there is no other adequate remedy in a court ..................................................................16

    A.   The notification is final agency action under 5 U.S.C. § 704..............................16

    B.   The post-enforcement judicial review provided by section 1557 and Title IX is not an "adequate remedy" within the meaning of 5 U.S.C. § 704 ...............20

IV.   The first amended complaint states a claim on which relief can be granted ...........21

V.   The plaintiffs may seek and obtain declaratory relief under 5 U.S.C. § 704...........24

Conclusion ........................................................................................................24

Certificate of service .........................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967) ......................................................14

*Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979) ...........................6

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020) ...............................................1, 22, 23

*Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138 (5th Cir. 1993) ........................9

*Christensen v. Harris County*, 529 U.S. 576 (2000) .......................................................13

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) .....................................................5, 6

*Diamond v. Charles*, 476 U.S. 54 (1986) ..........................................................................6

*Doe v. Bolton*, 410 U.S. 179 (1973) ..................................................................................2

*Ex parte Young*, 209 U.S. 123 (1908) ..............................................................................20

*Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016)...................15

*Gonzales v. Carhart*, 550 U.S. 124 (2007)...................................................................5, 10

*Hill v. Colorado*, 530 U.S. 703 (2000)...............................................................................5

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .............................................5, 6

*International Society for Krishna Consciousness of Atlanta v. Eaves*,
   601 F.2d 809 (5th Cir. 1979) ......................................................................................10

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................................1

*Rotkiske v. Klemm*, 140 S. Ct. 355 (2019) ......................................................................11

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996) ..............................................20

*State v. Arlene's Flowers, Inc.*, 441 P.3d 1203 (Wash. 2019) ..........................................11

*State v. Biden*, 10 F.4th 538 (5th Cir. 2021)....................................................................19

*Steffel v. Thompson*, 415 U.S. 452 (1974) ..........................................................2, 6, 9, 20

*Stenberg v. Carhart*, 530 U.S. 914 (2000.......................................................................3, 4, 5

*Stenberg v. Carhart*, 530 U.S. 914 (2000) .....................................................................2, 8

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)................................... 6, 10, 14, 15

*Telescope Media Group v. Lucero*, 936 F.3d 740 (8th Cir. 2019) ....................................10

*Texas v. Biden*, No. 21-10806, 2021 WL 5882670 (5th Cir. Dec. 13, 2021) ...................19

*Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019) ...........................................................18, 19

*Texas v. United States*, 300 F. Supp. 3d 810 (N.D. Tex. 2018)........................................16

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994).............................................20, 21

*Trump v. New York*, 141 S. Ct. 530 (2020) ................................................................5, 7, 8

*U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590 (2016)...................................17

*United States v. Mead Corp.,* 533 U.S. 218 (2001)......................................................13, 19

*Virginia v. American Booksellers Ass'n, Inc.,* 484 U.S. 383 (1988) ........................................6

*Whole Woman's Health v. Jackson*, 142 S. Ct. 522 (2021).......................................4, 5, 6, 8

**Statutes**

20 U.S.C. § 1681(a) ...........................................................................................................22

5 U.S.C. § 704.............................................................................................................passim

Tex. Health & Safety Code § 171.207(a) ..........................................................................4

**Constitutional Provisions**

Oliver Wendell Holmes, *The Path of the Law*, 110 Harv. L. Rev. 991 (1997) ..................17

**Rules**

Department of Health And Human Services, *Notification of Interpretation
    and Enforcement of Section 1557 of the Affordable Care Act and Title IX of
    the Education Amendments of 1972*, 86 Fed. Reg. 27,984 (May 25, 2021) ....................1

On May 10, 2021, Secretary Becerra issued a "Notification of Interpretation and Enforcement," which declares that section 1557 of the Affordable Care Act prohibits all forms of "discrimination on the basis of sexual orientation" and "discrimination on the basis of gender identity." *See* Department of Health And Human Services, *Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972*, 86 Fed. Reg. 27,984 (May 25, 2021). The Secretary's notification not only announces the Department's views on section 1557, but threatens to enforce this interpretation of the statute against every health program or activity that receives federal funds. *See id.* at 27,894 ("[B]eginning May 10, 2021, the Department of Health and Human Services (HHS) will interpret *and enforce* section 1557 of the Affordable Care Act prohibition on discrimination on the basis of sex to include: Discrimination on the basis of sexual orientation; and discrimination on the basis of gender identity." (emphasis added)). The plaintiffs claim that the Secretary is misinterpreting the Supreme Court's ruling in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), and they have alleged that Secretary's "notification" threatens them with loss of federal funds if they practice medicine in accordance with their ethical beliefs. The plaintiffs have every right to seek pre-enforcement relief to challenge the Secretary's interpretation of *Bostock*. They are not required to await a Department enforcement action before asserting their rights under federal law, and they are not required to endure the *in terrorem* effects of the Secretary's notification, which is threatening and intimidating health-care providers throughout the United States.

## I. THE PLAINTIFFS HAVE ALLEGED ARTICLE III STANDING TO SEEK RELIEF AGAINST SECRETARY BECERRA

To establish Article III standing at this stage of the litigation, a plaintiff needs only to allege: (1) an injury in fact, which is (2) fairly traceable to the challenged conduct of the defendants, and is (3) likely to be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Only one of the plaintiffs needs Article III standing to seek the requested relief; if a single plaintiff can establish Article III standing, then the

remaining plaintiffs may seek the same relief, regardless of whether they would have standing in their own right. *See Bowsher v. Synar*, 478 U.S. 714, 721 (1986).

Each of the plaintiffs is unwilling to provide gender-affirming care, in at least some situations, to patients who assert a gender identity that departs from their biological sex. Yet Secretary Becerra is threatening to cut off federal funding from these plaintiffs and health-care providers throughout the United States unless they immediately cease all forms of "discrimination on the basis of gender identity"—a phrase that is left undefined in the notification of May 10, 2021. The Declaratory Judgment Act and the rules of Article III have long permitted pre-enforcement challenges in these situations. *See, e.g.*, *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."); *Doe v. Bolton*, 410 U.S. 179, 188 (1973) (allowing abortion providers to challenge a state abortion statute "despite the fact that the record does not disclose that any one of them has been prosecuted, or threatened with prosecution, for violation of the State's abortion statutes."); *Stenberg v. Carhart*, 530 U.S. 914, 938–46 (2000).

### 1.    The Threats Conveyed In The Secretary's Notification Inflict Injury In Fact On The Plaintiffs

The Secretary claims that the plaintiffs' injuries are too speculative to support Article III standing because: (1) The notification does not say whether the Department will compel health-care providers to provide hormone therapy to minors or provide other forms of medical treatment that violate the plaintiffs' ethical beliefs;[1] and (2) The plaintiffs have not alleged

---

1.   Defs.' Br., ECF No. 16, at 9 ("The Notification states that it 'does not itself determine the outcome in any particular set of facts.'").

or shown that they are certain to encounter transgender patients who request medical treatment the plaintiffs find objectionable.[2] *See* Defs.' Br., ECF No. 16, at 8. Neither of these arguments defeats standing.

### a.     The Notification As Written Presents A "Credible Threat" That The Secretary Will Take Enforcement Action Against The Plaintiffs Unless They Change Their Behavior

Consider first the Secretary's observation that the notification merely states in general terms that section 1557 prohibits "discrimination on the basis of gender identity" and "sexual orientation"—without purporting to prejudge the application of this general principle to any specific set of facts. *See* Defs.' Br., ECF No. 16, at 9 ("The Notification states that it 'does not itself determine the outcome in any particular set of facts.'"). The Secretary contends that the plaintiffs cannot plausibly allege injury in fact until the Secretary makes clear that he *will* interpret section 1557 to require the provision of hormone therapy to minors—or that he will enforce section 1557 in a manner that specifically targets the conduct or practices described in the complaint. The Secretary is mistaken. A litigant has Article III standing to bring a pre-enforcement challenge if the statute or policy *could* be interpreted or enforced against him; he does not need to wait and see how the authorities go about interpreting or enforcing the disputed law before seeking declaratory relief.

The holding of *Stenberg v. Carhart*, 530 U.S. 914 (2000), makes this abundantly clear. *Stenberg* permitted abortion providers to bring a pre-enforcement challenge to Nebraska's partial-birth abortion statute on the ground that it would prohibit the dilation and evacuation (D&E) procedure—despite the fact that the Attorney General of Nebraska had *specifically disclaimed* any intention to enforce the statute against doctors who perform D&E abortions. *See id.* at 938–46. The Court allowed the doctors to raise this pre-enforcement challenge because "some present prosecutors and future Attorneys General *may choose to pursue*

---

2.   Defs.' Br., ECF No. 16, at 8 ("Plaintiffs . . . speculate that they might one day have patients seeking treatment Plaintiffs would prefer not to provide.").

physicians who use D & E procedures, the most commonly used method for performing previability second trimester abortions. All those who perform abortion procedures using that method must fear prosecution, conviction, and imprisonment." *Id*. at 945 (emphasis). The Court found that this mere *possibility* of future enforcement—even though it had been specifically disclaimed by the current Attorney General—not only imposed an Article III injury on abortion providers, but also violated the Constitution by imposing an "undue burden" on women seeking abortions. *See id*. at 945–46.

The holding of *Whole Woman's Health v. Jackson*, 142 S. Ct. 522 (2021), is in a similar vein. The abortion providers in *Whole Woman's Health* argued that provisions of the Texas Heartbeat Act *could* be interpreted to allow state licensing officials to discipline medical professionals that perform or assist post-heartbeat abortions—even though state officials vigorously contested this interpretation of the statute, and even though the Texas Heartbeat Act is most naturally read to prohibit this type of enforcement. *Compare id*. at 535–37 (plurality opinion of Gorsuch, J.), *with* Tex. Health & Safety Code § 171.207(a) ("Notwithstanding Section 171.005 or any other law, the requirements of this subchapter shall be enforced exclusively through the private civil actions described in Section 171.208."); *Whole Woman's Health*, 142 S. Ct. at 539–43 (Thomas, J., concurring in part and dissenting in part). Yet the Supreme Court allowed the abortion providers' pre-enforcement challenge to proceed past the motion-to-dismiss stage, because it was enough for them to identify statutory language that "appears" to empower state licensing officials to take adverse action against them. *See id*. at 536 (plurality opinion of Gorsuch, J.) ("[A]t this stage of the litigation, *it appears that* the licensing defendants do have authority to enforce S. B. 8." (emphasis added)); *id*. at 537 (plurality opinion of Gorsuch, J.) ("[T]hey have identified provisions of state law that *appear to impose* a duty on the licensing-official defendants to bring disciplinary actions against them if they violate S. B. 8. In our judgment, this is enough at the motion-to-dismiss stage to suggest the petitioners will be the target of an enforcement action and thus allow this suit to proceed." (emphasis added)). So too here: The Secretary's notice of May 10, 2021, *could* be

interpreted to prohibit health-care providers from denying hormone therapy to minors. And the Secretary does not even attempt to disclaim this interpretation of his notice—unlike the Nebraska Attorney General in *Stenberg* and the Texas officials in *Whole Woman's Health*, who denied that the challenged laws in those cases could be interpreted or enforced against the plaintiffs. If the abortion providers in *Stenberg* and *Whole Woman's Health* had standing to sue pre-enforcement, then the plaintiffs in this case can likewise seek pre-enforcement declaratory relief against the Secretary's notice. Indeed, the Secretary's argument, if taken to its logical conclusion, would deny standing in pre-enforcement challenges whenever the disputed law is vague or susceptible to competing interpretations. That is assuredly not the law, because courts entertain pre-enforcement constitutional vagueness challenges all the time. *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010); *Gonzales v. Carhart*, 550 U.S. 124, 148–50 (2007); *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *Stenberg*, 530 U.S. at 938–46. In all these cases, the injury comes from the *possibility* that the disputed law might be interpreted in the manner that the plaintiff fears, which presents a "credible threat" that the law will be enforced against the plaintiff unless the plaintiff changes his behavior. *See Holder*, 561 U.S. at 15; *Whole Woman's Health*, 142 S. Ct. at 536. The plaintiffs allege the same injury here: The Secretary's categorical ban on "discrimination on the basis of gender identity" could be interpreted to require health-care providers to provide hormone therapy to minors and gender-affirming care to every transgender patient that walks through the door, and that (in turn) presents a "credible threat" that the Secretary will take enforcement action against the plaintiffs unless they change their ways.

Against all of this the defendants cite only two Supreme Court cases: *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), and *Trump v. New York*, 141 S. Ct. 530 (2020). Neither case supports the defendants' position. The defendants claim that *Clapper* requires the plaintiffs to allege (and eventually show) that an adverse enforcement proceeding against

them "certainly impending,"[3] but that is wrong. When a litigant sues to prevent government officials from initiating enforcement proceedings against him, he needs only to allege a "credible threat" of enforcement; he is *not* required to allege or show a future enforcement proceeding is "certainly impending." *See Whole Woman's Health*, 142 S. Ct. at 536; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *see also Holder*, 561 U.S. at 15 (conferring Article III standing when the "[p]laintiffs face 'a credible threat of prosecution'"); *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) (allegations were sufficient when plaintiffs alleged an "*actual and well-founded fear* that the law will be enforced against them" (emphasis added)); *Diamond v. Charles*, 476 U.S. 54, 64 (1986) ("Appellees, however, had standing to bring suit against the state officials who were charged with enforcing the Abortion Law because appellees faced *possible criminal prosecution*." (emphasis added)); *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 302 (1979); *Steffel v. Thompson*, 415 U.S. 452, 475 (1974) ("[F]ederal declaratory relief is not precluded when no state prosecution is pending and a federal plaintiff demonstrates a *genuine threat of enforcement* of a disputed state criminal statute" (emphasis added)). *Clapper* acknowledged that a "certainly impending" injury is not a uniform requirement of Article III standing doctrine, and declared that it was *not* overruling or abrogating prior cases that require plaintiffs to show only a "substantial risk" of future harm (rather than a "certainly impending" injury). *See Clapper*, 568 U.S. at 414 n.5 ("Our cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about. In some instances, we have found standing based on a 'substantial risk' that the harm will occur"). The Court also made abundantly clear in *Susan B. Anthony List* that *Clapper* did not disturb or in any way alter the standing test for pre-enforcement challenges that had been previously established in cases such as *Holder*, *American Booksellers Ass'n*, *Babbitt*, and *Steffel*. *See Susan B. Anthony List*, 573 U.S. at 159–61; *see also id*. at 158 ("An allegation of future injury may

---

3.   *See* Defs.' Br., ECF No. 16, at 8 (quoting *Clapper*, 568 U.S. at 416)).

suffice if the threatened injury is 'certainly impending,' *or* there is a ' 'substantial risk' that the harm will occur.'" (quoting *Clapper*, 568 U.S. at 415 n. 5) (emphasis added)). The defendants' claim that a plaintiff must always allege and prove that its future injuries are "certainly impending" is simply false. And it has been long been established—both before and after *Clapper*—that a "credible threat" of enforcement is all that is needed when a litigant sues to enjoin government officials from initiating enforcement proceedings against him.

The holding of *Trump v. New York*, 141 S. Ct. 530 (2020), is even further afield. *Trump* dismissed a challenge to a Presidential memorandum that merely directed the Secretary of Commerce to provide *information to the President* in his census report:

> This past July, the President issued a memorandum to the Secretary respecting the apportionment following the 2020 census. The memorandum announced a policy of excluding "from the apportionment base aliens who are not in a lawful immigration status." 85 Fed. Reg. 44680 (2020). To facilitate implementation "to the maximum extent feasible and consistent with the discretion delegated to the executive branch," the President ordered the Secretary, in preparing his § 141(b) report, "to provide information permitting the President, to the extent practicable, to exercise the President's discretion to carry out the policy." *Ibid.* The President directed the Secretary to include such information in addition to a tabulation of population according to the criteria promulgated by the Census Bureau for counting each State's residents. *Ibid.*; see 83 Fed. Reg. 5525 (2018).

*Id.* at 534. The plaintiffs who sought to enjoin the enforcement of this memorandum initially alleged that the Presidential memorandum was deterring illegal aliens from responding to the census, but that injury ceased after the census was completed and could no longer support a claim for prospective relief. *See id.* at 534. The plaintiffs then tried to salvage their case by proffering a new theory of Article III injury: That the President's request for information from the Secretary would ultimately result in an unlawful apportionment, which would adversely affect the plaintiffs with respect to congressional representation and federal funding. *See id.* at 534–35. The Court held that this alleged injury was too speculative and premature to support Article III standing, because there was no way to know whether or what extent the President would attempt to exclude illegal aliens based on information that might be

provided by the Secretary. *See id.* at 535–36. Instead, the Court held that the plaintiffs must wait until "the Executive Branch's decisionmaking process run[s] its course" before challenging any eventual apportionment or proposed apportionment. *Id.* at 536.

The plaintiffs in this case are not seeking to enjoin the provision of information to the President based on "guesswork"[4] about what the President might ultimately do with the information that he seeks. Instead, they are suing to halt the implementation of an Administration policy that has already been announced and that the Secretary fully intends to enforce—and they have alleged a credible threat that they could face enforcement proceedings if they do not agree to provide hormone therapy to minors and gender-affirming responses to every transgender patient that comes through the door. The defendants try to extend the holding of *Trump* to this situation by insisting that the Secretary's ultimate decision on how to enforce section 1557 rests on "'contingencies and speculation,'"[5] because no one can know for certain whether the Secretary will take adverse action until the Secretary actually initiates enforcement proceedings against someone. But the "credible threat" test *allows* a plaintiff to establish standing by relying on the mere possibility that a disputed law or policy could be interpreted or enforced against him—because the *risk* of enforcement action is what deters an individual from acting in accordance with his legal rights. *See Stenberg*, 530 U.S. at 938–46; *Whole Woman's Health*, 142 S. Ct. at 535–37 (plurality opinion of Gorsuch, J.); *see also* cases cited on pages 5–6, *supra*. This is an exceedingly easy test to satisfy, as *Stenberg* and *Whole Woman's Health* have made clear.

---

4.   *Trump*, 141 S Ct. at 536.
5.   Defs.' Br., ECF No. 16, at 9 (quoting *Trump*, 141 S Ct. at 535).

b.    **The Plaintiffs Are Not Required To Wait Until A Transgender Patient Requests Medical Care That They Are Unwilling To Provide**

The Secretary also claims that the plaintiffs lack standing because they have not alleged or shown that they are certain to encounter transgender patients who request medical treatment the plaintiffs find objectionable. *See* Defs.' Br., ECF No. 16, at 8 ("Plaintiffs . . . speculate that they might one day have patients seeking treatment Plaintiffs would prefer not to provide."). In the Secretary's view, the plaintiffs must wait until it is *certain* that an actual transgender patient will request medical care that they are unwilling to provide, and then sue the Secretary for declaratory relief once it becomes certain that they will take actions that could trigger an enforcement proceeding under section 1557. *See* Defs.' Br., ECF No. 16, at 11 (claiming that the plaintiffs must "allege[ ] facts sufficient to show it is *certainly impending* they will face such a scenario." (emphasis added)). But a litigant is not required to wait until he needs to break the law—or violate the law as interpreted by the Secretary—before he can sue for pre-enforcement relief. And the defendants' stance would leave the plaintiffs subject to penalties and loss of federal funds if a court rejects their belated claims for declaratory relief against the Secretary. The entire point of declaratory judgments and pre-enforcement challenges is to allow litigants to seek judicial declarations of their rights *before* exposing themselves to punishment or enforcement actions. *See Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."); *Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1154 (5th Cir. 1993) ("'The purpose of the Declaratory Judgment Act is to settle 'actual controversies' *before* they ripen into violations of law or breach of some contractual duty.'" (citation omitted)). Yet the defendants' argument—if accepted by this Court—would thrust the plaintiffs into the very dilemma that a pre-enforcement challenge is supposed to avoid. As the Fifth Circuit has eloquently explained:

> To insist that a person must break the law in order to test its constitutionality is to risk punishing him for conduct which he may have honestly thought was constitutionally protected. Not only is this prima facie unfair, but it discourages people from engaging in protected activity and enforcing constitutional rights.

*International Society for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 821 (5th Cir. 1979).

The defendants' position is also incompatible with *Stenberg* and *Gonzales v. Carhart*, 550 U.S. 124 (2007), which allowed abortion providers to challenge the absence of a health exception in a partial-birth abortion ban without requiring them to show that it was "certain" that one of their patients would need that procedure for health reasons. *See Stenberg*, 530 U.S. at 932 (relying on a statement from the American College of Obstetricians and Gyne-cologists, which concluded that D & X "'*may be* the best or most appropriate procedure in *a particular circumstance* to save the life or preserve the health of a woman.'" (emphasis added) (citation omitted)); *Gonzales*, 550 U.S. at 166–67 (allowing physicians to challenge the absence of a health exception in federal partial-birth abortion ban, even though the plain-tiffs had established nothing more than "*uncertainty* over whether the barred procedure is *ever* necessary to preserve a woman's health" (emphasis added)). The mere possibility that a plaintiff physician *might* encounter a future patient with a health need for a partial-birth abortion was enough to provide Article III standing to challenge the absence of a health exception in the statute.

And the defendants' stance is incompatible with *Telescope Media Group v. Lucero*, 936 F.3d 740 (8th Cir. 2019), which allowed a Christian videography business (Telescope Media) to bring a pre-enforcement First Amendment challenge to the Minnesota Human Rights Act—even though Telescope Media had not yet entered the wedding-video business, and even though it had not alleged or shown that it was "certain" that it would encounter a customer that it would ask it to videotape a same-sex wedding. The Eighth Circuit held that Telescope Media had alleged a "credible threat of enforcement" sufficient to establish stand-ing under *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014), because Minnesota had

"publicly announced" that its statute would require wedding vendors to provide equal services for same-sex and opposite-sex weddings, and Telescope Media had alleged that it intended to violate the Minnesota Human Rights Act if a couple requested its services for a same-sex marriage ceremony. The Court did not require Telescope Media to allege or show that it was "certain" that a future customer would request its services for an objectionable wedding. And it would be untenable to require a wedding vendor to wait until a same-sex couple appears and requests its services before seeking declaratory relief, because an unsuccessful lawsuit will leave the wedding vendor exposed to penalties from the state over its refusal to provide the requested services. *See, e.g., State v. Arlene's Flowers, Inc.*, 441 P.3d 1203 (Wash. 2019), *cert. denied*, 141 S. Ct. 2884 (July 2, 2021). For the same reason, a health-care provider has standing to seek declaratory relief against the Secretary before it is "certain" to take action against an actual homosexual or transgender patient, which would leave the provider exposed to the loss of federal funds if the courts wind up rejecting its legal claims.

Finally, each of the plaintiffs has specifically alleged that it is "likely" that they will encounter transgender patients in the future who will either request hormone therapy and referrals for sex-change operations, or deny or dispute their need preventive care that corresponds to their biological sex:

> Dr. Barke is *likely to encounter* minor transgender patients who will request hormone therapy and referrals for sex-change operations that he is unwilling to provide, as well as adult transgender patients who will deny or dispute their need for preventive care that corresponds to their biological sex, *and he intends to provide care to these individuals in a manner consistent with his ethical beliefs*.

First Amended Complaint, ECF No. 11, at ¶ 33 (emphasis added); *see also id*. at ¶ 25 (same allegation from Dr. Neese); *id*. at ¶ 29 (similar allegation from Dr. Hurly). These factual allegations *must* be accepted as true when deciding a motion to dismiss. *See Rotkiske v. Klemm*, 140 S. Ct. 355, 359 n.1 (2019) ("Because this case comes to us from a decision granting a motion to dismiss, we assume the truth of the facts alleged in Rotkiske's operative

complaint."). The defendants cannot pronounce these allegations "speculative" when the complaint itself says they are "likely."

> **2.   The Injuries Caused By The Secretary's Threats Are Fairly Traceable To The Secretary And Are Likely To Be Redressed By A Favorable Decision From This Court**

The Secretary denies that the plaintiffs' injuries are "fairly traceable" to the Secretary's conduct because he claims that his Notification does nothing more than re-state the Supreme Court's holding in *Bostock. See* Defs.' Br., ECF No. 16, at 12 ("[T]heir quarrel is with *Bostock* and the statute itself, not with the Notification."). That is incorrect. The Secretary's Notification extends beyond the holding of *Bostock* by prohibiting *all* discrimination "on the basis of sexual orientation" and "on the basis of gender identity"—even when such discrimination fails to qualify as "sex" discrimination as defined in *Bostock. Bostock* allows health-care providers to take discriminatory actions with respect to homosexual, bisexual, or transgender patients as long as they would have acted in the exact same manner if the patient had been a member of the opposite biological sex. The Secretary's Notification ignores this limitation on *Bostock*'s holding and acts as though *Bostock* enacted The Equality Act through judicial decree. *See* First Amended Complaint, ECF No. 11, at ¶¶ 10–20, 47–48. The plaintiffs fully intend to comply with *Bostock* and its interpretation of "sex" discrimination; they object only to the Secretary's claim that *Bostock* defined "sex" discrimination to encompass all forms of discrimination on the basis of sexual orientation or gender identity.

The Secretary is equally wrong to deny redressability, as all of the plaintiffs' alleged injuries can be redressed by: (1) an injunction that prohibits the Secretary from enforcing its interpretation of *Bostock*; (2) a declaratory judgment that recognizes the limited scope of *Bostock*'s holding; and (3) a ruling that "sets aside" (formally revokes) the Secretary's Notification of May 10, 2021, under section 706 of the APA. *See* First Amended Complaint, ECF No. 11, at ¶ 50. If the Court issues a remedy of this sort, then the Secretary will be unable to enforce his misguided interpretation of section 1557 against the plaintiffs and their fellow

class members, and the plaintiffs and other health-care providers can safely operate without fear of enforcement proceedings or the loss of federal funds.

The Secretary tries to deny redressability by claiming that his Notification is "not binding" and will not receive deference from the judiciary—and that the courts rather than the Secretary will ultimately decide the scope of section 1557 and the Supreme Court's holding in *Bostock*. *See* Defs.' Br., ECF No 16, at 12–13. But even if that were true, it does not change the fact that the Secretary remains empowered to bring enforcement actions against the plaintiffs (and other health-care providers) unless and until the courts reject the Secretary's interpretation of *Bostock*. And the mere threat that the Secretary might bring such enforcement actions is what is inflicting the "injury in fact"—regardless of whether the Secretary ultimately prevails in his interpretation of section 1557.

It is also far from clear that the Secretary's Notification would receive *no* deference from the federal judiciary. *See* Defs.' Br., ECF No 16, at 13 ("[A] court would be bound to agree with the Notification only to the extent the court is persuaded by it."). The Supreme Court has held that an agency's "interpretative" rules—rules that are not "substantive" and do not go through notice and comment—are entitled to *Skidmore* deference. *See Christensen v. Harris County*, 529 U.S. 576, 587 (2000) ("[I]nterpretations contained in formats such as opinion letters are 'entitled to respect' under our decision in *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944)"); *see also United States v. Mead Corp.,* 533 U.S. 218, 234–35 (2001). A ruling from this Court that "sets aside" the Secretary's Notification would remove any possible deference from the judiciary that the Secretary's interpretation of section 1557 could receive, which would further redress the injuries that the plaintiffs allege.

But in all events, the plaintiffs' standing does not turn in any way on whether the Secretary's Notification will receive *Skidmore* deference (or any level of deference) from the judiciary. The Secretary is threatening enforcement action against the plaintiffs and any health-care provider that does not kowtow to his anti-discrimination edicts. Those threats are what impose injury in fact, and those threats of enforcement proceedings remain regardless of

whether the courts will extend deference to the Secretary's interpretation of section 1557. The Secretary may be right to assert that his Notification will make no difference in how the courts ultimately decide to interpret section 1557 and *Bostock*. But the "injury" inflicted by the Notification is not that it will alter judicial interpretations of section 1557, but that it threatens health-care providers with enforcement actions and loss of federal funding if they conduct their medical practices in accordance with their ethical beliefs.

## II.   THE PLAINTIFFS' CLAIMS ARE RIPE

In determining whether a claim is ripe, a Court must consider: (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967). Each of these factors is easily satisfied.

A claim is "fit for judicial decision" if it presents a pure question of law. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (finding the "fitness" factor to be "easily satisfied" because "petitioners' challenge to the Ohio false statement statute presents an issue that is 'purely legal, and will not be clarified by further factual development.'" (quoting *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 581 (1985)). The defendants do not dispute this, but they claim that the plaintiffs' claims present "non-legal questions about future enforcement under § 1557 that require factual development to meaningfully review." Defs.' Br., ECF No. 16, at 14. The plaintiffs, however, *are* presenting a pure question of law: Whether *Bostock* prohibits *all* forms of discrimination on the basis of sexual orientation and gender identity, as Secretary Becerra claims, or whether *Bostock* allows health-care providers to take discriminatory actions with respect to homosexual, bisexual, or transgender patients as long as they would have acted in the same manner had the patient had been a member of the opposite biological sex. *See* First Amended Complaint, ECF No. 11, at ¶¶ 10–20, 47–48. The resolution of that claim does not require any factual development; it is as pure a question of law as one can find. The defendants never explain how this

claim would become *more* "fit for judicial decision" if the plaintiffs were forced to wait until the Secretary specifically threatens them with enforcement proceedings over their refusal to provide hormone therapy or gender-affirming responses to a particular transgender individual. Nothing in the resolution of this legal question should depend on the facts of a particular patient encounter, so it is not apparent how anything would be gained from telling the plaintiffs to return to court later.

As for "hardship to the parties": The Court's answer to this question should mirror its answer on the Article III standing issues, and the Supreme Court's opinion in *Susan B. Anthony List* suggests that the standing and ripeness inquiries merge in pre-enforcement litigation. *See Susan B. Anthony List*, 573 U.S. at 167–68. So it the Court finds that the plaintiffs are suffering "injury in fact" from the *in terrorem* effects of the Secretary's Notification of May 10, 2021, then there will by definition be "hardship" to the plaintiffs from prolonging this injury and delaying the resolution of their claims. *See Susan B. Anthony List*, 573 U.S. at 167–68 ("Denying prompt judicial review would impose a substantial hardship on petitioners, forcing them to choose between refraining from core political speech on the one hand, or engaging in that speech and risking costly Commission proceedings and criminal prosecution on the other."); *Franciscan Alliance*, 227 F. Supp. 3d at 681 ("Substantial hardship is typically satisfied when a party is forced to choose between refraining from allegedly lawful activity or engaging in the allegedly lawful activity and risking significant sanctions."). The Secretary's claim that the plaintiffs will suffer no hardship from a delayed resolution of their claims is demonstrably untenable. *See* Defs.' Br., ECF No. 16, at 16 ("There is no hardship to Plaintiffs in withholding review."). The Secretary's Notification is designed to produce *in terrorem* effects that threaten the autonomy of every medical practitioner that receives federal funds, and the plaintiffs' complaint has specifically described how the Notification is threatening them with enforcement proceedings and loss of federal funds for acting in accordance with their ethical beliefs. *See* First Amended Complaint, ECF No. 11, at 21–36. And the

Secretary's Notification reaches beyond *Bostock* by purporting to outlaw *all* forms of discrimination on the basis of sexual orientation and gender identity, so the Secretary cannot plausibly claim that these *in terrorem* effects would exist in the absence of the Notification. *See* Defs.' Br., ECF No. 16, at 16 (claiming that the plaintiffs' fears "would exist in the absence of the Notification as well).

## III.  The Secretary's Notification Is Final Agency Action, And There Is No Other Adequate Remedy In A Court

The Secretary denies that his Notification of May 10, 2021, qualifies as "final agency action" under 5 U.S.C. § 704, and he further denies that it qualifies as agency action "for which there is no other adequate remedy in a court." Defs.' Br., ECF No. 16, at 16–17 (quoting 5 U.S.C. § 704). Neither of these arguments holds water.

### A.    The Notification Is Final Agency Action Under 5 U.S.C. § 704

The APA allows litigants to seek judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The Secretary claims that his Notification cannot qualify as "final agency action" because it is a mere "interpretive rule and general statement of policy" rather than a substantive rule, and that it therefore "has no legal force against Plaintiffs in any prospective enforcement proceeding." Defs.' Br., ECF No. 16, at 17. Those arguments have nothing to do with the finality requirement of section 704.

Agency "guidance documents" such as the Secretary's Notification do not go through notice and comment, and therefore not do qualify as substantive rules under the APA. But they still serve as warnings and threats to anyone who would depart from the agency's announced interpretation of the statute. These announcements are "rules" within the meaning of the APA—even though they are not *substantive* rules that go through notice and comment—and they qualify as final agency action that is subject to challenge under 5 U.S.C. § 704. *See Texas v. United States*, 300 F. Supp. 3d 810, 838 (N.D. Tex. 2018) ("[A]n agency guidance document that reflects a 'settled agency position' that the entire agency intends to follow in its enforcement of its regulations, and that gives 'marching orders' to a regulated

entity, is 'final' agency action against the regulated entity—even if the document contains boilerplate denying its legal effect."). The Secretary's Notification may not have the same legal effect as notice-and-comment rulemaking, but it most assuredly has "legal effect" from the standpoint of health-care providers who are being forced to choose between abandoning their ethical convictions and subjecting themselves to the risk of an enforcement proceedings and loss of federal funding. *See* Oliver Wendell Holmes, *The Path of the Law*, 110 Harv. L. Rev. 991, 992 (1997) ("[A] legal duty so called is nothing but a prediction that if a man does or omits certain things he will be made to suffer in this or that way").

And the Secretary's Notification easily satisfies the finality requirement of 5 U.S.C. § 704. An agency action is "final" if it: (1) "mark[s] the consummation of the agency's decisionmaking process"; and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 597 (2016); *see also* Defs.' Br., ECF No. 16 at 17 (reciting this two-part test). The first of these requirements is satisfied because the Notification reflects the "consummation" of the agency's decision to interpret section 1557 and *Bostock* as prohibiting *all* forms of discrimination on the basis of sexual orientation and gender identity. The Secretary's Notification has clearly and unequivocally rejected the plaintiffs' interpretation of *Bostock*, which (on the plaintiffs' view) allows discriminatory actions against homosexual, bisexual, or transgender individuals as long as the same action would have been taken against an identically situated member of the opposite biological sex. *See* First Amended Complaint, ECF No. 11, at ¶¶ 10–20, 47–48. The Secretary does not argue that his Notification leaves this issue open; indeed, the Secretary insists throughout his brief that the plaintiffs are simply wrong to interpret *Bostock* in that manner, and the Court should dismiss the plaintiffs' claims because they misconstrue the Supreme Court's ruling. *See* Defs.' Br., ECF No. 16, at 26–28. And the Secretary does not even appear to contest the notion that his Notification "mark[s] the consummation of the agency's decisionmaking process." *Hawkes*, 578 U.S. at 597. There is no

going back; the agency has unequivocally and finally decided to construe *Bostock* as prohibiting *all* forms of discrimination on the basis of sexual orientation and gender identity.

The Secretary instead focuses its energy on the second prong of the finality test, by denying that the Notification qualifies as an action "by which rights or obligations have been determined, or from which legal consequences will flow." Defs.' Br., ECF No. 16, at 18–20. The Secretary denies that "legal consequences" can flow from mere "interpretive rules or statements of policy" such as the Notification, but that is simply untrue. The Secretary's Notification announces that the Department of Health of and Human Services will interpret section 1557 as prohibiting all forms of discrimination on the basis of sexual orientation and gender identity—and it will enforce the statute accordingly. This binds everyone in the Department to follow the Secretary's interpretation of section 1557 and *Bostock*, and it requires them to initiate enforcement proceedings against health-care providers that violate the Secretary's interpretation of the statute. *See Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) ("Courts consistently hold that an agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations, thus meeting the second prong of [the final-agency-action test]."). This also determines the "rights and obligations" of health-care providers that receive federal funds, as well as the rights and obligations of homosexual and transgender patients. And it ensures that "legal consequences will flow" if any health-care provider has the temerity to act in a manner contrary to the Secretary's interpretation of section 1557, because those providers will face enforcement proceedings and the potential loss of federal funds. And there are additional "legal consequences" that "flow" from the Secretary's Notification, as the Secretary's interpretation of section 1557 will receive *Skidmore* deference from any court that considers the matter.

The Secretary tries to deny all of this by claiming that the Notification does nothing more than inform the public what the Secretary thinks. See Defs.' Br., ECF No. 16, at 17–18. But the Secretary does not deny that his Notification binds the Department of Health and Human Services, and that by itself is enough to show that "legal consequences" flow

from the Notification. *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). The Secretary's claim that his Notification lacks "the force of law"[6] ignores the fact that it binds the Department and its personnel, and it ignores the Notification's entitlement to *Skidmore* deference in judicial proceedings. *See Mead*, 533 U.S. at 234–35. And the Secretary's claim that "interpretive rules or statements of policy" are categorically excluded from "final agency action" has been repeatedly and emphatically rejected by the Fifth Circuit. *See State v. Biden*, 10 F.4th 538, 550 (5th Cir. 2021) ("[T]he Government simply asserts the Memorandum is a general policy statement—and therefore can neither determine rights nor produce obligations or legal consequences. Stay Mot. at 10–11. This argument ignores Circuit precedent establishing that a 'policy statement' can nonetheless be 'final agency action' under the APA." (citing *Merchants Fast Motor Lines, Inc. v. ICC*, 5 F.3d 911, 919–20 (5th Cir. 1993)); *Texas v. Biden*, No. 21-10806, 2021 WL 5882670, at *8 (5th Cir. Dec. 13, 2021) ("The Government also asserts the Termination Decision is a general policy statement—and therefore can neither determine rights nor produce obligations or legal consequences. Even if the Termination Decision is merely a 'policy statement,' this argument ignores our precedent establishing that such statements can nonetheless constitute 'final agency action' under the APA." (citing *Merchants Fast Motor Lines, Inc. v. ICC*, 5 F.3d 911, 919–20 (5th Cir. 1993)).

The Secretary also claims that his Notification simply re-states the holding of *Bostock*,[7] but that is simply not true. *Bostock* does not hold that *all* forms of discrimination on the basis of sexual orientation and gender identify constitute "sex" discrimination, and the Notification (at the very least) is adopting a contested interpretation of *Bostock* and imposing that

---

6. Defs.' Br., ECF No. 16, at 18 (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 88 (1995)).

7. Defs.' Br., ECF No. 16, at 18 ("Plaintiffs' legal obligations do not stem from the Notification; they come from § 1557 and Title IX").

view on the Department of Health and Human Services. That is undeniably a "legal conse-
quence" that "flows" from the Secretary's Notification of May 10, 2021, and it makes the
Notification a "final agency action" under 5 U.S.C. § 704.

### B.   The Post-Enforcement Judicial Review Provided By Section 1557 And Title IX Is Not An "Adequate Remedy" Within The Meaning Of 5 U.S.C. § 704

The Secretary also tries to defeat pre-enforcement review under 5 U.S.C. § 704 by claim-
ing that the plaintiffs can challenge the Secretary's Notification in any subsequent enforce-
ment proceedings that may be brought against them. *See* Defs.' Br., ECF No. 16, at 20–23.
But post-enforcement review of this sort is not an "adequate remedy" within the meaning of
section 704, because the plaintiffs must risk the loss of federal funding if they choose to
contest the Secretary's Notification in those proceedings. The Secretary cites no authority to
support its view that post-enforcement challenges to agency action qualify as an "adequate
remedy" under 5 U.S.C. § 704—especially when a litigant must risk draconian penalties
(such as the complete loss of federal funding) by waiting to raise his claims in those proceed-
ings. And the courts have long recognized that forcing litigants to undertake these risks as
the price of challenging the legality of government conduct is unacceptable; that is the entire
reason for allowing pre-enforcement challenges in federal court. *See, e.g.*, *Ex parte Young*,
209 U.S. 123 (1908); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary
that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge
a statute that he claims deters the exercise of his constitutional rights.").

The Secretary also claims that Congress implicitly foreclosed resort to pre-enforcement
challenge under the APA by establishing a regime for post-enforcement challenges to the
Secretary's Notification under section 1557 and Title IX. *See* Defs.' Br., ECF No. 16, at 22–
23 (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 216 (1994)); *see also Seminole
Tribe of Florida v. Florida*, 517 U.S. 44, 73–74 (1996) (holding that Congress precluded a
cause of action under *Ex parte Young* by enacting a "carefully crafted and intricate remedial

scheme"). But the remedial scheme in *Thunder Basin* did not require the plaintiffs in that case to risk serious penalties or adverse consequences by forgoing pre-enforcement judicial review. *See Thunder Basin*, 510 U.S. at 216 (rejecting the plaintiffs' claim that "the absence of pre-enforcement declaratory relief before the Commission will subject petitioner to serious and irreparable harm."); *id*. at 218 ("Nor does this approach a situation in which compliance is sufficiently onerous and coercive penalties sufficiently potent that a constitutionally intolerable choice might be presented."). It is implausible for the courts to presume that Congress somehow intended to foreclose resort to pre-enforcement remedies under 5 U.S.C. § 704 when health-care providers must risk the loss of *all* federal funding if they defy the Secretary and challenge his interpretation of section 1557 in subsequent enforcement proceedings. It is even more implausible to draw such an inference when Congress enacted section 1557 and the Title IX remedial scheme long before the Supreme Court issued its pronouncement in *Bostock*.

## IV. The First Amended Complaint States A Claim On Which Relief Can Be Granted

The plaintiffs do not deny that the holding of *Bostock* applies to Title IX and section 1557; they contest only the Secretary's interpretation of *Bostock*'s holding. So the plaintiffs do not dispute the material in Section III.A of the Secretary's brief. *Bostock*'s interpretation of Title VII applies to Title IX, and *Bostock*'s holding therefore is binding on health-care providers that receive federal funds under section 1557.

What the plaintiffs are contesting is the interpretation of *Bostock* that appears in the Secretary's notification. The Secretary thinks that *Bostock*'s holding enacted The Equality Act by judicial decree, by abolishing *all* forms of "discrimination on the basis of sexual orientation" and "discrimination on the basis of gender identity." The plaintiffs contend that *Bostock*'s holding is extends only to acts that discriminate on the basis of biological sex, and that discriminatory acts against homosexual or transgender individuals remain legal if the same action would be taken against an identically situated member of the opposite biological sex. *See*

First Amended Complaint, ECF No. 11, at ¶¶ 10–20, 47–48. This means, at the very least, that *Bostock* does *not* prohibit (1) discrimination against bisexuals; or (2) discriminatory acts against homosexual or transgender individuals that would be taken against an identically situated member of the opposite biological sex.

The Secretary claims that the plaintiffs' interpretation of *Bostock* is wrong, and he insists that *Bostock* prohibits all discrimination of whatever form on the basis of sexual orientation or gender identity. But that simply cannot be squared with the language of the Court's opinion. Consider once again the key passage from *Bostock*:

> Take an employer who fires a female employee for tardiness or incompetence or simply supporting the wrong sports team. Assuming the employer would not have tolerated the same trait in a man, Title VII stands silent.

*Bostock*, 140 S. Ct. at 1742. An employer who discriminates against *all* bisexual employees—regardless of whether they are male or female—cannot possibly be engaged in "sex" discrimination under *Bostock*. That is because the "same trait" (sexual attraction toward members of both sexes) is treated exactly the same regardless of whether that "trait" appears in a man or a woman. The Secretary has no answer to this passage from *Bostock*, and he does not explain how discrimination against bisexuals can qualify as "sex" discrimination under the terms of the Title IX or section 1557. It is not "sex stereotyping" to hold a belief that members of *each* biological sex should refrain from bisexuality and limit their sexual attractions (and sexual interactions) to one or the other sex.

The Secretary also fails to explain how a refusal to provide an identical medical treatment to men and women can qualify as "sex" discrimination, either under the text of Title IX or under *Bostock*. If a health-care provider subjects men and women to the exact same rules, and refuses to prescribe the identical hormone therapy regardless of the sex of the patient who asks for it, then it is impossible to see how the provider has discriminated "on the basis of sex." 20 U.S.C. § 1681(a). To hold otherwise would effectively amend the text of Title IX

by converting its prohibition on "sex" discrimination into a statute that outlaws discrimination on account of sexual orientation and gender identity—which is exactly what *Bostock* said it was *not* doing. *See Bostock*, 140 S. Ct. at 1746–47 ("We agree that homosexuality and transgender status are distinct concepts from sex.").

The Secretary observes that *Bostock* rejected the idea that employers could establish a sex-neutral rule of conduct by prohibiting "homosexual behavior" and extending that rule equally to men and women. *See Bostock*, 140 S. Ct. at 1741–42; *id*. at 1745–46. But that is because the Court held that the relevant prohibition could not be defined at that level of abstraction, and insisted that one must instead look to the employee's precise behavior (sexual attraction to a particular person) and then ask whether that exact situation would be tolerated in a member of the opposite biological sex. *See Bostock*, 140 S. Ct. at 1741 ("Consider, for example, an employer with two employees, both of whom are attracted to men. The two individuals are, to the employer's mind, materially identical in all respects, except that one is a man and the other a woman. If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague."). No such maneuver can be used to defeat the sex-neutral rules of conduct described in the plaintiffs' complaint. *See* First Amended Complaint, ECF No. 11, at ¶¶ 10–20, 47–48

It is understandable that the Secretary would chafe at the formalism of this argument. But *Bostock* is a formalistic ruling—and the entire *Bostock* regime is premised on a hyper-formalistic reading of statutory text. One cannot abandon the formalism of *Bostock* because it might lead to untoward or disagreeable results. And a court must always bear in mind that there is *no* federal statute that outlaws employment discrimination on account of sexual orientation or gender identify. Any prohibited practice under section 1557 must be derived from the statutory prohibition on "sex" discrimination—and a health-care provider cannot discriminate on the basis of sex when enforcing rules or policies that apply equally to men and women.

## V.   The Plaintiffs May Seek And Obtain Declaratory Relief Under 5 U.S.C. § 704

The Secretary observes that the Declaratory Judgment Act does not provide a cause of action, but the plaintiffs have a separate and independent cause of action under 5 U.S.C. § 704 and may seek and obtain declaratory relief as part of their APA claim. *See* 5 U.S.C. § 702 (allowing plaintiffs to seek "relief other than money damages" when challenging agency action under the APA).

## CONCLUSION

The defendants' motion to dismiss should be denied.

Respectfully submitted.

Gene P. Hamilton
Virginia Bar No. 80434
Vice-President and General Counsel
America First Legal Foundation
300 Independence Avenue SE
Washington, DC 20003
(202) 964-3721 (phone)
gene.hamilton@aflegal.org

H. Dustin Fillmore III
Texas Bar No. 06996010
Charles W. Fillmore
Texas Bar No. 00785861
The Fillmore Law Firm, LLP
201 Main Street, Suite 801
Fort Worth, Texas 76102
(817) 332-2351 (phone)
(817) 870-1859 (fax)
dusty@fillmorefirm.com
chad@fillmorefirm.com

Dated: January 4, 2022

 /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
Texas Bar No. 24075463
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiffs and the Proposed Classes*

## CERTIFICATE OF SERVICE

I certify that on January 4, 2022, I served this document through CM/ECF upon:

Christopher D. Dodge
Jordan L. Von Bokern
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20005
(202) 305-7919 (phone)
(202) 616-8460 (fax)
jordan.l.von.bokern2@usdoj.gov

*Counsel for the Defendants*

                                  /s/ Jonathan F. Mitchell
                                  Jonathan F. Mitchell
                                  *Counsel for Plaintiffs and*
                                  *the Proposed Classes*