IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

_____

SUSAN NEESE, M.D., *et al.*,

      Plaintiffs,

v.

XAVIER BECERRA, *et al.*,

      Defendants.

Civil Action No. 2:21-cv-163-Z

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE FIRST
AMENDED COMPLAINT**

CHAD E. MEACHAM
UNITED STATES ATTORNEY

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:    214-659-8626
Facsimile:    214-659-8807
brian.stoltz@usdoj.gov

BRIAN M. BOYNTON
Acting Assistant Attorney General

MICHELLE R. BENNETT
Assistant Branch Director

Christopher D. Dodge (MA Bar No. 696172)
Jordan L. Von Bokern
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20005
Tel: (202) 598-5571
Email: christopher.d.dodge@usdoj.gov

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

ARGUMENT ..............................................................................................................................2

I.      This Court Lacks Article III Jurisdiction Over Plaintiffs' Claims ...............................2

      A.      Plaintiffs have not shown any injury in fact from the Notification. ..............................2

      B.      Plaintiffs' purported injuries are traceable, if at all, to § 1557 itself, and any action against the Notification provides no redress of those injuries............................6

      C.      Plaintiffs' claims are not ripe for disposition ........................................................6

II.      Plaintiffs Have Further Failed To Show Jurisdiction Under The APA .....................8

      A.      The Notification is not final agency action........................................................8

      B.      Section 1557 provides an adequate, and exclusive, remedy for Plaintiffs. ..................11

III.      The First Amended Complaint Fails To State A Claim ...........................................14

CONCLUSION...........................................................................................................................15

# TABLE OF AUTHORITIES

**CASES**

*Am. Tort Reform Ass'n v. OSHA,*
   738 F.3d 387 (D.C. Cir. 2013) ........................................................................................11

*Ariz. Christian Sch. Tuition Org. v. Winn,*
   563 U.S. 125 (2011) ..........................................................................................................4

*Arpaio v. Obama,*
   797 F.3d 11 (D.C. Cir. 2015) ............................................................................................5

*Babbitt v. United Farm Workers Nat'l Union,*
   442 U.S. 289 (1979) ................................................................................................... 3, 13

*Bd. of Educ. of the Highland Local Sch. Dist. v. Dep't of Educ.,*
   208 F. Supp. 3d 850 (S.D. Ohio 2016) ...........................................................................12

*Bear Creek Bible Church v. Equal Emp. Opportunity Comm'n,*
   ___F. Supp. 3d___, 2021 WL 5449038 (N.D. Tex. Nov. 22, 2021)................................15

*Big Ridge, Inc. v. Fed. Mine Safety & Health Rev. Comm'n,*
   715 F.3d 631 (7th Cir. 2013) ..........................................................................................14

*Bostock v. Clayton County,*
   140 S. Ct. 1731 (2020)..........................................................................................1, 14, 15

*Bowen v. Massachusetts,*
   487 U.S. 879 (1988) ........................................................................................................12

*Bruni v. Hughes,*
   468 F. Supp. 3d 817 (S.D. Tex. 2020) .............................................................................5

*Ciba-Geigy Corp. v. EPA,*
   801 F.2d 430 (D.C. Cir. 1986) ..................................................................................... 6, 7

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ..........................................................................................................3

*Ctr. for Auto Safety v. NHTSA,*
   452 F.3d 798 (D.C. Cir. 2006) .........................................................................................8

*Glass v. Paxton,*
   900 F.3d 233 (5th Cir. 2018) ................................................................................... 4, 5, 7

*Hill v. SEC,*
   825 F.3d 1236 (11th Cir. 2016).......................................................................................14

*Hinojosa v. Horn,*
   896 F.3d 305 (5th Cir. 2018) ......................................................................................12

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010) ......................................................................................................13

*Indep. Equip. Dealers Ass'n v. EPA,*
   372 F.3d 420 (D.C. Cir. 2004) ..................................................................................8

*Luminant Generation Co. v. EPA,*
   757 F.3d 439 (5th Cir. 2014) ....................................................................................8

*Martinez v. Pompeo,*
   977 F.3d 457 (5th Cir. 2020) ..................................................................................12

*Nat'l Family Planning v. Sullivan,*
   979 F.2d 227 (5th Cir. 1992) ....................................................................................8

*Nat'l Taxpayers Union v. U.S. Soc. Sec. Admin.,*
   376 F.3d 239 (4th Cir. 2004) ..................................................................................14

*Pac. Gas & Elec. Co. v. FPC,*
   506 F.2d 33 (D.C. Cir. 1974) ..................................................................................11

*Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.,*
   847 F.2d 1168 (5th Cir. 1988) ................................................................................11

*Pros & Patients for Customized Care v. Shalala,*
   56 F.3d 592 (5th Cir. 1995) ......................................................................................8

*Pub. Emps. Ret. Sys. of Ohio v. Betts,*
   492 U.S. 158 (1989) ................................................................................................11

*Seminole Tribe of Fla. v. Florida,*
   517 U.S. 44 (1996) ..................................................................................................13

*Shalala v. Guernsey Mem'l Hosp.,*
   514 U.S. 87 (1995) ............................................................................................8, 11

*Shalala v. Ill. Council on Long Term Care, Inc.,*
   529 U.S. 1 (2000) ....................................................................................................13

*Skidmore v. Swift & Co.,*
   323 U.S. 134 (1944) ................................................................................................10

*Smith v. City of Jackson,*
   544 U.S. 228 (2005) ................................................................................................11

*Steffel v. Thompson,*
    415 U.S. 452 (1974) ...................................................................................................13

*Stenberg v. Carhart,*
    530 U.S. 914 (2000) .....................................................................................................4

*Sturm, Ruger & Co. v. Chao,*
    300 F.3d 867 (D.C. Cir. 2002) .............................................................................. 13, 14

*Susan B. Anthony List v. Driehaus,*
    573 U.S. 149 (2014) ................................................................................................... 3, 4

*Telescope Media Grp. v. Lucero,*
    936 F.3d 740 (8th Cir. 2019) .......................................................................................5

*Texas v. Biden,*
    ___F. Supp. 3d___, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021) .............................. 9, 10

*Texas v. Biden,*
    10 F.4th 538 (5th Cir. 2021) ........................................................................................9

*Texas v. Biden,*
    20 F.4th 928 (5th Cir.), *pet. for cert. filed*, No. 21-954 (U.S. Dec. 29, 2021) ................... 9, 10

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) .......................................................................................9

*Texas v. Rettig,*
    987 F.3d 518 (5th Cir.), *pet. for cert. filed*, No. 21-379 (U.S. Sep't 8, 2021)...........................10

*Texas v. United States,*
    300 F. Supp. 3d 810 (N.D. Tex. 2018) .......................................................................10

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) ..................................................................................................13

*Town of Sanford v. United States,*
    140 F.3d 20 (1st Cir. 1998) .......................................................................................12

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
    578 U.S. 590 (2016) ..................................................................................................11

*Walmart Inc. v. DOJ,*
    ___F.4th __, 2021 WL 6063557 (5th Cir. Dec. 22, 2021)................................................*passim*

*Whole Woman's Health v. Jackson,*
    142 S. Ct. 522 (2021).............................................................................................. 4, 9

**STATUTES**

5 U.S.C. § 704 .................................................................................................................................11

20 U.S.C. § 1682 .............................................................................................................................12

20 U.S.C. § 1683 .............................................................................................................................12

**INTRODUCTION**

Plaintiffs challenge a Department of Health and Human Services ("HHS") Notification announcing that, consistent with the Supreme Court's decision in *Bostock v. Clayton County*, the agency will review and, if accepted, investigate claims of sexual orientation and gender identity discrimination in federally funded health programs and activities under § 1557 of the Affordable Care Act.  Plaintiffs' claim is that HHS reads *Bostock* too broadly, and that, under the decision, it is not sex discrimination to discriminate against bisexual people or to adopt policies that discriminate against gay and transgender people, provided that such policies apply equally to men and women.

That reading of *Bostock* is wrong, as even a cursory review of the decision shows.  Indeed, the Court specifically rejected the very argument Plaintiffs put forward here—that it is not sex discrimination to equally discriminate against men and women for their sexual orientation or for having a gender identity different from their sex assigned at birth.  *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1741 (2020) (explaining it is not a "defense for an employer to say it discriminates against both men and women because of sex"); *id.* at 1742 (explaining it is "no better a defense" to be "equally happy to fire male *and* female employees" due to sexual orientation or transgender identity).  Plaintiffs' disagreement with *Bostock* does not plausibly state a legal claim.

But the Court should not even reach Plaintiffs' abstract challenge to *Bostock*'s reasoning because they present it only as an academic dispute with the nonbinding Notification issued by HHS. Yet not one of the Plaintiffs professes to have any policies that are in fact proscribed by the Notification.  Plaintiffs contend, instead, that the Notification shows the agency *may* someday apply § 1557 in a manner they dislike, including potentially against them.  But the Supreme Court and the Fifth Circuit have made clear that Article III demands greater certainty of immediate harm—pre-enforcement review does not exist to challenge possible future applications of a statute that might be asserted against a plaintiff.  Such speculative harm cannot even be traced to the Notification because, as Plaintiffs do not dispute, even without the Notification the agency remains free to apply its interpretation of § 1557 in a future enforcement proceeding.  Invalidating the Notification, which carries no force of law, would therefore do nothing to remedy Plaintiffs' speculative harms.

Finally, jurisdiction is further wanting because Plaintiffs cannot meet the jurisdictional requirements of the Administrative Procedure Act ("APA").  Plaintiffs admit the Notification is not a substantive rule, but insist such interpretive documents may sometimes constitute final agency action. Even accepting that premise, no legal consequences flow from the Notification because it does not bind the agency to enforce § 1557 in particular scenarios, nor does it limit existing agency discretion in choosing which cases to pursue.  Plaintiffs rely chiefly on a case finding that a purported interpretive rule *was* in fact a substantive rule—precisely what they admit is not the case here.  Similarly, Plaintiffs barely attempt to rebut the point that § 1557 and Title IX themselves provide an adequate mechanism for judicial review of the agency's interpretation, should proceedings be brought under those statutes. That availability of judicial review deprives the court of jurisdiction over Plaintiffs' APA claim. Plaintiffs argue that they should not have to risk losing federal funds to assert the arguments they raise here, but the Supreme Court has been clear that parties may not circumvent Congressionally-crafted review mechanisms that guarantee judicial review before any penalty or sanction is enforced.  Plaintiffs have therefore failed to plausibly allege jurisdiction under both Article III and the APA.

## ARGUMENT

### I.      This Court Lacks Article III Jurisdiction Over Plaintiffs' Claims

#### A.      Plaintiffs have not shown any injury in fact from the Notification.

This Court should not accept Plaintiffs' efforts to create a new, lowered standard of impending injury for pre-enforcement challenges.  They spend considerable time arguing that a plaintiff has standing to challenge a statute or regulatory action if it is "vague or susceptible to competing interpretations" and does not by its own terms conclusively *foreclose* application to the plaintiff.  In their view, the mere existence of a vague or susceptible provision is by itself a credible threat of enforcement that gives a plaintiff standing to seek a judicial declaration ruling out the interpretation or application that it fears.  For that reason, they claim that Article III standing for a pre-enforcement challenge is "an exceedingly easy test to satisfy."  Pls.' Opp'n at 8, ECF No. 17 ("Opp'n").

Even if the Notification put forward an interpretation that were "vague or susceptible to competing interpretations," there is no basis in precedent for Plaintiffs' proposal that Article III be

reinterpreted to automatically permit a pre-enforcement challenge for such a statement. To bring a claim for injunctive relief, Plaintiffs must satisfy the ordinary standards for showing that their interest in the prospective injunctive relief is sufficiently definite to present an actual case or controversy.  The Supreme Court has acknowledged that its precedents on prospective challenges sometimes use varying terminology to describe the requisite showing of likelihood of future harm, such as "substantial risk" and "clearly impending," which can create the appearance that the standards are distinct and apply in different circumstances.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) ("An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." (quoting *Clapper*, 568 U.S. at 414 n.5)).  But regardless of the terminology used, the question of standing in a pre-enforcement challenge at its baseline is "whether the threat of enforcement is sufficiently credible . . . or clear" that "enforcement [is] indeed impending."  *Walmart Inc. v. DOJ*, __ F.4th __, 2021 WL 6063557, at *8 (5th Cir. Dec. 22, 2021) (citations omitted); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

As discussed in Defendants' motion to dismiss, Plaintiffs' theory of future enforcement against them is not sufficiently credible or clear as to be "certainly impending" or to show a "substantial risk" or any articulation of that standard, because it relies on two layers of speculation.  First, Plaintiffs can only speculate that HHS will interpret the prohibition on gender identity discrimination to *per se* prohibit in all circumstances Plaintiffs' claimed refusal to provide hormone therapy or gender-transition surgery referrals to minor transgender patients.  And second, Plaintiffs speculate they will even encounter such a situation in their medical practices.  Plaintiffs' response brief does not point to anything in the Notification or in their complaint that takes either assertion beyond barest speculation.

First, Plaintiffs do not claim that the HHS Notification unambiguously prohibits Plaintiffs' alleged policies, or that any evidence exists that HHS would interpret the prohibition on gender identity discrimination to apply to such policies.  Instead, they argue that they need do nothing more than show an agency statement of policy (or a regulation or a statute) might plausibly be interpreted to prohibit something Plaintiffs want to do.  But as discussed above, Article III does not permit a

**Reply In Support of Defendants' Motion to Dismiss The First Amended Complaint – Page 3**

plaintiff to seek prospective relief on the basis of speculation about the risk of future enforcement against them. *See also Glass v. Paxton*, 900 F.3d 233, 241 (5th Cir. 2018) (a plaintiff must show that the harm she fears is "certainly impending," not merely "objectively understandable and reasonable").

Plaintiffs cite a litany of inapposite cases for the idea that a pre-enforcement challenge can proceed on the basis of speculation about remote possibilities of future applications of supposedly vague provisions. They frequently invoke cases in which the Supreme Court did not even address jurisdiction, even though the Supreme Court has explicitly stated that an opinion that fails to address a certain jurisdictional issue cannot *sub silentio* establish precedent with respect to the unaddressed jurisdictional question. *See, e.g.*, *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011). For that reason, *Stenberg v. Carhart* is irrelevant to the question of standing; the Court did not discuss jurisdiction at all, and Plaintiffs cite only a discussion regarding the authority of the Nebraska Attorney General to issue binding interpretations of state law, an analysis irrelevant to the question of Article III jurisdiction in this case. *See* 530 U.S. 914, 940-41 (2000). Similarly, the Supreme Court's recent decision in *Whole Woman's Health v. Jackson* discussed Article III standing only in holding that the plaintiffs *lacked* standing to sue a private individual for whom there was no record evidence showing he intended to file an enforcement action. *See* 142 S. Ct. 522, 537 (2021).

Other decisions Plaintiffs cite show just what is necessary to challenge a provision prior to its enforcement against a plaintiff. In *Susan B. Anthony List v. Driehaus*, for example, Plaintiffs were not relying on speculation that Ohio's prohibition on false political statements could be applied to them in the abstract; Ohio had just pursued enforcement of the statute against the plaintiff for speech that the plaintiff intended to continue in the future, making the threat of future enforcement plainly credible. *See* 573 U.S. at 164. The Court in *Driehaus* also discussed numerous other precedents on pre-enforcement challenges, many cited by Plaintiffs in their opposition, and made clear that a showing of a credible threat of future enforcement was necessary. *Id.* at 158-61. In contrast, Plaintiffs are asking this Court to rule that, until an agency issues a regulation addressing a specific hypothetical scenario, any plaintiff can sue for a declaration that the conduct in that hypothetical is lawful. That would turn Article III from a burden to a nullity in pre-enforcement challenges.

**Reply In Support of Defendants' Motion to Dismiss The First Amended Complaint – Page 4**

Plaintiffs' second round of speculation relates to whether they will even find themselves in the situation they fear will be prohibited—a transgender minor comes to them as a patient and seeks hormone therapy or a referral for gender-transition surgery, the only situation any Plaintiff specifically identifies as one where they would refuse to accommodate a patient. Plaintiffs allege only that it is "likely" they will have a minor transgender patient in the future who wants that treatment. But bare predictions of future events, and especially predictions of the future actions of third parties, are not factual allegations and thus cannot be accepted as true. *See, e.g.*, *Glass*, 900 F.3d at 240-41; *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015); *Bruni v. Hughes*, 468 F. Supp. 3d 817, 824 n.5 (S.D. Tex. 2020).

And Plaintiffs' examples are once again unavailing. They cite three abortion-related Supreme Court decisions that do not discuss Article III standing or even jurisdiction. Opp'n at 10. Plaintiffs present theories about how those cases would not have been properly litigated under jurisdictional rules discussed here, but it is inappropriate to read silent jurisdictional holdings into an opinion that comes at the end of lengthy litigation and does not discuss jurisdiction. And the Eighth Circuit decision cited by Plaintiffs shows that their challenge here should fail. The plaintiffs there ran a video-production business and intended to begin producing wedding videos promoting their view of marriage, which would not permit them to produce wedding videos for same-sex weddings. *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 748 (8th Cir. 2019). The plaintiffs alleged facts showing that they faced a credible threat of enforcement from Minnesota's nondiscrimination law: Minnesota had announced an intent to apply the law to require wedding vendors to provide equal service to same-sex weddings; Minnesota had in fact begun enforcement against a wedding venue that did not rent to same-sex weddings; and Minnesota employed "testers" to target noncompliant vendors. *Id.* at 750. Those facts made clear that the plaintiffs "will face legal consequences if they decide to start making wedding videos." *Id.* Compare that to this case, where Plaintiffs' only allegations regarding future enforcement are (1) a guess that they might one day encounter transgender minor patients seeking certain treatment, and (2) a guess that HHS might interpret § 1557 to require Plaintiffs to provide that treatment because HHS has said generally that § 1557 prohibits gender identity discrimination. Indeed, contrary to Plaintiffs' guesswork, HHS has *never* filed an enforcement action against either a

religious or non-religious health care provider that declined to provide gender-transition services.

**B.     Plaintiffs' purported injuries are traceable, if at all, to § 1557 itself, and any action against the Notification provides no redress of those injuries.**

Plaintiffs' opposition makes clear that they can identify no harm traceable to the Notification, nor any way that setting aside and enjoining the Notification will benefit them. The Notification does not expand HHS's authority with respect to § 1557, and HHS is not precluded from interpreting § 1557 in accordance with *Bostock* even in the absence of a public notification stating that policy. Thus, this challenge to the Notification can identify no harm that comes from the Notification itself and no way that setting aside and enjoining the Notification will achieve any relief for Plaintiffs.

Similarly, Plaintiffs claim that setting aside the Notification would provide redress because the Notification "threatens" them with enforcement. But the Notification merely sets forth HHS's view of the best way to interpret § 1557's language and does not threaten any individuals with enforcement. As the Notification makes clear, its interpretation "will guide [the Office for Civil Rights] in processing complaints and conducting investigations," but it "does not itself determine the outcome in any particular case or set of facts." Notification at 3, ECF No. 11-1. And again, HHS would be free to interpret § 1557 to prohibit gender identity discrimination even in the absence of the Notification. Plaintiffs provide no authority for the claim that an agency harms a plaintiff by prospectively stating an interpretation of a statute rather than advancing it for the first time during enforcement actions.

**C.     Plaintiffs' claims are not ripe for disposition**

The Fifth Circuit's recent decision in *Walmart* rejected Plaintiffs' argument here that an issue of statutory interpretation is *per se* fit for judicial review because it presents a question of law. Instead, ripeness also depends on whether consideration of the legal questions at issue "would benefit from a more concrete setting." *Walmart*, 2021 WL 6063557, at *6 (quoting *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435 (D.C. Cir. 1986)). As in *Walmart*, Plaintiffs' request here for broad pronouncements regarding the meaning of statutory provisions would be better addressed in the context of a concrete dispute that squarely presents a well-developed question about the reach of the provision at issue. *Id.* As Defendants discussed in their motion to dismiss, whether § 1557 prohibits any given practice is a

question dependent on subsidiary legal questions and also on factual questions particular to that dispute, making it both inappropriate and not useful to generate broad statements about legal duties and obligations divorced from resolution of specific disputes between parties with a stake in the resolution of those questions. *See also Glass*, 900 F.3d at 242 ("By adjudicating claims for which the alleged harm is not certainly impending, federal courts risk disregarding their constitutional mandate to limit their jurisdiction to actual cases and controversies and thereby avoid the issuance of advisory opinions."). The Fifth Circuit emphasized in *Walmart* that a ripe case needs "an unequivocally expressed position by the government," *id.* at *7, and the lack of such an unequivocal position in this case highlights why this litigation is premature. Contrary to Plaintiffs' assertions, the Notification does not express any position, let alone an unequivocal one, on whether § 1557 prohibits a doctor from refusing to prescribe or provide a referral for gender-transition treatment for minors. The question of whether and when a nondiscrimination law has been violated is best resolved in a concrete dispute about a particular policy or practice, rather than through prospective demand for a set of declarations concerning hypothetical scenarios.

Withholding court consideration also imposes no substantial hardship on Plaintiffs. They contend without factual support that they need judicial action because they are being forced to choose between federal funds and their ethical beliefs. But the as discussed above, the Notification itself does not force Plaintiffs to do or choose anything. And even if the Notification did express a *per se* prohibition on Plaintiffs' policies of refusing certain treatment to minor transgender patients (and it plainly does not), Plaintiffs have not shown any likelihood they will be put to that choice anytime soon, or ever; as discussed above, Plaintiffs have not alleged facts to show that they are likely to have a minor transgender patient who seeks such treatment. Plaintiffs cannot show substantial hardship just because they worry about a chain of speculative hypotheticals that lack any factual basis.

## II.   Plaintiffs Have Further Failed To Show Jurisdiction Under The APA

### A.   The Notification is not final agency action.

Plaintiffs concede that the Notification "do[es not] qualify as [a] substantive rule[] under the APA." Opp'n at 16. That concession dooms their APA claim because, as the Fifth Circuit recently

explained, only "[s]ubstantive rules have the force of law," while "[n]on-substantive rules . . . lack the force of law." *Walmart*, 2021 WL 6063557, at * 3.  Courts lack authority under the APA to review "mere legal theories" put forward by an agency in an interpretive document, as those theories ultimately will "succeed or fail in court based on their own merits" should they ever actually be asserted against a party.  *Id.* at *4.

Plaintiffs insist that the Notification is nonetheless final agency action because it "binds everyone in the Department to follow the Secretary's interpretation" of § 1557 and further "requires them to initiate enforcement proceedings" against healthcare providers who violate that interpretation.  Opp'n at 18.  But the Notification does no such thing; it repeatedly explains that it merely "will guide OCR in processing complaints and conducting investigations, but does not itself determine the outcome in any particular case or set of facts."  Notification at 1, 3.  Instead, the Notification simply "inform[s] the public" how HHS will interpret § 1557 "consistent with the Supreme Court's decision in *Bostock*."  *Id.*  Agency materials, like the Notification, that are "used to advise the public how an agency will apply its regulations in certain circumstances" qualify as interpretive rules because they do nothing more than "remind[] parties of existing statutory duties."  *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 601-02 (5th Cir. 1995) (citing *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 93-94 (1995)); *Nat'l Family Planning v. Sullivan,* 979 F.2d 227, 236-37 (5th Cir. 1992)).  As such, they are not final agency action immediately reviewable under the APA.  The "case law is clear that [courts] lack authority to review claims under the APA 'where an agency merely expresses its view of what the law requires of a party, even if that view is adverse to the party.'"  *Ctr. for Auto Safety v. NHTSA*, 452 F.3d 798, 808 (D.C. Cir. 2006) (quoting *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.)); *see also Luminant Generation Co. v. EPA*, 757 F.3d 439, 442 n.7 (5th Cir. 2014) (same); *Walmart*, 2021 WL 6063557, at *3-4.

Plaintiffs' own cases prove the point.  In *Texas v. EEOC*, the case upon which Plaintiffs chiefly rely for this issue, the Fifth Circuit set aside an EEOC guidance document laying out how the agency would review claims that an employer discriminatorily relied upon a job applicant's criminal history.  *See* 933 F.3d 433, 437 (5th Cir. 2019).  EEOC argued the guidance was merely interpretive, but the

Fifth Circuit disagreed and concluded it "[wa]s a substantive rule." *Id.* at 451 (further explaining this conclusion "follow[ed] naturally from [the] holding that the Guidance is a final agency action"). Plaintiffs here *agree* that "the Secretary's Notification" does "not [] qualify as [a] substantive rule[]," Opp'n at 16, unlike the agency action at issue in *Texas v. EEOC*.  Moreover, as the Fifth Circuit observed (and as EEOC conceded), the Guidance "purport[ed] to bind EEOC staff when conducting investigations." *EEOC*, 933 F.3d at 445.  It did so, for example, by specifically directing "decisions about which employers to refer for enforcement actions,"  "limit[ing] discretion respecting the use of certain evidence," "mandating that evidence of a racially-balanced workforce cannot overcome a showing of disparate impact," and "leav[ing] no room for EEOC staff *not* to issue referrals to the Attorney General when an employer uses a categorical felon-hiring ban." *Id.* at 443; *see also id.* (further explaining it "prescribe[d] a multi-factor framework for employers to use" in crafting hiring policies and also detailed substantive "safe harbors" that "tell[] employers how to avoid Title VII disparate-impact liability").  That is a far cry from the Notification, which does nothing to restrict HHS enforcement discretion, prescribes no standards concerning either substantive conduct or evidentiary issues, and cautions that any future enforcement will account for application of the Religious Freedom Restoration Act, applicable court orders, and all other legal requirements.

*Texas v. Biden* is unhelpful to Plaintiffs for similar reasons.  The Fifth Circuit there observed that the Memorandum at issue, which the Government argued was a general policy statement, specifically "directed 'DHS personnel, effective immediately, to take all appropriate actions to terminate [Migrant Protection Protocols], including taking all steps necessary to rescind implementing guidance and other directives issued to carry out MPP.'"  10 F.4th 538, 550 (5th Cir. 2021) (quoting *Texas v. Biden*, ___F. Supp. 3d___, 2021 WL 3603341, at *14 (N.D. Tex. Aug. 13, 2021)); *see also Texas v. Biden*, 20 F.4th 928, 950-51 (5th Cir.), *pet. for cert. filed*, No. 21-954 (U.S. Dec. 29, 2021) (termination of prior agency policy constituted final agency action).  The Memorandum thus withdrew prior agency discretion and compelled officials to take specific acts.  As this Court noted, the Memorandum "had the immediate legal consequence" of rescinding prior agency directives. *Biden*, 2021 WL 3603341, at *14.  But nothing in the Notification, which was issued in response to the Supreme Court's intervening

decision in *Bostock*, purports to rescind any prior rule or interpretation of § 1557.  And rather than bind officials to take specific acts in particular cases, the Notification disclaims any power to "determine the outcome in any particular case or set of facts."  Notification at 3.

Plaintiffs' reliance on *Texas v. United States*, 300 F. Supp. 3d 810 (N.D. Tex. 2018), is even further misplaced, as the Fifth Circuit later overruled the district court's conclusion that final agency action existed.  *See Texas v. Rettig*, 987 F.3d 518, 530 (5th Cir.), *pet. for cert. filed*, No. 21-379 (U.S. Sept. 8, 2021).  The Fifth Circuit disagreed with the conclusion that a guidance document constituted final agency action because "the guidance document did not create any new obligations or consequences" and merely reiterated requirements of an existing rule.  *Id.*  The court therefore "reverse[d] the district court's judgment on the [Plaintiffs'] APA claims."  *Id.*  The same reasoning applies here—the Notification merely clarifies the agency's understanding of § 1557 in view of intervening Supreme Court authority, but imposes no new obligations or consequences under the statute.  Plaintiffs themselves nowhere dispute that, in the Notification's absence, the agency could still process and investigate complaints of discrimination based on sexual orientation or gender identity.

Plaintiffs' final argument is that the Notification carries the force of the law because it may at some conjectural point in the future receive *Skidmore* deference from a court or tribunal.  *See* Opp'n at 18; *see Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944) (explaining agency opinions are entitled to respect to the extent they have persuasive force).  But under Plaintiffs' theory *every* agency interpretive rule or announcement would qualify as final agency action because a court *might* at some future date agree with its analysis.  *See* Opp'n at 18.  Plaintiffs cite no authority for the argument that the mere persuasive force of an interpretive rule renders it final agency action, nor could they—accepting such a novel theory of final agency action would swallow whole the well-established principle that "interpretive rules or statements of policy generally do not qualify [as final agency action] because they are not finally determinative of the issues or rights to which they are addressed."  *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) (cleaned up).  The argument also ignores that such agency pronouncements "do not . . . have the force and effect of law and are not accorded that weight in the adjudicatory process."  *Shalala*, 514 U.S. at 88.  While a persuasive agency interpretation may be

entitled to respect, if the Notification is contrary to law as Plaintiffs say, then "it is elementary that 'no deference is due to agency interpretations at odds with the plain language of the statute[.]'" *Smith v. City of Jackson*, 544 U.S. 228, 267 (2005) (O'Connor, J., concurring) (quoting *Pub. Emps. Ret. Sys. of Ohio v. Betts*, 492 U.S. 158, 171 (1989)). As the Fifth Circuit just explained, an agency's legal theories ultimately "succeed or fail in court based on their own merits." *Walmart*, 2021 WL 6063557, at *4.

Plaintiffs' *Skidmore* deference theory lays bare why no final agency action exists here—at bottom, their challenge is to a nonbinding legal analysis concluding HHS may, in its discretion, pursue enforcement actions already permitted under § 1557. Even if the Notification did not exist, thus fulfilling Plaintiffs' desire to "remove any possible deference from the judiciary that the Secretary's interpretation of section 1557 could receive," Opp'n at 13, Plaintiffs would be no better off. HHS could, of course, simply adopt the same interpretation in a future enforcement proceeding, without the benefit of notice to the public, where the interpretation would be tested under a concrete set of facts. *See Panhandle Producers & Royalty Owners Ass'n v. Econ. Regul. Admin.*, 847 F.2d 1168, 1175 (5th Cir. 1988) ("When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued." (quoting *Pac. Gas & Elec. Co. v. FPC*, 506 F.2d 33, 38-39 (D.C. Cir. 1974)). Because no legal consequences flow from the Notification alone, it does not qualify as final agency action under 5 U.S.C. § 704. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 596-97 (2016).

**B.     Section 1557 provides an adequate, and exclusive, remedy for Plaintiffs.**

Plaintiffs only briefly engage with § 704's additional requirement for review, namely the lack of any other adequate remedy in a court. *See* Opp'n at 20-21. They assert without explanation that Defendants failed to cite authority supporting the view that post-enforcement challenges to agency action constitute an adequate remedy under § 704. *Id.* at 20. But such precedent is legion, as Defendants' memorandum noted. *See* Defs.' Mem. at 20-21, ECF No. 16 (collecting cases). Indeed, at least one district court has already found that the review procedures in Title IX constitute a sufficiently adequate remedy to deprive courts of jurisdiction over APA claims. *See Bd. of Educ. of the Highland Local Sch. Dist. v. Dep't of Educ.*, 208 F. Supp. 3d 850, 860–64 (S.D. Ohio 2016).

Plaintiffs also allege that the various enforcement regimes incorporated into § 1557 fail to supply an adequate remedy under the APA because "plaintiffs must risk the loss of federal funding if they choose to contest" the Notification in such proceedings.  Opp'n at 20.  But that ignores that these enforcement mechanisms, including those under Title IX, do not permit the agency to withdraw federal funding until after an administrative hearing and "judicial review as may otherwise be provided by law" or "in accordance with chapter 7 of Title 5," *i.e.*, the APA.  20 U.S.C. § 1683; *see also id.* § 1682. In other words, in no scenario do Plaintiffs risk loss of federal funds without first obtaining the opportunity to raise the very arguments they make here before an Article III court.  This "direct and guaranteed path to judicial review" precludes Plaintiffs' premature challenge here.  *Hinojosa v. Horn*, 896 F.3d 305, 312 (5th Cir. 2018) (affirming district court's finding that it lacked jurisdiction where APA claim would have provided an "end[] run" around "congressional intent to provide a specific procedure to review the Plaintiffs' claims").   The mere fact that Plaintiffs would prefer pre-enforcement review over the statutory alternatives crafted by Congress is not enough—courts have reached the "uniform conclusion" that a "legal remedy is not inadequate for purposes of the APA because it is procedurally inconvenient for a given plaintiff."  *Martinez v. Pompeo*, 977 F.3d 457, 460 (5th Cir. 2020) (quoting *Town of Sanford v. United States*, 140 F.3d 20, 23 (1st Cir. 1998)).

Plaintiffs' cases are again unhelpful.  *Ex parte Young* permits individuals to seek injunctive relief against state officials violating federal law.  *See Whole Woman's Health*, 142 S. Ct. at 525.  But Plaintiffs here do not seek to enjoin *state* officials and, more importantly, the decision in *Ex parte Young* does not speak to Congress's well-recognized ability to displace pre-enforcement review by crafting an "alternative remedy" that "provide[s] the petitioner 'specific procedures' by which the agency action can receive judicial review or some equivalent."  *Hinojosa*, 896 F.3d at 310 (citing *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988)).  Plaintiffs themselves cite authority recognizing Congress's ability to do so. *See Seminole Tribe of Fla. v. Florida.*, 517 U.S. 44, 74 (1996) ("Where Congress has created a remedial scheme for the enforcement of a particular federal right, we have, in suits against federal officers, refused to supplement that scheme with one created by the judiciary.").  Plaintiffs cite no authority

permitting pre-enforcement review of agency action under the APA in the face of a comprehensive administrative review scheme culminating in *de novo* judicial review, as is available here.[1]

Plaintiffs also suggest that *Thunder Basin* does not apply because "the plaintiffs in that case [did not] risk serious penalties or adverse consequences by foregoing pre-enforcement judicial review." Opp'n at 21. That is simply wrong. Enforcement under the Mine Act permitted the Labor Secretary to seek "mandatory civil penalties, discretionary daily civil penalties, and other sanctions." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 204 (1994). Despite these penalties, the Supreme Court still held the Act "preclude[d] district court jurisdiction over the pre-enforcement challenge" because aggrieved mine operators retained the right of judicial review and were not subject "to a serious prehearing deprivation." *Id.* at 207, 216. The Court specifically rejected the argument made by Plaintiffs—that foreclosing pre-enforcement review "would [] force[] [the mine operator] to choose between violating the Act and incurring possible escalating daily penalties." *Id.* at 205; *see also Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 49 n.12 (2000) (Thomas, J., dissenting) (recognizing that in *Thunder Basin* "the aggrieved mine operator was . . . subject to civil penalties ($5,000) for each day of non-compliance with statutory provisions, which would become final and payable after review by the agency and the appropriate court of appeals"). Other courts have therefore rejected Plaintiffs' precise argument on the basis of *Thunder Basin. See Sturm, Ruger & Co. v. Chao*, 300 F.3d 867, 874-75 (D.C. Cir. 2002) (rejecting argument that administrative review was not "meaningful" due to risk of "sanctions" because the Supreme Court "rejected a similar argument in *Thunder Basin*"). *Thunder Basin* is in fact routinely applied where putative challengers face the prospect of civil penalties or sanctions that may be enforced after judicial review. *See, e.g., Hill v. SEC*, 825 F.3d 1236, 1241 (11th Cir. 2016); *Big Ridge, Inc. v. Fed. Mine Safety & Health Rev. Comm'n*, 715 F.3d 631, 653 (7th Cir. 2013); *Nat'l Taxpayers Union*

---

[1]  *Steffel v. Thompson* similarly concerned a request for injunctive relief against state officials who repeatedly threatened the petitioner with arrest for distributing handbills, in violation of his constitutional rights. *See generally* 415 U.S. 452, 455-56 (1974). Plaintiffs here have suffered no such enforcement threats, never mind with respect to a constitutional right or in the context of criminal sanction, nor do they seek relief against state officials. *Cf. Holder v. Humanitarian Law Project*, 561 U.S. 1, 15 (2010) (holding that plaintiffs who faced a "credible threat of prosecution . . . should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." (quoting *Babbitt*, 442 U.S. at 298)).

*v. U.S. Soc. Sec. Admin.*, 376 F.3d 239, 242 (4th Cir. 2004); *Sturm, Ruger & Co.*, 300 F.3d at 874-75. Plaintiffs' case is no different—they face no prospect of losing federal funds prior to the opportunity to present their statutory arguments to an Article III court in the context of a true dispute.

## III.   The First Amended Complaint Fails To State A Claim

Plaintiffs concede on the merits that *Bostock* controls the interpretation of § 1557 and Title IX but contend that the Notification overextends *Bostock* to prohibit otherwise permissible "(1) discrimination against bisexuals; [and] (2) discriminatory acts against homosexual or transgender individuals that would be taken against an identically situated member of the opposite biological sex." Opp'n at 22. That concession is telling because there is no way of knowing at this time whether any future enforcement action against Plaintiffs—already a speculative proposition—will fall within the scope of what Plaintiffs admit to be *Bostock's* broad governing rule. *See supra* § I.C (discussing ripeness).

But Plaintiffs' reading of *Bostock* is wrong regardless. Their merits argument focuses primarily on the claim that *Bostock* permits employers or healthcare providers to discriminate against bisexual people provided such employers are equally amenable to discriminating against both male and female bisexual people. *See* Opp'n at 21-22. That claim is doubly confounding. First, *nothing* in the amended complaint or supporting declarations suggests Plaintiffs have *any* policies with respect to treating bisexual patients. Resolving this issue on the merits therefore only provides an advisory opinion to hypothetical healthcare providers other than the Plaintiffs. And second, the Supreme Court already explained that an employer "musters no better a defense by responding that it is equally happy to fire male *and* female employees" due to their sexual orientation or gender identity. *Bostock*, 140 S. Ct. at 1742. That is because statutes like Title VII and Title IX "work[] to protect individuals of both sexes from discrimination, and do[] so equally." *Id.* at 1741. Thus, an employer or healthcare provider who discriminates against both male and female bisexual people "may treat men and women as groups more or less equally[,] [b]ut in *both* cases the employer fires an individual in part of because of sex." *Id.* (further explaining that rather than "avoiding Title VII exposure, this employer doubles it").[2]

---

[2] Plaintiffs seek an end run around *Bostock's* holding by speculating that some healthcare provider— but evidently not the Plaintiffs—may discriminate against both bisexual men and women based on

Plaintiffs offer only one remaining merits argument, namely that *Bostock* leaves open the door to "refus[ing] to provide an identical medical treatment to men and women" by, for example, subjecting men and women "to the exact same rules" regarding an "identical hormone therapy." Opp'n at 22. But it is frankly not clear what point Plaintiffs seek to make with this claim. Nothing in the Notification purports to require healthcare providers who do not provide a certain treatment to men *or* women to do so on command when asked by a person of a particular gender. Indeed, the Notification does not speak to providing hormone therapy *at all*. Plaintiffs' vague hypothetical, unadorned with any meaningful details or connection to the Plaintiffs' own practices, does not present any ripe controversy regarding the Notification.

The cursory merits argument presented by Plaintiffs, at bottom, can be distilled to their assertion that a "health-care provider cannot discriminate on the basis of sex when enforcing rules or policies that apply equally to men and women." Opp'n at 23. But that claim does not pass even fleeting scrutiny under *Bostock*, which makes clear that laws prohibiting discrimination on the basis of sex bar, for example, policies discriminating equally against both men and women for same-sex attraction. *See, e,g.*, 141 S. Ct. at 1741-42. Indeed, Plaintiffs' theory runs into the teeth of the Supreme Court's decision, which made clear that being "equally happy to fire male *and* female employees" because of their sexual orientation or transgender identity is not a valid defense to sex discrimination. *Id.* at 1742. While Plaintiffs may earnestly disagree with the Supreme Court's decision, such bare disagreement alone does not state a plausible legal claim.

## CONCLUSION

For the foregoing reasons, the First Amended Complaint should be dismissed in its entirety under Rule 12(b)(1) or, alternatively, Rule 12(b)(6).

---

the "same trait" of being attracted to "members of both sexes." Opp'n at 22. But, in any decision to discriminate against bisexual people, "[s]ex plays a necessary and undisguisable role in the decision, exactly what Title VII forbids." *Bostock*, 140 S. Ct. at 1737; *see also Bear Creek Bible Church v. EEOC*, ___F. Supp. 3d___, 2021 WL 5449038, at *33 (N.D. Tex. Nov. 22, 2021) (concluding discrimination against bisexuals "inherently targets sex and therefore violates Title VII").

Dated  January 18, 2022                        Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

MICHELLE BENNETT
Assistant Branch Director

*/s/ Christopher D. Dodge*
Christopher D. Dodge (MA Bar No. 696172)
Jordan L. Von Bokern
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20005
Tel: (202) 598-5571
Email: christopher.d.dodge@usdoj.gov

CHAD E. MEACHAM
Acting United States Attorney

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:     214-659-8626
Facsimile:      214-659-8807
brian.stoltz@usdoj.gov

*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

On January 18, 2022, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ *Christopher D. Dodge*
Christopher D. Dodge
Trial Attorney
United States Department of Justice