IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION



SUSAN NEESE *et al.*,                              §
                                                   §
        Plaintiffs,                                §
                                                   §
v.                                                 §          2:21-CV-163-Z
                                                   §
XAVIER BECERRA, in his official                    §
capacity as the Secretary of the United            §
States Department of Health and Human              §
Services, *et al.*,                                §
                                                   §
        Defendants.                                §

## OPINION AND ORDER

Justice Alito predicted this day would come: "Although the Court does not want to think

about the consequences of [*Bostock v. Clayton County*], we will not be able to avoid those issues

for long. The entire Federal Judiciary will be mired for years in disputes about the reach of the

Court's reasoning." 140 S. Ct. 1731, 1783 (2020) (Alito, J., dissenting). With similar prescience,

Justice Kavanaugh identified the *category* of controversy at issue here: "*Healthcare* benefits may

emerge as an intense battleground under the Court's holding." *Id.* at 1781 (Kavanaugh, J.,

dissenting) (collecting cases) (emphasis added). With poetic force, Justice Alito likened *Bostock*

to a "pirate ship" sailing under a "textualist flag," but representing "a theory of statutory

interpretation that Justice Scalia excoriated — the theory that courts should 'update' old statutes

so that they better reflect the current values of society." *Id.* at 1755–56 (Alito, J., dissenting).

Today, the metaphorical "pirate ship" arrives at an inland port: the Amarillo Division of the

Northern District of Texas.

Before the Court is Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint ("Motion") (ECF No. 16), filed on December 14, 2021.[1] In support of two claims, Plaintiffs argue that Section 1557 of the Affordable Care Act and *Bostock* "do not prohibit discrimination on account of sexual orientation and gender identity" if the healthcare providers "would have acted in the same manner had the patient had been a member of the opposite biological sex." ECF No. 11 at 10. Having considered the pleadings, *Bostock*, and relevant cases, the Court **DENIES** Defendants' Motion.

### BACKGROUND

Section 1557 of the Affordable Care Act prohibits discrimination on the basis of "sex." *See* 42 U.S.C. § 18116(a) (incorporating into Section 1557, *inter alia*, Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1681(a)). In *Bostock*, the Supreme Court held that Title VII's "because of . . . sex" terminology should be read to prohibit "sexual orientation" and "gender identity" (combined, "SOGI") discrimination.[2] *See generally* 140 S. Ct. 1731. Citing *Bostock*, the Department of Health and Human Services ("HHS") announced it would "interpret and enforce" Section 1557's prohibition on discrimination "on the basis of sex" to include SOGI. *See generally* Department of Health and Human Services, *Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972*, 86 Fed. Reg. 27,984 (May 25, 2021) ("Notification").

---

[1] Plaintiffs include Dr. Susan Neese, Dr. James Hurly, and Dr. Jeffrey Barke. Defendants include Xavier Becerra, in his official capacity as Secretary of Health and Human Services, and the United States.

[2] In the First Amended Complaint (ECF. No. 11), Defendants' Motion (ECF. No. 16), and Plaintiffs' Brief in Opposition (ECF. No. 17), Plaintiffs and Defendants intermittently use the terms "homosexual," "bisexual," and "transgender" to refer to the disputed categories "sexual orientation" and "gender identity" referenced in *Bostock* and the Notification. Because the relevant jurisprudence, statutes, regulations, and administrative issuances assume the former is included in the latter, this Court will refer to "SOGI" as collective of all aforementioned categories — unless particularity is necessary for the Court's analysis.

Plaintiffs — Texas and California-based physicians — allege Defendants misread *Bostock* and that healthcare providers may continue to discriminate on the basis of SOGI, "so long as one does not engage in 'sex' discrimination when doing so." ECF No. 11 at 5. Specifically, Plaintiffs aver that neither Section 1557 nor *Bostock* prohibit such discrimination, "as long as they would have acted in the exact same manner if the patient had been a member of the opposite biological sex." ECF No. 17 at 16. Plaintiffs "object only to the Secretary's claim that *Bostock* defined 'sex' discrimination to encompass all forms of discrimination on the basis of sexual orientation or gender identity." *Id.* Plaintiffs state they "fully intend to comply with *Bostock* and its interpretation of 'sex.'" *Id.*

Plaintiffs have discriminated on the basis of sex in their medical practices, and each receives federal money subject to Section 1557. *See generally* ECF No. 11. Dr. Neese "has treated patients suffering from gender dysphoria in the past and has on occasion prescribed hormone therapy for them." *Id.* at 5. But Dr. Neese "does not believe that hormone therapy or sex-change operations are medically appropriate for everyone who asks for them, even if those individuals are suffering from gender dysphoria, and she will on occasion decline to prescribe hormone therapy or provide referrals for sex-change operations." *Id.* at 6. "Dr. Neese is categorically unwilling to prescribe hormone therapy to minors who are seeking to transition, and she is equally unwilling to provide referrals to minors seeking a sex-change operation." *Id.* She "believes that it is unethical to provide 'gender affirming' care to transgender patients in situations where a patient's denial of biological realities will endanger their life or safety." *Id.*

Plaintiffs allege "Dr. Neese has treated many transgender patients . . . in the past, and she expects to continue doing so in the future." *Id.* Dr. Neese claims she "is likely to encounter minor transgender patients who will request hormone therapy and referrals for sex-change operations that

3

she is unwilling to provide, as well as adult transgender patients who will deny or dispute their need for preventive care that corresponds to their biological sex, and she intends to provide care to these individuals in a manner consistent with her ethical beliefs." *Id.*

Dr. Hurly "recognizes that some biological men may identify as women (and vice versa)." *Id.* In his practice, Dr. Hurly "has encountered situations . . . when he must insist that a patient acknowledge his biological sex rather than the gender identity that he asserts." *Id.* at 7. Plaintiffs provide an example: Dr. Hurly "once diagnosed a biological male patient with prostate cancer, but the patient refused to accept Dr. Hurly's diagnosis because he identified as a woman and insisted that he could not have a prostate." *Id.* Dr. Hurly "explain[ed] to this patient that he was indeed a biological man with a prostate, and that he needed to seek urgent medical treatment for his prostate cancer." *Id.* Plaintiffs claim "Dr. Hurly has treated transgender patients in the past, and he expects to continue doing so in the future." *Id.* Plaintiffs further allege: "Dr. Hurly is likely to encounter transgender patients who will deny or dispute their need for health care that corresponds to their biological sex, and he intends to provide care to these individuals in a manner consistent with his ethical beliefs." *Id.*

The last Plaintiff, Dr. Barke, "is unwilling to prescribe hormone therapy to minors who are seeking to transition, and he is unwilling to provide referrals to minors seeking a sex-change operation." *Id.* He "believes that it is unethical to provide 'gender affirming' care to transgender patients in situations where a patient's denial of biological realities will endanger their life or safety." *Id.* at 8. "Dr. Barke has treated many transgender patients . . . in the past, and he expects to continue doing so in the future." *Id.* He "is likely to encounter minor transgender patients who will request hormone therapy and referrals for sex-change operations that he is unwilling to provide, as well as adult transgender patients who will deny or dispute their need for preventive

care that corresponds to their biological sex." *Id.* Dr. Barke "intends to provide care to these individuals in a manner consistent with his ethical beliefs." *Id.*

Plaintiffs bring two claims. First, Plaintiffs ask the Court to hold unlawful and set aside the Notification and enjoin Defendants from enforcing the interpretation of Section 1557 detailed in the Notification. *Id.* at 10. Second, Plaintiffs ask the Court to declare Section 1557 does not prohibit discrimination on the basis of SOGI. *Id.* They argue instead it only prohibits "sex" discrimination, which means a provider would have acted differently towards an identically situated member of the opposite biological sex. *Id.*

### STANDARDS OF REVIEW

Federal courts are courts of limited jurisdiction; they possess only power authorized by the Constitution and federal statutes. *Xitronix Corp. v. KLA-Tencor Corp.*, 916 F.3d 429, 435 (5th Cir. 2019). "The requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception." *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998)).

When a motion to dismiss for lack of subject-matter jurisdiction "is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). When a complaint could be dismissed under Rule 12(b)(1) or 12(b)(6), "the court should dismiss only on the jurisdictional ground[,] . . . without reaching the question of failure to state a claim." *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977). Doing so avoids the issuance of an advisory opinion and prevents a court lacking jurisdiction "from prematurely dismissing a case with prejudice." *Ramming*, 281 F.3d at 161; *Steel Co.*, 523 U.S. at 101.

"To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of the cause of action will not do." *Twombly*, 550 U.S. at 555 (internal marks omitted).

"Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *In re Katrina*, 495 F.3d at 205 (quoting *Twombly*, 550 U.S. at 555) (internal marks omitted). "The 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Id.* (quoting *Martin K. Eby Constr. Co., Inc. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).

The court must "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). After assuming the veracity of any well-pleaded allegations, the court should then "determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. This "plausibility" standard is not necessarily a "probability requirement," but it requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* "Determining whether a complaint states a plausible

6

claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

ANALYSIS

**A. Rule 12(b)(1) Dismissal**

1. Plaintiffs Have Standing

The Court begins by determining whether this dispute can be "appropriately resolved through the judicial process." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Whitmore v. Arkansas*, 494 U.S. 149, 155 (1990)). The judicial power of federal courts is limited to certain "cases" and "controversies." U.S. CONST. art. III, § 2. "Every party that comes before a federal court must establish that it has standing to pursue its claims." *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013). Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan*, 504 U.S. at 560 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). When considering whether a plaintiff has standing, a court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

To have standing, the party invoking federal jurisdiction must establish she suffered: (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) an injury that is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) an injury that is "likely" rather than "speculative[ly]" to be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61. A plaintiff seeking only injunctive or declaratory relief cannot establish standing based on an alleged past injury alone. *Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003). She must instead show an injury with "continuing, present adverse effects" or a "substantial likelihood that she will suffer injury in the future." *Id.*

To engage in pre-enforcement review, a plaintiff must allege a "credible threat of enforcement" to establish Article III standing. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161 (2014); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) ("In some instances, we have found standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm."). An "administrative action, like arrest or prosecution, may give rise to harm sufficient to justify pre-enforcement review." *Susan B. Anthony List*, 573 U.S. at 165. A plaintiff need not first violate the statute and expose himself to liability to establish an injury for standing purposes. *See, e.g.*, *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979). "Indeed, the entire point of a pre-enforcement challenge is to allow courts to rule on the legality of a plaintiff's conduct *before* an enforcement action is brought." *Bear Creek Bible Church v. E.E.O.C.*, No. 4:18-CV-00824-O, 2021 WL 5449038, at *9 (N.D. Tex. Oct. 31, 2021). In determining whether a threat is credible or speculative, the Fifth Circuit "look[s] to the practical likelihood that a controversy will become real." *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002). A plaintiff must show a "serious" intention to engage in prohibited conduct. *Nat'l Fed'n of the Blind of Tex. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011). The Fifth Circuit — for example — denied standing to plaintiff charities when they had not alleged facts sufficient for the court to determine whether the charities intended to engage in specific conduct prohibited by the challenged statute. *Id.*

If a plaintiff possesses standing, the remaining plaintiffs may seek the same relief whether or not they individually possess standing. *Id.*; *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977) ("Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit."); *Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d 491, 501 n.18

(5th Cir. 2004) ("[W]hen one of multiple co-parties raising the same claims and issues properly has standing, we do not need to verify the independent standing of the other co-plaintiffs.").

a. *Injury in Fact*

Plaintiffs satisfy the first *Lujan* factor, which weighs whether Plaintiffs sustained an "injury in fact" that is "concrete and particularized" and "actual or imminent." *Lujan*, 504 U.S. at 560. Defendants first argue "Plaintiffs . . . provide no basis to conclude that HHS will treat particular practices and factual scenarios as prohibited discrimination in future enforcement proceedings" when they "point to the Notification's general statements on the impermissibility of discrimination because of sexual orientation and gender identity." ECF No. 16 at 16. Defendants next argue "Plaintiffs do not adequately allege that any of their own practices put them at risk of an enforcement proceeding" and, Plaintiffs instead "recount abstract hypotheticals and anecdotes about the medical treatment of gay and transgender individuals" and "speculate that they might one day have patients seeking treatment Plaintiffs would prefer not to provide." *Id.* These arguments fail.

First, Plaintiffs have a "credible threat of enforcement" that creates an "injury in fact" that is "concrete and particularized" and "actual or imminent." *Susan B. Anthony List*, 573 U.S. at 161; *Lujan*, 504 U.S. at 560–61. The Notification states Defendants will interpret "Section 1557's prohibition on discrimination on the basis of sex to include" both "[d]iscrimination on the basis of sexual orientation" and "discrimination on the basis of gender identity." 86 Fed. Reg. 27,984, 27,985. That "interpretation will guide [the Office of Civil Rights ("OCR")] in processing complaints and conducting investigations" although it "does not itself determine the outcome in any particular case or set of facts." *Id.* Equipped with this new interpretation, OCR will "appl[y]

the enforcement mechanisms provided for and available under Title IX when enforcing Section 1557's prohibition on sex discrimination." *Id.*

Defendants argue "Plaintiffs have not alleged how OCR will apply the Notification's reasoning to particular factual situations." ECF No. 16 at 16. To support this argument, Defendants rely on *Trump v. New York*. 141 S. Ct. 530 (2020) (per curiam). In *Trump*, the Supreme Court considered a challenge to a presidential memorandum that declared a census policy of excluding "from the apportionment base aliens who are not in a lawful immigration status." *Id.* at 534 (quoting 85 Fed. Reg. 44679, 44680 (2020)). The Supreme Court determined the plaintiffs' standing theory was "riddled with contingencies and speculation that impede judicial review." *Id.* at 535. For instance, although the President "ha[d] made clear his desire to exclude aliens without lawful status from the apportionment base," he had "qualified his directive by providing that the Secretary should gather information 'to the extent practicable' and that aliens should be excluded 'to the extent feasible.'" *Id.* (quoting 85 Fed. Reg. 44679, 44680). The Supreme Court therefore reasoned "[a]ny prediction how the Executive Branch might eventually implement this general statement of policy is 'no more than conjecture' at this time." *Id.* (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983)).

In contrast, how OCR "might eventually implement" its new interpretation of "sex" is more than "conjecture." *Id.* (quoting *Lyons*, 461 U.S. at 108). Plaintiffs alleged future injury is not based on a "speculative chain of possibilities." *Amnesty Int'l USA*, 568 U.S. at 410. The Notification expressly states Defendants' "interpretation will guide OCR in processing complaints and conducting investigations." 86 Fed. Reg. 27,984, 27,985. In doing so, OCR will "appl[y] the enforcement mechanisms provided for and available under Title IX when enforcing Section 1557's prohibition on sex discrimination." *Id.* Whereas the memorandum in *Trump* provided no

"prediction how the Executive Branch might eventually implement th[e] general statement of policy," the Notification itself details how OCR will "enforc[e] Section 1557's prohibition on sex discrimination" through existing "enforcement mechanisms." *Trump*, 141 S. Ct. at 535; 86 Fed. Reg. 27,984, 27,985.[3]

The Notification — too clever by half, maybe — states the new interpretation "does not itself determine the outcome in any particular case or set of facts." 86 Fed. Reg. 27,984, 27,985. Of course it doesn't. Each particular case or set of facts is different and must be independently reviewed. The next sentence is telling. That sentence states, "OCR will comply with the Religious Freedom Restoration Act [("RFRA")], 42 U.S.C. [§] 2000bb *et seq*., and all other legal requirements," including "applicable court orders." *Id.* The "particular case or set of facts" may indicate OCR should not enforce the new interpretation against an entity protected by a court order or statute. *Id.* Plaintiffs — however — suffer a "credible threat of enforcement" because they: (1) do not invoke RFRA and (2) have not argued they are protected by another federal law or court order preventing enforcement. *Susan B. Anthony List*, 573 U.S. at 161.

Second, Plaintiffs adequately allege their practices put them at risk of an enforcement action. Defendants seem to assert Plaintiffs must wait until a patient with a SOGI status at issue in this case requests objectionable medical care, then sue for declaratory relief once it becomes certain Defendants will take actions that could trigger an enforcement proceeding under Section 1557. Such certainty is not required. *See Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1154 (5th Cir. 1993) ("The purpose of the Declaratory Judgment Act is to settle actual

---

[3] On March 31, 2022, Assistant Attorney General Kristen Clarke sent a letter to all state attorneys general, endorsing the Secretary's interpretation of Section 1557. *See* ECF No. 28-1 at 1–4 (the "Letter"). The Letter warns "restricting an individual's ability to receive medically necessary care, *including gender-affirming care*, from their health care providers solely on the basis of their sex assigned at birth or their gender identity may also violate Section 1557." *Id.* at 3 (emphasis added). Neither Plaintiffs' Complaint nor this Court's conclusion *relies* on the Letter. ECF No. 28 at 2. But the Letter *reinforces* the Court's conclusion that Plaintiffs have alleged a "credible threat of enforcement."

controversies *before* they ripen into violations of law or breach of some contractual duty." (internal marks omitted)).

Restated, Plaintiffs must allege a "credible threat of prosecution" under the challenged regulation to establish an enforcement action is impending. *Susan B. Anthony List*, 573 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 298). The Notification is aimed at medical practitioners — such as Plaintiffs — who may discriminate "on the basis of sex," as interpreted by the Notification. *See generally* 86 Fed. Reg. 27,984. Plaintiffs allege they have: (1) refused requested treatments to help SOGI patients or (2) refused to abide the SOGI preferences of some patients. *See, e.g.*, ECF No. 11 at 6 (Dr. Neese "will on occasion decline to prescribe hormone therapy or provide referrals for sex-change operations, consistent with her Hippocratic Oath to do no harm."); ECF No. 11 at 7 ("Dr. Hurly had to firmly explain to [a] patient that he was indeed a biological man with a prostate . . . ."). And Plaintiffs allege they are "likely" to encounter SOGI patients who will: (1) request hormone therapy and referrals for sex-change operations or (2) dispute that they need preventive care that corresponds to their biological sex. *See id.* at 6–8.

If Defendants enforce the Notification as written against Plaintiffs' practices as pled, Plaintiffs face "a credible threat of prosecution." *Susan B. Anthony List*, 573 U.S. at 159 (quoting *Babbitt*, 442 U.S. at 298); 86 Fed. Reg. 27,984, 27,985. If Defendants remain silent on their particular case-by-case enforcement plans, Plaintiffs *still* face "a credible threat of prosecution." *Compare Speech First, Inc. v. Fenves*, 979 F.3d 319, 336–37 (5th Cir. 2020) ("Where the policy remains non-moribund, the claim is that the policy causes self-censorship among those who are subject to it, and the students' speech is arguably regulated by the policy, there is standing."); *Ctr. For Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006) ("Controlling

precedent . . . establishes that a chilling of speech because of the mere existence of an allegedly vague or overbroad [law] can be sufficient injury to support standing.").

The Notification states — three times — that Defendants "will interpret and *enforce*" Section 1557's protected class "sex" to include SOGI, which directly implicates Plaintiffs' treatment or non-treatment of transgender patients as pled in their Complaint. *See* ECF No. 11 at 8; *cf. Montclair Police Officers' Ass'n v. City of Montclair*, No. CV-12-6444-PSG, 2012 U.S. Dist. LEXIS 196338, at *4–5 (C.D. Cal. Oct. 24, 2012) (applying relaxed pre-enforcement test in vagueness challenge, asking whether the allegedly vague provisions created a chilling effect on constitutionally protected conduct). For this reason and reasons stated above, the Court finds Plaintiffs have suffered an "injury in fact" sufficient to satisfy the first requirement of pre-enforcement standing.

b. *Traceability and Redressability*

Plaintiffs have satisfied *Lujan*'s second and third prongs: traceability and redressability. *Lujan*, 504 U.S. at 560–61. Defendants argue "Plaintiffs have [ ] failed to allege traceability because they have not identified an injury attributable to the Notification or an injury that would be redressed by vacating the Notification." ECF No. 16 at 20. They contend the "request[ed] relief [ ] would treat the Notification . . . as a legislative rule that can be revoked and rendered nugatory." *Id.* As "only a statement of policy," the Notification is "not binding on anyone and carries no legal force." *Id.* Thus, Defendants contend, Plaintiffs' alleged injury cannot be traced to the policy and "is also why the Notification does not inflict present-day injury." *Id.* at 21.

Here, Plaintiffs have alleged a non-speculative injury that is "fairly traceable" to Defendants' actions because the Notification — not Section 1557 — pressures Plaintiffs to adjust their practices or face "the enforcement mechanisms provided for and available under Title IX when enforcing Section 1557's prohibition on sex discrimination." 86 Fed. Reg. 27,984, 27,985;

13

*cf. Texas v. E.E.O.C.*, 933 F.3d 433, 448 (5th Cir. 2019) ("The Guidance, not Title VII, condemns Texas's felon-hiring policies, and it, not Title VII, pressures Texas to change its laws and policies or risk referral to the Attorney General by [the Equal Employment Opportunity Commission ("EEOC")]."). The pressure on Plaintiffs to change their practices exists, in part, because OCR wields prosecutorial power to bring enforcement actions against Plaintiffs based on the Notification. *Id.* at 449 ("The pressure on [Plaintiff] to change its laws exists, in part, because the Attorney General has prosecutorial power to bring enforcement actions against [Plaintiff] based on EEOC referrals or a pattern-or-practice claim."). If a "plaintiff is himself an object of the [government] action at issue[,] . . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62. The Notification expressly states Defendants "will interpret and enforce" Section 1557 in a manner adverse to Plaintiffs' plausibly pled practices. Consequently, Plaintiffs' injuries are traceable to the Notification.

Regarding redressability: a judicial remedy redresses an injury when the "risk [of the alleged harm] would be reduced to some extent if [the plaintiffs] received the relief they seek." *Massachusetts v. U.S. Env't Prot. Agency*, 549 U.S. 497, 526 (2007). The "remedy need not forestall *every* injury a plaintiff will suffer." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. City of Lubbock*, No. 5:21-CV-114-H, 2021 WL 4775135, at *7 (N.D. Tex. Oct. 13, 2021). Because a court order preventing OCR from using "the enforcement mechanisms provided for and available under Title IX when enforcing Section 1557's prohibition on sex discrimination" would reduce the harm Plaintiffs allege to some extent, their alleged injury is redressable by a favorable decision of this Court. 86 Fed. Reg. 27,984, 27,985; *see also* ECF No. 17 at 16 (describing how a favorable decision could redress Plaintiffs' alleged injury). As Plaintiffs note,

their proposed remedies would preclude Defendants from enforcing a "misguided interpretation

of Section 1557[,] . . . and the plaintiffs and other health-care providers can safely operate without

fear of enforcement proceedings or the loss of federal funds." ECF No. 17 at 16–17. Based on the

foregoing, the Court finds Plaintiffs' alleged injury is "fairly . . . trace[able] to the challenged

action of the defendant" and is "likely" rather than "speculative[ly]" to be "redressed by a

favorable decision." *Lujan*, 504 U.S. at 560–61.

    2. Plaintiffs' Claims Are Ripe

    "The ripeness inquiry reflects 'Article III limitations on judicial power' as well as

'prudential reasons for refusing to exercise jurisdiction.'" *DM Arbor Ct., Ltd. v. City of Houston*,

988 F.3d 215, 218 (5th Cir. 2021) (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S.

662, 670 n.2 (2010)). "Ripeness ensures that federal courts do not decide disputes that are

'premature or speculative.'" *Id.* (quoting *Shields*, 289 F.3d at 835); *see also Texas v. United States*,

497 F.3d 491, 498 (5th Cir. 2007) (The ripeness doctrine "prevent[s] the courts, through avoidance

of premature adjudication, from entangling themselves in abstract disagreements over

administrative policies, and also to protect the agencies from judicial interference until an

administrative decision has been formalized and its effects felt in a concrete way by the

challenging parties." (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967))).

    To determine whether a case is ripe for adjudication, a court should consider: "(1) the

fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court

consideration." *Texas*, 497 F.3d at 498. "The fitness and hardship prongs must be balanced." *Id.*

"A case is generally ripe if any remaining questions are purely legal ones." *New Orleans Pub.

Serv., Inc. v. Council of the City of New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987). But "even

where an issue presents purely legal questions, the plaintiff must show some hardship in order to

establish ripeness." *Central & S. W. Servs. v. U.S. Env't Prot. Agency*, 220 F.3d 683, 690 (5th Cir. 2000).

    a. *Fitness for Judicial Review*

Defendants argue Plaintiffs' claims are not fit for judicial review because they present "non-legal questions about future enforcement under [Section] 1557 that require factual development to meaningfully review." ECF No. 16 at 22. "[A] challenge to administrative regulations is fit for review if (1) the questions presented are 'purely legal one[s],' (2) the challenged regulations constitute 'final agency action,' and (3) further factual development would not 'significantly advance [the court's] ability to deal with the legal issues presented.'" *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 681 (N.D. Tex. 2016) (quoting *Texas*, 497 F.3d at 498–99); *see also Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 736 n.10 (1997) (stating facial challenges are generally ripe the moment the challenged regulation is passed). "An additional consideration is 'whether resolution of the issues will foster effective administration of the statute.'" *Texas*, 497 F.3d at 498–99 (quoting *Merchs. Fast Motor Lines, Inc. v. ICC*, 5 F.3d 911, 920 (5th Cir. 1993)).

Here, Plaintiffs present a pure question of law. That question is straightforward: Does *Bostock* prohibit discrimination based on SOGI under the Section 1557 definition of "sex" — or does *Bostock* permit discrimination based on SOGI if the healthcare provider "would have acted in the exact same manner if the patient had been a member of the opposite biological sex?" ECF No. 17 at 16. The answer does not require further factual development. *See Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 287–88 (5th Cir. 2012) (finding facial attack on regulation raises a pure question of law). The Court need not consider facts related to a particular patient encounter or enforcement proceeding. *See Susan B. Anthony List*, 573 U.S. at 167 (finding "fitness" factor "easily satisfied" because "petitioners' challenge to the Ohio false statement statute

16

presents an issue that is 'purely legal, and will not be clarified by further factual development.'" (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985))). Instead, the Court need only consider the Notification's text, which defines "sex" and states that OCR will "appl[y] the enforcement mechanisms provided for and available under Title IX when enforcing Section 1557's prohibition on sex discrimination." 86 Fed. Reg. 27,984, 27,985.

The Court also finds the Notification constitutes a "final agency action." *Franciscan All.*, 227 F. Supp. at 681 (quoting *Texas*, 497 F.3d at 498–99). Defendants claim the Notification is not a final agency action because it is an "interpretive rule and general statement of policy" and therefore lacks "legal force against Plaintiffs in any prospective enforcement proceeding." ECF No. 16 at 25. An agency's action is final when the action "mark[s] the 'consummation' of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal marks omitted); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (same). Agency action marks the consummation of the agency's decisionmaking process if it "gives rise to 'direct and appreciable legal consequences.'" *Hawkes Co.*, 136 S. Ct. at 1814 (quoting *Bennett*, 520 U.S. at 178). The ultimate determination of finality is "'flexible' and 'pragmatic.'" *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011) (quoting *Abbott Labs.*, 387 U.S. at 149–50).

"[A]n agency guidance document that reflects a 'settled agency position' that the entire agency intends to follow in its enforcement of its regulations, and that gives 'marching orders' to a regulated entity, is 'final' agency action against the regulated entity." *Texas v. United States*, 300 F. Supp. 3d 810, 838 (N.D. Tex. 2018) (quoting *Appalachian Power Co. v. U.S. Env't Prot. Agency*, 208 F.3d 1015, 1020–23 (D.C. Cir. 2000)). That the Notification explains it "does not

itself determine the outcome in any particular case or set of facts" does not preclude a determination that it is a final agency action. 86 Fed. Reg. 27,984, 27,985. A guidance document can constitute a final agency action "even if the document contains boilerplate denying its legal effect." *Texas*, 300 F. Supp. 3d at 839. The Notification reflects a "settled agency position" that gives "marching orders." *Id.* (quoting *Appalachian Power Co.*, 208 F.3d at 1020–23). Defendants' settled position is they will "interpret and enforce" Section 1557's prohibition of "discrimination on the basis of sex" to include discrimination based on SOGI. *Id.* (quoting *Appalachian Power Co.*, 208 F.3d at 1020–23); 86 Fed. Reg. 27,984, 27,985. The Notification states Defendants' position on the settled agency position on interpretation of sex and the enforcement mechanisms it will use to ensure compliance with that position. 86 Fed. Reg. 27,984, 27,985.

The Court also finds the Notification is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (internal marks omitted). Defendants argue "legal consequences" cannot flow from "interpretive rules or statements of policy," such as the Notification. ECF No. 16 at 26. But the Fifth Circuit disagrees: "an agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations, thus meeting the second prong of [the final-agency-action test]." *Texas*, 933 F.3d at 441. "Whether an action binds the agency is evident 'if it either appears on its face to be binding[] or is applied by the agency in a way that indicates it is binding.'" *Id.* (quoting *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015)) (alterations in original); *see also Hawkes*, 136 S. Ct. at 1814 (finding agency actions committing agency to determination about jurisdictional scope to "give[] rise to direct and appreciable legal consequences, thereby satisfying the second prong of *Bennett*" (internal marks omitted)). Here, the Notification determines the "rights and obligations" of healthcare providers that receive federal

funds, such as Plaintiffs. *Texas*, 933 F.3d at 441. And the Notification references the "enforcement mechanisms" it will apply to enforce its new interpretation of "sex," thereby determining the actions from which legal consequences may flow. 86 Fed. Reg. 27,984, 27,985.

Based on the above, the Court finds the issues presented are fit for judicial decision and thus favors a finding that this case is ripe for adjudication.

### b. *Plaintiffs Will Endure Hardship*

The Court finds delayed review of the Notification would cause hardship to Plaintiffs. Defendants' claim that "[t]here is no hardship to Plaintiffs in withholding review" does not withstand scrutiny. ECF No. 16 at 24. Plaintiffs are physicians who are "likely to encounter minor transgender patients" they must diagnose, treat, or refer. *See* ECF No. 11 at 6–8. These medical decisions may be based on the threat of an enforcement action — not what Plaintiffs believe to be the best course of action. *Cf. Susan B. Anthony List*, 573 U.S. at 167–68 ("Denying prompt judicial review would impose a substantial hardship on petitioners, forcing them to choose between refraining from core political speech on the one hand or engaging in that speech and risking costly Commission proceedings and criminal prosecution on the other."); *Franciscan All.*, 227 F. Supp. 3d at 681 ("Substantial hardship is typically satisfied when a party is forced to choose between refraining from allegedly lawful activity or engaging in the allegedly lawful activity and risking significant sanctions."). Plaintiffs face the fear of losing federal funds if they do not act according to the interpretation of "sex" described in the Notification. ECF No. 11 at 8. Plaintiffs assert that fear will affect their actions. *Id.*

Accordingly, the Court finds the hardship to the parties favors a determination that this case is ripe for adjudication.

### 3. The Agency Decision is Final and There Is No Other Adequate Remedy

The Administrative Procedure Act ("APA") allows a litigant to seek judicial review of "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. As discussed above, the Court finds the Notification constitutes a final agency action. The Court now considers whether "there is no other adequate remedy." *Id.*; *see also Hinojosa v. Horn*, 896 F.3d 305, 310 (5th Cir. 2018) (stating 5 U.S.C. § 704 "limits the APA to the review of those agency actions which otherwise lack an 'adequate remedy in court'").

"At a minimum, the alternative remedy must provide the [plaintiff] specific procedures by which the agency action can receive judicial review or some equivalent." *Hinojosa*, 896 F.3d at 310 (internal marks omitted). An "alternative remedy need only be adequate[;] the alternative remedy does not need to be as effective as an APA lawsuit, merely that it provide the same general relief." *De La Garza v. Pompeo*, 741 F. App'x 994, 998 (5th Cir. 2018) (internal marks omitted). Defendants argue Plaintiffs "possess an adequate alternative remedy" because "they may defend against any future enforcement of [Section] 1557 under the express administrative and judicial review provisions provided by Congress." ECF No. 16 at 28 (citing 42 U.S.C. § 18116(a)). Plaintiffs disagree. They argue "post-enforcement review . . . is not an 'adequate remedy' within the meaning of [S]ection 704, because the plaintiffs must risk the loss of federal funding if they choose to contest the [ ] Notification in those proceedings." ECF No. 17 at 24.

The "alternative remedy . . . [must] provide the same genre of relief" as an APA lawsuit. *De La Garza*, 741 F. App'x at 998 (internal marks omitted). The Court finds an inability to obtain equitable relief — as would be the case when defending an enforcement action — renders an alternative remedy inadequate. *See, e.g.*, *Garcia v. Vilsack*, 563 F.3d 519, 525 (D.C. Cir. 2009); *compare Bowen v. Massachusetts*, 487 U.S. 879, 906–08 (1988) (concluding an alternative remedy

in Claims Court was inadequate because Claims Court lacked power to grant equitable relief) *with Citizens for Responsibility & Ethics in Wash v. U.S. Dep't of Just.*, 846 F.3d 1235, 1245–46 (D.C. Cir. 2017) (concluding FOIA was adequate alternative remedy although it only provided for making documents available to plaintiff). Additionally, Plaintiffs need not "run the risk of enforcement proceedings . . . to seek review of an already-final agency action." *De La Garza*, 741 F. App'x at 998. Demanding Plaintiffs' wait to make their arguments in an enforcement proceeding would defeat the purpose of a pre-enforcement challenge. In *Sackett v. United States Environmental Protection Agency*, the Supreme Court permitted a pre-enforcement challenge to an Environmental Protection Agency ("EPA") compliance order although "judicial review ordinarily comes by way of a civil action brought by the EPA." 566 U.S. 120, 127 (2012). Because the plaintiffs could not "initiate [an enforcement action]" and had to "wait for the Agency to drop the hammer" while they accrued daily penalties, "APA review" was the only "adequate remedy." *Id.* at 127, 131.

The same logic applies here. The Notification requires Plaintiffs to alter their medical practices, either: (1) *reverse* the transgender-specific decisions, advice, and treatments discussed in the Complaint; or (2) *continue* the transgender-specific decisions, advice, and treatments discussed in Complain and risk an enforcement action by Defendants. The latter option requires Plaintiffs to "wait for [OCR] to drop the hammer" because Plaintiffs themselves cannot initiate an enforcement action. *Id.* at 127. The Court therefore finds Plaintiffs lack an adequate alternative remedy.

Because Plaintiffs seek judicial review of a "final agency action for which there is no other adequate remedy in court," Plaintiffs satisfy the requirements of APA review. 5 U.S.C. § 704.

### B. Rule 12(b)(6) Dismissal

Next up: whether Plaintiffs' Complaint "state[s] a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Though Plaintiffs use *generalized* language in several places, the Court construes their arguments to refer to only those statutes, regulations, and rules implicated by the Notification.

Plaintiffs ask the Court to hold unlawful and set aside the Notification and enjoin Defendants from enforcing the interpretation of Section 1557 stated therein. ECF No. 11 at 10. Plaintiffs also ask the Court to declare Section 1557 does *not* prohibit healthcare providers from discriminating on the basis of SOGI. *Id.* Plaintiffs argue Section 1557 only prohibits "sex" discrimination — which means a provider would have acted *differently* towards an identically situated member of the opposite biological sex. *Id.* Plaintiffs argue that the Notification misapplies *Bostock* to the Section 1557 text incorporating Title IX's definition, "on the basis of sex" — and that no combination of *Bostock*, Section 1557, and Title IX may be fairly read to prohibit a discriminatory act against SOGI persons if the healthcare provider would take the *same* discriminatory act "against an identically situated member of the opposite biological sex." ECF No. 17 at 26.

In response, Defendants argue "Plaintiffs cannot plausibly allege that the Notification is 'not in accordance with the law.'" ECF No. 16 at 31 (quoting 5 U.S.C. § 706(2)(A)). "The Notification [ ] goes no further than permitted by Congress's statute and the Supreme Court's interpretation of substantially similar text in *Bostock*." *Id.*

### 1. Discrimination "On the Basis of Sex" under Title IX — and Section 1557

Congress enacted the Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act of 2010, collectively referred to as the Affordable Care Act ("ACA"), in March 2010. 111 Pub. L. No. 148 (March 23, 2010); 111 Pub. L. No. 152 (March 30, 2010). Section 1557 of the ACA provides an individual shall not be "excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). Defendants argue Section 1557 prohibits discrimination on the basis of SOGI in addition to the longstanding protected class "sex." However, Section 1557 does not employ the terms "sex," "sexual orientation," or "gender identity." *See id.* Instead, Section 1557 expressly incorporates Title IX, which prohibits discrimination "on the basis of sex." *See id.*; 20 U.S.C. § 1681(a).

What does "sex" mean as used in Title IX? Because the statute provides no definition, the Court must construe the term. The Court construes statutory text to give effect to the ordinary public meaning conveyed when Congress enacted the statute. *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS §§ 6–7 (2012).

Congress enacted Title IX in 1972. 20 U.S.C. § 1681. At that time, "sex" was commonly understood to refer to physiological differences between men and women — particularly with respect to reproductive functions. *See, e.g.*, *Sex*, AMERICAN HERITAGE DICTIONARY 1187 (1976) ("The property or quality by which organisms are classified according to their reproductive functions."); *Sex*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2081 (1971) ("The sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segmentation and recombination which

23

underlie most evolutionary change . . . ."); *Sex*, 9 OXFORD ENGLISH DICTIONARY 578 (1961) ("The sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these."). Indeed, *Bostock* itself "proceed[ed] on the assumption that 'sex' . . . refer[ed] only to biological distinctions between male and female." 140 S. Ct. at 1739.

But the Court cannot interpret "sex" in isolation. *United States v. Morton*, 467 U.S. 822, 828 (1984). The Court must instead "read the statute as a *whole*, so as to give effect to each of its provisions without rendering any language superfluous." *Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 397 (5th Cir. 2006) (emphasis added). And the Court must abide judicially accepted principles of linguistics in reading the whole — including compositionality. *See generally* James C. Phillips, *The Overlooked Evidence in the Title VII Cases: The Linguistic (and Therefore Textualist) Principle of Compositionality* (May 11, 2020) (unpublished manuscript);[4] *Bostock*, 140 S. Ct. at 1769, n.22 (citing same).

Title IX presumes sexual dimorphism in section after section, requiring equal treatment for each "sex." *See, e.g.*, 20 U.S.C. § 1681(a)(8) (stating if father-son or mother-daughter activities are provided for "one sex," reasonably comparable activities shall be provided for "the other sex."); 20 U.S.C. § 1681(a)(2) (requiring same in school admissions context). And Courts have long interpreted Title IX to prohibit federally funded education programs from treating men better than women (or vice versa). *See, e.g.*, *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530 (1982); *Cannon v. Univ. of Chi.*, 441 U.S. 677, 680 (1979). As written and commonly construed, Title IX appears to operate in binary terms — male and female — when it references "sex."

---

[4] "Compositionality is the notion that the meaning of a complex expression is a compositional function of the meaning of its semantic parts. Sometimes what you see is what you get: *apple pie* is a pie made from apples. But sometimes the combination of words has a meaning of its own that is not a reliable amalgamation of the components at all, such as *for good* or *at all*." (emphasis added) (internal marks omitted).

But Title IX's prohibition against discrimination "on the basis of sex" cannot be reduced to a literalist but-for test. Although not at issue here, Section 1686 states: "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintain separate living facilities for the different sexes." 20 U.S.C. § 1686. The implementing regulations clarify educational institutions "may provide separate toilet, locker room, and shower facilities *on the basis of sex*, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of *the other sex*." 34 C.F.R. § 106.33 (emphasis added).

Defendants argue Section 1681(a) contains a broader definition of "sex" that includes SOGI. But when read alongside Section 1686, Defendants' argument implodes. It is doubtful Section 1686 *permits* educational institutions to maintain separate living institutions for each SOGI, while a stand-alone Section 1681(a) *prohibits* same. The implementing regulation highlights the sex binary by referencing "the other sex" — which speaks directly to *biological* sex. 34 C.F.R. § 106.33; *see also, e.g.*, 20 U.S.C. 1681(a)(8) (stating "if such activities are provided for students of *one sex*, opportunities for reasonably comparable activities shall be provided for students of *the other sex*" (emphasis added)). At this stage of litigation, the approved tools of textualism do not support Defendants reading of Title IX — and by extension Section 1557.

Furthermore, Title IX's ordinary public meaning remains intact until changed by Congress. *See Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019) ("In all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning."). As noted above, the ordinary public meaning of "sex" turned on reproductive function when Congress enacted Title IX. Legislators tried to amend Title IX to include "sexual orientation" and "gender identity" on multiple occasions, but those attempts failed. *See, e.g.*, H.R. 1652, 113th Cong. (2013); S. 439, 114th Cong. (2015). By contrast, Congress *has* enacted hate-crimes legislation

with enhanced penalties for crimes motivated by "sexual orientation" or "gender identity." *See* 18 U.S.C. § 249(a)(2); 34 U.S.C. § 12291(b)(13)(A) (prohibiting discrimination in certain funding programs based on "sexual orientation" and "gender identity," separately from "sex"). Neither the Supreme Court nor the Fifth Circuit have addressed whether discrimination based on SOGI constitutes "sex" discrimination under Title IX or Section 1557, Congress has not amended the law to state as much, and it is questionable whether the Secretary can alter the term "sex" by administrative fiat. *See Franciscan Alliance, Inc. v. Becerra*, 553 F. Supp. 3d 361, 371 & n.7 (N.D. Tex. 2016). At this stage of litigation, Defendants reading of Title IX — and by extension Section 1557 — cannot support or sustain Defendants' Motion.

### 2. *Bostock*, Title IX, and Section 1557

*Bostock*'s Title VII analysis does *not* control the Title IX and Section 1557 analysis with the ease, precision, and force envisioned in Defendants' Motion. Though Courts *generally* apply the legal standards used in Title VII cases to decide Title IX cases — *see, e.g.*, *Canutillo Indep. Sch. Dist. v. Leija*, 101 F.3d 393, 404 (5th Cir. 1996) — Title IX and Section 1557 are not identical to Title VII in every material instance. In *Bostock*, the plaintiff sued for a violation of Title VII. 140 S. Ct. at 1738; 42 U.S.C. § 2000e-2(a)(1). Title VII makes it unlawful for an employer to make certain decisions "*because of*" certain factors, including "sex." *Id.* (emphasis added). By contrast, Title IX prohibits "discrimination *on the basis of* sex." 20 U.S.C. § 1681(a) (emphasis added). These phrases are not necessarily synonymous.

The Court must give full effect to the difference in word choice. Henry J. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes*, *in* BENCHMARKS 224 (1967) ("[W]hen Congress employs the same word, it normally means the same thing, when it employs different words, it usually means different things"). "After all, only the words on the page constitute the law adopted

by Congress and approved by the President." *Bostock*, 140 S. Ct. at 1738. By failing to acknowledge the different phrases Title VII and Title IX employ, the Court "would risk amending [the] statutes outside the legislative process reserved for the people's representatives." *Id.* The Supreme Court used a "but-for" causation analysis to decide *Bostock* based on Title VII's text, which bars discrimination "because of" sex. *See id.* at 1739. Since Title IX prohibits "on the basis of sex," the Court cannot reflexively adopt *Bostock*'s but-for causation analysis at this phase of litigation — without further briefing, evidence, or argument.   20 U.S.C. § 1681(a). Importantly, the majority and dissenting justices who adjudicated *Bostock* appear to agree on this point: *Bostock* does not answer all questions arising under Title IX.[5]

### 3. Plaintiffs' Complaint Survives Dismissal

The Court finds Plaintiffs plausibly plead Section 1557 and *Bostock* do not prohibit healthcare providers from discriminating on the basis of SOGI — "as long as they would have acted in the exact same manner if the patient had been a member of the opposite biological sex." ECF No. 17 at 16. *Bostock* expressly cabined its holding to Title VII. *See id.* at 1731. So, the question of whether *Bostock*'s reasoning applies to Section 1557 remains unsettled — at least in the Fifth Circuit. *But see Joganik v. E. Tex. Med. Ctr.*, No. 6:19-CV-517-JCB-KNM, 2021 WL 6694455, at *10 (E.D. Tex. Dec. 14, 2021), *report and recommendation adopted*, 2022 WL 243886 (E.D. Tex. Jan. 25, 2022); *Tovar v. Essential Health*, 342 F. Supp. 3d 947, 953 (D. Minn. 2018); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 949–50 (W.D. Wis. 2018);

---

[5] *See Bostock*, 140 S. Ct. at 1753 ("But none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and we do not prejudge any such question today."); *Id.* at 1780 (Alito, J., dissenting) ("The Court's decision may lead to Title IX cases . . . ."); *Id.* at 1836–37 (Kavanaugh, J., dissenting) ("And the implications of this Court's usurpation of the legislative process will likely reverberate in unpredictable ways for years to come.").

*Prescott v. Rady Child.'s Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1098–1100 (S.D. Cal. 2017). That is the question Plaintiffs ask this Court to answer. *See* ECF No. 11 at 10.

Plaintiffs aver that the medical diagnoses, treatments, or referrals alleged in the Complaint do *not* violate Section 1557's prohibition on "sex" discrimination because Plaintiffs "would have acted in the exact same manner if the patient had been a member of the opposite biological sex" — consistent with *Bostock*, notwithstanding SOGI. ECF No. 17 at 16; *see also, e.g.*, ECF No. 11 at 6 ("Dr. Neese believes that she is ethically obligated to inform biologically female patients of their need for cervical-cancer screening and other preventive care designated for women, regardless of the gender identity that the patient asserts. Dr. Neese also believes that she is ethically obligated to advise biologically male patients of their need for prostate-cancer screening, regardless of whether that patient identifies as a man or a woman."); ECF No. 11 at 7 ("Dr. Hurly is likely to encounter transgender patients who will deny or dispute their need for health care that corresponds to their biological sex, and he intends to provide care to these individuals in a manner consistent with his ethical beliefs.").

At times — however — Plaintiffs allege facts indicating that their medical diagnoses, treatments, or referrals may implicate SOGI categories. ECF No. 11 at 6 ("Dr. Neese is categorically unwilling to prescribe hormone therapy to minors who are seeking to transition, and she is equally unwilling to provide referrals to minors seeking a sex-change operation."); ECF No. 11 at 6 ("Dr. Neese believes that it is unethical to provide 'gender affirming' care to transgender patients in situations where a patient's denial of biological realities will endanger their life or safety."); ECF No. 11 at 7 ("Dr. Barke is unwilling to prescribe hormone therapy to minors who are seeking to transition, and he is unwilling to provide referrals to minors seeking a sex-change operation.").

After reviewing Plaintiffs' Complaint, the Court finds Plaintiffs allege facts sufficient to survive Rule 12(b)(6) dismissal. And for the reasons discussed above, the Court finds the pure question of law remains unanswered: Does *Bostock* prohibit SOGI discrimination under the Section 1557 definition of "sex" — or does *Bostock* permit SOGI discrimination if the healthcare provider "would have acted in the exact same manner if the patient had been a member of the opposite biological sex"? ECF No. 17 at 16.

CONCLUSION

For the reasons stated above, the Court **DENIES** Defendants' motion to dismiss Plaintiffs' First Amended Complaint (ECF No. 11).

**SO ORDERED**.

April 26, 2022

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE