IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

SUSAN NEESE, M.D., et al.,

*Plaintiffs,*

v.

XAVIER BECERRA, et al.

*Defendants.*

Case No. 2:21-cv-00163-Z

AMICI CURIAE BRIEF OF THREE FEMALE ATHLETES IN SUPPORT OF PLAINTIFFS

# Table of Contents

Table of Authorities ....................................................................................................iii

Introduction ............................................................................................................. 1

Argument ................................................................................................................. 2

    I.   Title IX prohibits sex discrimination, not sex blindness. ............................... 3

        A.   Title IX prohibits treating one sex worse than the other sex. .............. 3

        B.   Not all sex distinctions are discriminatory........................................... 4

        C.   Title IX sometimes requires sex distinctions to fulfill its mandate...... 7

    II.  Because Title IX allows sex distinctions, it only deals with biological sex, not sexual orientation or gender identity........................................................ 9

        A.   Title IX's original, ordinary meaning is about biological sex............... 9

        B.   Title IX's structure points to biological sex. ...................................... 10

        C.   Title IX's purpose is to promote equality based on biological sex....... 12

        D.   *Bostock* is inapposite............................................................................. 14

        E.   The federalism canon requires a narrow interpretation.................... 21

Conclusion.............................................................................................................. 24

Certificate of Service............................................................................................. 25

## TABLE OF AUTHORITIES

### Cases

*Adams v. School Board of St. Johns County,*
3 F.4th 1299 (11th Cir. 2021) ................................................................ 10

*Alabama Association of Realtors v. Department of Health and Human Services,*
141 S. Ct. 2485 (2021) ......................................................................... 22

*Arlington Central School District Board of Education v. Murphy,*
548 U.S. 291 (2006) ............................................................................. 22

*AT&T Mobility LLC v. Concepcion,*
563 U.S. 333 (2011) ............................................................................. 12

*Bauer v. Lynch,*
812 F.3d 340 (4th Cir. 2016) .................................................................. 5

*BFP v. Resolution Trust Corp.,*
511 U.S. 531 (1994) ............................................................................. 23

*Board of Education of Hendrick Hudson Central School District, Westchester County v. Rowley,*
458 U.S. 176 (1982) ............................................................................. 22

*Bond v. United States,*
572 U.S. 844 (2014) ....................................................................... 21, 22

*Bostock v. Clayton County,*
140 S. Ct. 1731 (2020) ................................................................. *passim*

*Bray v. Alexandria Women's Health Clinic,*
506 U.S. 263 (1993) ............................................................................. 13

*Cape v. Tennessee Secondary School Athletic Association,*
563 F.2d 793 (6th Cir. 1977) ............................................................... 6, 7

*Clark v. Arizona Interscholastic Association,*
695 F.2d 1126 (9th Cir. 1982) ............................................................. 6, 7

*Cohen v. Brown University,*
101 F.3d 155 (1st Cir. 1996) ............................................................ 15, 16

*Conforti v. St. Joseph's Healthcare System,*
No. 2:17-cv-00050, 2017 WL 67114 (D.N.J., Jan. 5, 2017) .................... 19

*CSX Transportation, Inc. v. Alabama Department of Revenue,*
562 U.S. 277 (2011) ............................................................................... 3

*Davis v. Monroe County Board of Education,*
526 U.S. 629 (1999) ............................................................................... 4

*Dawson v. Steager,*
   139 S. Ct. 698 (2019) ................................................................................ 4

*Doe 2 v. Shanahan,*
   917 F.3d 694 (D.C. Cir. 2019) ................................................................ 17

*Downtown Soup Kitchen v. Municipality of Anchorage,*
   406 F. Supp. 3d 776 (D. Alaska 2019) .................................................. 20

*Eline v. Town of Ocean City,*
   7 F.4th 214 (4th Cir. 2021) ...................................................................... 5

*Epic Systemps Corp. v. Lewis,*
   138 S. Ct. 1612 (2018) .............................................................................. 9

*Franciscan Alliance, Inc. v. Burwell,*
   227 F. Supp. 3d 660 (N.D. Tex. 2016) ................................................... 19

*Frontiero v. Richardson,*
   411 U.S. 677 (1973) .................................................................................. 5

*Gebser v. Lago Vista Independent School District,*
   524 U.S. 274 (1998) .......................................................................... 22, 23

*Gibbons v. Ogden,*
   22 U.S. 1 (1824) ...................................................................................... 22

*Gregory v. Ashcroft,*
   501 U.S. 452 (1991) ........................................................................... 21, 22

*Griffin v. Oceanic Contractors, Inc.,*
   458 U.S. 564 (1982) ................................................................................ 16

*Grimm v. Gloucester County School Board,*
   972 F.3d 586 (4th Cir. 2020) ..................................................... 5, 18, 23

*Hang On, Inc. v. City of Arlington,*
   65 F.3d 1248 (5th Cir. 1995) .................................................................... 5

*Jackson v. Birmingham Board of Education,*
   544 U.S. 167 (2005) ............................................................................ 4, 22

*Jacobson v. Commonwealth of Massachusetts,*
   197 U.S. 11 (1905) .................................................................................. 22

*King v. St. Vincent's Hospital,*
   502 U.S. 215 (1991) .................................................................................. 3

*Kleczek v. Rhode Island Interscholastic League, Inc.,*
   612 A.2d 734 (R.I. 1992) .......................................................................... 6

*Mansourian v. Regents of University of California,*
   602 F.3d 957 (9th Cir. 2010) ................................................................... 8

*McCormick v. School District of Mamaroneck,*
   370 F.3d 275 (2d Cir. 2004) ................................................................................. 13

*Meriwether v. Hartop,*
   992 F.3d 492 (6th Cir. 2021) ............................................................................... 15

*National Federation of Independent Business v. Sebelius,*
   567 U.S. 519 (2012) ............................................................................................. 22

*Neal v. Board of Trustees of California State Univ*ersities,
   198 F.3d 763 (9th Cir. 1999) ................................................................... 7, 13, 16

*New Prime Inc. v. Oliveira,*
   139 S. Ct. 532 (2019) .......................................................................................... 10

*Oliver v. Scott,*
   No. 3:98-CV-2246, 2000 WL 968784 (N.D. Tex. July 13, 2000) ........................... 19

*Pederson v. Louisiana State University,*
   213 F.3d 858 (5th Cir. 2000) ............................................................................ 7, 8

*Pelcha v. MW Bancorp, Inc.,*
   988 F.3d 318 (6th Cir. 2021) ............................................................................... 15

*Pennhurst State School & Hospital v. Halderman,*
   451 U.S. 1 (1981) ..................................................................................... 21, 22, 23

*Petrie v. Illinois High School Association,*
   394 N.E.2d 855 (1979) ...................................................................................... 6, 7, 8

*Rice v. Santa Fe Elevator Corp.,*
   331 U.S. 218 (1947) ............................................................................................. 21

*Roschen v. Ward,*
   279 U.S. 337 (1929) ............................................................................................... 1

*Sandifer v. U.S. Steel Corp.,*
   571 U.S. 220 (2014) ............................................................................................. 15

*School of the Ozarks, Inc. v. Biden,*
   No. 6:21CV03089, 2021 WL 8322682 (April 15, 2021) ......................................... 18

*United States v. Atlantic Research Corporation,*
   551 U.S. 128 (2007) ............................................................................................... 3

*United States v. Champlin Refining Co.,*
   341 U.S. 290 (1951) ........................................................................................ 12, 13

*United States v. Lauderdale County,*
   914 F.3d 96 (5th Cir. 2019) .................................................................................... 3

*United States v. Virginia* (*VMI*),
   518 U.S. 515 (1996) ......................................................................................... 4, 14

*United States v. Washington,*
   142 S. Ct. 1976 (2022) ................................................................... 4

*Whitman v. American Trucking Associations,*
   531 U.S. 457 (2001) ..................................................................... 10

*Williams v. School District of Bethlehem,*
   998 F.2d 168 (3d Cir. 1993)............................................... 7, 8, 13, 14

*Wisconsin v. Yoder,*
   406 U.S. 205 (1972) ..................................................................... 22

## Statutes

20 U.S.C. § 1681.................................................................... *passim*

20 U.S.C. § 1686.............................................................. 11, 12, 18

42 U.S.C. § 18116.................................................................... 1, 22

## Other Authorities

118 Cong. Rec. 5807 (1972) .............................................................. 8

*2010 NCAA Policy on Transgender Student-Athlete Participation,*
   https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/INC_TransgenderStudentA
   thleteParticipationPolicy.pdf ...................................................... 17

A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 63 (2012) . 12

ACLU of New Jersey, *Settlement of NJ Civil Rights Suit Promises Necessary
   Reform Affirming Transgender, Intersex, and Non-binary people in prison*
   (June 29, 2021) https://www.aclu-nj.org/en/press-releases/settlement-nj-civil-
   rights-suit-promises-necessary-reform-affirming-transgender ........................... 20

Black's Law Dictionary (5th ed. 1979) ................................................. 3

David S. Cohen, The Stubborn Persistence of Sex Segregation, 20 Colum. J.
   Gender & L. 51 (2011) .............................................................. 19

Hilton, E. N. and T.R. Lundberg, Transgender women in the female category of
   sport: perspectives on testosterone suppression and performance advantage,
   Sports Medicine 51:199–214 (2021), https://doi.org/10.1007/s40279-020-01389-
   3 .................................................................................. 17

Joe Atmonavage, *Transgender woman who impregnated 2 inmates removed from
   N.J.'s female prison*, NEWJERSEY.COM (July 16, 2022),
   https://www.nj.com/news/2022/07/transgender-woman-who-impregnated-2-
   inmates-removed-from-njs-female-prison.html .................................... 20

*NCAA Transgender Student-Athlete Participation Policy,*
   https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx .... 17

Rebecca Davis O'Brien & Ali Watkins, *How Did a Two-Time Killer Get Out to Be Charged Again at Age 83?* N.Y. Times (July 30, 2022), https://www.nytimes.com/2022/07/30/nyregion/how-did-a-two-time-killer-get-out-to-be-charged-again-at-age-83.htmL ................................................................. 20

Webster's Third New International Dictionary (1966) ............................................. 3, 7

Webster's Third New International Dictionary (1968) ....................................... 10, 11

World Rugby, Transgender Women Guidelines, https://www.world.rugby/the-game/player-welfare/guidelines/transgender/women ................................................. 6

World Rugby, World Rugby approves updated transgender participation guidelines (Oct. 9, 2020), https://www.world.rugby/news/591776/world-rugby-approves-updated-transgender-participation-guidelines ........................................ 6

## Regulations

34 C.F.R. § 106.33 ................................................................................................. 5, 11

34 C.F.R. § 106.34 ............................................................................................. 7, 11, 12

34 C.F.R. § 106.41 .......................................................................................... 6, 8, 11, 13

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41390 (July 12, 2022) (to be codified at 34 C.F.R. pt. 106) ...................................................................... 9

## INTRODUCTION

Section 1557 of the Affordable Care Act (ACA) prohibits discrimination "on the ground prohibited under … title IX of the Education Amendments of 1972." 42 U.S.C. § 18116(a). Since Title IX prohibits discrimination "on the basis of sex," a straightforward reading suggests that the ACA does the same. 20 U.S.C. § 1681(a). No more, no less. As Justice Oliver Wendell Holmes said, "there is no canon *against* using common sense in construing laws as saying what they obviously mean." *Roschen v. Ward*, 279 U.S. 337, 339 (1929) (emphasis added).

But determined to ignore the obvious meaning, Defendants Xavier Becerra, the Secretary of the Department of Health and Human Services, together with the United States, seek to reinterpret the ACA and Title IX to prohibit discrimination on the basis of sexual orientation and gender identity. In support, the Secretary argues that this comes directly from the text of Title IX according to the logic of *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020).

But having set out to sea under a "textualist flag," *id.* at 1755 (Alito, J., dissenting), the Secretary's argument quickly reveals its true colors. Title IX doesn't say anything about sexual orientation or gender identity. Its text, structure, historical context, and evident purpose each point to its true goal: promoting equal opportunities based on biological sex alone. And though *Bostock* said employers cannot consider sex when firing an employee, *Bostock* does not prohibit noticing sex in other contexts, whether under Title VII (*e.g.* bathrooms) or under Title IX. In fact, Title IX expressly allows sex distinctions and sometimes even requires them to promote equal opportunity. That proves *Bostock* cannot apply to Title IX. *Bostock*'s demand for sex-blindness in employment cannot apply to a statute that everyone admits calls for sex to be taken into account.

Even worse, the Secretary's theory actively "undermine[s] one of [Title IX's] major achievements, giving young women an equal opportunity to participate in

1

sports." *Id.* at 1779 (Alito, J., dissenting). Amici prove the point. Maddie Dichiara is on a full-tuition scholarship to play soccer at the University of Houston where she plans to major in business. This type of opportunity was almost unheard of fifty years ago. That was certainly the case at the University of Houston; it didn't field a women's soccer team until 1998, more than twenty years after Title IX.

The Secretary's fundamental reinterpretation of Title IX imperils these opportunities. That's not speculation either. Sprinter Chelsea Mitchell was an All-American long jumper who won numerous state championships in sprinting and jumping events. After two male athletes began competing in the women's category, she lost four championship titles to these males and never won a single race in which both of them competed. Madison Kenyon experienced the same deflating experience running cross-country and track. She faced a male athlete in her first collegiate cross-country race and saw this athlete displace female teammates and competitors numerous times.

These women want to ensure that women's sports continue to exist so that future female athletes have real opportunities to compete, to earn scholarships, and to win on a fair playing field. And this requires a correct interpretation of Title IX. Because the Secretary's interpretation finds no support in Title IX or *Bostock*, this Court should grant Plaintiffs Susan Neese and James Hurly summary judgment.

ARGUMENT

The Secretary interprets § 1557 to prohibit discrimination because of sexual orientation and gender identity on the theory that Title IX (which is incorporated into § 1557) prohibits discrimination because of sexual orientation and gender identity. To grasp the Secretary's mistake, it's helpful to start by examining what Title IX is all about. (I) Title IX prohibits sex discrimination, not all differential treatment based on sex. It naturally follows that (II) Title IX deals with biological sex, not sexual orientation or gender identity.

## I.   Title IX prohibits sex discrimination, not sex blindness.

Title IX (A) prohibits treating one sex worse than the other sex. Still (B) not all sex distinctions are discriminatory, and (C) Title IX sometimes requires sex distinctions to achieve its mandate.

### A. Title IX prohibits treating one sex worse than the other sex.

To interpret a statute, "we begin with the text." *United States v. Lauderdale Cnty.*, 914 F.3d 960, 961 (5th Cir. 2019). And we're mindful that "[s]tatutes must 'be read as a whole.'" *United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 135 (2007) (quoting *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991)). Title IX says no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity." 20 U.S.C. § 1681(a).

Start with discrimination. In one sense to "discriminate" is just "to make a distinction." Webster's Third New International Dictionary 648 (1966). But in the context of "subject[ing]" someone to discrimination, 20 U.S.C. § 1681, it likely means "to make a difference in treatment or favor on a class or categorical basis in disregard of individual merit." Webster's Third New International Dictionary 648 (1966). Another way of putting it is the "failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored." *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 286 (2011) (quoting Black's Law Dictionary 420 (5th ed. 1979)).

So to discriminate is "to make a distinction" between persons or "groups [that] are similarly situated and there is no justification for the difference in treatment." *CSX*, 562 U.S. at 287 (discussing differential taxation of railroads and their competitors); *Bostock*, 140 S. Ct. at 1740 ("To 'discriminate against' a person, then, would seem to mean treating that individual worse than others who are

similarly situated.").[1] And "subject[ing]" someone to discrimination "on the basis of sex," 20 U.S.C. § 1681(a), must mean subjecting someone to "differential" or "less favorable" treatment because of their sex (and without a legally justifiable reason for doing so). *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).

Add to this that educational programs cannot exclude persons from participation in or deny them the benefits of an activity because of their sex. 20 U.S.C. § 1681(a); *see also Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999) ("[Title IX's] other prohibitions … help give content to the term 'discrimination.'"). So at the very least schools cannot exclude women from educational programs because they are women, and schools cannot exclude men from educational programs because they are men.

Simply put, Title IX prohibits treating women worse than men, or treating men worse than women in the educational context.

### B. Not all sex distinctions are discriminatory.

Of course, not all sex distinctions are harmful or treat one sex worse than the other. After all, men and women are sometimes differently situated. "A community made up exclusively of one sex is different from a community composed of both." *United States v. Virginia* (*VMI*), 518 U.S. 515, 533 (1996) (cleaned up). And the "physical differences between men and women … are enduring: the two sexes are not fungible." *Id.* (cleaned up). This distinction is an "immutable" one too,

---

[1] Courts interpret discrimination to require differential treatment of similarly situated persons in many different contexts. *Dawson v. Steager*, 139 S. Ct. 698, 703 (2019) ("A State violates [a statute prohibiting discriminatory taxation of federal employees] when it treats retired state employees more favorably than retired federal employees and no 'significant differences between the two classes' justify the differential treatment."); *cf. United States v. Washington*, 142 S. Ct. 1976, 1984 (2022) (a state "discriminates against the Federal Government or its contractors" under the Constitution "if it 'singles them out' for less favorable 'treatment,' … or if it regulates them unfavorably on some basis related to their governmental 'status'" (cleaned up)).

"determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973).

For example, "[m]en and women simply are not physiologically the same for the purposes of physical fitness programs," because "equally fit men and women demonstrate their fitness differently." *Bauer v. Lynch*, 812 F.3d 340, 350–51 (4th Cir. 2016). So "physical fitness standards suitable for men may not always be suitable for women, and accommodations addressing physiological differences between the sexes are not necessarily unlawful." *Id.* at 350 (finding sex-specific FBI training requirements did not violate Title VII).

Consider the ways in which society approaches anatomical differences between the sexes. Nudity ordinances that cover women's (but not men's) breasts do "not discriminate against women solely on the basis of gender." *Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1257 (5th Cir. 1995); *accord Eline v. Town of Ocean City*, 7 F.4th 214, 221 (4th Cir. 2021) (law may prohibit only women from going topless to "protect[] the moral sensibilities of … society").

We can see some of these biology-based differences in Title IX's regulations on things like locker rooms and showers. "In light of the privacy interests that arise from the physical differences between the sexes, it has been commonplace and universally accepted—across societies and throughout history—to separate … public restrooms, locker rooms, and shower facilities" based on sex. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 634 (4th Cir. 2020), as amended (Aug. 28, 2020) (Niemeyer, J., dissenting). Title IX itself doesn't say anything about these facilities, yet its regulations (correctly) allow for "separate toilet, locker room, and shower facilities on the basis of sex" so long as the facilities are comparable for each sex. 34 C.F.R. § 106.33.

And in sports what's good for the gander isn't always good for the goose. "[D]ue to average physiological differences, males would displace females to a

substantial extent if they were allowed to compete" for the same teams. *Clark v. Ariz. Interscholastic Ass'n,* 695 F.2d 1126, 1131 (9th Cir. 1982). Indeed, "the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement," without distinct teams. *Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977). That's why women's-only teams are part of "a long-standing tradition in sports of setting up classifications whereby persons having objectively measured characteristics likely to make them more proficient are eliminated from certain classes of competition." *Petrie v. Ill. High Sch. Ass'n*, 394 N.E.2d 855, 861 (1979).

These differences also matter for safety. That's why World Rugby recently issued guidelines excluding biological males (who have experienced puberty) from women's rugby because "safety and fairness cannot presently be assured for women competing against transwomen in contact rugby."[2] And the women's category was created "to ensure protection, safety and equality" for those who do not benefit from males' biological advantages.[3] *See also Kleczek v. R.I. Interscholastic League, Inc.*, 612 A.2d 734, 739 (R.I. 1992) ("distinguishing between boys and girls in interscholastic sports will help promote safety").

Title IX's regulations correctly acknowledge these biological differences. They allow sex-separated teams "where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b). They also allow sex separation in "physical education classes or activities during participation in wrestling, boxing, rugby, ice hockey, football, basketball, and other

---

[2] World Rugby, World Rugby approves updated transgender participation guidelines (Oct. 9, 2020), https://www.world.rugby/news/591776/world-rugby-approves-updated-transgender-participation-guidelines [permalink: https://perma.cc/GHG6-LGN5].

[3] World Rugby, Transgender Women Guidelines, https://www.world.rugby/the-game/player-welfare/guidelines/transgender/women [permalink: https://perma.cc/HP6H-6NCV].

sports the purpose or major activity of which involves bodily contact." *Id.*
§ 106.34(a)(1).

### C. Title IX sometimes requires sex distinctions to fulfill its mandate.

Sports show that Title IX doesn't just permit sex distinctions; Title IX
sometimes requires it. Again, start with the text. Title IX doesn't stop at unjustified
discrimination but states no person "shall, on the basis of sex, be excluded from
participation in [or] be denied the benefits of … any education program or activity."
20 U.S.C. § 1681(a). The meaning of these words is straightforward. To "exclude"
means "to shut out," "hinder the entrance of," or "bar from participation, enjoyment,
consideration, or inclusion." Webster's Third New International Dictionary 793
(1966). To "deny" means (in this context) "to turn down or give a negative answer
to." *Id.* 603. So schools cannot shut women out or hinder them from enjoying,
participating in, or reaping the benefits of sports.

The thing is, everyone agrees males would displace females in activities like
soccer and track if both sexes were forced to compete against one another. *E.g.,*
*Clark*, 695 F.2d at 1131; *Cape*, 563 F.2d at 795; *Petrie*, 394 N.E.2d at 862. "[F]ailing
to field women's varsity teams … certainly creates a barrier for female students" to
participate in athletics. *Pederson v. La. State Univ.*, 213 F.3d 858, 871 (5th Cir.
2000). That means "the mere opportunity for girls to try out" for a team is not
enough if they don't stand a realistic chance of making the roster because of
competition from men. *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d
Cir. 1993). And the mere opportunity to participate also isn't enough if they don't
have a realistic chance to win scholarships or "enjoy the thrill of victory" because
the sport is dominated by men. *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d
763, 773 (9th Cir. 1999).

Hence, Title IX's regulations correctly require schools to provide "equal
athletic opportunity for members of both sexes," including in "the selection of sports

7

and levels of competition" necessary to "effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c). As Title IX's principal sponsor put it, sometimes sex segregation is "absolutely necessary to the success of the program - such as in classes for pregnant girls or emotionally disturbed students, in sports facilities or other instances where personal privacy must be preserved." 118 Cong. Rec. 5807 (1972).

Maddie Dichiara proves the point. A soccer player since she was five years old, she attends the University of Houston on a full-tuition athletic scholarship and plays on the women's soccer team. Her opportunity to compete on a scholarship is only possible because her school fields a women's-only team. Indeed, in any sport that similarly requires athleticism, women "are generally at a substantial physical disadvantage" compared to men. *Petrie*, 394 N.E.2d at 861 (discussing volleyball). That was obvious after one school eliminated its women's varsity wrestling team and gave the female wrestlers the opportunity to continue, "conditioned on their ability to beat male wrestlers in their weight class, using men's collegiate wrestling rules." *Mansourian v. Regents of Univ. of Cali.*, 602 F.3d 957, 962 (9th Cir. 2010). "As a result … the female students were unable to participate on the wrestling team and lost the benefits associated with varsity status, including scholarships and academic credit." *Id.*

Athletes like Dichiara benefited from "real opportunities, not illusory ones." *Williams*, 998 F.2d at 175. To provide women with equal opportunities, schools must field women's-only teams so women have the chance to compete, win, and become champions in their sport. *See Pederson*, 213 F.3d at 878 (explaining that "of course fewer women participate in sports" when a school "refus[es] to offer them comparable athletic opportunities to those it offers its male students"). That is what Title IX is all about.

8

## II. Because Title IX allows sex distinctions, it only deals with biological sex, not sexual orientation or gender identity.

The Secretary's interpretation suggests that you can read sexual orientation and gender identity into the word "sex" under Title IX.[4] Given that Title IX acknowledges and accommodates the differences between the sexes, it naturally follows that Title IX deals only with biological sex. The Secretary's interpretation is incompatible with Title IX's (A) text, (B) structure, and (C) purpose. Further, (D) *Bostock* doesn't apply to Title IX, and (E) our federalism cannon demands a narrow interpretation.

### A. Title IX's original, ordinary meaning is about biological sex.

Again, let's start with the text. "After all, only the words on the page constitute the law." *Bostock*, 140 S. Ct. at 1738. And judges cannot "add to, remodel, update, or detract from old statutory terms" according to their "own imaginations," *id.*, or to ensure statutes "better reflect the current values of society," *id.* at 1756 (Alito, J., dissenting).

Title IX doesn't say anything about sexual orientation or gender identity. It prohibits discrimination only "on the basis of sex." 20 U.S.C. § 1681(a). Plus, sexual orientation and "transgender status are distinct concepts from sex." *Bostock*, 140 S. Ct. at 1746–47. And for persons who identify as transgender, their biological sex

---

[4] The Department of Education has proposed regulations redefining "sex" in Title IX to include "sexual orientation" and "gender identity." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41390, 41391 (July 12, 2022) (to be codified at 34 C.F.R. pt. 106). Those regulations are not before this Court, and the Secretary concedes his interpretation receives no deference. Defs.' Mot. to Dismiss the First Am. Compl. 12–13 (Doc. 16). And even if the proposed regulations are eventually finalized, they should receive no deference because here Title IX's meaning is clear using "traditional tools of statutory construction." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018) ("Where … the canons supply an answer, '*Chevron* leaves the stage.'").

and gender identity are not aligned. "Sex" cannot fully encompass all of these terms at once, so this Court must decide what "sex" means under Title IX.

Because "sex" is not defined in the statute, it should be interpreted according to its ordinary meaning "at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (citation omitted). As this Court correctly noted, in 1972, "sex" was commonly understood to refer to biological differences between males and females, "particularly with respect to reproductive functions." Op. and Order 23 (Doc. 30); *see Sex*, Webster's Third New International Dictionary 2081 (1968) ("one of the two divisions of organic esp. human beings respectively designated male or female."). And "Title IX's ordinary public meaning remains intact until changed by Congress." Op. and Order 25.

### B. Title IX's structure points to biological sex.

Though we start with the words themselves, the text should be "interpreted in its statutory and historical context and with appreciation for its importance to the [statute] as a whole." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001). "After all, context matters. As the late Justice Thurgood Marshall once put it, 'A sign that says "men only" looks very different on a bathroom door than a courthouse door.'" *Adams v. Sch. Bd. of St. Johns Cnty.*, 3 F.4th 1299, 1321 (11th Cir.) (Pryor, J. dissenting) (citation omitted), *reh'g en banc granted*, 9 F.4th 1369 (11th Cir. 2021).

Throughout Title IX, "sex" is used as a binary concept, encapsulating only male and female. For example, Title IX allows schools in certain circumstances to change "from being an institution which admits only students of *one sex* to being an institution which admits students of *both sexes*." 20 U.S.C. § 1681(a)(2) (emphases added). The statute also exempts "father-son or mother-daughter activities … but if such activities are provided for students of *one sex*, opportunities for reasonably

comparable activities shall be provided for students of *the other sex*." *Id.* § 1681(a)(8) (emphases added).

Not only do these provisions speak of "the" other sex or "both sexes," rather than "another" sex or "all sexes," they also use terms like "father-son" and "mother-daughter" which are rooted in biology. At the time, mother was defined as "a female parent," Webster's Third New International Dictionary 1474 (1968); "father" as "a male parent," *id.* at 828; "son" as a "male offspring," *id.* at 2172; and "daughter" as "a human female," *id.* at 577. This makes no sense if "sex" includes the non-binary concept of gender identity.

If sex included concepts like a person's gender identity, Title IX's regulations do not make sense either. They correctly allow for separate locker rooms and showers, *supra* § I.B, so long as facilities "for students of *one sex*" are comparable to "facilities provided for students *of the other sex*." 34 C.F.R. § 106.33 (emphases added). In sports, the regulation allows schools to "sponsor separate teams for members *of each sex*." *Id.* § 106.41(b) (emphasis added). And schools must "provide equal athletic opportunity for members of *both sexes*" to "effectively accommodate the interests and abilities of members of *both sexes*." *Id.* § 106.41(c) (emphases added).

The list goes on. Title IX or its regulations exempt institutions "traditionally" limited to "only students of one sex," 20 U.S.C. § 1681(a)(5); "youth service organizations" traditionally "limited to persons of one sex," *Id.* § 1681(a)(6)(B); "living facilities for the different sexes," 20 U.S.C. § 1686; "separation of students by sex within physical education classes" for sports chiefly involving bodily contact, 34 C.F.R. § 106.34(a)(1); and human sexuality classes and choirs separated by "sex," *Id.* § 106.34(a)(3)–(4). Title IX and its regulations only make sense against a binary, biological backdrop.

11

In contrast, the Secretary's interpretation is too smart for its own good. If sex includes sexual orientation, these exemptions affirmatively bless heterosexual-only choirs, *see* 34 C.F.R. § 106.34(a)(4), or living facilities for gays only, *see* 20 U.S.C. § 1686. And if sex means gender identity, schools could not use a biology-based classification to separate physical education classes involving sports like boxing and rugby. *See* 34 C.F.R. § 106.34(a)(1); *see also infra* § II.C (explaining that sex-separated sports only exist to accommodate physiological differences between the sexes). These exemptions only make sense if they are rooted in biology, not identity or orientation.

### C. Title IX's purpose is to promote equality based on biological sex.

The Secretary's interpretation is at odds with Title IX's purpose too. A text "cannot be divorced from the circumstances existing at the time [the statute] was passed, and from the evil which Congress sought to correct and prevent." *United States v. Champlin Ref. Co.*, 341 U.S. 290, 297 (1951). And naturally, "a textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored."[5]

This isn't an endorsement of purposivism that "goes around or behind the words of the controlling text."[6] "[I]nterpretation always depends on context," "context always includes evident purpose, and … evident purpose always includes effectiveness."[7] Here, understanding a document's "overarching purpose," which is "evident in the text" itself, is an intuitive part of interpreting the statute. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011).

The statute plainly seeks to prohibit the discriminatory practice of treating women worse than men and denying opportunities to women because they are

---

[5] A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 63 (2012).
[6] *Id.* at 18.
[7] *Id.* at 63.

women (and vice versa). *Supra* § I.A. "The circumstances and the evil" that motivated Title IX "are well-known" too. *Champlin*, 341 U.S. at 297. Numerous courts have recognized that "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities."[8] *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 & n.36 (1979). This has nothing to do with sexual orientation or gender identity, particularly since "gender identity" was "a concept that was essentially unknown" fifty years ago. *Bostock*, 140 S. Ct. at 1755 (Alito, J., dissenting); *see also id.* at 1772 ("The term 'transgender' is said to have been coined 'in the early 1970s.'" (cleaned up)).

Title IX simply focuses on biology. And once again, sports prove the point. "[G]irls and women were historically denied opportunities for athletic competition based on stereotypical views that participating in highly competitive sports was not 'feminine' or 'ladylike.'" *McCormick*, 370 F.3d at 295. "Male athletes had been given an enormous head start." *Neal*, 198 F.3d at 767. So at the behest of Congress, Title IX's sports regulations aimed "to level the proverbial playing field, *id.*, and required that covered programs "shall provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). "[I]t would require blinders to ignore that the motivation for promulgation of the regulation on athletics was the historic emphasis on boys' athletic programs to the exclusion of girls' athletic programs in high schools as well as colleges." *Williams*, 998 F.2d at 175.

But the Secretary's interpretation would reverse decades of progress under Title IX by ignoring the statute's biology-based remedial scheme. Men and women

---

[8] "[W]hatever approach" cases like *McCormick* or *Cannon* "may have used" to deduce Title IX's purpose, we may rely on them as "an integral part of our jurisprudence" on Title IX. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 286 n.17 (1993).

are differently situated in sports because of the average physiological differences between the sexes. *See supra* § I.B. Sex-separated teams exist to accommodate these differences. *Id*. Take that biological distinction away and there's no justification for sex-separated teams in the first place.

Remember too that equal protection doesn't sanction differential treatment of persons "simply because they are women" or men. *VMI*, 518 U.S. at 532. That type of distinction rests "on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id*. at 533. So Title IX correctly allows for sex-separated sports and physical education classes *only* "where selection for such teams is based upon competitive skill or the activity involved is a contact sport" to accommodate real physiological differences. 34 C.F.R. § 106.41(b).

The Secretary simply takes women's teams for granted without stopping to consider the pivotal role that biology-based classifications have played in promoting equal opportunities. His interpretation has dire ramifications for female athletes too, threatening to end women's sports. Yet to give women "real opportunities," rather than participation trophies, schools must offer women-only teams. *See supra* § I.C (quoting *Williams*, 998 F.2d at 175). Title IX accomplishes this by focusing on biology, and neither the statute's text nor purpose support the Secretary's interpretation.

### D. *Bostock* is inapposite.

Having run aground Title IX's plain text, structure, and purpose, the Secretary must rely on *Bostock* to salvage his expedition. Defs.' Mot. to Dismiss the First Am. Compl. 23 (Doc. 16). But the Secretary treats *Bostock* like a yacht when it's little more than a dinghy—he demands a wide berth though the opinion explicitly calls for a narrow interpretation.

*Bostock* held that discrimination based on sexual orientation or gender identity in the employment context violates Title VII. 140 S. Ct. at 1741. In short,

14

the Court observed that an employer who discriminates against an employee based on their sexual orientation or gender identity bases their decision, in part, on sex, and sex "is not relevant to the selection, evaluation, or compensation of employees." *Id.* (citation omitted).

*Bostock* does not support the Secretary's interpretation for at least three reasons.[9] First, *Bostock* does not change the "ordinary, contemporary, common meaning" of sex under Title IX. *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted). Just the opposite: *Bostock* recognized that sex, gender identity, or sexual orientation are "distinct concepts." *Bostock,* 140 S. Ct. at 1746–47. And as already explained, you can't read sexual orientation and gender identity into sex under Title IX. *Supra* § II.A–C.

Second, *Bostock* was a narrow holding, and the Court disclaimed any application outside the Title VII employment context. *Bostock*, 140 S. Ct. at 1753. Even under the same statute, the Court declined to extend its holding to "bathrooms, locker rooms, or anything else of the kind." *Id.* at 1753. For this reason, other courts have concluded that "the rule in *Bostock* extends no further than Title VII." *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021).

Third, *Bostock*'s analysis does not work under Title IX. "Title VII differs from Title IX in important respects." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021). Though sex is irrelevant to hiring or firing decisions, "athletics differs from … employment in analytically material ways." *Cohen v. Brown Univ.*, 101 F.3d 155, 177 (1st Cir. 1996); *see supra* § I.B. So "it does not follow that principles announced in the Title VII context automatically apply in the Title IX context."

---

[9] Plaintiffs in this case make different arguments regarding *Bostock*'s scope and application. *E.g.* First. Am. Compl. ¶¶ 13–14 (Doc. 11) (arguing *Bostock* permits sexual orientation and gender identity discrimination that does not consider sex). Amici curiae take no position on other issues or arguments raised in this case outside of what is addressed in this brief.

*Meriwether*, 992 F.3d at 510 n.4; *Neal*, 198 F.3d at 772 n.8 (Title VII "precedents are not relevant in the context of collegiate athletics. Unlike most employment settings, athletic teams are gender segregated[.]"); *Cohen*, 101 F.3d at 177 ("It is imperative to recognize that athletics presents a distinctly different situation from … employment and requires a different analysis in order to determine the existence *vel non* of discrimination.").

Again, sports prove the point. Remember, *Bostock* simply held that Title VII forbids employers' taking sex into consideration (even in part) when they fire an employee. Applying the same reasoning here would mean Title IX forbids schools' taking sex into consideration (even in part) when they field a soccer team.[10] But "athletics programs *necessarily* allocate opportunities separately for male and female students." *Cohen*, 101 F.3d at 177; *supra* § I.C. And because males would largely displace females in sports if they were forced to compete against one another, the Secretary's interpretation would be the death knell of women's sports.

The Secretary may implausibly posit that he doesn't challenge sex separation *generally*, only sex separation that excludes someone from participating on the team that matches their gender identity. But you don't jettison the passengers to save the ship. Sex-separated sports only exist to accommodate the *average physiological differences* between the sexes and would otherwise be unlawful. *Supra* § II.C.

---

[10] Ironically, the Secretary's interpretation *forces* the state to discriminate based on gender identity, by excluding student-athletes from participating on the women's or men's teams based solely on gender identity. Presumably, this would force female athletes who identify as male to compete against males, even if they have the physiological characteristics of a typical female. That makes little sense in light of Title IX's text, structure, and purpose. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

And even if the Secretary's interpretation were legally feasible, it would still destroy women's sports by making it impossible to police males' participation. That's because "the transgender community is not a monolith in which every person wants to take steps necessary to live in accord with his or her preferred gender (rather than his or her biological sex)." *Doe 2 v. Shanahan*, 917 F.3d 694, 722 (D.C. Cir. 2019) (Williams, J., concurring); *see also id.* at 701 (Wilkins, J., concurring) (same). And major governing sports bodies that allow males to participate in women's sports only do so for males who have taken puberty blockers or suppressed their testosterone. World Rugby, for example, only allows males to participate if they have never experienced male puberty. *Supra* n.3. And organizations like the NCAA that promote inclusion acknowledge that males' participation in women's sports based solely on gender identity is untenable.[11] But even these regulations would violate the Secretary's interpretation of Title IX because they would still exclude *some* males (who identify as female) from the women's category.[12]

Of course, even regulations that try to include biological males in women's sports do not mitigate males' biological advantages.[13] Madison Kenyon can attest to

---

[11] The NCAA previously allowed males who identified as transgender and suppressed their testosterone for one year to compete in women's sports. *2010 NCAA Policy on Transgender Student-Athlete Participation,* https://ncaaorg.s3.amazonaws.com/inclusion/lgbtq/INC_TransgenderStudentAthlete ParticipationPolicy.pdf [permalink: https://perma.cc/J5WY-7A67]. The NCAA recently abandoned this policy for a "sport-by-sport approach" that will become effective this fall. *NCAA Transgender Student-Athlete Participation Policy*, https://www.ncaa.org/sports/2022/1/27/transgender-participation-policy.aspx [permalink: https://perma.cc/AV9C-EE4X].

[12] As Kenyon and Mitchell's experiences show (just below), the Secretary's interpretation is unworkable any way you implement it. The only way to provide equal opportunities consistent with Title IX is to field sex-separated teams.

[13] *See supra* n.3 (World Rugby regulations); *see also* Hilton, E. N. and T.R. Lundberg, Transgender women in the female category of sport: perspectives on testosterone suppression and performance advantage, *Sports Medicine* 51:199–214 (2021), https://doi.org/10.1007/s40279-020-01389-3 (reviewing literature).

that. When June Eastwood began to compete in women's cross country and track after competing in the men's category for three years, Kenyon was surprised to find herself standing next to a biological male in the first race of her collegiate career. She went on to race Eastwood numerous times, always losing by a wide margin. And despite being a mediocre competitor on the men's category, testosterone suppression did not stop Eastwood from winning the women's mile at the 2020 NCAA Big Sky Championship, where Kenyon witnessed one of her teammates lose a bronze medal after Eastwood bumped the teammate from third to fourth place.

The Secretary's interpretation is even more implausible. According to him, every male (who identifies as female) gets to participate in women's sports, regardless of medical interventions or athletic ability. The results are predictable. This was the policy in Connecticut which allowed two biological males to dominate girls' track events for several years. Chelsea Mitchell competed head-to-head with these male athletes on more than twenty occasions and never won a race in which both male athletes were running. The two male athletes won 15 state championship titles and set 17 new meet records from 2017 to 2020.

Moving on, the Secretary's interpretation would make sex-separated bathrooms, locker rooms, and showers illegal too. Similar to sports, "the implementation of his position would allow" persons of one biological sex to use restrooms "contrary to the basis for separation." *Grimm*, 972 F.3d at 634 (Niemeyer, J., dissenting) ("[R]equiring the school to allow [the plaintiff], a biological female who identifies as male, to use the male restroom compromises the separation as explicitly authorized by Title IX.").

Or how about housing. Some religious schools strictly separate dorm rooms or entire dormitories according to sex. *See* Compl. ¶¶ 5, 81–89, *Sch. of the Ozarks, Inc. v. Biden*, No. 6:21-cv-03089, 2021 WL 8322682 (April 15, 2021). Title IX's text allows this. 20 U.S.C. § 1686. But under the Secretary's interpretation schools must

18

house students according to their gender identity, burdening the religious practices of these institutions. Compl. ¶¶ 1–5, *Sch. of the Ozarks*, 2021 WL 3822682 (challenging similar interpretation that *Bostock* applies to the Fair Housing Act).

Mechanistically applying *Bostock*'s reasoning to § 1557 raises the stakes. Take hospitals that "tailor[] care according to the biological differences between men and women." *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 674 & n.8 (N.D. Tex. 2016). Or what about mental health facilities, nursing homes, and assisted living facilities that honor a patient's request for same-sex care. *See* David S. Cohen, The Stubborn Persistence of Sex Segregation, 20 Colum. J. Gender & L. 51, 83 (2011) (collecting statutes permitting or requiring sex-conscious provision of certain services to patients). Applying *Bostock* to § 1557 means that these practices are presumptively unlawful because they consider the provider's and patient's sex.

What about patients who assert a transgender identity and wish to receive "sex reassignment procedures"? *Bostock*, 140 S. Ct. at 1782 (Alito, J., dissenting). One biological female sued a Catholic hospital for discrimination under the ACA after it "refused to allow a surgeon to perform a hysterectomy" on the patient. *Id.* at 1781 n.57 (citing Complaint in *Conforti v. St. Joseph's Healthcare System*, No. 2:17-cv-00050, 2017 WL 67114 (D.N.J., Jan. 5, 2017)).

What if we go beyond § 1557 or Title IX, where some litigants have already applied the Secretary's logic to classifications in jails and prisons. When it comes to safety, "the difference between male and female inmates … is obvious." *Oliver v. Scott*, No. 3:98-CV-2246, 2000 WL 968784, at *5 (N.D. Tex. July 13, 2000), *aff'd*, 276 F.3d 736 (5th Cir. 2002). But that didn't stop New Jersey from agreeing to provide

"housing in line with gender identity" after a lawsuit by the ACLU.[14] This resulted in a biological male who identified as a female impregnating two female inmates.[15]

Or take homeless shelters that house women who "have escaped from sex trafficking or been abused or battered, primarily at the hands of men." *Downtown Soup Kitchen v. Mun. of Anchorage*, 406 F. Supp. 3d 776, 781 (D. Alaska 2019). When one shelter in Alaska declined to admit a biological male who identified as female, the municipality filed a complaint alleging it "had discriminated against [the male] on the basis of sex and gender identity." *Id.* at 784; *see id.* at 789–800 (enjoining municipality from enforcing public accommodations law against shelter). A shelter in New York city took a different route and admitted a biological male, who was recently released from prison and had a "propensity for violence" toward women.[16] The male is currently standing accused of murdering a woman who was visiting him.[17]

The list could go on. The Secretary's logic has seismic ramifications that will hurt vulnerable members of society, all the while ignoring Title IX's text, structure, and purpose. This Court should reject the Secretary's interpretation.

---

[14] ACLU of New Jersey, *Settlement of NJ Civil Rights Suit Promises Necessary Reform Affirming Transgender, Intersex, and Non-binary people in prison* (June 29, 2021) https://www.aclu-nj.org/en/press-releases/settlement-nj-civil-rights-suit-promises-necessary-reform-affirming-transgender [permalink: https://perma.cc/NQG3-PNVD].

[15] Joe Atmonavage, *Transgender woman who impregnated 2 inmates removed from N.J.'s female prison*, NEWJERSEY.COM (July 16, 2022), https://www.nj.com/news/2022/07/transgender-woman-who-impregnated-2-inmates-removed-from-njs-female-prison.html [permalink: https://perma.cc/TZ5S-QDDD].

[16] Rebecca Davis O'Brien & Ali Watkins, *How Did a Two-Time Killer Get Out to Be Charged Again at Age 83?* N.Y. TIMES (July 30, 2022), https://www.nytimes.com/2022/07/30/nyregion/how-did-a-two-time-killer-get-out-to-be-charged-again-at-age-83.htmL [permalink: https://perma.cc/36JG-4FXL?view-mode=server-side].

[17] *Id.*

**E. The federalism canon requires a narrow interpretation.**

Left high and dry after traversing Title IX's text and *Bostock*'s significance, the Secretary's shipwreck fares no better when it reaches the shores of our Constitution. Owing to our system's division of powers, the federalism cannon compels a narrow reading of Title IX.

Our federal government is one "of limited powers." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). "The powers not delegated to the United States" are reserved to the individual states and the people. U.S. Const. amend. X. And though the supremacy clause gives the federal government "a decided advantage" to "impose its will on the States," states still "retain substantial sovereign authority" owing to our system's "constitutionally mandated balance of power." *Gregory*, 501 U.S. at 457–460 (citation omitted). This decentralized structure "preserves to the people numerous advantages," and helps to protect "our fundamental liberties." *Id.* at 458.

That is why "'it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' this balance." *Id.* at 460 (citation omitted). Court may, for example, "insist on a clear" statement "before interpreting" even "expansive language in a way that intrudes on the police power of the States." *Bond v. United States*, 572 U.S. 844, 860 (2014); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) (requiring "clear and manifest purpose" to override the "historic police powers of the States"). This includes regulations over real estate, "land and water use," and the power to punish "local criminal activity." *Bond*, 572 U.S. at 858.

Courts may also insist that "Congress speak with a clear voice" when it imposes conditions on the receipt of federal funds. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). "'Legislation enacted pursuant to the spending power is much in the nature of a contract,' and therefore, to be bound by 'federally imposed conditions,' recipients of federal funds must accept them 'voluntarily and

knowingly.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17).

So the federal government may not "surpris[e] participating States with post acceptance or 'retroactive' conditions," *Pennhurst*, 451 U.S. at 24, or impose "a burden of unspecified proportions and weight, to be revealed only through case-by-case adjudication," *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 190 n.11 (1982). And private recipients of federal funds must have "notice" of their responsibilities too. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998) (citation omitted). Congress must "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property." *Ala. Ass'n of Realtors v. Dep't of Health and Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (citation omitted) (striking down eviction 'moratorium').

Both of these federalism concerns call for the "clear statement" rule in this case. *Bond*, 572 U.S. at 858. The Secretary's interpretation obviously affects education, which is the state's "high responsibility." *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972). In fact, public education is "the very apex of the function of a State." *Id.* Health care and medicine also falls squarely within the state's historic "police power." *Jacobson v. Commonwealth of Mass.*, 197 U.S. 11, 25 (1905) ("police power" extends to "health laws of every description"); *Gibbons v. Ogden*, 22 U.S. 1, 3 (1824) ("[H]ealth laws … are not within the power granted to Congress."). And remember that "Title IX was enacted as an exercise of Congress' powers under the Spending Clause." *Jackson*, 544 U.S. at 181. So was § 1557 of the ACA. 42 U.S.C. § 18116(a); *see Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 585 (2012). For these reasons Congress' "intention" to cover sexual orientation and gender identity discrimination under Title IX (and therefore § 1557) must be "unmistakably clear in the language of the statute." *Gregory*, 501 U.S. at 460 (citations omitted).

22

The Secretary's interpretation, however, goes against the plaint text and purpose of Title IX. And in doing so, it doesn't just infringe core state responsibilities or upend settled expectations; it seeks to redefine notions of privacy, fairness, and biological differences that have "been commonplace and universally accepted … across societies and throughout history." *Grimm*, 972 F.3d at 634 (Niemeyer, J., dissenting). Remember, Congress did not address sexual orientation or gender identity when it codified Title IX in 1972. *Supra* § II.A. For fifty years, everyone has accepted that schools may recognize biological differences between males and females. *Supra* § I.B & II.B. And the Secretary's interpretation and logic would have momentous consequences throughout society. *Supra* § II.D. That's an unfair "surpris[e]" to states and their citizens if there ever was one. *Pennhurst*, 451 U.S. at 25.

*Bostock* does not help the Secretary here. *Supra* § II.D. In fact, Title IX's "contractual framework distinguishes [it] from Title VII, which is framed in terms not of a condition but of an outright prohibition." *Gebser*, 524 U.S. at 286. So while "Title VII applies to all employers without regard to federal funding and aims broadly to 'eradicate discrimination throughout the economy,'" "Title IX focuses more on 'protecting' individuals from discriminatory practices carried out by recipients of federal funds." *Id.* at 286–87 (citations omitted). "Title IX's contractual nature" is one more reason to distinguish this case from *Bostock*, and why Title IX demands a narrow reading. *Id.* at 287.

The Secretary's interpretation "radically readjusts the balance of state and national authority." *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 544 (1994) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 539–540 (1947). This Court should reject the Secretary's argument and affirm that Title IX means what it has always said: equal opportunities for men and women according to biological sex.

CONCLUSION

The Secretary seeks to reinterpret Title IX contrary to its text, structure, and purpose, as well as fifty years of precedent interpreting "sex" according to its original and ordinary meaning. This would undermine Title IX's aim of promoting equal opportunities for women, make long-standing practices like sex-separated sports illegal and unworkable, and harm athletes like Dichiara, Mitchell, and Kenyon, who want to compete and win, not serve as spectators in their own sport. This Court should reject the Secretary's interpretation and grant Plaintiffs summary judgment.

Respectfully submitted this 5th day of August, 2022.

*/s/ Christian D. Stewart*
Christian Stewart, TX Bar No. 24013569
Burdett Morgan & Williamson
500 S. Taylor, Suite 900
Amarillo, TX 79101
(806) 358-8116
(806) 350-7642
cstweart@bmwb-law.com

Jonathan A. Scruggs, AZ Bar No. 030505*
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 Fax
jscruggs@adflegal.org

Johannes S. Widmalm-Delphonse, MN Bar No. 396303**
Rachel A. Csutoros, MA Bar No. 706225*
Alliance Defending Freedom
44180 Riverside Parkway
Lansdowne, VA 20176
(571) 707-2119
(571) 707-4790 Fax
jwidmalmdelphonse@adflegal.org
rcsutoros@adflegal.org

*PHV Motion filed contemporaneously*
**PHV Motions forthcoming*
*Attorneys for proposed Amici Curiae*

24

**CERTIFICATE OF SERVICE**

I hereby certify that on August 5, 2022 I electronically filed a true and exact copy of this document with the Clerk of Court and all parties using the CM/ECF system.

/s/ Christian D. Stewart

Christian D. Stewart
*Attorney for proposed Amici Curiae*