IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION
_____

SUSAN NEESE, M.D., *et al.*,

     Plaintiffs,

v.

XAVIER BECERRA, *et al.*,

     Defendants.

Civil Action No. 2:21-cv-163-Z

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

CHAD E. MEACHAM
UNITED STATES ATTORNEY

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:     214-659-8626
Facsimile:     214-659-8807
brian.stoltz@usdoj.gov

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MICHELLE R. BENNETT
Assistant Branch Director

Jeremy S.B. Newman (Mass. Bar No. 688968)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20005
Tel: (202) 532-3114
Email: jeremy.s.newman@usdoj.gov

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

BACKGROUND .........................................................................................................................2

I.      Statutory and Regulatory Background ...........................................................................2

        A.      Section 1557 of the Affordable Care Act ..........................................................2

        B.      *Bostock v. Clayton County, Georgia* .................................................................3

        C.      HHS's May 2021 Notification ..........................................................................4

        D.      HHS's 2022 Notice of Proposed Rulemaking Implementing Section 1557 ....5

II.     Factual Background ........................................................................................................6

        A.      Dr. Neese ...........................................................................................................6

        B.      Dr. Hurly ............................................................................................................9

III.    Procedural History .......................................................................................................10

LEGAL STANDARD ...............................................................................................................11

ARGUMENT .............................................................................................................................11

I.      Plaintiffs Have Failed to Show They Have Article III Standing ..................................11

        A.      Plaintiffs Lack Standing to Challenge the Notification's Interpretation that
                Section 1557 Prohibits Discrimination on the Basis of Sexual Orientation ...13

        B.      Plaintiffs Lack Standing to Challenge the Notification's Interpretation that
                Section 1557 Prohibits Discrimination on the Basis of Gender Identity ........14

II.     The Notification Correctly Interprets Section 1557 ....................................................18

        A.      The Plain Text of Section 1557 Confirms HHS's Interpretation ....................18

             1.      As in Bostock, The Court Can Assume, Without Deciding, that "Sex" in
                        Title IX Refers to Biological Distinctions Between Male and Female ..........18

              2.      The Phrase "On the Basis of Sex" Is Satisfied by But-For Causation ...........19

              3.      Section 1557 Prohibits Discrimination Against Individuals on the
                        Basis of Sex        .................................................................................21

4.      Discrimination on the Basis of Sexual Orientation and Discrimination on the Basis of Gender Identity Necessarily Involve Discrimination on the Basis of Sex...............................................................22

B.      Plaintiffs' Contrary Arguments Lack Merit.............................................................24

C.      *Amici* Provide No Reason to Rule for Plaintiffs....................................................27

D.      The Court Should Grant Summary Judgment to Defendants and Deny Summary Judgment to Plaintiffs ...........................................................................30

CONCLUSION.................................................................................................................................31

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ........................................................................................ 11

*Arizona v. Biden,*
   40 F.4th 375 (6th Cir. 2022) .......................................................................... 31

*B. P. J. v. W. Virginia State Bd. of Educ.,*
   550 F. Supp. 3d 347 (S.D.W. Va. 2021) ....................................................... 24

*Babbitt v. Farm Workers Nat'l Union,*
   442 U.S. 289 (1979) ........................................................................................ 12

*Bennett v. Ky. Dep't of Educ.,*
   470 U.S. 656 (1985) ........................................................................................ 29

*Benning v. Georgia,*
   391 F.3d 1299 (11th Cir. 2004) ..................................................................... 30

*Blum v. Yaretsky,*
   457 U.S. 991 (1982) ........................................................................................ 14

*Bostock v. Clayton County, Georgia,*
   140 S. Ct. 1731 (2020) ............................................................................ *passim*

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) ........................................................................................ 31

*California v. Texas,*
   141 S. Ct. 2104 (2021) ............................................................................ 12, 14

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ........................................................................................ 17

*Cutter v. Wilkinson,*
   423 F.3d 579 (6th Cir. 2005) .......................................................................... 30

*Doe v. Snyder,*
   28 F.4th 103 (9th Cir. 2022) ..................................................................... 21, 24

*Doe v. Univ. of Scranton,*
   No. 3:19-CV-01486, 2020 WL 5993766 (M.D. Pa. Oct. 9, 2020) ................ 24

*Franklin v. Gwinnett Cnty. Pub. Sch.*,
  503 U.S. 60 (1992)............................................................................20

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018)......................................................................31

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991)..........................................................................29

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020)...............................................21, 23, 30

*In re Franchise Servs. of N. Am.*,
  891 F.3d 198 (5th Cir. 2018).......................................................17, 27

*Joganik v. E. Texas Med. Ctr.*, Civ A.,
  No. 6:19-CV-517-JCB-KNM, 2021 WL 6694455 (E.D. Tex. Dec. 14, 2021)
  *report and recommendation adopted*, Civ. A. No. 6:19-CV-00517, 2022 WL 243886
  (E.D. Tex. Jan. 25, 2022)...................................................................24

*John Doe #1 v. Veneman*,
  380 F.3d 807 (5th Cir. 2004).............................................................31

*Koenke v. Saint Joseph's Univ.*,
  Civ. A. No.19-4731, 2021 WL 75778 (E.D. Pa. Jan. 8, 2021)..............24

*Lakoski v. James*,
  66 F.3d 751 (5th Cir. 1995)...............................................................20

*Lewis v. Casey*,
  518 U.S. 343 (1996)..........................................................................14

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992).....................................................................11, 12

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994)..........................................................................31

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973)..........................................................................27

*Meritor Sav. Bank, FSB v. Vinson*,
  477 U.S. 57 (1986)............................................................................20

*Okpalobi v. Foster*,
  244 F.3d 405 (5th Cir. 2001).............................................................30

*Pederson v. La. State Univ.*,
213 F.3d 858 (5th Cir. 2000) ........................................................................21

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) ...........................................................................................29

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ........................................................................................11

*Susan B. Anthony List v. Driehaus* (*SBA List*),
573 U.S. 149 (2014) .............................................................................12, 14, 16

Statutes

5 U.S.C. § 706 .......................................................................................... 10, 30

20 U.S.C. § 1681 .............................................................................................*passim*

42 U.S.C. § 2000e-2 ................................................................................ 3, 22, 29

42 U.S.C. § 18116 ...........................................................................................*passim*

**Rules**

Fed. R. Civ. P. 56 ............................................................................................11

Fed. R. Civ. P. 5 ..............................................................................................33

**Regulations**

45 C.F.R. § 92.206 ................................................................................5, 6, 17, 27

45 C.F.R. § 92.101 ............................................................................................5

**Other Authorities**

Nondiscrimination in Health Programs and Activities, Notice of Proposed Rulemaking,
87 Fed. Reg. 47, 824 (Aug. 4, 2022) ...............................................5, 16, 17, 27

## INTRODUCTION

Plaintiffs Dr. Susan Neese ("Dr. Neese") and Dr. James Hurly ("Dr. Hurly," and collectively with Dr. Neese, "Plaintiffs") challenge a guidance document of the U.S. Department of Health and Human Services ("HHS") that contains the following interpretation of Section 1557 of the Affordable Care Act: HHS "will interpret and enforce Section 1557's prohibition on discrimination on the basis of sex to include: (1) discrimination on the basis of sexual orientation; and (2) discrimination on the basis of gender identity." Dept. of Health & Human Servs., Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972, ECF No. 11-1, at 1 ("Notification").

The undisputed facts show that Plaintiffs lack standing. Neither Plaintiff asserts that they engage in conduct or intend to engage in conduct that would constitute discrimination on the basis of sexual orientation, and Plaintiffs admit that they were not injured by the Notification that Section 1557 prohibits such discrimination. Plaintiffs assert they are concerned that HHS will deem them to have engaged in discrimination on the basis of gender identity if they decline to perform gender transition services that are outside their area of specialty, or if they provide medically appropriate care based on a transgender patient's sex characteristics (e.g., caring for the cervix and ovaries of a transgender man or the prostate of a transgender woman). But HHS has stated in the preamble to its proposed rulemaking that would implement Section 1557 that HHS does not consider such behavior to constitute discrimination on the basis of gender identity. Accordingly, no credible threat exists that HHS will enforce against Plaintiffs the legal interpretations contained in the Notification based on the behavior Plaintiffs identify.

Should the Court reach the merits, the Court should reject Plaintiffs' claims that the Notification is unlawful. Section 1557, through its prohibition of discrimination on the ground prohibited by Title IX of the Education Amendments of 1972 ("Title IX"), prohibits discrimination

against an individual in federally funded health programs "on the basis of sex." 42 U.S.C. § 18116(a); 20 U.S.C. § 1681(a). That means exactly what it sounds like: when a health care provider takes a discriminatory action against an individual, and the individual's sex is a cause of that action, then the health care provider has discriminated on the basis of sex. As the Supreme Court recently explained, "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1741 (2020). When a health care provider discriminates against an individual on the basis of the individual's sexual orientation, the provider necessarily discriminates against the individual on the basis of sex because the provider treats the individual worse based on a characteristic (e.g., being attracted to men if the individual is male) that the provider would tolerate in the opposite sex. *Id.* Similarly, when a health care provider discriminates against an individual on the basis of the individual's gender identity, the provider necessarily discriminates against the individual on the basis of sex because the provider treats the individual worse based on a characteristic (e.g., identifying as female if the individual was assigned male at birth) that the provider would tolerate in someone assigned a different sex at birth. *Id.* at 1741-42. The plain import of Section 1557's text prohibits discrimination on the basis of sexual orientation and discrimination on the basis of gender identity.

Plaintiffs lack standing, and their claims fail on the merits as a matter of law. The Court should grant Defendants' Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment.

## BACKGROUND

## I.      Statutory and Regulatory Background

### A.      Section 1557 of the Affordable Care Act

Section 1557 provides that "an individual shall not, on the ground prohibited under" any of four civil rights statutes, "be excluded from participation in, be denied the benefits of, or be subjected

to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, . . . or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments)." 42 U.S.C. § 18116(a). One of the statutes listed in Section 1557 is Title IX. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Therefore, Section 1557 prohibits discrimination "on the basis of sex" in federally funded health programs and activities.

### B.    *Bostock v. Clayton County, Georgia*

In 2020, the Supreme Court decided *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020), a case involving sex discrimination claims under Title VII of the Civil Rights Act of 1964, which prohibits discrimination in employment "because of [an] individual's . . . sex." 42 U.S.C. § 2000e-2. The Court found it unnecessary to resolve the parties' dispute over the meaning of the word "sex," because, even if one adopted for the sake of argument the employers' narrow definition of sex as limited "only to biological distinctions between male and female," discrimination because of a person's gender identity or sexual orientation would still be discrimination on the basis of sex. *Bostock*, 140 S. Ct. at 1739. The Supreme Court held that Title VII prohibits firing an employee for being gay or transgender "because it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 1741. That is because "[a]n employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex." *Id.* at 1737. The Court explained that "homosexuality and transgender status are inextricably bound up with sex" because "to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex." *Id.* at 1742. It rejected the employers' contention that Congress had

to specifically name sexual orientation or gender identity in the statute to prohibit discrimination on those bases: there is no "such thing as a 'canon of donut holes,' in which Congress's failure to speak directly to a specific case that falls within a more general statutory rule creates a tacit exception." *Id.* at 1747. The Court concluded that when an employee's sexual orientation or transgender status is a but-for cause of an adverse employment action, that action occurs "because of sex." *Id.*

To explain its conclusion, the Court offered the hypothetical of two otherwise identical employees, one male and one female, "both of whom are attracted to men." *Id.* at 1741. "If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague." *Id.* The Court also considered the example of two employees—"a transgender person who was identified as a male at birth but who now identifies as a female" and "an otherwise identical employee who was identified as female at birth." *Id.* If "the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth," then the employer has discriminated because of sex. *Id.* at 1741-42.

### C.    HHS's May 2021 Notification

On May 10, 2021, HHS issued the Notification that Plaintiffs challenge in this case. The Notification states: "[C]onsistent with the Supreme Court's decision in *Bostock* and Title IX, beginning May 10, 2021, the Department of Health and Human Services (HHS) will interpret and enforce Section 1557's prohibition on discrimination on the basis of sex to include: (1) discrimination on the basis of sexual orientation; and (2) discrimination on the basis of gender identity." Notification, at 1. The Notification does not further define what practices or conduct constitute discrimination on the basis of sexual orientation and gender identity, stating that "[t]his interpretation will guide [HHS's Office of Civil Rights] in processing complaints and conducting investigations, but does not itself determine the outcome in any particular case or set of facts." *Id.*

### D.        HHS's 2022 Notice of Proposed Rulemaking Implementing Section 1557

HHS recently issued a Notice of Proposed Rulemaking proposing a rule implementing Section 1557. *See* Dep't of Health & Human Servs., Nondiscrimination in Health Programs and Activities, Notice of Proposed Rulemaking, 87 Fed. Reg. 47,824 (Aug. 4, 2022) ("NPRM"). HHS will consider the issuance of a final rule following a period in which the public, including the parties, can submit comments on the proposed rule on or before October 3, 2022. *Id.* at 47,824.

Consistent with the Notification, the proposed rule would prohibit discrimination "on the basis of . . . sex" in federally funded health programs and activities, which "includes, but is not limited to, discrimination on the basis of . . . sexual orientation; and gender identity." *Id.* at 47,916 (proposed 45 C.F.R. § 92.101(a)(1)-(2)). The NPRM further explains the proposed contours and limits of proscribed discrimination on the basis of gender identity. The proposed rule provides that covered entities must not "[d]eny or limit health services, including those that are offered exclusively to individuals of one sex, to an individual based upon the individual's sex assigned at birth, gender identity, or gender otherwise recorded." *Id.* at 47,918 (proposed 45 C.F.R. § 92.206(b)(1)). In the NPRM's preamble, HHS explained this provision as follows:

> Under this provision [proposed 45 C.F.R. § 92.206(b)(1)], a covered entity that routinely provides gynecological or obstetric care could not deny an individual a pelvic exam or pregnancy-related care because the individual is a transgender man or nonbinary person assigned female at birth, if the entity otherwise provides that care to cisgender individuals. Similarly, a community clinic that receives funding from the Department could not refuse to provide a transgender woman a prostate cancer screening because her sex is listed female in her electronic health record, if the entity otherwise provides these screenings to cisgender individuals.

*Id.* at 47,865.

The proposed rule would prohibit covered entities from "adopting a policy or engaging in a practice that prevents an individual from participating in a health program or activity consistent with the individual's gender identity," *Id.* at 47,918 (proposed 45 C.F.R. § 92.206(b)(3)). HHS clarified that this proposed provision "does not, however, prohibit a covered entity from treating an individual for

conditions that may be specific to their sex characteristics.  For example, it would be permissible for an emergency department to treat a transgender man with a positive human chorionic gonadotropin (pregnancy) test as a pregnant person, even though pregnancy is generally associated with 'female' sex characteristics, such as having a functioning uterus and ovaries." *Id.* at 47,866.

The section of the proposed rule prohibiting sex discrimination provides: "Nothing in this section requires the provision of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting that service." *Id.* at 47,918 (proposed 45 C.F.R. § 92.206(c)).   HHS clarified that the proposed rule "does not require health care professionals to perform services outside of their normal specialty area; therefore a provider that declines to provide services outside its specialty area would have a legitimate, nondiscriminatory reason for its action." *Id* at 47,867; *see also id.* at 47,866 (proposed § 92.206 "does not require covered entities to perform services outside of their specialty area").  HHS further clarified that providers "would not be required to perform a cervical exam on an individual who does not have a cervix, or to perform a prostate exam on an individual who does not have a prostate," because the provider could "reasonably determine[] that such health service is not clinically appropriate for that particular individual," which would be "a legitimate, nondiscriminatory reason for denying or limiting that service." *Id.* at 47,867.

## II.     Factual Background

### A.      Dr. Neese

Dr. Susan Neese is a physician who "practice[s] general internal medicine for adults."  Plaintiff Susan Neese's Answers to First Set of Interrogatories 1, A1[1] ("Neese Rog. Resp."); Declaration of

---

[1] Citations to "A___" are to Defendants' Appendix, submitted concurrently with this brief.  Because Defendants are also concurrently submitting their Opposition to Plaintiffs' Motion for Class Certification, and significant overlap exists in the portions of the record relevant to the two briefs, Defendants have prepared a single Appendix that covers both this brief and Defendants' class certification opposition.

Susan Neese, M.D., ECF No. 47-1, ¶ 4 ("Neese Decl."). She does not treat any patients younger than 16, and patients younger than 18 form about two to three percent of her practice. Transcript of Deposition of Susan Neese, 26:19-27:11, 28:10-13 (July 22, 2022), A117-A118, A119 ("Neese Dep. Tr.").

Dr. Neese does not believe she has ever discriminated against patients on the basis of sexual orientation or engaged in behavior that she believes HHS would regard as discrimination on the basis of sexual orientation. Neese Rog Resp. 7, A7 ("I have never engaged in conduct that I regard as 'discrimination on the basis of sexual orientation,' or that I believe Secretary Becerra would regard as 'discrimination on the basis of sexual orientation.'"); Neese Dep. Tr. 22:8-16, A113. She also believes that she is not "likely to engage in" any conduct "in the future with respect to a gay, lesbian or bisexual patient that [she] believe[s] would constitute discrimination on the basis of sexual orientation as that phrase is used in [the Notification]." Neese Tr. 22:17-22, A113; Neese Rog. Resp. 8, A008. She testified that she was not harmed when HHS interpreted Section 1557 to prohibit discrimination on the basis of sexual orientation, and she would not benefit if this Court were to hold that Section 1557 permits discrimination on the basis of sexual orientation:

> Q When HHS stated that [it] interpreted section 1557 to prohibit discrimination on the basis of sexual orientation, do you believe that harmed you [in] any way?
> A No.
> . . .
> Q . . . [I]f the Judge issues a ruling in this case saying that it's permissible for healthcare providers to discriminate on the basis of sexual orientation, do you believe that would benefit you in any way?
> A No.

Neese Dep. Tr. 23:1-16, A114.

Dr. Neese has five adult transgender patients. Neese Dep. Tr. 29:1-3, A120. She "do[es] not refuse to provide them services," Neese Rog. Resp. 2, A2, and cannot recall ever having objected to providing services they have requested, Neese Dep. Tr. 29:11-14, A120. She manages these transgender patients' hormone therapy without objection. Neese Rog. Resp. 2, A2; Neese Decl. ¶ 8.

Dr. Neese asserts that she is "categorically unwilling to prescribe puberty blockers or hormone therapy to minors, or to assist a minor with transitioning," Neese Decl. ¶ 10, and on one occasion she refused to take on a 16-year-old patient who wanted Dr. Neese to prescribe hormones for gender transition, *id.* ¶ 9; Neese Rog. Resp. 2, A2. Dr. Neese explained: "I did not believe that I could appropriately manage the transition of a teenager. These are complex medical issues which I do not specialize in." Neese Rog. Resp. 3, A3; *see also id.* at 2, A2 (overseeing teenager's transition "is not my area of specialty"); Neese Decl. ¶ 9 (same); Neese Dep. Tr. 31:8-13, A122 (testifying that she is "not familiar" with the medical processes for a pubescent patient to transition genders). As a general matter, Dr. Neese does not provide services to patients that are outside her area of specialty. Neese Dep. Tr. 31:18-20, A122.

Dr. Neese asserts that she is concerned that HHS will deem her to have engaged in discrimination on the basis of gender identity if she recommends medically appropriate preventive care to transgender patients consistent with their biological sex characteristics. Neese Rog. Resp. 6, A6; Neese Decl. ¶¶ 15-16. She had a transgender male patient who was assigned female at birth. She recommended that the patient undergo a variety of medically appropriate preventive care consistent with the patient's sex characteristics, including a pap smear, breast examinations, a pelvic exam, and a pelvic ultrasound, but the patient refused to do so. Neese Rog. Resp. 3-4, A3-A4; Neese Decl. ¶¶ 13-14. In the future, when her female transgender patients who were assigned male at birth get older, she expects to recommend that they undergo medically appropriate preventive care consistent with their sex characteristics, such as prostate-cancer screening. Neese Rog. Resp. 4, A4; Neese Decl. ¶ 16. Dr. Neese testified that other than "overseeing the gender transition of a minor" and "recommending preventive care in accordance with the transgender patient's biological sex," she could not "come up with any" other "situations in which [she was] concerned that [she] might engage in conduct that Secretary Becerra would consider to be discrimination on the basis of gender identity." Neese Dep.

Tr. 37:9-22, A128.

**B.      Dr. Hurly**

Dr. James Hurly is a community-based pathologist, certified in anatomic and clinical pathology.  Declaration of James Hurly, M.D., ECF No. 47-2, ¶ 5 ("Hurly Decl."); Plaintiff James Hurly's Answers to First Set of Interrogatories 1, A48 ("Hurly Rog. Resp.").  As a pathologist, Dr. Hurly diagnoses patients with conditions based on laboratory analysis of body fluids and tissues.  Hurly Decl. ¶ 5; Hurly Rog. Resp. 1, A48.  Dr. Hurly does not directly treat patients and almost never meets with patients; rather, he delivers diagnoses to a patient's treating physician, who then delivers the diagnosis to the patient.  Hurly Rog. Resp. 2, A49; Transcript of Deposition of James Hurly 22:24-23:9 (July 28, 2022), A175 ("Hurly Dep. Tr.").  As a pathologist, Dr. Hurly does not perform surgery or prescribe hormones to any patients, transgender or otherwise.  Hurly Dep. Tr. 23:10-14, A175.

Like Dr. Neese, Dr. Hurly does not believe he has engaged, and does not intend to engage, in behavior that he believes HHS would regard as discrimination on the basis of sexual orientation. Hurly Rog. Resp. 4-5, A51-A52; Hurly Dep. Tr. 17:3-18, A169.  Like Dr. Neese, Dr. Hurly testified that he was not "harmed" when HHS "interpreted Section 1557 to prohibit discrimination on the basis of sexual orientation," and he would not "benefit" if this Court ruled "that it is permissible for health care providers to discriminate on the basis of sexual orientation."  Hurly Dep. Tr. 17:19-18:2, A169-A170.

Dr. Hurly has expressed concern that HHS would deem him to have engaged in discrimination on the basis of gender identity if he accurately diagnosed a transgender patient with a condition consistent with that patient's sex assigned at birth.  Hurly Rog. Resp. 4, A51; Hurly Decl. ¶ 10.  On one occasion, Dr. Hurly's secretary informed him that a transgender female patient who was assigned male at birth had called the office and spoken to the secretary to object that Dr. Hurly's practice group had diagnosed her with prostate cancer.  Hurly Dep. Tr. 24:4-25:4, A176-A177; Hurly Decl. ¶ 7.  As

Dr. Hurly's secretary recounted, the patient objected that the patient was a woman and therefore could not have prostate cancer. Hurly Dep. Tr. 25:6-14, A177; Hurly Decl. ¶ 7. Dr. Hurly never interacted with that patient and does not know what happened to the patient. Hurly Dep. Tr. 25:3-4, 25:15-17, A177. Dr. Hurly testified his concerns that HHS will deem him to have discriminated on the basis of gender identity are "all in the general situation of diagnosing someone based on the organs or body parts that they have and the transgender patient disputing that diagnosis." Hurly Dep. Tr. 28:14-29:13, A180-A181.

## III.   Procedural History

Dr. Neese and Dr. Hurly filed their original Complaint in this action on August 25, 2021. *See* Compl., ECF No. 1. On November 23, 2021, Dr. Neese and Dr. Hurly filed the operative First Amended Complaint along with a third named plaintiff who later dismissed his claims,[2] Dr. Jeffrey Barke. *See* First. Am. Compl., ECF No. 11. In Claim 1, Plaintiffs claimed that the Notification was "not in accordance with law," 5 U.S.C. § 706(2)(A), in violation of the APA. First. Am. Compl. ¶ 44. Plaintiffs asked the Court to "hold unlawful and set aside" the Notification and "enjoin the Secretary from enforcing its interpretation of section 1557." *Id.* ¶ 45. In Claim 2, Plaintiffs asked the Court to issue a declaratory judgment "that section 1557 does not prohibit discrimination on account of sexual orientation and gender identity, as Secretary Becerra claims, but that it prohibits only 'sex' discrimination, which means that provider would have acted differently toward an identically situated member of the opposite biological sex." *Id.* ¶ 48. Plaintiffs filed the lawsuit as a putative class action on behalf of "a class of all healthcare providers subject to section 1557 of the Affordable Care Act." *Id.* ¶ 38. Defendants filed a motion to dismiss, which this Court denied. ECF No. 30. Following that ruling, Plaintiffs did not take discovery, and Defendants took discovery related to standing and class certification, *see* Joint Proposed Scheduling Order, ECF No. 34, § 5(B), which consisted of document

---

[2] *See* ECF No. 39 (stipulation of voluntary dismissal with prejudice of Dr. Barke's claims).

requests, interrogatories, and depositions of Dr. Neese and Dr. Hurly.  On August 5, 2022, Plaintiffs moved for certification of the proposed class.  ECF No. 44.[3]  Also on August 5, 2022, Plaintiffs filed a Motion for Summary Judgment, seeking judgment on both claims.  ECF No. 46.

## LEGAL STANDARD

When the record establishes "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate.  Fed. R. Civ. P. 56(a).  "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ARGUMENT

## I.     Plaintiffs Have Failed to Show They Have Article III Standing

"[T]he 'irreducible constitutional minimum' of standing consists of three elements.  The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Plaintiffs "bear[] the burden of establishing these elements."  *Lujan*, 504 U.S. at 561.  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice . . . . In response to a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true."  *Id.* (quoting Fed. R. Civ. P. 56(e)).  Therefore, the Court's rejection at the pleading stage of Defendants' motion to dismiss for lack of standing is not dispositive of the standing issue at the summary judgment stage.

---

[3] Defendants are filing an opposition to Plaintiffs' Motion for Class Certification concurrently with this brief.

The discovery record, combined with HHS's statements concerning discrimination on the basis of gender identity in its proposed rule, show that Plaintiffs have not established and cannot establish standing. An injury in fact must be "actual or imminent, not 'conjectural' or 'hypothetical.'" *Susan B. Anthony List v. Driehaus* (*SBA List*), 573 U.S. 149, 158 (2014) (quoting *Lujan*, 504 U.S. at 560). A plaintiff must show a "credible threat" of enforcement to raise a preenforcement challenge to a law. *SBA List*, 573 U.S. at 159 (quoting *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). "In the absence of contemporary enforcement, . . . a plaintiff claiming standing must show that the likelihood of future enforcement is 'substantial.'" *California v. Texas*, 141 S. Ct. 2104, 2114 (2021) (quoting *SBA List* at 164)). Because Plaintiffs do not contend that HHS has enforced Section 1557 against them, they must establish a substantial likelihood that HHS will enforce Section 1557 against them in the future.

Plaintiffs have failed to make such a showing. As to HHS's interpretation that Section 1557 prohibits discrimination on the basis of sexual orientation, Plaintiffs plainly lack standing. They do not believe they have engaged in discrimination on the basis of sexual orientation and do not intend to do so, and they admit that they were not harmed by HHS's interpretation of Section 1557 as prohibiting such discrimination.

Plaintiffs also lack standing to challenge HHS's interpretation that Section 1557 prohibits discrimination on the basis of gender identity. Plaintiffs state they are concerned that HHS will deem their conduct to constitute discrimination on the basis of gender identity. Discovery showed that their concerns are based on providing medically appropriate preventive and diagnostic care related to a transgender patient's sex characteristics (e.g., providing care for the prostate of a transgender woman or the cervix or ovaries of a transgender man) or, for Dr. Neese only, refusing to provide gender transition services that are not within her area of specialization. However, in articulating its proposed rule, HHS explained its view that such conduct does not constitute discrimination and proposed a rule

that would not treat such conduct as discrimination. Accordingly, no substantial threat exists that Section 1557 will be enforced against Plaintiffs.

### A. Plaintiffs Lack Standing to Challenge the Notification's Interpretation that Section 1557 Prohibits Discrimination on the Basis of Sexual Orientation

Plaintiffs lack standing to challenge the Notification insofar as it interprets Section 1557 to prohibit discrimination on the basis of sexual orientation. Both Dr. Neese and Dr. Hurly state they have not engaged in any behavior that HHS would deem to be discrimination on the basis of sexual orientation, and they do not intend to do so in the future. Neese Rog. Resp. 7-8, A7-A8; Neese Dep. Tr. 22:8-22, A113; Hurly Rog. Resp. 4-5, A51-A52; Hurly Dep. Tr. 17:3-18, A169. Both Dr. Neese and Dr. Hurly admit that it did not "harm[]" them "in any way" when HHS "interpreted section 1557 to prohibit discrimination on the basis of sexual orientation," Neese Dep. Tr. 23:1-5, A114; Hurly Dep. Tr. 17:19-22, A169. That is, there is no injury-in-fact. Both Dr. Neese and Dr. Hurly also admit that if the Court issued their requested relief by ruling that it is "permissible for healthcare providers to discriminate on the basis of sexual orientation," that would not "benefit" them "in any way." Neese Dep. Tr. 23:11-16, A114; Hurly Dep. Tr. 17:23-18:2, A169-A170. That is, the Court could not redress any injury related to a requirement not to discriminate on the basis of sexual orientation. Tellingly, the section of Plaintiffs' summary judgment brief arguing for Article III standing refers only to "gender identity" and "transgender" patients, and not to "sexual orientation" or gay, lesbian, or bisexual patients. Pls. SJ Br. 2-3.

Plaintiffs may seek to argue that they have standing to challenge HHS's interpretation that Section 1557 prohibits discrimination on the basis of gender identity, so therefore they can also challenge HHS's interpretation that Section 1557 prohibits discrimination on the basis of sexual orientation. This argument is unavailing. As explained below, Plaintiffs also lack standing to challenge HHS's interpretation concerning gender identity. *See infra*, Part I.B. But even if the Court were to hold that Plaintiffs have standing to challenge the Notification's interpretation that Section 1557

prohibits discrimination on the basis of gender identity, that would not establish standing to challenge the Notification's interpretation that Section 1557 prohibits discrimination on the basis of sexual orientation. That is because "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358, n.6 (1996). "[T]he right to complain of *one* administrative deficiency" does not "automatically confer[] the right to complain of *all* administrative deficiencies." *Id.* Of the two interpretations of Section 1557 contained in the Notification, that Section 1557's prohibition on sex discrimination includes "(1) discrimination on the basis of sexual orientation; and (2) discrimination on the basis of gender identity," ECF No. 11-1, at 1, Plaintiffs admit they have not been injured by the first.[4] They therefore lack standing to challenge it.

### B.   Plaintiffs Lack Standing to Challenge the Notification's Interpretation that Section 1557 Prohibits Discrimination on the Basis of Gender Identity

It is undisputed that HHS has not enforced Section 1557 against Plaintiffs based on its interpretation that Section 1557 prohibits discrimination on the basis of gender identity. To raise a preenforcement challenge, Plaintiffs must show "a credible threat" of enforcement. *SBA List*, 573 U.S. at 159; *see also California*, 141 S. Ct. at 2114 ("In the absence of contemporary enforcement, . . . a plaintiff claiming standing must show that the likelihood of future enforcement is 'substantial.'"). At the pleading stage, the Court concluded that Plaintiffs had met this standard. *See* Opinion and Order, ECF No. 30, at 9-13. However, the discovery record has shown that no such credible threat of enforcement exists because Plaintiffs do not intend to engage in behavior that HHS regards as discrimination on the basis of gender identity.

---

[4] Plaintiffs make distinct legal arguments concerning the applicability of Section 1557 to sexual orientation and to gender identity, showing that the two issues are not identical. *See* Pls. SJ Br. 4-5, 9 (addressing applicability of Section 1557 to "bisexual patients"); *id.* at 5 (addressing applicability of Section 1557 to "transgender patients"). Even if the two issues are similar in some respects, "a plaintiff who has been subject to injurious conduct of one kind" does not "possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Lewis*, 518 U.S. at 358 n.6 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982)).

Plaintiffs have clarified, through their interrogatory responses, depositions, and summary judgment declarations, that their concerns about potential future enforcement are quite narrow. Dr. Neese treats several transgender patients and has never objected to providing any services they have requested, including hormone therapy. Neese Rog. Resp. 2, A2; Neese Decl. ¶ 8; Neese Dep. Tr. 29:1-5, 29:11-14, A120. As a pathologist, Dr. Hurly does not treat patients directly, and he has never refused to provide his diagnostic services to transgender patients. Hurly Rog. Resp. 1-2, A48-A49.

Plaintiffs have expressed concern that HHS may deem them to have engaged in discrimination on the basis of gender identity in two situations. First, both Dr. Neese and Dr. Hurly are concerned that HHS will consider them to have engaged in discrimination if they provide medically appropriate care based on a transgender patient's sex characteristics, when those sex characteristics do not align with the patient's gender identity, such as treating or diagnosing conditions of the prostate of a transgender woman or the cervix or ovaries of a transgender man. *See* Neese Rog. Resp. 8, A8; Neese Decl. ¶¶ 15-16; Hurly Rog. Resp. 4, A51; Hurly Decl. ¶ 10; *see also* Neese Rog. Resp. 3-4, A3-A4 (describing instance in which a transgender man rejected Dr. Neese's recommendation that the patient undergo preventive care such as a pap smear, breast examinations, a pelvic exam, and a pelvic ultrasound); Hurly Dep. Tr. 24:4-25:17, A176-A177 (describing instance in which Dr. Hurly was informed that a transgender woman had objected to his practice group's diagnosis of prostate cancer). Second, Dr. Neese (but not Dr. Hurly) has expressed concern that HHS would deem her to have engaged in discrimination if she declines to perform services overseeing the gender transition of a minor, which are "not [her] area of specialty," Neese Rog. Resp. 2, A2, and with which she is "not familiar," Neese Dep. Tr. 31:8-13, A122; *see also* Neese Rog. Resp. 3, A3 ("These are complex medical issues which I do not specialize in."). Both Plaintiffs testified that they could not think of any other concerns about potential future enforcement. Neese Dep. Tr. 37:9-22, A128; Hurly Dep. Tr. 28:14-29:13, A180-A181.

HHS has never taken the position that either category of behavior in which Plaintiffs intend to engage — providing medically appropriate care based on a transgender patient's sex characteristics, or declining to provide services outside a physician's area of specialty — constitutes discrimination on the basis of gender identity. Indeed, Plaintiffs could not point to any language in any statement from HHS signifying that HHS would view their behavior to constitute discrimination beyond the mere statement in the Notification that Section 1557 prohibits discrimination on the basis of gender identity. *See* Neese Dep. Tr. 36:19-37:8, A127-A128; Hurly Dep. Tr. 27:9-28:1, A179-A180.

Further, in the NPRM, HHS has indicated that it *does not* consider behavior of the kind in which Plaintiffs anticipate engaging to constitute discrimination, and therefore proposed a rule that would not treat such behavior as discrimination. First, the NPRM states that it would not constitute discrimination to provide medically appropriate care based on a transgender patient's sex characteristics. *See* 87 Fed. Reg., at 47,866 (HHS would not "prohibit a covered entity from treating an individual for conditions that may be specific to their sex characteristics," such as treating the pregnancy of a pregnant transgender man). To the contrary, HHS's proposed rule states that it would constitute discrimination to *deny* to transgender patients medically appropriate care based on their sex characteristics. In fact, HHS cited the specific examples of the types of care offered by Dr. Neese and Dr. Hurly to their transgender patients — such as "a pelvic exam" for a "transgender man . . . assigned female at birth," or "a prostate cancer screening" for a "transgender woman" — as care that providers "could not deny" or "could not refuse to provide" under the proposed rule. *Id.* at 47,865. Given that HHS's proposed rule considers it discriminatory to deny a transgender patient medically appropriate care based on the patient's sex characteristics, no "credible threat," *SBA List*, 573 U.S. at 159, exists that HHS would take an enforcement action against Dr. Neese or Dr. Hurly for providing such care.

Second, HHS's proposed rule states that health care providers may decline "to perform services outside of their normal specialty area" because "a provider that declines to provide services

outside its specialty area would have a legitimate, nondiscriminatory reason for its action." 87 Fed. Reg., at 47,867; *see also id.* at 47,918 (proposed 45 C.F.R. § 92.206(c)) ("Nothing in this section requires the provision of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting that service."); *id.* at 47,866 (proposed § 92.206 "does not require covered entities to perform services outside of their specialty area"). Therefore, Dr. Neese faces no credible threat of enforcement for declining to provide gender transition services to minors that are outside her area of specialty.

To be sure, the NPRM sets forth a proposed rule, and HHS must consider any significant comments it receives before issuing a final rule. Nonetheless, any claimed future injury hinges on the highly speculative notion that HHS will take enforcement actions against Plaintiffs in the future based on positions that are at odds with the positions HHS expressed very recently in the NPRM. But a "highly speculative fear" about future government action does not constitute the type of "imminent" injury required by Article III. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 410 (2013).

Plaintiffs wish to provide transgender patients with medically appropriate care for their body parts associated with sex characteristics, such as the prostate of a transgender woman or the cervix or ovaries of a transgender man. Dr. Neese declines to perform services that are outside her area of specialization. HHS has stated in the NPRM that such conduct does not constitute discrimination on the basis of gender identity. Therefore, Plaintiffs are not injured by the Notification, which contains the legal interpretation that Section 1557 prohibits discrimination on the basis of gender identity. It is possible that Plaintiffs would have academic disagreements with HHS about the application of Section 1557 to various hypothetical situations that do not touch their concrete interests. But Article III does not permit federal courts to issue advisory opinions on such matters. *See In re Franchise Servs. of N. Am.*, 891 F.3d 198, 205 (5th Cir. 2018) ("The prohibition of advisory opinions is a constitutional limit on the power of the courts.").

## II.     The Notification Correctly Interprets Section 1557

### A.     The Plain Text of Section 1557 Confirms HHS's Interpretation

In interpreting a statute's text, a court "begin[s] by examining the key statutory terms in turn before assessing their impact on the case[] at hand and then confirming [its] work against [applicable] precedents." *Bostock*, 140 S. Ct. at 1738-39.  This process of textual analysis confirms that HHS correctly interpreted Section 1557 to prohibit discrimination on the basis of sexual orientation and discrimination on the basis of gender identity.

As noted above, Section 1557 provides that "an individual shall not, on the ground prohibited under . . . [Title IX], be excluded from participation in, be denied the benefits of, or be subjected to discrimination under," certain health programs or activities.  42 U.S.C. § 18116(a).  Title IX in turn provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Therefore, should the Court deem it necessary to reach the merits of HHS's interpretation, the Court's task is to determine what it means under Section 1557 (through its incorporation of Title IX's ground of sex discrimination) to discriminate against an individual "on the basis of sex," and whether such discrimination includes discrimination on the basis of sexual orientation and discrimination on the basis of gender identity.

### 1.     *As in* Bostock*, The Court Can Assume, Without Deciding, that "Sex" in Title IX Refers to Biological Distinctions Between Male and Female*

In *Bostock*, the Supreme Court assumed, but did not decide, that in Title VII, "sex . . . referr[ed] only to biological distinctions between male and female." 140 S. Ct. at 1739.  Plaintiffs and their *amici* argue that "sex" in Section in Section 1557, which incorporates the grounds of discrimination from Title IX, also refers to "biological" distinctions between male and female.  *See* Pls. SJ Br. 6 (arguing that "sex" refers to "biological sex"); Amici Curiae Brief of Three Female Athletes in Support of

Plaintiffs, ECF No. 50, at 10 ("Athletes Amici Br.") (arguing that "sex" "refer[s] to biological differences between males and females"). Although Defendants do not concede that this interpretation of "sex" is correct, as in *Bostock*, this Court can assume, without deciding, that "sex" in Title IX and Section 1557 refers to biological distinctions between male and female. For the reasons explained below, even assuming that reading of "sex" for the sake of argument, HHS is correct that discrimination on the basis of sex includes discrimination on the basis of sexual orientation and gender identity.[5]

2. *The Phrase "On the Basis of Sex" Is Satisfied by But-For Causation*

This Court's "question isn't just what 'sex' meant, but what [Section 1557] says about it." *Bostock*, 140 S. Ct. at 1739. The *Bostock* Court analyzed the meaning of "because of sex" in Title VII in light of the surrounding statutory language as well as the causation standards that language may invoke. *Id.* at 1739-41. As to the causation standard, the Court acknowledged that Title VII allows for liability in cases where sex was a "motivating factor" in the challenged practice, but "because nothing in [the Court's] analysis depend[ed] on the motivating factor test, [the Court] focus[ed] on the more traditional but-for causation" when determining whether an action was taken "because of sex." *Id.* at 1940. As shown below, Section 1557's prohibition of discrimination "on the basis of sex" can also be satisfied by showing but-for causation. Because consideration of the but-for causation

---

[5] At the pleading stage, the Court understood Defendants to be arguing that "Section 1557 prohibits discrimination on the basis of [sexual orientation and gender identity] in addition to the longstanding protected class 'sex.'" Op. & Order 23, ECF No. 30. The Court also understood Defendants to argue that Title IX "contains a broader definition of 'sex' that includes [sexual orientation and gender identity]." *Id.* at 25. In this brief, Defendants clarify that their argument is somewhat different. Defendants do not argue that Title IX includes discrimination on the basis of sexual orientation and gender identity as distinct, additional grounds of prohibited discrimination. Just as the Supreme Court did in *Bostock*, this Court can assume, without deciding, that the word "sex" in Title IX refers to biological distinctions between male and female, and that the only ground of discrimination in Title IX or Section 1557 relevant to this case is discrimination "on the basis of sex." But Defendants argue — again, following the Supreme Court in *Bostock* — that Section 1557 prohibits discrimination on the basis of sexual orientation and discrimination on the basis of gender identity because discrimination on either of those grounds necessarily involves discrimination on the basis of sex.

standard suffices to show that discrimination on the basis of sexual orientation or gender identity is discrimination on the basis of sex under Section 1557, this Court can "focus on the more traditional but-for causation" standard, *id.*, and need not decide whether, or under what circumstances, the "motivating factor" test establishes that an action was taken "on the basis of sex" under Section 1557.

Similar to Title VII's prohibition on discrimination "because of sex," Section 1557 prohibits health care providers (and Title IX prohibits educational institutions) from taking certain actions "*on the basis of* sex." 20 U.S.C. § 1681(a) (emphasis added). In *Bostock*, the Supreme Court repeatedly used the phrases "because of," "based on," and "on the basis of" interchangeably, using each phrase as articulating a causation standard that could be satisfied by but-for causation. *See Bostock*, 140 S. Ct. at 1753 ("employers are prohibited from firing employees *on the basis of* homosexuality or transgender status") (emphasis added).[6] The Supreme Court has likewise applied Title IX's "on the basis of" standard by utilizing a "because of" standard, explaining that Title IX imposes "the duty not to discriminate *on the basis of* sex, and 'when a supervisor sexually harasses a subordinate *because of* the subordinate's sex, that supervisor "discriminate[s]" *on the basis of* sex.'" *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75 (1992) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)) (emphases added).

Indeed, the Fifth Circuit has noted widespread recognition that even though Title IX uses the phrase "on the basis of sex" and Title VII uses the phrase "because of . . . sex," "the prohibitions of discrimination on the basis of sex of Title IX and Title VII are the same." *Lakoski v. James*, 66 F.3d

---

[6] *See also id.* at 1741 ("An employer violates Title VII when it intentionally fires an individual employee *based in part on* sex."); *id.* ("it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual *based on* sex"); *id.* at 1743 ("For an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part *because of* sex."); *id.* at 1747 ("discrimination *based on* homosexuality or transgender status necessarily entails discrimination *based on* sex") (emphases added).

751, 757 (5th Cir. 1995) (collecting cases and explaining that "Title IX's proscription of sex discrimination . . . does not differ from Title VII's"); *Pederson v. La. State Univ.*, 213 F.3d 858, 880 (5th Cir. 2000) (explaining that a Title IX violation is present where an "institution intended to treat women differently because of their sex"). Similarly, the Fourth Circuit concluded that Title IX's prohibition of discrimination "on the basis of sex" should be interpreted consistently with *Bostock*'s discussion of "because of sex," and thus it would violate Title IX if sex was "a but-for cause" of a challenged action. *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616-17 (4th Cir. 2020); *see also Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022) ("While the language in Title VII is 'because of sex' and the language in Title IX is 'on the basis of sex,' *Bostock* used those phrases interchangeably throughout the decision.").[7]

But-for causation "is established whenever a particular outcome would not have happened 'but for' the purported cause. In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Bostock*, 140 S. Ct. at 1739 (citation omitted). But-for causation "can be a sweeping standard" because "[o]ften, events have multiple but-for causes," yet "the traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to" a challenged action. *Id.* In other words, where a sex discrimination law is applied using a but-for causation standard, "[s]o long as the plaintiff's sex was one but-for cause of [a challenged] decision, that is enough to trigger the law." *Id.*

        3.      *Section 1557 Prohibits Discrimination Against Individuals on the Basis of Sex*

The next question is *what* actions on the basis of sex Section 1557 prohibits. Section 1557 provides that "an individual shall not . . . be excluded from participation in, be denied the benefits of,

---

[7] Defendants agree with the Court that it cannot "reflexively" assume that "on the basis of" in Title IX and Section 1557 has the same meaning as "because of" in Title VII. Op. & Order 27, ECF No. 30. However, careful analysis of statutory text and applicable precedents show that under Title IX and Section 1557, showing that sex was a but-for cause of a challenged action is a way of showing that the action was taken "on the basis of sex."

or be subjected to discrimination" in federally funded health programs or activities on the basis of sex. 42 U.S.C. § 18116(a). Title IX uses the same language (as applied to federally funded educational programs or activities), except that it uses the word "person" instead of "individual." 20 U.S.C. § 1681(a). And both articulations are similar, though not identical, to Title VII, which prohibits certain specific adverse actions against "any individual" (e.g., "to fail or to refuse to hire") or generally "to discriminate against any individual." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court observed that "as used in Title VII, the term discriminate against refers to distinctions or differences in treatment that injure protected individuals." 140 S. Ct. 1753 (quotations and citations omitted). No reason exists to interpret discrimination differently in Title IX or Section 1557. Therefore, Title VII, Title IX, and Section 1557 each prohibit "intentionally treat[ing] a person worse because of sex." *Id.* at 1740. The primary difference between the sex discrimination provisions in these statutes is the domain of application: employment for Title VII, federally funded educational programs for Title IX, and federally funded health programs or activities for Section 1557.

4. *Discrimination on the Basis of Sexual Orientation and Discrimination on the Basis of Gender Identity Necessarily Involve Discrimination on the Basis of Sex*

The question remains whether a health care provider discriminates on the basis of sex when it discriminates on the basis of sexual orientation or gender identity. Applying the same plain-text analysis the Supreme Court employed in *Bostock*, the answer is yes. "That's because it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1731. Discriminating against a person on the basis of that person's sexual orientation necessarily involves discriminating against that person on the basis of the person's sex. So too, discriminating against a person on the basis of that person's gender identity necessarily involves discriminating against that person on the basis of that person's sex.

The *Bostock* court explained its reasoning with respect to sexual orientation as follows:

Consider, for example, an employer with two employees, both of whom are attracted to men. The two individuals are, to the employer's mind, materially identical in all respects, except that one is a man and the other a woman. If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague. Put differently, the employer intentionally singles out an employee to fire based in part on the employee's sex, and the affected employee's sex is a but-for cause of his discharge.

140 S. Ct. at 1741. One can easily rewrite this example to apply to the domain of health care covered by Section 1557, instead of the domain of employment covered by Title VII, and the reasoning would be the same. For example, a cardiologist who refuses to see gay, lesbian, or bisexual patients on the basis of their sexual orientation is discriminating against those patients on the basis of sex because the doctor would see a female patient attracted to men but would not see a male patient attracted to men; the male patient's sex is a but-for cause for the refusal to see the patient. Treating a person worse on the basis of the person's sexual orientation necessarily involves treating the person worse on the basis of sex.

With respect to gender identity, the *Bostock* court explained its reasoning as follows:

[T]ake an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable and impermissible role in the discharge decision.

140 S. Ct. at 1741-42. Again, the same reasoning applies in the realm of health care. For example, if a hospital refuses to admit transgender patients because it disapproves of their gender identity, that hospital is discriminating against those patients on the basis of sex because the hospital penalizes patients identified male at birth for traits or actions (e.g., identifying as a woman) that it would tolerate in patients identified female at birth.

Although the Fifth Circuit has not yet addressed whether Title IX or Section 1557 prohibit discrimination on the basis of sexual orientation and gender identity, the weight of authority nationwide since *Bostock* holds that those statutes prohibit such discrimination. *See Grimm*, 972 F.3d

at 616-17 (holding that discrimination against a transgender student constituted discrimination on the basis of sex under Title IX); *Snyder*, 28 F.4th at 114 (holding that discrimination against a transgender patient on the basis of gender identity constituted discrimination on the basis of sex under Section 1557); *B. P. J. v. W. Virginia State Bd. of Educ.*, 550 F. Supp. 3d 347, 356 (S.D.W. Va. 2021) (discrimination against transgender student violated Title IX); *Koenke v. Saint Joseph's Univ.*, Civ. A. No.19-4731, 2021 WL 75778, at *2 (E.D. Pa. Jan. 8, 2021) ("Title IX's prohibition on sex discrimination constitutes a prohibition on sexual orientation discrimination."); *Doe v. Univ. of Scranton*, No. 3:19-CV-01486, 2020 WL 5993766, at *5 n. 61 (M.D. Pa. Oct. 9, 2020) (joining courts that "have extended the Supreme Court's reasoning in *Bostock* to discrimination claims based on sexual orientation brought under Title IX"); *Joganik v. E. Texas Med. Ctr.*, Civ A. No. 6:19-CV-517-JCB-KNM, 2021 WL 6694455, at *6 (E.D. Tex. Dec. 14, 2021) ("Plaintiffs have alleged discrimination based on Ms. Joganik's gender identity pursuant to Section 1557 of the Affordable Care Act."), *report and recommendation adopted*, Civ. A. No. 6:19-CV-00517, 2022 WL 243886 (E.D. Tex. Jan. 25, 2022).  Those court decisions provide additional persuasive authority in support of Defendants' interpretation of Title IX and Section 1557.

In sum, Section 1557, which bars discrimination on the ground prohibited by Title IX (sex), prohibits covered entities from taking discriminatory actions in cases where sex is a but-for cause of the action.  When someone takes a discriminatory action against a person on the basis of that person's sexual orientation or gender identity, sex is necessarily a but-for cause of that action.  Therefore, Section 1557's prohibition on sex necessarily prohibits discrimination on the basis of sexual orientation and discrimination on the basis of gender identity.

### B.      Plaintiffs' Contrary Arguments Lack Merit

None of Plaintiffs' legal arguments in their summary judgment brief can overcome the import of Section 1557's text.  Plaintiffs argue that "the key passage" from *Bostock*, Pls. SJ. Br. 9, shows that

*Bostock*'s reasoning does not support prohibiting discrimination on the basis of sexual orientation or gender identity. This passage reads: "Take an employer who fires a female employee for tardiness or incompetence or simply supporting the wrong sports team. Assuming the employer would not have tolerated the same trait in a man, Title VII stands silent." *Bostock*, 140 S. Ct. at 1742. Plaintiffs argue that this passage shows that a health care provider can discriminate against patients on the basis of sexual orientation or gender identity, so long as the provider equally discriminates against patients of the opposite sex with the same sexual orientation or gender identity.[8]  Plaintiffs assert that Defendants "ha[ve] no answer to this passage from *Bostock*." Pls. SJ. Br. 9-10. Yet *Bostock* itself provides the answer in the rest of the paragraph of that "key passage," which Plaintiffs selectively omit:

> But unlike any of these other traits or actions [i.e., tardiness, incompetence, or supporting the wrong sports team], homosexuality and transgender status are inextricably bound up with sex. Not because homosexuality or transgender status are related to sex in some vague sense or because discrimination on these bases has some disparate impact on one sex or another, but because to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex.

*Bostock*, 140 S. Ct. at 1742. Although that passage analyzed employment discrimination under Title VII rather than discrimination under Section 1557, its reasoning holds applies equally if one replaces the word "employer" with "health care provider," and if one replaces the word "employees" with "patients."

Likewise, Plaintiffs' argument that "a healthcare provider cannot discriminate on the basis of sex when enforcing rules or policies that apply equally to men and women," Pls. SJ. Br. 11, cannot be squared with *Bostock*'s discussion of sex discrimination. *Bostock* rejected the argument that Title VII allowed discriminatory rules or policies that applied equally to men and women:

> Nor is it a defense for an employer to say it discriminates against both men and women because of sex. This statute works to protect individuals of both sexes from discrimination,

---

[8] *See* Pls. SJ. Br. 9 ("A healthcare provider who discriminates against *all* bisexual patients—regardless of whether they are male or female—cannot possibly be engaged in 'sex' discrimination under *Bostock*. That is because the 'same trait' (sexual attraction toward members of both sexes) is treated exactly the same regardless of whether that 'trait' appears in a man or a woman.").

and does so equally.  So an employer who fires a woman, Hannah, because she is insufficiently feminine and also fires a man, Bob, for being insufficiently masculine may treat men and women as groups more or less equally.  But in *both* cases the employer fires an individual in part because of sex.  Instead of avoiding Title VII exposure, this employer doubles it.

*Bostock*, 140 S. Ct. at 1741.  Applying this principle to discrimination on the basis of sexual orientation or gender identity, *Bostock* reasoned:

> An employer musters no better a defense by responding that it is equally happy to fire male *and* female employees who are homosexual or transgender. . . . [T]he law makes each instance of discriminating against an individual employee because of that individual's sex an independent violation of Title VII.  So just as an employer who fires both Hannah and Bob for failing to fulfill traditional sex stereotypes doubles rather than eliminates Title VII liability, an employer who fires both Hannah and Bob for being gay or transgender does the same.

*Id.* at 1742-43.

Of course, *Bostock* analyzed Title VII, but the salient textual feature from Title VII on which that analysis rested is also present in Title IX and Section 1557.  *Bostock* reasoned that under Title VII, employers could not avoid liability by taking the same discriminatory actions against men and women because Title VII "focus[es] on individuals rather than groups," prohibiting discrimination against an "individual."  *Id.* at 1740-41.  Section 1557 and Title IX likewise focus on individuals, with Section 1557 prohibiting discrimination against "an individual," 42 U.S.C. § 18116(a), and Title IX prohibiting discrimination against any "person," 20 U.S.C. § 1681(a).  Therefore, under Section 1557, as under Title VII, a covered entity cannot avoid liability by discriminating against both men and women on the basis of sexual orientation or gender identity in the same way.

Finally, Plaintiffs argue that "[t]here are many situations in which a health-care provider might refuse to provide 'gender-affirming' care to a transgender patient without violating the statutory prohibition on 'sex' discrimination."  Pls. SJ. Br. 5.  But HHS has never taken the position, in the Notification or elsewhere, that every single refusal to provide gender-affirming care to a transgender patient constitutes sex discrimination.  For example, in cases evaluating claims of unlawful discrimination under federal civil rights laws, courts generally allow a defendant "to articulate some

legitimate, nondiscriminatory reason" for taking an action that would constitute prima facie discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also* 87 Fed. Reg., at 47,918 (proposed 45 C.F.R. § 92.206(c)) (proposed rule stating that "[n]othing in" the section prohibiting sex discrimination "requires the provision of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting that service").[9]  There may be situations in which a provider could permissibly refuse to perform a particular service for a particular transgender patient, but that does not refute the Notification's conclusion that Section 1557 prohibits discrimination on the basis of gender identity.

### C.  *Amici* Provide No Reason to Rule for Plaintiffs

None of the arguments of Plaintiffs' supporting *amici* suffice to overcome the plain import of the text of Title IX and Section 1557.[10]  *Amici* argue that the word "sex" in Title IX refers to biological distinctions between male and female.  Athletes Amici Br. 9-14.  As explained above, even if the Court

---

[9] The Court should not consider the specific hypotheticals on page 5 of Plaintiffs' summary judgment brief because they have no effect on Plaintiffs' concrete interests and do not arise in the context of a ripe controversy.  Each hypothetical concerns refusing to provide gender transition services to children age 15 or younger.  But Dr. Neese, who specializes in general internal medicine for adults, does not take on patients under age 16 for any purpose.  Neese Dep. Tr. 26:16-27:11, A117-A118. And Dr. Hurly does not treat patients at all; he performs diagnostic services as a pathologist.  Hurly Rog. Resp. 1-2, A48-A49.  Likewise, although Plaintiffs argue that Section 1557 "does not prohibit discrimination against bisexuals," Pls. SJ Br. 4, that question has no bearing on Plaintiffs' concrete interests because Plaintiffs assert that they do not discriminate against bisexuals.  *See* Neese Rog. Resp. 8, A8 ("There are no services that I would refuse to provide to a gay, lesbian, or bisexual patient, nor is there any other conduct that I would engage in with respect to a gay, lesbian, or bisexual patient, that I believe would constitute 'discrimination on the basis of sexual orientation' as that phrase is used in the Notification."); Hurly Rog. Resp. 5, A52 (same).  For the Court to decide the application of Section 1557 in such hypothetical situations would be to wade into the realm of advisory opinion, forbidden to federal courts by Article III.  *See In re Franchise Servs. of N. Am.*, 894 F.3d at 205.

[10] *Amici*, who are college students at federally funded educational institutions, focus almost entirely on Title IX.  But while Section 1557 prohibits discrimination "on the ground prohibited under . . . [T]itle IX" (i.e., discrimination "on the basis of sex"), and expressly incorporates "[t]he enforcement mechanisms provided for and available under . . . [T]itle IX," 42 U.S.C. § 18116(a), Section 1557 does not by its terms incorporate Title IX wholesale.  Therefore, this case does not concern the aspects of Title IX that Congress chose not to incorporate into Section 1557.

assumes that *amici* are correct concerning the meaning of "sex," discrimination on the basis of sexual orientation or gender identity still constitutes discrimination on the basis of sex. *See supra*, __.

*Amici* also argue that interpreting Title IX to prohibit discrimination on the basis of sexual orientation and gender identity would violate the supposed "purpose" of those who enacted Title IX, to "prohibit the discriminatory practice of treating women worse than men and denying opportunities to women because they are women (and vice versa)." Athletes Amici Br. 12-13. Even if *amici* were correct that the legislators who adopted Title IX "might not have anticipated" that it prohibited discrimination on the basis of sexual orientation and gender identity, "the limits of the drafters' imagination supply no reason to ignore the law's demands. When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Bostock*, 140 S. Ct. at 1737. In addition, *amici's* argument would undermine the supposed purpose of protecting a woman from being treated worse than men. Under *amici's* interpretation, a school could deny admittance to a woman because the woman is attracted to other women, while admitting men who possess that same trait of attraction to women. Such an action clearly treats women worse than men and denies opportunities to women, and it constitutes discrimination on the basis of sex under the plain meaning of those words. *Amici's* effort to ignore Title IX's text to achieve its supposed purpose therefore offends both its text and purpose.

*Amici* further argue that "*Bostock's* analysis does not work under Title IX" because "sex is irrelevant to hiring or firing decisions" but is relevant to certain educational programs. Athletes *Amici* Br. 15. That supposed distinction is illusory. Title VII recognizes that sex sometimes is relevant to hiring decisions, and therefore employers can make hiring decisions based on sex when sex "is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business

or enterprise." 42 U.S.C. § 2000e-2(e). Title VII and Title IX both prohibit sex discrimination, but neither statute prohibits all sex-based distinctions.

*Amici* further argue that Title IX must be read narrowly because that statute is Spending Clause legislation and because, they argue, the Notification's interpretation purportedly disrupts the federal-state balance. Athletes *Amici* Br. 21. But there is no ambiguity in Title IX or Section 1557 that might require or cause them to be read narrowly. Title IX and Section 1557 clearly and unambiguously prohibit discrimination "on the basis of sex." 20 U.S.C. § 1681(a); 42 U.S.C. § 18116(a). And "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741. *Amici* cite no case holding that the federalism clear-statement rule of *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991), applies to Title IX or Section 1557. Title IX does not fundamentally override the balance between states and the federal government, but merely requires that educational institutions do not discriminate on the basis of sex when receiving federal funds, and Section 1557 does the same in federally funded health programs.

Nor does interpreting Section 1557 and Title IX to prohibit discrimination on the basis of sexual orientation and gender identity violate the principle that recipients of federal funds must accept conditions "voluntarily and knowingly." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Recipients of federal funds in educational and health programs are clearly on notice that they must comply with the antidiscrimination provisions of Title IX and Section 1557, respectively. Even if one accepted *amici's* argument that the "application of [the condition] might be unclear in [some] contexts," that would not render the condition unenforceable under the Spending Clause. *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 665-66, 673 (1985) (where statute makes clear that conditions apply to receipt of federal funds, Congress need not "specifically identif[y] and proscrib[e]" each action that will violate its terms). Unlike *Pennhurst*, in which the federal law at issue was unclear as to whether the

states incurred any obligations *at all* by accepting federal funds, Title IX and Section 1557 clearly condition receipt of funds on complying with the statutes' prohibition on sex discrimination. *See* 20 U.S.C. § 1681(a). "Nothing more is required under *Pennhurst*, which held that Congress need provide no more than 'clear notice' to the [S]tates that funding is conditioned upon compliance with certain standards." *Cutter v. Wilkinson*, 423 F.3d 579, 586 (6th Cir. 2005). "[S]o long as a spending condition has a clear and actionable prohibition of discrimination, it does not matter that the manner of that discrimination can vary widely." *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004). Indeed, the Fourth Circuit recently rejected the precise Spending Clause argument *amici* raise here. In *Grimm*, 972 F.3d at 619, n.18, the school board claimed that the Spending Clause required that the word "sex" in Title IX be construed to bar application of the statute to gender identity "in order to give the Board fair notice." The Fourth Circuit rejected this argument, holding that "*Bostock* forecloses that 'on the basis of sex' is ambiguous as to discrimination against transgender individuals." *Id.*[11]

### D.   The Court Should Grant Summary Judgment to Defendants and Deny Summary Judgment to Plaintiffs

The Notification correctly interpreted Section 1557 when it concluded that Section 1557 prohibits discrimination on the basis of sexual orientation and discrimination on the basis of gender identity. Accordingly, Plaintiffs' claim that the Notification was "not in accordance with law," 5 U.S.C. § 706(2)(A), in violation of the APA fails. Plaintiffs concede that their claim for a declaratory judgment hinges on their substantive APA claim. Pls. SJ Br. 7; *see Okpalobi v. Foster*, 244 F.3d 405, 423 n.31 (5th Cir. 2001) (en banc) ("[T]he Declaratory Judgment Act . . . does not provide an additional cause of

---

[11] Much of *amici*'s brief consists of policy arguments about what athletic opportunities should (or should not) be available to transgender collegiate athletes. But that question is not before the Court in this dispute between physicians and HHS. *Amici* acknowledge that other litigation is ongoing concerning participation of transgender athletes in school sports, and that they have participated in some of those cases as parties or *amici*. Unopposed Motion for Leave to File Amici Curiae Brief of Three Female Athletes in Support of Plaintiffs, ECF No. 41, at 2. This case is not the forum to decide the issue of athletic opportunities for transgender collegiate athletes.

action with respect to the underlying claim."). Because Plaintiffs' APA claim fails, their claim for a declaratory judgment fails as well. And their requested declaration that Section 1557 "does not prohibit discrimination on account of 'sexual orientation' and 'gender identity,'" Pls. SJ Br. 1, is an inaccurate statement of law. Defendants are entitled to summary judgment on both claims.[12]

## CONCLUSION

The Court should grant Defendants' Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment. The Court should enter judgment for Defendants on all of Plaintiffs' claims.

---

[12] If the Court rules for Plaintiffs, relief should be limited to the named Plaintiffs, Dr. Neese and Dr. Hurly. For the reasons explained in Defendants' concurrently filed Opposition to Plaintiffs' Motion for Class Certification, this action does not meet Rule 23's requirements for a class action, so other health care providers subject to Section 1557 are not parties to this case. Injunctive relief must be narrowly drawn to provide relief to the specific plaintiffs. *See, e.g., Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (noting "the general rule . . . 'that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs'") (quoting *Califano v. Yamasaki,* 442 U.S. 682, 702 (1979)); *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004) ("The district court must narrowly tailor an injunction to remedy the specific action which gives rise to the order."); *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, J., concurring) ("Call them what you will—nationwide injunctions or universal remedies—they seem to take the judicial power beyond its traditionally understood uses, permitting district courts to order the government to act or refrain from acting toward nonparties in the case. The law already has a mechanism for applying a judgment to third parties. That is the role of class actions, and Civil Rule 23 carefully lays out the procedures for permitting a district court to bind nonparties to an action. Nationwide injunctions sometimes give States victories they did not earn and sometimes give States victories they do not want. They always sidestep Rule 23's requirements.").

Dated August 26, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MICHELLE BENNETT
Assistant Branch Director

*/s/ Jeremy S.B. Newman*
Jeremy S.B. Newman (Mass. Bar No. 688968)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20005
Tel: (202) 532-3114
Email: jeremy.s.newman@usdoj.gov

CHAD E. MEACHAM
Acting United States Attorney

*/s/ Brian W. Stoltz*
Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:      214-659-8626
Facsimile:      214-659-8807
brian.stoltz@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

On August 26, 2022, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ *Jeremy S.B. Newman*
Jeremy S.B. Newman
Trial Attorney
United States Department of Justice