undermines the ability to make population-level estimates.[9] The U.S. Census Bureau is fielding the Household Pulse Survey as a part of their Experimental Data Series.[10] We continue to learn about the Household Pulse Survey methods and its promise and limitations as a data source to study the population size and characteristics of transgender people in the U.S.[11] Although they do not yet collect data about gender identity in all U.S. states, the CDC's BRFSS and YRBS currently provide the best available data to generate estimates of the number of adults and youth who identify as transgender.

In 2016 and 2017, the Williams Institute used data from the CDC's 2014-15 BRFSS to estimate the number of adults (ages 18 and older) and youth (ages 13 to 17) who identify as transgender.[12] Since then, a total of 43 states have used the BRFSS optional gender identity module for at least one year, providing more years of data from more states since these initial estimates. Additionally, since 2017, 15 states have included a question to identify transgender youth in their YRBS statewide questionnaire.[13] These more recent data from the BRFSS and the YRBS provide an opportunity to update our prior population estimates of the number of adults and youth who identify as transgender in the U.S. In this report, we describe our updated estimates, including estimates regarding gender, age, and race/ethnicity at the national level and age and race/ethnicity at the regional and state levels. A detailed description of our methods and accompanying appendix can be found at the end of this report.

---

[9]From 2016 through the second quarter of 2019, questions pertaining to sexual orientation and gender identity were included in the NCVS. In 2019, the Bureau of Justice Statistics determined that the sexual orientation and gender identity questions would be administered only to those age 16 or older who reported violent victimization (not to all respondents). More recently, BJS has determined that the sexual orientation and gender identity items will be reinstated and administered to the original universe of all persons age 16 or older beginning in January 2022. *See* Bureau of Justice Statistics. (2021). *NCVS OMB Supporting Statement Part A*. Office of Management and Budget, Office of Information and Regulatory Affairs. https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202109-1121-002; Office of Information and Regulatory Affairs. (2021). *OIRA Conclusion, OMB Control No: 1121-0111*. Office of Management and Budget. https://www.reginfo.gov/public/do/PRAViewICR?ref_nbr=202109-1121-002#.

[10]United States Census Bureau. (2021). *Measuring Household Experiences during the Coronavirus Pandemic*. https://www.census.gov/data/experimental-data-products/household-pulse-survey.html.

[11]United States Census Bureau. (2021). *Source of the Data and Accuracy of the Estimates for the Household Pulse Survey – Phase 3.2*. https://www2.census.gov/programs-surveys/demo/technical-documentation/hhp/Phase3-2_Source_and_Accuracy_Week39.pdf; Jesdale, B.M. (2021). *Counting Gender Minority Populations in the Household Pulse Survey (The AGENID=2 Memo)*. National LGBT Cancer Network. https://cancer-network.org/wp-content/uploads/2021/10/Counting-GM-People-in-Pulse-Data.pdf.

[12]Flores, A.R., Herman, J.L., Gates, G.J., & Brown, T.N.T. (2016). *How Many Adults Identify as Transgender in the United States?* Los Angeles, CA: The Williams Institute; Herman, J.L., Flores, A.R., Brown, T.N.T., Wilson, B.D.M., & Conron, K.J. (2017). *Age of Individuals who Identify as Transgender in the United States*. Los Angeles, CA: The Williams Institute. Those who report that they consider themselves to be transgender in the BRFSS may identify with and use different gender identity terms outside the survey context, such as man, woman, and nonbinary.

[13]The count of 15 states is based on authors' original analysis of YRBS data.

# FINDINGS

## NATIONAL POPULATION ESTIMATES BY GENDER IDENTITY, AGE, AND RACE/ETHNICITY

Nationally, we estimate that 0.6% of those ages 13 and older identify as transgender in the United States, which is about 1.6 million individuals based on current U.S. population size. Among adults, 0.5% (over 1.3 million adults) identify as transgender. Among youth ages 13 to 17, 1.4% (about 300,000 youth) identify as transgender. The BRFSS and YRBS data allow us to further describe gender identity for adults, age categories for individuals ages 13 and older, and race/ethnicity separately for youth and adults.

### Gender Identity

The BRFSS optional gender identity module includes a follow-up question of adults who identify as transgender to further describe their gender identity.[14] Based on that follow-up question, we find that of adults who identify as transgender, 38.5% (515,200) are transgender women, 35.9% (480,000) are transgender men, and 25.6% (341,800) reported they are gender nonconforming. It is possible that transgender adults who identify as nonbinary may have reported their gender in the BRFSS as gender nonconforming. A recent study estimated that nearly one-third of transgender adults identify as nonbinary, which is similar to our finding of 25.6%.[15] The YRBS does not include a follow-up question to allow respondents to further describe their gender identity. Therefore, we are unable to provide a more detailed description of gender identities among youth.

Figure 1. Gender identity of adults who identify as transgender in the U.S.



- Transgender women
- Transgender men
- Transgender gender nonconforming

---

[14]The BRFSS questionnaire asks, "Do you consider yourself to be transgender?" If the answer is yes, the respondent is then asked, "Do you consider yourself to be 1. male-to-female, 2. female-to-male, or 3. gender nonconforming?" We categorize those who answered "male-to-female" as transgender women, those who answered "female-to-male" as transgender men, and those who answered "gender noncomforming" as gender noncomforming.

[15]Wilson, B.D.M & Meyer, I.H. (2021). *Nonbinary LGBTQ Adults in the United States*. Los Angeles, CA: The Williams Institute.

## Age

We describe the age of individuals who identify as transgender in two ways: the percentage of each age group that identifies as transgender and the age distribution of the transgender-identified population compared to the age distribution of the U.S. population. When looking at the percentage in each age group that identifies as transgender, those in the youngest age groups appear to have a higher percentage of those who identity as transgender. For instance, 1.4% of those ages 13 to 17 identify as transgender whereas 0.3% of those ages 65 and older identify as transgender. While these age group differences appear to be only statistically significant between the oldest and youngest age groups, this age trend among transgender individuals is consistently found in studies using population-based samples.[16]

**Table 1. Percent of each age group that identifies as transgender in the U.S.**

|  | PERCENT | NUMBER |
|---|---|---|
| 13 to 17 | 1.4% | 300,100 |
| 18 to 24 | 1.3% | 398,900 |
| 25 to 64 | 0.5% | 766,500 |
| 65 and older | 0.3% | 171,700 |
| 13 and older | 0.6% | 1,637,200 |

When looking at the age distribution of those who identify as transgender, it appears that the age distribution of transgender-identified individuals (ages 13 and older) is younger compared to the U.S. population. For instance, those ages 13 to 17 comprise 18.3% of transgender-identified individuals (ages 13 and older), whereas that age group comprises 7.6% of the U.S. population (ages 13 and older). This age trend is consistent with prior research that has found transgender individuals have a lower mean age than cisgender individuals.[17]

---

[16] Jones, J. M. (2022). *LGBT Identification in U.S. Ticks up to 7.1%*. Gallup. https://news.gallup.com/poll/389792/lgbt-identification-ticks-up.aspx; Herman, J.L., Flores, A.R., Brown, T.N.T., Wilson, B.D.M., & Conron, K.J. (2017). *Age of Individuals who Identify as Transgender in the United States*. Los Angeles, CA: The Williams Institute.; Feldman, J.L., Luhur, W.E., Herman, J.L., Poteat, T., Meyer, I.H. (2021). Health and health care access in the US transgender population health (TransPop) survey. *Andrology*, *9*, 1707– 1718. https://doi.org/10.1111/andr.13052.

[17] Feldman, J.L., Luhur, W.E., Herman, J.L., Poteat, T., Meyer, I.H. (2021). Health and health care access in the US transgender population health (TransPop) survey. *Andrology*, *9*, 1707– 1718. https://doi.org/10.1111/andr.13052; Andrew R. Flores, Ilan H. Meyer, Lynn Langton, Jody L. Herman. (2021). Gender Identity Disparities in Criminal Victimization: National Crime Victimization Survey, 2017–2018. *American Journal of Public Health 111*(4), 726-729; Statistics Canada. (2022). Canada is the first country to provide census data on transgender and non-binary people. *The Daily*. https://www150.statcan.gc.ca/n1/daily-quotidien/220427/dq220427b-eng.htm?HPA=1.

Figure 2. Age distribution among those who identify as transgender and among the U.S. population (ages 13 and older)



## Race/Ethnicity

Similar to age, we look at race and ethnicity of individuals who identify as transgender in two different ways: the percentage of each race/ethnicity group that identifies as transgender and the racial and ethnic distribution of the transgender-identified population compared to the racial and ethnic distribution of the U.S. population. We stratify this analysis by age, separately describing the race/ethnicity of youth and adults. Tables 2 and 3 describe the percentage of each racial/ethnic group that identifies as transgender, along with the population estimate. Differences between racial/ethnic groups are not statistically significant, but our findings do reflect prior research with population-based samples that have found that Latinx people, American Indian or Alaska Native, and biracial/multiracial groups appear more likely than White people to identify as transgender.[18]

Table 2. Percent of each racial/ethnic group that identifies as transgender in the U.S., among adults (ages 18 and older)

|  | PERCENT | NUMBER |
|---|---|---|
| White | 0.5% | 731,200 |
| Black | 0.6% | 173,500 |
| Asian | 0.5% | 77,300 |
| AIAN | 0.9% | 14,500 |
| Latinx | 0.7% | 289,700 |
| Biracial, Multiracial, or Other Race/Ethnicity | 1.0% | 50,900 |

Note: White, Black, Asian, and American Indian or Alaska Native (AIAN) are non-Hispanic. The Latinx category includes Hispanic and Latinx people of any race. Biracial, multiracial, and other race/ethnicity are non-Hispanic.

[18] Feldman, J.L., Luhur, W.E., Herman, J.L., Poteat, T., Meyer, I.H. (2021). Health and health care access in the US transgender population health (TransPop) survey. *Andrology, 9*, 1707– 1718. https://doi.org/10.1111/andr.13052; Meyer, I. H., Brown, T. N., Herman, J. L., Reisner, S. L., & Bockting, W. O. (2017). Demographic Characteristics and Health Status of Transgender Adults in Select US Regions: Behavioral Risk Factor Surveillance System, 2014. *American Journal of Public Health, 107*(4), 582–589. https://doi.org/10.2105/AJPH.2016.303648.

**Table 3. Percent of each racial/ethnic group that identifies as transgender in the U.S., among youth (ages 13 to 17)**

|  | PERCENT | NUMBER |
|---|---|---|
| White | 1.3% | 138,800 |
| Black | 1.4% | 39,600 |
| Asian | 1.0% | 10,800 |
| AIAN | 1.8% | 3,000 |
| Latinx | 1.8% | 92,900 |
| Biracial, Multiracial, or Other Race/Ethnicity | 1.5% | 15,000 |

Note: White, Black, Asian, and American Indian or Alaska Native (AIAN) are non-Hispanic. The Latinx category includes Hispanic and Latinx people of any race. Biracial, multiracial, and other race/ethnicity are non-Hispanic.

The racial and ethnic distribution of adults and youth appear generally similar to the racial/ethnic distribution of the U.S. population. However, transgender-identified youth and adults appear more likely to report being Latinx and less likely to report being White, as compared to the U.S. population (see Figures 3 and 4). As described above, this trend is in keeping with prior research.[19]

**Figure 3. Race/ethnicity of adults who identify as transgender and of the U.S. population (ages 18 and older)**



---
[19] Ibid.

**Figure 4. Race/ethnicity of youth who identify as transgender and of the U.S. population (ages 13-17)**



## REGIONAL AND STATE POPULATION ESTIMATES, BY AGE AND RACE

Adults and youth who identify as transgender in the U.S. reside in all 50 states and the District of Columbia. Table 4 describes the percentage of each age group that identifies as transgender, and the population estimate for each, in the four U.S. regions, and in each state within each region. Overall, for youth ages 13 to 17, we find that 1.4% identify as transgender, which is about 300,000 youth. Our estimates of youth ages 13 to 17 who identify as transgender are similar across U.S. regions, ranging from 1.8% in the Northeast to 1.2% in the Midwest. At the state level, our estimates range from 3.0% of youth ages 13 to 17 identifying as transgender in New York to 0.6% in Wyoming.[20] Among all adults, we find that 0.5%, or over 1.3 million, identifies as transgender. Our estimates of adults in U.S. regions who identify as transgender range from 0.6% in the Northeast to 0.4% in the Midwest. At the state level, our estimates range from 0.9% of adults identifying as transgender in North Carolina to 0.2% in Missouri.[21]

---

[20]Appendix Table A4 describes 95% credible intervals for our national, regional, and state level estimates for youth and adults by age group. This table can serve as a reference to help determine if estimates across regions and states appear to be significantly different from each other. For instance, the percent of youth in New York who identify as transgender (3.0%) is significantly higher than 10 other states, meaning the upper bound estimate in these 10 states is lower than the lower bound estimate for New York. For adults, the percent that identifies as transgender in North Carolina (0.9%) is significantly higher than 19 other states.

[21]The District of Columbia is not included in this range for states. DC had a notably high percentage of transgender-identified adults (0.92%), but is considered an outlier compared to the rest of the U.S. states due to its unique geographic (urban) and demographic profile.

**Table 4. Regional and state-level estimates of those who identify as transgender in the U.S. population by age group (ages 13 and older)**

| STATE | 13-17 | | 18-24 | | 25-64 | | 65+ | | ALL ADULTS 18+ | |
|---|---|---|---|---|---|---|---|---|---|---|
| | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER |
| United States | 1.43% | 300,100 | 1.31% | 398,900 | 0.45% | 766,500 | 0.32% | 171,700 | 0.52% | 1,337,100 |
| WEST | 1.62% | 81,700 | 1.14% | 82,600 | 0.51% | 209,400 | 0.30% | 36,400 | 0.54% | 328,500 |
| Alaska | 1.23% | 500 | 1.51% | 1,000 | 0.65% | 2,500 | 0.34% | 300 | 0.70% | 3,900 |
| Arizona | 1.54% | 7,300 | 1.92% | 13,000 | 0.71% | 25,200 | 0.23% | 3,000 | 0.73% | 41,200 |
| California | 1.93% | 49,100 | 0.70% | 25,500 | 0.50% | 105,100 | 0.34% | 19,500 | 0.49% | 150,100 |
| Colorado | 1.14% | 4,200 | 2.09% | 10,800 | 0.51% | 15,800 | 0.06% | 500 | 0.60% | 27,000 |
| Hawaii | 2.15% | 1,700 | 1.50% | 1,800 | 0.66% | 4,800 | 0.44% | 1,200 | 0.70% | 7,800 |
| Idaho | 0.76% | 1,000 | 0.92% | 1,500 | 0.51% | 4,500 | 0.36% | 1,000 | 0.52% | 7,000 |
| Montana | 0.78% | 500 | 0.70% | 700 | 0.47% | 2,500 | 0.13% | 300 | 0.41% | 3,400 |
| Nevada | 1.67% | 3,300 | 0.87% | 2,200 | 0.35% | 5,700 | 0.04% | 200 | 0.34% | 8,100 |
| New Mexico | 2.62% | 3,700 | 0.81% | 1,600 | 0.62% | 6,500 | 0.73% | 2,800 | 0.67% | 10,900 |
| Oregon | 1.18% | 2,900 | 1.57% | 5,700 | 0.52% | 11,500 | 0.35% | 2,700 | 0.59% | 19,900 |
| Utah | 0.83% | 2,100 | 1.34% | 4,800 | 0.47% | 7,300 | 0.43% | 1,600 | 0.60% | 13,700 |
| Washington | 1.09% | 5,000 | 2.01% | 13,300 | 0.41% | 16,900 | 0.26% | 3,200 | 0.56% | 33,300 |
| Wyoming | 0.56% | 200 | 1.21% | 700 | 0.41% | 1,200 | 0.29% | 300 | 0.48% | 2,100 |
| MIDWEST | 1.24% | 54,500 | 1.27% | 81,200 | 0.34% | 119,900 | 0.26% | 30,100 | 0.44% | 231,200 |
| Illinois | 1.66% | 13,700 | 1.94% | 22,300 | 0.24% | 16,300 | 0.24% | 4,800 | 0.44% | 43,400 |
| Indiana | 0.91% | 4,100 | 1.18% | 7,800 | 0.45% | 15,100 | 0.27% | 2,900 | 0.50% | 25,800 |
| Iowa | 1.07% | 2,100 | 0.45% | 1,400 | 0.28% | 4,400 | 0.23% | 1,200 | 0.29% | 7,100 |
| Kansas | 1.05% | 2,100 | 1.92% | 5,700 | 0.35% | 5,000 | 0.34% | 1,600 | 0.56% | 12,400 |
| Michigan | 1.41% | 8,900 | 1.13% | 10,800 | 0.38% | 19,600 | 0.14% | 2,600 | 0.42% | 33,000 |
| Minnesota | 0.94% | 3,500 | 1.62% | 7,900 | 0.52% | 15,200 | 0.32% | 2,900 | 0.60% | 26,000 |
| Missouri | 0.75% | 2,900 | 0.71% | 3,900 | 0.07% | 2,100 | 0.33% | 3,500 | 0.20% | 9,500 |
| Nebraska | 0.94% | 1,200 | 1.12% | 2,100 | 0.37% | 3,600 | 0.28% | 900 | 0.45% | 6,600 |
| North Dakota | 1.16% | 500 | 1.02% | 800 | 0.36% | 1,400 | 0.26% | 300 | 0.43% | 2,500 |
| Ohio | 1.15% | 8,500 | 1.14% | 12,200 | 0.45% | 27,100 | 0.35% | 7,200 | 0.51% | 46,500 |
| South Dakota | 0.90% | 500 | 1.12% | 900 | 0.37% | 1,600 | 0.27% | 400 | 0.44% | 2,900 |
| Wisconsin | 1.75% | 6,400 | 0.99% | 5,300 | 0.29% | 8,500 | 0.17% | 1,700 | 0.34% | 15,500 |
| SOUTH | 1.25% | 102,200 | 1.33% | 154,500 | 0.45% | 295,500 | 0.36% | 73,600 | 0.54% | 523,600 |
| Alabama | 1.08% | 3,400 | 1.18% | 5,400 | 0.42% | 10,400 | 0.30% | 2,500 | 0.48% | 18,400 |
| Arkansas | 0.88% | 1,800 | 3.59% | 9,800 | 0.24% | 3,500 | 0.58% | 2,900 | 0.70% | 16,200 |
| Delaware | 0.96% | 600 | 2.36% | 2,000 | 0.69% | 3,400 | 0.49% | 900 | 0.82% | 6,300 |
| District of Columbia | 2.11% | 600 | 2.21% | 1,600 | 0.77% | 3,200 | 0.56% | 500 | 0.92% | 5,300 |
| Florida | 1.32% | 16,200 | 1.28% | 22,400 | 0.49% | 53,900 | 0.41% | 18,600 | 0.55% | 94,900 |
| Georgia | 1.18% | 8,500 | 1.24% | 12,700 | 0.48% | 26,800 | 0.61% | 9,200 | 0.60% | 48,700 |
| Kentucky | 0.68% | 2,000 | 1.27% | 5,300 | 0.43% | 9,900 | 0.32% | 2,400 | 0.51% | 17,700 |
| Louisiana | 1.30% | 4,000 | 0.79% | 3,300 | 0.45% | 10,700 | 0.23% | 1,700 | 0.44% | 15,700 |
| Maryland | 2.08% | 8,000 | 1.90% | 10,100 | 0.38% | 12,200 | 0.18% | 1,700 | 0.51% | 24,000 |
| Mississippi | 1.20% | 2,400 | 0.81% | 2,400 | 0.37% | 5,500 | 0.33% | 1,600 | 0.42% | 9,600 |

| STATE | 13-17 | | 18-24 | | 25-64 | | 65+ | | ALL ADULTS 18+ | |
|---|---|---|---|---|---|---|---|---|---|---|
| | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER |
| North Carolina | 1.27% | 8,500 | 2.46% | 24,000 | 0.73% | 38,400 | 0.53% | 8,900 | 0.87% | 71,300 |
| Oklahoma | 1.00% | 2,600 | 2.52% | 9,300 | 0.44% | 8,500 | 0.19% | 1,100 | 0.63% | 18,900 |
| South Carolina | 1.14% | 3,700 | 0.87% | 4,100 | 0.43% | 11,300 | 0.38% | 3,500 | 0.47% | 19,000 |
| Tennessee | 0.74% | 3,100 | 1.95% | 11,700 | 0.44% | 15,000 | 0.09% | 1,000 | 0.52% | 27,700 |
| Texas | 1.42% | 29,800 | 0.71% | 19,800 | 0.42% | 61,500 | 0.31% | 11,600 | 0.43% | 92,900 |
| Virginia | 1.18% | 6,200 | 1.11% | 8,800 | 0.40% | 18,000 | 0.34% | 4,600 | 0.47% | 31,400 |
| West Virginia | 0.68% | 700 | 1.18% | 1,800 | 0.36% | 3,200 | 0.22% | 800 | 0.40% | 5,700 |
| NORTHEAST | 1.82% | 61,700 | 1.58% | 80,600 | 0.48% | 141,600 | 0.32% | 31,600 | 0.57% | 253,800 |
| Connecticut | 1.64% | 3,700 | 1.35% | 4,600 | 0.45% | 8,300 | 0.38% | 2,400 | 0.54% | 15,300 |
| Maine | 1.59% | 1,200 | 1.44% | 1,600 | 0.47% | 3,300 | 0.34% | 1,000 | 0.53% | 5,900 |
| Massachusetts | 1.44% | 5,900 | 2.30% | 15,700 | 0.44% | 16,100 | 0.46% | 5,400 | 0.67% | 37,100 |
| New Hampshire | 0.84% | 700 | 1.53% | 1,900 | 0.48% | 3,500 | 0.34% | 900 | 0.57% | 6,300 |
| New Jersey | 0.67% | 3,800 | 1.67% | 12,700 | 0.52% | 24,800 | 0.38% | 5,600 | 0.62% | 43,100 |
| New York | 3.00% | 34,800 | 1.37% | 24,100 | 0.46% | 47,600 | 0.31% | 10,100 | 0.53% | 81,800 |
| Pennsylvania | 1.30% | 10,000 | 1.50% | 16,900 | 0.51% | 33,400 | 0.24% | 5,600 | 0.55% | 56,000 |
| Rhode Island | 1.93% | 1,200 | 2.11% | 2,300 | 0.54% | 3,000 | 0.21% | 400 | 0.66% | 5,700 |
| Vermont | 1.33% | 500 | 1.26% | 800 | 0.48% | 1,500 | 0.29% | 400 | 0.53% | 2,700 |



Table 5 describes the percentage and the population estimate of each racial/ethnic group that identifies as transgender nationally, in the four U.S. regions, and in each state within each region. Due to sample size limitations, our estimates are limited only to adults. Furthermore, we must combine into one heterogenous category all those reporting a race or ethnicity other than White, Black, Asian, and Latinx, which includes Native American, Alaska Native, Native Hawaiian, Pacific Islander, biracial, multiracial, and individuals with other racial/ethnic identities.

**Table 5.** Regional and state-level estimates of those who identify as transgender in the U.S. population by race/ethnicity (adults ages 18+ only)

| STATE | WHITE | | BLACK | | ASIAN | | LATINX | | ALL OTHER RACE/ ETHNICITY GROUPS | |
|---|---|---|---|---|---|---|---|---|---|---|
| | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER |
| United States | 0.46% | 731,200 | 0.56% | 173,500 | 0.50% | 77,300 | 0.69% | 289,700 | 0.94% | 65,400 |
| WEST | 0.45% | 142,500 | 0.51% | 14,100 | 0.48% | 33,200 | 0.70% | 115,500 | 0.91% | 23,100 |
| Alaska | 0.49% | 1,900 | 0.70% | 100 | 0.67% | 300 | 0.78% | 300 | 1.12% | 1,200 |
| Arizona | 0.52% | 18,700 | 0.66% | 1,800 | 0.63% | 1,400 | 0.91% | 15,600 | 1.17% | 3,700 |
| California | 0.40% | 44,200 | 0.50% | 8,000 | 0.47% | 20,900 | 0.70% | 69,900 | 0.74% | 7,100 |
| Colorado | 0.50% | 16,200 | 0.64% | 1,100 | 0.61% | 1,000 | 0.86% | 7,500 | 1.04% | 1,300 |
| Hawaii | 0.50% | 1,400 | 0.59% | 100 | 0.58% | 3,500 | 0.80% | 800 | 1.08% | 1,900 |
| Idaho | 0.46% | 5,300 | 0.63% | <100 | 0.49% | 100 | 0.76% | 1,200 | 0.82% | 300 |
| Montana | 0.38% | 2,800 | 0.57% | <100 | 0.38% | <100 | 0.62% | 200 | 0.68% | 400 |
| Nevada | 0.39% | 3,300 | 0.50% | 700 | 0.45% | 700 | 0.69% | 2,900 | 0.54% | 500 |
| New Mexico | 0.47% | 3,200 | 0.63% | 200 | 0.56% | 200 | 0.76% | 5,800 | 0.95% | 1,500 |
| Oregon | 0.53% | 13,700 | 0.65% | 400 | 0.64% | 1,100 | 0.89% | 3,300 | 1.02% | 1,400 |
| Utah | 0.54% | 9,800 | 0.66% | 100 | 0.67% | 500 | 0.82% | 2,400 | 1.06% | 800 |
| Washington | 0.49% | 20,300 | 0.61% | 1,400 | 0.58% | 3,400 | 0.86% | 5,400 | 0.98% | 2,900 |
| Wyoming | 0.44% | 1,700 | 0.58% | <100 | 0.59% | <100 | 0.75% | 300 | 0.85% | 100 |
| MIDWEST | 0.40% | 164,000 | 0.48% | 25,100 | 0.48% | 8,700 | 0.64% | 23,100 | 0.87% | 10,200 |
| Illinois | 0.40% | 23,900 | 0.49% | 6,300 | 0.43% | 2,400 | 0.65% | 9,400 | 0.85% | 1,400 |
| Indiana | 0.46% | 19,500 | 0.53% | 2,500 | 0.56% | 700 | 0.70% | 2,200 | 1.03% | 1,000 |
| Iowa | 0.31% | 5,700 | 0.41% | 300 | 0.41% | 200 | 0.53% | 600 | 0.56% | 200 |
| Kansas | 0.49% | 8,600 | 0.60% | 800 | 0.61% | 400 | 0.82% | 1,900 | 1.04% | 700 |
| Michigan | 0.40% | 23,400 | 0.48% | 4,700 | 0.46% | 1,100 | 0.66% | 2,200 | 0.79% | 1,500 |
| Minnesota | 0.53% | 19,300 | 0.71% | 1,700 | 0.72% | 1,500 | 0.88% | 1,800 | 1.27% | 1,600 |
| Missouri | 0.34% | 7,300 | 0.41% | 1,200 | 0.41% | 200 | 0.52% | 500 | 0.37% | 400 |
| Nebraska | 0.40% | 4,800 | 0.54% | 400 | 0.53% | 200 | 0.71% | 1,000 | 0.89% | 300 |
| North Dakota | 0.39% | 2,000 | 0.49% | 100 | 0.59% | 100 | 0.74% | 200 | 0.70% | 200 |
| Ohio | 0.48% | 35,400 | 0.56% | 6,000 | 0.53% | 1,200 | 0.70% | 2,100 | 1.03% | 1,900 |
| South Dakota | 0.39% | 2,200 | 0.52% | 100 | 0.61% | 100 | 0.63% | 100 | 0.82% | 500 |
| Wisconsin | 0.35% | 11,900 | 0.48% | 1,100 | 0.47% | 600 | 0.56% | 1,300 | 0.65% | 600 |
| SOUTH | 0.48% | 273,900 | 0.58% | 104,800 | 0.51% | 17,800 | 0.66% | 104,800 | 0.99% | 22,300 |
| Alabama | 0.44% | 11,200 | 0.54% | 5,400 | 0.46% | 200 | 0.72% | 900 | 0.80% | 600 |
| Arkansas | 0.55% | 11,200 | 0.62% | 2,600 | 0.72% | 300 | 0.89% | 1,500 | 1.16% | 600 |
| Delaware | 0.65% | 3,600 | 0.81% | 1,400 | 0.70% | 200 | 1.15% | 800 | 1.77% | 300 |
| District of Columbia | 0.77% | 1,800 | 0.99% | 2,400 | 0.98% | 300 | 1.11% | 600 | 1.42% | 200 |
| Florida | 0.46% | 44,300 | 0.62% | 15,100 | 0.55% | 2,700 | 0.69% | 29,500 | 0.97% | 3,300 |
| Georgia | 0.53% | 23,700 | 0.61% | 15,700 | 0.57% | 2,000 | 0.84% | 5,800 | 1.04% | 1,600 |
| Kentucky | 0.49% | 14,500 | 0.55% | 1,500 | 0.53% | 300 | 0.76% | 800 | 1.09% | 600 |
| Louisiana | 0.43% | 8,700 | 0.51% | 5,200 | 0.50% | 300 | 0.60% | 1,000 | 0.71% | 500 |
| Maryland | 0.46% | 11,200 | 0.52% | 7,200 | 0.49% | 1,500 | 0.75% | 3,200 | 0.88% | 1,100 |
| Mississippi | 0.40% | 5,100 | 0.47% | 3,800 | 0.43% | 100 | 0.65% | 400 | 0.77% | 200 |

| STATE | WHITE | | BLACK | | ASIAN | | LATINX | | ALL OTHER RACE/ ETHNICITY GROUPS | |
|---|---|---|---|---|---|---|---|---|---|---|
| | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER |
| North Carolina | 0.71% | 41,400 | 0.84% | 15,700 | 0.80% | 2,100 | 1.17% | 8,200 | 1.59% | 3,800 |
| Oklahoma | 0.53% | 10,900 | 0.60% | 1,300 | 0.66% | 500 | 0.88% | 2,400 | 1.00% | 3,900 |
| South Carolina | 0.43% | 11,300 | 0.53% | 5,400 | 0.49% | 300 | 0.69% | 1,300 | 0.90% | 600 |
| Tennessee | 0.48% | 19,400 | 0.56% | 4,900 | 0.55% | 600 | 0.81% | 1,900 | 0.96% | 900 |
| Texas | 0.36% | 32,500 | 0.44% | 10,600 | 0.40% | 4,300 | 0.58% | 42,800 | 0.69% | 2,700 |
| Virginia | 0.43% | 17,900 | 0.51% | 6,300 | 0.47% | 2,100 | 0.66% | 3,700 | 0.92% | 1,500 |
| West Virginia | 0.42% | 5,200 | 0.44% | 200 | 0.40% | <100 | 0.55% | 100 | 0.75% | 100 |
| NORTHEAST | 0.51% | 150,800 | 0.61% | 29,500 | 0.58% | 17,600 | 0.78% | 46,200 | 1.04% | 9,700 |
| Connecticut | 0.46% | 9,100 | 0.62% | 1,700 | 0.55% | 700 | 0.76% | 3,200 | 0.96% | 600 |
| Maine | 0.52% | 5,300 | 0.63% | 100 | 0.74% | 100 | 0.80% | 100 | 0.99% | 200 |
| Massachusetts | 0.58% | 23,900 | 0.74% | 2,800 | 0.73% | 2,800 | 0.96% | 5,800 | 1.21% | 1,800 |
| New Hampshire | 0.54% | 5,500 | 0.63% | 100 | 0.60% | 200 | 0.86% | 300 | 1.18% | 200 |
| New Jersey | 0.49% | 20,800 | 0.61% | 5,800 | 0.52% | 3,800 | 0.79% | 11,200 | 1.11% | 1,400 |
| New York | 0.46% | 39,800 | 0.56% | 12,100 | 0.55% | 7,500 | 0.70% | 19,100 | 0.92% | 3,300 |
| Pennsylvania | 0.50% | 40,200 | 0.61% | 6,500 | 0.58% | 2,100 | 0.78% | 5,300 | 1.09% | 1,800 |
| Rhode Island | 0.57% | 3,700 | 0.71% | 300 | 0.72% | 200 | 0.89% | 1,100 | 1.14% | 300 |
| Vermont | 0.51% | 2,400 | 0.67% | <100 | 0.55% | <100 | 0.91% | 100 | 1.04% | 100 |

Note: White, Black, and Asian are non-Hispanic. The Latinx category includes Hispanic and Latinx people of any race. All other race/ethnicity groups are non-Hispanic.



White
Black
Asian
Latinx
All other race/ethnicity groups

A078

# CONCLUSION

Based on our estimates from 2016-2017 and the current report, the percentage and number of adults who identify as transgender has remained steady over time in the United States. The availability of the YRBS data has given us a more direct look into youth gender identity and provides better data than was previously available to us for estimating the size and characteristics of the youth population. Youth ages 13 to 17 comprise a larger share of the transgender-identified population than we previously estimated, currently comprising about 18% of the transgender-identified population in the U.S., up from 10% previously. Our findings regarding gender, age, and race/ethnicity are in keeping with existing research, which has found that nonbinary adults comprise nearly a third of transgender adults, transgender people are on average younger than the general population, and transgender people are more likely to report being Latinx and less likely to report being White.

Our estimates described in this report were made possible by advances in gender identity data collection over the past five years. More states have included the BRFSS optional gender identity module over the years and the availability of YRBS data has given us a direct look into youth gender identity. In this study, we were also able, for the first time, to produce national and state-level population estimates for Asian adults and national population estimates for American Indian and Alaska Native adults who identify as transgender. Despite these advances, our study required the use of advance statistical modeling in order to produce our estimates. This is because several states do not include the optional gender identity module in their BRFSS surveys. Other surveys that identify transgender respondents are still emerging as potential data sources for similar population estimates, like Household Pulse Survey, or do not yet exist. To improve the availability of data about the U.S. transgender population, and negate the need for advanced statistical modeling to overcome limitations in the current data, the CDC should make the BRFSS gender identity module part of the core survey rather than an optional module. Furthermore, the federal government should include questions to identify transgender people in all federal surveys. Visibility for the transgender people in our federal surveys would further bring to light the characteristics, experiences, well-being, and needs of the transgender population in the United States.

## METHODS

The BRFSS collects demographic and health information from representative samples at the state level. In addition to a core questionnaire provided by the CDC that coordinates the BRFSS, states can add optional modules that ask unique sets of questions. One module asks about sexual orientation and gender identity (SOGI). Similarly, the YRBS allows states to include a module that asks about SOGI. The BRFSS module asks, "Do you consider yourself to be transgender?" with response options, "Yes; No; Don't know/not sure" or respondents could refuse to answer. If a respondent expresses confusion, then interviewers provide definitions of transgender and/or gender nonconforming. If respondents affirmatively answer the question, they are then asked if they consider themselves to be male-to-female; female-to-male; or gender nonconforming. The YRBS module asks, "Some people describe themselves as transgender when their sex at birth does not match the way they think or feel about their gender. Are you transgender?" with response options, "No; Yes, I am transgender; Not sure if I am transgender, Don't know what the question is asking."

We pool the 2017-2020 BRFSS surveys; 41 states used the SOGI module one or more times in this timeframe ($n$ = 1,707,678). We pool the 2017 and 2019 YRBS where 15 states used the module at least one during this time period ($n$ = 372,214). We analyze adults and youth separately considering they come from different sources. All respondents who were asked whether they identify as transgender are coded as 1 if they did or 0 if they did not, which includes don't know responses, not sure responses, and refusals to answer.

We directly analyze the results from any state that implemented the sexual orientation and gender identity module. For example, the estimates for the 41 states in the BRFSS will be the same as the weighted results one would obtain from direct analyses of available 2017-2020 BRFSS data for that state.[22] The pooled estimates do not account for various years.

The strategy we employ for states where transgender identification is not observed, because the SOGI module was not used, combines small area estimation strategies common in demographic research with poststratification techniques common in survey research.[23] This strategy is called multilevel regression and poststratification (MRP). We fit a multilevel model relying on demographics and state of residence. The general model can be summarized in two stages. The first stage performs a multilevel regression to data. The following is the specification for the BRFSS:

$$y_i = g\left(b_0 + b_1 * \text{cell\_int} + \alpha^j_{\text{race}_i} + \alpha^k_{\text{age}_i} + \alpha^l_{\text{educ}_i} + \alpha^m_{\text{age.educ}_i} + \alpha^s_{\text{state}_i}\right).$$

where $g(.)$ is a link function, and $\alpha$'s represent random coefficients for demographic and geographic predictors. All demographic random effects are distributed normally, $\alpha \sim N(0, \sigma^2)$.

In building our estimation models, we included covariates that are correlated with the percentage of transgender or LGBT people within a state and where there are population estimates from the United States Census Bureau. Individual-level and contextual covariates are related to identification, disclosure, and may be associated with migration to a state. Evaluations of models employing this estimation strategy for statewide estimates show that even using a single demographic predictor, such as race, in addition to geographic predictors produce estimates that out-perform disaggregated analysis.[24] Studies document that LGBT and transgender populations tend to be younger,[25] more

[22] This is true for all overall estimates. However, for subgroups we rely on the model described in this note and then generalize those model results to the estimated population total of people who identify as transgender. We do this because of small cell sizes and unstable direct estimates.

[23] Park, D.K., Gelman, A., & Bafumi, J. (2004). Bayesian multilevel estimation with poststratification: State-level estimates from national polls. *Political Analysis, 12*, 375-385.

[24] Lax, J. R., and Phillips, J. H. (2009). How should we estimate public opinion in the states? *American Journal of Political Science, 53*(1), 107-121.

[25] James, S. E., Herman, J. L., Rankin, S., Keisling, M., Mottet, L. A., & Anafi, M. (2016). *The Report of the 2015 U.S. Transgender Survey*. Washington, DC: National Center for Transgender Equality; Meyer, I.H., Wilson, B.D.M., & O'Neill, K. (2021). LGBTQ People in the US: Select Findings from the Generations and TransPop Studies. Los Angeles, CA: The Williams Institute.

racially and ethnically diverse,[26] and have levels of educational attainment that differ from non-LGBT[27] or cisgender populations.[28] Further, varying social contexts may create environments that are either more welcoming to LGBT people encouraging greater identity uptake or migration.[29] Thus, the models rely on basic demographics and state-level contextual characteristics that may covary with transgender status.

We use six race and ethnicity categories. We also use 10 age categories ranging from 18 to over 65 years old. Educational attainment is comprised of four categories (i.e., less than a high school diploma or equivalent, a high school diploma or equivalent, some college education, and those with a college degree or more education). We also use the interaction of age and education categories, which is a standard procedure in survey weighting as age and educational attainment are interrelated. At times, the BRFSS module may or may not be used in a cell phone interview depending on a person's residency,[30] so it is used as a covariate to account for a systematic missing data pattern. The geographic-level coefficients are given group-level covariates:

$$\alpha_s \sim \mathrm{N}(\alpha_{\mathrm{region}_s}^r + G^s U, \sigma_{\mathrm{state}}^2),$$

where $G^s$ is a matrix of $(s \times j)$ matrix of $j$ group-level variables and $U$ is a vector of length $j$ regression coefficients. We include statewide contextual variables such as race/ethnic composition of the state, the percentage of same-sex couple households in the state, statewide measures of public opinion on LGBT rights, and median income in a state. In total, the percentage of same-sex couple households in the state was among the strongest predictors in the current model. We further add a third level to the model for regional groupings of the states, which is also distributed normally.[31]

The YRBS was analyzed with the same approach, except there were only two age groups (13-14; 15-17), and we do not use educational attainment or cell phone interviews. Our analyses use the sampling weights from both the BRFSS and YRBS. We rescale these weights to account for multilevel modeling using Carle's method A.[32] All models are fit in R relying on maximum likelihood estimation.[33] The second step of MRP is to use the fitted regression and generalize it over known population distributions. For example, if $g(.)$ were a logistic regression, then the probabilities an individual identifies with a group can be predicted for each demographic and geographic characteristic ($\theta_C$),

[26] Flores, A. R., Langton, L., Meyer, I. H., and Romero, A. P. (2020). Victimization rates and traits of sexual and gender minorities in the United States: Results from the National Crime Victimization Survey, 2017. *Science Advances, 6*: eaba6910.

[27] Ibid.

[28] Badgett, M. V. L., Choi, S. K., & Wilson, B. D. M., (2019, October). *LGBT poverty in the United States: A study of differences between sexual orientation and gender identity groups.* Los Angeles, CA: The Williams Institute.

[29] Esposito, E., Calanchini, J. (2022). Examining selective migration as attitudinal fit versus gay migration. *Journal of Experimental Social Psychology, 101*, 104307.

[30] Jesdale, B.M. (2021). Sources of missing sexual orientation and gender identity data in the Behavioral Risk Factor Surveillance System. *American Journal of Preventative Medicine, 61*(2), 281-290.

[31] Given the uniqueness of the District of Columbia, it is treated as its own state and region in this process.

[32] Carle, A.C. (2009). Fitting multilevel models in complex survey data with design weights: Recommendations. *BMV Medical Research Methodology, 9*, https://doi.org/10.1186/1471-2288-9-49

[33] Bates, D., Máchler, M., Bolker, B., and Walker, S. (2015). Fitting linear mixed-effects models using lme4. *Journal of Statistical Software, 67*, 1-48.

where max $(c) = j * k * l * s$. Every fitted value can then be weighted by the size of the population, $N_c$, and these weighted values summed by state for population size and further divided by the state's population for a population proportion:

$$\text{Population size}_s = \sum_{c \in s} \theta_c * N_c \,; \text{Population Proportion}_s = \frac{\sum_{c \in s} \theta_c * N_c}{\sum_{c \in s} N_c}.$$

We use the 2019 three-year estimates from the American Community Survey for our poststratification dataset, which we retrieved through IPUMS. For the states where data are observed, we multiply the 2019 3-year estimates to the proportion of people identifying as transgender, providing us with a population estimate. For the states where data are not observed, model-based estimates are used, and we incorporate model uncertainty in predictions when providing confidence intervals of our estimates.[34]

Since our estimation strategy produces two sets of estimates for states where data are observed (i.e., direct estimates and model-based estimates). We compared these two sets of estimates. Overall, they tended to strongly correlate with one another (e.g., correlation above 0.80), suggesting that the model-based estimates perform similar to direct estimation. Figure 5 compares model-based estimates to direct estimates at the state level. We see very few deviations that all fall beyond the margin of error. The three exceptions are Missouri and Nevada in the BRFSS and New Jersey in the YRBS, where the direct estimates are smaller than the model-based estimates. These deviations all fall well within confidence intervals. While we report direct estimates whenever possible, these discrepancies suggest that model-based estimates may better adjust weighted estimates to population targets without producing bias. We still opt to be conservative in our reporting and rely on direct estimates whenever the data are available.

**Figure 5. Model-based estimates and direct estimates from BRFSS and YRBS**



---

[34]There is no consensus about the best method for uncertainty estimation for multilevel models. We use the predictInterval function from the merTools package in R for uncertainty estimation. Ideally, a fully Bayesian model would be preferred, but we were limited by computing power.

To ensure subgroup estimates summed to national estimates, the subgroup counts of people who identify as transgender were divided by total counts of people who identify as transgender and the resulting percentage was then multiplied by the total population estimate to create an adjusted subgroup population estimate. For example, the population estimates of adults who identify as transgender by age group in California were added together to create a population estimate of the total number of adults who identify as transgender in California. The estimated number of 18- to 24-year-old transgender people in California is then divided by this total, to create an estimate of what percentage of transgender adults in California are 18 to 24. This percentage is then multiplied by the total estimated number of adults who identify as transgender in California. The resulting population estimate for that subgroup is only slightly different than the original subgroup estimate but it now correctly adds to the total estimated number of adults who identify as transgender in California.

To create national estimates, count estimates for each state were summed and then divided by the total population estimate. For example, the estimated number of Black adults who identify as transgender in the United States was summed across all states and then divided by the total estimated number of Black adults in the U.S. This created a national estimate of the percentage of Black adults who identify as transgender. A similar approach was used to create regional estimates.

All numbers were rounded to the nearest 100th. Some lower-bound credible intervals reported below were negative; these were truncated to zero.

# AUTHORS

**Jody L. Herman, Ph.D.**, is the Reid Rasmussen Fellow and a Senior Scholar of Public Policy at the Williams Institute, UCLA School of Law.

**Andrew R. Flores, Ph.D.**, is a Visiting Scholar at the Williams Institute and an Assistant Professor of Government at American University.

**Kathryn K. O'Neill**, M.P.P., is the Peter J. Cooper Policy Fellow and a Policy Analyst at the Williams Institute UCLA School of Law.

## ACKNOWLEDGEMENTS

The authors thank Bianca Wilson, Kerith Conron, Christy Mallory, and Brad Sears for their thoughtful reviews and contributions to this report. We also thank Rachel Dowd and Sandro Del Rosario for their design and creation of the data interactive that accompanies this report. Finally, the authors thank Gary J. Gates for his foundational research that launched this series of reports.

## SUGGESTED CITATION

Herman, J.L., Flores, A.R., O'Neill, K.K. (2022). How Many Adults and Youth Identify as Transgender in the United States? The Williams Institute, UCLA School of Law

## ABOUT THE WILLIAMS INSTITUTE

The Williams Institute is dedicated to conducting rigorous, independent research on sexual orientation and gender identity law and public policy. A think tank at UCLA Law, the Williams Institute produces high-quality research with real-world relevance and disseminates it to judges, legislators, policymakers, media, and the public. These studies can be accessed at the Williams Institute website.

**FOR MORE INFORMATION**
The Williams Institute, UCLA School of Law
Box 951476, Los Angeles, CA 90095-1476
williamsinstitute.law.ucla.edu



**RESEARCH THAT MATTERS**

A084

# APPENDIX

**Table A1. Percent of each age group that identifies as transgender in the U.S.**

|  | PERCENT [LB, UB] | NUMBER [LB, UB] |
|---|---|---|
| 13 to 17 | [0.61%, 4.02%] | [128,834, 843,773] |
| 18 to 24 | [0.43%, 2.43%] | [130,902, 736,873] |
| 25 to 64 | [0.23%, 0.74%] | [399,265, 1,260,344] |
| 65 and older | [0.12%, 0.57%] | [64,824, 310,718] |
| Total (ages 13+) | [0.26%, 1.14%] | [723,825, 3,151,708] |

**Table A2. Percent of each racial/ethnic group that identifies as transgender in the U.S., among adults (ages 18 and older)**

|  | PERCENT [LB, UB] | NUMBER [LB, UB] |
|---|---|---|
| White | [0.28%, 0.72%] | [450,300, 1,151,079] |
| Black | [0.36%, 0.84%] | [110,698, 258,977] |
| Asian | [0.31%, 0.74%] | [47,451, 113,294] |
| AIAN | [0.50%, 1.39%] | [8,327, 23,097] |
| Latinx | [0.41%, 1.00%] | [172,709, 420,079] |
| Biracial, multiracial, or other race/ethnicity | [0.58%, 1.42%] | [40,459, 98,207] |
| Total | [0.32%, 0.77%] | [816,644, 1,964,330] |

Note: White, Black, Asian, and American Indian or Alaska Native (AIAN) are non-Hispanic. The Latinx category includes Hispanic and Latinx people of any race. Biracial, multiracial, and other race/ethnicity are non-Hispanic.

**Table A3. Percent of each racial/ethnic group that identifies as transgender in the U.S., among youth (ages 13 to 17)**

|  | PERCENT [LB, UB] | NUMBER [LB, UB] |
|---|---|---|
| White | [0.34%, 4.63%] | [36,900, 498,000] |
| Black | [0.38%, 5.05%] | [10,700, 142,250] |
| Asian | [0.28%, 3.80%] | [2,900, 39,800] |
| AIAN | [0.48%, 6.46%] | [800, 10,900] |
| Latinx | [0.49%, 6.34%] | [25,600, 330,650] |
| Biracial, multiracial, or other race/ethnicity | [0.41%, 5.47%] | [4,000, 53,850] |
| Total | [0.58%, 3.92%] | [122,000, 823,200] |

Note: White, Black, Asian, and American Indian or Alaska Native (AIAN) are non-Hispanic. The Latinx category includes Hispanic and Latinx people of any race. Biracial, multiracial, and other race/ethnicity are non-Hispanic.

Table A4. 95% Credible Intervals for regional and state-level estimates of those who identify as transgender in the U.S. population by age group

| STATE | 13-17 PERCENT [LB, UB] | 13-17 NUMBER [LB, UB] | 18-24 PERCENT [LB, UB] | 18-24 NUMBER [LB, UB] | 25-64 PERCENT [LB, UB] | 25-64 NUMBER [LB, UB] | 65+ PERCENT [LB, UB] | 65+ NUMBER [LB, UB] | ALL ADULTS PERCENT [LB, UB] | ALL ADULTS NUMBER [LB, UB] |
|---|---|---|---|---|---|---|---|---|---|---|
| United States | [0.61%, 4.02%] | [128,834, 843,773] | [0.43%, 2.43%] | [130,902, 736,873] | [0.23%, 0.74%] | [399,265, 1,260,344] | [0.12%, 0.57%] | [64,824, 310,718] | [0.32%, 0.77%] | [816,644, 1,964,330] |
| WEST | [0.51%, 5.48%] | [25,784, 277,035] | [0.35%, 2.16%] | [25,647, 156,784] | [0.18%, 0.92%] | [73,888, 377,554] | [0.04%, 0.63%] | [4,962, 76,784] | [0.27%, 0.76%] | [162,515, 461,338] |
| Alaska | [0.33%, 4.44%] | [143, 1,930] | [0.00%, 3.50%] | [0, 2,345] | [0.21%, 1.09%] | [837, 4,272] | [0.03%, 0.66%] | [26, 616] | [0.31%, 1.10%] | [1,715, 6,085] |
| Arizona | [0.43%, 5.63%] | [2,040, 26,881] | [0.00%, 4.14%] | [0, 28,838] | [0.14%, 1.28%] | [5,047, 46,633] | [0.03%, 0.44%] | [398, 5,734] | [0.30%, 1.20%] | [16,921, 67,683] |
| California | [0.54%, 7.01%] | [13,828, 178,759] | [0.14%, 1.25%] | [5,169, 46,288] | [0.12%, 0.89%] | [24,372, 187,926] | [0.00%, 0.70%] | [0, 40,614] | [0.21%, 0.77%] | [64,328, 235,869] |
| Colorado | [0.68%, 1.60%] | [2,484, 5,849] | [1.08%, 3.09%] | [5,686, 16,305] | [0.35%, 0.68%] | [10,898, 21,338] | [0.00%, 0.11%] | [0, 950] | [0.43%, 0.76%] | [19,372, 34,239] |
| Hawaii | [1.66%, 2.63%] | [1,330, 2,104] | [0.77%, 2.22%] | [905, 2,604] | [0.51%, 0.81%] | [3,698, 5,928] | [0.26%, 0.62%] | [707, 1,668] | [0.56%, 0.83%] | [6,249, 9,262] |
| Idaho | [0.20%, 2.85%] | [261, 3,737] | [0.22%, 1.62%] | [362, 2,632] | [0.25%, 0.77%] | [2,249, 6,823] | [0.09%, 0.62%] | [262, 1,797] | [0.33%, 0.72%] | [4,414, 9,631] |
| Montana | [0.21%, 3.00%] | [137, 1,997] | [0.08%, 1.32%] | [76, 1,334] | [0.31%, 0.64%] | [1,652, 3,378] | [0.04%, 0.22%] | [87, 464] | [0.29%, 0.54%] | [2,440, 4,543] |
| Nevada | [0.93%, 2.40%] | [1,844, 4,746] | [0.00%, 1.96%] | [0, 4,932] | [0.16%, 0.53%] | [2,642, 8,772] | [0.00%, 0.09%] | [0, 466] | [0.16%, 0.52%] | [3,823, 12,445] |
| New Mexico | [0.71%, 9.49%] | [989, 13,308] | [0.00%, 1.74%] | [0, 3,460] | [0.16%, 1.08%] | [1,628, 11,274] | [0.00%, 1.46%] | [0, 5,537] | [0.31%, 1.03%] | [5,032, 16,718] |
| Oregon | [0.31%, 4.21%] | [778, 10,451] | [0.40%, 5.77%] | [1,457, 21,059] | [0.13%, 2.07%] | [2,897, 45,955] | [0.09%, 1.44%] | [671, 11,073] | [0.15%, 2.33%] | [50, 781] |
| Utah | [0.22%, 3.02%] | [568, 7,700] | [0.71%, 1.98%] | [2,563, 7,142] | [0.31%, 0.63%] | [4,848, 9,763] | [0.25%, 0.62%] | [899, 2,270] | [0.45%, 0.75%] | [10,244, 17,073] |
| Washington | [0.29%, 4.06%] | [1,325, 18,761] | [1.41%, 2.62%] | [9,262, 17,293] | [0.31%, 0.51%] | [12,818, 20,840] | [0.15%, 0.37%] | [1,841, 4,471] | [0.46%, 0.65%] | [27,386, 38,698] |
| Wyoming | [0.15%, 2.13%] | [56, 814] | [0.30%, 4.58%] | [167, 2,553] | [0.10%, 1.61%] | [302, 4,652] | [0.07%, 1.13%] | [71, 1,124] | [0.12%, 1.88%] | [540, 8,330] |
| MIDWEST | [0.49%, 3.67%] | [21,739, 161,975] | [0.42%, 2.32%] | [26,559, 148,216] | [0.19%, 0.54%] | [67,789, 188,624] | [0.11%, 0.45%] | [12,382, 52,130] | [0.27%, 0.65%] | [144,115, 344,082] |
| Illinois | [0.46%, 5.85%] | [3,836, 48,306] | [0.42%, 3.46%] | [4,811, 39,925] | [0.11%, 0.38%] | [7,446, 25,144] | [0.07%, 0.40%] | [1,407, 8,217] | [0.24%, 0.64%] | [23,656, 63,082] |
| Indiana | [0.24%, 3.42%] | [1,097, 15,534] | [0.44%, 1.92%] | [2,946, 12,738] | [0.28%, 0.61%] | [9,528, 20,945] | [0.12%, 0.43%] | [1,270, 4,662] | [0.35%, 0.65%] | [18,068, 33,554] |
| Iowa | [0.29%, 3.91%] | [586, 7,805] | [0.15%, 0.75%] | [468, 2,364] | [0.19%, 0.38%] | [2,947, 5,947] | [0.11%, 0.35%] | [584, 1,913] | [0.21%, 0.37%] | [5,112, 9,006] |
| Kansas | [0.28%, 3.90%] | [559, 7,841] | [1.15%, 2.70%] | [3,395, 8,011] | [0.24%, 0.46%] | [3,453, 6,577] | [0.21%, 0.47%] | [993, 2,234] | [0.42%, 0.68%] | [9,294, 15,048] |
| Michigan | [1.02%, 1.79%] | [6,432, 11,316] | [0.00%, 2.27%] | [33, 21,458] | [0.11%, 0.65%] | [5,797, 33,300] | [0.00%, 0.32%] | [0, 5,577] | [0.19%, 0.64%] | [14,909, 50,221] |

| STATE | 13-17 | | 18-24 | | 25-64 | | 65+ | | ALL ADULTS | |
|---|---|---|---|---|---|---|---|---|---|---|
| | PERCENT [LB, UB] | NUMBER [LB, UB] | PERCENT [LB, UB] | NUMBER [LB, UB] | PERCENT [LB, UB] | NUMBER [LB, UB] | PERCENT [LB, UB] | NUMBER [LB, UB] | PERCENT [LB, UB] | NUMBER [LB, UB] |
| Minnesota | [0.25%, 3.32%] | [934, 12,413] | [1.16%, 2.08%] | [5,675, 10,182] | [0.42%, 0.62%] | [12,268, 18,075] | [0.22%, 0.42%] | [2,028, 3,831] | [0.52%, 0.69%] | [22,541, 29,910] |
| Missouri | [0.20%, 2.70%] | [778, 10,548] | [0.00%, 2.08%] | [0, 11,667] | [0.00%, 0.16%] | [0, 5,189] | [0.05%, 0.62%] | [480, 6,555] | [0.02%, 0.39%] | [954, 18,595] |
| Nebraska | [0.25%, 3.47%] | [324, 4,561] | [0.30%, 4.35%] | [561, 8,234] | [0.09%, 1.52%] | [909, 14,575] | [0.07%, 1.13%] | [224, 3,537] | [0.12%, 1.80%] | [1,694, 26,346] |
| North Dakota | [0.30%, 4.32%] | [127, 1,842] | [0.25%, 3.93%] | [204, 3,144] | [0.09%, 1.43%] | [347, 5,489] | [0.06%, 1.02%] | [76, 1,229] | [0.11%, 1.69%] | [627, 9,862] |
| Ohio | [0.30%, 4.31%] | [2,242, 31,883] | [0.62%, 1.66%] | [6,661, 17,749] | [0.33%, 0.57%] | [19,847, 34,509] | [0.22%, 0.48%] | [4,536, 9,844] | [0.40%, 0.61%] | [36,471, 55,618] |
| South Dakota | [0.24%, 3.21%] | [141, 1,875] | [0.29%, 4.35%] | [238, 3,590] | [0.09%, 1.51%] | [409, 6,536] | [0.07%, 1.12%] | [110, 1,734] | [0.11%, 1.77%] | [757, 11,860] |
| Wisconsin | [1.29%, 2.21%] | [4,683, 8,050] | [0.29%, 1.68%] | [1,568, 9,155] | [0.16%, 0.41%] | [4,838, 12,337] | [0.07%, 0.27%] | [675, 2,797] | [0.22%, 0.46%] | [10,033, 20,979] |
| SOUTH | [0.53%, 3.68%] | [42,806, 299,986] | [0.45%, 2.50%] | [51,865, 290,313] | [0.27%, 0.73%] | [176,871, 475,755] | [0.16%, 0.62%] | [33,661, 128,183] | [0.35%, 0.82%] | [343,999, 793,395] |
| Alabama | [0.30%, 3.99%] | [956, 12,593] | [0.31%, 4.55%] | [1,391, 20,700] | [0.10%, 1.66%] | [2,619, 41,531] | [0.08%, 1.20%] | [657, 10,233] | [0.12%, 1.90%] | [4,667, 72,464] |
| Arkansas | [0.24%, 3.37%] | [471, 6,712] | [0.00%, 7.89%] | [0, 22,365] | [0.03%, 0.45%] | [392, 6,878] | [0.12%, 1.04%] | [618, 5,458] | [0.17%, 1.20%] | [3,943, 27,831] |
| Delaware | [0.51%, 1.40%] | [305, 843] | [0.95%, 3.76%] | [796, 3,155] | [0.42%, 0.97%] | [2,077, 4,827] | [0.18%, 0.79%] | [335, 1,501] | [0.58%, 1.10%] | [4,465, 8,468] |
| District of Columbia | [0.46%, 9.29%] | [130, 2,603] | [0.54%, 8.51%] | [392, 6,156] | [0.18%, 3.14%] | [773, 13,125] | [0.14%, 2.20%] | [121, 1,927] | [0.22%, 3.67%] | [1,286, 21,207] |
| Florida | [0.97%, 1.67%] | [11,898, 20,515] | [0.33%, 2.23%] | [5,791, 39,269] | [0.32%, 0.67%] | [34,691, 73,562] | [0.25%, 0.58%] | [11,041, 26,257] | [0.40%, 0.70%] | [68,989, 120,730] |
| Georgia | [0.32%, 4.54%] | [2,307, 32,790] | [0.38%, 2.10%] | [3,869, 21,625] | [0.30%, 0.67%] | [16,445, 37,242] | [0.32%, 0.89%] | [4,878, 13,621] | [0.43%, 0.77%] | [34,896, 62,489] |
| Kentucky | [0.18%, 2.68%] | [517, 7,813] | [0.31%, 4.83%] | [1,300, 20,252] | [0.11%, 1.72%] | [2,505, 39,533] | [0.09%, 1.32%] | [653, 9,997] | [0.13%, 2.01%] | [4,457, 69,781] |
| Louisiana | [0.35%, 4.77%] | [1,062, 14,546] | [0.13%, 1.44%] | [550, 6,102] | [0.27%, 0.64%] | [6,464, 15,288] | [0.08%, 0.37%] | [569, 2,776] | [0.29%, 0.59%] | [10,334, 21,025] |
| Maryland | [1.95%, 2.22%] | [7,507, 8,542] | [0.91%, 2.89%] | [4,803, 15,160] | [0.26%, 0.50%] | [8,264, 16,046] | [0.10%, 0.26%] | [948, 2,506] | [0.37%, 0.65%] | [17,444, 30,644] |
| Mississippi | [0.31%, 4.52%] | [627, 9,213] | [0.16%, 1.47%] | [463, 4,385] | [0.16%, 0.57%] | [2,411, 8,575] | [0.10%, 0.56%] | [474, 2,746] | [0.25%, 0.58%] | [5,695, 13,211] |
| North Carolina | [0.36%, 4.69%] | [2,413, 31,369] | [1.42%, 3.50%] | [14,413, 35,472] | [0.52%, 0.95%] | [28,416, 51,386] | [0.31%, 0.75%] | [5,355, 13,123] | [0.68%, 1.05%] | [55,724, 86,044] |
| Oklahoma | [0.27%, 3.63%] | [691, 9,438] | [1.36%, 3.68%] | [5,236, 14,186] | [0.30%, 0.58%] | [6,038, 11,532] | [0.06%, 0.32%] | [381, 1,999] | [0.46%, 0.80%] | [13,830, 24,053] |
| South Carolina | [0.30%, 4.28%] | [975, 13,788] | [0.25%, 1.50%] | [1,186, 7,093] | [0.23%, 0.63%] | [6,084, 16,683] | [0.23%, 0.53%] | [2,186, 4,932] | [0.32%, 0.62%] | [12,923, 25,038] |
| Tennessee | [0.19%, 2.79%] | [822, 11,816] | [0.07%, 3.84%] | [410, 24,084] | [0.18%, 0.70%] | [6,535, 25,020] | [0.00%, 0.18%] | [0, 2,086] | [0.25%, 0.78%] | [13,296, 41,484] |

| STATE | 13-17 | | 18-24 | | 25-64 | | 65+ | | ALL ADULTS | |
|---|---|---|---|---|---|---|---|---|---|---|
| | PERCENT [LB, UB] | NUMBER [LB, UB] | PERCENT [LB, UB] | NUMBER [LB, UB] | PERCENT [LB, UB] | NUMBER [LB, UB] | PERCENT [LB, UB] | NUMBER [LB, UB] | PERCENT [LB, UB] | NUMBER [LB, UB] |
| Texas | [0.37%, 5.07%] | [7,732, 106,687] | [0.27%, 1.15%] | [7,577, 32,579] | [0.26%, 0.57%] | [38,793, 85,989] | [0.08%, 0.55%] | [3,139, 20,418] | [0.30%, 0.56%] | [64,803, 120,966] |
| Virginia | [0.80%, 1.55%] | [4,225, 8,149] | [0.40%, 1.82%] | [3,198, 14,624] | [0.28%, 0.53%] | [12,515, 23,842] | [0.15%, 0.54%] | [2,009, 7,290] | [0.35%, 0.60%] | [23,377, 40,074] |
| West Virginia | [0.16%, 2.47%] | [168, 2,569] | [0.32%, 2.05%] | [489, 3,107] | [0.20%, 0.51%] | [1,851, 4,696] | [0.08%, 0.36%] | [299, 1,316] | [0.27%, 0.55%] | [3,870, 7,884] |
| NORTHEAST | [1.14%, 3.10%] | [38,504, 104,777] | [0.53%, 2.78%] | [26,831, 141,561] | [0.27%, 0.74%] | [80,717, 218,410] | [0.14%, 0.55%] | [13,818, 53,622] | [0.37%, 0.82%] | [166,015, 365,516] |
| Connecticut | [0.44%, 5.87%] | [980, 13,222] | [0.54%, 2.15%] | [1,882, 7,435] | [0.31%, 0.59%] | [5,789, 10,968] | [0.20%, 0.55%] | [1,267, 3,475] | [0.40%, 0.68%] | [11,351, 19,297] |
| Maine | [1.39%, 1.80%] | [1,021, 1,322] | [0.36%, 5.00%] | [386, 5,407] | [0.12%, 1.87%] | [849, 13,159] | [0.09%, 1.28%] | [254, 3,679] | [0.14%, 2.03%] | [1,489, 22,246] |
| Massachusetts | [0.38%, 5.36%] | [1,571, 21,958] | [0.69%, 3.90%] | [4,792, 26,922] | [0.20%, 0.68%] | [7,444, 24,975] | [0.12%, 0.81%] | [1,411, 9,457] | [0.41%, 0.93%] | [22,723, 51,543] |
| New Hampshire | [0.22%, 3.01%] | [177, 2,414] | [0.36%, 5.78%] | [443, 7,157] | [0.12%, 1.90%] | [877, 13,793] | [0.09%, 1.38%] | [225, 3,478] | [0.14%, 2.21%] | [1,545, 24,427] |
| New Jersey | [0.19%, 1.15%] | [1,056, 6,521] | [0.31%, 3.03%] | [2,356, 22,910] | [0.22%, 0.83%] | [10,185, 39,143] | [0.16%, 0.59%] | [2,433, 8,681] | [0.36%, 0.88%] | [25,018, 61,156] |
| New York | [2.28%, 3.72%] | [26,448, 43,209] | [0.79%, 1.96%] | [13,832, 34,452] | [0.37%, 0.55%] | [37,926, 57,554] | [0.19%, 0.43%] | [6,302, 14,018] | [0.43%, 0.62%] | [66,374, 95,703] |
| Pennsylvania | [0.78%, 1.82%] | [5,987, 14,014] | [0.16%, 2.84%] | [1,818, 32,295] | [0.22%, 0.79%] | [14,634, 52,649] | [0.07%, 0.40%] | [1,617, 9,626] | [0.31%, 0.79%] | [31,543, 80,383] |
| Rhode Island | [1.32%, 2.54%] | [828, 1,593] | [0.95%, 3.28%] | [1,043, 3,613] | [0.35%, 0.73%] | [1,977, 4,096] | [0.07%, 0.35%] | [139, 647] | [0.47%, 0.85%] | [4,029, 7,286] |
| Vermont | [1.21%, 1.45%] | [435, 524] | [0.43%, 2.10%] | [279, 1,371] | [0.32%, 0.65%] | [1,036, 2,073] | [0.14%, 0.45%] | [169, 560] | [0.38%, 0.68%] | [1,942, 3,475] |

A088

Table A5. 95% Credible Intervals for regional and state-level estimates of adults who identify as transgender in the U.S. by race/ethnicity

| STATE | WHITE | | BLACK | | ASIAN | | LATINX | | ALL OTHER RACE/ ETHNICITY GROUPS | |
|---|---|---|---|---|---|---|---|---|---|---|
| | PERCENT [LB, UB] | NUMBER [LB, UB] | PERCENT [LB, UB] | NUMBER [LB, UB] | PERCENT [LB, UB] | NUMBER [LB, UB] | PERCENT [LB, UB] | NUMBER [LB, UB] | PERCENT [LB, UB] | NUMBER [LB, UB] |
| United States | [0.28%, 0.72%] | [450,300, 1,151,079] | [0.36%, 0.84%] | [110,698, 258,977] | [0.31%, 0.74%] | [47,451, 113,294] | [0.41%, 1.00%] | [172,709, 420,079] | [0.58%, 1.42%] | [40,459, 98,207] |
| WEST | [0.24%, 0.76%] | [77,004, 243,246] | [0.25%, 0.81%] | [6,967, 22,361] | [0.25%, 0.74%] | [17,511, 51,508] | [0.33%, 1.12%] | [53,629, 184,482] | [0.49%, 1.45%] | [12,378, 37,047] |
| Alaska | [0.12%, 1.92%] | [855, 3,045] | [0.17%, 2.68%] | [57, 202] | [0.17%, 2.59%] | [144, 501] | [0.19%, 2.90%] | [133, 459] | [0.49%, 1.76%] | [526, 1,878] |
| Arizona | [0.13%, 2.03%] | [7,583, 31,021] | [0.17%, 2.54%] | [708, 2,866] | [0.16%, 2.40%] | [555, 2,252] | [0.24%, 3.49%] | [6,590, 25,602] | [0.47%, 1.89%] | [1,485, 5,942] |
| California | [0.10%, 1.58%] | [19,339, 69,353] | [0.13%, 2.03%] | [3,503, 12,883] | [0.12%, 1.85%] | [9,258, 32,861] | [0.17%, 2.76%] | [29,094, 109,835] | [0.33%, 1.15%] | [3,135, 10,936] |
| Colorado | [0.13%, 2.02%] | [11,741, 20,909] | [0.15%, 2.45%] | [744, 1,376] | [0.16%, 2.36%] | [691, 1,201] | [0.22%, 3.28%] | [5,262, 9,172] | [0.76%, 1.28%] | [934, 1,581] |
| Hawaii | [0.13%, 1.97%] | [1,152, 1,675] | [0.15%, 2.34%] | [104, 155] | [0.15%, 2.34%] | [2,815, 4,269] | [0.20%, 3.09%] | [654, 946] | [0.86%, 1.25%] | [1,524, 2,216] |
| Idaho | [0.11%, 1.76%] | [3,357, 7,392] | [0.16%, 2.47%] | [29, 63] | [0.12%, 1.94%] | [60, 137] | [0.19%, 2.82%] | [746, 1,555] | [0.53%, 1.16%] | [223, 484] |
| Montana | [0.09%, 1.50%] | [1,968, 3,707] | [0.15%, 2.12%] | [16, 28] | [0.10%, 1.50%] | [19, 35] | [0.17%, 2.43%] | [131, 225] | [0.49%, 0.88%] | [305, 548] |
| Nevada | [0.10%, 1.52%] | [1,547, 5,032] | [0.13%, 1.93%] | [352, 1,111] | [0.11%, 1.74%] | [329, 1,052] | [0.17%, 2.71%] | [1,352, 4,451] | [0.26%, 0.82%] | [243, 778] |
| New Mexico | [0.12%, 1.83%] | [1,483, 5,024] | [0.15%, 2.45%] | [97, 338] | [0.14%, 2.18%] | [80, 271] | [0.19%, 2.83%] | [2,671, 8,773] | [0.45%, 1.48%] | [701, 2,313] |
| Oregon | [0.13%, 2.06%] | [3,463, 53,887] | [0.16%, 2.53%] | [93, 1,454] | [0.16%, 2.51%] | [276, 4,275] | [0.22%, 3.47%] | [836, 12,993] | [0.25%, 3.91%] | [357, 5,477] |
| Utah | [0.13%, 2.07%] | [7,306, 12,214] | [0.17%, 2.47%] | [114, 181] | [0.17%, 2.58%] | [412, 677] | [0.21%, 3.15%] | [1,855, 3,035] | [0.78%, 1.36%] | [556, 966] |
| Washington | [0.12%, 1.87%] | [16,788, 23,459] | [0.15%, 2.36%] | [1,144, 1,604] | [0.15%, 2.18%] | [2,868, 3,884] | [0.20%, 3.33%] | [4,228, 6,304] | [0.81%, 1.18%] | [2,358, 3,447] |
| Wyoming | [0.11%, 1.71%] | [422, 6,526] | [0.15%, 2.32%] | [6, 100] | [0.15%, 2.36%] | [6, 92] | [0.19%, 2.87%] | [76, 1,132] | [0.22%, 3.36%] | [31, 480] |
| MIDWEST | [0.25%, 0.60%] | [103,416, 245,223] | [0.29%, 0.68%] | [15,082, 35,880] | [0.30%, 0.70%] | [5,418, 12,613] | [0.38%, 0.95%] | [13,844, 34,444] | [0.54%, 1.35%] | [6,356, 15,921] |
| Illinois | [0.10%, 1.60%] | [13,094, 35,165] | [0.12%, 1.95%] | [3,432, 9,223] | [0.11%, 1.70%] | [1,283, 3,432] | [0.16%, 2.51%] | [5,044, 13,364] | [0.49%, 1.16%] | [802, 1,898] |
| Indiana | [0.12%, 1.75%] | [13,594, 25,148] | [0.13%, 2.11%] | [1,727, 3,333] | [0.15%, 2.27%] | [541, 1,007] | [0.18%, 2.65%] | [1,547, 2,778] | [0.70%, 1.37%] | [658, 1,288] |
| Iowa | [0.08%, 1.20%] | [4,140, 7,333] | [0.11%, 1.59%] | [235, 398] | [0.10%, 1.56%] | [154, 271] | [0.14%, 2.10%] | [430, 742] | [0.42%, 0.71%] | [152, 261] |
| Kansas | [0.12%, 1.83%] | [6,458, 10,452] | [0.15%, 2.33%] | [559, 944] | [0.15%, 2.40%] | [300, 510] | [0.21%, 3.07%] | [1,447, 2,269] | [0.77%, 1.26%] | [530, 873] |

| STATE | WHITE | | BLACK | | ASIAN | | LATINX | | ALL OTHER RACE/ ETHNICITY GROUPS | |
|---|---|---|---|---|---|---|---|---|---|---|
| | PERCENT [LB, UB] | NUMBER [LB, UB] | PERCENT [LB, UB] | NUMBER [LB, UB] | PERCENT [LB, UB] | NUMBER [LB, UB] | PERCENT [LB, UB] | NUMBER [LB, UB] | PERCENT [LB, UB] | NUMBER [LB, UB] |
| Michigan | [0.10%, 1.58%] | [10,596, 35,680] | [0.12%, 1.89%] | [2,129, 7,240] | [0.12%, 1.82%] | [528, 1,765] | [0.16%, 2.50%] | [960, 3,234] | [0.36%, 1.19%] | [697, 2,302] |
| Minnesota | [0.14%, 2.10%] | [16,873, 22,434] | [0.18%, 2.73%] | [1,510, 1,961] | [0.18%, 2.76%] | [1,281, 1,734] | [0.23%, 3.46%] | [1,510, 2,009] | [1.08%, 1.40%] | [1,368, 1,772] |
| Missouri | [0.08%, 1.40%] | [723, 14,324] | [0.10%, 1.59%] | [121, 2,219] | [0.10%, 1.57%] | [24, 449] | [0.13%, 2.06%] | [49, 930] | [0.04%, 0.70%] | [36, 674] |
| Nebraska | [0.10%, 1.63%] | [1,238, 19,344] | [0.13%, 2.14%] | [88, 1,393] | [0.13%, 2.12%] | [49, 784] | [0.18%, 2.74%] | [246, 3,692] | [0.22%, 3.41%] | [74, 1,134] |
| North Dakota | [0.10%, 1.54%] | [492, 7,765] | [0.12%, 1.92%] | [18, 291] | [0.15%, 2.27%] | [17, 257] | [0.19%, 2.87%] | [39, 596] | [0.17%, 2.73%] | [61, 952] |
| Ohio | [0.12%, 1.87%] | [27,892, 42,266] | [0.14%, 2.15%] | [4,542, 7,125] | [0.13%, 2.11%] | [859, 1,414] | [0.18%, 2.78%] | [1,689, 2,593] | [0.82%, 1.22%] | [1,488, 2,220] |
| South Dakota | [0.10%, 1.59%] | [575, 9,025] | [0.13%, 2.00%] | [18, 276] | [0.15%, 2.36%] | [14, 225] | [0.16%, 2.47%] | [34, 522] | [0.20%, 3.14%] | [115, 1,812] |
| Wisconsin | [0.09%, 1.39%] | [7,739, 16,287] | [0.12%, 1.83%] | [704, 1,475] | [0.12%, 1.90%] | [367, 764] | [0.14%, 2.15%] | [850, 1,717] | [0.42%, 0.83%] | [374, 736] |
| SOUTH | [0.30%, 0.76%] | [174,367, 433,893] | [0.38%, 0.90%] | [68,709, 161,966] | [0.35%, 0.72%] | [12,221, 25,405] | [0.46%, 0.88%] | [73,399, 140,419] | [0.67%, 1.40%] | [15,303, 31,712] |
| Alabama | [0.11%, 1.75%] | [2,918, 44,892] | [0.13%, 2.08%] | [1,307, 20,777] | [0.11%, 1.85%] | [60, 970] | [0.18%, 2.77%] | [236, 3,612] | [0.21%, 3.14%] | [145, 2,213] |
| Arkansas | [0.14%, 2.17%] | [2,728, 19,259] | [0.16%, 2.49%] | [625, 4,448] | [0.18%, 2.73%] | [83, 580] | [0.22%, 3.39%] | [362, 2,534] | [0.28%, 1.95%] | [146, 1,009] |
| Delaware | [0.17%, 2.54%] | [2,553, 4,789] | [0.20%, 3.16%] | [999, 1,931] | [0.17%, 2.79%] | [162, 318] | [0.29%, 4.64%] | [545, 1,051] | [1.26%, 2.33%] | [205, 379] |
| District of Columbia | [0.18%, 3.08%] | [426, 7,167] | [0.24%, 3.89%] | [586, 9,573] | [0.23%, 4.23%] | [61, 1,102] | [0.27%, 4.35%] | [157, 2,516] | [0.35%, 5.32%] | [55, 850] |
| Florida | [0.12%, 1.87%] | [32,116, 58,022] | [0.15%, 2.39%] | [10,771, 19,025] | [0.14%, 2.18%] | [1,978, 3,461] | [0.18%, 2.60%] | [21,699, 36,102] | [0.73%, 1.24%] | [2,424, 4,121] |
| Georgia | [0.13%, 2.05%] | [16,907, 30,596] | [0.15%, 2.33%] | [11,308, 19,835] | [0.15%, 2.23%] | [1,474, 2,590] | [0.21%, 3.27%] | [4,031, 7,398] | [0.78%, 1.37%] | [1,175, 2,069] |
| Kentucky | [0.12%, 1.92%] | [3,654, 57,354] | [0.14%, 2.19%] | [387, 6,048] | [0.13%, 2.05%] | [72, 1,124] | [0.19%, 2.92%] | [199, 3,055] | [0.28%, 4.24%] | [146, 2,200] |
| Louisiana | [0.11%, 1.67%] | [5,647, 11,468] | [0.13%, 2.06%] | [3,538, 7,257] | [0.13%, 1.93%] | [189, 375] | [0.15%, 2.36%] | [635, 1,280] | [0.48%, 0.95%] | [325, 646] |
| Maryland | [0.11%, 1.78%] | [8,104, 14,063] | [0.13%, 2.11%] | [5,198, 9,412] | [0.12%, 1.91%] | [1,079, 1,893] | [0.19%, 2.91%] | [2,298, 3,977] | [0.64%, 1.08%] | [764, 1,298] |
| Mississippi | [0.10%, 1.53%] | [3,002, 7,046] | [0.12%, 1.81%] | [2,273, 5,204] | [0.11%, 1.74%] | [54, 131] | [0.16%, 2.53%] | [222, 511] | [0.47%, 1.04%] | [144, 319] |
| North Carolina | [0.18%, 2.71%] | [32,262, 49,657] | [0.22%, 3.41%] | [12,387, 19,794] | [0.20%, 3.08%] | [1,645, 2,554] | [0.30%, 4.41%] | [6,406, 9,643] | [1.27%, 1.84%] | [3,024, 4,397] |
| Oklahoma | [0.13%, 2.09%] | [7,960, 14,042] | [0.16%, 2.36%] | [961, 1,623] | [0.17%, 2.55%] | [343, 584] | [0.22%, 3.48%] | [1,749, 3,065] | [0.72%, 1.21%] | [2,818, 4,739] |
| South Carolina | [0.11%, 1.64%] | [7,647, 14,681] | [0.13%, 2.10%] | [3,701, 7,334] | [0.12%, 1.86%] | [229, 442] | [0.18%, 2.70%] | [916, 1,759] | [0.63%, 1.21%] | [430, 823] |

| STATE | WHITE PERCENT [LB, UB] | WHITE NUMBER [LB, UB] | BLACK PERCENT [LB, UB] | BLACK NUMBER [LB, UB] | ASIAN PERCENT [LB, UB] | ASIAN NUMBER [LB, UB] | LATINX PERCENT [LB, UB] | LATINX NUMBER [LB, UB] | ALL OTHER RACE/ ETHNICITY GROUPS PERCENT [LB, UB] | ALL OTHER RACE/ ETHNICITY GROUPS NUMBER [LB, UB] |
|---|---|---|---|---|---|---|---|---|---|---|
| Tennessee | [0.12%, 1.90%] | [9,335, 29,154] | [0.14%, 2.29%] | [2,312, 7,483] | [0.13%, 2.15%] | [257, 817] | [0.21%, 3.07%] | [952, 2,757] | [0.48%, 1.39%] | [440, 1,274] |
| Texas | [0.09%, 1.40%] | [22,375, 41,846] | [0.11%, 1.73%] | [7,461, 13,921] | [0.10%, 1.61%] | [2,997, 5,679] | [0.15%, 2.30%] | [30,120, 56,217] | [0.48%, 0.85%] | [1,850, 3,304] |
| Virginia | [0.11%, 1.66%] | [13,200, 22,700] | [0.13%, 1.95%] | [4,747, 7,973] | [0.11%, 1.85%] | [1,506, 2,721] | [0.17%, 2.62%] | [2,811, 4,811] | [0.69%, 1.15%] | [1,113, 1,869] |
| West Virginia | [0.10%, 1.58%] | [3,532, 7,157] | [0.10%, 1.75%] | [148, 328] | [0.10%, 1.60%] | [30, 66] | [0.14%, 2.25%] | [62, 132] | [0.52%, 1.07%] | [99, 202] |
| NORTHEAST | [0.32%, 0.77%] | [95,512, 228,717] | [0.41%, 0.80%] | [19,939, 38,770] | [0.41%, 0.79%] | [12,302, 23,768] | [0.54%, 1.03%] | [31,838, 60,733] | [0.69%, 1.44%] | [6,423, 13,528] |
| Connecticut | [0.12%, 1.84%] | [6,772, 11,623] | [0.15%, 2.35%] | [1,234, 2,130] | [0.14%, 2.14%] | [546, 909] | [0.19%, 2.93%] | [2,380, 3,936] | [0.72%, 1.21%] | [419, 700] |
| Maine | [0.13%, 1.95%] | [1,350, 20,093] | [0.16%, 2.39%] | [19, 295] | [0.18%, 2.88%] | [25, 399] | [0.20%, 3.13%] | [34, 526] | [0.25%, 3.89%] | [60, 933] |
| Massachusetts | [0.15%, 2.32%] | [14,764, 33,486] | [0.18%, 2.86%] | [1,697, 3,818] | [0.18%, 2.80%] | [1,696, 3,831] | [0.24%, 3.79%] | [3,514, 8,027] | [0.72%, 1.64%] | [1,052, 2,382] |
| New Hampshire | [0.13%, 2.13%] | [1,344, 21,355] | [0.16%, 2.52%] | [22, 342] | [0.15%, 2.28%] | [45, 683] | [0.22%, 3.36%] | [83, 1,251] | [0.30%, 4.48%] | [53, 796] |
| New Jersey | [0.12%, 1.90%] | [12,037, 29,622] | [0.15%, 2.41%] | [3,455, 8,423] | [0.13%, 2.11%] | [2,255, 5,651] | [0.19%, 2.98%] | [6,451, 15,533] | [0.65%, 1.53%] | [819, 1,927] |
| New York | [0.11%, 1.79%] | [32,028, 46,924] | [0.14%, 2.16%] | [9,675, 13,955] | [0.14%, 2.17%] | [6,346, 8,788] | [0.18%, 2.73%] | [15,592, 22,256] | [0.75%, 1.04%] | [2,733, 3,780] |
| Pennsylvania | [0.13%, 1.95%] | [22,840, 57,720] | [0.15%, 2.41%] | [3,566, 9,310] | [0.14%, 2.31%] | [1,191, 3,135] | [0.20%, 3.13%] | [2,948, 7,707] | [0.59%, 1.50%] | [998, 2,511] |
| Rhode Island | [0.14%, 2.19%] | [2,641, 4,781] | [0.18%, 2.76%] | [245, 449] | [0.18%, 2.90%] | [163, 311] | [0.22%, 3.36%] | [773, 1,385] | [0.83%, 1.45%] | [206, 359] |
| Vermont | [0.13%, 2.05%] | [1,735, 3,114] | [0.16%, 2.69%] | [26, 48] | [0.14%, 2.20%] | [34, 60] | [0.22%, 3.58%] | [63, 113] | [0.77%, 1.29%] | [84, 141] |

Note: White, Black, and Asian are non-Hispanic. The Latinx category includes Hispanic and Latinx people of any race. All other race/ethnicity groups are non-Hispanic.

Page 1

1  IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN

2          DISTRICT OF TEXAS AMARILLO DIVISION

3  _____

4  SUSAN NEESE, M.D., ET AL.,

5          Plaintiffs,

6      v.                          Case No.

7  XAVIER BECERRA, ET AL.,           2:21-cv-163-Z

8          Defendants.

9  _____

10              VIDEOTAPED DEPOSITION OF

11                  SUSAN NEESE

12  DATE:        Friday, July 22, 2022

13  TIME:        9:05 a.m.

14  LOCATION:    Remote, via Zoom

15  REPORTED BY:  Josh Divers, Videographer

16              Merienne Gasca, Notary Public

17  JOB No.:     5329209

18

19

20

21

22

Susan Neese                                        July 22, 2022

Page 2

```
 1              A P P E A R A N C E S

 2   ON BEHALF OF PLAINTIFFS SUSAN NEESE, M.D., ET AL.:

 3        JONATHAN F. MITCHELL, ESQUIRE (by

 4        videoconference)

 5        Mitchell Law PLLC

 6        111 Congress Avenue

 7        Suite 400

 8        Austin, TX 78701

 9        jonathan@mitchell.law

10        (512) 686-3940

11

12   ON BEHALF OF DEFENDANTS XAVIER BECERRA, ET AL.:

13        JEREMY NEWMAN, ESQUIRE (by videoconference)

14        Department of Justice Civil Division Federal

15        Programs Branch

16        1100 L Street, NW

17        Washington, DC 20005

18        jeremy.s.newman@usdoj.gov

19        (202) 532-3114

20

21

22
```

Page 3

1                         I N D E X

2  EXAMINATION:                              PAGE

3        By Mr. Newman                        7

4

5                       E X H I B I T S

6  NO.            DESCRIPTION                 PAGE

7  Exhibit 1     First amended complaint

8                    class action                09

9  Exhibit 2     Department of Health and Human

10                   Services 42 USC section 18116(a)  20

11 Exhibit 3     Answers to First Set

12                   of Interrogatories            23

13

14

15                   (Exhibits attached.)

16

17

18

19

20

21

22

Susan Neese                                                      July 22, 2022

Page 4

1                    P R O C E E D I N G S

2                    REPORTER:  Good morning.  My name is

3        Merienne Gasca; I'm the reporter assigned by the

4        company to take the record of this proceeding.  We are

5        now on the record at 9:05 a.m.

6                    This is the deposition of Dr. Susan

7        Neese taken in the matter of Susan Neese MD et al vs.

8        Xavier Becerra et al on July 22, 2022 at Amarillo,

9        Texas 79106.  The reporter is located at Leander,

10       Texas.

11                   I am a notary authorized to take

12       acknowledgements and administer oaths in Texas.

13       Parties agree that I will swear in the witness

14       remotely outside of his or her presence.

15                   Additionally, absent an objection on

16       the record before the witness is sworn, all parties

17       and the witness understand and agree that any

18       certified transcript produced from the recording of

19       this proceeding:

20                          - is intended for all uses permitted

21                          under applicable procedural and

22                          evidentiary rules and laws in the same

Susan Neese                                                    July 22, 2022

Page 5

 1                    manner as a deposition recorded by

 2                    stenographic means; and

 3                    - shall constitute written stipulation

 4                    of such.

 5                    This proceeding will also be recorded

 6    via video technology by Josh Divers.

 7                    At this time will everyone in

 8    attendance please identify yourself for the record,

 9    beginning with Mr. Newman.

10                    MR. NEWMAN:  Hi, I'm Jeremy Newman with

11    U.S. Department of Justice.

12                    MS. NEESE:  Hi, I'm Dr. Susan Neese.

13                    MR. MITCHELL:  Jonathan Mitchell with

14    Mitchell Law, PLLC.

15                    REPORTER:  Thank you.  Hearing no

16    objection, I would now swear in the witness.  Dr.

17    Neese please raise your right hand.

18    WHEREUPON,

19                         SUSAN NEESE,

20    called as a witness, and having been first duly sworn

21    to tell the truth, the whole truth and nothing but the

22    truth, was examined and testified as follows:

Susan Neese                                                July 22, 2022

                                                          Page 6

1            REPORTER:  Please proceed.

2            MR. NEWMAN:  Thank you.

3                        EXAMINATION

4    BY MR. NEWMAN:

5       Q   Dr. Neese, my name is Jeremy Newman.  I'm an

6    attorney with the US Department of Justice.  I

7    represent the Defendants in this case, Xavier Becerra,

8    secretary of the US Department of Health and Human

9    Services in the United States of America.

10           And I may use the acronym HHS to refer to

11   the Department of Health and Human Services during

12   this deposition.  All right.  Dr. Neese, have you ever

13   been deposed before?

14      A   Yes.

15      Q   About how many times?

16      A   Once.

17      Q   What was the name of the case?

18      A   I don't recall the name of the case.  It was

19   probably 20 years ago.

20      Q   What was it about?

21      A   It was an elderly patient in mind that had

22   been taken advantage of by a caregiver that had stolen

Susan Neese                                            July 22, 2022

                                                        Page 7

 1   all her money.

 2       Q   All right.  So, I will -- since it's been a

 3   while, I'll go through some of the general ground

 4   rules of the deposition.  Do you understand that

 5   you're under oath?

 6       A   Yes.

 7       Q   Do you understand you have the same

 8   obligation to tell the truth as if you were testifying

 9   in a courtroom?

10       A   Yes.

11       Q   Okay.  I'll be asking you some questions.

12   If you don't understand the question, you can tell me

13   that you don't understand or ask me to clarify the

14   question.  Do you understand?

15       A   Yes.

16       Q   But if you answer a question, I'll assume

17   that you understood the question, okay?

18       A   Yes.  Okay.

19       Q   And if there are any technical issues with

20   the remote deposition setup like you can't hear me or

21   you can't access the exhibits, please let me know,

22   okay?

Susan Neese                                                  July 22, 2022

Page 8

1        A   Okay.

2        Q   And if you don't know the answer to a

3    question you can answer that you don't know.  And if

4    you don't remember or recall the answer to a question

5    you can answer that you don't remember or you don't

6    recall it, do you understand?

7        A   Yes.

8        Q   And since the Court Reporter is taking down

9    a transcript, we need to provide -- you need to

10   provide clear verbal answers, for example, yes or no,

11   rather than a nod or shrug or uh-huh or uh-uh.  Do you

12   understand?

13       A   Yes.

14       Q   And try not to speak too fast or to speak

15   over me.  Please allow me to finish my question before

16   you start to answer and in turn, I'll let you complete

17   your answer before I start my next question, okay?

18       A   Okay.

19       Q   And if at any point you wish to correct an

20   earlier answer, you can let me know, okay?

21       A   Okay.

22       Q   Your counsel, Mr. Mitchell might object to

Susan Neese                                                    July 22, 2022

                                                        Page 9

1    some of my questions.  If he objects, you still need

2    to answer the question unless Mr. Mitchell

3    specifically instructs you not to answer the question,

4    do you understand?

5         A    Yes.

6         Q    And if you need to take a break for any

7    reason, just let me know and we'll do so.  The only

8    exception is if there's a pending question then I'll

9    ask you to answer the question before we take the

10   break.  All right.

11                MR. NEWMAN:  So, I'm going to introduce

12   Exhibit 1 so just give me a second to do that.  Okay.

13   I believe that I have introduced Exhibit 1.

14                    (Exhibit 1 was marked for

15                     identification.)

16   BY MR. NEWMAN:

17        Q    Dr. Neese, can you please let me know if

18   you're able to view the exhibit?

19        A    Yes.  I can see.

20        Q    Okay.  So, I've just introduced Exhibit 1

21   which is a document titled, first amended complaint

22   class action.  And I'll ask you some questions about

Susan Neese                                           July 22, 2022

Page 10

1    this document.

2           And I'll direct you to specific parts of the

3    document that if you'd like, you can take some time to

4    look at the document before I begin asking some

5    questions.

6        A   Okay.

7        Q   I'll start with some general questions about

8    the document.  Do you recognize this document?

9        A   Yes.

10       Q   What is it?

11       A   It's my case.  My complaint.

12       Q   Have you read this document before?

13       A   Actually, this is not the same one that I

14   have, I think but let me see -- let me look.  Okay.

15   No, I don't recognize this document.  This isn't the

16   same one that I had.  This -- I thought this was

17   something else.

18       Q   Okay.

19       A   I'm assuming it's the case.  Yes.  Okay.  I

20   can read it real quick.  I was thinking of a different

21   one.  I'm sorry.

22       Q   So, have you ever read this document before?

Susan Neese                                                July 22, 2022

Page 11

1        A    No.

2        Q    Can you turn to page one and in the upper

3    left corner of page one, there are listed three names

4    as Plaintiffs, Susan Neese MD, James Hurley, MD and

5    Jeffrey Barke, MD.  Do you see that?

6        A    Yes, sir.

7        Q    Are you the Susan Neese, MD listed on this

8    document?

9        A    Yes.

10       Q    This document says you are one of the

11   Plaintiffs.

12       A    Yes.

13       Q    Do you know what a Plaintiff is?

14       A    Yes.

15       Q    What's your understanding of what a

16   Plaintiff is?

17       A    Someone who has a complaint that brings a

18   lawsuit.

19       Q    Does this document contain the allegations

20   and claims in the lawsuit that you filed?

21       A    Yes.

22       Q    Why did you file this lawsuit?

A102

Susan Neese                                                    July 22, 2022

Page 12

1       A    Because I want to be able to treat my

2    patients based on standard of care and my ethical

3    beliefs without fear of losing my federal funding or

4    other physicians losing their federal funding for

5    trying to do their best thing for their patients.

6       Q    So, I'm not asking you to -- sorry.

7       A    Go ahead.

8       Q    I'm not asking you disclose the substance of

9    your communications with your counsel, but what did

10   you do to prepare for filing this lawsuit?

11      A    Discussed several patients and issues that I

12   had with several of my patients.  I mean, I didn't

13   give them any names of my patients, just what I

14   thought was wrong with the discrimination.

15           What's the word I'm looking for?  With the

16   potential for being accused of being discriminatory

17   against my patients.

18      Q    Did you do anything to make sure that the

19   allegations in this document were accurate?

20      A    I haven't done anything specific.

21      Q    Other than --

22      A    I don't understand what you're asking me.

Susan Neese                                                    July 22, 2022

                                                              Page 13

1        Q    I'm asking whether you took any steps before

2   this document was filed to ensure that the factual

3   allegations made in this document were true.

4        A    I don't remember reading this specific

5   document.  I don't recall read in this specific

6   document.

7        Q    Other than your counsel, did you talk to

8   anyone about the lawsuit before filing the lawsuit?

9        A    No.

10       Q    Other than your counsel, have you talked to

11  anyone about the lawsuit since filing the lawsuit?

12       A    No.  I told my husband I had to give a

13  deposition today.

14       Q    Okay.  So, I'd like to direct your attention

15  to the introductory paragraph on page one under where

16  it says, "First amended complaint class action."  The

17  paragraph that begins with section 1557.

18            That paragraph reads, "Section 1557 of the

19  Affordable Care Act prohibits sex discrimination in

20  any health program or activity that receives federal

21  financial assistance.  See 42 USC Section 18116.

22            On May 10, 2021, Secretary Becerra announced

Susan Neese                                           July 22, 2022

Page 14

1    that the Department of Health and Human Services, HHS,

2    will interpret and enforce section 1557 to prohibit,

3    one, discrimination on the basis of sexual

4    orientation, and two, discrimination on the basis of

5    gender identity.

6            See Exhibit 1, the secretary's

7    interpretation of section 1557 is incompatible with

8    the statutory language and the court should declare it

9    so and then join the secretary from using or enforcing

10   this interpretation of section 1557."  Do you see

11   that?

12       A   Yes.

13       Q   What is section 1557 of the Affordable Care

14   Act?

15       A   Well, just what it says, that they wanted --

16   that you're not able to discriminate based on sex,

17   race, gender identity, et cetera.

18       Q   Have you read section 1557 of the Affordable

19   Care Act?

20       A   Not fully.  I think at the very beginning we

21   went over it.

22       Q   What's your understanding of what section

Susan Neese                                                July 22, 2022

Page 15

1    1557 says?

2         A    That you are not able to -- you're not

3    allowed to discriminate based on age, sex, gender,

4    identity, race, religion.

5         Q    In your view, how is Secretary Becerra's

6    interpretation of section 1557 incompatible with the

7    statutory language?

8         A    I don't understand that question.

9         Q    Well, the lawsuit, the paragraph I just read

10   said the secretary's interpretation of section 1557 is

11   incompatible with the statutory language.  Do you have

12   an understanding of why you have alleged in this

13   lawsuit that the secretary's interpretation is

14   incompatible with the statutory language?

15        A    Repeat that one more time.

16        Q    Do you have an understanding of why the

17   secretary's interpretation of section 1557 is

18   incompatible with the statutory language as you allege

19   in the lawsuit?

20        A    My issue with it or what my understanding

21   is, is that if I don't treat my transgender patients

22   based on their gender identity versus their biologic

Susan Neese                                    July 22, 2022

Page 16

1   identity, that I could be held or considered

2   discriminating against my patients.  That's what my

3   understanding is.

4        Q   What's your understanding of what you're

5   asking the court to do in this lawsuit?

6        A   Is to make sure that if I treat my patients

7   based on their biologic identity for their needs,

8   versus what their gender identity is, that I am not

9   considered and based -- treating my patients based on

10  what is scientifically proven and the best practices

11  that I will not be considered discriminating against

12  my patients.

13       Q   At page one of this document here at the top

14  there's a title first amended complaint class action.

15  Do you see that?

16       A   Yes.

17       Q   What's your understanding of what a class

18  action is?

19       A   Where it's to multiple Plaintiffs to protect

20  the rights of multiple people.  I mean, who have the

21  same beliefs, I guess, or the same views or the same

22  issue.  I guess that would be the word.

Susan Neese                                        July 22, 2022

Page 17

1      Q   Why did you decide to file this lawsuit with

2   a class action?

3      A   Because I think this affects just more than

4   me.  I think it's an issue that could be -- it could

5   be for physicians across the country could be held or

6   considered discriminatory if they're treating patients

7   based on their biologic sex.

8      Q   Are you familiar with the Supreme Court

9   decision called Bostock v. Clayton County?

10     A   Just what's in here, but no.  No, I'm not.

11     Q   Have you read that Supreme Court decision?

12     A   No.

13     Q   Have you read anything about that Supreme

14  Court decision?

15     A   No.

16     Q   Do you have any understanding about what the

17  Supreme Court ruled in that decision?

18     A   No.

19     Q   Okay.  Please turn to page nine of the

20  document.  And I am going to ask you about paragraph

21  38, which is in the middle of the page.

22     A   Yes.

Susan Neese                                    July 22, 2022

Page 18

```
 1      Q    Paragraph 38 reads, "Dr. Neese, Dr. Hurley
 2   and Dr. Barke seek to represent a class of all health
 3   care providers subject to Section 1557 of the
 4   Affordable Care Act."  Do you see that?
 5      A    Yes, sir.
 6      Q    What's your understanding of what it means
 7   for a Plaintiff to represent a class?
 8      A    That you are representing the -- I don't
 9   know how to say it.  Excuse me.  That you are wanting
10   to do the right thing for the majority of people to
11   protect our whole profession.
12      Q    What's your understanding of what your
13   responsibilities would be as a class representative?
14      A    That I just want to clarify our legal rights
15   to take care of our patients without worrying about
16   losing funding because we may be considered
17   discriminatory and -- I don't know how to answer that
18   question.
19      Q    What's your understanding of who is in the
20   class proposed in paragraph 38?
21      A    Healthcare professionals -- all healthcare
22   professionals.
```

Susan Neese                                                    July 22, 2022

Page 19

1        Q    All healthcare professionals?

2        A    Yes.

3        Q    Okay.

4              MR. NEWMAN:  I am going to introduce

5    another exhibit so just give me a minute to do that.

6    Okay.  I have just introduced Exhibit 2.

7              (Exhibit 2 was marked for

8              identification.)

9    BY MR. NEWMAN:

10       Q    Are you able to see it Dr. Neese?

11       A    Not yet, no.  Let me refresh.  I don't have

12   anything on my end showing up.

13       Q    Okay.

14             REPORTER:  I can see it.  Dr. Neese,

15   try refreshing your page again.  If you go back to the

16   marked folder exhibit.

17             THE WITNESS:  All right.  Okay.  There

18   it is.  Let me pull it up.  Okay.

19             MR. NEWMAN:  Okay.

20   BY MR. NEWMAN:

21       Q    So, I've just introduced Exhibit 2.  This

22   document was filed as an exhibit to the first amended

Susan Neese                                                    July 22, 2022

                                                              Page 20

1    complaint.  It is titled Department of Health and

2    Human Services 42 USC Section 18116(a).

3              Notification of interpretation and

4    enforcement of section 1557 of the Affordable Care Act

5    and Title Nine of the Education Amendments of 1972.

6    And I may refer to this document as the notification.

7              Again, take your time if you need to look

8    over the document and then I'll ask you some questions

9    about it.  Dr. Neese, have you ever seen this document

10   before?

11        A    No.

12        Q    Have you ever read this document before?

13        A    No.

14        Q    Do you know what this document is?

15        A    No, I mean…

16        Q    Do you have any understanding of what this

17   document has to do with the claims in your lawsuit?

18        A    Is it clarifying section 1557?  I…

19        Q    So, you don't have any understanding of what

20   this document has to do with the claims in your

21   lawsuit?

22        A    Well, it says it prohibits discrimination on

Susan Neese                                              July 22, 2022

                                                        Page 21

1    the basis of sexual orientation and gender identity --

2         Q    And so --

3         A    -- and enforce it.  So, let me read a little

4    bit more?

5         Q    Sure.

6         A    Okay.  I've read the rest of it, sorry.

7         Q    Is it -- do you have an understanding of

8    what this document has to do with the claims in your

9    lawsuit?

10        A    No.

11        Q    All right.  In your view, does this document

12   contain any incorrect legal interpretations?

13        A    No.  But I don't know how to interpret

14   things legally.

15        Q    I'd like to direct your attention to the

16   middle of the first page where it says summary.  After

17   summary is the following paragraph, "This notification

18   is to inform the public that consistent with the

19   Supreme Court's decision and Bostock Entitle 9,

20   beginning May 10, 2021.

21             The Department of Health and Human Services,

22   HHS, will interpret and enforce section 1537's

Susan Neese                                              July 22, 2022

Page 22

1    prohibition on discrimination on the basis of sex to

2    include, one, discrimination on the basis of sexual

3    orientation, and two, discrimination on the basis of

4    gender identity."  Do you see that?

5        A    Yes, sir.

6        Q    Okay.  And we'll get to gender identity

7    later but I want to start by asking you about sexual

8    orientation.  Have you ever engaged in any conduct

9    that you believe would constitute discrimination on

10   the basis of sexual orientation as that phrase is used

11   in this document?

12       A    No.

13       Q    Have you ever engaged in any conduct that

14   you believe secretary Becerra would regard as

15   discrimination on the basis of sexual orientation?

16       A    No.

17       Q    Is there any conduct that you believe you're

18   likely to engage in in the future with respect to a

19   gay, lesbian or bisexual patient that you believe

20   would constitute discrimination on the basis of sexual

21   orientation as that phrase is used in this document?

22       A    No.

Susan Neese                                    July 22, 2022

Page 23

1       Q   When HHS stated that and interpreted section

2   1557 to prohibit discrimination on the basis of sexual

3   orientation, do you believe that harmed you have any

4   way?

5       A   No.

6       Q   If the Judge issues a ruling in this case

7   saying that it is permissible for healthcare providers

8   to discriminate on the basis of sexual orientation, do

9   you believe that would benefit you in any way?

10      A   Repeat that one more time.

11      Q   If the Judge if the judge issues a ruling in

12  this case saying that it's permissible for healthcare

13  providers to discriminate on the basis of sexual

14  orientation, do you believe that would benefit you in

15  any way?

16      A   No.

17      Q   Okay.

18          MR. NEWMAN:  I am going to introduce

19  another exhibit.  Okay.  I have just introduced

20  Exhibit 3.

21              (Exhibit 3 was marked for

22              identification.)

Susan Neese                                          July 22, 2022

Page 24

1    BY MR. NEWMAN:

2        Q   Can you please let me know when you're able

3    to view the exhibit documents?

4        A   Yes, I have it.

5        Q   Okay.  And this document is titled,

6    Plaintiff Susan Neese's answers to first set of

7    interrogatories.  Have you seen this document before?

8        A   Yes.

9        Q   Have you read this document before?

10       A   Yes.

11       Q   What is this document?

12       A   The answers to the questions that I was

13   given.

14       Q   Okay.  Please turn to page 12 of the

15   document and let me know when you're there.

16       A   I'm there.

17       Q   Okay.  On that page, it says verification.

18   I declare under penalty of perjury that the answers to

19   these interrogatories are true and correct.  And then

20   it says DocuSign by Susan Neese.  Do you see that?

21       A   Yes.

22       Q   And you're the Susan Neese who

Page 25

1   electronically signed that document?

2        A   Yes, sir.

3        Q   So, did you do something on a computer or

4   electronic device to cause that electronic signature

5   to be added on that document?

6        A   Yes.

7        Q   Okay.  What is your understanding of what

8   you were representing when you electronically signed

9   this document?

10       A   My answers to my complaint.

11       Q   What did you do to make sure that the

12  answers to the interrogatories in this document were

13  true and correct?

14               MR. MITCHELL:  And Dr. Neese, may I

15  just instruct you not to disclose the contents of

16  conversations you've had with me or my co-counsel when

17  answering the question.

18               THE WITNESS:  Okay.  I just answered

19  questions truthfully.

20               MR. NEWMAN:  Okay.

21  BY MR. NEWMAN:

22       Q   Sitting here right now are you aware of any

Susan Neese                                         July 22, 2022

Page 26

1    statements in these interrogatory answers that were

2    not correct?

3         A    No.

4         Q    Okay.  So, please turn back to page one.

5    And I'm going to ask you about your response to

6    interrogatory number one.  In that answer you wrote,

7    "I practice general internal medicine for adults."

8    Can  you explain to me what is general internal

9    medicine?

10        A    General internal medicine is specialized in

11   adult medicine or teenagers and adults medicine.  We

12   treat a broad range.  We are diagnosticians

13   essentially and treat chronic medical conditions long

14   term throughout somebody's life.  Kind of like a

15   pediatrician before adults.

16        Q    And when you wrote that you practice general

17   internal medicine for adults, what did you mean by

18   adults?

19        A    My age group is 16 and above.

20        Q    Okay.  So --

21        A    That's what I have set at my practice in my

22   office.

Susan Neese                                              July 22, 2022

Page 27

1      Q   So, you -- do you treat anyone below the age

2   of 16?

3      A   No.  Actually I have in the past.  Yes, I

4   have in the past.  I don't believe I have anybody in

5   my practice that's below the age of 16 right now.

6      Q   If someone -- if a parent of a patient below

7   the age of 16 asked you to treat their child who's

8   below the age of 16, would you treat a patient below

9   the age of 16?

10      A   I don't any longer, no.  I refer them to the

11   pediatrician.

12                  MR. MITCHELL:  Mr. Newman.

13                  MR. NEWMAN:  Yes.

14                  MR. MITCHELL:  My internet connection

15   was stuck for the last 5 or 10 seconds so I did not

16   hear the question you asked, Dr. Neese.  Could you

17   please repeat it?

18                  MR. NEWMAN:  It's something along the

19   lines of if you were -- if a parent asked you to treat

20   a patient below the age of 16, would you treat that

21   patient.

22                  MR. MITCHELL:  Did Dr. Neese answer the

Susan Neese                                          July 22, 2022

                                          Page 28

 1    question?

 2               THE WITNESS:  Yes.  I said I no longer

 3    accept patients under the age of 16.

 4               MR. MITCHELL:  Thank you.

 5    BY MR. NEWMAN:

 6       Q   About how many patients do you currently

 7    have?

 8       A   There's thousands, two or 3000.  I have no

 9    idea.

10       Q   About how many of your patients are under

11    the age of 18?

12       A   It is a minority.  I would say probably two,

13    three percent of my practice.

14       Q   Okay.  I like to direct your attention to

15    interrogatory number two and the interrogatory is on

16    page one and the response is on page two.  So, you can

17    take a minute to read over that and then I'll ask you

18    some questions about it.

19       A   Okay.

20       Q   Do you have several transgender patients in

21    their 30s and 40s?

22       A   Yes.

Susan Neese                                                    July 22, 2022

Page 29

1        Q    About how many transgender patients do you

2    have?

3        A    Five.

4        Q    Do you -- strike that.  What's the age range

5    of those patients?

6        A    They're all I believe 30 to 40 range.

7        Q    Are there any treatments that you object to

8    providing to those adult transgender patients?

9        A    I don't know how to answer that.  It depends

10   on what the issue is.

11       Q    Have any situations come up in which any of

12   those patients have requested any treatment that

13   you've objected to providing?

14       A    No.  Not that I can recall it.  It all

15   depends on -- go ahead.

16       Q    About four lines down on page two, you

17   wrote, "In one instance, I declined to take on a new

18   patient who is 16 years old whom I had never seen

19   before and his mother, who's a long standing patient

20   of mine, came to me and asked if I would assist her

21   teenage daughter in obtaining transition hormones.

22            I did not take on this patient because I was

Susan Neese                                              July 22, 2022

Page 30

1   not comfortable taking a teenager transition due to

2   the complexity of the medical and emotional issues

3   that case would present and that is not my area of

4   specialty."  Do you see that?

5        A   Yes, sir.

6        Q   Is that the only time that you've been asked

7   to provide gender transition services to a minor?

8        A   No.  I've had one other instance.

9        Q   When was that other instance?

10       A   Probably 10 plus years ago I had a patient

11  that was a minor that transitioned over time.

12       Q   Can you describe what happened with that

13  patient?

14       A   I had taken care of this patient for years,

15  and had him into counseling for his gender dysphoria

16  for years who eventually transitioned from female --

17  male to female over time.  I mean, I had a

18  relationship with this patient for 10 years plus.

19       Q   Were -- that previous patient, were there

20  any instances in which that patient requested

21  treatment that you refuse to provide?

22       A   No.  I take that back, we did not start

Susan Neese                                    July 22, 2022

                                               Page 31

1    hormone therapy for quite some time.  For several

2    years post puberty.

3        Q   Now, I'd like to go back to the person that

4    you're talking about in this interrogatory response.

5    And you wrote at the end of the sentence I just read,

6    that is not my area of specialty.  Can you explain

7    what you meant by that?

8        A   When you have a pubertal -- pre pubertal or

9    a patient that's in puberty, for transgender care you

10   have to put them on puberty blockers and then over

11   time you start them on hormone therapy.  I have never

12   done puberty blockers and I'm not familiar with that

13   or comfortable in doing that.

14           And don't -- and I'm quite concerned about

15   the long term ramifications of doing that in young

16   patients.  I mean, puberty sometimes starts at 9 years

17   old or sooner for people now.

18       Q   As a general matter, do you provide services

19   to patients that are outside your area of specialty?

20       A   No.

21       Q   Okay.

22       A   You mean…

Susan Neese                                                July 22, 2022

Page 32

1        Q    Now, I'd like to direct your attention to

2    interrogatory number five, and that interrogatory

3    begins on page two and the response is on page three.

4    So, please take a minute to read that and then I'll

5    ask you some questions about it.

6                    REPORTER:  I think Mr. Mitchell's

7    frozen or has a bad internet connection.  I think he's

8    trying to say something.

9                    MR. NEWMAN:  Mr. Mitchell, can -- are

10   you able to hear what's going on?

11                   MR. MITCHELL:  I just heard you this

12   last time, but I did not hear Dr. Neese's answer to

13   the question you had asked previously.

14                   MR. NEWMAN:  Okay.  Do you want to keep

15   going or do you want to go off the record for a

16   minute, Mr. Mitchell?

17                   MR. MITCHELL:  I'm not sure.  I've had

18   two instances now where I've had internet issues, it's

19   been otherwise smooth.  Are either of you having any

20   problems?

21                   MR. NEWMAN:  I am not.

22                   MR. MITCHELL:  So, the problem's

Susan Neese                                          July 22, 2022

                                                    Page 33

1    probably on my end.  Let me -- could we go off the

2    record briefly and I will see if there is a different

3    spot in the house I should go to?

4                    MR. NEWMAN:  Sure.  We can go off the

5    record right now.

6                    VIDEOGRAPHER:  Going off the record.

7    The time is 9:44.

8                    (Recess)

9                    VIDEOGRPHER:  Back on the record.  Time

10   is 9:53.

11   BY MR. NEWMAN:

12       Q   So Dr. Neese, we are discussing Exhibit 3,

13   your interrogatory responses.  And I'd like to direct

14   your attention to interrogatory number six.  The

15   interrogatory is on page three and your response

16   extends from page three to page five.

17          So, you can take some time to look at that

18   and then I'll ask you some questions about it.

19       A   Okay.

20       Q   In that response, you described a patient in

21   the late 30s who's a biological female but identifies

22   as male who has refused necessary preventative care

Susan Neese                                                            July 22, 2022

                                                                        Page 34

1     that you strongly recommended.

2              I don't want any personally identifying

3     details but can you generally describe your

4     interactions with this patient concerning the

5     preventive care that you've recommended?

6          A    Well, I've recommended routine regular

7     pelvic examinations and pap smears per guidelines

8     based on biologic females.

9              And he has continually refused and made

10    appointments for it and then rescheduled and has not

11    been -- we have not been getting -- giving -- he has

12    not been getting the appropriate preventive care

13    because he continues to refuse and now he's having

14    some health issues that are concerning.

15         Q    Do you believe that your care for this

16    patient has been medically appropriate?

17         A    Yes.

18         Q    Do you believe that you -- strike that.  Do

19    you believe that you have discriminated against this

20    patient on the basis of his gender identity?

21         A    No.

22         Q    Do you believe that secretary Becerra would

Susan Neese                                    July 22, 2022

Page 35

1   consider your treatment of this patient to constitute

2   discrimination on the basis of gender identity?

3         A    I don't know the answer to that.  I'm

4   concerned about it.

5         Q    Can you explain --

6         A    And when I say my care has been medically

7   appropriate for him, he should be having pap smears

8   and pelvic exams.  I can't get him to do that.  So

9   that's where it's not medically appropriate.

10             I mean, I'm having -- I'm struggling with

11  that.  Otherwise his care is fine but we're missing a

12  huge part of his preventive care.

13        Q    Can you explain your concern that secretary

14  Becerra might consider your treatment of his patient

15  to constitute discrimination on the basis of gender

16  identity?

17        A    Well, I really should terminate my physician

18  patient relationship with this patient because he

19  refuses to allow routine preventive screenings.  But

20  am I going to be considered discriminating against

21  this patient because they believe they are a male

22  versus a biologic female.  That's my concern.

Page 36

1      Q   So, look back at Exhibit 2 which is the

2  notification of interpretation and enforcement of

3  section 1557 of the Affordable Care Act and Title Nine

4  of the Education Amendments of 1972.  Do you have

5  Exhibit 2 up?

6      A   I do.

7      Q   Can you point to any language in that

8  document that would make you believe that Secretary

9  Becerra might consider your treatment of this patient

10  to be discriminatory?

11      A   Patient's gender identity is a male and I'm

12  trying to treat him as a biologic female and do the

13  appropriate thing by him.

14          So, if I'm -- and if I agree to refuse to

15  treat him based on his gender identity because I'm not

16  allowed to treat him based on his biologic, that's

17  where I think he -- that's where I think it looks like

18  I could be discriminating against my patient.

19      Q   Can you point to any language in this

20  document that makes you believe that Secretary Becerra

21  might consider your treatment of this patient to be

22  discriminatory?

Susan Neese                                              July 22, 2022

Page 37

1        A    Just it says discrimination based on gender

2    identity.

3        Q    Are you aware of any other statements from

4    Secretary Becerra or the Department of Health and

5    Human Services that makes you concern that Secretary

6    Becerra or HHS would consider your treatment of this

7    patient to be discriminatory?

8        A    No.

9        Q    So, we've discussed two situations in which

10   you have expressed some concern that Secretary Becerra

11   might conclude that your behavior would constitute

12   discrimination.  The first involved overseeing the

13   gender transition of a minor.

14            And the second involves recommending

15   preventive care in accordance with the transgender

16   patient's biological sex.

17            Are there any other situations in which

18   you're concerned that you might engage in conduct that

19   Secretary Becerra would consider to be discrimination

20   on the basis of gender identity?

21       A    I'm sure there could be several.  I can't

22   come up with any right now.

Susan Neese                                          July 22, 2022

Page 38

1        Q    In your view, what does it mean to

2    discriminate against a patient on the basis of gender

3    identity?

4        A    That you do not go along with their belief

5    that they are fully female or fully male.  And that if

6    you don't do what they want as their gender identity

7    sex versus what needs to be done based on their

8    biologic sex, am I being discriminatory?

9             Am I discriminating because they believe

10   that they are this sex when biologically they're this

11   sex and I'm treating them based biologically on that

12   sex.  Trying to do no harm.

13       Q    So, do you believe that in that situation,

14   Secretary Becerra would deem it to be discrimination

15   on the basis of gender identity to treat the patient

16   as you described in line with their biological sex?

17       A    I don't know.  I think that needs to be

18   elucidated.  It's not specific enough.

19       Q    Do all doctors in this country agree about

20   when it is appropriate to provide gender transition

21   services to transgender individuals?

22       A    No.  There's no set standard.

Susan Neese                                           July 22, 2022

Page 39

1       Q    Is -- do doctors and does -- strike that.

2   Do some doctors disagree about when it's appropriate

3   to provide gender transition services to transgender

4   individuals?

5       A    Yes, I believe so.

6       Q    Is it fair to say that there are a wide

7   range of different views among doctors in this country

8   about when it is appropriate to provide gender

9   transition services to transgender individuals?

10      A    Yes, I believe so.

11      Q    Do all doctors in this country agree about

12  what it means to discriminate against a patient on the

13  basis of gender identity?

14      A    I can't answer that.  I don't know the

15  answer to that.

16      Q    Do --

17      A    I think it's confusing.

18      Q    Do all doctors in this country agree about

19  whether it should be legal to discriminate against

20  patients on the basis of gender identity?

21      A    I don't know the answer to that.  What all

22  doctors believe from that standpoint.

Susan Neese                                            July 22, 2022

                                                        Page 40

1       Q   Do you believe that some doctors believe

2    that it should be illegal to discriminate against

3    patients on the basis of gender identity?

4       A   Yes.

5       Q   Do all doctors in this country have the same

6    views about the notification Exhibit 2 that we've just

7    looked at?

8       A   I just missed part of that.  The -- have

9    views, what?

10      Q   I said do -- have -- do all doctors in this

11   country have the same views about the notification

12   Exhibit 2 that we were previously discussing.

13              MR. MITCHELL:  Mr. Newman, I'm going to

14   object to the form of the question.  Calls for

15   speculation.

16   BY MR. NEWMAN:

17      Q   Do you have any understanding about whether

18   all doctors in this country have the same views about

19   that notification?

20      A   I don't know what all doctors believe.

21      Q   Take a look back at Exhibit 1, which is the

22   first amended complaint.  And in particular, I'd like

Susan Neese                                              July 22, 2022

                                                        Page 41

1    to direct your attention to page 10 and paragraph 48

2    on page 10.

3         A    Okay.

4         Q    That paragraph reads, "The court should

5    therefore declare that Section 1557 does not prohibit

6    discrimination on account of sexual orientation and

7    gender identity as Secretary Becerra claims.

8              But that it prohibits only sex

9    discrimination, which means that the provider would

10   have acted differently toward an identically situated

11   member of the opposite biological sex."  Do you see

12   that?

13        A    I do.

14        Q    Do you believe that all doctors in this

15   country would want the court to issue a declaration

16   that Section 1557 does not prohibit discrimination on

17   account of sexual orientation and gender identity?

18        A    Do I believe that all doctors?

19        Q    Yes.

20        A    I think -- say it one more time.  I'm sorry.

21        Q    Do you believe that all doctors in this

22   country would want the court in this case to declare

Susan Neese                                              July 22, 2022

Page 42

1    that Section 1557 does not prohibit discrimination on

2    account of sexual orientation gender identity?

3        A   Does not prohibit discrimination on account

4    of sexual orientation and gender identity?  Is that

5    what you --

6        Q   Let me --

7        A   I don't understand what your question is.

8        Q   Okay.  So, let me rephrase that in different

9    way.  You are asking in -- paragraph 48 asked the

10   court to declare that Section 1557 does not prohibit

11   discrimination on account of sexual orientation and

12   gender identity.

13           Do you believe that all doctors in the

14   country would want the court to issue such a

15   declaration?

16       A   I don't know what all doctors would want.

17       Q   There are many lesbian, gay, bisexual and

18   transgender doctors in this country, correct?

19       A   Correct.

20       Q   Do you believe that all of the lesbian, gay,

21   bisexual and transgender doctors in this country would

22   want the court to issue a declaration that Section

Susan Neese                                                   July 22, 2022

Page 43

1    1557 does not prohibit discrimination on account of

2    sexual orientation and gender identity?

3         A   I don't believe they would but I can't

4    answer for everybody.  But I think it's a complicated

5    issue.

6         Q   What do you mean by that that it's

7    complicated issue?

8         A   Well, I mean, you're bringing in gay and

9    lesbian versus gender identity, transgender

10   treatments.  That's a totally separate issue in my

11   opinion.

12        Q   You're not concerned with issues concerning

13   gay and lesbian patients?

14        A   What issues?

15        Q   Strike that.  Are you aware that during the

16   Trump administration, HHS took the legal position that

17   you advocate in this case that Section 1557 does not

18   prohibit discrimination on account of sexual

19   orientation and gender identity?

20        A   Yes.

21        Q   Are you aware that during the Trump

22   administration, some groups of doctors and medical

Susan Neese                                        July 22, 2022

Page 44

1   providers sued HHS to try to get that interpretation

2   set aside as unlawful?

3        A    No.

4        Q    Are you aware that those groups ask the

5   courts in those cases to rule that Section 1557 does

6   prohibit discrimination on account of sexual

7   orientation and gender identity?

8        A    I don't know.

9        Q    Do you believe that in this lawsuit, you're

10  adequately representing the interests of doctors and

11  medical providers who disagree with your view that

12  Section 1557 does not prohibit discrimination on the

13  basis of sexual orientation and gender identity?

14       A    Yes.  I guess I'm a little confused.  Say

15  that one more time.  I'm getting --

16       Q    Do you believe that in this lawsuit, you are

17  adequately representing the interests of the doctors

18  and medical providers who disagree with your view that

19  Section 1557 does not prohibit discrimination on the

20  basis of sexual orientation and gender identity?

21       A    Yes.

22       Q    How so?

Susan Neese                                          July 22, 2022

Page 45

 1      A    Well, I want to make sure this is clarified

 2   that we know what we're talking about when it comes to

 3   discrimination against transgender patients.

 4           That if I'm doing something that's not based

 5   on their -- that I'm doing something that's based --

 6   I'm doing appropriate care based on their biologic sex

 7   versus what they -- what their gender identity is.

 8           I want to make sure that I'm not considered

 9   discriminatory if I'm doing the right thing by my

10   patient.

11      Q    Do you believe that in your -- in this

12   lawsuit, you are adequately representing the interests

13   of doctors and medical providers who have previously

14   sued HHS under the Trump administration to challenge

15   the legal interpretation that you are offering in this

16   lawsuit?

17      A    I don't know the answer to that.  I don't

18   know how to answer that.

19      Q    Okay.

20           MR. NEWMAN:  I have no further

21   questions at this point.

22           MR. MITCHELL:  I have no questions

Susan Neese                                          July 22, 2022

Page 46

1    either.

2                    VIDEOGRAPHER:   Going off the video

3    record.   The time is 10:10.

4                    (Signature Waived.)

5                    (Whereupon, at 10:10 a.m., the

6              proceeding was concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 47

1              CERTIFICATE OF NOTARY PUBLIC

2              I, MERIENNE GASCA, the officer before whom

3    the foregoing proceedings were taken, do hereby

4    certify that any witness(es) in the foregoing

5    proceedings, prior to testifying, were duly sworn;

6    that the proceedings were recorded by me and

7    thereafter reduced to typewriting by a qualified

8    transcriptionist; that said digital audio recording of

9    said proceedings are a true and accurate record to the

10   best of my knowledge, skills, and ability; that I am

11   neither counsel for, related to, nor employed by any

12   of the parties to the action in which this was taken;

13   and, further, that I am not a relative or employee of

14   any counsel or attorney employed by the parties

15   hereto, nor financially or otherwise interested in the

16   outcome of this action.

17                                    MERIENNE GASCA

18                            Notary Public in and for the

19                                    State of Texas

20

21

22

Susan Neese                                          July 22, 2022

Page 48

1                    CERTIFICATE OF TRANSCRIBER

2              I, JIMMY JACOB, do hereby certify that this

3      transcript was prepared from the digital audio

4      recording of the foregoing proceeding, that said

5      transcript is a true and accurate record of the

6      proceedings to the best of my knowledge, skills, and

7      ability; that I am neither counsel for, related to,

8      nor employed by any of the parties to the action in

9      which this was taken; and, further, that I am not a

10     relative or employee of any counsel or attorney

11     employed by the parties hereto, nor financially or

12     otherwise interested in the outcome of this action.

13

14

15                                              JIMMY JACOB

16

17

18

19

20

21

22

Susan Neese

July 22, 2022

**[09 - answer]**

Page 1

| **0** |
|---|
| **09**   3:8 |

| **1** |
|---|
| **1**   3:7 9:12,13,14 9:20 14:6 40:21 |
| **10**   13:22 21:20 27:15 30:10,18 41:1,2 |
| **10:10**   46:3,5 |
| **1100**   2:16 |
| **111**   2:6 |
| **12**   24:14 |
| **1537's**   21:22 |
| **1557**   13:17,18 14:2,7,10,13,18 15:1,6,10,17 18:3 20:4,18 23:2 36:3 41:5 41:16 42:1,10 43:1,17 44:5,12 44:19 |
| **16**   26:19 27:2,5 27:7,8,9,20 28:3 29:18 |
| **163**   1:7 |
| **17539**   48:14 |
| **18**   28:11 |
| **18116**   3:10 13:21 20:2 |
| **1972**   20:5 36:4 |

| **2** |
|---|
| **2**   3:9 19:6,7,21 36:1,5 40:6,12 |
| **20**   3:10 6:19 |
| **20005**   2:17 |
| **202**   2:19 |
| **2021**   13:22 21:20 |

| **2022**   1:12 4:8 |
|---|
| **22**   1:12 4:8 |
| **23**   3:12 |
| **26261**   47:16 |
| **2:21**   1:7 |

| **3** |
|---|
| **3**   3:11 23:20,21 33:12 |
| **30**   29:6 |
| **3000**   28:8 |
| **30s**   28:21 33:21 |
| **38**   17:21 18:1,20 |

| **4** |
|---|
| **40**   29:6 |
| **400**   2:7 |
| **40s**   28:21 |
| **42**   3:10 13:21 20:2 |
| **48**   41:1 42:9 |

| **5** |
|---|
| **5**   27:15 |
| **512**   2:10 |
| **532-3114**   2:19 |
| **5329209**   1:17 |

| **6** |
|---|
| **686-3940**   2:10 |

| **7** |
|---|
| **7**   3:3 |
| **78701**   2:8 |
| **79106**   4:9 |

| **9** |
|---|
| **9**   21:19 31:16 |
| **9:05**   1:13 4:5 |
| **9:44**   33:7 |
| **9:53**   33:10 |

| **a** |
|---|
| **a.m.**   1:13 4:5 46:5 |
| **ability**   47:10 48:7 |
| **able**   9:18 12:1 14:16 15:2 19:10 24:2 32:10 |
| **absent**   4:15 |
| **accept**   28:3 |
| **access**   7:21 |
| **account**   41:6,17 42:2,3,11 43:1 43:18 44:6 |
| **accurate**   12:19 47:9 48:5 |
| **accused**   12:16 |
| **acknowledge...**   4:12 |
| **acronym**   6:10 |
| **act**   13:19 14:14 14:19 18:4 20:4 36:3 |
| **acted**   41:10 |
| **action**   3:8 9:22 13:16 16:14,18 17:2 47:12,16 48:8,12 |
| **activity**   13:20 |
| **added**   25:5 |
| **additionally**   4:15 |
| **adequately**   44:10,17 45:12 |
| **administer**   4:12 |
| **administration**   43:16,22 45:14 |
| **adult**   26:11 29:8 |

| **adults**   26:7,11 26:15,17,18 |
|---|
| **advantage**   6:22 |
| **advocate**   43:17 |
| **affordable**   13:19 14:13,18 18:4 20:4 36:3 |
| **age**   15:3 26:19 27:1,5,7,8,9,20 28:3,11 29:4 |
| **ago**   6:19 30:10 |
| **agree**   4:13,17 36:14 38:19 39:11,18 |
| **ahead**   12:7 29:15 |
| **al**   1:4,7 2:2,12 4:7,8 |
| **allegations**   11:19 12:19 13:3 |
| **allege**   15:18 |
| **alleged**   15:12 |
| **allow**   8:15 35:19 |
| **allowed**   15:3 36:16 |
| **amarillo**   1:2 4:8 |
| **amended**   3:7 9:21 13:16 16:14 19:22 40:22 |
| **amendments**   20:5 36:4 |
| **america**   6:9 |
| **announced**   13:22 |
| **answer**   7:16 8:2 8:3,4,5,16,17,20 9:2,3,9 18:17 26:6 27:22 29:9 |

**[answer - come]**                                                         Page 2

32:12 35:3
39:14,15,21
43:4 45:17,18
**answered** 25:18
**answering** 25:17
**answers** 3:11
  8:10 24:6,12,18
  25:10,12 26:1
**anybody** 27:4
**applicable** 4:21
**appointments**
  34:10
**appropriate**
  34:12,16 35:7,9
  36:13 38:20
  39:2,8 45:6
**area** 30:3 31:6
  31:19
**aside** 44:2
**asked** 27:7,16,19
  29:20 30:6
  32:13 42:9
**asking** 7:11 10:4
  12:6,8,22 13:1
  16:5 22:7 42:9
**assigned** 4:3
**assist** 29:20
**assistance** 13:21
**assume** 7:16
**assuming** 10:19
**attached** 3:15
**attendance** 5:8
**attention** 13:14
  21:15 28:14
  32:1 33:14 41:1
**attorney** 6:6
  47:14 48:10
**audio** 47:8 48:3
**austin** 2:8

**authorized** 4:11
**avenue** 2:6
**aware** 25:22
  37:3 43:15,21
  44:4

**b**

**b** 3:5
**back** 19:15 26:4
  30:22 31:3 33:9
  36:1 40:21
**bad** 32:7
**barke** 11:5 18:2
**based** 12:2 14:16
  15:3,22 16:7,9,9
  17:7 34:8 36:15
  36:16 37:1 38:7
  38:11 45:4,5,6
**basis** 14:3,4 21:1
  22:1,2,3,10,15
  22:20 23:2,8,13
  34:20 35:2,15
  37:20 38:2,15
  39:13,20 40:3
  44:13,20
**becerra** 1:7 2:12
  4:8 6:7 13:22
  22:14 34:22
  35:14 36:9,20
  37:4,6,10,19
  38:14 41:7
**becerra's** 15:5
**beginning** 5:9
  14:20 21:20
**begins** 13:17
  32:3
**behalf** 2:2,12
**behavior** 37:11
**belief** 38:4
**beliefs** 12:3
  16:21

**believe** 9:13 22:9
  22:14,17,19
  23:3,9,14 27:4
  29:6 34:15,18
  34:19,22 35:21
  36:8,20 38:9,13
  39:5,10,22 40:1
  40:1,20 41:14
  41:18,21 42:13
  42:20 43:3 44:9
  44:16 45:11
**benefit** 23:9,14
**best** 12:5 16:10
  47:10 48:6
**biologic** 15:22
  16:7 17:7 34:8
  35:22 36:12,16
  38:8 45:6
**biological** 33:21
  37:16 38:16
  41:11
**biologically**
  38:10,11
**bisexual** 22:19
  42:17,21
**bit** 21:4
**blockers** 31:10
  31:12
**bostock** 17:9
  21:19
**branch** 2:15
**break** 9:6,10
**briefly** 33:2
**bringing** 43:8
**brings** 11:17
**broad** 26:12

**c**

**c** 2:1 4:1
**called** 5:20 17:9

**calls** 40:14
**care** 12:2 13:19
  14:13,19 18:3,4
  18:15 20:4
  30:14 31:9
  33:22 34:5,12
  34:15 35:6,11
  35:12 36:3
  37:15 45:6
**caregiver** 6:22
**case** 1:6 6:7,17
  6:18 10:11,19
  23:6,12 30:3
  41:22 43:17
**cases** 44:5
**cause** 25:4
**certificate** 47:1
  48:1
**certified** 4:18
**certify** 47:4 48:2
**cetera** 14:17
**challenge** 45:14
**child** 27:7
**chronic** 26:13
**civil** 2:14
**claims** 11:20
  20:17,20 21:8
  41:7
**clarified** 45:1
**clarify** 7:13
  18:14
**clarifying** 20:18
**class** 3:8 9:22
  13:16 16:14,17
  17:2 18:2,7,13
  18:20
**clayton** 17:9
**clear** 8:10
**come** 29:11
  37:22

[comes - division]                                                              Page 3

comes  45:2
comfortable
  30:1 31:13
communications
  12:9
company  4:4
complaint  3:7
  9:21 10:11
  11:17 13:16
  16:14 20:1
  25:10 40:22
complete  8:16
complexity  30:2
complicated
  43:4,7
computer  25:3
concern  35:13
  35:22 37:5,10
concerned  31:14
  35:4 37:18
  43:12
concerning  34:4
  34:14 43:12
conclude  37:11
concluded  46:6
conditions  26:13
conduct  22:8,13
  22:17 37:18
confused  44:14
confusing  39:17
congress  2:6
connection
  27:14 32:7
consider  35:1,14
  36:9,21 37:6,19
considered  16:1
  16:9,11 17:6
  18:16 35:20
  45:8

consistent  21:18
constitute  5:3
  22:9,20 35:1,15
  37:11
contain  11:19
  21:12
contents  25:15
continually  34:9
continues  34:13
conversations
  25:16
corner  11:3
correct  8:19
  24:19 25:13
  26:2 42:18,19
counsel  8:22
  12:9 13:7,10
  25:16 47:11,14
  48:7,10
counseling
  30:15
country  17:5
  38:19 39:7,11
  39:18 40:5,11
  40:18 41:15,22
  42:14,18,21
county  17:9
court  1:1 8:8
  14:8 16:5 17:8
  17:11,14,17
  41:4,15,22
  42:10,14,22
court's  21:19
courtroom  7:9
courts  44:5
currently  28:6
cv  1:7

d

d  3:1 4:1
date  1:12
daughter  29:21
dc  2:17
decide  17:1
decision  17:9,11
  17:14,17 21:19
declaration
  41:15 42:15,22
declare  14:8
  24:18 41:5,22
  42:10
declined  29:17
deem  38:14
defendants  1:8
  2:12 6:7
department  2:14
  3:9 5:11 6:6,8
  6:11 14:1 20:1
  21:21 37:4
depends  29:9,15
deposed  6:13
deposition  1:10
  4:6 5:1 6:12 7:4
  7:20 13:13
describe  30:12
  34:3
described  33:20
  38:16
description  3:6
details  34:3
device  25:4
diagnosticians
  26:12
different  10:20
  33:2 39:7 42:8
differently
  41:10

digital  47:8 48:3
direct  10:2
  13:14 21:15
  28:14 32:1
  33:13 41:1
disagree  39:2
  44:11,18
disclose  12:8
  25:15
discriminate
  14:16 15:3 23:8
  23:13 38:2
  39:12,19 40:2
discriminated
  34:19
discriminating
  16:2,11 35:20
  36:18 38:9
discrimination
  12:14 13:19
  14:3,4 20:22
  22:1,2,3,9,15,20
  23:2 35:2,15
  37:1,12,19
  38:14 41:6,9,16
  42:1,3,11 43:1
  43:18 44:6,12
  44:19 45:3
discriminatory
  12:16 17:6
  18:17 36:10,22
  37:7 38:8 45:9
discussed  12:11
  37:9
discussing  33:12
  40:12
district  1:1,2
divers  1:15 5:6
division  1:2 2:14

[doctors - gender]                                                                                      Page 4

doctors  38:19
  39:1,2,7,11,18
  39:22 40:1,5,10
  40:18,20 41:14
  41:18,21 42:13
  42:16,18,21
  43:22 44:10,17
  45:13
document  9:21
  10:1,3,4,8,8,12
  10:15,22 11:8
  11:10,19 12:19
  13:2,3,5,6 16:13
  17:20 19:22
  20:6,8,9,12,14
  20:17,20 21:8
  21:11 22:11,21
  24:5,7,9,11,15
  25:1,5,9,12 36:8
  36:20
documents  24:3
docusign  24:20
doing  31:13,15
  45:4,5,6,9
dr  4:6 5:12,16
  6:5,12 9:17 18:1
  18:1,2 19:10,14
  20:9 25:14
  27:16,22 32:12
  33:12
due  30:1
duly  5:20 47:5
dysphoria  30:15

e

e  2:1,1 3:1,5 4:1
  4:1
earlier  8:20
education  20:5
  36:4

either  32:19
  46:1
elderly  6:21
electronic  25:4,4
electronically
  25:1,8
elucidated  38:18
emotional  30:2
employed  47:11
  47:14 48:8,11
employee  47:13
  48:10
enforce  14:2
  21:3,22
enforcement
  20:4 36:2
enforcing  14:9
engage  22:18
  37:18
engaged  22:8,13
ensure  13:2
entitle  21:19
es  47:4
esquire  2:3,13
essentially  26:13
et  1:4,7 2:2,12
  4:7,8 14:17
ethical  12:2
eventually  30:16
everybody  43:4
evidentiary  4:22
examination  3:2
  6:3
examinations
  34:7
examined  5:22
example  8:10
exams  35:8
exception  9:8

excuse  18:9
exhibit  3:7,9,11
  9:12,13,14,18
  9:20 14:6 19:5,6
  19:7,16,21,22
  23:19,20,21
  24:3 33:12 36:1
  36:5 40:6,12,21
exhibits  3:15
  7:21
explain  26:8
  31:6 35:5,13
expressed  37:10
extends  33:16

f

f  2:3
factual  13:2
fair  39:6
familiar  17:8
  31:12
fast  8:14
fear  12:3
federal  2:14
  12:3,4 13:20
female  30:16,17
  33:21 35:22
  36:12 38:5
females  34:8
file  11:22 17:1
filed  11:20 13:2
  19:22
filing  12:10 13:8
  13:11
financial  13:21
financially
  47:15 48:11
fine  35:11
finish  8:15
first  3:7,11 5:20
  9:21 13:16

16:14 19:22
  21:16 24:6
  37:12 40:22
five  29:3 32:2
  33:16
folder  19:16
following  21:17
follows  5:22
foregoing  47:3,4
  48:4
form  40:14
four  29:16
friday  1:12
frozen  32:7
fully  14:20 38:5
  38:5
funding  12:3,4
  18:16
further  45:20
  47:13 48:9
future  22:18

g

g  4:1
gasca  1:16 4:3
  47:2,17
gay  22:19 42:17
  42:20 43:8,13
gender  14:5,17
  15:3,22 16:8
  21:1 22:4,6 30:7
  30:15 34:20
  35:2,15 36:11
  36:15 37:1,13
  37:20 38:2,6,15
  38:20 39:3,8,13
  39:20 40:3 41:7
  41:17 42:2,4,12
  43:2,9,19 44:7
  44:13,20 45:7

[general - justice]                                                                     Page 5

general  7:3 10:7
  26:7,8,10,16
  31:18
generally  34:3
getting  34:11,12
  44:15
give  9:12 12:13
  13:12 19:5
given  24:13
giving  34:11
go  7:3 12:7
  19:15 29:15
  31:3 32:15 33:1
  33:3,4 38:4
going  9:11 17:20
  19:4 23:18 26:5
  32:10,15 33:6
  35:20 40:13
  46:2
good  4:2
ground  7:3
group  26:19
groups  43:22
  44:4
guess  16:21,22
  44:14
guidelines  34:7

**h**

h  3:5
hand  5:17
happened  30:12
harm  38:12
harmed  23:3
health  3:9 6:8,11
  13:20 14:1 18:2
  20:1 21:21
  34:14 37:4
healthcare
  18:21,21 19:1
  23:7,12

hear  7:20 27:16
  32:10,12
heard  32:11
hearing  5:15
held  16:1 17:5
hereto  47:15
  48:11
hhs  6:10 14:1
  21:22 23:1 37:6
  43:16 44:1
  45:14
hi  5:10,12
hormone  31:1
  31:11
hormones  29:21
house  33:3
huge  35:12
huh  8:11
human  3:9 6:8
  6:11 14:1 20:2
  21:21 37:5
hurley  11:4 18:1
husband  13:12

**i**

idea  28:9
identically  41:10
identification
  9:15 19:8 23:22
identifies  33:21
identify  5:8
identifying  34:2
identity  14:5,17
  15:4,22 16:1,7,8
  21:1 22:4,6
  34:20 35:2,16
  36:11,15 37:2
  37:20 38:3,6,15
  39:13,20 40:3
  41:7,17 42:2,4
  42:12 43:2,9,19

44:7,13,20 45:7
illegal  40:2
include  22:2
incompatible
  14:7 15:6,11,14
  15:18
incorrect  21:12
individuals
  38:21 39:4,9
inform  21:18
instance  29:17
  30:8,9
instances  30:20
  32:18
instruct  25:15
instructs  9:3
intended  4:20
interactions
  34:4
interested  47:15
  48:12
interests  44:10
  44:17 45:12
internal  26:7,8
  26:10,17
internet  27:14
  32:7,18
interpret  14:2
  21:13,22
interpretation
  14:7,10 15:6,10
  15:13,17 20:3
  36:2 44:1 45:15
interpretations
  21:12
interpreted  23:1
interrogatories
  3:12 24:7,19
  25:12

interrogatory
  26:1,6 28:15,15
  31:4 32:2,2
  33:13,14,15
introduce  9:11
  19:4 23:18
introduced  9:13
  9:20 19:6,21
  23:19
introductory
  13:15
involved  37:12
involves  37:14
issue  15:20
  16:22 17:4
  29:10 41:15
  42:14,22 43:5,7
  43:10
issues  7:19 12:11
  23:6,11 30:2
  32:18 34:14
  43:12,14

**j**

jacob  48:2,15
james  11:4
jeffrey  11:5
jeremy  2:13
  5:10 6:5
jeremy.s.new...
  2:18
jimmy  48:2,15
job  1:17
join  14:9
jonathan  2:3,9
  5:13
josh  1:15 5:6
judge  23:6,11,11
july  1:12 4:8
justice  2:14 5:11
  6:6

[keep - number]                                                              Page 6

**k**

**keep** 32:14
**kind** 26:14
**know** 7:21 8:2,3
  8:20 9:7,17
  11:13 18:9,17
  20:14 21:13
  24:2,15 29:9
  35:3 38:17
  39:14,21 40:20
  42:16 44:8 45:2
  45:17,18
**knowledge**
  47:10 48:6

**l**

**l** 2:16
**language** 14:8
  15:7,11,14,18
  36:7,19
**late** 33:21
**law** 2:5 5:14
**laws** 4:22
**lawsuit** 11:18,20
  11:22 12:10
  13:8,8,11,11
  15:9,13,19 16:5
  17:1 20:17,21
  21:9 44:9,16
  45:12,16
**leander** 4:9
**left** 11:3
**legal** 18:14
  21:12 39:19
  43:16 45:15
**legally** 21:14
**lesbian** 22:19
  42:17,20 43:9
  43:13
**life** 26:14

**line** 38:16
**lines** 27:19 29:16
**listed** 11:3,7
**little** 21:3 44:14
**located** 4:9
**location** 1:14
**long** 26:13 29:19
  31:15
**longer** 27:10
  28:2
**look** 10:4,14
  20:7 33:17 36:1
  40:21
**looked** 40:7
**looking** 12:15
**looks** 36:17
**losing** 12:3,4
  18:16

**m**

**m.d.** 1:4 2:2
**majority** 18:10
**male** 30:17
  33:22 35:21
  36:11 38:5
**manner** 5:1
**marked** 9:14
  19:7,16 23:21
**matter** 4:7 31:18
**md** 4:7 11:4,4,5
  11:7
**mean** 12:12
  16:20 20:15
  26:17 30:17
  31:16,22 35:10
  38:1 43:6,8
**means** 5:2 18:6
  39:12 41:9
**meant** 31:7
**medical** 26:13
  30:2 43:22

  44:11,18 45:13
**medically** 34:16
  35:6,9
**medicine** 26:7,9
  26:10,11,11,17
**member** 41:11
**merienne** 1:16
  4:3 47:2,17
**middle** 17:21
  21:16
**mind** 6:21
**mine** 29:20
**minor** 30:7,11
  37:13
**minority** 28:12
**minute** 19:5
  28:17 32:4,16
**missed** 40:8
**missing** 35:11
**mitchell** 2:3,5
  5:13,13,14 8:22
  9:2 25:14 27:12
  27:14,22 28:4
  32:9,11,16,17
  32:22 40:13
  45:22
**mitchell's** 32:6
**mitchell.law** 2:9
**money** 7:1
**morning** 4:2
**mother** 29:19
**multiple** 16:19
  16:20

**n**

**n** 2:1 3:1 4:1
**name** 4:2 6:5,17
  6:18
**names** 11:3
  12:13

**necessary** 33:22
**need** 8:9,9 9:1,6
  20:7
**needs** 16:7 38:7
  38:17
**neese** 1:4,11 2:2
  4:7,7 5:12,12,17
  5:19 6:5,12 9:17
  11:4,7 18:1
  19:10,14 20:9
  24:20,22 25:14
  27:16,22 33:12
**neese's** 24:6
  32:12
**neither** 47:11
  48:7
**never** 29:18
  31:11
**new** 29:17
**newman** 2:13
  3:3 5:9,10,10
  6:2,4,5 9:11,16
  19:4,9,19,20
  23:18 24:1
  25:20,21 27:12
  27:13,18 28:5
  32:9,14,21 33:4
  33:11 40:13,16
  45:20
**nine** 17:19 20:5
  36:3
**nod** 8:11
**northern** 1:1
**notary** 1:16 4:11
  47:1,18
**notification** 20:3
  20:6 21:17 36:2
  40:6,11,19
**number** 26:6
  28:15 32:2

Susan Neese
July 22, 2022

[number - profession]                                                      Page 7

33:14
nw 2:16

**o**

o 4:1
oath 7:5
oaths 4:12
object 8:22 29:7
 40:14
objected 29:13
objection 4:15
 5:16
objects 9:1
obligation 7:8
obtaining 29:21
offering 45:15
office 26:22
officer 47:2
okay 7:11,17,18
 7:22 8:1,17,18
 8:20,21 9:12,20
 10:6,14,18,19
 13:14 17:19
 19:3,6,13,17,18
 19:19 21:6 22:6
 23:17,19 24:5
 24:14,17 25:7
 25:18,20 26:4
 26:20 28:14,19
 31:21 32:14
 33:19 41:3 42:8
 45:19
old 29:18 31:17
once 6:16
opinion 43:11
opposite 41:11
orientation 14:4
 21:1 22:3,8,10
 22:15,21 23:3,8
 23:14 41:6,17
 42:2,4,11 43:2

43:19 44:7,13
 44:20
outcome 47:16
 48:12
outside 4:14
 31:19
overseeing
 37:12

**p**

p 2:1,1 4:1
page 3:2,6 11:2
 11:3 13:15
 16:13 17:19,21
 19:15 21:16
 24:14,17 26:4
 28:16,16 29:16
 32:3,3 33:15,16
 33:16 41:1,2
pap 34:7 35:7
paragraph
 13:15,17,18
 15:9 17:20 18:1
 18:20 21:17
 41:1,4 42:9
parent 27:6,19
part 35:12 40:8
particular 40:22
parties 4:13,16
 47:12,14 48:8
 48:11
parts 10:2
patient 6:21
 22:19 27:6,8,20
 27:21 29:18,19
 29:22 30:10,13
 30:14,18,19,20
 31:9 33:20 34:4
 34:16,20 35:1
 35:14,18,18,21
 36:9,18,21 37:7

38:2,15 39:12
 45:10
patient's 36:11
 37:16
patients 12:2,5
 12:11,12,13,17
 15:21 16:2,6,9
 16:12 17:6
 18:15 28:3,6,10
 28:20 29:1,5,8
 29:12 31:16,19
 39:20 40:3
 43:13 45:3
pediatrician
 26:15 27:11
pelvic 34:7 35:8
penalty 24:18
pending 9:8
people 16:20
 18:10 31:17
percent 28:13
perjury 24:18
permissible 23:7
 23:12
permitted 4:20
person 31:3
personally 34:2
phrase 22:10,21
physician 35:17
physicians 12:4
 17:5
plaintiff 11:13
 11:16 18:7 24:6
plaintiffs 1:5 2:2
 11:4,11 16:19
please 5:8,17 6:1
 7:21 8:15 9:17
 17:19 24:2,14
 26:4 27:17 32:4

pllc 2:5 5:14
plus 30:10,18
point 8:19 36:7
 36:19 45:21
position 43:16
post 31:2
potential 12:16
practice 26:7,16
 26:21 27:5
 28:13
practices 16:10
pre 31:8
prepare 12:10
prepared 48:3
presence 4:14
present 30:3
preventative
 33:22
preventive 34:5
 34:12 35:12,19
 37:15
previous 30:19
previously 32:13
 40:12 45:13
prior 47:5
probably 6:19
 28:12 30:10
 33:1
problem's 32:22
problems 32:20
procedural 4:21
proceed 6:1
proceeding 4:4
 4:19 5:5 46:6
 48:4
proceedings
 47:3,5,6,9 48:6
produced 4:18
profession 18:11

Susan Neese

[professionals - scientifically]

**professionals**
18:21,22 19:1
**program** 13:20
**programs** 2:15
**prohibit** 14:2
23:2 41:5,16
42:1,3,10 43:1
43:18 44:6,12
44:19
**prohibition** 22:1
**prohibits** 13:19
20:22 41:8
**proposed** 18:20
**protect** 16:19
18:11
**proven** 16:10
**provide** 8:9,10
30:7,21 31:18
38:20 39:3,8
**provider** 41:9
**providers** 18:3
23:7,13 44:1,11
44:18 45:13
**providing** 29:8
29:13
**pubertal** 31:8,8
**puberty** 31:2,9
31:10,12,16
**public** 1:16
21:18 47:1,18
**pull** 19:18
**put** 31:10

**q**

**qualified** 47:7
**question** 7:12,14
7:16,17 8:3,4,15
8:17 9:2,3,8,9
15:8 18:18
25:17 27:16
28:1 32:13

40:14 42:7
**questions** 7:11
9:1,22 10:5,7
20:8 24:12
25:19 28:18
32:5 33:18
45:21,22
**quick** 10:20
**quite** 31:1,14

**r**

**r** 2:1 4:1
**race** 14:17 15:4
**raise** 5:17
**ramifications**
31:15
**range** 26:12 29:4
29:6 39:7
**read** 10:12,20,22
13:5 14:18 15:9
17:11,13 20:12
21:3,6 24:9
28:17 31:5 32:4
**reading** 13:4
**reads** 13:18 18:1
41:4
**real** 10:20
**really** 35:17
**reason** 9:7
**recall** 6:18 8:4,6
13:5 29:14
**receives** 13:20
**recess** 33:8
**recognize** 10:8
10:15
**recommended**
34:1,5,6
**recommending**
37:14
**record** 4:4,5,16
5:8 32:15 33:2,5

33:6,9 46:3 47:9
48:5
**recorded** 5:1,5
47:6
**recording** 4:18
47:8 48:4
**reduced** 47:7
**refer** 6:10 20:6
27:10
**refresh** 19:11
**refreshing** 19:15
**refuse** 30:21
34:13 36:14
**refused** 33:22
34:9
**refuses** 35:19
**regard** 22:14
**regular** 34:6
**related** 47:11
48:7
**relationship**
30:18 35:18
**relative** 47:13
48:10
**religion** 15:4
**remember** 8:4,5
13:4
**remote** 1:14
7:20
**remotely** 4:14
**repeat** 15:15
23:10 27:17
**rephrase** 42:8
**reported** 1:15
**reporter** 4:2,3,9
5:15 6:1 8:8
19:14 32:6
**represent** 6:7
18:2,7

**representative**
18:13
**representing**
18:8 25:8 44:10
44:17 45:12
**requested** 29:12
30:20
**rescheduled**
34:10
**respect** 22:18
**response** 26:5
28:16 31:4 32:3
33:15,20
**responses** 33:13
**responsibilities**
18:13
**rest** 21:6
**right** 5:17 6:12
7:2 9:10 18:10
19:17 21:11
25:22 27:5 33:5
37:22 45:9
**rights** 16:20
18:14
**routine** 34:6
35:19
**rule** 44:5
**ruled** 17:17
**rules** 4:22 7:4
**ruling** 23:6,11

**s**

**s** 2:1 3:5 4:1
**saying** 23:7,12
**says** 11:10 13:16
14:15 15:1
20:22 21:16
24:17,20 37:1
**scientifically**
16:10

**screenings** 35:19
**second** 9:12
   37:14
**seconds** 27:15
**secretary** 6:8
   13:22 14:9 15:5
   22:14 34:22
   35:13 36:8,20
   37:4,5,10,19
   38:14 41:7
**secretary's** 14:6
   15:10,13,17
**section** 3:10
   13:17,18,21
   14:2,7,10,13,18
   14:22 15:6,10
   15:17 18:3 20:2
   20:4,18 21:22
   23:1 36:3 41:5
   41:16 42:1,10
   42:22 43:17
   44:5,12,19
**see** 9:19 10:14
   11:5 13:21 14:6
   14:10 16:15
   18:4 19:10,14
   22:4 24:20 30:4
   33:2 41:11
**seek** 18:2
**seen** 20:9 24:7
   29:18
**sentence** 31:5
**separate** 43:10
**services** 3:10 6:9
   6:11 14:1 20:2
   21:21 30:7
   31:18 37:5
   38:21 39:3,9
**set** 3:11 24:6
   26:21 38:22

**44:2**
**setup** 7:20
**sex** 13:19 14:16
   15:3 17:7 22:1
   37:16 38:7,8,10
   38:11,12,16
   41:8,11 45:6
**sexual** 14:3 21:1
   22:2,7,10,15,20
   23:2,8,13 41:6
   41:17 42:2,4,11
   43:2,18 44:6,13
   44:20
**showing** 19:12
**shrug** 8:11
**signature** 25:4
   46:4 47:16
   48:14
**signed** 25:1,8
**sir** 11:6 18:5
   22:5 25:2 30:5
**sitting** 25:22
**situated** 41:10
**situation** 38:13
**situations** 29:11
   37:9,17
**six** 33:14
**skills** 47:10 48:6
**smears** 34:7
   35:7
**smooth** 32:19
**somebody's**
   26:14
**sooner** 31:17
**sorry** 10:21 12:6
   21:6 41:20
**speak** 8:14,14
**specialized**
   26:10

**specialty** 30:4
   31:6,19
**specific** 10:2
   12:20 13:4,5
   38:18
**specifically** 9:3
**speculation**
   40:15
**spot** 33:3
**standard** 12:2
   38:22
**standing** 29:19
**standpoint**
   39:22
**start** 8:16,17
   10:7 22:7 30:22
   31:11
**starts** 31:16
**state** 47:19
**stated** 23:1
**statements** 26:1
   37:3
**states** 1:1 6:9
**statutory** 14:8
   15:7,11,14,18
**stenographic**
   5:2
**steps** 13:1
**stipulation** 5:3
**stolen** 6:22
**street** 2:16
**strike** 29:4 34:18
   39:1 43:15
**strongly** 34:1
**struggling** 35:10
**stuck** 27:15
**subject** 18:3
**substance** 12:8
**sued** 44:1 45:14

**suite** 2:7
**summary** 21:16
   21:17
**supreme** 17:8,11
   17:13,17 21:19
**sure** 12:18 16:6
   21:5 25:11
   32:17 33:4
   37:21 45:1,8
**susan** 1:4,11 2:2
   4:6,7 5:12,19
   11:4,7 24:6,20
   24:22
**swear** 4:13 5:16
**sworn** 4:16 5:20
   47:5

---

**t**

**t** 3:5
**take** 4:4,11 9:6,9
   10:3 18:15 20:7
   28:17 29:17,22
   30:22 32:4
   33:17 40:21
**taken** 4:7 6:22
   30:14 47:3,12
   48:9
**talk** 13:7
**talked** 13:10
**talking** 31:4
   45:2
**technical** 7:19
**technology** 5:6
**teenage** 29:21
**teenager** 30:1
**teenagers** 26:11
**tell** 5:21 7:8,12
**term** 26:14
   31:15
**terminate** 35:17

**testified**   5:22
**testifying**   7:8
    47:5
**texas**   1:2 4:9,10
    4:12 47:19
**thank**   5:15 6:2
    28:4
**therapy**   31:1,11
**thing**   12:5 18:10
    36:13 45:9
**things**   21:14
**think**   10:14
    14:20 17:3,4
    32:6,7 36:17,17
    38:17 39:17
    41:20 43:4
**thinking**   10:20
**thought**   10:16
    12:14
**thousands**   28:8
**three**   11:3 28:13
    32:3 33:15,16
**time**   1:13 5:7
    10:3 15:15 20:7
    23:10 30:6,11
    30:17 31:1,11
    32:12 33:7,9,17
    41:20 44:15
    46:3
**times**   6:15
**title**   16:14 20:5
    36:3
**titled**   9:21 20:1
    24:5
**today**   13:13
**told**   13:12
**top**   16:13
**totally**   43:10
**transcriber**   48:1

**transcript**   4:18
    8:9 48:3,5
**transcriptionist**
    47:8
**transgender**
    15:21 28:20
    29:1,8 31:9
    37:15 38:21
    39:3,9 42:18,21
    43:9 45:3
**transition**   29:21
    30:1,7 37:13
    38:20 39:3,9
**transitioned**
    30:11,16
**treat**   12:1 15:21
    16:6 26:12,13
    27:1,7,8,19,20
    36:12,15,16
    38:15
**treating**   16:9
    17:6 38:11
**treatment**   29:12
    30:21 35:1,14
    36:9,21 37:6
**treatments**   29:7
    43:10
**true**   13:3 24:19
    25:13 47:9 48:5
**trump**   43:16,21
    45:14
**truth**   5:21,21,22
    7:8
**truthfully**   25:19
**try**   8:14 19:15
    44:1
**trying**   12:5 32:8
    36:12 38:12
**turn**   8:16 11:2
    17:19 24:14

    26:4
**two**   14:4 22:3
    28:8,12,15,16
    29:16 32:3,18
    37:9
**tx**   2:8
**typewriting**   47:7

**u**

**u.s.**   5:11
**uh**   8:11,11,11
**understand**   4:17
    7:4,7,12,13,14
    8:6,12 9:4 12:22
    15:8 42:7
**understanding**
    11:15 14:22
    15:12,16,20
    16:3,4,17 17:16
    18:6,12,19
    20:16,19 21:7
    25:7 40:17
**understood**   7:17
**united**   1:1 6:9
**unlawful**   44:2
**upper**   11:2
**usc**   3:10 13:21
    20:2
**usdoj.gov**   2:18
**use**   6:10
**uses**   4:20

**v**

**v**   1:6 17:9
**verbal**   8:10
**verification**
    24:17
**versus**   15:22
    16:8 35:22 38:7
    43:9 45:7
**video**   5:6 46:2

**videoconference**
    2:4,13
**videographer**
    1:15 33:6 46:2
**videogrpher**
    33:9
**videotaped**   1:10
**view**   9:18 15:5
    21:11 24:3 38:1
    44:11,18
**views**   16:21 39:7
    40:6,9,11,18
**vs**   4:7

**w**

**waived**   46:4
**want**   12:1 18:14
    22:7 32:14,15
    34:2 38:6 41:15
    41:22 42:14,16
    42:22 45:1,8
**wanted**   14:15
**wanting**   18:9
**washington**   2:17
**way**   23:4,9,15
    42:9
**we've**   37:9 40:6
**went**   14:21
**wide**   39:6
**wish**   8:19
**witness**   4:13,16
    4:17 5:16,20
    19:17 25:18
    28:2 47:4
**word**   12:15
    16:22
**worrying**   18:15
**written**   5:3
**wrong**   12:14
**wrote**   26:6,16
    29:17 31:5

Susan Neese                                          July 22, 2022

[x - zoom]                                                    Page 11

| x |
|---|
| **x**   3:1,5 |
| **xavier**   1:7 2:12 |
| 4:8 6:7 |

| y |
|---|
| **years**   6:19 29:18 |
| 30:10,14,16,18 |
| 31:2,16 |
| **young**   31:15 |

| z |
|---|
| **z**   1:7 |
| **zoom**   1:14 |

A150

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foreground transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Page 1

 1                IN UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF TEXAS

 3                    AMARILLO DIVISION

 4   SUSAN NEESE, M.D., et al.,     )

                                    )

 5                                  )

          Plaintiffs,               )

 6                                  )   CIVIL ACTION NO.

     VS.                            )   2:21-CV-163-Z

 7                                  )

     XAVIER BECERRA, et al.,        )

 8                                  )

          Defendants.               )

 9

10

11   ****************************************************************

                REMOTE ORAL VIDEOTAPED DEPOSITION OF

12                   JAMES HURLY, M.D.

                     JULY 28, 2022

13                     VOLUME 1

     ****************************************************************

14

15

16

17

18

19          REMOTE ORAL VIDEOTAPED DEPOSITION OF JAMES HURLY,

20   M.D., produced as a witness at the instance of the Defendants

21   taken in the above-styled and -numbered cause on the 28th day

22   of July, 2022, from 2:12 p.m. to 3:30 p.m., before Schias K.

23   Carmon-Brown, a Certified Shorthand Reporter in and for the

24   State of Texas, reported by machine shorthand, remotely via

25   Zoom, pursuant to the Federal Rules of Civil Procedure.

Page 2

```
 1                A P P E A R A N C E S
 2                 (Via Videoconference)
 3    FOR THE PLAINTIFFS:
 4         Mr. Jonathan F. Mitchell
                MITCHELL LAW PLLC
 5              Jonathan@mitchell.law
                111 Congress Avenue, Suite 400
 6              Austin, Texas  78701
 7
 8
 9    FOR THE DEFENDANTS:
10         Mr. Jeremy Newman
                UNITED STATES DEPARTMENT OF JUSTICE
11              Civil Division, Federal Programs Branch
                Jeremy.s.newman@usdoj.gov
12              1100 L Street N.W.
                Washington, DC  20005
13
14    ALSO PRESENT:
15         Ms. Megan King, Videographer
16
17
18
19
20
21
22
23
24
25
```

Page 3

1                          I N D E X

2    EXAMINATION                                          PAGE

3    By Mr. Newman...................................4

4

5    Reporter's Certificate.........................49

6

                       INDEX OF EXHIBITS

7

     NUM.            DESCRIPTION                          PAGE

8

9    Exhibit 4   First Amended Complaint..............7

10   Exhibit 5   Notification of Interpretation and
                 Enforcement of Section 1557.........14

11

     Exhibit 6   Plaintiff Answers to

12               Interrogatories.....................18

13   Exhibit 7   AMA Statement of Biden Decision to
                 Restore Anti-Bias Protections.......32

14

     Exhibit 8   Press Release from GLMA.............33

15

     Exhibit 9   Press Release from Planned

16               Paernthood..........................35

17   Exhibit 10  Press Release from Kaiser
                 Permanente..........................36

18

     Exhibit 11  Press Release from Endocrine

19               Society.............................38

20   Exhibit 12  Letter dated 8/13/2019 from NAPNAP..39

21   Exhibit 13  Letter dated 8/9/2019 from Alameda..41

22   Exhibit 14  Complaint for Declatory and Injunctive
                 Relief, Whitman-Walker v. US HHS....43

23

     Exhibit 15  Press Release from American College

24               Of Physicians.......................45

25

Page 4

```
 1                      P R O C E E D I N G S:

 2              THE VIDEOGRAPHER:  Good afternoon.  We are on

 3     the record at 12 -- excuse me -- 2:12 p.m. on July 28th, 2022.

 4     This is the deposition of Dr. James Hurly in the matter of

 5     Susan Neese, M.D., et al., versus Xavier Becerra, et al., filed

 6     in the Northern District of Texas, Amarillo Division, Civil

 7     Action Number 2:21-CV-163-Z.  Please note this deposition is

 8     being conducted virtually.  My name is Megan King representing

 9     Veritext, and I am the videographer.  At this time, Counsel,

10     please state your appearances for the record.

11              MR. NEWMAN:  My name is Jeremy Newman.  I'm an

12     attorney with the U.S. Department of Justice for the

13     defendants.

14              MR. MITCHELL:  Jonathan Mitchell from Mitchell

15     Law, PLLC, and I represent the plaintiffs.

16              THE WITNESS:  Dr. James Hurly with Amarillo

17     Pathology Group.

18                      JAMES HURLY, M.D.,

19        having been first duly sworn, testified as follows:

20     EXAMINATION

21     BY MR. HURLY:

22        Q.   My name is Jeremy Newman.  I'm an attorney with the

23     U.S. Department of Justice.  I represent the defendants in this

24     case, Xavier Becerra, Secretary of U.S. Department of Health

25     and Human Services and the Unites States of America.  And I may
```

James Hurly                                         July 28, 2022

Page 5

1    refer to the Department of Health and Human Services during

2    this deposition as "HHS."  Have you ever been deposed before,

3    Dr. Hurly?

4          A.   I have.

5          Q.   How many times?

6          A.   Twice.

7          Q.   And can you explain what were those cases about?

8          A.   One was a medical-legal lawsuit.  I was just a

9    witness for some pathology that I had read and I was not a

10   defendant or a plaintiff.  And the other one was an issue -- a

11   legal issue with the local golf course here where my property

12   was taking some golf balls an endangered my children.

13         Q.   Do you understand you're under oath?

14         A.   Yes.

15         Q.   Do you understand you have the same obligation to

16   tell the truth as if you were testifying in a courtroom?

17         A.   Yes.

18         Q.   I'll be asking you some questions.  If you don't

19   understand a question, you can tell me you don't understand or

20   ask me to clarify the question.  Do you understand that?

21         A.   Yes.

22         Q.   If you answer a question, I'll assume that you

23   understood it.  Okay?

24         A.   Yes.

25         Q.   And if you don't know or -- an answer to a question

James Hurly                                  July 28, 2022

Page 6

1    or if you don't recall the answer to a question, it's okay to

2    answer that you don't know or you don't recall.

3         A.   Okay.

4         Q.   And the court reporter will be taking down answers to

5    my questions.  For that reason, you need to provide clear,

6    verbal answers.  For example, "yes" or "no" rather than just a

7    nod or a shrug or an "huh-uh" or "uh-uh."  Do you understand?

8         A.   Sure.  Yes.

9         Q.   And so I'll -- try not to speak too fast and try not

10   to speak over me.  I'll need to finish my question before you

11   start to answer.  And in turn, I'll try to let you complete

12   your answer before I start my next question, okay?

13        A.   No problem.

14        Q.   And your counsel might object to some of my

15   questions.  And if your counsel objects, you still need to

16   answer the question unless your counsel specifically instructs

17   you not to answer the question.  Do you understand?

18        A.   Understood.

19        Q.   If you need to take a break for any reason, just let

20   me know and we'll do so.  The only exception is if there's a

21   question pending, then I'll ask you to answer that question

22   before we take a break, okay?

23        A.   Okay.

24        Q.   All right.  So I am going to introduce an exhibit

25   right now.  Just give me a minute to do that.  Okay.  I have

James Hurly                                              July 28, 2022

                                                              Page 7

1    just introduced Exhibit 4, which is a document titled, First

2    Amended Complaint Class Action.

3                    (Exhibit 4 marked.)

4        Q.   (BY MR. NEWMAN)  Dr. Hurly, are you able to view the

5    document?

6        A.   So when I get onto the Veritext, do I click on a

7    particular file?

8        Q.   It -- so it should be in the marked exhibits folder.

9        A.   Marked, okay.

10       Q.   So Exhibit 4.

11       A.   I see it, yeah.

12       Q.   Okay.  Yes.

13       A.   That's our amended complaint.  Yeah.  I see it.

14       Q.   Okay.  So I'll start with just some general questions

15   about the document.  Do you recognize this document?

16       A.   I do.

17       Q.   What is it?

18       A.   It looks like our first amended complaint in the

19   class action lawsuit against the U.S.

20       Q.   Have you read this document before?

21       A.   I have.

22       Q.   Can you explain the circumstances in which you read

23   this document?

24       A.   Well, I just read it at home.

25       Q.   Did you -- did you read it before or after it was

James Hurly                                              July 28, 2022

Page 8

1   filed in court?

2              MR. MITCHELL:  Mr. Newman, may I just interject

3   briefly and instruct the witness --

4              MR. NEWMAN:  Yes.

5              MR. MITCHELL:  -- not to disclose any

6   communications he may have had with me or my co-counsel in

7   answering your question.

8              You can answer, Dr. Hurly.

9      A.   Can you repeat the question?  I'm sorry.

10     Q.   (BY MR. NEWMAN) Sure.  Sure.  Sure.  The question

11  was, did you read this document before or after it was filed in

12  court?  And then you keep in mind your counsel's instruction

13  not to disclose the communication --

14     A.   I'm not sure.

15     Q.   Okay.  So on page one of the document in the upper

16  left corner, there are listed three names as plaintiffs, Susan

17  Neese, M.D., James Hurly, M.D., and Jeffrey Barke, M.D.  Do you

18  see that?

19     A.   Yes.

20     Q.   Are you the James Hurly, M.D. listed there?

21     A.   I am.

22     Q.   The document says the you're one of the plaintiffs.

23  Do you know what a plaintiff is?

24     A.   Yes, I do.

25     Q.   What's a plaintiff?

James Hurly                                    July 28, 2022

Page 9

1    A.   Well, I'm initiating a lawsuit, making a claim.

2    Q.   So how does -- strike that.

3         Does this document contain allegations in a

4    lawsuit that you filed?

5    A.   Yes.

6    Q.   Why did you file this lawsuit?

7    A.   Well, mainly I think the memo that Xavier Becerra

8    sent out was a little bit unclear to me, but I did that to --

9    really to clarify my obligations and obligations of all

10   physicians under the law because the memo is a bit unclear and

11   to protect and preserve the autonomy of all health care

12   providers to treat transgender patients and patients with

13   gender dysphoria consistent with their ethical beliefs.

14   Q.   I'm not asking you to disclose the substance of your

15   communications with counsel, but what did you do to prepare for

16   filing this lawsuit?

17   A.   Well, I had some consultations with my attorneys.

18   Q.   Have you talked to anyone other than your attorneys

19   about this lawsuit?

20   A.   No.  I think I may have casually talked to Susan

21   Neese about it, but we didn't discuss the substance because we

22   wouldn't have known anything.

23   Q.   So I'd like to direct your attention to the

24   introductory photograph on Page 1, under where it says, First

25   amended complaint class action.  The paragraph that begins,

James Hurly                                          July 28, 2022

                                                    Page 10

1    Section 1557.  That paragraph states, Section 1557 of the

2    Affordable Care Act prohibits sex discrimination in any health

3    program or activity that receives federal financial assistance.

4    See 42 U.S.C Section 18116.  On May 10, 2021, Secretary Becerra

5    announced that the Department of Health and Human Services,

6    HHS, will interpret -- interpret and enforce Section 1557 to

7    prohibit, one, discrimination on the basis of sexual

8    orientation and, two, discrimination on the basis of gender

9    identity.  See Exhibit 1.  The Secretary's interpretation of

10   Section 1557 is incompatible with the statutory language, and

11   the court should declare it so and enjoin the Secretary from

12   using or enforcing this interpretation of Section 1557.  Do you

13   see that?

14        A.   Yes.

15        Q.   What is Section 1557 of the Affordable Care Act?

16        A.   Well, from what I understood, it prohibits us -- the

17   main issue that I have is -- that I'm looking at is it

18   prohibits discrimination on the basis of sexual orientation and

19   discrimination on the basis of gender identity basically to

20   prevent discrimination against patients.

21        Q.   Have you read it before?

22        A.   I have not, no.

23        Q.   In your view, how is Secretary Becerra's

24   interpretation of Section 1557 incompatible with the statutory

25   language?

James Hurly                                                    July 28, 2022

                                                                  Page 11

1        A.   I think the language is vague and it leaves a lot --

2   leaves open to interpretation a lot of actions which could

3   possibly inappropriately construe physicians as being

4   discriminatory when they're not being discriminatory.

5        Q.   What is your understanding of what you're asking the

6   court to do in the lawsuit?

7        A.   To clarify the language.

8        Q.   In this lawsuit, are you -- strike that.

9             What's your understanding of how you're asking

10  the court to clarify the language?

11       A.   Well, I think they should be maybe a little bit more

12  specific.

13       Q.   In this lawsuit, are you asking the court to order

14  the federal government to do something or not to do something?

15       A.   I believe I'm asking them to do that, yeah, the court

16  to order that.

17       Q.   Do you have an understanding of what you're asking

18  the court to order the federal government to do or not to do?

19       A.   Yes, to be more specific in their language.

20       Q.   On page one near the top, the title of the document

21  is First Amended Complaint Class Action.  Do you see that?

22       A.   Yeah, I'm going to have to switch other to that.  I

23  may lose you guys on the video.  Is that okay?  So go ahead.

24  Tell me.

25       Q.   Do you see where it says, First Amended Complaint

Page 12

1    Class Action?

2         A.   Yes.  Correct.

3         Q.   What's your understanding of what a class action is?

4         A.   Well, that's where you pool -- if you have different

5    plaintiffs, you pool all their complaints into one for

6    simplification.

7         Q.   But why didn't you decide to file this lawsuit as a

8    class action?

9         A.   Well, I think there were some different issues that a

10   few of us different physicians have and we spoke to the

11   attorneys and thought it would be a good idea to do it as a

12   class action.

13        Q.   Are you familiar with the Supreme Court decision

14   called Bostock v. Clayton County?

15        A.   Not really.  Just very vaguely but, no, not really.

16   I don't read a lot of Supreme Court decisions.

17        Q.   Can you describe your vague familiarity with that

18   decision?

19        A.   I really have very little familiarity with it.

20        Q.   Do you have any sense -- do you have any sense of

21   what the Supreme Court decided in that case?

22        A.   No.

23        Q.   All right.  Turn to page nine of this document.  Page

24   nine.  I'm going to ask you about paragraph 38, which is in the

25   middle of the page.  Paragraph 38 reads, Dr. Neese, Dr. Hurly,

James Hurly                                                  July 28, 2022

                                                            Page 13

1    Dr. Barke seek to represent a class of all healthcare providers

2    subject to Section 1557 of the Affordable Care Act.  Do you see

3    that?

4         A.   I do.

5         Q.   What is your understanding of what it means for a

6    plaintiff to represent a class?

7         A.   Well, I'm representing all physicians, I would think,

8    but I'm representing a class -- a class of people that treat

9    patients under the Affordable Care Act.

10        Q.   What is your understanding of what your

11   responsibilities would be as a class representative?

12        A.   My responsibilities?

13        Q.   Yes.

14        A.   To represent their interests and to be honest with my

15   answers.

16        Q.   And what's your understanding of who is in the class

17   in paragraph 38?

18        A.   Just the three of us physicians.

19        Q.   Let me rephrase that.  What's your understanding of

20   who is in the -- the -- the class that you hope to represent?

21        A.   Sure.  I would believe that means all healthcare

22   providers who treat patients that are covered under the

23   Affordable Care Act.

24        Q.   Do you have an understanding of which physicians are

25   covered under the Affordable Care Act?

James Hurly                                    July 28, 2022

                                                    Page 14

1       A.   I would assume that's people that in some way receive

2   reimbursement from the federal government under some -- any

3   type of federal program.

4       Q.   Does that include most physicians in the country?

5       A.   I would think most of us do some type of care for

6   people that are on Medicare, Medicaid, but I couldn't speak for

7   all physicians.

8       Q.   Okay.  Thank you.  I'm going to introduce another

9   exhibit.  Just give me a minute.  Okay.  I have just introduced

10  Exhibit 5.

11              (Exhibit 5 marked.)

12      Q.   (BY MR. NEWMAN)  Are you able to see it?

13      A.   Yeah.  Let me open it.  Yeah.  I just opened it.

14  Sure.

15      Q.   So this document was filed as an exhibit to the first

16  amended complaint.  It is titled, Department of Health and

17  Human Services 42 U.S.C. Section 18116A, Notification of

18  Interpretation and Enforcement of Section 1557 of the

19  Affordable Care Act and Title Nine of the Education Amendments

20  of 1972.  Have you ever seen this document before?

21      A.   I don't believe so.

22      Q.   Have you read it before?

23      A.   No.  I don't believe so.

24      Q.   Do you have an understanding of what this document

25  is?

James Hurly                               July 28, 2022

                                                    Page 15

1        A.    I could read it real quick and tell you.

2        Q.    Oh, yeah.  Sorry.  Sorry.  Go ahead and take as much

3    time as you need to -- to look at it.  When you're ready, my

4    question pending is, do you have an understanding of what this

5    document is.

6        A.    Sure.  Just give me a moment.  It looks like Xavier

7    Becerra -- it's a notification or some kind of a clarification

8    on Section 1557 and title -- and title nine explaining the

9    background of the 1557 section of the Affordable Care Act and

10   how that's enforced and kind of defining for patients if they

11   believe -- if any entities violated their civil rights, they

12   can file a complaint.  Something to inform patients of their

13   rights.

14       Q.    What does this document have to do with the claims in

15   your lawsuit?

16       A.    Well, I believe that I would be open to a lawsuit

17   that I was discriminating against someone if I told them that

18   the cancer they have is incompatible with their gender

19   identity.

20       Q.    What does this document have to do with the claims in

21   your lawsuit, though?

22       A.    Well, it covers your civil rights and whether you

23   could file a complaint that you've been discriminated against.

24   And I'm concerned that if I tell a patient that they have a

25   cancer -- let's say it's a male-specific cancer like prostate

James Hurly                                           July 28, 2022

                                                        Page 16

1   cancer and they identify as a woman, they could say that I'm

2   discriminating against them by telling them they're not the sex

3   that they identify with.

4        Q.   In your view, does this document contain any

5   incorrect legal interpretations?

6        A.   I believe I would say I'm opposed to the language

7   based on how vague it is in Bostock, discrimination on the

8   basis of gender identity.  Incorrect language, I would say,

9   yes.

10       Q.   Why is that language incorrect, in your view?

11       A.   Because the term "discrimination" is not very well

12   defined there.

13       Q.   So I'd like to address your attention to the middle

14   of the first page where it says "summary."  After "summary" is

15   the following paragraph:  This notification is to inform the

16   public that consistent with the Supreme Court's decision in

17   Bostock and Title Nine, beginning May 10, 2021, the Department

18   of Health and Human Services, HHS, will interpret and enforce

19   Section 1557's prohibition on discrimination on the basis of

20   sex to include, one, discrimination on the basis of sexual

21   orientation and, two, discrimination on the basis of gender

22   identity.  Do you see that?

23       A.   I do.

24       Q.   Okay.  So I'm going to ask about gender identity

25   later.  But for now, I'm going to ask you about the statement

James Hurly                                            July 28, 2022

Page 17

1    that HHS will interpret Section 1557 to prohibit discrimination

2    on the basis of sexual orientation.

3                   Have you -- have you ever engaged in any conduct

4    that you believe would constitute discrimination on the basis

5    of sexual orientation as that phrase is used in this document?

6         A.   No.

7         Q.   Have you ever engaged in any conduct that you believe

8    Secretary Becerra would regard as discrimination on the basis

9    of sexual orientation?

10        A.   No.

11        Q.   Is there any conduct you believe you are likely to

12   engage in, in the future with respect to a gay, lesbian or

13   bisexual patient that you believe would constitute

14   discrimination on the basis of sexual orientation as that

15   phrased --

16        A.   No.

17        Q.   -- is used in this document?

18        A.   No.

19        Q.   When HHS said that it interpreted Section 1557 to

20   prohibit discrimination on the basis of sexual orientation, do

21   you believe that that harmed you in any way?

22        A.   No.

23        Q.   If the judge in this case issues a ruling stating

24   that it is permissible for health care providers to

25   discriminate on the basis of sexual orientation, do you believe

James Hurly                                                    July 28, 2022

Page 18

1    that would benefit you in any way?

2        A.   No.

3        Q.   Okay.  I am going to introduce another exhibit.  I

4    have just introduced Exhibit 6.

5                   (Exhibit 6 marked.)

6        Q.   (BY MR. NEWMAN)  This document is titled, Plaintiff

7    James Hurly's Answers to First Set of Interrogatories.  Do

8    you -- are you able to see it, Dr. Hurly?

9        A.   I am.

10                  MR. MITCHELL:  Mr. Newman, I'm still trying to

11   pull that exhibit up.

12                  MR. NEWMAN:  Okay.

13                  MR. MITCHELL:  Sorry for the delay.

14                  THE WITNESS:  And, Jonathan, just so you know, I

15   cannot see you when I'm viewing this document.

16                  MR. MITCHELL:  Okay.  Thank you for telling me.

17                  I have the exhibit now, Mr. Newman.

18                  MR. NEWMAN:  Okay.  Great.

19       Q.   (BY MR. NEWMAN)  Okay.  So this document is titled,

20   Plaintiff James Hurly's Answers to First Set of

21   Interrogatories.

22                  Dr. Hurly, have you seen this document before?

23       A.   I have, yeah.

24       Q.   Have you read this document before?

25       A.   Yes.

James Hurly                                      July 28, 2022

Page 19

 1        Q.    What is this document?

 2        A.    These are answers to a series of questions that were

 3   posed to me, I think, by the U.S. attorney's office or

 4   Department of Justice.

 5        Q.    Okay.  Can you please turn to page nine of the

 6   document?

 7        A.    Sure.

 8        Q.    That page states, Verification.  I declare under

 9   penalty of perjury that the answers to the interrogatories are

10   true and correct.  And it says, DocuSigned by James Hurly.  Do

11   you see that?

12        A.    Yeah, I see -- I see that.

13        Q.    Did you do something on a computer or electronic

14   device to cause that electric signature to be entered?

15        A.    Yes.  That's my signature.

16        Q.    What were you representing when you electronically

17   signed this document?

18        A.    That I was being truthful to my questions -- the

19   questions put to me.

20        Q.    What did you do to make sure that the answers to the

21   interrogatories were true and correct?

22        A.    I answered --

23              MR. MITCHELL:  Dr. Hurly, just let me instruct

24   you not to disclose -- do not disclose communications between

25   you and your counsel in answering Mr. Newman's question.

James Hurly                                      July 28, 2022

                                                       Page 20

1              THE WITNESS:  Sure.

2       A.   Just to be truthful, just to answer truthfully.

3       Q.   (BY MR. NEWMAN)  Okay.  Please turn back to page one,

4  and I'm going to ask you about your response to interrogatory

5  number one.

6       A.   Sure.  Yeah, I see it.

7       Q.   In that answer, you wrote, I am a community-based

8  pathologist certified in anatomic and clinical pathology.  Do

9  you see that?

10      A.   I do.

11      Q.   What is a community-based pathologist?

12      A.   Well, I work in a community -- in the community

13 hospital rather than a university hospital.  So basically it's

14 a community versus university hospital, private slash public

15 hospital.

16      Q.   What is a pathologist?

17      A.   Pathologist comes from the Greek meaning study of

18 disease.  So I am -- I am a diagnostician.  I am a consultant

19 for other physicians that handles bodily fluids and bodily

20 tissues.

21      Q.   What is anatomic and clinical pathology?

22      A.   Anatomic -- I'm in the middle of deposition.  One of

23 my children.  Sorry.

24              So "anatomic" has to do with actual structural

25 tissues.  "Clinical" has to do more with analyzing blood and

James Hurly                                July 28, 2022

Page 21

```
 1    fluids.  Counting cells or, you know, giving some numeric value

 2    to blood such as serum lipid profile, cholesterol, something

 3    like that.  So those are the differences.

 4         Q.   Can you generally describe the services that you

 5    perform in your medical practice?

 6         A.   I interpret fluids and tissues from all areas of the

 7    body from the brain to the skin to the bone marrow to the liver

 8    to the lungs, basically any part of the human body.  And I do

 9    that microscopically.  And I also provide the -- the

10    certification and guarantee the quality of the clinical

11    laboratory that I serve that all results coming from the

12    various branches of the laboratory are true and correct, and

13    that would include blood bank, chemistry, microbiology,

14    immunology, serology and things like that.

15         Q.   So now please look at interrogatory number two, which

16    begins at the bottom of page one, and then your answer is on

17    page two.

18         A.   Uh-huh.

19         Q.   So in your answer you wrote, I do not directly treat

20    patients.  As a pathologist, I analyze lab work to confirm a

21    patient's diagnosis for their treating physician.  Do you see

22    that?

23         A.   Correct.

24         Q.   Can you explain the difference between a treating

25    physician and a pathologist?
```

James Hurly                                              July 28, 2022

                                                              Page 22

1        A.   Well, I would say that I'm not a clinician.  We use

2    the term "clinician."  I'm more of a consultant for the

3    clinician.  So I don't directly see the pathologist.  I'm sort

4    of the secondary physician that diagnoses -- diagnoses and

5    gives treatment -- diagnoses and treatment and recommendations

6    to the physicians who have done the sampling.

7        Q.   I believe in your answer you said, I don't directly

8    see the pathologist.  Did you mean, I don't directly see the

9    patient?

10       A.   I do not directly treat patients as a pathologist.  I

11   analyze lab work and confirm the patient's diagnosis for their

12   treating physician.  Yeah.

13       Q.   So how do you -- how do you obtain your patients?

14       A.   Obtain my -- doesn't make sense.  Obtain --

15       Q.   How do you get -- how do you get your work?  How do

16   you get patients?

17       A.   They send them to us.  The clinicians relay the

18   tissues to us.

19       Q.   Do you determine what tests to run for patients or

20   does the treating physician determine that?

21       A.   They generally will determine that.  On occasion,

22   they will consult with me to order proper lab tests, but

23   generally they determine that.

24       Q.   Do you meet directly with patients?

25       A.   Very rarely.  Very rarely.

James Hurly                                    July 28, 2022

Page 23

 1       Q.   How often?

 2       A.   Oh, gosh, maybe once or twice in my career.

 3       Q.   So suppose that based on lab work you -- you

 4   diagnosed a patient with a certain condition, who do you

 5   deliver that diagnosis to?

 6       A.   To the physician that ordered the test.

 7       Q.   And then your understanding is that the physician

 8   would deliver the diagnosis to the patient?

 9       A.   Correct.

10       Q.   Do you perform any kind of surgery on any patients?

11       A.   I do not.

12       Q.   Do you provide hormone therapy -- do you provide

13   hormone therapy of any kind to any patients?

14       A.   No, I do not.

15       Q.   So please look at interrogatory number eight, which

16   begins at the bottom of page two and your answer is on page

17   three.  In your answer, you wrote, In my practice, I have

18   encountered situations in which patients have denied a

19   diagnosis wrongly claiming they cannot have it because they are

20   no longer of a particular gender.  For example, my group once

21   diagnosed a biologic male patient with prostate cancer but the

22   patient refused to accept this diagnosis because he identified

23   as a woman and insisted that he could not have a prostate and

24   that he had a cervix instead.  We had to firmly explain to this

25   patient that he was indeed a biologic man with a prostate, and

James Hurly                                          July 28, 2022

Page 24

1    that he needed to seek urgent medical treatment for his

2    prostate cancer.  Do you see that?

3        A.   I do.

4        Q.   So the first sentence of this response says, I have

5    countered -- encountered situations, plural, and then you

6    describe one --

7        A.   Yeah.  It's one -- yeah.  It's one situation.  I have

8    had one encounter.

9        Q.   Okay.  So there -- other than the example you

10   describe, there have been no other examples of someone wrongly

11   claiming that they can't have a diagnosis because of their --

12       A.   No, only one so far.

13       Q.   Okay.  Can you just describe generally what happened

14   with the patient that you describe in this answer?

15       A.   I was informed by one of our secretaries who took a

16   phone call directly from the patient that the patient was

17   arguing with her and in denial that they had a prostate cancer

18   because they were a woman and it was not possible that they

19   could have prostate cancer and it must be a misdiagnosis and it

20   should be either cervical or endometrial cancer.

21       Q.   Did you deliver the diagnosis directly to the

22   patient?

23       A.   No, I did not.  Our secretary handled that.  And I'm

24   not sure which pathologist in our group made that diagnosis.

25       Q.   So you did not make the diagnosis to that patient?

James Hurly                                          July 28, 2022

                                                    Page 25

1        A.   I may have but I don't know.  There's seven of us

2    pathologists, so it may have been me.

3        Q.   Did you ever have any interaction with this patient?

4        A.   No.

5        Q.   Do you know -- strike that.

6             What did your secretary tell you about what the

7    patient had said?

8        A.   Repeated that the patient was in denial that they

9    could possibly have prostate cancer, since they were a woman.

10       Q.   Do you know -- do you know what -- how the secretary

11   responded to the patient?

12       A.   I couldn't give you specifics.  I would be

13   paraphrasing.  But she assured the patient that it was prostate

14   cancer.

15       Q.   Do you know what happened to this patient after this

16   interaction over the phone?

17       A.   No, sir, I have no idea.

18       Q.   Do you believe that your group's care for this

19   patient was medically appropriate?

20       A.   Yes.

21       Q.   Do you believe that your group -- strike that.

22            Based on your personal understanding of what it

23   means to discriminate on the basis of gender identity, do you

24   believe that your group discriminated against this patient on

25   the basis of gender identity?

James Hurly                                              July 28, 2022

                                                              Page 26

 1        A.    Absolutely not.  We did not discriminate on the basis

 2   of gender identity.

 3        Q.    Why do you believe that?

 4        A.    Well, because our job is to take care of patients and

 5   ensure their health and safety.  And that is our first job is

 6   to do no harm, so we have to be accurate with our diagnoses.

 7        Q.    Do you belief that Secretary Becerra would consider

 8   your group's treatment of this patient would constitute

 9   discrimination on the basis of gender identity?

10        A.    I think that very well could happen.

11        Q.    Why do you believe that?

12        A.    Well, I have seen people have lawsuits filed or even

13   jailed for using incorrect pronouns.  So if language, the free

14   speech First Amendment rights become jeopardized by a federal

15   act, then I would think that my diagnosis would be open to that

16   same interpretation and I might be considered criminal that I

17   diagnosed someone with an organ that they claim they don't

18   have.

19        Q.    Can you take a look back at Exhibit 5, which is the

20   notification of interpretation and enforcement of Section 1557?

21        A.    Yeah, I see it.

22        Q.    Can you point to any language in that document that

23   makes you believe that Secretary Becerra would consider your

24   group's treatment of this patient to constitute discrimination?

25        A.    This is interrogatory number five?

James Hurly                                            July 28, 2022

                                                           Page 27

1        Q.    Sorry.  In Exhibit Number 5.

2        A.    Oh, Exhibit 5.

3        Q.    Yeah.  Sorry.  Do you see that's the --

4        A.    I have to go back.  We're on six.  Is it okay if I go

5    back?

6        Q.    Yeah, yeah, please do.

7        A.    Sorry about that.  Okay.  Please repeat.  I'm looking

8    at Exhibit 5.  Can you please repeat the question?

9        Q.    The -- the patient that you described disputed the

10   diagnosis of prostate cancer, can you point to any language in

11   Exhibit 5 that would make you believe that Secretary Becerra

12   would consider your group's treatment of that patient to

13   constitute discrimination?

14       A.    Under the summary, it's numeric two where it says

15   discrimination on the basis of gender identity.  The patient

16   denies that they are male, I could very well suffer under that

17   interpretation.

18       Q.    Any other language in that document besides that

19   phrase discrimination on the basis of gender identity?

20       A.    No.  I think this's the very specific language that

21   concerns me.

22       Q.    Are you aware of any other statements by Secretary

23   Becerra or HHS that -- that makes you concerned that Secretary

24   Becerra or HHS would consider your group's treatment of this

25   patient to be discriminatory?

James Hurly                                    July 28, 2022

Page 28

1        A.    Oh, I don't believe so.

2        Q.    Do you believe that Secretary Becerra has a different

3   view from you about what it means to discriminate against a

4   patient on the basis of gender identity?

5        A.    I couldn't speak to his opinion, but I could say he

6   definitely could have a difference of opinion from me if it

7   were expedient.

8        Q.    Are you aware of anything that he or anyone at HHS

9   has said or written that would make you believe that Secretary

10  Becerra or HHS have a different view from you about what it

11  means to discriminate against a patient on the basis of gender

12  identity?

13       A.    No.

14       Q.    So we've talked about one situation where you're

15  concerned about being charged with discrimination where a

16  transgender patient denies a diagnosis based on a gender --

17  gender identity.  Are there any other situations in which you

18  are concerned that you have done or might do something that

19  Secretary Becerra would consider to be discriminatory?

20       A.    Nothing that I have done but I'm concerned it could

21  happen more frequently because it seems to be occupying a

22  little bit more time in the public conscious -- consciousness

23  and I believe we'll probably see more of these with increasing

24  frequency.

25       Q.    What specifically are you concerned that you might do

James Hurly                                              July 28, 2022

Page 29

1    in the future that Secretary Becerra might consider to be

2    discriminatory?

3        A.   I'm concerned specifically with specific cancers such

4    as prostate or testicular cancer versus ovarian, endometrial

5    and endocervical or ectocervical cancers that are sex-specific

6    that would have to be properly diagnosed and properly treated.

7    I don't include breast cancer because males can, on occasion,

8    get breast cancer, not very commonly, but can.

9        Q.   Is your -- is your concern about sort of situations

10   that may arise in the future all in the general situation of

11   diagnosing someone based on the organs or body parts that they

12   have and the transgender patient disputing that diagnosis?

13       A.   Yes.  That's correct.

14       Q.   Okay.  Do all the doctors in this country agree about

15   when it is appropriate to provide gender transition services to

16   transgender individuals?

17       A.   Oh, gosh, I couldn't answer for other doctors.  I

18   couldn't answer that.

19       Q.   Do -- do all doctors in this country agree about

20   whether it should be legal to discriminate against patients on

21   the basis of gender identity?

22       A.   I would think uniformly all physicians agree that

23   they should not discriminate, but their views on gender

24   identity and gender dysphoric disorder would be pretty nuanced.

25       Q.   Different -- different doctors have different views

James Hurly                                      July 28, 2022

Page 30

1   about gender identity?

2        A.   I would think so.  I'm almost assured that --

3        Q.   What do you mean by that?

4        A.   Well, I think if you put ten people in a room and ask

5   them the question you just asked me, you would get ten slightly

6   different opinions.

7        Q.   Do -- do all doctors in this country have the same

8   views about the notification from HHS that you're challenging

9   in this case?

10       A.   Can you --

11                 MR. MITCHELL:  Mr. Newman -- I'm sorry -- Mr.

12  Newman, I'm going to object to the form of the question because

13  the way you phrased it calls for speculation.  There's no way

14  he can know what other doctors think.  I'm sorry.  Go ahead.

15                 MR. NEWMAN:  Sorry.  Let me rephrase that.

16       Q.   (BY MR. NEWMAN)  Do you have any understanding about

17  whether all doctors in the country have the same views about

18  the notification from HHS that you're challenging in this case?

19       A.   No.  I have no understanding of that.

20       Q.   Take a look back at Exhibit 4, which is the first

21  amended complaint.  And in particular, please look at page ten

22  and paragraph 48, which is near the bottom of page ten.

23       A.   I see it.

24       Q.   Okay.  Page 40 -- sorry.  Paragraph 48 states, The

25  Court should therefore declare that Section 1557 does not

James Hurly                                           July 28, 2022

Page 31

1    prohibit discrimination on account of sexual orientation and

2    gender identity, as Secretary Becerra claims, but that it

3    prohibits only sex discrimination, which means that provider

4    would have acted differently toward an identically situated

5    member of the opposite biological sex.  Do you see that?

6        A.   Yes.

7        Q.   Do you believe -- strike that.

8             Do you have any understanding about whether all

9    doctors in this country would want The Court to issue a

10   declaration that Section 1557 does not prohibit discrimination

11   on account of sexual orientation and gender identity?

12       A.   I couldn't speak for all of the physicians.

13       Q.   Isn't it true that there are many lesbian, gay,

14   bisexual and transgender doctors in this country?

15       A.   Sure.  Yes.

16       Q.   Do you believe that all of the lesbian, gay, bisexual

17   and transgender doctors in this country would want The Court to

18   issue a declaration that Section 1557 does not prohibit

19   discrimination on account of sexual orientation and gender

20   identity?

21       A.   I don't think I could speak for anybody based even on

22   their sexual orientation on what their opinions would be.

23       Q.   Are you aware that during the Trump administration

24   HHS took the legal position that you advocate in this case that

25   Section 1557 does not prohibit discrimination on account of

James Hurly                                    July 28, 2022

                                                        Page 32

1    sexual discrimination and gender identity?

2         A.   No, sir.

3         Q.   Okay.  I am going to introduce another exhibit.

4                    (Exhibit 7 marked.)

5         Q.   (BY MR. NEWMAN)  Okay.  I have introduced Exhibit 7.

6    This is a press release of the American Medical Association

7    dated May 10, 2021, titled AMA Statement on Biden Decision to

8    Restore Anti-Bias Protections.  Do you see the exhibit?

9         A.   I do.

10        Q.   This press release is dated May 10, 2021.  Is that

11   the same date that HHS issued the notification that you're

12   challenging in your lawsuit?

13        A.   Oh, I'm not sure.  I don't know.

14        Q.   Take a look back at Exhibit 5, which is --

15        A.   Let's see here.  I'm looking at it.

16        Q.   Do you see that, page one?  It says, Dates, this

17   notification is effective May 10, 2021?

18        A.   Yes.  I see it.  Yes.  Around the same date.

19   Correct.

20        Q.   Okay.  And now back to Exhibit 7.  The press release

21   beginning on page one reads, The following statement is

22   attributable to Susan R. Bailey, M.D., AMA president.  The

23   Biden administration did the right thing by terminating a

24   short-lived effort to allow discrimination based on gender or

25   sexual orientation when seeking health care.  As we said in our

James Hurly                                          July 28, 2022

Page 33

1    letter PDF to the previous administration, the interpretation

2    was contrary to the intent and the plain language of the law.

3    It's unfortunate that such an obvious step had to be taken.

4    The AMA welcomes this common-sense understanding of the law.

5    This move is a victory for health equity and ends a dismal

6    chapter in which a federal agency sought to remove civil rights

7    protections.  Do you see that?

8        A.   I do.

9        Q.   In this press release, is the American Medical

10   Association expressing support for the notification that you're

11   challenging is unlawful?

12       A.   Well, I'm not sure.  It sounds like it is, but I'm

13   not a hundred percent sure.

14       Q.   In this -- in this press release, is the American

15   Medical Association advocating for a legal interpretation that

16   is different from the legal interpretation that you're

17   advancing in this lawsuit?

18       A.   It could be, yes.

19       Q.   Based on this press release, do you believe that

20   Dr. Susan R. Bailey, the president of the AMA, who is quoted in

21   this press release, would support or oppose your lawsuit?

22       A.   Sounds like she might oppose it.

23       Q.   All right.  I'd like to introduce another exhibit.

24   I've introduced Exhibit 8 -- sorry.

25                (Exhibit 8 marked.)