James Hurly                                                    July 28, 2022

                                                              Page 34

1       Q.   (BY MR. NEWMAN)   I've introduced Exhibit 8, which is

2   a press release of GLMA Health Professionals Advancing LGBTQ

3   Equality.   And I'll represent that the forwarding GLMA is Gay

4   and Lesbian Medical Association.   And the press release is

5   titled GLMA Applauds Action to Reverse Health Care

6   Discrimination Rule.   Do you see that?

7       A.   I do.

8       Q.   The press release begins, On May 10, 2021, the U.S.

9   Department of Health and Human Services announced that the

10  Office for Civil Rights will interpret and enforce Section 1557

11  of the Affordable Care Act and Title Nine's prohibitions on

12  discrimination based on sex to include discrimination on the

13  basis of sexual orientation and gender identity.   GLMA

14  President Scott Nass, MD, MPA, FAAFP, AAHIVS, and GLMA

15  Executive Director Hector Vargas, JD, issued the following

16  statement in response:   Prohibiting discrimination based on

17  sexual orientation and gender identity is a foundational

18  building block for LGBTQ health equity.   Every LGBTQ person

19  should be able to access health care without fear of

20  discrimination and today's announcement is a major step towards

21  this future.   We at GLMA applaud HHS Secretary Xavier Becerra

22  for his leadership and the Biden administration for its

23  commitment to improving the lives and advancing the health of

24  LGBTQ people.   Do you see that?

25      A.   I do.

James Hurly                                          July 28, 2022

                                                        Page 35

 1      Q.    In this the press release, GLMA expressed support for

 2   the notification that you're challenging is unlawful, correct?

 3      A.    Correct.

 4      Q.    Based on this press release, do you believe that the

 5   health care professionals in GLMA would support or oppose your

 6   lawsuit?

 7      A.    They would oppose my lawsuit.

 8      Q.    All right.  I'll introduce another exhibit.

 9            (Exhibit 9 marked.)

10      Q.    (BY MR. NEWMAN)  I have introduced Exhibit 9, which

11   is a press release of Planned Parenthood dated May 10, 2021

12   titled Planned Parenthood Applauds Biden Administration's Move

13   to Enforce Protections Against Discrimination on the Basis of

14   Sexual Orientation and Gender Identity.  Do you see that?

15      A.    I do.

16      Q.    The press release reads, Today the department of

17   Health and Human Services, HHS, announced that the Office for

18   Civil Rights will interpret and enforce Section 1557's

19   prohibition on discrimination based on sex to include sexual

20   orientation and gender identity.  This announcement comes after

21   the Trump administration weakened protections against

22   discrimination in healthcare for the LGBTQ+ community.  Today's

23   move will ensure HHS's interpretation of the law protects all

24   people's access to the healthcare they need to control their

25   health and their futures.  Do you see that?

James Hurly                                                    July 28, 2022

Page 36

1        A.    I do.

2        Q.    The press release then quotes the president and CEO

3    of Planned Parenthood, Alexis McGill Johnson, saying, quote,

4    Every person deserves access to health care free from judgment

5    and discrimination.  We know nearly one in three transgender

6    people have faced discrimination with a health care provider.

7    This rate is even higher for black transgender people and other

8    transgender people of color.  We thank Secretary Becerra and

9    the Biden-Harris administration for taking this critical step

10   to better ensure health care access for all.  Do you see that?

11       A.    I do.

12       Q.    In this press release, did Planned Parenthood express

13   support for the notification that you are challenging is

14   unlawful?

15       A.    Looks like they did.

16       Q.    Based on this press release, do you believe Planned

17   Parenthood would support or oppose your lawsuit?

18       A.    They would oppose it.

19       Q.    Okay.  I'm introducing another exhibit.

20             (Exhibit 10 marked.)

21       Q.    I have just introduced Exhibit 10, which is a press

22   release issued by Kaiser Permanente on May 10, 2021.  Are you

23   able to see the exhibit?

24       A.    Yes.  I see it.

25       Q.    On page one near the bottom of the page it reads,

James Hurly                                    July 28, 2022

Page 37

1    Kaiser Permanente applauds the U.S. Department of Health and

2    Human Services for updating, effective immediately, its

3    interpretation of the nondiscrimination protections in the

4    Affordable Care Act to include gender identity and sexual

5    orientation.  Do you see that?

6        A.   I do.

7        Q.   And on the top of page two, it quotes, Kaiser

8    Permanente's CEO, Greg A. Adams as saying, quote, No person

9    should live in fear that they will be denied care based on

10   their gender identity or sexual orientation.  Today's action by

11   HHS restoring protections for LGBTQ people is critical to

12   ensuring that never happens again.  Do you see that?

13       A.   I do.

14       Q.   In this press release, did Kaiser Permanente express

15   support for the notification that you're challenging is

16   unlawful?

17       A.   Yes.

18       Q.   Based on this press release, do you believe that

19   Kaiser Permanente would support or oppose your lawsuit?

20       A.   They would oppose it.

21       Q.   Okay.  So I will represent to you that in 2019 under

22   the Trump administration, HHS proposed a rule implementing

23   Section 1557 of the Affordable Care Act that would not prohibit

24   discrimination on the basis of gender identity.  When it issued

25   the proposed rule, HHS asked for comments on that rule.  And

James Hurly                                      July 28, 2022

                                                        Page 38

1    we're now going to look at the few of the comments on that

2    proposed rule.  So I'm going to introduce another exhibit.

3              (Exhibit 11 marked.)

4         Q.   (BY MR. NEWMAN)  I have introduced Exhibit 11.  It's

5    a document dated August 13, 2019.  At the top of page one, it

6    bears the logo of the Endocrine Society.  And at the bottom of

7    the letter, it is signed by Dr. E. Dale Abel, President of the

8    Endocrine Society.  And I'll represent that this is a comment

9    that Endocrine Society submitted in response to HHS's 2019

10   proposed rule.

11              The second paragraph on page one reads, The

12   proposed rule is focused on, among other things, the 2016

13   implementing regulation for Section 1557 of the ACA that

14   defined on the basis of sex to include discrimination based on

15   pregnancy, false pregnancy, termination of pregnancy or

16   recovery therefrom, childbirth or related medical conditions,

17   sex stereotyping and gender identity.  The rule proposes to

18   eliminate specific nondiscrimination protections based on sex

19   and gender identity.  We opposed the proposed rule.  If

20   finalized, this rule will threaten women and transgender

21   individuals' access to care and health insurance, create

22   confusion among providers and patients about their rights and

23   obligations, and promote discrimination against vulnerable

24   populations that already struggle to access health care.  Do

25   you see that?

Page 39

1        A.    I do.

2        Q.    And this comment was the Endocrine Society opposing a

3    proposed rule that would remove a prohibition on discrimination

4    on this basis of gender identity from Section 1557?

5        A.    Yes, it was.

6        Q.    And in this lawsuit, you are trying to get the court

7    to rule that Section 1557 does not prohibit discrimination on

8    the basis of gender identity, correct?

9        A.    Correct.

10        Q.    Based on this comment, do you believe that the

11    Endocrine Society would support or oppose your lawsuit?

12        A.    They would oppose my lawsuit.

13        Q.    Okay.  I'm going to introduce another exhibit.  I

14    have just introduced Exhibit 12.

15              (Exhibit 12 marked.)

16        Q.    (BY MR. NEWMAN)  It's dated August 13, 2019.  The top

17    of page one, it bears the logo of the National Association of

18    Pediatric Nurse Practitioners or NAPNAP.  And at the bottom of

19    the last page, it is signed by Rajashree Koppolu, RN, the

20    president of NAPNAP.  And I will represent that this is also a

21    comment on HHS's 2019 proposed rule.

22              I'd like to direct you to page two.  And the

23    third full paragraph on page two which begins, "The proposed

24    rule," that paragraph reads, The proposed rule would eliminate

25    specific protections on the basis of sex including the 2016

James Hurly                                                    July 28, 2022

                                                              Page 40

1    rules provisions related to gender identity nondiscrimination.

2    The department also proposes to eliminate the definition of

3    gender identity which includes gender expression and

4    transgender status.  Furthermore, the rule proposes to remove

5    specific provisions that require covered entities to treat

6    individuals consistent with their gender identity.

7              NAPNAP opposes these proposals, all of which

8    would threaten LGBTQ patients' access to health care and

9    coverage.  Removing gender identity and sex stereotyping from

10   the definition of prohibited sex-based discrimination could

11   allow health care providers to refuse to serve individuals who

12   are transgender or who do not conform to traditional sex

13   stereotypes, magnifying already significant inequities that

14   exist for youth who identify as TGD related to access to care.

15   These denials of care would only increase stigma, prolong

16   gender dysphoria, and worsen already poor mental health

17   outcomes.  They could lead patients to seek potentially

18   dangerous nonmedically supervised treatments.  Do you see that?

19        A.   I do.

20        Q.   In this -- in this comment, the National Association

21   of Pediatric Nurse Practitioners opposed a proposed rule that

22   would remove a prohibition of discrimination on the basis of

23   gender identity from Section 1557, correct?

24        A.   Correct.

25        Q.   And in this lawsuit, you are trying to get The Court

James Hurly                                                    July 28, 2022

                                                               Page 41

1      to rule that Section 1557 does not prohibit gender identity

2      discrimination, correct?

3           A.   Correct.

4           Q.   Based on this comment, do you believe that the

5      National Association of Pediatric Nurse Practitioners would

6      support or oppose your lawsuit?

7           A.   They would oppose it.

8           Q.   Okay.  I'm going to introduce another exhibit.

9                (Exhibit 13 marked.)

10          Q.   (BY MR. NEWMAN)  I have introduced Exhibit 13.  The

11     top of page one bears the logo of Alameda Health System.  It's

12     dated August 9, 2019.  And at the bottom of the last page, it's

13     signed by Delvecchio Finley, CEO of Alameda Health System.

14     I'll represent that this is also a comment on HHS's 2019

15     proposed rule.

16               The last sentence in the first paragraph of the

17     letter reads, We strongly oppose the NPRM provisions which seek

18     to eliminate and limit protections for individuals such as

19     those who are limited English proficient and LGBTQ persons.  Do

20     you see that?

21          A.   You know what?  I'm having a hard time.  I clicked on

22     the file and it went back and the only place I can get down to

23     is where it says Susa Neese, M.D.  I might have to close this

24     out.

25          Q.   Okay.

James Hurly                                        July 28, 2022

                                                         Page 42

1        A.   And get back down to the marked files.

2        Q.   Sure.

3        A.   Apologies.

4        Q.   Can you --

5        A.   Okay.  Hold on.  Yeah.  I've got it.  Sorry about

6    that.

7        Q.   Okay.  You have Exhibit 13?

8        A.   13.  Yeah.

9        Q.   Okay.  So I'd like to direct your attention to the

10   end of the first full paragraph on page one.  And the last

11   sentence of that paragraph says, We strongly oppose the NPRM

12   provisions which seek to eliminate and limit protections for

13   individuals such as those who are limited English proficient

14   and LGBTQ persons.  Do you see that?

15       A.   I do.

16       Q.   Okay.  And then the last paragraph on page one reads,

17   Removing gender identity and sex stereotyping from the

18   definition of prohibited sex-based discrimination undermines

19   the rights and welfare of LGBTQ persons and their families.

20   This proposal would put LGBTQ community at greater risk of

21   being denied necessary and appropriate health care solely based

22   on their sexual orientation or gender identity.  The resulting

23   inability to access needed health care services could

24   exacerbate health disparities experienced by LGBTQ persons,

25   such as higher rates of depression and suicide attempts, higher

James Hurly                                              July 28, 2022

Page 43

1    risk of HIV/AIDS, higher use of tobacco and drugs, and higher

2    risk of breast cancer.  Do you see that?

3         A.   I do.

4         Q.   In this comment, did Alameda Health System oppose a

5    proposed rule that would remove a prohibition discrimination on

6    the basis of gender identity from Section 1557?

7         A.   Yes.

8         Q.   And in this lawsuit are you trying to get The Court

9    to rule that Section 1557 does not prohibit gender identity

10   discrimination?

11        A.   Yes.

12        Q.   Based on this comment, do you believe that Alameda

13   Health System would support or oppose your lawsuit?

14        A.   They would oppose it.

15        Q.   Okay.  I'm going to introduce another exhibit.

16             (Exhibit 14 marked.)

17        Q.   (BY MR. NEWMAN)  Okay.  I have just introduced

18   Exhibit 14, which is a Complaint for Declaratory and Injunctive

19   Relief in a case captioned Whitman-Walker Clinic, et al, v.

20   U.S. Department of Health and Human Services, et al.  And I

21   will represent that this is a complaint in a lawsuit filed

22   challenging a rule that HHS issued in 2020 under the Trump

23   administration implementing Section 1557, which did not include

24   a prohibition on discrimination on the basis of gender

25   identity.

James Hurly                                              July 28, 2022

Page 44

1              So can you turn to page two and paragraph one.

2    Paragraph one reads, A person's access to health care should

3    not be contingent on their sex, gender identity, transgender

4    status, sexual orientation, race, national origin, age,

5    disability, or religion.  When people -- when people go to a

6    doctor's office, hospital, or an emergency room seeking

7    treatment, they expect and are entitled to receive care

8    appropriate to meet their health needs without regard to who

9    they are or the type of health care they seek.  Do you see

10   that?

11        A.   I do.

12        Q.   And in paragraph two, it reads, Yet, in the midst of

13   a global pandemic, the Trump Administration's Department of

14   Health and Human Services, HHS, has sought to diminish

15   protections from discrimination in health care because of a

16   person's sex, gender identity, transgender status, sexual

17   orientation, race, national origin, age, or disability.  Do you

18   see that?

19        A.   I do.

20        Q.   Okay.  Now turn to paragraph 31, which is on page 10

21   and 11 of the document.

22        A.   I see it.

23        Q.   Do you see that this -- this paragraph generally

24   describes who the plaintiffs are in this lawsuit?

25        A.   I see that.

James Hurly                                                    July 28, 2022

Page 45

1        Q.   And are the plaintiffs two private health care

2   facilities that provide health care services to LGBTQ people,

3   two organizations that provide a wide range of services to the

4   LGBTQ community, two national associations of health

5   professionals, and three individual physicians, and one

6   behavioral health provider?

7        A.   I see that.

8        Q.   Based on this document, do you believe that the

9   plaintiffs who filed the complaint in this exhibit would

10  support or oppose your lawsuit?

11       A.   Looks like they would oppose it.

12               MR. NEWMAN:  Okay.  I'm going to introduce

13  another exhibit.  Actually, I need to -- sorry.  I need to find

14  this exhibit.  Can we -- can we go off the record for a minute?

15               THE VIDEOGRAPHER:  We're off the record at

16  3:20 p.m.

17               (Off the record, 3:20-3:26.)

18               (Exhibit 15 marked.)

19               THE VIDEOGRAPHER:  We are back on the record at

20  3:26 p.m.

21       Q.   (BY MR. NEWMAN)  All right.  During the break, I

22  introduced Exhibit 15.  Can you see that exhibit, Dr. Hurly?

23       A.   Yes, I see it.

24       Q.   So this exhibit is a press release of the American

25  College of Physicians dated June 15, 2020, titled Internists

James Hurly                                    July 28, 2022

                                                              Page 46

1    Applaud Supreme Court Decision Making It Illegal for Employers

2    to Discriminate Against LGBTQ Individuals Urge Reversal of the

3    Federal Rule Allowing Discrimination in Health Care.  Do you

4    see that?

5         A.   I do.

6         Q.   And I'll represent that June 15, 2020, is the date

7    that the Supreme Court decided Bostock v. Clayton County.  So

8    the press release states, Statement attributable to:

9    Jacqueline W. Fincher, MD, MACP, President, American College of

10   Physicians.  The American College of Physicians, ACP, strongly

11   believes that LGBTQ individuals must be legally protected from

12   discrimination and we are in full support of today's U.S.

13   Supreme Court ruling forbidding job discrimination on the basis

14   of sexual orientation.  The Court ruled that title seven of The

15   Civil Rights Act of 1964, which prohibits employers from

16   discrimination because of a person's sex, covers sexual

17   orientation.

18             Discrimination harms the health of LGBTQ

19   individuals, both mentally and physically.  As physicians, we

20   have a responsibility to protect our patients and improve the

21   health of all Americans, and LGBTQ individuals are no

22   exception.  ACP has long said that discrimination against any

23   person based on sexual orientation, gender, gender orientation,

24   and other personal characteristics, is a public health issue.

25             That is also why ACP strongly condemns the

James Hurly                                                  July 28, 2022

                                                            Page 47

1    recent announcement from the Trump administration that does

2    away with federal protections under the Affordable Care Act for

3    transgender and other individuals seeking health care.  Do you

4    see that?

5         A.   I do.

6         Q.   Based on this press release, do you believe the

7    American College of Physicians would support or oppose your

8    lawsuit?

9         A.   They would oppose it.

10        Q.   Do you -- strike that.

11             Do you believe that all of the health care

12   providers covered by the Affordable Care Act would support your

13   lawsuit?

14        A.   Can you repeat that?  I'm sorry.  I didn't --

15        Q.   Do you -- do you believe that all health care

16   providers subject to Section 1557 of the Affordable Care Act

17   would support your lawsuit?

18        A.   Oh, no.  No.

19        Q.   In fact, many health care providers subject to

20   Section 1557 would oppose your lawsuit, correct?

21        A.   Yes.

22        Q.   Do you have any way of ascertaining which health care

23   providers subject to Section 1557 would support your lawsuit

24   and which would oppose it?

25        A.   No.

James Hurly                                                July 28, 2022

                                                            Page 48

1        Q.   If you were to try to make a list of only the health

2    care providers that supported your lawsuit, would you have any

3    way of doing that?

4        A.   What was the last -- the question?

5        Q.   If you were -- if you were to try and make a list of

6    only the health care providers subject to 1557 that support

7    your lawsuit, would you have any way of doing that?

8        A.   No.

9                MR. NEWMAN:   I have no further questions at this

10   time.

11               MR. MITCHELL:   I don't have anything on

12   redirect.

13               THE VIDEOGRAPHER:   All right.   We're off the

14   record at 3:30 p.m.

15               (Proceedings concluded at 3:30 p.m.)

16

17

18

19

20

21

22

23

24

25

James Hurly                                                    July 28, 2022

Page 49

```
 1                IN UNITED STATES DISTRICT COURT

 2                   NORTHERN DISTRICT OF TEXAS

 3                        AMARILLO DIVISION

 4     SUSAN NEESE, M.D., et al.,      )

                                       )

 5                                     )

            Plaintiffs,                )

 6                                     )   CIVIL ACTION NO.

       VS.                             )   2:21-CV-163-Z

 7                                     )

       XAVIER BECERRA, et al.,         )

 8                                     )

                 Defendants.           )

 9

10

                REMOTE ORAL VIDEOTAPED DEPOSITION OF

11                     JAMES HURLY, M.D.

                        JULY 28, 2022

12                       VOLUME 1

13          I, SCHIAS K. CARMON-BROWN, Certified Shorthand

14     Reporter in and for the State of Texas, hereby certify to the

15     following:

16            That the witness, JAMES HURLY, M.D., was duly sworn

17     by the officer and that the transcript of the oral deposition

18     is a true record of the testimony given by the witness;

19            I further certify that pursuant to FRCP Rule 30(e)

20     that the signature by the deponent:

21            ___ was requested by the deponent's counsel, by

22     stipulation agreement of both parties, after the completion of

23     the deposition and is to be returned within 30 days from the

24     date of receipt of the transcript.  If returned, the attached

25     Errata contains any changes and the reasons therefor;
```

James Hurly                                              July 28, 2022

Page 50

1              _X__ was not requested by the deponent or a party

2       before the completion of the deposition.

3              I further certify that I am neither counsel

4       for, related to, nor employed by any of the parties or

5       attorneys in the action in which this proceeding was taken, and

6       further that I am not financially or otherwise interested in

7       the outcome of the action.

8              CERTIFIED to by me this 12th day of August, 2022.

9

10

            SCHIAS K. CARMON-BROWN, Texas CSR #7682

11          Expiration date:  July 31, 2023

            VERITEXT LEGAL SOLUTIONS

12          Firm Registration #571

            300 Throckmorton Street, Suite 1600

13          Fort Worth, Texas  76102

            800.336.4000

14

15

16

17

18

19

20

21

22

23

24

25

James Hurly

[1 - administration]

**1**

**1**  1:13 9:24 10:9
 49:12
**10**  3:17 10:4
 16:17 32:7,10
 32:17 34:8
 35:11 36:20,21
 36:22 44:20
**11**  3:18 38:3,4
 44:21
**1100**  2:12
**111**  2:5
**12**  3:20 4:3
 39:14,15
**12th**  50:8
**13**  3:21 38:5
 39:16 41:9,10
 42:7,8
**14**  3:10,22 43:16
 43:18
**15**  3:23 45:18,22
 45:25 46:6
**1557**  3:10 10:1,1
 10:6,10,12,15
 10:24 13:2
 14:18 15:8,9
 17:1,19 26:20
 30:25 31:10,18
 31:25 34:10
 37:23 38:13
 39:4,7 40:23
 41:1 43:6,9,23
 47:16,20,23
 48:6
**1557's**  16:19
 35:18
**1600**  50:12
**163**  1:6 4:7 49:6
**18**  3:12

**18116**  10:4
**18116a**  14:17
**1964**  46:15
**1972**  14:20

**2**

**20005**  2:12
**2016**  38:12
 39:25
**2019**  37:21 38:5
 38:9 39:16,21
 41:12,14
**2020**  43:22
 45:25 46:6
**2021**  10:4 16:17
 32:7,10,17 34:8
 35:11 36:22
**2022**  1:12,22 4:3
 49:11 50:8
**2023**  50:11
**26260**  50:10
**28**  1:12 49:11
**28th**  1:21 4:3
**2:12**  1:22 4:3
**2:21**  1:6 4:7 49:6

**3**

**30**  49:19,23
**300**  50:12
**31**  44:20 50:11
**32**  3:13
**33**  3:14
**35**  3:16
**36**  3:17
**38**  3:19 12:24,25
 13:17
**39**  3:20
**3:20**  45:16
**3:20-3:26**  45:17
**3:26**  45:20
**3:30**  1:22 48:14
 48:15

**4**

**4**  3:3,9 7:1,3,10
 30:20
**40**  30:24
**400**  2:5
**41**  3:21
**42**  10:4 14:17
**43**  3:22
**45**  3:24
**48**  30:22,24
**49**  3:5

**5**

**5**  3:10 14:10,11
 26:19 27:1,2,8
 27:11 32:14
**571**  50:12

**6**

**6**  3:11 18:4,5

**7**

**7**  3:9,13 32:4,5
 32:20
**76102**  50:13
**7682**  50:10
**78701**  2:6

**8**

**8**  3:14 33:24,25
 34:1
**8/13/2019**  3:20
**8/9/2019**  3:21
**800.336.4000**
 50:13

**9**

**9**  3:15 35:9,10
 41:12

**a**

**aahivs**  34:14
**abel**  38:7

**able**  7:4 14:12
 18:8 34:19
 36:23
**absolutely**  26:1
**aca**  38:13
**accept**  23:22
**access**  34:19
 35:24 36:4,10
 38:21,24 40:8
 40:14 42:23
 44:2
**account**  31:1,11
 31:19,25
**accurate**  26:6
**acp**  46:10,22,25
**act**  10:2,15 13:2
 13:9,23,25
 14:19 15:9
 26:15 34:11
 37:4,23 46:15
 47:2,12,16
**acted**  31:4
**action**  1:6 4:7
 7:2,19 9:25
 11:21 12:1,3,8
 12:12 34:5
 37:10 49:6 50:5
 50:7
**actions**  11:2
**activity**  10:3
**actual**  20:24
**adams**  37:8
**address**  16:13
**administration**
 31:23 32:23
 33:1 34:22
 35:21 36:9
 37:22 43:23
 47:1

**administration's** 35:12 44:13

**advancing** 33:17 34:2,23

**advocate** 31:24

**advocating** 33:15

**affordable** 10:2 10:15 13:2,9,23 13:25 14:19 15:9 34:11 37:4 37:23 47:2,12 47:16

**afternoon** 4:2

**age** 44:4,17

**agency** 33:6

**agree** 29:14,19 29:22

**agreement** 49:22

**ahead** 11:23 15:2 30:14

**aids** 43:1

**al** 1:4,7 4:5,5 43:19,20 49:4,7

**alameda** 3:21 41:11,13 43:4 43:12

**alexis** 36:3

**allegations** 9:3

**allow** 32:24 40:11

**allowing** 46:3

**ama** 3:13 32:7 32:22 33:4,20

**amarillo** 1:3 4:6 4:16 49:3

**amended** 3:9 7:2 7:13,18 9:25 11:21,25 14:16 30:21

**amendment** 26:14

**amendments** 14:19

**america** 4:25

**american** 3:23 32:6 33:9,14 45:24 46:9,10 47:7

**americans** 46:21

**analyze** 21:20 22:11

**analyzing** 20:25

**anatomic** 20:8 20:21,22,24

**announced** 10:5 34:9 35:17

**announcement** 34:20 35:20 47:1

**answer** 5:22,25 6:1,2,11,12,16 6:17,21 8:8 20:2 20:7 21:16,19 22:7 23:16,17 24:14 29:17,18

**answered** 19:22

**answering** 8:7 19:25

**answers** 3:11 6:4 6:6 13:15 18:7 18:20 19:2,9,20

**anti** 3:13 32:8

**anybody** 31:21

**apologies** 42:3

**appearances** 4:10

**applaud** 34:21 46:1

**applauds** 34:5 35:12 37:1

**appropriate** 25:19 29:15 42:21 44:8

**areas** 21:6

**arguing** 24:17

**ascertaining** 47:22

**asked** 30:5 37:25

**asking** 5:18 9:14 11:5,9,13,15,17

**assistance** 10:3

**association** 32:6 33:10,15 34:4 39:17 40:20 41:5

**associations** 45:4

**assume** 5:22 14:1

**assured** 25:13 30:2

**attached** 49:24

**attempts** 42:25

**attention** 9:23 16:13 42:9

**attorney** 4:12,22

**attorney's** 19:3

**attorneys** 9:17 9:18 12:11 50:5

**attributable** 32:22 46:8

**august** 38:5 39:16 41:12 50:8

**austin** 2:6

**autonomy** 9:11

**avenue** 2:5

**aware** 27:22 28:8 31:23

**b**

**back** 20:3 26:19 27:4,5 30:20 32:14,20 41:22 42:1 45:19

**background** 15:9

**bailey** 32:22 33:20

**balls** 5:12

**bank** 21:13

**barke** 8:17 13:1

**based** 16:7 20:7 20:11 23:3 25:22 28:16 29:11 31:21 32:24 33:19 34:12,16 35:4 35:19 36:16 37:9,18 38:14 38:18 39:10 40:10 41:4 42:18,21 43:12 45:8 46:23 47:6

**basically** 10:19 20:13 21:8

**basis** 10:7,8,18 10:19 16:8,19 16:20,21 17:2,4 17:8,14,20,25 25:23,25 26:1,9 27:15,19 28:4 28:11 29:21 34:13 35:13 37:24 38:14 39:4,8,25 40:22 43:6,24 46:13

James Hurly
July 28, 2022

[bears - clayton]                                                              Page 3

**bears** 38:6 39:17
41:11
**becerra** 1:7 4:5
4:24 9:7 10:4
15:7 17:8 26:7
26:23 27:11,23
27:24 28:2,10
28:19 29:1 31:2
34:21 36:8 49:7
**becerra's** 10:23
**beginning** 16:17
32:21
**begins** 9:25
21:16 23:16
34:8 39:23
**behavioral** 45:6
**belief** 26:7
**beliefs** 9:13
**believe** 11:15
13:21 14:21,23
15:11,16 16:6
17:4,7,11,13,21
17:25 22:7
25:18,21,24
26:3,11,23
27:11 28:1,2,9
28:23 31:7,16
33:19 35:4
36:16 37:18
39:10 41:4
43:12 45:8 47:6
47:11,15
**believes** 46:11
**benefit** 18:1
**better** 36:10
**bias** 3:13 32:8
**biden** 3:13 32:7
32:23 34:22
35:12 36:9

**biologic** 23:21
23:25
**biological** 31:5
**bisexual** 17:13
31:14,16
**bit** 9:8,10 11:11
28:22
**black** 36:7
**block** 34:18
**blood** 20:25 21:2
21:13
**bodily** 20:19,19
**body** 21:7,8
29:11
**bone** 21:7
**bostock** 12:14
16:7,17 46:7
**bottom** 21:16
23:16 30:22
36:25 38:6
39:18 41:12
**brain** 21:7
**branch** 2:11
**branches** 21:12
**break** 6:19,22
45:21
**breast** 29:7,8
43:2
**briefly** 8:3
**brown** 1:23
49:13 50:10
**building** 34:18

**c**

**c** 2:1 4:1
**call** 24:16
**called** 12:14
**calls** 30:13
**cancer** 15:18,25
15:25 16:1
23:21 24:2,17

24:19,20 25:9
25:14 27:10
29:4,7,8 43:2
**cancers** 29:3,5
**captioned** 43:19
**care** 9:11 10:2
10:15 13:2,9,23
13:25 14:5,19
15:9 17:24
25:18 26:4
32:25 34:5,11
34:19 35:5 36:4
36:6,10 37:4,9
37:23 38:21,24
40:8,11,14,15
42:21,23 44:2,7
44:9,15 45:1,2
46:3 47:2,3,11
47:12,15,16,19
47:22 48:2,6
**career** 23:2
**carmon** 1:23
49:13 50:10
**case** 4:24 12:21
17:23 30:9,18
31:24 43:19
**cases** 5:7
**casually** 9:20
**cause** 1:21 19:14
**cells** 21:1
**ceo** 36:2 37:8
41:13
**certain** 23:4
**certificate** 3:5
**certification**
21:10
**certified** 1:23
20:8 49:13 50:8
**certify** 49:14,19
50:3

**cervical** 24:20
**cervix** 23:24
**challenging** 30:8
30:18 32:12
33:11 35:2
36:13 37:15
43:22
**changes** 49:25
**chapter** 33:6
**characteristics**
46:24
**charged** 28:15
**chemistry** 21:13
**childbirth** 38:16
**children** 5:12
20:23
**cholesterol** 21:2
**circumstances**
7:22
**civil** 1:6,25 2:11
4:6 15:11,22
33:6 34:10
35:18 46:15
49:6
**claim** 9:1 26:17
**claiming** 23:19
24:11
**claims** 15:14,20
31:2
**clarification**
15:7
**clarify** 5:20 9:9
11:7,10
**class** 7:2,19 9:25
11:21 12:1,3,8
12:12 13:1,6,8,8
13:11,16,20
**clayton** 12:14
46:7

[clear - declare]                                                                 Page 4

clear   6:5
click   7:6
clicked   41:21
clinic   43:19
clinical   20:8,21
   20:25 21:10
clinician   22:1,2
   22:3
clinicians   22:17
close   41:23
college   3:23
   45:25 46:9,10
   47:7
color   36:8
comes   20:17
   35:20
coming   21:11
comment   38:8
   39:2,10,21
   40:20 41:4,14
   43:4,12
comments   37:25
   38:1
commitment
   34:23
common   33:4
commonly   29:8
communication
   8:13
communications
   8:6 9:15 19:24
community   20:7
   20:11,12,12,14
   35:22 42:20
   45:4
complaint   3:9
   3:22 7:2,13,18
   9:25 11:21,25
   14:16 15:12,23
   30:21 43:18,21

45:9
complaints   12:5
complete   6:11
completion
   49:22 50:2
computer   19:13
concern   29:9
concerned   15:24
   27:23 28:15,18
   28:20,25 29:3
concerns   27:21
concluded   48:15
condemns   46:25
condition   23:4
conditions   38:16
conduct   17:3,7
   17:11
conducted   4:8
confirm   21:20
   22:11
conform   40:12
confusion   38:22
congress   2:5
conscious   28:22
consciousness
   28:22
consider   26:7,23
   27:12,24 28:19
   29:1
considered
   26:16
consistent   9:13
   16:16 40:6
constitute   17:4
   17:13 26:8,24
   27:13
construe   11:3
consult   22:22
consultant   20:18
   22:2

consultations
   9:17
contain   9:3 16:4
contains   49:25
contingent   44:3
contrary   33:2
control   35:24
corner   8:16
correct   12:2
   19:10,21 21:12
   21:23 23:9
   29:13 32:19
   35:2,3 39:8,9
   40:23,24 41:2,3
   47:20
counsel   4:9 6:14
   6:15,16 8:6 9:15
   19:25 49:21
   50:3
counsel's   8:12
countered   24:5
counting   21:1
country   14:4
   29:14,19 30:7
   30:17 31:9,14
   31:17
county   12:14
   46:7
course   5:11
court   1:1 6:4 8:1
   8:12 10:11 11:6
   11:10,13,15,18
   12:13,16,21
   30:25 31:9,17
   39:6 40:25 43:8
   46:1,7,13,14
   49:1
court's   16:16
courtroom   5:16

coverage   40:9
covered   13:22
   13:25 40:5
   47:12
covers   15:22
   46:16
create   38:21
criminal   26:16
critical   36:9
   37:11
csr   50:10
cv   1:6 4:7 49:6

                d
d   3:1 4:1
dale   38:7
dangerous   40:18
date   32:11,18
   46:6 49:24
   50:11
dated   3:20,21
   32:7,10 35:11
   38:5 39:16
   41:12 45:25
dates   32:16
day   1:21 50:8
days   49:23
dc   2:12
decide   12:7
decided   12:21
   46:7
decision   3:13
   12:13,18 16:16
   32:7 46:1
decisions   12:16
declaration
   31:10,18
declaratory
   43:18
declare   10:11
   19:8 30:25

[declatory - ectocervical]                                                    Page 5

**declatory** 3:22
**defendant** 5:10
**defendants** 1:8
   1:20 2:9 4:13,23
   49:8
**defined** 16:12
   38:14
**defining** 15:10
**definitely** 28:6
**definition** 40:2
   40:10 42:18
**delay** 18:13
**deliver** 23:5,8
   24:21
**delvecchio** 41:13
**denial** 24:17
   25:8
**denials** 40:15
**denied** 23:18
   37:9 42:21
**denies** 27:16
   28:16
**department** 2:10
   4:12,23,24 5:1
   10:5 14:16
   16:17 19:4 34:9
   35:16 37:1 40:2
   43:20 44:13
**deponent** 49:20
   50:1
**deponent's**
   49:21
**deposed** 5:2
**deposition** 1:11
   1:19 4:4,7 5:2
   20:22 49:10,17
   49:23 50:2
**depression**
   42:25

**describe** 12:17
   21:4 24:6,10,13
   24:14
**described** 27:9
**describes** 44:24
**description** 3:7
**deserves** 36:4
**determine** 22:19
   22:20,21,23
**device** 19:14
**diagnosed** 23:4
   23:21 26:17
   29:6
**diagnoses** 22:4,4
   22:5 26:6
**diagnosing**
   29:11
**diagnosis** 21:21
   22:11 23:5,8,19
   23:22 24:11,21
   24:24,25 26:15
   27:10 28:16
   29:12
**diagnostician**
   20:18
**difference** 21:24
   28:6
**differences** 21:3
**different** 12:4,9
   12:10 28:2,10
   29:25,25,25
   30:6 33:16
**differently** 31:4
**diminish** 44:14
**direct** 9:23
   39:22 42:9
**directly** 21:19
   22:3,7,8,10,24
   24:16,21

**director** 34:15
**disability** 44:5
   44:17
**disclose** 8:5,13
   9:14 19:24,24
**discriminate**
   17:25 25:23
   26:1 28:3,11
   29:20,23 46:2
**discriminated**
   15:23 25:24
**discriminating**
   15:17 16:2
**discrimination**
   10:2,7,8,18,19
   10:20 16:7,11
   16:19,20,21
   17:1,4,8,14,20
   26:9,24 27:13
   27:15,19 28:15
   31:1,3,10,19,25
   32:1,24 34:6,12
   34:12,16,20
   35:13,19,22
   36:5,6 37:24
   38:14,23 39:3,7
   40:10,22 41:2
   42:18 43:5,10
   43:24 44:15
   46:3,12,13,16
   46:18,22
**discriminatory**
   11:4,4 27:25
   28:19 29:2
**discuss** 9:21
**disease** 20:18
**dismal** 33:5
**disorder** 29:24
**disparities** 42:24

**disputed** 27:9
**disputing** 29:12
**district** 1:1,2 4:6
   49:1,2
**division** 1:3 2:11
   4:6 49:3
**doctor's** 44:6
**doctors** 29:14,17
   29:19,25 30:7
   30:14,17 31:9
   31:14,17
**document** 7:1,5
   7:15,15,20,23
   8:11,15,22 9:3
   11:20 12:23
   14:15,20,24
   15:5,14,20 16:4
   17:5,17 18:6,15
   18:19,22,24
   19:1,6,17 26:22
   27:18 38:5
   44:21 45:8
**docusigned**
   19:10
**doing** 48:3,7
**dr** 4:4,16 5:3 7:4
   8:8 12:25,25
   13:1 18:8,22
   19:23 33:20
   38:7 45:22
**drugs** 43:1
**duly** 4:19 49:16
**dysphoria** 9:13
   40:16
**dysphoric** 29:24

| e |
| --- |

**e** 2:1,1 3:1 4:1,1
   38:7 49:19
**ectocervical**
   29:5

A207

[education - foundational]                                          Page 6

education   14:19
effective   32:17
    37:2
effort   32:24
eight   23:15
either   24:20
electric   19:14
electronic   19:13
electronically
    19:16
eliminate   38:18
    39:24 40:2
    41:18 42:12
emergency   44:6
employed   50:4
employers   46:1
    46:15
encounter   24:8
encountered
    23:18 24:5
endangered   5:12
endocervical
    29:5
endocrine   3:18
    38:6,8,9 39:2,11
endometrial
    24:20 29:4
ends   33:5
enforce   10:6
    16:18 34:10
    35:13,18
enforced   15:10
enforcement
    3:10 14:18
    26:20
enforcing   10:12
engage   17:12
engaged   17:3,7
english   41:19
    42:13

enjoin   10:11
ensure   26:5
    35:23 36:10
ensuring   37:12
entered   19:14
entities   15:11
    40:5
entitled   44:7
equality   34:3
equity   33:5
    34:18
errata   49:25
et   1:4,7 4:5,5
    43:19,20 49:4,7
ethical   9:13
exacerbate
    42:24
examination   3:2
    4:20
example   6:6
    23:20 24:9
examples   24:10
exception   6:20
    46:22
excuse   4:3
executive   34:15
exhibit   3:9,10,11
    3:13,14,15,17
    3:18,20,21,22
    3:23 6:24 7:1,3
    7:10 10:9 14:9
    14:10,11,15
    18:3,4,5,11,17
    26:19 27:1,2,8
    27:11 30:20
    32:3,4,5,8,14,20
    33:23,24,25
    34:1 35:8,9,10
    36:19,20,21,23
    38:2,3,4 39:13

39:14,15 41:8,9
41:10 42:7
43:15,16,18
45:9,13,14,18
45:22,22,24
exhibits   3:6 7:8
exist   40:14
expect   44:7
expedient   28:7
experienced
    42:24
expiration   50:11
explain   5:7 7:22
    21:24 23:24
explaining   15:8
express   36:12
    37:14
expressed   35:1
expressing
    33:10
expression   40:3

            f

f   2:4
faafp   34:14
faced   36:6
facilities   45:2
fact   47:19
false   38:15
familiar   12:13
familiarity
    12:17,19
families   42:19
far   24:12
fast   6:9
fear   34:19 37:9
federal   1:25
    2:11 10:3 11:14
    11:18 14:2,3
    26:14 33:6 46:3
    47:2

file   7:7 9:6 12:7
    15:12,23 41:22
filed   4:5 8:1,11
    9:4 14:15 26:12
    43:21 45:9
files   42:1
filing   9:16
finalized   38:20
financial   10:3
financially   50:6
fincher   46:9
find   45:13
finish   6:10
finley   41:13
firm   50:12
firmly   23:24
first   3:9 4:19 7:1
    7:18 9:24 11:21
    11:25 14:15
    16:14 18:7,20
    24:4 26:5,14
    30:20 41:16
    42:10
five   26:25
fluids   20:19 21:1
    21:6
focused   38:12
folder   7:8
following   16:15
    32:21 34:15
    49:15
follows   4:19
forbidding
    46:13
form   30:12
fort   50:13
forwarding   34:3
foundational
    34:17

A208

frcp 49:19
free 26:13 36:4
frequency 28:24
frequently 28:21
full 39:23 42:10
  46:12
further 48:9
  49:19 50:3,6
furthermore
  40:4
future 17:12
  29:1,10 34:21
futures 35:25

**g**

g 4:1
gay 17:12 31:13
  31:16 34:3
gender 9:13 10:8
  10:19 15:18
  16:8,21,24
  23:20 25:23,25
  26:2,9 27:15,19
  28:4,11,16,17
  29:15,21,23,24
  30:1 31:2,11,19
  32:1,24 34:13
  34:17 35:14,20
  37:4,10,24
  38:17,19 39:4,8
  40:1,3,3,6,9,16
  40:23 41:1
  42:17,22 43:6,9
  43:24 44:3,16
  46:23,23
general 7:14
  29:10
generally 21:4
  22:21,23 24:13
  44:23

give 6:25 14:9
  15:6 25:12
given 49:18
gives 22:5
giving 21:1
glma 3:14 34:2,3
  34:5,13,14,21
  35:1,5
global 44:13
go 11:23 15:2
  27:4,4 30:14
  44:5 45:14
going 6:24 11:22
  12:24 14:8
  16:24,25 18:3
  20:4 30:12 32:3
  38:1,2 39:13
  41:8 43:15
  45:12
golf 5:11,12
good 4:2 12:11
gosh 23:2 29:17
government
  11:14,18 14:2
great 18:18
greater 42:20
greek 20:17
greg 37:8
group 4:17
  23:20 24:24
  25:21,24
group's 25:18
  26:8,24 27:12
  27:24
guarantee 21:10
guys 11:23

**h**

handled 24:23
handles 20:19

happen 26:10
  28:21
happened 24:13
  25:15
happens 37:12
hard 41:21
harm 26:6
harmed 17:21
harms 46:18
harris 36:9
health 4:24 5:1
  9:11 10:2,5
  14:16 16:18
  17:24 26:5
  32:25 33:5 34:2
  34:5,9,18,19,23
  35:5,17,25 36:4
  36:6,10 37:1
  38:21,24 40:8
  40:11,16 41:11
  41:13 42:21,23
  42:24 43:4,13
  43:20 44:2,8,9
  44:14,15 45:1,2
  45:4,6 46:3,18
  46:21,24 47:3
  47:11,15,19,22
  48:1,6
healthcare 13:1
  13:21 35:22,24
hector 34:15
hhs 3:22 5:2
  10:6 16:18 17:1
  17:19 27:23,24
  28:8,10 30:8,18
  31:24 32:11
  34:21 35:17
  37:11,22,25
  43:22 44:14

hhs's 35:23 38:9
  39:21 41:14
higher 36:7
  42:25,25 43:1,1
hiv 43:1
hold 42:5
home 7:24
honest 13:14
hope 13:20
hormone 23:12
  23:13
hospital 20:13
  20:13,14,15
  44:6
huh 6:7 21:18
human 4:25 5:1
  10:5 14:17
  16:18 21:8 34:9
  35:17 37:2
  43:20 44:14
hundred 33:13
hurly 1:12,19
  4:4,16,18,21 5:3
  7:4 8:8,17,20
  12:25 18:8,22
  19:10,23 45:22
  49:11,16
hurly's 18:7,20

**i**

idea 12:11 25:17
identically 31:4
identified 23:22
identify 16:1,3
  40:14
identity 10:9,19
  15:19 16:8,22
  16:24 25:23,25
  26:2,9 27:15,19
  28:4,12,17
  29:21,24 30:1

[identity - language]                                                Page 8

31:2,11,20 32:1
34:13,17 35:14
35:20 37:4,10
37:24 38:17,19
39:4,8 40:1,3,6
40:9,23 41:1
42:17,22 43:6,9
43:25 44:3,16
**illegal**  46:1
**immediately**
37:2
**immunology**
21:14
**implementing**
37:22 38:13
43:23
**improve**  46:20
**improving**  34:23
**inability**  42:23
**inappropriately**
11:3
**include**  14:4
16:20 21:13
29:7 34:12
35:19 37:4
38:14 43:23
**includes**  40:3
**including**  39:25
**incompatible**
10:10,24 15:18
**incorrect**  16:5,8
16:10 26:13
**increase**  40:15
**increasing**  28:23
**index**  3:6
**individual**  45:5
**individuals**
29:16 38:21
40:6,11 41:18
42:13 46:2,11

46:19,21 47:3
**inequities**  40:13
**inform**  15:12
16:15
**informed**  24:15
**initiating**  9:1
**injunctive**  3:22
43:18
**insisted**  23:23
**instance**  1:20
**instruct**  8:3
19:23
**instruction**  8:12
**instructs**  6:16
**insurance**  38:21
**intent**  33:2
**interaction**  25:3
25:16
**interested**  50:6
**interests**  13:14
**interject**  8:2
**internists**  45:25
**interpret**  10:6,6
16:18 17:1 21:6
34:10 35:18
**interpretation**
3:10 10:9,12,24
11:2 14:18
26:16,20 27:17
33:1,15,16
35:23 37:3
**interpretations**
16:5
**interpreted**
17:19
**interrogatories**
3:12 18:7,21
19:9,21
**interrogatory**
20:4 21:15

23:15 26:25
**introduce**  6:24
14:8 18:3 32:3
33:23 35:8 38:2
39:13 41:8
43:15 45:12
**introduced**  7:1
14:9 18:4 32:5
33:24 34:1
35:10 36:21
38:4 39:14
41:10 43:17
45:22
**introducing**
36:19
**introductory**
9:24
**issue**  5:10,11
10:17 31:9,18
46:24
**issued**  32:11
34:15 36:22
37:24 43:22
**issues**  12:9 17:23

**j**

**jacqueline**  46:9
**jailed**  26:13
**james**  1:12,19
4:4,16,18 8:17
8:20 18:7,20
19:10 49:11,16
**jd**  34:15
**jeffrey**  8:17
**jeopardized**
26:14
**jeremy**  2:10
4:11,22
**jeremy.s.new...**
2:11

**job**  26:4,5 46:13
**johnson**  36:3
**jonathan**  2:4,5
4:14 18:14
**judge**  17:23
**judgment**  36:4
**july**  1:12,22 4:3
49:11 50:11
**june**  45:25 46:6
**justice**  2:10 4:12
4:23 19:4

**k**

**k**  1:22 49:13
50:10
**kaiser**  3:17
36:22 37:1,7,14
37:19
**keep**  8:12
**kind**  15:7,10
23:10,13
**king**  2:15 4:8
**know**  5:25 6:2
6:20 8:23 18:14
21:1 25:1,5,10
25:10,15 30:14
32:13 36:5
41:21
**known**  9:22
**koppolu**  39:19

**l**

**l**  2:12
**lab**  21:20 22:11
22:22 23:3
**laboratory**
21:11,12
**language**  10:10
10:25 11:1,7,10
11:19 16:6,8,10
26:13,22 27:10
27:18,20 33:2

**[law - newman]**                                                    Page 9

**law**   2:4 4:15
  9:10 33:2,4
  35:23
**lawsuit**   5:8 7:19
  9:1,4,6,16,19
  11:6,8,13 12:7
  15:15,16,21
  32:12 33:17,21
  35:6,7 36:17
  37:19 39:6,11
  39:12 40:25
  41:6 43:8,13,21
  44:24 45:10
  47:8,13,17,20
  47:23 48:2,7
**lawsuits**   26:12
**lead**   40:17
**leadership**   34:22
**leaves**   11:1,2
**left**   8:16
**legal**   5:8,11 16:5
  29:20 31:24
  33:15,16 50:11
**legally**   46:11
**lesbian**   17:12
  31:13,16 34:4
**letter**   3:20,21
  33:1 38:7 41:17
**lgbtq**   34:2,18,18
  34:24 35:22
  37:11 40:8
  41:19 42:14,19
  42:20,24 45:2,4
  46:2,11,18,21
**limit**   41:18
  42:12
**limited**   41:19
  42:13
**lipid**   21:2

**list**   48:1,5
**listed**   8:16,20
**little**   9:8 11:11
  12:19 28:22
**live**   37:9
**lived**   32:24
**liver**   21:7
**lives**   34:23
**local**   5:11
**logo**   38:6 39:17
  41:11
**long**   46:22
**longer**   23:20
**look**   15:3 21:15
  23:15 26:19
  30:20,21 32:14
  38:1
**looking**   10:17
  27:7 32:15
**looks**   7:18 15:6
  36:15 45:11
**lose**   11:23
**lot**   11:1,2 12:16
**lungs**   21:8

**m**

**m.d.**   1:4,12,20
  4:5,18 8:17,17
  8:17,20 32:22
  41:23 49:4,11
  49:16
**machine**   1:24
**macp**   46:9
**magnifying**
  40:13
**main**   10:17
**major**   34:20
**making**   9:1 46:1
**male**   15:25
  23:21 27:16

**males**   29:7
**man**   23:25
**marked**   7:3,8,9
  14:11 18:5 32:4
  33:25 35:9
  36:20 38:3
  39:15 41:9 42:1
  43:16 45:18
**marrow**   21:7
**matter**   4:4
**mcgill**   36:3
**md**   34:14 46:9
**mean**   22:8 30:3
**meaning**   20:17
**means**   13:5,21
  25:23 28:3,11
  31:3
**medicaid**   14:6
**medical**   5:8 21:5
  24:1 32:6 33:9
  33:15 34:4
  38:16
**medically**   25:19
**medicare**   14:6
**meet**   22:24 44:8
**megan**   2:15 4:8
**member**   31:5
**memo**   9:7,10
**mental**   40:16
**mentally**   46:19
**microbiology**
  21:13
**microscopically**
  21:9
**middle**   12:25
  16:13 20:22
**midst**   44:12
**mind**   8:12
**minute**   6:25
  14:9 45:14

**misdiagnosis**
  24:19
**mitchell**   2:4,4
  4:14,14,14 8:2,5
  18:10,13,16
  19:23 30:11
  48:11
**mitchell.law**   2:5
**moment**   15:6
**move**   33:5 35:12
  35:23
**mpa**   34:14

**n**

**n**   2:1 3:1 4:1
**n.w.**   2:12
**name**   4:8,11,22
**names**   8:16
**napnap**   3:20
  39:18,20 40:7
**nass**   34:14
**national**   39:17
  40:20 41:5 44:4
  44:17 45:4
**near**   11:20 30:22
  36:25
**nearly**   36:5
**necessary**   42:21
**need**   6:5,10,15
  6:19 15:3 35:24
  45:13,13
**needed**   24:1
  42:23
**needs**   44:8
**neese**   1:4 4:5
  8:17 9:21 12:25
  41:23 49:4
**neither**   50:3
**never**   37:12
**newman**   2:10
  3:3 4:11,11,22

**[newman - pathologist]**                                              Page 10

7:4 8:2,4,10
14:12 18:6,10
18:12,17,18,19
20:3 30:11,12
30:15,16 32:5
34:1 35:10 38:4
39:16 41:10
43:17 45:12,21
48:9
**newman's** 19:25
**nine** 12:23,24
14:19 15:8
16:17 19:5
**nine's** 34:11
**nod** 6:7
**nondiscrimina...**
37:3 38:18 40:1
**nonmedically**
40:18
**northern** 1:2 4:6
49:2
**note** 4:7
**notification** 3:10
14:17 15:7
16:15 26:20
30:8,18 32:11
32:17 33:10
35:2 36:13
37:15
**nprm** 41:17
42:11
**nuanced** 29:24
**num** 3:7
**number** 4:7 20:5
21:15 23:15
26:25 27:1
**numbered** 1:21
**numeric** 21:1
27:14

**nurse** 39:18
40:21 41:5

**o**

**o** 4:1
**oath** 5:13
**object** 6:14
30:12
**objects** 6:15
**obligation** 5:15
**obligations** 9:9,9
38:23
**obtain** 22:13,14
22:14
**obvious** 33:3
**occasion** 22:21
29:7
**occupying** 28:21
**office** 19:3 34:10
35:17 44:6
**officer** 49:17
**oh** 15:2 23:2
27:2 28:1 29:17
32:13 47:18
**okay** 5:23 6:1,3
6:12,22,23,25
7:9,12,14 8:15
11:23 14:8,9
16:24 18:3,12
18:16,18,19
19:5 20:3 24:9
24:13 27:4,7
29:14 30:24
32:3,5,20 36:19
37:21 39:13
41:8,25 42:5,7,9
42:16 43:15,17
44:20 45:12
**once** 23:2,20
**open** 11:2 14:13
15:16 26:15

**opened** 14:13
**opinion** 28:5,6
**opinions** 30:6
31:22
**oppose** 33:21,22
35:5,7 36:17,18
37:19,20 39:11
39:12 41:6,7,17
42:11 43:4,13
43:14 45:10,11
47:7,9,20,24
**opposed** 16:6
38:19 40:21
**opposes** 40:7
**opposing** 39:2
**opposite** 31:5
**oral** 1:11,19
49:10,17
**order** 11:13,16
11:18 22:22
**ordered** 23:6
**organ** 26:17
**organizations**
45:3
**organs** 29:11
**orientation** 10:8
10:18 16:21
17:2,5,9,14,20
17:25 31:1,11
31:19,22 32:25
34:13,17 35:14
35:20 37:5,10
42:22 44:4,17
46:14,17,23,23
**origin** 44:4,17
**outcome** 50:7
**outcomes** 40:17
**ovarian** 29:4

**p**

**p** 2:1,1 4:1
**p.m.** 1:22,22 4:3
45:16,20 48:14
48:15
**paernthood** 3:16
**page** 3:2,7 8:15
9:24 11:20
12:23,23,25
16:14 19:5,8
20:3 21:16,17
23:16,16 30:21
30:22,24 32:16
32:21 36:25,25
37:7 38:5,11
39:17,19,22,23
41:11,12 42:10
42:16 44:1,20
**pandemic** 44:13
**paragraph** 9:25
10:1 12:24,25
13:17 16:15
30:22,24 38:11
39:23,24 41:16
42:10,11,16
44:1,2,12,20,23
**paraphrasing**
25:13
**parenthood**
35:11,12 36:3
36:12,17
**part** 21:8
**particular** 7:7
23:20 30:21
**parties** 49:22
50:4
**parts** 29:11
**party** 50:1
**pathologist** 20:8
20:11,16,17

James Hurly                                                   July 28, 2022

**[pathologist - prohibited]**                               Page 11

21:20,25 22:3,8
22:10 24:24
**pathologists**
25:2
**pathology**   4:17
5:9 20:8,21
**patient**   15:24
17:13 22:9 23:4
23:8,21,22,25
24:14,16,16,22
24:25 25:3,7,8
25:11,13,15,19
25:24 26:8,24
27:9,12,15,25
28:4,11,16
29:12
**patient's**   21:21
22:11
**patients**   9:12,12
10:20 13:9,22
15:10,12 21:20
22:10,13,16,19
22:24 23:10,13
23:18 26:4
29:20 38:22
40:8,17 46:20
**pdf**   33:1
**pediatric**   39:18
40:21 41:5
**penalty**   19:9
**pending**   6:21
15:4
**people**   13:8 14:1
14:6 26:12 30:4
34:24 36:6,7,8
37:11 44:5,5
45:2
**people's**   35:24
**percent**   33:13

**perform**   21:5
23:10
**perjury**   19:9
**permanente**
3:17 36:22 37:1
37:14,19
**permanente's**
37:8
**permissible**
17:24
**person**   34:18
36:4 37:8 46:23
**person's**   44:2,16
46:16
**personal**   25:22
46:24
**persons**   41:19
42:14,19,24
**phone**   24:16
25:16
**photograph**
9:24
**phrase**   17:5
27:19
**phrased**   17:15
30:13
**physically**   46:19
**physician**   21:21
21:25 22:4,12
22:20 23:6,7
**physicians**   3:24
9:10 11:3 12:10
13:7,18,24 14:4
14:7 20:19 22:6
29:22 31:12
45:5,25 46:10
46:10,19 47:7
**place**   41:22
**plain**   33:2

**plaintiff**   3:11
5:10 8:23,25
13:6 18:6,20
**plaintiffs**   1:5 2:3
4:15 8:16,22
12:5 44:24 45:1
45:9 49:5
**planned**   3:15
35:11,12 36:3
36:12,16
**please**   4:7,10
19:5 20:3 21:15
23:15 27:6,7,8
30:21
**pllc**   2:4 4:15
**plural**   24:5
**point**   26:22
27:10
**pool**   12:4,5
**poor**   40:16
**populations**
38:24
**posed**   19:3
**position**   31:24
**possible**   24:18
**possibly**   11:3
25:9
**potentially**
40:17
**practice**   21:5
23:17
**practitioners**
39:18 40:21
41:5
**pregnancy**
38:15,15,15
**prepare**   9:15
**present**   2:14
**preserve**   9:11

**president**   32:22
33:20 34:14
36:2 38:7 39:20
46:9
**press**   3:14,15,17
3:18,23 32:6,10
32:20 33:9,14
33:19,21 34:2,4
34:8 35:1,4,11
35:16 36:2,12
36:16,21 37:14
37:18 45:24
46:8 47:6
**pretty**   29:24
**prevent**   10:20
**previous**   33:1
**private**   20:14
45:1
**probably**   28:23
**problem**   6:13
**procedure**   1:25
**proceeding**   50:5
**proceedings**
48:15
**produced**   1:20
**professionals**
34:2 35:5 45:5
**proficient**   41:19
42:13
**profile**   21:2
**program**   10:3
14:3
**programs**   2:11
**prohibit**   10:7
17:1,20 31:1,10
31:18,25 37:23
39:7 41:1 43:9
**prohibited**
40:10 42:18

**prohibiting**
34:16
**prohibition**
16:19 35:19
39:3 40:22 43:5
43:24
**prohibitions**
34:11
**prohibits** 10:2
10:16,18 31:3
46:15
**prolong** 40:15
**promote** 38:23
**pronouns** 26:13
**proper** 22:22
**properly** 29:6,6
**property** 5:11
**proposal** 42:20
**proposals** 40:7
**proposed** 37:22
37:25 38:2,10
38:12,19 39:3
39:21,23,24
40:21 41:15
43:5
**proposes** 38:17
40:2,4
**prostate** 15:25
23:21,23,25
24:2,17,19 25:9
25:13 27:10
29:4
**protect** 9:11
46:20
**protected** 46:11
**protections** 3:13
32:8 33:7 35:13
35:21 37:3,11
38:18 39:25
41:18 42:12

44:15 47:2
**protects** 35:23
**provide** 6:5 21:9
23:12,12 29:15
45:2,3
**provider** 31:3
36:6 45:6
**providers** 9:12
13:1,22 17:24
38:22 40:11
47:12,16,19,23
48:2,6
**provisions** 40:1
40:5 41:17
42:12
**public** 16:16
20:14 28:22
46:24
**pull** 18:11
**pursuant** 1:25
49:19
**put** 19:19 30:4
42:20

**q**

**quality** 21:10
**question** 5:19,20
5:22,25 6:1,10
6:12,16,17,21
6:21 8:7,9,10
15:4 19:25 27:8
30:5,12 48:4
**questions** 5:18
6:5,15 7:14 19:2
19:18,19 48:9
**quick** 15:1
**quote** 36:3 37:8
**quoted** 33:20
**quotes** 36:2 37:7

**r**

**r** 2:1 4:1 32:22
33:20
**race** 44:4,17
**rajashree** 39:19
**range** 45:3
**rarely** 22:25,25
**rate** 36:7
**rates** 42:25
**read** 5:9 7:20,22
7:24,25 8:11
10:21 12:16
14:22 15:1
18:24
**reads** 12:25
32:21 35:16
36:25 38:11
39:24 41:17
42:16 44:2,12
**ready** 15:3
**real** 15:1
**really** 9:9 12:15
12:15,19
**reason** 6:5,19
**reasons** 49:25
**recall** 6:1,2
**receipt** 49:24
**receive** 14:1
44:7
**receives** 10:3
**recognize** 7:15
**recommendati...**
22:5
**record** 4:3,10
45:14,15,17,19
48:14 49:18
**recovery** 38:16
**redirect** 48:12
**refer** 5:1

**refuse** 40:11
**refused** 23:22
**regard** 17:8 44:8
**registration**
50:12
**regulation** 38:13
**reimbursement**
14:2
**related** 38:16
40:1,14 50:4
**relay** 22:17
**release** 3:14,15
3:17,18,23 32:6
32:10,20 33:9
33:14,19,21
34:2,4,8 35:1,4
35:11,16 36:2
36:12,16,22
37:14,18 45:24
46:8 47:6
**relief** 3:22 43:19
**religion** 44:5
**remote** 1:11,19
49:10
**remotely** 1:24
**remove** 33:6
39:3 40:4,22
43:5
**removing** 40:9
42:17
**repeat** 8:9 27:7
27:8 47:14
**repeated** 25:8
**rephrase** 13:19
30:15
**reported** 1:24
**reporter** 1:23
6:4 49:14
**reporter's** 3:5

represent  4:15
  4:23 13:1,6,14
  13:20 34:3
  37:21 38:8
  39:20 41:14
  43:21 46:6
representative
  13:11
representing  4:8
  13:7,8 19:16
requested  49:21
  50:1
require  40:5
respect  17:12
responded  25:11
response  20:4
  24:4 34:16 38:9
responsibilities
  13:11,12
responsibility
  46:20
restore  3:13
  32:8
restoring  37:11
resulting  42:22
results  21:11
returned  49:23
  49:24
reversal  46:2
reverse  34:5
right  6:24,25
  12:23 32:23
  33:23 35:8
  45:21 48:13
rights  15:11,13
  15:22 26:14
  33:6 34:10
  35:18 38:22
  42:19 46:15

risk  42:20 43:1,2
rn  39:19
room  30:4 44:6
rule  34:6 37:22
  37:25,25 38:2
  38:10,12,17,19
  38:20 39:3,7,21
  39:24,24 40:4
  40:21 41:1,15
  43:5,9,22 46:3
  49:19
ruled  46:14
rules  1:25 40:1
ruling  17:23
  46:13
run  22:19

**s**

s  2:1 4:1
safety  26:5
sampling  22:6
saying  36:3 37:8
says  8:22 9:24
  11:25 16:14
  19:10 24:4
  27:14 32:16
  41:23 42:11
schias  1:22
  49:13 50:10
scott  34:14
second  38:11
secondary  22:4
secretaries
  24:15
secretary  4:24
  10:4,11,23 17:8
  24:23 25:6,10
  26:7,23 27:11
  27:22,23 28:2,9
  28:19 29:1 31:2
  34:21 36:8

secretary's  10:9
section  3:10 10:1
  10:1,4,6,10,12
  10:15,24 13:2
  14:17,18 15:8,9
  16:19 17:1,19
  26:20 30:25
  31:10,18,25
  34:10 35:18
  37:23 38:13
  39:4,7 40:23
  41:1 43:6,9,23
  47:16,20,23
see  7:11,13 8:18
  10:4,9,13 11:21
  11:25 13:2
  14:12 16:22
  18:8,15 19:11
  19:12,12 20:6,9
  21:21 22:3,8,8
  24:2 26:21 27:3
  28:23 30:23
  31:5 32:8,15,16
  32:18 33:7 34:6
  34:24 35:14,25
  36:10,23,24
  37:5,12 38:25
  40:18 41:20
  42:14 43:2 44:9
  44:18,22,23,25
  45:7,22,23 46:4
  47:4
seek  13:1 24:1
  40:17 41:17
  42:12 44:9
seeking  32:25
  44:6 47:3
seen  14:20 18:22
  26:12

send  22:17
sense  12:20,20
  22:14 33:4
sent  9:8
sentence  24:4
  41:16 42:11
series  19:2
serology  21:14
serum  21:2
serve  21:11
  40:11
services  4:25 5:1
  10:5 14:17
  16:18 21:4
  29:15 34:9
  35:17 37:2
  42:23 43:20
  44:14 45:2,3
set  18:7,20
seven  25:1 46:14
sex  10:2 16:2,20
  29:5 31:3,5
  34:12 35:19
  38:14,17,18
  39:25 40:9,10
  40:12 42:17,18
  44:3,16 46:16
sexual  10:7,18
  16:20 17:2,5,9
  17:14,20,25
  31:1,11,19,22
  32:1,25 34:13
  34:17 35:14,19
  37:4,10 42:22
  44:4,16 46:14
  46:16,23
short  32:24
shorthand  1:23
  1:24 49:13

[shrug - tgd]                                                    Page 14

shrug   6:7
signature   19:14
  19:15 49:20
  50:10
signed   19:17
  38:7 39:19
  41:13
significant   40:13
simplification
  12:6
sir   25:17 32:2
situated   31:4
situation   24:7
  28:14 29:10
situations   23:18
  24:5 28:17 29:9
six   27:4
skin   21:7
slash   20:14
slightly   30:5
society   3:19 38:6
  38:8,9 39:2,11
solely   42:21
solutions   50:11
sorry   8:9 15:2,2
  18:13 20:23
  27:1,3,7 30:11
  30:14,15,24
  33:24 42:5
  45:13 47:14
sort   22:3 29:9
sought   33:6
  44:14
sounds   33:12,22
speak   6:9,10
  14:6 28:5 31:12
  31:21
specific   11:12,19
  15:25 27:20
  29:3,5 38:18

39:25 40:5
specifically   6:16
  28:25 29:3
specifics   25:12
speculation
  30:13
speech   26:14
spoke   12:10
start   6:11,12
  7:14
state   1:24 4:10
  49:14
statement   3:13
  16:25 32:7,21
  34:16 46:8
statements
  27:22
states   1:1 2:10
  4:25 10:1 19:8
  30:24 46:8 49:1
stating   17:23
status   40:4 44:4
  44:16
statutory   10:10
  10:24
step   33:3 34:20
  36:9
stereotypes
  40:13
stereotyping
  38:17 40:9
  42:17
stigma   40:15
stipulation
  49:22
street   2:12 50:12
strike   9:2 11:8
  25:5,21 31:7
  47:10

strongly   41:17
  42:11 46:10,25
structural   20:24
struggle   38:24
study   20:17
styled   1:21
subject   13:2
  47:16,19,23
  48:6
submitted   38:9
substance   9:14
  9:21
suffer   27:16
suicide   42:25
suite   2:5 50:12
summary   16:14
  16:14 27:14
supervised
  40:18
support   33:10
  33:21 35:1,5
  36:13,17 37:15
  37:19 39:11
  41:6 43:13
  45:10 46:12
  47:7,12,17,23
  48:6
supported   48:2
suppose   23:3
supreme   12:13
  12:16,21 16:16
  46:1,7,13
sure   6:8 8:10,10
  8:10,14 13:21
  14:14 15:6 19:7
  19:20 20:1,6
  24:24 31:15
  32:13 33:12,13
  42:2

surgery   23:10
susa   41:23
susan   1:4 4:5
  8:16 9:20 32:22
  33:20 49:4
switch   11:22
sworn   4:19
  49:16
system   41:11,13
  43:4,13

            t

take   6:19,22
  15:2 26:4,19
  30:20 32:14
taken   1:21 33:3
  50:5
talked   9:18,20
  28:14
tell   5:16,19
  11:24 15:1,24
  25:6
telling   16:2
  18:16
ten   30:4,5,21,22
term   16:11 22:2
terminating
  32:23
termination
  38:15
test   23:6
testicular   29:4
testified   4:19
testifying   5:16
testimony   49:18
tests   22:19,22
texas   1:2,24 2:6
  4:6 49:2,14
  50:10,13
tgd   40:14

[thank - videotaped]                                                      Page 15

thank  14:8
  18:16 36:8
therapy  23:12
  23:13
therefor  49:25
therefrom  38:16
thing  32:23
things  21:14
  38:12
think  9:7,20
  11:1,11 12:9
  13:7 14:5 19:3
  26:10,15 27:20
  29:22 30:2,4,14
  31:21
third  39:23
this's  27:20
thought  12:11
threaten  38:20
  40:8
three  8:16 13:18
  23:17 36:5 45:5
throckmorton
  50:12
time  4:9 15:3
  28:22 41:21
  48:10
times  5:5
tissues  20:20,25
  21:6 22:18
title  11:20 14:19
  15:8,8 16:17
  34:11 46:14
titled  7:1 14:16
  18:6,19 32:7
  34:5 35:12
  45:25
tobacco  43:1
today  35:16

today's  34:20
  35:22 37:10
  46:12
told  15:17
top  11:20 37:7
  38:5 39:16
  41:11
traditional
  40:12
transcript  49:17
  49:24
transgender
  9:12 28:16
  29:12,16 31:14
  31:17 36:5,7,8
  38:20 40:4,12
  44:3,16 47:3
transition  29:15
treat  9:12 13:8
  13:22 21:19
  22:10 40:5
treated  29:6
treating  21:21
  21:24 22:12,20
treatment  22:5,5
  24:1 26:8,24
  27:12,24 44:7
treatments
  40:18
true  19:10,21
  21:12 31:13
  49:18
trump  31:23
  35:21 37:22
  43:22 44:13
  47:1
truth  5:16
truthful  19:18
  20:2

truthfully  20:2
try  6:9,9,11 48:1
  48:5
trying  18:10
  39:6 40:25 43:8
turn  6:11 12:23
  19:5 20:3 44:1
  44:20
twice  5:6 23:2
two  10:8 16:21
  21:15,17 23:16
  27:14 37:7
  39:22,23 44:1
  44:12 45:1,3,4
type  14:3,5 44:9

                u

u.s.  4:12,23,24
  7:19 19:3 34:8
  37:1 43:20
  46:12
u.s.c  10:4
u.s.c.  14:17
uh  6:7,7,7 21:18
unclear  9:8,10
undermines
  42:18
understand  5:13
  5:15,19,19,20
  6:7,17
understanding
  11:5,9,17 12:3
  13:5,10,16,19
  13:24 14:24
  15:4 23:7 25:22
  30:16,19 31:8
  33:4
understood  5:23
  6:18 10:16
unfortunate
  33:3

uniformly  29:22
united  1:1 2:10
  49:1
unites  4:25
university  20:13
  20:14
unlawful  33:11
  35:2 36:14
  37:16
updating  37:2
upper  8:15
urge  46:2
urgent  24:1
usdoj.gov  2:11
use  22:1 43:1

                v

v  3:22 12:14
  43:19 46:7
vague  11:1
  12:17 16:7
vaguely  12:15
value  21:1
vargas  34:15
various  21:12
verbal  6:6
verification  19:8
veritext  4:9 7:6
  50:11
versus  4:5 20:14
  29:4
victory  33:5
video  11:23
videoconference
  2:2
videographer
  2:15 4:2,9 45:15
  45:19 48:13
videotaped  1:11
  1:19 49:10

James Hurly                                              July 28, 2022

[view - zoom]                                                    Page 16

**view**   7:4 10:23
  16:4,10 28:3,10
**viewing**   18:15
**views**   29:23,25
  30:8,17
**violated**   15:11
**virtually**   4:8
**volume**   1:13
  49:12
**vs**   1:6 49:6
**vulnerable**
  38:23

| w |
| --- |

**w**   46:9
**walker**   3:22
  43:19
**want**   31:9,17
**washington**   2:12
**way**   14:1 17:21
  18:1 30:13,13
  47:22 48:3,7
**we've**   28:14
**weakened**   35:21
**welcomes**   33:4
**welfare**   42:19
**went**   41:22
**whitman**   3:22
  43:19
**wide**   45:3
**witness**   1:20
  4:16 5:9 8:3
  18:14 20:1
  49:16,18
**woman**   16:1
  23:23 24:18
  25:9
**women**   38:20
**work**   20:12
  21:20 22:11,15
  23:3

**worsen**   40:16
**worth**   50:13
**written**   28:9
**wrongly**   23:19
  24:10
**wrote**   20:7 21:19
  23:17

| x |
| --- |

**x**   3:1 50:1
**xavier**   1:7 4:5,24
  9:7 15:6 34:21
  49:7

| y |
| --- |

**yeah**   7:11,13
  11:15,22 14:13
  14:13 15:2
  18:23 19:12
  20:6 22:12 24:7
  24:7 26:21 27:3
  27:6,6 42:5,8
**youth**   40:14

| z |
| --- |

**z**   1:6 4:7 49:6
**zoom**   1:25

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Join /
Renew

## PRESS RELEASES

# AMA statement on Biden decision to restore anti-bias protections

## MAY 10, 2021

**The following statement is attributable to:**

Susan R. Bailey, MD

AMA President

"The Biden administration did the right thing by terminating a short-lived effort to allow discrimination based on gender or sexual orientation when seeking health care. As we said in our letter (PDF) to the previous administration, the interpretation was contrary to the intent and the plain language of the law. It's unfortunate that such an obvious step had to be taken; the AMA welcomes this common-sense understanding of the law.

"This move is a victory for health equity and ends a dismal chapter in which a federal agency sought to remove civil rights protections."

## Media Contact:

Jack Deutsch
ph: (202) 789-7442
jack.deutsch@ama-assn.org

## About the American Medical Association

The American Medical Association is the physicians' powerful ally in patient care. As the only medical association that convenes 190+ state and specialty medical societies

Exhibit
0007

A221

and other critical stakeholders, the AMA represents physicians with a unified voice to all key players in health care.  The AMA leverages its strength by removing the obstacles that interfere with patient care, leading the charge to prevent chronic disease and confront public health crises and, driving the future of medicine to tackle the biggest challenges in health care.

**More about:**

LGBTQ Population Care

Health Care Equity

Federal Advocacy

## FEATURED STORIES



**PUBLIC HEALTH**

### What sets apart Novavax option from other COVID-19 vaccines



**PHYSICIAN HEALTH**

## Harassment of doctors is on the rise. Here's how to stop it.

A223



- to JAMA Network™ and Gr...
- ...urance
- ...d pa...  righ...

### Join the AMA today

The AMA promotes the art and science of medicine and the betterment of public health.

**AMA Contact Us**
Download AMA Connect app for **iPhone** or **Android**

**AMA Careers**
**Events**
**Press Center**

AMA Alliance

AMPAC

AMA Foundation

---

The best in medicine, delivered to your mailbox

| Email Address | Subscribe |

☐ I verify that I'm in the U.S. and agree to receive communication from the AMA or third parties on behalf of AMA.

---

JAMA NETWORK™  |  FREIDA™  |  AMA ED HUB™  |  COVID-19 RESOURCES  |
COVID-19 CPT® CODES  |  AMA JOURNAL OF ETHICS®  |  CPT  |  STORE  |
AMA PHYSICIAN PROFILES

---

Terms of Use  |  Privacy Policy  |  Code of Conduct  |  Website Accessibility

Copyright 1995 - 2022 American Medical Association. All rights reserved.

GLMA: Health Professionals Advancing LGBTQ Equality

Home   About GLMA   Membership   Resources   Advocacy   Lesbian Health Fund   Conference   Newsroom   Support GLMA

My GLMA Home
Find a Provider

About GLMA
Membership
Resources
Advocacy
Lesbian Health Fund
Conference
Newsroom
Support GLMA

Site Search

Go

  

**GLMA Applauds Action to Reverse Healthcare Discrimination Rule**

On May 10, 2021, the US Department of Health and Human Services announced that the Office for Civil Rights will interpret and enforce Section 1557 of the Affordable Care Act and Title IX's prohibitions on discrimination based on sex to include discrimination on the basis of sexual orientation and gender identity. GLMA President Scott Nass, MD, MPA, FAAFP, AAHIVS, and GLMA Executive Director Hector Vargas, JD, issued the following statement in response:

"Prohibiting discrimination based on sexual orientation and gender identity is a foundational building block for LGBTQ health equity. Every LGBTQ person should be able to access healthcare without fear of discrimination, and today's announcement is a major step towards this future. We at GLMA applaud HHS Secretary Xavier Becerra for his leadership and the Biden administration for its commitment to improving the lives and advancing the health of LGBTQ people.

"GLMA is proud to be a plaintiff in a lawsuit challenging the previous administration's attempts to limit nondiscrimination protections under the Affordable Care Act, and we look forward to working with Secretary Becerra and his team to fully implement today's reversal and address all the concerns raised in the lawsuit."

To see the statement of Lambda Legal, which represents GLMA and other plaintiffs in the Section 1557 litigation, please click here.

Back to Current News

  

Home   About GLMA   Membership   Resources   Advocacy   Lesbian Health Fund   Conference   Newsroom   Support GLMA

© GLMA, All rights reserved.
Privacy Policy



Exhibit
0008

A226

# Planned Parenthood Applauds Biden Administration's Move to Enforce Protections Against Discrimination on the Basis of Sexual Orientation and Gender Identity

**For Immediate Release:** May 10, 2021

Share This

𝕏   f   t

**WASHINGTON –**  Today, the Department of Health and Human Services (HHS) announced that (https://www.hhs.gov/sites/default/files/ocr-bostock-notification.pdf)the Office for Civil Rights will  interpret and enforce Section 1557's prohibition on discrimination based on sex to include sexual orientation and gender identity. This announcement comes after the Trump administration weakened protections against discrimination in health care for the LGBTQ+ community. Today's move will ensure HHS's interpretation of the law protects all people's access to the health care they need to control their health and their futures.

**Statement from Alexis McGill Johnson, president and CEO, Planned Parenthood Federation of America:**



Exhibit 0009

A227

> " Every person deserves to access health care free from judgment and discrimination. We know nearly one in three transgender people have faced discrimination with a health care provider. This rate is even higher for Black transgender people and other transgender people of color. We thank Secretary Becerra and the Biden-Harris administration for taking this critical step to better ensure health care access for all. However, the work cannot and should not stop here. Planned Parenthood is ready to continue working with the administration on next steps to repeal the harmful Trump-era rule and  ensure all people can access the health care they need. "

Section 1557 of the Affordable Care Act was a historic step toward health equity for communities  that have historically faced discrimination in access to health care services and coverage. The rule prohibits discrimination on the basis of race, color, national origin, sex, age, and disability in covered health programs or activities. Today's action recognizes the precedent set by the Supreme Court in Bostock v. Clayton County, but more work is needed to undo the harmful attacks from the Trump administration.

Today's announcement comes as state legislatures across the country continue to perpetuate transphobia by attacking the rights of trans youth (https://www.aclu.org/news/lgbtq-rights/there-is-a-coordinated-attack-against-trans-youth-in-state-legislatures/). Federal action to better protect the health and rights of trans people cannot come swiftly enough.

### 

Planned Parenthood is the nation's leading provider and advocate of high-quality, affordable sexual and reproductive health care for all people, as well as the nation's largest provider of sex education. With more than 600 health centers across the country, Planned Parenthood organizations serve

all patients with care and compassion, with respect, and without judgment,
striving to create equitable access to health care. Through health centers,
programs in schools and communities, and online resources, Planned
Parenthood is a trusted source of reliable education and information that
allows people to make informed health decisions. We do all this because
we care passionately about helping people lead healthier lives. Planned
Parenthood Federation of America (PPFA) is a 501(c)(3) charitable
organization that supports the independently incorporated Planned
Parenthood affiliates operating health centers across the U.S.



**KAISER PERMANENTE** | About

May 10, 2021

# Our support for HHS actions protecting transgender care

A statement from chair and chief executive officer Greg A. Adams on the importance of equitably providing high-quality care to all people.



Kaiser Permanente applauds the U.S. Department of Health and Human Services for updating, effective immediately, its interpretation of the nondiscrimination protections in the Affordable Care Act to include gender identity and sexual orientation. This past year the pandemic has shown tremendous disparities in health and care faced by many populations in our country. In the midst of the pandemic, a rule finalized in June 2020 eliminated these protections and exposed some of the most vulnerable people in our society to being denied care. Despite that past action to eliminate protections, Kaiser Permanente remained fully committed to transgender care and maintained all services and protections for our LGBTQ members.

**Exhibit
0010**

"No person should live in fear that they will be denied care based on their gender identity or sexual orientation. Today's action by HHS restoring protections for LGBTQ people is critical to ensuring that never happens again," said Kaiser Permanente chair and CEO Greg A. Adams (https://about.kaiserpermanente.org/who-we-are/leadership-team/national-leaders/greg-a-adams) . "All people deserve respect, support, and dignity when they reach out for care and healing. At Kaiser Permanente we are committed to equitably providing high-quality care to all people. That has always been part of our mission and today it is even more important, as we seek equality, social justice, and an end to discrimination."

In 2018, when HHS began the process of redefining gender under the existing nondiscrimination provision of the ACA, Kaiser Permanente joined more than 50 other major companies and organizations by signing a statement in support of transgender equality. Kaiser Permanente also strongly objected to the proposed changes in a comment letter to HHS in August 2019, joining more than 130,000 others calling on the agency to maintain the critical nondiscrimination protections of the long-standing rule.

Kaiser Permanente is a nationally recognized leader in LGBTQ health care equality, providing full-spectrum medical, surgical, and mental health care to our transgender patients and members. We are proud to offer gender-affirming services that ensure respectful, equitable, and inclusive care to all of our transgender and gender-expansive patients and members everywhere that we deliver care.



August 13, 2019

Mr. Roger Severino
Director, Office for Civil Rights
U.S. Department of Health and Human Services
200 Independence Ave. SW
Washington, DC 20201

**Re: Nondiscrimination in Health and Health Education Programs and Activities (Section 1557 NPRM), RIN 0945-AA11**

Dear Mr. Severino:

On behalf of the Endocrine Society, we appreciate the opportunity to provide comments on the proposed revisions to the non-discrimination provisions set forth in Section 1557 of the Affordable Care Act (ACA). Founded in 1916, the Endocrine Society represents approximately 18,000 physicians and scientists engaged in the treatment and research of endocrine disorders, such as diabetes, hypertension, infertility, obesity, osteoporosis, and thyroid disease. In 2013, the American Psychiatric Association removed "Gender Identity Disorder" to underscore the concept that a transgender identity, in and of itself, was no longer considered to be pathological. Many of our members care for transgender individuals, providing expert care across the range of transgender medical interventions including hormone therapy and surgeries. As established in our position statement on transgender health[1], we strongly support access to the full spectrum of medical care for transgender individuals and urge the Office for Civil Rights (OCR) to withdraw this proposed rule.

The proposed rule is focused on, among other things, the 2016 implementing regulation for Section 1557 of the ACA that defined "on the basis of sex" to include discrimination based on pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity. The rule proposes to eliminate specific nondiscrimination protections based on sex and gender identity. **We oppose the proposed rule.** If finalized, this rule will threaten women and transgender individuals' access to care and health insurance, create confusion among providers and patients about their rights and obligations, and promote discrimination against vulnerable populations that already struggle to access health care.

---

[1] Endocrine Society. Transgender Health. September 2017 *https://www.endocrine.org/advocacy/priorities-and-positions/transgender-health*

2055 L Street NW
Suite 600
Washington, DC
20036

T. 202.971.3636
F. 202.736.9705

endocrine.org

**Exhibit
0011**



**Impact on access to care**

Even with existing protections for transgender individuals that are meant to shield them from discrimination in the health care system, access to appropriately trained healthcare professionals can be challenging. There is a lack of formal education on gender dysphoria/gender incongruence among clinicians trained in the United States, making it difficult to find physicians with expertise in the transition process. Furthermore, they face barriers in accessing standard preventive services for their sex assigned at birth (i.e., prostate cancer screening for a transgender woman) from physicians who have had minimal experience caring for transgender individuals.

Removing these nondiscrimination protections will make it easier for providers to deny care to transgender individuals for any health care service, not just those related to their gender transition, and will discourage transgender individuals from seeking care or reporting when they have been a victim of discrimination. Furthermore, covered entities will no longer be required to treat a patient consistent with their gender identity and the rule will allow differential coverage or cost-sharing for services that are associated with their gender assigned at birth (denying medical treatment for ovarian cancer in a transgender male).

Studies have indicated that 70% of transgender individuals have experienced maltreatment by medical providers, including harassment and violence.[2] Transgender individuals who have been denied care show an increased likelihood of committing suicide and self-harm.[3] Making it harder to access health care services could further impact the health disparities and mental health issues that are experienced by transgender individuals. It is critical that transgender individuals can access appropriate treatment and care to ensure their health and well-being without the fear of discrimination or harassment.

**Impact on insurance coverage and benefit design**

The proposed rule interprets a covered entity much more narrowly than the 2016 implementing rule. Under current regulation, Section 1557 applies to all health programs and activities that receive federal financial assistance through the Department of Health and Human Services (HHS). As a result, all health plans offered by an insurer that participates in the Marketplace are subject to section 1557. This proposed rule will apply Section 1557 to only the specific program or activity that is principally engaged in providing health care and receives federal funding. This means that an insurance provider that is not principally engaged in providing health care will only have to apply Section 1557 regulations to its Marketplace plans (which receive federal funding). Furthermore, the proposed rule also eliminates the entire regulation that prohibits discrimination in insurance issuance, coverage, cost-sharing, marketing and benefit design.

---

[2] Davidge-Pitts, C., et al. Transgender Health in Endocrinology: Current Status of Endocrinology Fellowship Program and Practicing Clinicians. *J Clin Endocrinol Metab*. (2017) 102(4):1286-1290.
[3] *ibid.*



Treatment for gender dysphoria/gender incongruence is considered elective by insurance companies, and many plans fail to provide coverage for physician-prescribed treatment. The 2016 implementing regulation changed that by prohibiting health insurance companies from discriminating through marketing practices or benefit design. As a result, insurers may not categorically exclude health care services related to gender transition or subject a policyholder to additional benefit limitations because they are transgender. A study looked at the response of insurers in the state individual markets and found that many insurers now include affirmative coverage language for transition-related services as a result of the 2016 Section 1557 implementing rule.  By eliminating protections based on gender identity and limiting the scope of covered entities, this proposed rule will once again allow health insurers to use discriminatory benefit design, potentially resulting in more insurers reverting back to plans that do not provide coverage for transition-related care that is based on evidence-based standards of care.

Eliminating these protections from health insurance issuance, coverage, cost-sharing, marketing and benefit design will also allow plans to selectively cover services for a man and not a woman, place all or most medications for treatment of a specific disease on the plan's highest cost formulary tier, or applying age limits to treatment that has been proven to be effective at all ages. While this proposed rule will not impact essential health benefits, it will once again allow insurance providers to discriminate against someone solely because of their age, sexual orientation, gender and/or gender identity.

## Expanded religious exemptions

The proposed rule applies Title IX's religious exemption to Section 1557's prohibition on sex discrimination. If implemented, this could allow religiously-affiliated hospitals and other health care entities to discriminate against patients based on sex, disproportionately harming transgender people and people seeking reproductive health services. This could impact a broad range of health services, including birth control, sterilization, certain fertility treatments, abortion, gender-affirming care, and end of life care.

In our comments on the Statutory Conscience Rights in Health Care proposed rule (March 2018), we expressed concern that the expanded religious exemption would impact the right of every person to access comprehensive care that is affordable and easily accessible. As mentioned above, transgender individuals already face challenges finding physicians who have the experience to care for transgender individuals. Furthermore, there are residents of many rural and underserved communities that may have access to only one health care provider. According to a 2018 study of transgender individuals, 31 percent said if they were turned away, it would be very difficult or not possible to find the same type of service at a different hospital, and 30 percent said it would be



very difficult or not possible to find the same type of service at a different clinic.[4] We are concerned that this proposed rule would make it even more difficult to access transition-related care, obtain contraception or other reproductive planning, or treat a medical condition, and may result in the individual forgoing necessary health care, ultimately at a higher cost to both the individual and the healthcare system.

Nondiscrimination protections like the ones in Section 1557 do not prevent health care providers from using their medical judgement in the care of transgender individuals or women, they simply guarantee that these patients can access the same care provided to other patients, no matter who they are. The protections are fundamental for these vulnerable populations to be able to access the care that they need.

Thank you for considering our comments. We strongly believe that transgender individuals and women should have affordable access to the full continuum of care without the fear of discrimination and urge you not to finalize this rule. If we can be of further assistance, please contact Stephanie Kutler, Director, Advocacy & Policy, at skutler@endocrine.org.

Sincerely,

E. Dale Abel, MB.BS., D.Phil. (M.D., Ph.D.)
President, Endocrine Society

---

[4] Shabab Ahmed Mirza & Caitlin Rooney, *Discrimination Prevents LGBTQ People from Accessing Health Care*, Ctr. for Am. Progress (Jan. 18, 2018) https://www.americanprogress.org/issues/lgbt/news/2018/01/18/445130/discrimination-prevents-lgbtq-people-accessing-health-care/.



**Headquarters**
5 Hanover Square
Suite 1401
New York, NY 10004
P.917-746-8300
www.napnap.org

August 13, 2019

Roger Severino
Director, Office for Civil Rights
U.S. Department of Health and Human Services
Attn: RIN 0945-AA11
200 Independence Avenue, SW
Hubert H. Humphrey Building, Room 509F
Washington, D.C. 20201

**RE: RIN 0945-AA11; Docket No. HHS-OCR-2019-0007 – Nondiscrimination in Health and Health Education Programs or Activities**
*(Submitted electronically via www.regulations.gov)*

Dear Director Severino:

On behalf of more than 9,000 pediatric nurse practitioners (PNPs) and pediatric-focused advanced practice registered nurses (APRNs) committed to providing optimal health care to children, the National Association of Pediatric Nurse Practitioners (NAPNAP) appreciates the opportunity to provide its comments in response to the June 14, 2019 rule (Docket No. HHS-OCR-2019-0007; 84 Fed. Reg. 115; pp. 27846-27895) proposed by the Department of Health and Human Services (HHS), the Centers for Medicare & Medicaid Services (CMS), and the Office for Civil Rights (OCR) revising regulations implementing Section 1557 of the Patient Protection and Affordable Care Act (ACA) (collectively, "the Department"). NAPNAP and its members are disappointed and concerned that the Department has chosen to propose essentially rescinding the existing protections prohibiting discrimination against patients in health care. We must strongly oppose the intended policy changes and urge the Department to withdraw the proposed rule in its entirety and work with NAPNAP and other stakeholders to improve enforcement of the existing regulations.

As you know, pediatric nurse practitioners (PNPs) and fellow pediatric-focused advanced practice registered nurses (APRNs) are committed to providing optimal health care to children in primary, specialty and acute care settings. APRNs who concentrate on children's care, including PNPs, have attained enhanced education in pediatric nursing and health care using evidence-based practice guidelines. They have provided quality, accessible, affordable healthcare to children and families for more than 50 years in an extensive range of community practice settings including pediatric offices, clinics, schools, and hospitals. Practicing in primary care, specialty, and acute care, they diagnose illnesses, prescribe medications and are fully qualified to provide both primary and acute healthcare services to children in a trauma-informed, culturally-responsive, evidence-based manner. They have witnessed first-hand the impact of discrimination in health care coverage and practice that interfere with children's access to comprehensive, developmentally appropriate care that can affect them throughout their lives.

Despite the Department's attempt to justify the revision of existing protections to "relieve billions of dollars in undue regulatory burdens...and clarify the scope of Section 1557 in keeping with pre-existing civil rights statutes and regulations," it is clear that the proposed rule would significantly reduce the number and type of entities required to comply with non-discrimination protection, exposing children and other patients to unfair practices that deny or limit their access to care. Research has clearly linked discrimination in childhood years to toxic stress that, compounded over time, predisposes them to a greater likelihood of chronic disease in adulthood and other long-term negative health outcomes.

The 2016 rule was the product of a lengthy process of deliberation and public input, developed over the course of six years of study and following two comment periods, with more than 25,000 comments from stakeholders, including NAPNAP, which were overwhelmingly supportive of inclusion of protections against discrimination based on sex stereotyping and gender identity. The 2016 rule removed barriers to health care for children – if the proposed changes are finalized, NAPNAP believes they would have the opposite effect.

**Exhibit 0012**

A236

NAPNAP offers the following comments on specific aspects of the proposed rule:

## Discrimination on the Basis of Sex, Gender Identity, and Sexual Orientation

Despite some advances in public awareness and legal protections, youth who identify as LGBTQ continue to face disparities that stem from multiple sources, including inequitable laws and policies, societal discrimination, and a lack of access to quality health care, including mental health care. Such challenges are often more intense for youth who do not conform to social expectations and norms regarding gender.

Youth who identify as TGD often confront stigma and discrimination, contributing to feelings of rejection and isolation that can adversely affect physical and emotional well-being. Evidence shows that youth who identify as TGD experience disproportionately high rates of homelessness, physical violence at home and in the community, substance abuse, and high-risk sexual behaviors. Among the 3 million HIV testing events that were reported in 2015, the highest percentages of new infections were among women who identified as transgender and who were also at particular risk for not knowing their HIV status. In addition to societal challenges, youth identifying as TGD also face several barriers within the health care system, especially regarding access to care. A recent study found that roughly 25 percent of individuals who identified as transgender were denied coverage because of being transgender.

The proposed rule would eliminate specific protections on the basis of sex, including the 2016 rule's provisions related to gender identity nondiscrimination. The Department also proposes to eliminate the definition of gender identity, which includes gender expression and transgender status. Furthermore, the rule proposes to remove specific provisions that require covered entities to treat individuals consistent with their gender identity.

NAPNAP opposes these proposals, all of which would threaten LGBTQ patients' access to health care and coverage. Removing gender identity and sex stereotyping from the definition of prohibited sex-based discrimination could allow health care providers to refuse to serve individuals who are transgender or who do not conform to traditional sex stereotypes, magnifying already significant inequities that exist for youth who identify as TGD related to access to care. These denials of care would only increase stigma, prolong gender dysphoria, and worsen already poor mental health outcomes. They could lead patients to seek potentially dangerous nonmedically supervised treatments.

In addition, the proposed rule would no longer prohibit covered entities from denying, limiting, or imposing additional cost-sharing for services that are ordinarily or exclusively available to one sex or gender when those services are sought by an individual of a different sex or gender. It also proposes to eliminate the provision that prohibits a health plan from categorically or automatically excluding or limiting coverage for health services related to gender transition. The rollback of these protections could have a devastating impact on access to medically necessary services for youth who identify as TGD, adversely affecting their self-esteem and contributing to the perception that they are undervalued by society and the health care system. Insurance denials can also reinforce the socioeconomic divide between those who can finance the high costs of uncovered care and those who cannot. If finalized, the proposed rule would also create confusion among patients and providers about their rights and obligations and would promote discrimination, encouraging hospitals and clinics to deny care to people who identify as TGD and enabling insurance companies to deny individuals who identify as transgender coverage for health care services that they cover for those who identify as cisgender.

The proposed rule also opens the door to discrimination on the basis of pregnancy termination or other pregnancy-related status, potentially denying adolescents access to comprehensive health care, including reproductive health care. Timely access to medical care is especially important for pregnant teenagers because of the significant medical, personal, and social consequences of adolescent childbearing. Beyond allowing providers to discriminate in these and other instances, it would leave the patient without redress for such discrimination. Allowing health care entities that receive federal funding to refuse care to patients who have had a pregnancy termination or accessed other reproductive health care services will have a dangerous effect on access to care.

## Explicit Religious Exemptions

The proposed rule would allow discrimination against children, adolescents, and young adults when a health care provider or other covered entity uses religious beliefs as justification to deny, delay, or discourage patients from receiving needed health care services. For example, the proposed rule may allow a health care provider to refuse care to an adolescent who seeks basic information on reproductive health, such as the routine use of contraception for pregnancy prevention, simply because the provider objects to such care.

Such denials could place patients at risk of serious or life-threatening outcomes in emergencies and other circumstances where the individual's choice of health care provider is limited.  These situations may be more likely to occur because the proposed rule raises more questions about nondiscrimination protections and exemptions than it clearly answers.

By permitting sex discrimination based on a provider's religious beliefs, the proposed rule obstructs the delivery of reproductive health care aligned with clinical guidelines and the recommendations of major professional medical organizations.  NAPNAP opposes the blanket religious exemptions proposed by the Department.  Religious exemptions such as those permitted by the proposed rule will discriminate against women seeking necessary reproductive health care services, contrary to the intent of Congress and the express purpose of Section 1557.

**Rollback of Language Access Requirements**

Immigrant children or children with immigrant parents, groups that face persistent discrimination in accessing health care, represent the fastest growing segment of the U.S. population – one in every 4 children in the United States, roughly 18.6 million children, lives in an immigrant family.  Lack of health care coverage is more common among children in immigrant families than for nonimmigrant children, and children of immigrants are nearly twice as likely to be uninsured as are children of nonimmigrant families.

Even when immigrant children and families can access health care providers, they face obstacles when language barriers prevent effective communication between pediatricians, children, and families on medical issues.  Although many immigrant children speak English, their parents may not, creating a barrier that can prevent families from accessing needed health services and leading to inadequate communication with health care providers.  Without access to qualified medical interpreters in health care settings, language barriers can place English-speaking children in the difficult position of trying to translate between health care providers and their family members.  These patients and their families need adequate language resources and access to language professionals, including posted signs in multiple languages, written materials, live interpreters (preferably in-person, but also remote video and telephonic interpreters), and dedicated translators of written instructions.

NAPNAP supported the specific requirements in the 2016 regulations to ensure meaningful access for individuals with limited English proficiency because they help to prevent discrimination and improve the quality of care for children and families.  We oppose the changes proposed in this rule that would increase barriers to access to care for families with limited English proficiency (LEP), rather than ensuring that all health facilities have access to trained interpreter services and for CMS to require that Medicaid provide full payment for these services for patients with LEP.  The proposed rule would limit many of these resources, and could result in inadequate communication and costly, dangerous medical errors.

We disagree with the Department's assertions that the nondiscrimination notice, taglines and language access plan language in the 2016 rule were not justified by need or are overly burdensome.  The proposed changes would limit access to care for the 25.5 million individuals with LEP in the U.S. and result in discrimination based on national origin for an already-vulnerable population.  These policies could result in direct harm for children and patients with LEP, including improper use of medication, incorrect understanding of treatment options, or inadequate informed consent, leading to adverse, costly health consequences or even death.

**Discrimination on the Basis of Disability**

Although the Department proposes to retain the protections outlined in the current regulation related to effective communication for individuals with disabilities, it seeks public comment on whether some of these provisions should be relaxed, including: 1) exempting entities with fewer than 15 employees from providing auxiliary aids and services to ensure effective communication; 2) whether all covered entities should be subject to the architectural standards applicable to public buildings; and 3) whether an exemption for undue hardship should be provided to covered entities required to make reasonable modifications in policies, practices, and procedures to avoid disability-based discrimination.

These policies have serious implications for children: over the last five decades, the number of children living with disabilities has tripled, largely as the result of health care advances that have made their survival possible. Despite these changing demographics, the health care system continues to use an outdated approach that emphasizes acute illness and well-child care and de-emphasizes long-term management of chronic conditions and disabilities.

Children with disabilities and special health care needs disproportionately lack access to a comprehensive medical home, even though evidence shows that receiving coordinated care in a medical home can profoundly improve outcomes for these children: increased access to subspecialty care, fewer missed days of school, and decreased family financial burden.

NAPNAP urges the Department to maintain communication and physical access protections for individuals with disabilities to enable more children to benefit from the care coordination and other benefits of a medical home. Relaxing or expanding exemptions from any of the provisions would disproportionately affect children and could harm their access to necessary services and care.

The result of these changes is an overall reduction of the number and type of entities required to comply with the Section 1557 non-discrimination protections. Thus, most patients who have healthcare coverage will be potentially subjected to discrimination at the plan and the provider level with no legal recourse. If finalized, the proposed rule would have severe implications for children and families' access to care. We strongly oppose the proposed changes to scope of applicability of Section 1557 antidiscrimination protections.

## Health insurance plan design and marketing

NAPNAP is also troubled by the proposal to eliminate the applicability of Section 1557 protections to all health insurance issuers, opening the door to discriminatory benefit designs and marketing practices including, but not limited to, restricted provider networks, covered benefits, drug formularies, visit limits, and utilization management. Plans would be able to exclude benefits, design prescription drug formularies, or restrict provider networks in ways that impede access to medically necessary and age-appropriate care for children with serious, chronic or complex medical conditions. Plans that limit coverage, without a medical basis, to a certain number of visits, provider type, specific condition, or a child's capacity to attain a certain functional status could unfairly impact children with special health care needs who need timely access to critically important services.

Further, the rule would eliminate existing prohibitions on marketing practices that might target or exclude certain populations on the basis of race, color, national origin, gender or gender identity, age, or disability. Under the proposed rule, none of these practices would be subject to scrutiny for potential discrimination on the basis of health or other status due to the exemption of health insurers as a covered entity. NAPNAP continues to believe that all insurers and entities should be required to abide by these basic patient protections.

## Grievance procedures and enforcement actions

We are also concerned that the elimination of current requirements that covered entities establish grievance procedures and designate a responsible employee to coordinate compliance efforts, combined with the elimination of the Right to Private Action in federal court, creates seriously harmful barriers to individual remedies against discriminatory actions. As such, the proposed rule is likely to discourage families and others who have experienced discrimination in a health care setting from seeking remediation. In particular, the proposed removal of the requirement that covered entities have a designated compliance coordinator and written grievance procedure weakens the ability of children, youth, and their families to file complaints following an alleged discriminatory action.

NAPNAP opposes the proposed weakening of current enforcement mechanisms, which we believe are essential to ensure nondiscrimination in benefit design, including codification of the transgender-inclusive protections in the proposed rule and clarification that Section 1557 prohibits other forms of discrimination, such as restricting access to medications used to treat specific conditions by placing them in high cost-sharing tiers, or by using discriminatory standards to determine medical necessity for specific populations or conditions. These diluted provisions on enforcement and rights to private action further diminish enforcement provisions of the underlying civil rights laws. As a result, families would be left with little protection or recourse when they face discriminatory limits on access to comprehensive, medically necessary quality care.

In summary, NAPNAP and its members are grateful for the chance to express our serious concerns about these proposed regulations, which we believe would severely threaten access to care for millions of children, including those that identify as LGBTQ, those with disabilities or with limited English proficiency, and those who have sought or may seek comprehensive reproductive health services, ultimately leading to poorer health outcomes or unlawful coverage denials.

Director Roger Severino                                                                                      Page 5
August 13, 2019

NAPNAP strongly urges the Department to immediately rescind the proposed rule, confirm the retention of the 2016 rule now in place, and work with us to strengthen policies to protect health care providers and our patients from bias and discrimination and ensure access to comprehensive health care.  We are eager to assist you in these efforts and to offer our expertise and perspective on any children's health issues.

Sincerely,

Rajashree Koppolu, RN, MSN, CPNP-PC/AC, MSL
President



August 9, 2019

Mr. Roger Severino
Director, Office for Civil Rights
U.S. Department of Health and Human Services
200 Independence Ave. SW, Washington, DC 20201

**Re: Nondiscrimination in Health and Health Education Programs and Activities (Section 1557 NPRM), RIN 0945-AA11**

Dear Mr. Severino:

Alameda Health System thanks the Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) for the opportunity to comment on the notice of proposed rulemaking (NPRM) on Section 1557 of the Patient Protection and Affordable Care Act (ACA) ("Health Care Rights Law" or "Section 1557"). Section 1557 prohibits discrimination on the basis of race, color, national origin, sex, age, and disability. Alameda Health System is committed to caring, healing, teaching and serving all. It goes to the core of our mission to reduce health disparities in our community. We strongly oppose the NPRM provisions which seek to eliminate and limit protections for individuals such as those who are limited English proficient, and LGBTQ persons.

Alameda Health System (AHS) is a leading health care provider and medical training institution in the San Francisco Bay Area. With more than 4600 employees, 1000 physicians and almost 500 volunteers, AHS provides comprehensive medical treatment, health promotion and disease prevention programs to more than 162,000 patients annually. Our system includes three hospitals, a Level 1 adult trauma center, four wellness centers and the only psychiatric emergency services in the area.

Discrimination based on national origin, which encompasses discrimination on the basis of language, creates unequal access to health care. Over twenty-five million Americans are limited English proficient (LEP). An estimated 19 million LEP adults are insured. Language assistance is necessary for LEP persons to access federally funded programs and activities in the healthcare system. Alameda Health System provides interpretation services in more than 20 different languages because we want to make sure our patients, regardless of what languages they speak, get the information and care they need. This not only improves our patients' well-being, but also reduces health care cost in the long term.

Removing gender identity and sex stereotyping from the definition of prohibited sex-based discrimination undermines the rights and welfare of LGBTQ persons and their families. This proposal would put LGBTQ community at greater risk of being denied necessary and appropriate health care solely based on their sexual orientation or gender identity. The resulting inability to access needed health care services could exacerbate health disparities experienced by LGBTQ persons, such as higher rates of depression and suicide attempts, higher risk of HIV/AIDS, higher use of tobacco and drugs, and higher risk of breast cancer.

Exhibit
0013

For these reasons, Alameda Health System strongly opposes the NPRM's provisions and urge HHS to withdraw this rule. Thank you for your considerations and please contact our Director of Public Affairs and Community Engagement Terry Lightfoot at tlightfoot@alamedahealthsystem.org or (510) 290-6737 should you have any questions.

Sincerely,

Delvecchio Finley, CEO Alameda Health System

A242

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WHITMAN-WALKER CLINIC, Inc. d/b/a | ) |
| WHITMAN-WALKER HEALTH | ) Case No. |
| 1377 R Street NW | ) |
| Washington, DC 20009; | ) |
| | ) **COMPLAINT FOR DECLARATORY** |
| THE TRANSLATIN@ COALITION | ) **AND INJUNCTIVE RELIEF** |
| 3055 Wilshire Boulevard, Suite 350 | ) |
| Los Angeles, CA 90010; | ) |
| | ) |
| LOS ANGELES LGBT CENTER | ) |
| 1625 Schrader Boulevard | ) |
| Los Angeles, CA 90028; | ) |
| | ) |
| BRADBURY-SULLIVAN LGBT | ) |
| COMMUNITY CENTER | ) |
| 522 West Maple Street | ) |
| at Bayard Rustin Way | ) |
| Allentown, PA 18101; | ) |
| | ) |
| AMERICAN ASSOCIATION OF PHYSICIANS | ) |
| FOR HUMAN RIGHTS, INC. d/b/a GLMA: | ) |
| HEALTH PROFESSIONALS ADVANCING | ) |
| LGBTQ EQUALITY | ) |
| 1133 19th Street NW, Suite 302 | ) |
| Washington, DC 20036; | ) |
| | ) |
| AGLP: THE ASSOCIATION OF LGBTQ | ) |
| PSYCHIATRISTS | ) |
| 4514 Chester Avenue | ) |
| Philadelphia, PA 19143; | ) |
| | ) |
| SARAH HENN, MD, MPH | ) |
| c/o Steptoe & Johnson LLP | ) |
| 1330 Connecticut Avenue NW | ) |
| Washington, DC 20036; | ) |
| | ) |
| RANDY PUMPHREY, D.MIN, LCC, BCC | ) |
| c/o Steptoe & Johnson LLP | ) |
| 1330 Connecticut Avenue NW | ) |
| Washington, DC 20036; | ) |

**Exhibit**
**0014**

A243

ROBERT BOLAN, MD                                    )
c/o Steptoe & Johnson LLP                           )
1330 Connecticut Avenue NW                          )
Washington, DC  20036; and                          )
                                                    )
WARD CARPENTER, MD                                  )
c/o Steptoe & Johnson LLP                           )
1330 Connecticut Avenue NW                          )
Washington, DC  20036,                              )
                                                    )
                            *Plaintiffs*,           )
                                                    )
            v.                                      )
                                                    )
U.S. DEPARTMENT OF HEALTH AND                       )
HUMAN SERVICES                                      )
200 Independence Avenue SW                          )
Washington, D.C. 20201;                             )
                                                    )
ALEX M. AZAR II, in his official capacity as        )
Secretary of U.S. Department of Health and          )
Human Services,                                     )
200 Independence Avenue SW                          )
Washington, D.C. 20201;                             )
                                                    )
ROGER SEVERINO, in his official capacity as         )
Director, Office for Civil Rights, U.S.             )
Department of Health and Human Services,            )
200 Independence Avenue, SW                         )
Room 509F, HHH Building                             )
Washington, D.C. 20201; and                         )
                                                    )
SEEMA VERMA, in her official capacity as            )
Administrator for the Centers for Medicare and      )
Medicaid Services, U.S. Department of Health        )
and Human Services,                                 )
7500 Security Boulevard,                            )
Baltimore, MD 21244,                                )
                                                    )
                           *Defendants*.            )
                                                    )

2

A244

**INTRODUCTION**

1.      A person's access to health care should not be contingent on their sex, gender identity, transgender status, sexual orientation, race, national origin, age, disability, or religion. When people go to a doctor's office, hospital, or an emergency room seeking treatment, they expect and are entitled to receive care appropriate to meet their health needs without regard to who they are or the type of health care they seek.

2.      Yet, in the midst of a global pandemic, the Trump Administration's Department of Health and Human Services ("HHS") has sought to diminish protections from discrimination in health care because of a person's sex, gender identity, transgender status, sexual orientation, race, national origin, age, or disability.

3.      HHS has taken these actions notwithstanding and despite the decision of the Supreme Court of the United States on June 15, 2020 holding that discrimination on the basis of a person's transgender status or sexual orientation is discrimination on the basis of sex.  *See Bostock v. Clayton Cty., Ga.*, 590 U.S. ___, 2020 WL 3146686 (June 15, 2020).

4.      As of the filing of this Complaint, and in less than six months, approximately 2.25 million people in the United States have tested positive for COVID-19, resulting in approximately 120,000 deaths to date.[1]  The United States is facing a public health crisis. During these difficult times, Americans need the security and peace of mind that they will be able to access the health care they need and require.  The government should be doing everything within its capacity to protect and preserve the safe and effective delivery of health care to all patients regardless of their sex, gender identity, transgender status, sexual orientation, race,

---

[1] Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19): Cases in the U.S.*, https://perma.cc/38HG-JUBB (last visited June 21, 2020).

national origin, age, or disability.  Yet, HHS is doing exactly the opposite, adopting positions that fly in the face of its stated mission to "enhance and protect the health and well-being of all Americans by providing for effective health and human services."[2]

5.      Recognizing the paramount importance of providing people with prompt, effective, and nondiscriminatory access to health care, Congress has taken repeated and concerted efforts to improve access to health care and bar discrimination within the health care industry.

6.      Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116, specifically and explicitly protects against discrimination in the provision of health care services.  Section 1557 prohibits discrimination based on sex, race, color, national origin, age, and disability.

7.      In 2016, HHS promulgated a final rule, developed over the course of six years and two notice-and-comment periods, to implement the nondiscrimination requirements of Section 1557.  *See* Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376 (May 18, 2016) (formerly codified at 45 C.F.R. pt. 92) (the "2016 Final Rule").  Consistent with Section 1557's nondiscrimination mandate, the 2016 Final Rule made clear that health care providers and insurers may not discriminate against lesbian, gay, bisexual, transgender, and queer ("LGBTQ") people in making medical and coverage decisions.  Doing so constitutes discrimination on the basis of sex, which the 2016 Final Rule specifically defined to include discrimination on the basis of gender identity and sex stereotyping, among other criteria.

---

[2] U.S. Dep't of Health & Human Servs., *About HHS*, HHS.GOV, https://perma.cc/CY5N-RBPH.

A246

8.      The 2016 Final Rule also included specific guidance about how Section 1557's sex discrimination prohibition applies to transgender people, including access to and coverage of gender-affirming health services.

9.      In addition, the 2016 Final Rule confirmed, based on the plain statutory language of Section 1557, that all enforcement mechanisms available under the statutes listed in Section 1557 are available to any person regardless of the person's protected characteristic, establishing a unitary legal standard for all violations of the statute.  It also confirmed that Section 1557 prohibits not only intentional discrimination, but conduct and practices that have the effect of subjecting individuals to discrimination on the basis of their sex.

10.     Since the 2016 Final Rule went into effect, it has led to a dramatic decrease in discriminatory policies and practices.[3]

11.     Now, however, with next-to-no legal, medical, or reasoned policy foundation, and contrary to the opinions of professional medical and public health organizations,[4] HHS has issued a revised regulation under Section 1557 (the "Revised Rule") that rolls back the 2016 Final Rule and limits the protections for LGBTQ people, among others.  *See* Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg.

---

[3] *See, e.g.*, Sharita Gruberg and Frank J. Bewkes, *The ACA's LGBTQ Nondiscrimination Regulations Prove Crucial*, Center for American Progress (Mar. 7, 2018), https://perma.cc/CTP2-UMEJ.

[4] *See, e.g.*, Letter from James L. Madara, MD, Exec. Vice President/CEO, American Medical Association, to The Hon. Alex M. Azar II, Sec'y, U.S. Dep't Health & Hum. Servs. (Aug. 13, 2019), https://perma.cc/9N7N-JJ3G; Letter from Saul Levin, MD, MPA, FRCP-E, CEO & Med. Dir., American Psychiatric Association, to Sec'y Alex Azar II, U.S. Dep't Health & Hum. Servs. (Aug. 9, 2019), https://perma.cc/YUG9-E6SW; Letter from Katherine B. McGuire, Chief Advocacy Officer, American Psychological Association, to U.S. Dep't Health & Hum. Servs. (Aug. 13, 2019), https://perma.cc/LE65-6Q63.

A247

37,160 (June 19, 2020) (to be codified at 42 C.F.R. pts. 438, 440, & 460 and 45 C.F.R. pts. 86, 92, 147, 155, & 156).

12.     Although the Revised Rule cannot change the law, it is part of the Trump Administration's concerted and aggressive effort to undermine protections for LGBTQ people, including Section 1557's nondiscrimination protections and the regulatory structure and administrative processes the 2016 Final Rule established.  Multiple provisions in the Revised Rule threaten to confuse and mislead patients, health care providers, and insurers and will result in increased discrimination and substantial harm to precisely those vulnerable communities that Section 1557 is intended to protect, like LGBTQ people and their families.

13.     Relying on essentially one federal district court opinion, the Revised Rule arbitrarily and capriciously repeals entirely the 2016 Final Rule's definition of discrimination on the basis of sex, which specifically included discrimination based on gender identity and sex stereotyping, as well as related provisions prohibiting discrimination against transgender individuals.  The elimination of this definition not only invites health care insurers and providers to discriminate against LGBTQ people seeking health care, but it also introduces substantial confusion among health care providers and insurers regarding their legal obligations and the right of the populations they serve to be free from sex discrimination, particularly in light of the Supreme Court's decision in *Bostock* v. *Clayton County, Georgia*, 590 U.S. __, 2020 WL 3146686, which held that discrimination based on transgender status or sexual orientation "necessarily entails discrimination based on sex."  *Id.* at *11.

14.     The Revised Rule, which HHS publicly released three days prior to the Supreme Court's ruling in *Bostock*, recognizes that "a holding by the U.S. Supreme Court on the meaning of 'on the basis of sex' under Title VII will likely have ramifications for the definition of 'on the

A248

basis of sex' under Title IX," because "Title VII case law has often informed Title IX case law with respect to the meaning of discrimination 'on the basis of sex.'"  85 Fed. Reg. 37,168.  However, undeterred from their goal to foster discrimination against LGBTQ people, HHS published the Revised Rule, without any changes, four days after the Supreme Court's decision in *Bostock*.

15.    To be clear, *Bostock*'s holding that discrimination on the basis of sexual orientation or transgender status constitutes discrimination on the basis of sex forecloses HHS's attempts to deny the full protection of Section 1557 to LGBTQ individuals and patients in health care settings.

16.    The Revised Rule also eliminates the unitary legal standard for enforcement of violations of Section 1557, replacing it with a fractured approach that will complicate and make it more difficult to bring discrimination claims under Section 1557, particularly claims of intersectional discrimination.  The Revised Rule's elimination of the explicit recognition of private rights of action and the availability of compensatory damages under Section 1557 also will confuse the public and mislead individuals into not asserting their legal rights.

17.    In addition, the Revised Rule imports broad and sweeping exemptions for discrimination based on personal religious or moral beliefs from the identified statutes in Section 1557 *and* other statutes, including the Religious Freedom Restoration Act (42 U.S.C. § 2000bb *et seq*.), which Section 1557 does not reference.  These exemptions invite individual health care providers, health care entities, and insurers across the country to opt out of treating patients, including many transgender patients, if they believe doing so would compromise their faith.

18.    These exemptions will adversely affect health care providers that serve and treat the LGBTQ community and their LGBTQ patients because (1) their individual health care

5

employees may decline to serve patients based on religious objections, and (2) their ability to refer patients to other providers will be impaired, as the Revised Rule would invite discrimination against their LGBTQ patients.

19.     HHS's attempt to create new religious exemptions in Section 1557 is contrary to law and endangers patients' health in the name of advancing the religious beliefs of those who are entrusted with caring for them—a result sharply at odds with HHS's stated mission to "enhance and protect the health and well-being of all Americans" and to "provid[e] for effective health and human services."[5]

20.     The Revised Rule also arbitrarily and capriciously eliminates the requirement that covered entities post notices informing individuals about nondiscrimination requirements and their rights and also cuts back the safeguards that the 2016 Final Rule implemented for patients with Limited English Proficiency ("LEP"), weakening protections for LEP patients and depriving families and individuals of adequate care.

21.     In addition, the Revised Rule limits the scope of Section 1557, cutting back on the entities subject to Section 1557.  Despite the plain language of Section 1557, the Revised Rule excludes health programs and activities that HHS funds but are not established or administered under Title I of the ACA and health insurance plans outside of Title I of the ACA that do not receive Federal financial assistance.  Not only is this action inconsistent with Section 1557, it will cause drastic reductions in protections for LGBTQ people.

22.     The Revised Rule also amends a series of unrelated regulations issued under statutes other than Section 1557 by deleting references to sexual orientation and gender identity discrimination.  HHS does not have the authority to make these changes within the rulemaking

---

[5] U.S. Dep't of Health & Human Servs., *About HHS*, HHS.GOV, https://perma.cc/CY5N-RBPH.

A250

challenged, and these changes are not supported by any analysis or evidence.  The Revised Rule

is intended only to send a message that a person's LGBTQ identity is not recognized and

LGBTQ people can be subjected to discrimination.

23.     The Revised Rule's cost-benefit analysis is fatally flawed, incomplete, and

unreasonable.  Specifically, HHS fails to account for the increased costs to patients, insurers, and

the health care system at large stemming from discrimination against LGBTQ and other patients.

24.     The Revised Rule, if allowed to go into effect, will undermine the progress

achieved so far in eradicating health care discrimination against LGBTQ people in a broad array

of health care programs and entities by inviting health care insurers and providers once again to

discriminate against them, while also discouraging LGBTQ people from seeking health care in

the first instance.

25.     In adopting the Revised Rule, HHS acted arbitrarily and capriciously, in excess of

its statutory authority, and not in accordance with the law in violation of the Administrative

Procedure Act ("APA") (5 U.S.C. § 551 *et seq.*).  The Revised Rule also violates the Equal

Protection Guarantee and Due Process Clause of the Fifth Amendment, and the Free Speech and

Establishment Clauses of the First Amendment to the United States Constitution.

26.     The Revised Rule is causing and will continue to cause irreparable harm to

LGBTQ people and health care providers.  The Revised Rule should be declared unlawful,

enjoined, and vacated.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises

under the laws of the United States and United States Constitution; 28 U.S.C. § 1346, as a civil

action against the United States founded upon the Constitution, an Act of Congress, or an

A251

executive regulation; and 28 U.S.C. § 1361, as an action to compel an officer or agency to perform a duty owed to plaintiffs.

28.     Jurisdiction also is proper under the Administrative Procedure Act, 5 U.S.C. §§ 701-706.  Defendants' issuance of the Revised Rule on June 19, 2020, constitutes a final agency action that is subject to judicial review under 5 U.S.C. §§ 702, 704, and 706.

29.     An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

30.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (b)(2), & (e)(1) because at least one plaintiff resides in this judicial district, a substantial part of the events or omissions giving rise to this action occurred in this district, and each defendant is an agency of the United States or an officer of the United States sued in their official capacity.

## PARTIES

### A.     Plaintiffs

31.     Plaintiffs are two private health care facilities that provide health care services to LGBTQ people and many individuals and families with LEP (Whitman-Walker Clinic, Inc. d/b/a Whitman-Walker Health and the Los Angeles LGBT Center) ("private health care provider plaintiffs"); two organizations that provide a wide range of services to the LGBTQ community, including people and families with LEP (the TransLatin@ Coalition and Bradbury-Sullivan LGBT Community Center) ("LGBTQ-services plaintiffs"); two national associations of health professionals (American Association of Physicians for Human Rights d/b/a GLMA: Health Professionals Advancing LGBTQ Equality and AGLP: The Association of LGBTQ Psychiatrists) ("health professional association plaintiffs"); and three individual physicians and

8

A252

one behavioral health provider who work for the private health care provider plaintiffs

("individual provider plaintiffs").

32.    The private health care provider plaintiffs (Whitman-Walker Health and the Los

Angeles LGBT Center) and the individual provider plaintiffs assert claims on their own behalf

and also on behalf of their patients and recipients of services, who face barriers to asserting their

own claims and protecting their own interests.

33.    The LGBTQ-services plaintiffs (the TransLatin@ Coalition and the Bradbury-

Sullivan LGBT Community Center) assert claims on their own behalf and also on behalf of the

recipients of their services who face barriers to asserting their own claims and protecting their

own interests.

34.    The TransLatin@ Coalition also asserts claims on behalf of its transgender and

gender nonconforming members, including members who are leaders of affiliated community

organizations serving Latinx transgender and gender nonconforming people.

35.    The health professional association plaintiffs (GLMA and AGLP) assert claims on

their own behalf and on behalf of their members and also on behalf of the LGBTQ patients

whose interests they represent and the patients whom their members treat who face barriers to

asserting their own claims and protecting their own interests.

36.    Plaintiffs assert different but complementary interests and share the common

objective of maintaining an effective, functioning health care system that protects patients'

dignity and their rights to access health services.  Plaintiffs also support providing informed

access to comprehensive, medically appropriate care to LGBTQ patients, including gender-

affirming care for transgender persons, without discrimination based on a patient's sex, gender

A253

identity, transgender status, or sexual orientation and in accordance with medical and ethical

standards of care.

37.     Plaintiff **Whitman-Walker Clinic, Inc. d/b/a Whitman-Walker Health**, a

Federally Qualified Health Center located in Washington, D.C., has a special mission to serve

the LGBTQ community and persons living with HIV of every sexual orientation and gender.

More than 280 medical, behavioral health and dental professionals, lawyers and paralegals,

support staff and administrators provide a range of services, including medical and community

health care, transgender care and services, behavioral-health services, dental-health services,

legal services, insurance-navigation services, and youth and family support.  In 2019, Whitman-

Walker provided health care services to 20,760 individuals.  More than 10% of those individuals

identified as transgender or gender nonconforming.  Almost 45% of health care patients – and

60% of those who provided information on their sexual orientation – identified as lesbian, gay,

bisexual, or otherwise non-heterosexual.  More than 9% of patients had limited English

proficiency.  Whitman-Walker receives various forms of federal funding from HHS and from

institutions affiliated with or funded by HHS, including but not limited to funds under the Public

Health Services Act ("PHSA"), direct grants, funding under the Ryan White Comprehensive

AIDS Resources Emergency Act of 1990, 42 U.S.C. § 300ff *et seq.* ("Ryan White funding"),

funds under the 340B Drug Discount Program, and research grants from the Centers for Disease

Control and Prevention and the National Institutes of Health, and Medicaid and Medicare

reimbursements.  Whitman-Walker also receives funds from the Health Resources and Service

Administration ("HRSA") and is a Federally Qualified Heath Center.  In 2019, Whitman-

Walker's federally funded research contracts and grants totaled more than $7 million.  Whitman-

Walker is subject to Section 1557 of the ACA and the Revised Rule.

A254

38.     Plaintiff **Dr. Sarah Henn** is the Chief Health Officer of Whitman-Walker.  Dr. Henn oversees all health care-related services at Whitman-Walker and maintains a panel of patients for whom she provides direct care.  Whitman-Walker's patient population, including patients to whom Dr. Henn provides direct care and whose care she oversees, includes many patients who have experienced refusals of health care or who have been subjected to disapproval, disrespect, or hostility from medical providers outside of Whitman-Walker because of their actual or perceived sexual orientation, gender identity, or transgender status.  Many of Dr. Henn's patients and those whose care she oversees are, therefore, apprehensive or fearful of encountering stigma and discrimination in health care settings because of their past experiences.  Such experiences will increase as a result of the Revised Rule.  In addition to overseeing medical care of patients and working with her own patients, Dr. Henn oversees Whitman-Walker's Research Department and is personally involved in a number of clinical research projects, including as the Leader of Whitman-Walker's Clinical Research Site for the AIDS Clinical Trials Group funded by the National Institutes of Health.

39.     Plaintiff **Dr. Randy Pumphrey** is Senior Director of Behavioral Health at Whitman-Walker.  As Senior Director of Behavioral Health, Dr. Pumphrey oversees Whitman-Walker's portfolio of mental-health services and substance-use-disorder-treatment services and maintains a panel of patients for whom he provides direct behavioral health care.  In 2019, Whitman-Walker provided mental-health or substance-use-disorder-treatment services to more than 1,800 patients, many of whom identify as LGBT or are living with HIV.   Many, if not most, of the patients to whom Dr. Pumphrey provides direct care and whose behavioral health care he oversees face considerable stigma and discrimination as people living with HIV, sexual or gender minorities, or people of color.  They have experienced difficulty finding therapists or

11

other mental-health or substance-use-disorder professionals who are understanding and welcoming of their sexual orientation, gender identity, or transgender status.  These experiences of discrimination will increase as a result of the Revised Rule.

40.      Plaintiff **The TransLatin@ Coalition** is a nationwide 501(c)(3) nonprofit membership organization that advocates for the interests of transgender and gender nonconforming individuals, particularly Latinx people, and provides direct services to the transgender community, including leadership development, educational services, and employment services.  The TransLatin@ Coalition currently has a presence in Los Angeles, California; Washington, D.C.; Chicago, Illinois; New York, New York; Atlanta, Georgia; Houston, Texas; and Tucson, Arizona.  The TransLatin@ Coalition has thousands of individual members across the United States, including transgender and gender nonconforming Latinx individuals who have experienced or fear discrimination based on their sex, transgender status, national origin, or LEP status in health care.  This includes individual transgender and gender nonconforming Latinx members like Bamby Salcedo, who resides in California, and Arianna Lint, who resides in Florida.  Ms. Salcedo and Ms. Lint have experienced discrimination in health care because of their transgender status and fear the Revised Rule will make it more likely they will encounter discrimination in health care again.  The TransLatin@ Coalition's membership also includes leaders of affiliated community organizations that serve Latinx transgender and gender nonconforming people across the country, such as Arianna's Center headquartered in Florida and with offices in Puerto Rico, Community Estrella in Georgia, and the Fundación Latinoamericana de Accion Social (FLAS) in Texas.  The Coalition and its members advocate for policy changes at the local, state, and federal levels, and conducts research regarding homelessness, health and health care, and employment in the transgender Latinx

12

A256

community.  Through its Center for Violence Prevention & Transgender Wellness, the Coalition

also provides direct services to transgender, gender nonconforming, and intersex people in the

City of Los Angeles.  Many of the members of the Coalition and the individuals they and the

Coalition serve are immigrants, some living with HIV/AIDS.  The Coalition and its members

serve many communities in which English is not the primary language spoken and a number of

individuals in these communities are not fluent in English.

     41.    Plaintiff **Los Angeles LGBT Center** is located in Los Angeles, California.  Its

mission is to build a world in which LGBT people thrive as healthy, equal, and complete

members of society.  The LA LGBT Center offers programs, services, and advocacy spanning

four broad categories: health, social services and housing, culture and education, and leadership

and advocacy.  The LA LGBT Center has more than 750 employees and provides services to

more LGBT people than any other organization in the world, with about 500,000 client visits per

year, including LEP patients.  LA LGBT Center receives funds under the PHSA.  Approximately

80% of the LA LGBT Center's funding originates from the federal government, including but

not limited to Ryan White funding; direct funding from the Centers for Disease Control and

Prevention; discounts under the 340B Drug Discount Program; grants under section 330 of the

PHSA; grants from HRSA's Bureau of Primary Health Care under which the LA LGBT Center

is a Federally Qualified Health Center; and Medicaid and Medicare reimbursements.  The LA

LGBT Center is an entity subject to Section 1557 of the ACA and the Revised Rule.

     42.    Plaintiff **Dr. Robert Bolan** is the Chief Medical Officer of the LA LGBT Center.

He oversees the delivery of health care for over 20,000 patients who come to the LA LGBT

Center and personally treats approximately 300 patients.  More than 90% of these patients

identify as LGBT, many of them coming from different areas of California and other States to

A257

obtain services in a safe and affirming environment.  Dr. Bolan also oversees the LA LGBT

Center's Research Department.  Dr. Bolan and the providers he supervises treat patients who

identify as transgender and who require gender-affirming treatment, including medically

necessary health care for gender dysphoria.  Many of Dr. Bolan's patients and many of the

patients of the providers he supervises at the LA LGBT Center already have experienced

traumatic and discriminatory denials of health care based on their sexual orientation, gender

identity, transgender status, or HIV status at the hands of providers outside the LA LGBT Center,

including by health care providers who have expressed religious or moral objections to treating

them.  These experiences will increase as a result of the Revised Rule.

      43.     Plaintiff **Dr. Ward Carpenter** is the Co-Director of Health Services at the LA

LGBT Center.  Dr. Carpenter is a nationally recognized expert in the field of transgender

medicine.  In his role as Co-Director of Health Services, Dr. Carpenter oversees the healthcare of

more than 25,000 patients who come to the LA LGBT Center and personally treats 150 patients.

All of Dr. Carpenter's patients identify within the LGBT community and approximately 30% are

people living with HIV.  These patients come from different areas of California and other States

to obtain services in a safe and affirming environment.  Dr. Carpenter's patient population is

disproportionately low-income and experiences high rates of chronic medical conditions,

homelessness, unstable housing, and extensive trauma history.  In addition, many of Dr.

Carpenter's patients, as well as the patients of the other medical providers he supervises at the

Center, already have experienced traumatic and discriminatory denials of healthcare based on

their sexual orientation, gender identity, transgender status, or HIV status at the hands of

providers outside the LA LGBT Center, including by healthcare providers who have expressed

A258

religious or moral objections to treating them.  These experiences will increase as a result of the
Revised Rule.

44.     Plaintiff **Bradbury-Sullivan LGBT Community Center** is a 501(c)(3) nonprofit
organization based in Allentown, Pennsylvania, and incorporated in Pennsylvania.  It is
dedicated to securing the health and well-being of LGBTQ people of the Greater Lehigh Valley.
It provides a variety of programs and services for the LGBTQ community, including HIV/STI
testing, health care-enrollment events, health promotion programs for LGBTQ adults and youth,
support groups, and a free legal clinic.  Bradbury-Sullivan Center also provides referrals to
LGBT-welcoming health care providers.  Patrons of Bradbury-Sullivan Center often seek health
care services from other health care organizations, including religiously affiliated organizations.
Bradbury-Sullivan Center works with patrons who have experienced discriminatory treatment
when seeking health care services from such organizations, and it advocates on behalf of those
patrons by providing referrals to LGBT-welcoming agencies and providers, training agencies to
provide LGBT-welcoming services, and, when necessary, communicating with agencies to
inform them of their legal obligations to serve LGBT people.  Bradbury-Sullivan Center also
conducts research documenting health disparities in the LGBT community and performs related
community-education efforts to improve public health within the LGBT community.  Bradbury-
Sullivan Center receives pass-through funding from HHS through the Assistance Programs for
Chronic Disease Prevention and Control, State Public Health Approaches to Ensuring Quitline
Capacity funded in part by Prevention and Public Health Fund, State Physical Activity and
Nutrition, Injury Prevention and Control Research and State and Community Based Programs,
National State-Based Tobacco Control Programs, Maternal and Child Health Services Block
Grant, and in the past also has received Ryan White funding.

A259

45.     Plaintiff **American Association of Physicians For Human Rights, Inc. d/b/a**

**GLMA: Health Professionals Advancing LGBTQ Equality** (formerly known as the Gay &

Lesbian Medical Association) is a 501(c)(3) nonprofit membership organization based in

Washington, D.C. and incorporated in California.  GLMA is a national organization committed

to ensuring health equity for lesbian, gay, bisexual, transgender, queer, and all sexual and gender

minority individuals, and equality for health professionals in such communities in their work and

learning environments.  To achieve this mission, GLMA utilizes the scientific expertise of its

diverse multidisciplinary membership to inform and drive advocacy, education, and research.

GLMA works with professional accreditation bodies and health professional associations on

standards, guidelines, and policies that address LGBTQ health and protect individual patient

health and public health in general.  GLMA also represents the interests of hundreds of

thousands of LGBTQ health professionals and millions of LGBTQ patients and families across

the United States.  GLMA's membership includes approximately 1,000 member physicians,

nurses, advanced practice nurses, physician assistants, researchers and academics, behavioral

health specialists, health-profession students, and other health professionals throughout the

country.  Their practices represent the major health care disciplines and a wide range of health

specialties, including primary care, internal medicine, family practice, psychiatry, pediatrics,

obstetrics/gynecology, emergency medicine, neurology, and infectious diseases.

46.     Plaintiff **AGLP: The Association of LGBTQ Psychiatrists** is a 501(c)(3)

nonprofit membership organization based in Philadelphia, Pennsylvania.  AGLP is a national

organization of 450 LGBTQ+ psychiatrists that educates and advocates on LGBTQ mental-

health issues.  It is the oldest association of LGBTQ+ professionals in the country.  AGLP

represents the interests of its members, LGBTQ+ patients, and the patients whom AGLP

A260

members treat in working to influence policies relevant to the LGBTQ+ community and

advocating for its members' patients.  AGLP's goals are to foster a fuller understanding of

LGBTQ+ mental-health issues; research and advocate for the best mental healthcare for the

LGBTQ community; develop resources to promote LGBTQ mental health; create a welcoming,

safe, nurturing, and accepting environment for members; and provide valuable and accessible

services to our members.  AGLP also assists medical students and residents in their professional

development; encourages and facilitates the presentation of programs and publications relevant

to LGBTQ concerns at professional meetings; and serves as liaison with other minority and

advocacy groups within the psychiatric community.  Some of the institutions in which AGLP's

members work receive various forms of federal funding directly or indirectly via federal

programs.  AGLP's members therefore are subject to Section 1557 of the ACA and the Revised

Rule.

   **B.**  **Defendants**

  47.  Defendant **United States Department of Health and Human Services** is a

cabinet department of the federal government, headquartered in the District of Columbia.  HHS

promulgated the Revised Rule and is responsible for its enforcement.  HHS is an "agency"

within the meaning of the APA. 5 U.S.C. § 551(1).

  48.  Defendant **Alex M. Azar, II** is the Secretary of HHS.  He is sued in his official

capacity.  Secretary Azar is responsible for all aspects of the operation and management of HHS,

including the adoption, administration, and enforcement of the Revised Rule, and with

implementing and fulfilling HHS's duties under the United States Constitution and the APA.

  49.  Defendant **Roger Severino** is the Director of the Office of Civil Rights ("OCR")

at HHS.  He is sued in his official capacity.  Director Severino is responsible for all aspects of

the operation and management of OCR, including the adoption, administration, and enforcement

A261

of the Revised Rule.  As an HHS law enforcement agency, OCR is supposed to ensure equal

access to health and human services by enforcing civil rights laws such as Section 1557.

50.     Defendant **Seema Verma** is the Administrator for the Centers for Medicare and

Medicaid Services ("CMS"), a component of HHS.  She is sued in her official capacity.

Administrator Verma is responsible for all aspects of the operation and management of CMS,

including the adoption, administration, and enforcement of the Revised Rule as it pertains to

regulations relating to the establishment and operation of ACA exchanges; in the marketing and

design practices of health insurance issuers under the ACA; in the administration, marketing, and

enrollment practices of Qualified Health Plans ("QHPs") under the ACA; in beneficiary

enrollment and the promotion and delivery of services under Medicaid; and in the delivery of

services under the Programs for All-Inclusive Care for the Elderly ("PACE").

**FACTUAL ALLEGATIONS**

I.      **Discrimination Against Transgender People Prior to the Affordable Care Act**

51.     Before the Affordable Care Act was enacted in 2010 during the Obama

Administration, HHS documented many forms of discrimination against transgender people in

accessing health care services, insurance coverage, and facilities.

52.     The administrative record documents and demonstrates that, prior to the

enactment of the ACA, transgender people experienced significant discrimination from entities

providing health care, even for routine medical care.  HHS reported that "[f]or transgender

individuals, a major barrier to receiving care is a concern over being refused medical treatment

based on bias against them."  81 Fed. Reg. 31,376, 31,460.  For example, "[i]n a 2010 report,

26.7% of transgender respondents reported that they were refused needed health care.  A 2011

survey revealed that 25% of transgender individuals reported being subject to harassment in

medical settings."  *Id*.

18

53.     Some entities providing insurance or health care discriminated against transgender patients by refusing to cover medically necessary treatments for gender dysphoria in accordance with accepted standards of care.  Gender dysphoria is a serious medical condition codified in the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) and International Classification of Diseases (ICD-11).  The criteria for diagnosing gender dysphoria are set forth in the DSM-V (302.85).  The World Professional Association for Transgender Health ("WPATH") publishes widely accepted standards of care for treating gender dysphoria. Leading medical organizations and federal courts have recognized the WPATH Standards of Care as the authoritative standards of care.  The overwhelming consensus among medical experts and every major medical organization is that treatments for gender dysphoria, including surgical procedures, are effective, safe, and medically necessary when clinically indicated to alleviate gender dysphoria.

54.     Prior to the enactment of the ACA, however, insurance companies routinely excluded coverage for transition-related care based on the misguided assumption that such treatments were cosmetic and experimental.  Today, medical consensus recognizes that such exclusions have no basis in medical science.[6]

55.     Those discriminatory exclusions prevented transgender people from obtaining medically necessary treatment for gender dysphoria.  *See* 81 Fed. Reg. at 31,460.  As a result, transgender people were more likely to lack health insurance and suffer significant health disparities, including high rates of untreated mental health needs, suicide attempts, and HIV.  *Id.*

---

[6] *See* Decision No. 2576, National Coverage Determination 140.3: Transsexual Surgery at 18 (Docket No. A-13-87) (U.S. Dep't of Health & Human Servs. Appeals Bd. App. Div. 2014), https://perma.cc/3BGA-F9DH.

A263

II.     **Section 1557 of the Affordable Care Act**

56.     On March 23, 2010, Congress enacted the Patient Protection and Affordable Care

Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010), recognizing the importance of

providing patients with prompt and nondiscriminatory access to medical care and to information

about all treatment options.

57.     Section 1554 of the ACA provides:

> Notwithstanding any other provision of this Act, the Secretary of
> Health and Human Services shall not promulgate any regulation
> that—
>
>> (1)   creates any unreasonable barriers to the ability of
>> individuals to obtain appropriate medical care;
>>
>> (2)  impedes timely access to healthcare services;
>>
>> (3) interferes with communications regarding a full range of
>> treatment options between the patient and the provider;
>>
>> (4) restricts the ability of healthcare providers to provide full
>> disclosure of all relevant information to patients making
>> healthcare decisions;
>>
>> (5)   violates the principles of informed consent and the
>> ethical standards of healthcare professionals; or
>>
>> (6)  limits the availability of healthcare treatment for the full
>> duration of a patient's medical needs.

42 U.S.C. § 18114.

58.     Section 1557 of the ACA protects against discrimination in the provision of health

care services.  It provides, in relevant part:

> Except as otherwise provided for in this title [I] (or an amendment
> made by this title), an individual shall not, on the ground prohibited
> under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et
> seq.), title IX of the Education Amendments of 1972 (20 U.S.C.
> 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101
> et seq.), or section 794 of Title 29 [Section 504 of the Rehabilitation
> Act of 1973], be excluded from participation in, be denied the

20

> benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title [I] (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection.

42 U.S.C. § 18116(a).

59.    Section 1557 prohibits discrimination based on sex, including discrimination based on a patient's gender identity, transgender status, sexual orientation, and failure to conform to sex stereotypes, all of which are forms of sex discrimination.  It also prohibits discrimination on the basis of race, color, national origin, age, and disability.

60.    Section 1557 provides that "[t]he enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection."  *Id.* § 18116(a).

61.    Section 1557 further provides that the Secretary of HHS "may promulgate regulations to implement this section."  *Id.* § 18116(c).

62.    The ACA covers nearly every health care provider in the country.

**III.    The 2016 Final Rule**

63.    On May 18, 2016, HHS published a final rule implementing Section 1557.  *See* Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376 (May 18, 2016) (formerly codified at 45 C.F.R. pt. 92) (the "2016 Final Rule").  A copy of the 2016 Final Rule is attached as **Exhibit 1**.

64.    In implementing Section 1557's prohibition of discrimination "on the basis of . . . sex," the 2016 Final Rule defined "on the basis of sex" to include "discrimination on the basis of

21

. . . sex stereotyping, and gender identity."  81 Fed. Reg. at 31,467 (formerly codified at 45

C.F.R. § 92.4).[7]

65.     The 2016 Final Rule defined "gender identity" as "an individual's internal sense

of gender, which may be male, female, neither, or a combination of male and female, and which

may be different from an individual's sex assigned at birth."  *Id.*  In the 2016 Final Rule, HHS

emphasized that "even where it is permissible to make sex-based distinctions, individuals may

not be excluded from health programs and activities for which they are otherwise eligible based

on their gender identity."  81 Fed. Reg. at 31,409.

66.     The 2016 Final Rule defined "sex stereotypes" as

> stereotypical notions of masculinity or femininity, including
> expectations of how individuals represent or communicate their
> gender to others, such as behavior, clothing, hairstyles, activities,
> voice, mannerisms, or body characteristics.  These stereotypes can
> include the expectation that individuals will consistently identify
> with only one gender and that they will act in conformity with the
> gender-related expressions stereotypically associated with that
> gender.  Sex stereotypes also include gendered expectations related
> to the appropriate roles of a certain sex.

81 Fed. Reg. at 31,468 (formerly codified at 45 C.F.R. § 92.4).

67.     In defining "on the basis of sex" to include "discrimination on the basis of . . . sex

stereotyping, and gender identity," HHS explained that "courts, including in the context of

Section 1557, have recognized that sex discrimination includes discrimination based on gender

---

[7] Although OCR stated in 2016 "that current law is mixed on whether existing Federal
nondiscrimination laws prohibit discrimination on the basis of sexual orientation as a part of their
prohibitions on sex discrimination," 81 Fed. Reg. at 31388, the Supreme Court now has
definitively answered this question by holding in *Bostock* that "it is impossible to discriminate
against a person for being homosexual or transgender without discriminating against that
individual based on sex."  2020 WL 3146686, at *7.

A266

identity.  Thus, we proposed to adopt formally this well-accepted interpretation of discrimination

'on the basis of sex.'"  81 Fed. Reg. at 31,387-88.

68.     The 2016 Final Rule also prohibited discrimination based on association – that is,

it prohibited discrimination against a person on the basis of the sex, race, color, national origin,

age, or disability of "an individual with whom the individual or entity is known or believed to

have a relationship or association."  81 Fed. Reg. at 31,472 (formerly codified at 92 C.F.R.

§ 209).  HHS explained that a "prohibition on associational discrimination is consistent with

longstanding interpretations of existing antidiscrimination laws, whether the basis of

discrimination is a characteristic of the harmed individual or an individual who is associated with

the harmed individual."  81 Fed. Reg. at 31,439.  It also is consistent with the Age

Discrimination Act, which includes a specific prohibition of discrimination based on association

with an individual with a disability.  *Id.*; *see also* 42 U.S.C. § 12182(b)(1)(E); 28 C.F.R.

§ 35.130(g).

69.     The 2016 Final Rule also recognized that Section 1557 not only prohibits

intentional discrimination on the basis of sex, it also prohibits conduct and practices "that *have*

*the effect of subjecting individuals to discrimination* on the basis of sex," which can give rise to

disparate impact claims.  81 Fed. Reg. at 31,470 (formerly codified at 45 C.F.R.

§ 92.101(b)(3)(ii)) (emphasis added).

70.     The 2016 Final Rule applied to "every health program or activity, any part of

which receives Federal financial assistance provided or made available by the Department; every

health program or activity administered by the Department; and every health program or activity

administered by a Title I entity."  81 Fed. Reg. at 31,466 (formerly codified at 45 C.F.R.

A267

§ 92.2(a)).  HHS estimated that the rule would "likely cover almost all licensed physicians because they accept Federal financial assistance."  81 Fed. Reg. at 31,445.

71.    With respect to health care insurance providers or employee benefits plans, the 2016 Final Rule specifically required covered entities to treat individuals consistent with their gender identity.  *See* 81 Fed. Reg. at 31,471 (formerly codified at 45 C.F.R. § 92.206).  And it prohibited covered entities from having or implementing "a categorical coverage exclusion or limitation for all health care services related to gender transition," 81 Fed. Reg. at 31,472 (formerly codified at 45 C.F.R. § 92.207(b)(4)), because such an exclusion is "discriminatory on its face," 81 Fed. Reg. at 31,456.  In adopting these provisions, HHS explained that blanket "exclusions of coverage for all care related to gender dysphoria or associated with gender transition" were "outdated and not based on current standards of care."  81 Fed. Reg. at 31,429.

72.    The "range of transition-related services" the 2016 Final Rule contemplated were "not limited to surgical treatments and may include, but [were] not limited to, services such as hormone therapy and psychotherapy, which may occur over the lifetime of the individual."  81 Fed. Reg. at 31,435-36.

73.    Consistent with the plain language of Section 1557, which provides that the "enforcement mechanisms provided for and available under such title VI, title IX, section 794, *or* such Age Discrimination Act shall apply for purposes of violations" of Section 1557, 42 U.S.C. § 18116(a) (emphasis added), the 2016 Final Rule adopted a unitary legal standard for addressing discrimination in health care and enforcing Section 1157.  The 2016 Final Rule provided:  "The enforcement mechanisms available for and provided under Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, *or* the Age Discrimination Act of 1975 shall apply for purposes of

24

Section 1557 as implemented by this part."  81 Fed. Reg. at 31,472 (formerly codified at 45

C.F.R. § 92.301) (emphasis added).

74.     In the preamble to the 2016 Final Rule, HHS clarified that *all* enforcement

mechanisms available under the statutes listed in Section 1557 are available for purposes of

Section 1557 enforcement, regardless of an individual's protected characteristic or

characteristics.  Otherwise, different enforcement mechanisms and standards would apply

depending on whether an individual's claim is based on her sex, race, age, or disability.  81 Fed.

Reg. at 31,439-40.  HHS thus interpreted Section 1557 as "authorizing a private right of action

for claims of disparate impact discrimination on the basis of any of the criteria enumerated in the

legislation."  *Id.* at 31,440.

75.     The 2016 Final Rule also specifically recognized that a private right of action is

available under Section 1557 and compensatory damages are available.  *See* 81 Fed. Reg. at

31,472 (formerly codified at 45 C.F.R. §§ 92.301(b), 92.302(d)).  HHS explained that its

"interpretation of Section 1557 as authorizing compensatory damages is consistent with our

interpretations of Title VI, Section 504, and Title IX."  81 Fed. Reg. at 31,440.

76.     The 2016 Final Rule did not incorporate Title IX's blanket religious exemption

because Section 1557 "contains no religious exemption."  81 Fed. Reg. at 31,380.  In declining

to import Title IX's religious exemption, HHS further explained that "Title IX and its exemption

are limited in scope to educational institutions, and there are significant differences between the

educational and health care contexts that warrant different approaches."  *Id.*  HHS noted that "a

blanket religious exemption could result in a denial or delay in the provision of health care to

individuals and in discouraging individuals from seeking necessary care, with serious and, in

some cases, life threatening results."  *Id.*

25

77.     After a careful and deliberate analysis, HHS determined that a "more nuanced

approach in the health care context" was warranted.  *Id*.  The 2016 Final Rule provided:  "Insofar

as the application of any requirement under this part would violate applicable Federal statutory

protections for religious freedom and conscience, such application shall not be required."  81

Fed. Reg. at 31,466 (formerly codified at 45 C.F.R. § 92.2(b)(2)).

78.     The 2016 Final Rule also included provisions to ensure that the approximately 25

million Americans who are Limited English Proficient (LEP)[8] have access to the health care they

need.  The 2016 Final Rule required health care providers and other covered entities to post

nondiscrimination notices and include taglines in the top 15 languages spoken throughout the

state with all significant publications and communications.  *See* 81 Fed. Reg. at 31,469 (formerly

codified at 45 C.F.R. § 92.8).

79.     The 2016 Final Rule also included standards that governed access to language

assistance services for LEP individuals by requiring that language interpreters be "qualified" and

that when covered entities video interpretation services to LEP individuals, it be real-time and

high quality.  *See* 81 Fed. Reg. at 31,470-71 (formerly codified at 45 C.F.R. § 92.201).

80.     The promulgation of the 2016 Final Rule led to a decrease in discriminatory

policies and practices.[9]  For example, a recent study of 37 states in the federal marketplace

---

[8] U.S. Census Bureau, *Language Spoken at Home*, American Community Survey 2018 1-Year
Estimates Subject Tables, tbl. S1601 (2018), https://perma.cc/Z452-RSWR; U.S. Census Bureau,
Characteristics of People by Language Spoken at Home, American Community Survey 2018 1-
Year Estimates Subject Tables, tbl. S1603, https://perma.cc/R59J-HG4K.

[9] *See* Gruberg & Bewkes, *The ACA's LGBTQ Nondiscrimination Regulations Prove Crucial*,
https://perma.cc/CTP2-UMEJ.

A270

showed that, in 2019, 97% of plans did not contain blanket exclusions of transition-related care.[10]

## IV.    The Trump Administration's Proposed Revision to the 2016 Final Rule

81.    On June 14, 2019, the Trump Administration issued a Notice of Proposed Rulemaking, proposing to "make substantial revisions" to the 2016 Final Rule, including repealing certain provisions.  *See* Notice of Proposed Rulemaking, *Nondiscrimination in Health and Health Education Programs or Activities*, 84 Fed. Reg. 27,846, 27,848 (June 14, 2019) ("Proposed Rule").

82.    In an attempt to explain why it was reversing course merely three years after the 2016 Final Rule went into effect, HHS stated it was revising the implementing regulations "to better comply with the mandates of Congress, address legal concerns, relieve billions of dollars in undue regulatory burdens, further substantive compliance, reduce confusion, and clarify the scope of Section 1557 in keeping with existing civil rights statutes and regulations prohibiting discrimination on the basis of race, color, national origin, sex, age, and disability."  84 Fed. Reg. at 27,846.

83.    HHS further claimed that the 2016 Final Rule "exceeded its authority under Section 1557, adopted erroneous and inconsistent interpretations of civil rights law, caused confusion, and imposed unjustified and unnecessary costs."  *Id.* at 27,849.

84.    These purported justifications do not withstand scrutiny.

85.    HHS received nearly 200,000 comments during the public comment period.  The comments that HHS received identified and expressed concerns about many of HHS's proposed

---

[10] Out2Enroll, *Summary of Findings: 2020 Marketplace Plan Compliance with Section 1557*, https://perma.cc/WU25-C9BN.  This finding is consistent with summaries from 2017, 2018, and 2019.

A271

revisions, including many of the same issues that form the basis of this complaint.  Commenters
emphasized that the following actions, taken individually or combined, will cause immediate and
irreparable harm to LGBTQ people and their families:

a.      Eliminating the definition of "on the basis of sex" and the specific
        prohibition on discrimination on the basis of gender identity and sex
        stereotyping is arbitrary and capricious, not the result of reasoned
        decision-making, contrary to law, and invites covered health care
        providers and insurers to discriminate against transgender people;

b.      Eliminating a unitary legal standard for enforcing violations of Section
        1557 and replacing it with a fractured and complex set of procedures is
        contrary to the plain language of Section 1557 and Congress's intent, and
        will complicate and make it more difficult to bring discrimination claims,
        particularly claims of intersectional discrimination;

c.      Incorporating sweeping religious exemptions is contrary to the statutory
        language of Section 1557 and will create significant burdens on patients
        and providers;

d.      Eliminating notice requirements and critical language access provisions
        that ensure LEP individuals can access necessary health care is arbitrary
        and capricious, contrary to statutory intent, and will make it more difficult
        for LEP patients to understand their health care rights, communicate with
        doctors and other health care workers, and navigate complex insurance
        and medical documents with specialized terminology, and cause an
        increase in patients who will delay or not seek care at all;

A272

     e.     Excluding from Section 1557 health programs and activities that HHS

          administers but are not established under Title I of the ACA and health

          insurance plans outside of Title I of the ACA that do not receive Federal

          financial assistance is inconsistent with Section 1557 and will cause

          drastic reductions in protections for LGBTQ people;

     f.     Eliminating gender identity and sexual orientation protections in unrelated

          regulations is procedurally improper, arbitrary and capricious, and

          contrary to law; and

     g.     Eliminating protections relating to discrimination on the basis of

          association is arbitrary and capricious and contrary to law.

**V.**     **The Revised Rule**

     86.     Despite the significant concerns raised during the comment period, HHS

published the Revised Rule in the Federal Register on June 19, 2020, making only "minor and

primarily technical corrections." *See* Nondiscrimination in Health and Health Education

Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37,160, 37,161 (June 19, 2020). A

copy of the Revised Rule is attached as **Exhibit 2** and incorporated by reference.

     87.     In adopting the Revised Rule, HHS failed to address adequately many of the

serious issues commenters raised, including concerns that the proposed elimination of the

definition of "on the basis of sex," which the 2016 Final Rule defined to include gender identity

and sex stereotyping, would invite discrimination against LGBTQ people. *See* 85 Fed. Reg. at

37,165, 37,180.

     88.     Relying essentially on one federal district court opinion—*Franciscan Alliance,*

*Inc.* v. *Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016)—which the preamble cites more than 40

times, HHS takes the position that "the ordinary public meaning of the term 'sex' in Title IX is

A273

unambiguous" and refers to a "biological binary meaning of sex," 85 Fed. Reg. at 37,178-80, and

discrimination on the basis of sex under Title IX does not encompass discrimination on the basis

of gender identity or sex stereotyping, 85 Fed. Reg. at 37,183-86.

89.     HHS explicitly rejected comments urging it to wait until the Supreme Court

decided *Bostock* and related cases because of the potential implications for the Revised Rule.

*See* 85 Fed. Reg. at 37,168.  Despite acknowledging that "a holding by the U.S. Supreme Court

on the meaning of 'on the basis of sex' under Title VII will likely have ramifications for the

definition of 'on the basis of sex' under Title IX," because "Title VII case law has often

informed Title IX case law with respect to the meaning of discrimination 'on the basis of sex,'"

*id.*, HHS stated it was sticking with the position the federal government had taken in *Bostock* and

related cases that "discrimination 'on the basis of sex' in Title VII and Title IX does not

encompass discrimination on the basis of sexual orientation or gender identity," *id.*

90.     HHS further asserted that even if the Supreme Court determined that the

prohibition on sex discrimination in Title VII encompassed gender identity and sexual

orientation, such a ruling may not fully address the implications for the health care context.  85

Fed. Reg. at 37,168.

91.     Among other revisions, the Revised Rule:

    a.     Repeals the definition of "on the basis of sex" and the specific prohibition

        of discrimination on the basis of gender identity and sex stereotyping, *see*

        85 Fed. Reg. at 37,161-62;

    b.     Repeals the unitary legal standard for enforcing violations of Section 1557

        and eliminates provisions recognizing a private right of action and

        compensatory damages, *see* 85 Fed. Reg. at 37,162;

30

c.      Incorporates sweeping religious exemptions, *see id.*;

d.      Repeals notice requirements and access to language provisions, *see id.*;

e.      Excludes from the scope of Section 1557 certain health programs and activities and health insurance plans, *see id.*;

f.      Repeals gender identity and sexual orientation protections in unrelated regulations, *see id.*; and

g.      Repeals provisions relating to discrimination on the basis of association, *see id*.

92.      These changes are arbitrary and capricious, not the process of reasoned decision-making, contrary to the statutory language and Congress's intent, not in accordance with law, in excess of HHS's statutory authority, and unconstitutional.

**VI.   HHS's Repeal of the Definition of "On the Basis of Sex" and Protections Against Discrimination on the Basis of Gender Identity and Sex Stereotyping Is Arbitrary and Capricious and Contrary to Law**

93.      Section 1557 prohibits sex discrimination.  In line with that prohibition, the 2016 Final Rule included a definition of "on the basis of sex" that explicitly prohibited discrimination on the basis of gender identity and sex stereotyping, among other grounds.  *See* 81 Fed. Reg. at 31,467 (formerly codified at 45 C.F.R. § 92.4).

94.      The Revised Rule repeals entirely the 2016 Final Rule's definition of discrimination "on the basis of sex," without providing a different definition.  Although HHS's Notice of Proposed Rulemaking stated HHS was declining to define the term because "of the likelihood that the Supreme Court will be addressing the issue in the near future," 84 Fed. Reg. at 27,857, HHS did not wait for the Supreme Court to decide whether discrimination on the basis of "sex" encompasses discrimination against LGBTQ people.

31

95.     Instead, it staked its elimination of the definition of "on the basis of sex" on the *Franciscan Alliance* decision and the government's position in the *Bostock* litigation "that discrimination 'on the basis of sex' in Title VII and Title IX does not encompass discrimination on the basis of sexual orientation or gender identity."  85 Fed. Reg. at 37,168.

96.     The Supreme Court now has conclusively rejected that position, holding "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual on the basis of sex."  *Bostock*, 2020 WL 3146686, at *7. *Bostock*'s conclusion that discrimination "on the basis of sex" encompasses claims of discrimination based on transgender status and sexual orientation affirms the validity of the substantial body of case law that formed the basis of the 2016 Final Rule.  *See* 81 Fed. Reg. at 31,387-90, 31,392.

97.     The Revised Rule's repeal of the definition of "on the basis of sex" and elimination of the protections for LGTBQ people against discrimination is contrary to law and will invite health care insurers and providers to discriminate against LGBTQ people seeking health care.  It also introduces substantial confusion among health care providers and insurers regarding their legal obligations and the right of the populations they serve to be free from discrimination, particularly in light of the Supreme Court's ruling in *Bostock*.

98.     The Revised Rule also eliminates the provisions in the 2016 Final Rule specifically requiring covered entities to treat individuals consistent with their gender identity and prohibiting covered entities from having or implementing "a categorical coverage exclusion or limitation for all health care services related to gender transition."  *Compare* 81 Fed. Reg. at 31,471-72 (formerly codified at 45 C.F.R. §§ 92.101(b)(3)-(4)), *with* 85 Fed. Reg. at 37,187-88.

32

99.     HHS claims this provision inappropriately interfered with the ethical and medical judgment of health professionals.  *See* 85 Fed. Reg. at 37,187-88.  However, as the 2016 Final Rule demonstrates, prohibiting the exclusion or denial of health programs or activities on the basis of an individual's LGBTQ status does not prevent medical providers from providing appropriate medical advice.

100.     The Revised Rule also eliminates the provision in the 2016 Final Rule that prohibited a covered entity from discriminating against an individual based on those with whom they are known or believed to have a relationship or to be associated.  *Compare* 81 Fed. Reg. at 31,472 (formerly codified at 45 C.F.R. § 92.209), *with* 85 Fed. Reg. at 37,199-200.  The 2016 Final Rule grounded this provision on a thorough examination of existing case law.  *See* 81 Fed. Reg. at 31,438-39.

101.     Former Section 92.209 accurately reflected current law.  HHS has provided no good reason to eliminate it.  Its decision to do so is arbitrary and capricious and contrary to the law, in violation of the APA.

**VII.    The Revised Rule's Repeal of the Unitary Standard Is Arbitrary and Capricious and Contrary to Law**

102.     Section 1557 provides:  "The enforcement mechanisms provided for and available under such title VI, title IX, section 794, *or* such Age Discrimination Act shall apply for purposes of violations of [Section 1557]."  42 U.S.C. § 18116(a) (emphasis added).  Congress's use of the disjunctive "or" indicates that the enforcement mechanisms applicable under any of the incorporated statutes are available to every claim of discrimination under Section 1557, regardless of the particular type of discrimination.

103.     During the notice-and-comment period on the 2016 Final Rule, commenters pointed to the plain language of Section 1557 and asked HHS to "clarify that all enforcement

33

mechanisms available under the statutes listed in Section 1557 are available to each Section 1557 plaintiff, regardless of the plaintiff's protected class.  Thus, for example, an individual could bring a race claim under the Age Act procedure and an age claim under the Title VI procedure." 81 Fed. Reg. at 31,439.

104.    As commenters emphasized, by enacting Section 1557, Congress intended to create a new health-specific, anti-discrimination cause of action subject to a singular standard regardless of a person's protected characteristic.  Otherwise, different enforcement mechanisms and standards would apply depending on whether an individual's claim is based on their sex, race, national origin, age, or disability, in which case a person who faces intersectional discrimination – that is, discrimination based on more than one ground – would have different remedies and enforcement mechanisms for the same conduct under the same law.  *Id.* at 31,439-40.

105.    In response, HHS stated:  "OCR interprets Section 1557 as authorizing a private right of action for claims of disparate impact on the basis of any of the criteria enumerated in the legislation."  *Id.* at 31,440.

106.    The 2016 Final Rule specified, consistent with this interpretation, that Section 1557 not only prohibits intentional discrimination on the basis of sex, but also conduct and practices "that *have the effect of subjecting individuals to discrimination* on the basis of sex" – conduct that can give rise to disparate impact claims based on sex.  81 Fed. Reg. at 31,470 (formerly codified at 45 C.F.R. § 92.101(b)(3)(ii)) (emphasis added).

107.    The 2016 Final Rule implemented Section 1557's directives regarding enforcement by promulgating 45 C.F.R. § 92.301, which provided:  "The enforcement mechanisms available for and provided under Title VI of the Civil Rights Act of 1964, Title IX

34

of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, *or* the Age Discrimination Act of 1975 shall apply for purposes of Section 1557 as interpreted by this part." 81 Fed. Reg. at 31,472 (formerly codified at 45 C.F.R. § 92.301(a)) (emphasis added).

108.    In addition, the 2016 Final Rule specified that a private right of action is available under Section 1557 and compensatory damages are available.  *See* 81 Fed. Reg. at 31,472 (formerly codified at 45 C.F.R. §§ 92.301(b), 92.302(d)).  HHS explained that its "interpretation of Section 1557 as authorizing compensatory damages is consistent with our interpretations of Title VI, Section 504, and Title IX."  81 Fed. Reg. at 31,440.

109.    Under these regulations, individuals bringing claims of intersectional discrimination, i.e., discrimination based on multiple characteristics, would not need to litigate their claims under different standards and different enforcement mechanisms.

110.    The Revised Rule, however, without reasoned explanation, rejects the 2016 Final Rule's establishment of a unitary legal standard and enforcement mechanism under Section 1557, limiting the remedies available from claims of discrimination based on a characteristic listed in Section 1557 to only those remedies available under the statute from which the characteristic was incorporated.  HHS acknowledged commenters raised concerns about intersectional discrimination but brushed them aside by noting that OCR accepts complaints that allege discrimination based on more than one protected status.  85 Fed. Reg. at 37,199-200.

111.    HHS claims the 2016 Final Rule applied the enforcement mechanisms in existing statutes "in a confusing and inconsistent manner," 85 Fed. Reg. at 37,202, and resulted in "a new patchwork regulatory framework unique to Section 1557 covered entities," 85 Fed. Reg. at 37,162.

A279

112.    The 2016 Final Rule accomplished precisely the opposite.  It established a consistent, unitary legal standard and enforcement mechanism as Section 1557 contemplates.  It is HHS's arbitrary and capricious elimination of a unitary standard that creates a confusing and patchwork approach, applying different remedies and enforcement mechanisms to discriminatory conduct that arises under a single statute – Section 1557.

113.    The Revised Rule also eliminates, without providing a reasoned explanation, the provisions in the 2016 Final Rule expressly recognizing a private right of action to "challenge a violation of Section 1557 or this part."  *Compare* 81 Fed. Reg. at 31,472 (formerly codified 45 C.F.R. § 92.302(d)), *with* 85 Fed. Reg. at 37,203.

114.    HHS eliminated the private right of action provision even though the existence of such a right is clear from the statutory language of Section 1557, which explicitly references and incorporates the "enforcement mechanisms" of four civil rights laws, all of which have a private right action, and even though every court that has ruled on the question has held that the statutory language of Section 1557 confers a private right of action.

115.    The Revised Rule also eliminates, without providing a reasoned explanation, § 92.301(b) of the 2016 Final Rule that recognized "[c]ompensatory damages for violations of Section 1557 are available in appropriate administrative and judicial actions brought under this rule."  81 Fed. Reg. at 31,472 (formerly codified 45 C.F.R. § 301(b)).  The only justification HHS offers is that "the Department has concluded that its enforcement of Section 1557 should conform to the Department of Justice's Title VI Manual," which states that "under applicable Federal case law, compensatory damages are generally unavailable for claims based solely on a Federal agency's disparate impact regulations."  85 Fed. Reg. at 37,202.

36

A280

116.    HHS ignores entirely its own statement in the preamble to the 2016 Final Rule that its interpretation of Section 1557 as authorizing compensatory damages was consistent with HHS's "interpretations of Title VI, Section 504, and Title IX," as providing for compensatory damages.  *See* 81 Fed. Reg. at 31,440.  HHS's elimination of the provision recognizing the availability of compensatory damages also is inconsistent with controlling U.S. Supreme Court decisions holding that damages are available under these civil rights statutes.

117.    HHS's unreasonable interpretation of Section 1557 is arbitrary, capricious, and contrary to law in that it fails to follow the statutory language of Section 1557 and apply each of the "enforcement mechanisms" available under each of the civil rights statutes incorporated into Section 1557 to every claim of discrimination arising under Section 1557 regardless of the basis. HHS's arbitrary and capricious elimination of provisions recognizing a private right of action under Section 1557 and the availability of compensatory damages likewise is contrary to the plain language of the statute and the law.

118.    Although HHS cannot change the law, its fracturing of the consolidated procedures established in the 2016 Final Rule undermines Congress's intent to create a new, health-specific anti-discrimination cause of action and will make it more difficult to bring discrimination claims under Section 1557.  HHS's elimination of the private right of action and compensatory damages provisions also will confuse the public and mislead some persons into not asserting their legal rights.

## VIII.   The Revised Rule's Incorporation of Sweeping Religious Exemptions Conflicts with the Statutory Language of Section 1557 and Is Inappropriate in the Health Care Context

119.    The 2016 Final Rule included a provision stating that covered entities do not have to comply with Section 1557 if doing so would violate applicable federal statutory protections

A281

for religious conscience and freedom.  *See* 81 Fed. Reg. at 31,466 (formerly codified at 45

C.F.R. § 92.2(b)(2)).

120.    HHS considered incorporating Title IX's blanket religious exemptions into

Section 1557, but after careful consideration and deliberation, HHS declined to do so in the 2016

Final Rule.  81 Fed. Reg. at 31,379-80.  Title IX's religious exemption by its terms applies only

to educational institutions and programs, not health care providers or health plans.  It protects

religiously-controlled educational institutions and programs from requirements that violate their

religious tenets.  *See* 20 U.S.C. § 1681(a)(3); 34 C.F.R. § 106.12.  For example, religious schools

that believe only men can be priests, rabbis, or ministers are not required to admit women to

training programs for the priesthood, rabbinate, or ministry.

121.    In declining to import Title IX's blanket religious exemption into Section 1557,

HHS explained that Section 1557, unlike Title IX, does not include a religious exemption.  It

further explained that Title IX's blanket exemption would be inappropriate in the health care

setting because it is framed for educational institutions, which are very different from health care

settings, and those differences "warrant different approaches."  81 Fed. Reg. at 31,380.

122.    HHS noted that, unlike the educational context where individuals may select a

religious educational institution by choice, in the health care context, individuals may have

limited or no choice of providers.  *Id.*  In addition, "a blanket religious exemption could result in

a denial or delay in the provision of health care to individuals and in discouraging individuals

from seeking necessary care, with serious and, in some cases, life threatening results."  *Id.*

123.    HHS determined that a "more nuanced approach in the health care context" was

warranted.  *Id.*  As a result, the 2016 Final Rule provided:  "Insofar as the application of any

requirement under this part would violate applicable Federal statutory protections for religious

A282

freedom and conscience, such application shall not be required." 81 Fed. Reg. at 31,466

(formerly codified at 45 C.F.R. § 92.2(b)(2)).

124.    The Revised Rule upends this nuanced and carefully considered approach by

explicitly identifying and incorporating sweeping religious exemptions from a number of

different statutes.   Not only does the Revised Rule incorporate the Title IX religious exemptions,

it also incorporates "definitions, exemptions, affirmative rights, or protections" from unrelated

statutes.  85 Fed. Reg. at 37,245 (to be codified at 45 C.F.R. § 92.6(b)).

125.    The inclusion of sweeping religious exemptions in Section 1557 is contrary to the

statutory language of Section 1557, which by its terms does not incorporate any exemptions from

Title IX or any other statute.  Section 1557 expressly incorporates the enforcement mechanisms

from four civil rights statutes, but pointedly does not incorporate the religious exemptions from

Title IX or any other statute.

126.    Religiously affiliated hospitals and health care systems occupy a large and

growing percentage of health care markets.  The Revised Rule's sweeping religious exemptions

to Section 1557's prohibitions on discrimination will invite these institutions to allow their

religious beliefs to determine patient care, contrary to medical standards and the health of an

increasing number of individuals.

127.    The Revised Rule also invites individual health care providers to deny care to

LGBTQ patients on the basis of their individual religious beliefs.  It prioritizes the protection of

individual conscience and religious freedom rights over ensuring that LGBTQ people receive the

health care to which they are entitled.  *See* 85 Fed. Reg. at 37,206.

128.    The Revised Rule's religious exemptions disproportionately harm LGBTQ

people, who often are refused health care because of their sexual orientation or gender identity.

39

According to a 2018 study, 8% of LGBTQ people were refused health care because of their sexual orientation, and 29% of transgender people were denied care because of their gender identity.[11]

129.    When LGBTQ people are denied care, it becomes difficult and sometimes impossible to find another provider, especially for those who live in rural areas and for transgender people.  In one recent study, 18% of LGBTQ people said it would be very difficult if not impossible to find the same type of service in another hospital.  Outside of a metropolitan area, 41% of respondents stated that, if they were denied treatment, it would be very difficult if not impossible to find the same service at a different location.[12]

130.    These religious exemptions also will frustrate the ability of organizations who provide health care to LGBTQ patients to accomplish their missions.  Individual health care providers employed by these organizations may choose to deny care to LGBTQ patients, claiming that doing so would violate their religious beliefs.  This denial of care would harm the ability of these organizations to treat their patients effectively.  These exemptions also would impair the ability of these organizations to refer their LGBTQ patients to other health care providers because they would be unsure whether these providers would invoke these exemptions to deny care to LGBTQ patients.

---

[11] Shabab Ahmed Mirza & Caitlin Rooney, *Discrimination Prevents LGBTQ People From Accessing Health Care*, Center for American Progress (Jan. 18, 2018), https://perma.cc/ZG7E-7WK8.

[12] *Id.*

A284

IX.     **The Revised Rule's Elimination of Notices of Nondiscrimination Rights and
       Language Access Provisions Is Arbitrary and Capricious and Contrary to Statutory
       Intent**

131.    More than 25 million Americans are of LEP, meaning they speak, read, or write
English less than "very well."[13]  An estimated 6.5 million LEP adults are uninsured.[14]

132.    The 2016 Final Rule contained a number of provisions to ensure that LEP patients
understand their rights and are able to communicate fully and effectively with their providers and
other health care staff.  The 2016 Final Rule required covered entities to provide notice of
nondiscrimination policies, including notice of availability of and how to access language
assistance services.  81 Fed. Reg. at 31,469 (formerly codified at 45 C.F.R. § 92.8(a)).

133.    In addition, covered entities were required to include taglines on all significant
documents in the top fifteen languages spoken by individuals with LEP in their state.  81 Fed.
Reg. at 31,469 (formerly codified at 45 C.F.R. § 92.8(d)(1)).  Taglines are short statements that
inform individuals of their right to language assistance and how to seek such assistance.

134.    The 2016 Final Rule also required that a covered entity with at least 15 employees
designate a specific individual or individuals with responsibility to oversee compliance with
Section 1557, including LEP efforts, and investigate complaints and concerns and establish and
adhere to a specific grievance procedure.  81 Fed. Reg. at 31,469 (formerly codified at 45 C.F.R.
§ 92.7).

---

[13] *See* U.S. Census Bureau, *Language Spoken at Home*, American Community Survey 2018 1-
Year Estimates Subject Tables, tbl. S1601 (2018), https://perma.cc/Z452-RSWR; U.S. Census
Bureau, *Characteristics of People by Language Spoken at Home*, American Community Survey
2018 1-Year Estimates Subject Tables, tbl. S1603, https://perma.cc/R59J-HG4K.

[14] *See* Letter from Kathy Ko Chin, President & CEO, Asian & Pacific Islander American Health
Forum, to Roger Severino, Dir., Office of Civil Rights, U.S. Dep't Health & Hum. Servs., at 21
(Aug. 13, 2019), https://perma.cc/6HWW-6833.

135.    The Revised Rule repeals §§ 92.7 and 92.8 of the 2016 Final Rule, eliminating the notice and tagline requirements and the requirement to designate a specific individual to oversee Section 1557 compliance, including LEP efforts, and grievance procedure requirements.  *See* 85 Fed. Reg. at 37,204.

136.    The elimination of the notice, tagline, and LEP requirements is arbitrary and capricious and will result in some LEP patients failing to understand or assert their rights.  It also will result in some LEP patients failing to receive adequate care because of the difficulties patients may have in understanding their providers or other staff, undermining the purpose and intent of the nondiscrimination provisions of Section 1557.

137.    HHS has not explained how individuals will know about their rights and how elimination of notices will not deny LEP individuals meaningful access to health care.

**X.    The Revised Rule's Attempt to Narrow paduthe Scope of Health Programs and Activities Subject to Section 1557 is Arbitrary and Capricious and Contrary to Law**

138.    The plain language of Section 1557 prohibits discrimination based on sex, race, color, national origin, age, and disability under:

> any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under [Title I of the ACA] (or amendments).

42 U.S.C. § 18116(a).

139.    The 2016 Final Rule correctly interpreted Section 1557 to cover all health-related operations and programs of any health care or health insurance provider, if any part of its operations receives Federal financial assistance; any other health program or activity that HHS administers; or any health insurance exchange or other entity established under ACA Title I or health insurance-exchange-related insurance plan.

A286

140.    The Revised Rule attempts to limit the scope of Section 1557 in two principal ways.  First, it applies Section 1557's nondiscrimination protections only to health programs or activities of HHS that are administered under Title I of the ACA, not to other health programs and activities that HHS administers.  85 Fed. Reg. at 37,244 (to be codified at 45 C.F.R. § 92.3(a)(2)).  Such a limitation excludes from Section 1557 numerous HHS health programs and activities, including health programs and activities of the Centers for Medicare and Medicaid Services, the Centers for Disease Control and Prevention, the National Institutes of Health, and the Substance Abuse and Mental Health Services Administration.

141.    The Revised Rule's interpretation of the scope of Section 1557 is inconsistent with and contradicts the plain language of Section 1557, which states that it applies to "any program or activity that is administered by an Executive Agency."  42 U.S.C. § 18116(a).  It does not limit Section 1557 to health programs and activities established or administered under ACA Title I.

142.    Second, the Revised Rule erroneously declares that health insurers are not a "health program or activity" under Section 1557 and not subject to Section 1557's nondiscrimination prohibitions because, now according to HHS, they are not "principally engaged in the business of providing healthcare."  85 Fed. Reg. at 37,244-45 (to be codified at 45 C.F.R. § 92.3(c)).

143.    By declaring that health insurance providers are not principally engaged in the business of providing health care, HHS purports to exclude health insurance providers from the requirements of Section 1557, except for plans offered on the Health Insurance Marketplace or Federally-facilitated Marketplace created under Title I and insurance plans outside of Title I that receive Federal financial assistance.  For those health insurers that operate plans outside of Title I

43

A287

but receive Federal financial assistance, the Revised Rule further limits the application of Section 1557 to only those operations that receive Federal financial assistance—all other operations of the insurer are excluded.  85 Fed. Reg. at 37,244 (to be codified at 45 C.F.R. § 92.3(b)).

144.     This Revised Rule exempts many plans, products, and operations of many health insurance issuers, such as self-funded group health plans, the Federal Employees Health Benefits (FEHB) Program, and short-term limited duration insurance plans.  85 Fed. Reg. at 37,173-74.

145.     To support its new interpretation, HHS contends that providing "health insurance" is different than providing "healthcare" and points to the definitions of "healthcare" and "health insurance" in unrelated statutes to support its distinction.  85 Fed. Reg. at 37,172-73.

146.     But Section 1557 covers "health programs and activities," not just direct health care.  Health insurance clearly is a health-related program or activity.  It is what enables the vast majority of Americans to access health care.  Indeed, health insurance companies design the health care individuals receive by determining benefits offered and establishing formularies, payment structures, and networks.  They also conduct prior authorization and establish and evaluate other clinical coverage criteria, as well as exercise considerable control over the health care of enrollees—deciding which providers a patient may see, what hospitals they may visit, and what treatments or medications they may receive.

147.     Neither the plain language of Section 1557 nor HHS's effort to rely on unrelated statutes supports HHS's unreasonable assertion that "healthcare" is different than "health insurance."  Section 1557 explicitly provides that it covers "health programs and activities."  Its scope is not limited to direct health care.

A288

**XI.      The Revised Rule Arbitrarily and Capriciously Eliminates Gender Identity and
          Sexual Orientation Protections in Unrelated Regulations**

148.    The Revised Rule amends a series of unrelated regulations that had identified

gender identity and sexual orientation as prohibited bases of discrimination, including

regulations related to Medicaid State Plans, Programs for All-Inclusive Care for the Elderly

(PACE), and ACA state health insurance exchanges and plans.  The Revised Rule eliminates

protections against gender identity and sexual orientation discrimination in those regulations.  85

Fed. Reg. at 37,218-22, 37,243.

149.    These regulations were not issued pursuant to Section 1557 and do not interpret

Section 1557.  They were promulgated by CMS pursuant to the authority granted by several

unrelated statutes.  These unrelated regulations were not promulgated pursuant to HHS's

authority to implement regulations under Section 1557.

150.    For example, the Revised Rule amends regulations regarding Medicaid State

Plans and Medicaid contractors, 42 C.F.R. §§ 438.3(d)(4), 438.206 (c)(2), and 440.262, which

were issued pursuant to HHS's authority under Section 1902 of the Social Security Act to

implement Section 1902(a)(19).  That section directs HHS to "provide such safeguards as may

be necessary to assure that eligibility for care and services under the [Medicaid] plan will be

determined, and such care and services will be provided, in a manner consistent with simplicity

of administration and the best interest of the recipients."  42 U.S.C. § 1396a(a)(19); *see also*

Medicaid and Children's Health Insurance Program (CHIP) Programs, 81 Fed. Reg. 27,498,

27,538-39, 27,666 (May 6, 2016).

151.    Prior to the Revised Rule, 42 C.F.R. § 438.3(d)(4) provided:  "The MCO, PIHP,

PAHP, PCCM or PCCM entity will not discriminate against individuals eligible to enroll on the

basis of race, color, national origin, sex, sexual orientation, gender identity, or disability and will

A289

not use any policy or practice that has the effect of discriminating on the basis of race, color, or national origin, sex, sexual orientation, gender identity, or disability."  The Revised Rule amends § 438.3(d)(4) to state:  "The MCO, PIHP, PAHP, PCCM or PCCM entity will not discriminate against individuals eligible to enroll on the basis of race, color, national origin, sex, or disability and will not use any policy or practice that has the effect of discriminating on the basis of race, color, or national origin, sex, or disability."  85 Fed. Reg. at 37,243 (to be codified at 42 C.F.R. § 438.3(d)(4)).

152.    PACE is a program for services for frail community-dwelling elderly persons, most of whom are Medicaid and Medicare dual eligible, to keep them in the community rather than moving to nursing homes.  *See* 42 C.F.R. §§ 460.98, 460.112.  HHS added sexual orientation to the list of protected categories of persons eligible for PACE services in 2006, explaining that "we do not believe anyone should be denied enrollment in PACE because of discrimination of any kind."  Medicare and Medicaid Programs; Programs of All-Inclusive Care for the Elderly (PACE); Program Revisions, 71 Fed. Reg. 71,244, 71,295 (Dec. 8, 2006).

153.    Prior to the Revised Rule, 42 C.F.R. § 460.98(b)(3) provided:  "The PACE organization may not discriminate against any participant in the delivery of required PACE services based on race, ethnicity, national origin, religion, sex, age, sexual orientation, mental or physical disability, or source of payment."  The Revised Rule amends 42 C.F.R. § 460.98(b)(3) to state:  "The PACE organization may not discriminate against any participant in the delivery of required PACE services based on race, ethnicity, national origin, religion, sex, age, mental or physical disability, or source of payment."  85 Fed. Reg. at 37,243 (to be codified at 42 C.F.R. § 460.98(b)(3)).  The Revised Rule also eliminates protections against sexual orientation

46

A290

discrimination in 42 C.F.R. § 460.112(a).  85 Fed. Reg. at 37,220, 37,243 (to be codified at 42

C.F.R. § 460.112(a)).

154.    Prohibitions of discrimination on the basis of sexual orientation and gender

identity were added to regulations regarding group and individual market health insurance plans

subject to the ACA and to ACA-created health insurance exchanges and qualified health plans.

These prohibitions were added to further the ACA's aim of expanding insurance coverage, which

discriminatory marketing practices and benefit designs can thwart.  *See* 45 C.F.R. §§ 147.104(e),

155.120(c)(1)(ii), 155.220(j)(2)(i), 156.200(e), & 156.1230(b)(2); *see also* PPACA;

Establishment of Exchanges and Qualified Health Plans, 77 Fed. Reg. 18,310, 18,319, 18,415

(March 27, 2012); PPACA; Health Insurance Market Rules, 78 Fed. Reg. 13,406, 13,417 (Feb.

27, 2013); PPACA; Exchange and Insurance Market Standards for 2015 and Beyond, 79 Fed.

Reg. 30,240, 30,261 (May 27, 2014); PPACA; HHS Notice of Benefit and Payment Parameters

for 2018, 81 Fed. Reg. 94,058, 94,064, 94,152 (Dec. 22, 2016).

155.    The Revised Rule eliminates the prohibitions on gender identity and sexual

orientation discrimination in these regulations.  *See* 85 Fed. Reg. at 37, 219-21, 37,247-48 (to be

codified at 45 C.F.R. §§ 147.104(e), 155.120(c)(1)(ii), 155.220(j)(2)(i), 156.200(e), &

156.1230(b)(2)).

156.    HHS offers no legal, policy, or cost-benefit analysis for amending these

regulations, including the effects they have had during the years they have been in place or the

costs and benefits of amending them.

157.    HHS's erroneous analysis of discrimination on the basis of sex under

longstanding civil rights laws provides no justification for amending these regulations, which

were promulgated to advance the goals of other statutory provisions.

158.    HHS's amendment of these unrelated regulations to eliminate protections for LGBTQ people is arbitrary and capricious and without legal support.

**XII.    The Revised Rule's Cost-Benefit Analysis Is Arbitrary and Capricious**

159.    The Revised Rule fails to address adequately the direct and indirect costs that repeal of protections for LGBTQ people will have on patients, providers, insurers, and the overall health care system.

160.    These costs take many forms, none of which the Revised Rule considers.  First, out-of-pocket costs for necessary medical procedures will shift from insurers to patients and providers.  Under the 2016 Final Rule, most insurers covered these services, but under the Revised Rule, insurers can deny coverage on the basis that these are cosmetic procedures, rather than medically necessary to alleviate gender dysphoria.  Thus, many patients may forgo this necessary medical care due to the high cost of these procedures or cover the cost themselves.  Providers also would lose out on the revenue from these procedures when patients cannot afford them.

161.    Second, insurers' increased transgender exclusions and transgender patients' increased fear of discrimination by health care providers empowered by the Revised Rule will lead to transgender patients delaying or declining to seek care.[15]  As such, transgender patients may develop comorbid conditions such as depression, anxiety, drug abuse, and other stress-related conditions.  Treating these increased comorbid conditions will increase costs to patients, insurers, providers, and the health system overall.

---

[15] *See* Lambda Legal, *When Health Care Isn't Caring:  Lambda Legal's Survey on Discrimination Against LGBT People and People Living with HIV* at 12 (2010), https://perma.cc/9SEG-JD2K; *see also* S.E. James *et al.*, Nat'l Ctr. for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey* at 98 (2016), https://perma.cc/9S9L-VJ9C.

A292

162.     Third, patients' delays or failures to obtain treatment will increase the direct cost of treating physical medical conditions and is a patient safety issue that can lead to poor patient outcomes.  LGBTQ patients who fear discrimination may delay, or never receive, preventative care such as cancer screenings.  Without regular screenings, LGBTQ patients will develop more advanced cancers and other health conditions.  Because the cost of treating more advanced diseases far outweighs the cost of preventative care, the Revised Rule will increase costs to patients, insurers, providers, and the overall health care system.

163.     The Revised Rule does not consider these costs associated with inviting discrimination against LGBTQ patients, and in particular those who are transgender.  Ignoring such substantial costs makes the Revised Rule's cost-benefit analysis seriously flawed and arbitrary and capricious.

164.     Indeed, the Revised Rule specifically admits HHS did not take the costs or harms to transgender patients into account, stating: "the Department also lacks the data necessary to estimate the number of individuals who currently benefit from covered entities' policies governing discrimination on the basis of gender identity who would no longer receive those benefits after publication of this rule."  85 Fed. Reg. at 37,225.

165.     The costs of prohibiting sex-based discrimination against transgender people in health insurance coverage is minimal compared to the costs associated with inviting such discrimination.  The 2016 Final Rule acknowledged this fact, stating that prohibiting discrimination against transgender consumers in health insurance "will have de minimis impact on the overall cost of care and on health insurance premiums."  81 Fed. Reg. at 31,456-57.  Moreover, studies have found that providing coverage of transition-related care is extremely cost-effective and reduces costs in the long term.  For example, a 2013 survey of employers

49

found that providing transition-related health care benefits has "zero or very low costs" and utilization rates of approximately 1 per 10,000 to 20,000 employees.[16]  Another study found that the cost of providing coverage for treatment of gender dysphoria was about $0.016 per member per month.  It also concluded that this small cost could reduce other costly health risks like depression and drug abuse.[17]  Numerous other studies confirm these conclusions.[18]

166.    The Revised Rule also fails to include in its cost-benefit analysis the costs associated with (1) eliminating gender identity nondiscrimination protections in the CMS regulations promulgated under different statutes, and (2) adopting the broad religious exemptions from Title IX and unrelated statutes.  The costs of these changes include those associated with the increased discrimination that will result from the Revised Rule.  Failing to consider these costs also makes the Revised Rule arbitrary and capricious.

---

[16] Jody L. Herman, *Cost and Benefits of Providing Transition-Related Health Care Coverage in Employee Health Benefits Plans,* The Williams Institute of the UCLA School of Law (Sept. 2013), https://perma.cc/D8J5-FACP.

[17] William V. Padula *et al.*, *Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis*, 31 J. GEN. INTERN. MED. 394, 398 (Oct. 2015), https://perma.cc/74EW-LZPY.

[18] *See* Declaration of Raymond Edwin Mabus, Jr., former Secretary of the Navy, in Support of Plaintiff's Motion for Preliminary Injunction ¶ 41, *Doe* v. *Trump*, No. 1:17-cv-1597-CKK (Aug. 31, 2017), ECF No. 13-9, https://perma.cc/8ZU8-8NGE (concluding costs associated with providing health care to transgender service members was considered by a former Secretary of the Navy to be "budget dust, hardly even a rounding error"); Padula, *et al.*, *Societal Implications of Health Insurance Coverage for Medically Necessary Services in the U.S. Transgender Population: A Cost-Effectiveness Analysis* at 398, https://perma.cc/74EW-LZPY (calculating the costs would be fewer than two pennies per month for every person with health insurance coverage in the United States); Cal. Dep't of Ins., Economic Impact Assessment: Gender Nondiscrimination in Health Insurance (Reg. File No. REG-2011-00023) (Apr. 13, 2012), https://perma.cc/QJ34-RVNQ (finding that costs of providing health care did not increase materially when employers adopted policies that prohibited discrimination against transgender individuals).

A294

**XIII.    The Revised Rule Betrays Discriminatory Animus Against LGBTQ People**

167.    HHS's discriminatory animus in promulgating the Revised Rule is evident, as the promulgation of the Revised Rule is just the latest step in its multi-step erasure of LGBTQ people from health care-related nondiscrimination protections.

168.    Defendant Severino has a history of anti-LGBTQ sentiments, advocacy, and comments.  For example, in 2016, before he became Director of OCR, defendant Severino decried the 2016 Final Rule because it ran counter to some people's "moral, and religious beliefs about biology" and because, in his opinion, the 2016 Final Rule "create[d] special privileges, new protected classes, or new rights to particular procedures."[19]

169.    In 2016, defendant Severino also denounced the Department of Justice's enforcement of Title IX's sex discrimination protections as they applied to transgender people as "using government power to coerce everyone, including children, into pledging allegiance to a radical new gender ideology."[20]

170.    That same year, defendant Severino also stated that he believes transgender military personnel serving openly "dishonors" the service of other service members.[21]  In addition, he referred to a transgender male student involved in a Title IX lawsuit as a "teen biological girl."[22]

---

[19] Ryan Anderson & Roger Severino, *Proposed Obamacare Gender Identity Mandate Threatens Freedom of Conscience and the Independence of Physicians*, The Heritage Foundation (Jan. 8, 2016), https://perma.cc/5XKG-S79Z.

[20] Roger Severino, *DOJ's Lawsuit Against North Carolina Is Abuse of Power*, The Daily Signal (May 9, 2016), https://perma.cc/3FFM-KFMB.

[21] Roger Severino, *Pentagon's Radical New Transgender Policy Defies Common Sense*, CNSNews (July 1, 2016), https://perma.cc/VK37-5FP7.

[22] Roger Severino & Jim DeMint, *Court Should Reject Obama's Radical Social Experiment, The Heritage Foundation* (Dec. 14, 2016), https://perma.cc/N6K8-HQY5.

A295

171.    In 2018, it was reported that HHS's OCR was considering defining sex as "a person's status as male or female based on immutable biological traits identifiable by and before birth," a definition that is contrary to the legal, medical, and scientific understanding of sex.[23]

172.    And in 2019, HHS issued a Notification of Nonenforcement of Health and Human Services Grants Regulation, in which it stated that it would no longer enforce regulations that prohibit discrimination based on sex, sexual orientation, or gender identity in grant programs that HHS funds.  84 Fed. Reg. 63,809 (Nov. 19, 2019).

173.    With defendant Severino now Director of OCR, defendants seek to eviscerate the nondiscrimination protections Severino denounced.

174.    For example, HHS asserts that it considered adding gender identity and sexual orientation discrimination to a definition of "sex" or discrimination "on the basis of sex" under Title IX, but concluded doing so was "inappropriate to do so in light of the ordinary public meaning of discrimination on the basis of sex under Title IX" and because "[a]s a policy matter," state and local entities "are better equipped to address with sensitivity issues of gender dysphoria, sexual orientation, and any competing privacy interests, especially when young children or intimate settings are involved."  85 Fed. Reg. at 37,222.  Not only has the Supreme Court rejected HHS's position on the definition of "sex" under Title VII, but the notion that health care protections for LGBTQ people are at odds with "young children" is as offensive as it is telling.

175.    As another example, although HHS declares that its position on the meaning of sex discrimination "will not bar covered entities from choosing to grant protections on the basis

---

[23] Erica L. Green, Katie Benner & Robert Pear, '*Transgender' Could Be Defined Out of Existence Under Trump Administration*, N.Y. Times (Oct. 21, 2018), https://perma.cc/YQR6-YN2F.

A296

of sexual orientation and gender identity that do not conflict with any other Federal law," 85 Fed.

Reg. at 37,222, HHS also states that a covered entity's refusal to make distinctions on the basis

of sex "could in some cases violate personal privacy interests and so create a hostile environment

under Title IX." 85 Fed. Reg. at 37,184. This assertion and the cases cited have nothing to do

with Section 1557 and what facilities should be available to a patient in a health care setting.

176.    HHS also fails to acknowledge that no cognizable legal claim exists based on

having to share a restroom or other single-sex facility with a transgender person. HHS's

suggestion to the contrary, *see* 85 Fed. Reg. at 37,190-91, is inconsistent with the rule of law and

not a "reasonable" analysis. It serves only to heighten alarm among LGBTQ people and

embolden those who attack them with frivolous assertions.

177.    The Revised Rule reflects HHS's animosity toward LGBTQ people.

**XIV.   The Revised Rule Creates Immediate and Irreparable Harms**

178.    The Revised Rule cannot change the law and the courts will determine the

meaning of Section 1557. However, HHS's rules have a substantial effect on health care

providers and institutions, as well as on the public. The Revised Rule will result in increased

discrimination against LGBTQ people, including those with LEP, by health care providers and

health insurers. This increased discrimination will directly and irreparably injure plaintiffs, their

members, their patients, and the individuals whom they serve.

**A.      The Revised Rule Will Increase LGBTQ Discrimination by Health Care
          Providers and Staff and Cause Irreparable Harm to Plaintiffs and the
          Patients and Individuals They Serve**

179.    Discrimination delays or denies necessary health care. It also discourages

LGBTQ people from seeking care and from fully disclosing personal information that health care

providers need for proper diagnosis and treatment.

A297

180.    The Revised Rule sends a message to the health care industry and the LGBTQ community that federal law permits discrimination against LGBTQ patients.

181.    Indeed, in its Notice of Proposed Rulemaking, HHS acknowledged the 2016 Final Rule "likely induced many covered entities to conform their policies and operations to reflect gender identity as protected classes [sic] under Title IX."  84 Fed. Reg. at 27,876.  And in the Revised Rule, HHS acknowledges that some covered entities may revert to the policies and practices they had in place before the 2016 Final Rule.  85 Fed. Reg. at 37,225.  OCR also estimates that 60% of the increase in its anticipated long-term caseload of claims of discrimination are attributable to discrimination claims based on the 2016 Rule's definition of sex discrimination with respect to gender identity and sex stereotyping, though OCR has not enforced such claims.  85 Fed. Reg. at 37,235.

182.    HHS tries to minimize the harm the Revised Rule will create, repeatedly claiming that because a federal district court enjoined enforcement of claims based on the definition of sex discrimination in the 2016 Final Rule in December 2016 and later vacated those provisions, any harm would not be the result of the Revised Rule, which merely is maintaining the status quo. *See, e.g.*, 85 Fed. Reg. at 37,181-82, 37,192, 37,199, & 37,238.

183.    HHS's position is disingenuous at best.  HHS has issued a Revised Rule attempting to legislate that claims of discrimination based on LGBTQ status are not "cognizable" under Section 1557.  85 Fed. Reg. at 37,225.

184.    Without complete protection from discrimination based on their sex, including discrimination based on their sexual orientation, gender identity, transgender status, or failure to conform to sex stereotypes, LGBTQ people will be discouraged from seeking the health care they need.

A298

185.    The Revised Rule also will discourage LGBTQ people from fully disclosing personal information related to their sexuality and gender that health care providers need for proper diagnosis.

186.    The Revised Rule will harm plaintiffs, their patients, and the LGBTQ people whom they serve in multiple ways.

**1.    Harm to Patients and Individuals Whom Plaintiffs Serve**

187.    LGBTQ individuals and especially transgender and gender-nonconforming people already face particularly acute barriers to care and health disparities that will be compounded by the Revised Rule.  A majority of LGBTQ patients fear going to health care providers because of past experiences of anti-LGBTQ bias in health care settings.  Many LGBTQ patients report negative experiences, including hostility, discrimination, and denials of care, when they disclose to health care providers their sexual orientation, history of sexual conduct, gender identity, transgender status, or history of gender-affirming medical treatment, and related medical histories.

188.    For example, multiple LGBTQ patients at Whitman-Walker have previously been refused medical care, including routine care unrelated to gender dysphoria, by providers outside of Whitman-Walker simply because they are LGBTQ.  In one instance, a radiological technician refused to perform an ultrasound for testicular cancer on a transgender patient.  In another, a health care worker at a dialysis clinic confronted a Whitman-Walker patient with end-stage renal disease and objected to being involved in the patient's care because of hostility to his sexual orientation.  In another, after a Whitman-Walker patient—a transgender teenager—was hospitalized in a local hospital following a suicide attempt, the staff would only address or refer to the young person with pronouns inconsistent with their gender identity, exacerbating the teenager's acutely fragile state of mind.  Local hospitals and surgeons have refused to perform

55

transition-related surgeries on Whitman-Walker transgender patients, even when they routinely perform the very same procedures on non-transgender patients, including in situations when the patient's insurance would have covered the procedure or when the patient was able to pay for the procedure.  Many local primary-care physicians unaffiliated with Whitman-Walker have refused to prescribe hormone therapy for transgender patients.  And multiple Whitman-Walker patients have been denied prescriptions by pharmacists.  Behavioral-health providers at Whitman-Walker report that the vast majority of transgender patients—as many as four out of five—report instances of mistreatment or discrimination by health care providers, hospitals, clinics, doctors' offices, or other facilities outside of Whitman-Walker.

189.    Patients of the LA LGBT Center report similar experiences of discrimination by other providers.  One transgender patient, who developed profuse bleeding after surgery, was denied treatment at an emergency room and arrived at the LA LGBT Center in distress three days later, having lost a significant amount of blood.  Another patient required extensive surgery to repair damage caused by a prior silicone breast-augmentation procedure.  But she was turned down by an academic plastic-surgery center in Los Angeles because the surgeon said her health problems were caused by her own poor decision-making and she therefore would not be considered for treatment.  By the time she was able to identify a surgeon who was willing to treat her, with the assistance of a physician at the LA LGBT Center, years had passed and her condition had become life-threatening.  For patients at the LA LGBT Center, the ability to receive gender-affirming medical care can mean the difference between life and death.

190.    In many geographic regions, a majority of LGBTQ people lack a provider whom they consider to be their personal doctor.  As a result, when they seek health care services, they will encounter a health care provider with whom they do not have a relationship.  This makes

56

them especially vulnerable to discriminatory treatment from providers who are not LGBTQ-affirming.  For some medical specialties, there are only a handful of health care providers in the region who have the expertise necessary to treat a patient for a particular condition, so a denial of care from even one provider could make it practically impossible for an LGBTQ patient to receive any care at all.

191.    In a recent study, nearly one in five LGBTQ people, including 31% of transgender people, said that if they were turned away from a hospital, it would be very difficult or impossible to get the health care they need elsewhere.[24]  The rate was substantially higher for LGBTQ people living in non-metropolitan areas, with 41% reporting that it would be very difficult or impossible to find an alternative provider.  Even when they are able to get access to care, many LGBTQ individuals report that health care professionals have used harsh language toward them, refused to touch them, used excessive precaution, or blamed the individuals for their health status.[25]

192.    Consequently, LGBTQ patients are disproportionately likely to delay preventative screenings and necessary medical treatment and therefore to end up with more acute health problems and outcomes, raising concerns about patient safety.  Research has identified pervasive health disparities for LGBTQ people with respect to cancer, HIV, obesity, mental health, tobacco use, and more.  In other words, LGBTQ people, who are disproportionately likely to need a wide range of routine medical care, already have reason to fear, and often do fear, negative consequences of "coming out" to health care providers about their sexual orientation, history of

---

[24] *See* Mirza & Rooney, *Discrimination Prevents LGBT People From Accessing Health Care*, https://perma.cc/ZG7E-7WK8.

[25] *Id.*

A301

sexual conduct, gender identity, transgender status, history of gender-affirming medical treatment, and related medical histories.

193.    The Revised Rule will exacerbate the acute health disparities LGBTQ people already face.  The Revised Rule sends the message that discrimination on the basis of gender identity and sex stereotyping is permissible under federal law, which will increase the number of LGBTQ people who will be denied care.

194.    The Revised Rule also encourages LGBTQ people to remain closeted to the extent possible when seeking medical care.  But remaining closeted to a health care provider may result in significant adverse health consequences.  For instance, a patient who conceals or fails to disclose a same-sex sexual history may not be screened for HIV or other relevant infections or cancers, or may not be prescribed preventative medications such as Pre-Exposure Prophylaxis or PrEP, which is extremely effective at preventing HIV transmission.  Patients who fail fully to disclose their gender identity and sex assigned at birth may not undergo medically indicated tests or screenings (such as tests for cervical or breast cancer for some transgender men, or testicular or prostate cancer for some transgender women).  The barriers to care are particularly high for transgender people.  Nearly one-quarter of transgender people report delaying or avoiding medical care when sick or injured, at least partially because of fear of discrimination by and disrespect from health care providers.[26]

195.    Patients remaining closeted to health care providers also results in increased costs to the health care system.  For example, when a patient is closeted, medical providers may not order medically necessary tests or screenings, which has downstream effects such as

---

[26] *See* Mirza & Rooney, *Discrimination Prevents LGBT People From Accessing Health Care*, https://perma.cc/ZG7E-7WK8.

58

exacerbating a patient's distress and increasing costs to providers and the health care system as a

whole for delayed treatment.

196.    The Revised Rule will result in increased discrimination against LGBTQ people

in the provision of health care and cause harm to the health of LGBTQ people and to public

health generally.

> **2.    Harm to Private Health Care Provider Plaintiffs, LGBTQ-Services Plaintiffs, and Health Professional Association Plaintiffs**

197.    The Revised Rule, which fosters discrimination against LGBTQ people in the

provision of health care, frustrates plaintiffs' core missions of providing and advocating for

affirming, high-quality care to all LGBTQ people and protecting against discrimination on the

basis of LGBTQ status in the delivery of health care and services to patients.

198.    In addition, because more LGBTQ patients will delay seeking health care, they

will come to Whitman-Walker and the LA LGBT Center, the private health care provider

plaintiffs who serve many LGBTQ patients, and members of the health professional association

plaintiffs – GLMA and AGLP – with more acute conditions, diseases that are more advanced at

diagnosis, less responsive to treatment, or no longer treatable.  This delay will strain the

resources of providers and increase costs for providers and patients and the health care system in

general.

199.    The discriminatory experiences LGBTQ patients have with other health care

providers erode patients' trust in health care providers overall and thus also challenges the ability

of plaintiffs to treat their patients effectively and provide appropriate services and referrals.  To

provide proper medical care and services to the LGBTQ community, plaintiffs rely on frank and

complete communication with their patients and the individuals who seek their services.

Plaintiffs need patients and individuals seeking services to fully disclose all aspects of their

A303

health history, sexual history, and gender identity to provide appropriate care for the patients'

health.  Without full disclosure, plaintiffs are not able to treat adequately their patients.  For

instance, plaintiffs need to know patients' sexual history to know whether to test them for HIV or

other infections or cancers.  And plaintiffs need to be aware of patients' gender identity and sex

assigned at birth to order proper screenings and tests – like cervical or breast cancer for some

transgender men, or testicular or prostate cancer for some transgender women.  The Revised

Rule endangers the provider-patient relationship and will harm plaintiffs and their patients by

discouraging full disclosure.  This also means that medical and health care providers bear

increased risk of malpractice when patients do not feel comfortable to fully disclose all aspects

of their health history, sexual history, and gender identity.

200.     The Revised Rule's effect of increasing discrimination by other providers will

lead to increased demand for providers, entities, and individuals who serve the LGBTQ

community, like Whitman-Walker, LA LGBT Center, the TransLatin@ Coalition (and its

affiliated organizations like FLAS and Arianna's Center), Bradbury-Sullivan Center, and the

members of GLMA and AGLP.  This increased demand will place a strain on these plaintiffs'

resources, leaving them unable to fulfill their organizational missions, spend sufficient time on

each patient or individual seeking services, and provide care and services to all individuals.  It

also will harm LGBTQ people through increased wait times and delays of care that may worsen

conditions.

201.     In addition, Whitman-Walker, LA LGBT Center, the TransLatin@ Coalition (and

some of its affiliated organizations like FLAS and Arianna's Center), and Bradbury-Sullivan

Center, as well as the members of GLMA and AGLP and the individual provider plaintiffs, all

refer patients to other health care providers.  The Revised Rule will harm the ability of these

A304

plaintiffs to refer LGBTQ patients to other providers because they will not know whether these providers will discriminate against their patients and/or refuse to treat their patients under the Revised Rule's personal religious or moral belief exemptions.  Thus, these plaintiffs will be required to redirect their staff and resources from providing their own services to assisting patrons in determining who among the health care providers in the region will serve LGBTQ patients in a nondiscriminatory manner.

202.    The Revised Rule also will burden the private health care provider and LGBTQ-services plaintiffs by precluding them from carrying out their organizational missions of providing affirming, non-discriminatory care to all LGBTQ patients based on the religious views of a single employee.  The sweeping religious exemptions in the Revised Rule encourage individual employees to believe their discriminatory beliefs can prevail over their duties to patients – and to their fellow employees – posing barriers to patient care and creating burdens for the organizations.  The private health care provider and LGBTQ-services plaintiffs may be forced to institute costly workarounds and duplicative staff to accommodate the religious views of a single employee, which also may result in unfairly burdening non-objecting employees.  These increased costs also may result in a reduction of services and closure of programs, thus frustrating plaintiffs' institutional missions and core functions of providing comprehensive health care and other services to LGBTQ people.

### 3.    Additional Harm to GLMA, AGLP, and Their Members

203.    The Revised Rule also will create additional harms to the health professional association plaintiffs GLMA and AGLP, their members, the LGBTQ patients whose interests they represent, and the patients whom their members treat.

204.    GLMA works with professional accreditation bodies, such as the Joint Commission, and health-professional associations, on standards, guidelines, and policies that

61

address LGBTQ health and protect individual patient health and public health in general.  The

Revised Rule prevents GLMA from achieving its goals with professional accreditation bodies by

preventing such bodies from holding health care providers accountable for discrimination against

LGBTQ people.

205.    For a health care organization to participate in and receive federal payment from

Medicare or Medicaid programs, the organization must obtain a certification of compliance with

health and safety requirements.  That certification is achieved based on a survey conducted either

by a state agency on behalf of the federal government, or by a federally recognized national

accrediting organization, like the Joint Commission.  Accreditation surveys include requirements

that health care organizations not discriminate on the basis of sex, sexual orientation, or gender

identity in providing services or in employment.  The Revised Rule presents a direct conflict

with nondiscrimination standards the Joint Commission has adopted and all the major health-

professional associations stating that health care providers should not discriminate in providing

care for patients and clients because of sexual orientation or gender identity.

206.    The Revised Rule invites health care organizations who discriminate against

LGBTQ people to become accredited.  The Revised Rule conflicts with GLMA's mission of

achieving and enforcing accreditation standards relating to nondiscrimination.

207.    Members of GLMA and AGLP also will be harmed by the Revised Rule because

some members are employed by health care organizations that may rely on the religious and

moral exemptions in the Revised Rule to deny care or discriminate against LGBTQ patients.

The Revised Rule encourages religiously-affiliated health care employers to discriminate against

employees who are GLMA or AGLP members for adhering to and enforcing their medical and

A306

ethical obligations to treat all patients in a nondiscriminatory manner, including providing all medically-necessary care that is in LGBTQ patients' best interests.

208.    In addition, the Revised Rule invites harassment and discriminatory treatment of GLMA and AGLP members in the workforce by fellow employees.  The Revised Rule sends a message that discrimination against LGBTQ health care providers and their LGBTQ patients is permissible.  GLMA and AGLP members and their LGBTQ patients are stigmatized and demeaned by this message that LGBTQ people are not deserving of legal protections in the health care context.  The Revised Rule thus frustrates GLMA's and AGLP's missions of achieving and enforcing safe workspaces for LGBTQ health professionals and non-discriminatory health care services for their LGBTQ patients.

### 4.    Additional Harm to the TransLatin@ Coalition, Its Members, and the Individuals it Serves

209.    The Revised Rule also will harm the TransLatin@ Coalition, its members, its affiliated organizations, and the individuals whom the Coalition serves in that the harms the Revised Rule will exact on LGBTQ people, particularly those who are transgender, will be exacerbated for those with LEP.  The Revised Rule's elimination of notice and tagline requirements will make it more difficult for LGBTQ people with LEP to be aware of their rights, which language services and aids are available, how to access such services, and how to handle discrimination and complaints.  The health care system was already difficult to navigate for LEP individuals, and the Revised Rule serves to exacerbate those difficulties and undermines access to health care, health insurance, and legal redress.  The Revised Rule will harm the TransLatin@ Coalition's mission and members by making it more difficult to access health care and by decreasing protections from discrimination.

63

210.    The Revised Rule's elimination of the unitary standard also harms the

TransLatin@ Coalition, its members, and individuals whom it serves by making it more difficult

to bring claims of intersectional discrimination.  Rather than being able to assert claims under a

unitary standard, intersectional discrimination claims will be subject to different standards,

enforcement mechanisms, and remedies based on which identities are at issue.

**B.     The Revised Rule Will Result in Increased Discrimination by Health Plans,
        Particularly Against Persons Seeking Gender-Affirming Care**

211.    Many private and public plans resist coverage of medically necessary procedures,

whether through blanket exclusions of "sex change" or "sex transition" procedures, or through

denials of coverage of specific procedures.  Many plans that do not contain blanket exclusions

still exclude many essential types of surgeries related to gender transition, such as facial or chest

surgery.

212.    Many insurers also deny coverage of other specific treatments needed to complete

an individual's transition on the grounds that the procedure is "cosmetic" – either by relying on

general plan language excluding cosmetic procedures or concluding that a procedure is not

medically necessary.  Examples of procedures that are categorically excluded as "cosmetic" in

many plans and by many utilization reviewers include:

      a.      Surgeries of the head and face, such as hair transplant, scalp advancement,

           brow reduction, lip reduction or augmentation, rhinoplasty, cheek and chin

           contouring, jawline modification, blepheroplasty, and other facial

           feminization techniques for transgender women;

      b.      Laser hair removal and electrolysis, on the face and elsewhere on the

           body;

64

      c.     Surgeries involving the neck, such as cartilage reduction (modification of the Adam's Apple) and vocal feminization surgery;

      d.     Breast augmentation and reduction;

      e.     Other body contouring procedures, such as waist reduction, hip/buttocks implants, fat transfer, pectoral implants; and

      f.     Lessons/training to modify the vocal range.

213.    Relying on its definition of "on the basis of sex" to include gender identity and to forbid discrimination against transgender individuals, the 2016 Final Rule helped persuade Medicaid administrators, insurance company personnel, and employee health plan sponsors to eliminate outdated exclusions and to agree to cover procedures when supported by evidence of medical necessity.  Following its promulgation, the 2016 Final Rule led to a decrease in discriminatory policies and practices.[27]  A recent study of 37 states in the federal marketplace showed that 97% of plans analyzed did not contain blanket exclusions of transition-related care in 2019.[28]

214.    By eliminating the 2016 Final Rule's definition of "on the basis of sex" and the explicit prohibitions on "categorical coverage exclusion[s] or limitation[s] for all health services related to gender transition" and denials, limitations, or restrictions "for specific health services related to gender transition if such denial, limitation, or restriction results in discrimination against a transgender individual," 81 Fed. Reg. at 31,472 (formerly codified at 45 C.F.R. § 92.207(b)(4)-(5)), the Revised Rule invites reversal of much of this progress, leading to a

---

[27] Gruberg & Bewkes, *The ACA's LGBTQ Nondiscrimination Regulations Prove Crucial*, https://perma.cc/CTP2-UMEJ.

[28] Out2Enroll, *Summary of Findings: 2020 Marketplace Plan Compliance with Section 1557*, https://perma.cc/WU25-C9BN.  This is consistent with summaries from 2017, 2018, and 2019.

A309

reduction in coverage and access to medically necessary health care for transgender and gender nonconforming patients.

215.     In addition, the Revised Rule's narrow interpretation of what constitutes a covered entity similarly will result in a reduction in coverage and access to medically necessary health care for transgender and gender nonconforming patients.

216.     Increased discrimination by health insurance plans will harm plaintiffs and the patients and individuals whom they serve.  Plaintiffs that provide health care services will face increased costs because many private and public plans will refuse to cover medically necessary procedures based on the Revised Rule's elimination of protections against gender identity discrimination.  Plaintiffs, in turn, will be forced to either cover the costs of these medically necessary procedures, or turn away LGBTQ patients who need these services but cannot afford to pay for them out of pocket.  Likewise, patients may forgo necessary medical care due to the high cost of these procedures or cover the cost themselves.

C.     **The Revised Rule Will Result in Increased Discrimination towards Patients with Limited English Proficiency**

217.     Language access protections are required to prevent discrimination based on national origin.  These services are important because ineffective communication between health care providers and LEP patients for the purposes of diagnosis, treatment options, proper use of medication, obtaining informed consent, and insurance coverage can result in adverse health consequences or death.

218.     The Revised Rule eliminates the requirement that covered entities take reasonable steps to provide meaningful access to "*each individual* with LEP eligible to be served or likely to be encountered" and replaces it with a general reference to "LEP individuals."  *See, e.g.*, 85 Fed.

A310

Reg. at 37,245.  However, focusing on LEP individuals in general as opposed to each individual will result in some individuals not receiving the services they need for meaningful access.

219.    In addition, the Revised Rule eliminates the existing requirement that non-discrimination notices include the availability of language assistance services and taglines in the top 15 languages spoken by LEP individuals in a state.  HHS "acknowledges the potential of reduced awareness of the availability of language services by LEP individuals by the changes made in this rule, or downstream effects on malpractice claims due to less awareness," 85 Fed. Reg. at 37,235, yet HHS dismissed these negative effects claiming enforcement of Section 1557 will diminish them.

220.    The Revised Rule will harm LEP patients, including members of the TransLatin@ Coalition and those the Coalition and its affiliated organizations (like FLAS and Arianna's Center) serve, as well as the LEP patients private health care provider plaintiffs serve, by diminishing or eliminating meaningful access to health care because they will not be aware of their rights or the programs or services available to them.

221.    The weakening of protections for LEP individuals will result not only in poorer health outcomes for LEP individuals, but also in increased costs and burdens for plaintiffs.  As a result of the Revised Rule, private health care and individual provider plaintiffs will face increased burdens due to fewer clients being aware of their language access rights and the likelihood that more people will turn to them for help in their language, rather than other covered health care providers.

222.    For example, the weakening of protections for LEP individuals will harm LEP patients of private health care providers who get care elsewhere and who private health care providers need to refer outside their organizations for specialty care, as they will no longer

A311

benefit from the notices, taglines, and additional language access provisions that are critical to ensure meaningful access to care.

223.    The weakening of protections also will burden private health care and individual provider plaintiffs, as well as members of health professional association plaintiffs, because patients will come to them sicker due to inadequate care elsewhere, and more people may come to them because their LEP services will remain robust.

224.    In addition, the weakening of protections for LEP individuals will harm private health care providers and individual provider plaintiffs, as well as members of health professional association plaintiffs, as it will place them at an increased risk for malpractice claims linked to inadequate language access.

### FIRST CLAIM FOR RELIEF
#### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
#### Arbitrary and Capricious

225.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

226.    Defendants are subject to the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*.

227.    The APA provides that courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).

228.    The Revised Rule is arbitrary and capricious because defendants' justifications for repealing critical anti-discrimination protections run counter to the evidence before the agency and disregard material facts and evidence, defendants fail to supply a reasoned explanation for their policy change from the 2016 Final Rule to the Revised Rule, defendants have failed to consider important aspects of the problem, including the Revised Rule's interference with

A312

current law, and defendants failed to account properly for the costs and benefits of the Revised Rule.

229.     The Revised Rule relies primarily on a single ruling and the federal government's litigation position in the *Bostock* case and related litigation to justify HHS's rejection of long-standing authority that has defined discrimination on the basis of sex in a variety of federal civil rights laws to include discrimination against individuals who are LGBTQ.  The Supreme Court now has rejected HHS's position.

230.     The Revised Rule also eliminates, contrary to statutory authority, the unitary legal standard for enforcement of violations of Section 1557, replacing it with a fractured approach that will complicate and make it more difficult to bring discrimination claims under Section 1557, particularly claims of intersectional discrimination.

231.     The Revised Rule's elimination of the explicit recognition of private rights of action and the availability of compensatory damages under Section 1557 also will confuse the public and mislead many individuals into not asserting their legal rights.

232.     In addition, contrary to the statutory language of Section 1557, the Revised Rule imports broad and sweeping exemptions for discrimination based on personal religious or moral belief from both the named statutes in Section 1557 and other statutes, like the Religious Freedom Restoration Act (42 U.S.C. § 2000bb *et seq.*), which Section 1557 does not reference. These exemptions invite individual health care providers, health care entities (hospitals, clinics etc.), and insurers across the country to opt out of treating patients, including many transgender patients, if they believe doing so would compromise their faith.  Defendants' attempt to create new religious exemptions in Section 1557 is contrary to law and endangers patients' health in the name of advancing the religious beliefs of those who are entrusted with caring for them – a result

A313

sharply at odds with HHS's stated mission, which is to "enhance and protect the health and well-being of all Americans" and to "provid[e] for effective health and human services."  It also adversely affects health care providers that serve and treat the LGBTQ community because (1) individual health care employees may decline to serve patients based on religious objections, and (2) their ability to refer patients to other providers will be impaired, as the Revised Rule invites those other providers to discriminate against their LGBTQ patients.

233.    The Revised Rule also arbitrarily limits the scope of Section 1557, cutting back on the entities subject to the statute, contrary to the plain language of Section 1557.

234.    Defendants also have failed to provide a sufficient explanation for the decision to eliminate the references to sexual orientation and gender identity discrimination in unrelated regulations promulgated under different statutes.  Neither the evidence before the agency nor the weight of the legal authority supports the elimination of these protections.

235.    Defendants also have failed to provide a sufficient explanation for the decision to eliminate protections against discrimination on the basis of association.  Neither the evidence before the agency nor the weight of the legal authority supports the elimination of these protections.

236.    The Revised Rule also is arbitrary and capricious in that it eliminates the requirement of notice of nondiscrimination requirements and access to language protections without adequate justification, undermining the ACA's charge to ensure individuals have access to health care and health insurance.

237.    The Revised Rule fails to consider important regulatory costs, including significant direct or indirect health costs to plaintiffs, their patients, and public health and safety.

A314

238.    The Revised Rule therefore is arbitrary, capricious, [or] an abuse of discretion" in

violation of the APA.  5 U.S.C. § 706(2)(A).

239.    Defendants' violations cause ongoing harm to plaintiffs, their patients, the

individuals they serve, and their members.

**SECOND CLAIM FOR RELIEF**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Not in Accordance with Law**

240.    Plaintiffs repeat and incorporate by reference each allegation of the prior

paragraphs as if fully set forth herein.

241.    Under the APA, a court must "hold unlawful and set aside agency action" that is

"not in accordance with law."  5 U.S.C. § 706(2)(A).

242.    The Revised Rule is not in accordance with law because it conflicts with the

Supreme Court's ruling in *Bostock* that discrimination on the basis of a person's sexual

orientation or transgender status is discrimination on the basis of sex under Title VII, and rejects

the well-established understanding of "sex" under longstanding civil rights laws as including

such discrimination.

243.    The Revised Rule's elimination of protections based on sexual orientation and

gender identity in unrelated regulations promulgated under different statutes likewise conflicts

with controlling legal authority regarding the meaning of "sex."

244.    The Revised Rule's elimination of protections against discrimination on the basis

of association contravenes existing case law and the underlying statutes and therefore is , not in

accordance with law.

245.    The Revised Rule conflicts with the statutory language and purpose of Section

1557 by failing to make the enforcement mechanisms provided by Title VI, Title IX, the Age

71

Discrimination Act, and the Rehabilitation Act available in the case of discrimination against a person based on any characteristic protected by these statutes.

246.    The Revised Rule also conflicts with the statutory language of Section 1557 by importing broad and sweeping exemptions based on personal religious or moral belief from the identified statutes in Section 1557 and other statutes, including the Religious Freedom Restoration Act (42 U.S.C. § 2000bb *et seq.*), which Section 1557 does not reference.

247.    In addition, the Revised Rule conflicts with the statutory language of Section 1557 by limiting the entities covered under Section 1557.

248.    The Revised Rule violates Section 1554 of the ACA, which explicitly prohibits the Secretary of HHS from promulgating any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care" or "impedes timely access to health care services." 42 U.S.C. § 18114.  The Revised Rule creates unreasonable barriers and impedes timely access to health care by reversing protections against discrimination of historically marginalized communities and eliminating access to language provisions.

249.    The Revised Rule therefore is "not in accordance with law" as required by the APA.  5 U.S.C. § 706(2)(A).

250.    Defendants' violations cause ongoing harm to plaintiffs, their patients, the individuals they serve, and their members.

**THIRD CLAIM FOR RELIEF**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(C)**
**Exceeds Statutory Authority**

251.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

A316

252.     Under the APA, a court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

253.     Federal agencies do not have the power to act unless Congress confers the power upon them.  Defendants were not given the power to alter Section 1557's statutory terms, but that is precisely what the Revised Rule attempts to do.  The Revised Rule unduly limits the explicit nondiscrimination protections against sex discrimination set forth in Section 1557 by purporting to preclude claims of discrimination based on an individual's LGBTQ status.  It also places health care services for LGBTQ people, gender nonconforming people, and other consumers at risk without congressional authorization to make these changes.

254.     The Revised Rule's elimination of a unitary legal standard to address violations of Section 1557 and limitation on the entities covered under Section 1557 likewise is contrary to the language and intent of Section 1557 and exceeds HHS's authority.

255.     The Revised Rule also amends a series of unrelated regulations to conform with the Revised Rule.  The Revised Rule erases not only existing protections for LGBTQ people in the 2016 Final Rule, but eliminates such protections in other regulations, which were promulgated pursuant to the authority granted by several different statutes, including Section 1321(a) and the provisions of the ACA, Social Security Act, and other statutory authority, not Section 1557.

256.     The Revised Rule also eliminates notice requirements and access to language protections, undermining the ACA's central purpose to ensure individuals have access to health care and health insurance.

A317

257.     The Revised Rule therefore is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" in violation of the APA.  5 U.S.C. § 706(2)(C).

258.      Defendants' violations cause ongoing harm to plaintiffs, their patients, the individuals they serve, and their members.

**FOURTH CLAIM FOR RELIEF**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(B)**
**and U.S. Constitution, Fifth Amendment, Equal Protection Component**

259.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

260.     Under the APA, a court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

261.     The Fifth Amendment's Due Process Clause provides that no person shall be deprived of life, liberty, or property without due process of law.

262.     The Due Process Clause includes within it a prohibition against the denial of equal protection of the laws by the federal government, its agencies, or its officials or employees.

263.     The purpose and effect of the Revised Rule are to discriminate against plaintiffs, their patients, the individuals they serve, and their members based on their sex, gender identity, transgender status, gender nonconformity, and exercise of their fundamental rights, including the rights to bodily integrity and autonomous medical decision-making, and the rights to live and express oneself consistent with one's gender identity.

264.     The Revised Rule also is intended to have and will have a disproportionate impact on LGBTQ people.  The Revised Rule places an impermissible special burden on these individuals.

A318

265.     LGBTQ people have suffered a long history of discrimination and continue to suffer that discrimination.  They are part of discrete and insular groups and lack the power to protect their rights through the political process.

266.     Transgender people have a gender identity that differs from the sex assigned to them at birth.  A person's gender identity is a core, defining trait fundamental to a person's sense of self and personhood.

267.     Requiring a person to abandon their gender identity as a condition to equal treatment violates the Equal Protection Clause.

268.     Discrimination on the basis of sex, including on the basis of gender identity, transgender status, sexual orientation, and failure to conform to sex stereotypes, is presumptively unconstitutional and subject to heightened scrutiny.

269.     Similarly, discrimination based on the exercise of a fundamental right is presumptively unconstitutional and is subject to strict scrutiny.

270.     The Revised Rule lacks a rational or legitimate justification, let alone the important or compelling one that is constitutionally required.  The Revised Rule also lacks adequate tailoring under any standard of review.

271.     Defendants' encouragement of discrimination against LGBTQ people deprives LGBTQ people of their right to equal dignity and stigmatizes them as second-class citizens.

272.     The Revised Rule therefore violates the Equal Protection Clause of the Fifth Amendment of the U.S. Constitution and must be set aside under the APA and the Fifth Amendment.

273.     Defendants' violations cause ongoing harm to plaintiffs, their patients, the individuals they serve, and their members.

A319

## FIFTH CLAIM FOR RELIEF
### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(B)
### and U.S. Constitution, Fifth Amendment, Substantive Due Process

274.    Plaintiffs repeat and incorporate by reference each allegation of the prior
paragraphs as if fully set forth herein.

275.    Under the APA, a court must "hold unlawful and set aside agency action" that is
"contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

276.    The Fifth Amendment's Due Process Clause protects individuals' substantive
rights to be free to make certain decisions central to privacy, bodily autonomy, integrity, self-
definition, intimacy, and personhood without unjustified governmental intrusion.  Those
decisions include the right to transition-related medical treatment, as well as the right to live
openly and express oneself consistent with one's gender identity.

277.    By encouraging health care providers and insurers to interfere with and unduly
burden patients' access to medically necessary health care, the Revised Rule violates the rights
of plaintiffs to privacy, liberty, dignity, and autonomy as guaranteed by the Fifth Amendment.

278.    A person's gender identity and ability to live and express oneself consistent with
one's gender identity without unwarranted governmental interference is a core aspect of each
person's autonomy, dignity, self-definition, and personhood.  By encouraging health care
providers and insurers to deny or otherwise interfere with individuals' access to gender-affirming
medical care, including surgical procedures, hormone therapy, and other medically necessary
care, and by interfering with the ability of transgender and gender-nonconforming individuals to
live and express themselves in accordance with their gender identities, the Revised Rule
infringes on patients' interests in privacy, liberty, dignity, and autonomy protected by the Fifth
Amendment.

76

A320

279.     There is no legitimate interest supporting the Revised Rule's infringement on patients' fundamental rights, let alone an interest that can survive the elevated scrutiny required to justify infringement of these fundamental rights.

280.     The Revised Rule therefore violates the Due Process Clause of the Fifth Amendment of the U.S. Constitution and must be set aside under the APA and the Fifth Amendment.

281.     Defendants' violations cause ongoing harm to plaintiffs, their patients, the individuals they serve, and their members.

**SIXTH CLAIM FOR RELIEF**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(B)**
**and U.S. Constitution, First Amendment, Free Speech**

282.     Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

283.     Under the APA, a court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

284.     The Free Speech Clause of the First Amendment to the United States Constitution declares:  "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  The Free Speech Clause prohibits the government from "chilling" a person's right to free expression.

285.     A person's disclosure of their transgender or gender nonconforming status, speech or expression that discloses gender identity, and a person's gendered speech and expressive conduct all receive constitutional protection under the First Amendment.

286.     The Revised Rule has the purpose and effect of chilling constitutionally protected First Amendment activity.  As a result of the Revised Rule, an increased number of LGBTQ

A321

people will remain closeted in health care settings and to doctors, nurses, and other healthcare

providers and will decline to disclose their sexual orientation, transgender status, or gender

identity.

287.    Further, an increased number of LGBTQ people will decline to engage in

gendered speech and expression, including by declining to disclose related medical histories—

even when that self-censorship impedes the ability of their health care providers to provide

appropriate treatment and results in negative health consequences to the patients and to public

health.

288.    The Revised Rule will chill a patient of ordinary firmness from making such

disclosures.

289.    The Revised Rule violates the Free Speech Clause of the First Amendment

because it impermissibly burdens the exercise of patients' constitutionally protected speech,

expression and expressive conduct based on the content and viewpoint of patients' speech.

290.    In addition, the Revised Rule is overbroad because it will chill protected First

Amendment activity.

**SEVENTH CLAIM FOR RELIEF**
**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(B)**
**and U.S. Constitution, First Amendment, Establishment Clause**

291.    Plaintiffs repeat and incorporate by reference each allegation of the prior

paragraphs as if fully set forth herein.

292.    Under the APA, a court must "hold unlawful and set aside agency action" that is

"contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).

293.     The Establishment Clause of the First Amendment to the United States

Constitution declares:  "Congress shall make no law respecting an establishment of religion."

A322

U.S. Const. amend. I.  The Establishment Clause prohibits the government from favoring one religion over another, or religion over nonreligion.

294.   The Establishment Clause permits the government to provide religious accommodations or exemptions from generally applicable laws only if, among other requirements, the accommodation (1) lifts a substantial, government-imposed burden on the exercise of religion, and (2) does not shift substantial costs or burdens onto a discrete class of third parties, without regard for the third parties' interests.  In other words, the government may "accommodate" religion in accordance with the Free Exercise Clause, but it may not "promote" religion.

295.   The Revised Rule violates the Establishment Clause by creating expansive religious exemptions for health care providers, plans, and employees at the expense of third parties – namely, plaintiffs, other providers, and most importantly the patients and the individuals whom plaintiffs serve.  It invites health care providers, including insurance companies, hospitals, doctors, and nurses, to deny LGBTQ patients necessary medical treatment based on their religious beliefs.

296.   The effect of the Revised Rule will be that patients who seek care at odds with the religious beliefs of a health care provider or employee of a health care provider may be delayed in receiving care (including emergency care) or denied care altogether.

297.   The Revised Rule also will burden plaintiffs by precluding them from carrying out their organizational missions based solely on the religious views of a single employee.

298.   In addition, plaintiffs will be harmed because their ability to refer LGBTQ patients to other providers will be affected in that they will not know whether these providers will discriminate against their patients and/or refuse to treat their patients under the Revised

A323

Rule's personal religious or moral belief exemptions.  Plaintiffs thus will be required to redirect their staff and resources from providing their own services to assisting patrons in determining who among the health care providers in the region will serve LGBTQ patients in a nondiscriminatory manner.

299.    The Revised Rule violates the Establishment Clause because it:

(a)    has the primary purpose and effect of favoring, preferring, and endorsing certain religious beliefs and certain religious denominations over others and over nonreligion;

(b)    has the primary purpose and effect of preferring the religious beliefs of some people and institutions over the lives, health, and other rights and interests of third parties;

(c)    impermissibly entangles government with religion;

(d)    makes plaintiffs, their patients, and other third parties bear the costs and harms of objecting employees' religious beliefs or religious exercise; and

(e)    imposes on plaintiffs a requirement to accommodate employees' religious objections without taking constitutionally required account of the actual burdens (if any) on the objectors or the effects on or harms to plaintiffs, their patients, or the greater public health.

300.    Those who are denied coverage will suffer the stigma of government-sanctioned discrimination.  They also will be forced to either endure significant psychological burdens or, if they can afford it, pay for treatment out-of-pocket.  The Revised Rule favors religion at the expense of LGBTQ patients without regard for LGBTQ patients' interests.  The Revised Rule contains no provision for balancing or accounting for a patient's right to care.  Instead, it applies

A324

categorically to deny patients the right to medical treatment based on a provider's religious or moral beliefs.

301.    The Revised Rule therefore violates the Establishment Clause of the First Amendment of the U.S. Constitution and must be set aside under the APA and the Establishment Clause.

302.    Defendants' violations cause ongoing harm to plaintiffs, their patients, the individuals they serve, and their members.

**EIGHTH CLAIM FOR RELIEF**
**Equitable Relief to Preserve Remedy**

303.    Plaintiffs repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

304.    The Revised Rule will become effective on August 18, 2020 unless it is enjoined. Plaintiffs are entitled to a full, fair, and meaningful process to adjudicate the lawfulness of the Revised Rule before being required to implement its far-reaching and harmful requirements.

305.    Plaintiffs will suffer irreparable injury by implementation of the Revised Rule, which would erode hard-won trust between LGBTQ people and their health care providers, stigmatize and traumatize patients, interfere with medical procedures and operations, and result in delays and denials of care leading to physical harm and even death.  Preliminary and permanent injunctive relief is needed to ensure that plaintiffs' injuries are fully remedied.

306.    Injunctive relief also is needed to prevent the immediate harm resulting from the Revised Rule.  Patients need assurance that they will receive complete, accurate information and timely and responsive medical care in an environment that protects their constitutional rights and does not expose them to stigma and harm.  This Court should step in to protect plaintiffs' institutions, their patients, the individuals they serve, and their members, in addition to the

A325

foremost principle guiding medical providers in responding to those in need of assistance and care – first, do no harm.

307.    Accordingly, to ensure that plaintiffs receive meaningful relief should they prevail in this action, the Court should preliminarily and permanently enjoin defendants from implementing the Revised Rule.

## REQUEST FOR RELIEF

Wherefore, plaintiffs pray that the Court grant the following relief:

A.  Declare that the Revised Rule is unlawful and unconstitutional through a declaratory judgment under 28 U.S.C. § 2201(a) and 5 U.S.C. § 706(a);

B.  Set aside and vacate the Revised Rule;

C.  Preliminarily and permanently enjoin the implementation and enforcement of the Revised Rule;

D.  Award reasonable attorneys' fees, costs, and expenses; and

E.  Award any other further and additional relief the Court deems just and proper.

A326

Dated:  June 22, 2020

LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.

By:  /s/ Omar Gonzalez-Pagan

OMAR GONZALEZ-PAGAN*
*ogonzalez-pagan@lambdalegal.org*
KAREN LOEWY*
*kloewy@lambdalegal.org*
CARL S. CHARLES*
*ccharles@lambdalegal.org*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY  10005
Phone: (212) 809-8585
Fax:     (212) 809-0055

JAMIE A. GLIKSBERG*
*jgliksberg@lambdalegal.org*
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
105 West Adams, 26th Floor
Chicago, IL  60603
Phone: (312) 663-4413
Fax:     (312) 663-4307


* *Motion for admission pro hac vice pending.*

** *Application for admission to U.S. District
Court for the District of Columbia forthcoming.*

Respectfully submitted,

STEPTOE & JOHNSON LLP

By:  /s/ Johanna Dennehy

LAURA (LAURIE) J. EDELSTEIN*
*ledelstein@steptoe.com*
STEPTOE & JOHNSON LLP
One Market Plaza
Spear Tower, Suite 3900
San Francisco, CA  94105
Phone: (415) 365-6700
Fax:     (415) 365 6699

MICHAEL VATIS
(D.C. Bar No. 422141)
*mvatis@steptoe.com*
KHRISTOPH A. BECKER*
*kbecker@steptoe.com*
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, NY  10036
Phone: (212) 506-3900
Fax:     (212) 506-3950

JOHANNA DENNEHY
(D.C. Bar No. 1008090)
*jdennehy@steptoe.com*
LAURA LANE-STEELE**
*llanesteele@steptoe.com*
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, DC  20036
Phone: (202) 429-3000
Fax:     (202) 429-3902

*Counsel for Plaintiffs*

83

A327



HOME  >  ACP NEWSROOM  >  INTERNISTS APPLAUD SUPREME COURT DECISION MAKING IT ILLEGAL FOR EMPLOYERS TO DISCRIMINATE AGAINST
LGBTQ INDIVIDUALS, URGE REVERSAL OF FEDERAL RULE ALLOWING DISCRIMINATION IN HEALTH CARE

# Internists Applaud Supreme Court Decision Making It Illegal for Employers to Discriminate Against LGBTQ Individuals, Urge Reversal of Federal Rule Allowing Discrimination in Health Care

*Statement attributable to:*
*Jacqueline W. Fincher, MD, MACP*
*President, American College of Physicians*

Washington, DC (June 15, 2020) — The American College of Physicians (ACP) strongly believes that LGBTQ individuals must be legally protected from discrimination and we are in full support of today's U.S. Supreme Court ruling forbidding job discrimination on the basis of sexual orientation. The court ruled that Title VII of the Civil Rights Act of 1964, which prohibits employers from discrimination because of a person's sex, covers sexual orientation.

Discrimination harms the health of LGBTQ individuals, both mentally and physically. As physicians, we have a responsibility to protect our patients and improve the health of all Americans, and LGBTQ individuals are no exception. ACP has long said that discrimination against any person based on sexual orientation, gender, gender orientation and other personal characteristics, is a public health issue.

That is also why ACP strongly condemns the recent announcement from the Trump administration that does away with federal protections under the Affordable Care Act for transgender and other individuals seeking health care. The administration's final rule will allow and even encourage health care facilities to discriminate against patients based on their gender identity, eliminates explicit non-discrimination protections for LGBQ persons in qualified health plans, and lead to persons being denied access to care because of their gender identity. ACP submitted comments to the administration opposing weakening of such protections and remains committed to seeking reversal of the administration's ru

Discrimination based on a person's sexual orientation, gender, gender identity, and other personal characteristics should never be permissible in employment, and in health care.  ACP will continue to advocate on behalf of ALL of America's health care patients.



Read more about ACP's policies on Lesbian, Gay, Bisexual, and Transgender Health Disparities here ↗.

***

*About the American College of Physicians*
*The American College of Physicians is the largest medical specialty organization in the United States with members in more than 145 countries worldwide. ACP membership includes 159,000 internal medicine physicians (internists), related subspecialists, and medical students. Internal medicine physicians are specialists who apply scientific knowledge and clinical expertise to the diagnosis, treatment, and compassionate care of adults across the spectrum from health to complex illness. Follow ACP on Twitter ↗, Facebook ↗, and Instagram ↗.*

**Contact**: Taneishia Bundy, (202) 261-4523, tbundy@acponline.org

A329