# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | |
|---|---|
| **AMERICAN COLLEGE OF PEDIATRICIANS**, on behalf of itself and its members; **CATHOLIC MEDICAL ASSOCIATION**, on behalf of itself and its members; and **JEANIE DASSOW, M.D.,** | Civil Action No. 1:21-cv-195 |
| *Plaintiffs,* | |
| v. | |
| **XAVIER BECERRA**, in his official capacity as Secretary of the United States Department of Health and Human Services; **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES**; **LISA J. PINO**, in her official capacity as Director of the Office for Civil Rights of the U.S. Department of Health and Human Services; and **OFFICE FOR CIVIL RIGHTS OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**, | |
| *Defendants.* | |

## DECLARATION OF MARIO DICKERSON

I, Mario Dickerson, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.   I am over eighteen years of age and make this declaration on personal knowledge. If called as a witness, I could and would testify competently to the matters set for herein.

2.   I serve as the Executive Director of the Catholic Medical Association ("CMA"). Given my involvement in CMA, I am familiar with the organization's history, the issues confronting it, and the views of the organization and its members concerning various emerging issues, including the gender identify mandate at issue in this litigation.

1

## I.   CMA's Membership and Mission

3.   CMA is the largest association of Catholic individuals in healthcare. CMA is a national, physician-led community that includes about 2500 physicians and health providers nationwide.

4.   CMA is a nonprofit organization incorporated in Virginia, and its registered agent is in Virginia.

5.   CMA has three member guilds in Tennessee: in Clarksville, the Immaculate Conception Catholic Medical Guild; in Memphis, the Catholic Medical Association of Memphis Guild; and in Nashville, the Nashville Guild. It hosted its annual national conference in 2019 in Nashville.

6.   CMA also has individual members in Tennessee.

7.   Most CMA members provide medical care in health programs and activities receiving federal financial assistance under 42 U.S.C. § 18116.

8.   Some CMA members provide medical care in programs or entities receiving grants from HHS governed by 45 C.F.R. § 75.300.

9.   CMA's mission is to inform, organize, and inspire its members, in steadfast fidelity to the teachings of the Catholic Church, to uphold the principles of the Catholic faith in the science and practice of medicine.

10.   For CMA and its members, medical ethics and science, not cultural ideologies or political correctness, serve as the basis of all true healthcare.

11.   CMA also follows the teachings of the Catholic Church, believing that faith and reason work together to inform how to love and care for community members.

12.   CMA seeks to pursue its mission in conformity to Christ the Divine Physician. Its members are challenged to be a voice of truth spoken in charity, to show how Catholic teachings on the human person, human rights and the common good intersect with and improve the science and practice of medicine, and to defend the sacredness and dignity of human life at all stages.

2

13.   CMA is committed to handing on a Catholic and Hippocratic approach to medicine.

14.   CMA builds communities of support through local guilds (chapters) covering every region of the country and the military. Guilds provide fellowship, education, and service to the local Church, the community, and peers in healthcare.

15.   CMA is dedicated to educating and supporting the next generation. Through the Catholic Medical Association Student Section (CMA-SS) and its student chapters, as well as the Catholic Medical Association Resident Section, CMA provides meaningful support and instruction to medical students as they grow in the Catholic faith and as medical professionals.

16.   CMA represents faithful Catholics in the healthcare field so that its members can grow in faith, maintain ethical integrity, and provide excellent healthcare in accordance with the teachings of the Roman Catholic Church. CMA's mission is forming and supporting current and future physicians to live and promote the principles of the Catholic faith in the science and practice of medicine. CMA's vision is inspiring physicians to imitate Jesus Christ.

17.   CMA is a leading national voice on applying the principles of the Catholic faith to medicine. CMA creates and organizes educational resources and events; advocates for members, the Church, and the medical profession in public forums; and provides guidance for bishops and other national leaders on healthcare ethics and policy.

18.   Since its early founding, CMA has published a scholarly journal, *The Linacre Quarterly*, which was designed to educate members and subscribers on how the principles of the Catholic faith applied to pertinent medical and scientific issues of the times. The name, The Linacre Quarterly, was chosen to honor Thomas Linacre, M.D., a physician and priest in 16th century England, who served as the private physician to King Henry VIII and was a founding member of the Royal College of

3

Physicians. Dr. Linacre was well known for his scholarship, high standards for scientific medicine, and strong Catholic faith.

## II.   Core Beliefs Regarding Conscience, Sex, and Gender

### A. Freedom of Conscience

19.   CMA believes that the rights of conscience and religious freedom are integral to each person's dignity.

20.   Pope Francis, speaking recently in Morocco, reminds us that "freedom of conscience and religious freedom—which is not limited to freedom of worship alone, but allows all to live in accordance with their religious convictions—are inseparably linked to human dignity."

21.   The importance of freedom of conscience is taught by the Second Vatican Council and emphasized by St. John Paul II, who reiterated that conscience must be allowed to seek the truth of a question, thus necessarily allowing for open public discourse.

22.   As the Catechism explains, "Conscience includes the perception of the principles of morality (synderesis); their application in the given circumstances by practical discernment of reasons and goods; and finally judgment about concrete acts yet to be performed or already performed. the truth about the moral good, stated in the law of reason, is recognized practically and concretely by the prudent judgment of conscience." Catechism § 1780.[1] "A human being must always obey the certain judgment of his conscience." Catechism § 1800.

23.   The Catholic Church teaches that each person must be respected in their conscience. "Man has the right to act in conscience and in freedom so as personally to make moral decisions. 'He must not be forced to act contrary to his conscience. Nor

---

[1] *See, e.g.*, Catechism of the Catholic Church § 1780 (2d ed.), https://www.usccb.org/beliefs-and-teachings/what-we-believe/catechism/catechism-of-the-catholic-church ("Catechism").

must he be prevented from acting according to his conscience, especially in religious matters.'" Catechism § 1782 (citation omitted).

24.   In the same way, the Catholic Church teaches that freedom of religion must be respected for all. "Nobody may be forced to act against his convictions, nor is anyone to be restrained from acting in accordance with his conscience in religious matters in private or in public, alone or in association with others, within due limits." This right is based on the very nature of the human person, whose dignity enables him freely to assent to the divine truth which transcends the temporal order. For this reason it "continues to exist even in those who do not live up to their obligation of seeking the truth and adhering to it." Catechism § 2106 (citation omitted). "The right to religious liberty is neither a moral license to adhere to error, nor a supposed right to error, but rather a natural right of the human person to civil liberty, i.e., immunity, within just limits, from external constraint in religious matters by political authorities. This natural right ought to be acknowledged in the juridical order of society in such a way that it constitutes a civil right." Catechism § 2108.

25.   In the medical context, CMA continues to uphold the importance for conscience protection and religious freedom for healthcare providers in accord with their personal dignity.

26.   CMA and its members believe that the controversial and complex issues addressed in the gender identity mandate must be thoroughly discussed among the medical community, and so no government mandates would be appropriate while this discussion is ongoing, and no mandates would be appropriate in a way that violates conscience rights or religious freedom.

### B. Core Understanding of Sex and Gender

27.   CMA and its members sincerely believe that sex is a biological, immutable characteristic.

5

28.   CMA and its members believe that the norm for human design is to be conceived either male or female.

29.   They respect the dignity of the human person as an embodied true male or female.

30.   Every cell in the human body holds either an "XY" or "XX" pair of sex chromosomes, the genetic markers for males and females, respectively.

31.   Human sexuality is binary by design to ensure the reproduction and flourishing of our species.

32.   The very rare disorders of sex development ("intersex" individuals) are medical deviations from the sexual binary norm, and do not constitute additional sexes.

33.   These beliefs reflect scientific reality, as well as thousands of years of Christian anthropology, with its roots in the narrative of human origins that appears in the Book of Genesis, when "God created man in his own image . . . male and female he created them." Gen. 1:27.

34.   The Catholic Church teaches that men and women are created in two sexes with corresponding identities.[2]

35.   The Catholic Church thus opposes invasive and drastic medical interventions promoted by modern gender ideology. "Except when performed for strictly therapeutic medical reasons, directly intended amputations, mutilations, and sterilizations performed on innocent persons are against the moral law." Catechism § 2297.

36.   The Catholic Church also teaches this lived biological reality of two sexes creates various obligations for public authorities. Catechism § 1907.

---

[2] *See, e.g.*, Catechism § 2333, 2393; Pope Francis, Encyclical letter *Laudato Si'* ¶ 155 (2015), https://www.vatican.va/content/francesco/en/encyclicals/ documents/papa-francesco_20150524_encicli ca-laudato-si.html.

6

37.   The Catholic Church's most extensive statement today exclusively on gender identity is *Male and Female He Created Them: Towards a Path of Dialogue on the Question of Gender Theory in Education*.[3] The Church calls for love and respect for all people.

38.   In this guide it outlines both theological and scientific truths about the human person, including that there are two sexes created by God and found in nature, that one cannot separate one's sex from one's gender, and that there are biological and unchangeable differences between men and women. Ignoring these truths does not address or help persons who are suffering.

### C. Concerns on Gender Interventions

39.   More and more people now no longer identify with their biological sex, and teens in particular are identifying as transgender in record numbers. Studies report that in 2017, 3–4 in 100 teens in the United States reported that they are or may be transgender. Even now, a more recent 2021 study suggests that the rate of transgender identification among America's youth may be as high as 9 in 100. Studies also show that every major gender center in the world have reported a several-thousand-percent increase in youth presenting with gender distress.[4]

40.   Increasing numbers of children with gender dysphoria are being placed on puberty-arresting medications, to allow them more time to "decide" on their gender. Along with preventing the development of secondary sex characteristics, these medications arrest bone growth, decrease bone density, prevent the normal pubertal organization and maturation of the adolescent brain, and prevent the development of

---

[3] Congregation for Catholic Education, *Male and Female He Created Them: Towards a Path of Dialogue on the Question of Gender Theory in Education* (2019), http://www.educatio.va/content/dam/cec/Documenti/19_0997_INGLESE.pdf.

[4] William Malone, *Time to Hit Pause on 'Pausing' Puberty in Gender-Dysphoric Youth*, Medscape (Sept. 17, 2021), https://wb.md/3D4IVf5.

sperm in boys and eggs in girls. Further interventions include hormones and surgeries.

41.   One representative article outlining and illustrating CMA members' concerns with invasive gender interventions was published in a scholarly format in CMA's quarterly journal by Paul W. Hruz, M.D., PhD at the Washington University School of Medicine.[5]

42.   The article identifies a lack of high-quality scientific data for common gender identity interventions, such as the general lack of randomized prospective trial design, a small sample size, recruitment bias, short study duration, high subject dropout rates, and reliance on opinion. It explains the serious deficits in understanding the cause of this condition or in understanding the reasons for the marked increase in people presenting for medical care.

43.   While a need for effective treatment modalities for patients in this distress is clear, the article shows the immediate and long-term risks relative to benefit of these new forms of medical intervention, including significant intervention-associated morbidity—raising concerns that the primary goal of suicide prevention is not achieved.

44.   The article notes that, on top of substantial moral questions, under the established principles of evidence-based medicine, providers should have a high degree of caution in accepting gender-transition medical interventions as a preferred treatment approach. It recommends continued consideration and rigorous investigation of alternate approaches to alleviating suffering in people with gender dysphoria. It particularly encourages further investigation of the phenomenon of adolescent girls with no prior expression of gender dysphoria presenting as having a transgendered identity in social networks (aka rapid onset gender dysphoria).

---

[5] Paul W. Hruz, *Deficiencies in Scientific Evidence for Medical Management of Gender Dysphoria*, 87 Linacre Quarterly 34, 34-42 (Sept. 20, 2019), https://doi.org/10.1177/0024363919873762.

8

45.   CMA is especially concerned about the lack of studies revealing the long-term effects of these procedures and interventions. In no other area of science would these types of surgeries, procedures, and interventions move forward without the research to back it up. CMA has always favored sound medical science, and ignoring biology would do a great disservice to the medical profession.

### D. Concerns on Gender Interventions

46.   Science shows that arresting puberty as a gender identity intervention is scientifically dangerous to children. Arresting puberty past its natural onset is therefore ethically, scientifically, and religiously objectionable for CMA members to support.

47.   Healthcare professionals need to use biological identity to treat the hundreds of sex-linked disorders that patients may present. Otherwise, poor care would result. Doctors must treat patients based on their genetic make-up, the presence of reproductive organs and diseases unique to biological gender. Changing pronouns will not and cannot change this obligation.

48.   These scientific facts are reflected in Christian anthropology, which is ground in biological and medical reality. As one bishop explained in a recent pastoral letter, "We know from biology that a person's sex is genetically determined at conception and present in every cell of the body. Because the body tells us about ourselves, our biological sex does in fact indicate our inalienable identity as male or female. Thus, so-called transitioning' might change a person's appearance and physical traits (hormones, breasts, genitalia, etc.) but does not in fact change the truth of the person's identity as male or female, a truth reflected in every cell of the body." "Indeed, no amount of masculinizing' or 'feminizing' hormones or surgery can make a man into a woman, or a woman into a man."[6]   As a result, the "claim to 'be

---

[6] Most Rev. Michael F. Burbidge, Bishop of Arlington, A Catechesis on the Human Person and Gender Ideology,https://www.arlingtondiocese.org/bishop/public-messages/2021/a-catechesis-on-the-human-

transgender' or the desire to seek 'transition' rests on a mistaken view of the human person, rejects the body as a gift from God, and leads to grave harm. To affirm someone in an identity at odds with biological sex or to affirm a person's desired 'transition' is to mislead that person. It involves speaking and interacting with that person in an untruthful manner." *Id*.

49.  CMA thus urges healthcare professionals to adhere to genetic science and sexual complementarity over ideology in the treatment of gender dysphoria in children. This includes especially avoiding puberty suppression and the use of cross-sex hormones in children with gender dysphoria. One's sex is not a social construct, but an unchangeable biological reality.

50.  In accord with these scientific and religious understandings, CMA and its members believe that healthcare that provides gender-transition procedures and interventions is neither healthful nor caring; it is experimental and dangerous.

51.  For CMA and its members, gender-transition procedures and interventions can be harmful, particularly to children, and medical science does not support the provision of such procedures or interventions.

52.  CMA and its members thus believe providing or referring patients for the provision of gender identity interventions violates their core beliefs and their oath to "do no harm."

53.  CMA thus opposes pubertal suppression of minors, as well as hormone administration or other surgical interventions for purposes of "choosing" a gender or sex, and it objects to engaging in speech affirming these gender interventions.

---

person-and-gender-ideology/. Of course, at the same time, every "disciple of Christ desires to love all people and to seek their good actively. Denigration or bullying of any person, including those struggling with gender dysphoria, is to be rejected as completely incompatible with the Gospel." *Id*.

10

54. CMA has adopted an official resolution stating, "the Catholic Medical Association does not support the use of any hormones, hormone blocking agents or surgery in all human persons for the treatment of Gender Dysphoria."

55. CMA has adopted an official resolution stating, "Catholic Medical Association and its members reject all policies that condition children to accept as normal a life of chemical and surgical impersonation of the opposite sex" as well as "the use of puberty blocking hormones and cross-sex hormones."

56. CMA has adopted an official resolution stating, "the Catholic Medical Association, in recognition of the dignity of the person, supports the continuation of gender-specific facilities in all public and private places; and further resolves that a reasonable accommodation is a single-occupancy facility available for all persons who are uncomfortable with the standard arrangement of gender-specific facilities."

57. In short, CMA holds that the longstanding principle of "First do no harm" must be upheld in all medical treatment, including for children and adolescents with gender dysphoria.

## III. HHS's Gender Identity Mandate is Inconsistent with CMA and its Members' Beliefs.

58. Our members provide high-quality medical services to all people, regardless of their "internal sense of gender."

59. For our members, the Hippocratic Oath, their faith, and commitment to the medical professional demand nothing less.

60. Our members believe that a patient with medical needs, such as a broken bone, an infection, or cancer, should be given the best medical care possible, regardless of their identity.

61. But HHS' gender identity mandate conflicts with our organization's foundational principles, and the core ethical beliefs of our members.

62.   This pertains to both HHS's gender identity mandate under Section 1557 of the ACA, in the 2016 ACA Rule and the May 10, 2021 notice of enforcement, and HHS's gender identity mandate under HHS's 2016 Grants rule, since CMA members are affected by both. Herein, I refer to these collectively as the gender identity mandate.

63.   Most of CMA's members treat patients within federal healthcare programs such as Medicaid, Medicare, and CHIP.

64.   Many CMA members also work in hospitals that receive HHS grants and are thus subject to the 2016 Grants Rule, and some provide services in clinics serving rural or underserved populations.

65.   Upon information and belief, the hospitals where CMA's members provide care receive grants from HHS, as do the clinics serving rural or underserved populations.

66.   CMA has many members who receive federal funds.

67.   CMA has many members who provide medical services that are used by others as part of attempted medical gender transitions.

68.   At its core, HHS's gender identity mandate requires CMA members to provide gender-transition interventions, treat patients as if their sex is their gender identity and not their actual biological sex, and engage in speech affirming gender identity regardless of the doctors' medical judgment and religious or ethical objections.

69.   The gender identity mandate requires CMA members to engage in various practices to which our members objection on medical and ethical grounds, including the following:

  a.  Prescribing puberty blockers off-label from the FDA-approved indication to treat gender dysphoria and initiate or further transition in adults and children;

b. Prescribing hormone therapies off-label from the FDA-approved indication to treat gender dysphoria in all adults and children;

c. Providing other continuing interventions to further gender transitions ongoing in both adults and minors;

d. Performing hysterectomies or mastectomies on healthy women who believe themselves to be men;

e. Removing the non-diseased ovaries of healthy women who believe themselves to be men;

f. Removing the testicles of healthy men who believe themselves to be women;

g. Performing a process called "de-gloving" to remove the skin of a man's penis and use it to create a faux vaginal opening;

h. Remove vaginal tissue from women to facilitate the creation of a faux or cosmetic penis;

i. Performing or participating in any combination of the above mutilating cosmetic procedures or similar surgeries,[7] to place a patient somewhere along the socially constructed gender identity spectrum;

j. Offering to perform, provide, or prescribe any and all such interventions, procedures, services, or drugs;

k. Referring patients for any and all such interventions, procedures, services, or drugs;

l. Ending or modifying their policies, procedures, and practices of not offering to perform or prescribe these procedures, drugs, and interventions;

---

[7] Similar objectionable surgeries include orchiectomy and penectomy (removal of testicles and penis); clitoroplasty, labiaplasty, and vaginoplasty (creation of a clitoris, labia, and vagina); vulvectomy and vaginectomy (removal of vulva and vagina); and metoidioplasty and phalloplasty (creation of penis).

m. Saying in their professional opinions that these gender intervention procedures are the standard of care, are safe, are beneficial, are not experimental, or should otherwise be recommended;

n. Treating patients according to gender identity and not sex;

o. Expressing views on gender interventions that they do not share;

p. Saying that sex or gender is nonbinary or on a spectrum;

q. Using language affirming any self-professed gender identity;

r. Using patients' preferred pronouns according to gender identity, rather than using no pronouns or using pronouns based on biological sex;

s. Creating medical records and coding patients and services according to gender identity not biological sex;

t. Providing the government assurances of compliance, providing compliance reports, and posting notices of compliance in prominent physical locations, if the 2016 Rule's interpretation of the term sex governs these documents;

u. Refraining from expressing their medical, ethical, or religious views, options, and opinions to patients when those views disagree with gender identity theory or transitions; and

v. Allowing patients to access single-sex programs and facilities, such as mental health therapy groups, breastfeeding support groups, post-partum support groups, educational sessions, changing areas, restrooms, communal showers, and other single-sex programs and spaces, by gender identity and not by biological sex.

For ease of reference, the items in this list will be referred to as the "objectionable practices."

70.   The objectionable practices violate the teachings of the Church, and our organization's members cannot carry them out in good conscience.

14

71.   Our members do not have policies or practices in favor of engaging in these objectionable practices, and they object to changing their current policies or to implementing different policies, as the gender identity mandate would require of them for these objectionable practices.

72.   Our members will never abandon a patient and they will discuss procedures and interventions used for altering biological sex characteristics under informed consent. If a patient still requests such procedures, the patient's care can be safely transferred to a provider selected by the patient. All medical care available through a medical practice will be provided to all persons except those objectionable procedures and interventions that alter biologically determined sex characteristics.

73.   Our members write pronouns on charts and refer to clients with biologically correct pronouns, as well as create charts and medical records by biological sex.

## IV.   Effect on Patient Privacy and to Single-Sex Medical Programs

74.   CMA also believes that to eliminate sex-specific private spaces violates fundamental rights of all persons to privacy, safety, and a secure environment. In healthcare programs, as in schools, locker rooms, and restrooms, the facilities exist for the utilitarian purpose of hygiene, not to affirm the self-identified gender of certain individuals. These facilities are traditionally restricted to persons of the same sex for the sound and self-evident reason that such separation protects the bodily privacy of all. It also shields girls and women from offensive, criminal, or dangerous behaviors of voyeurs, exhibitionists, and rapists, whose claim to transgender status may exist to take advantage of access given to transgender persons.

75.   Rather than end single-sex spaces by allowing persons of either sex to access them, there is a commonsense solution to respect the many individuals who are uncomfortable in public facilities for various reasons, including religious beliefs, disability, deformity, or discomfort with their body, as well as gender dysphoria. A

reasonable accommodation is a single-occupancy restroom available for all people who are uncomfortable with the standard arrangement of sex-specific bathrooms or locker rooms.

## V.   Specific CMA Members Impacted by the Gender Identity Mandate.

76.   Several specific CMA members are impacted by HHS's gender identity mandate.

77.   Dr. Quentin Van Meter, President of Plaintiff American College of Pediatricians, is also a member of the Catholic Medical Association. Facts concerning his practice and the effect of the mandate on him are set forth separately in his declaration.

78.   As another example, Dr. Rachel Kaiser practices medicine in Nashville, TN.

79.   As a past president of the Nashville Guild of the Catholic Medical Association and the current Tennessee State Director for the CMA, Dr. Kaiser is member of CMA and shares CMA's views.

80.   Dr. Kaiser is an emergency room doctor who currently sees patients.

81.   Dr. Kaiser works at Ascension Saint Thomas Hospital West.

82.   She provides services to patients reimbursed by federal financial assistance programs. Her hospital accepts all insurance, including TennCare, Medicare, etc., and she sees patients who have no insurance at all.

83.   The kinds of patients and situations handled by Dr. Kaiser are wide ranging.

84.   Dr. Kaiser is a dedicated medical professional and recently performed significant and admirable actions in the battle against the COVID-19 virus.[8]

85.   When Dr. Kaiser creates a chart for a patient, she lists the patient by their biological sex but if applicable would also note that the patient refers to himself or herself by another gender.

---

[8] Andy Telli, Nashville doctor serving on COVID front lines in Texas, *Tennessee Register* (Aug. 26, 2020), https://tennesseeregister.com/nashville-doctor-serving-on-covid-front-lines-in-texas/.

86.   Dr. Kaiser has encountered patients who have said that their gender identity differs from the patient's sex. In one case, she cared for one patient who identified as a female and the diagnosis was a prostate issue. In another case, a patient came into the ER and was treated by one of the other doctors. That case involved a mother who came in with a female child taking testosterone and wanted a continuation of the prescription for testosterone. Had Dr. Kaiser been taking care of that patient, she would not have filled the prescription request, based on medical and moral implications.

87.   Dr. Kaiser is a member of the Catholic Medical Association but not of the Christian Medical & Dental Associations.

88.   Dr. Kaiser is therefore directly affected by the Section 1557 gender transition mandate in her practice, but she opposes engaging in the objectionable practices with respect to her patients.

89.   Dr. Kaiser has practiced and wishes to practice medicine consistent with the principles concerning gender identity she shares with CMA but fears liability from the Section 1557 gender identity mandate if she continues to practice and speak consistent with those principles.

90.   In particular, Dr. Kaiser shares CMA's objections to providing interventions that assist gender transitions, she wishes to be free to use patient pronouns consistent with biological sex, she wishes to be able to chart patients based on biological sex, and she wishes to be able to counsel patients about the flaws of gender transition practices and affirmation of gender ideology.

91.   As another example, the President of CMA, Dr. Michael S. Parker, practices in Ohio. As the President of CMA, Dr. Parker is member of CMA and shares CMA's views.

92.   Dr. Parker is an OBGYN in the Columbus, Ohio area.

17

93.   Dr. Parker provides services to patients reimbursed by Medicaid, and he is a member of a private practice of physicians.

94.   Dr. Parker serves as the Medical Director for Employed Obstetricians at Mount Carmel St. Ann Hospital, and that hospital receives patients through programs such as Medicaid and Medicare.

95.   Dr. Parker helped establish the Order of Malta Center of Care in Columbus, which provides free medical care to the homeless and underserved.

96.   Dr. Parker is not a member of the Christian Medical & Dental Associations.

97.   Dr. Parker is therefore directly affected by the Section 1557 gender transition mandate in his practice, but he opposes engaging in the objectionable practices with respect to his patients.

98.   Dr. Parker has practiced and wishes to practice medicine consistent with the principles concerning gender identity he shares with CMA but fears liability from the Section 1557 gender identity mandate if he continues to practice and speak consistent with those principles

## VI.    Injury that HHS's Gender Identity Mandate Causes to CMA Members.

99.   The gender identity mandate presents our members with three choices: (1) not comply with the government's mandate, and risk significant government enforcement and penalties, likely driving them out of much of the healthcare field and market; or (2) comply with the government's mandates, abandoning their medical, conscientious, and religious beliefs, and accept the dangers and burdens of compliance; or (3) exit most healthcare fields entirely, a penalty in and of itself.

100.  Our members are susceptible to risk under the gender identity mandate at any moment of practice.

101.  If our members do not abide by HHS's mandate, they face losing access to federal healthcare program funds, potential civil lawsuits from plaintiffs, and being

18

investigated by HHS's Office for Civil Rights or the Attorney General, imposing significant costs of time, money, attorney's fees, and diversion of resources our members could use to continue providing quality medical care and receive compensation for the same.

102. HHS's announcement of enforcement of HHS's gender identity mandate under Section 1557, the 2016 ACA Rule's gender identity language, the May 10, 2021 announcement, and the 2016 Grants rule's gender identity language, create substantial confusion and uncertainty for CMA's members.

103. If our members do not comply with the gender identity mandate, they risk expulsion from participation in Medicaid, Medicare, and CHIP, and from receiving, or participating in other programs receiving federal financial assistance or HHS grants.

104. Failure to comply with the gender identity mandate threatens our members with loss of income and employment.

105. CMA members will incur increased costs from the investigation and enforcement of claims against them, and they will suffer damaging barriers to their ability to participate in the marketplace as healthcare providers.

106. Many of our members cannot continue their healthcare practices if they are not eligible to participate in federal healthcare programs like Medicare, Medicaid, and CHIP, or to work in programs receiving HHS grants.

107. The gender identity mandate requires our members to incur significant burdens of time and resources to plan for how they must either comply or risk loss of participation in federal programs.

108. The gender identity mandate has necessitated that our members spend time and money training staff, issuing guidance, and engaging in public education campaigns to mitigate the confusion caused by the mandate.

109. The gender identity mandate limits and compels the speech of our members, including what they can say to patients.

110. As the result of the gender identity mandate, many of our members are unlikely to express their full and frank views to patients for fear of liability.

111. If our members were to comply with the gender identity mandate, they would suffer the loss of their integrity and reputation because it will be perceived that they profess one thing but do another.

112. Such loss of integrity and reputation devastates conscientious medical professionals and their practices such as our members, and makes patients less likely to trust them, which in turn drives patients away from their practices.

113. At the same time, all providers and members need assurance that they can provide complete, accurate information and timely and responsive medical care in an environment that protects their constitutional rights and does not expose them to stigma and harm because of their medical judgment, conscientious objections, and religious beliefs.

## VII. The Impact on CMA's Members from Complying with the Gender Identity Mandate

114. If our members comply with the gender identity mandate by performing or recommending gender transition interventions, they take on increased malpractice liability due to the risks and harms of those interventions, and of patients later regretting the decision to undergo those interventions. CMA members are thus stuck between HHS and a risk of litigation that is significant, but difficult to quantify.

115. At the same time the gender identity mandate constricts our members' ability to warn patients about the risks and harms of gender transition interventions, increasing our members' liability if they were to succumb to the gender identity mandate and perform such interventions in violation of their consciences.

116. Compliance with the gender identity mandate leads to medically unnecessary procedures, wasting the time and money of providers, patients, and insurers, and draining resources that could be better spent elsewhere, especially during a pandemic.

117. Compliance with the gender identity mandate presents risks to our members' patients, including life-threatening risks, by requiring that necessary procedures and inquiries be omitted by our members because those are associated with the patient's biological sex not the patient's gender identity.

118. Imposing the gender identity mandate on our members will deprive our members' patients, who want to receive care from them because of their ethical and religious beliefs, of their chosen doctor.

119. Imposing the gender identity mandate's penalties on our members will harm patients in low-income and underserved communities and regions because it will deprive those patients of our members' care. These are the very communities our organization is called to serve by Catholic social teaching.

## VIII.   The Impact of the Gender Identity Mandate on Doctor-Patient Communications

120. Families have a right to know certain facts regarding documented harms associated with transgender interventions as well as the permanence of a decision to follow through with a gender transition.

121. In the past, our members have conveyed medical views and concerns, in appropriate and patient-sensitive ways, to their patients and their families in the context of their clinical practice, but under the gender identity mandate, the government would consider the expression of these views to be unlawful harassment, the creation of hostile environment, or discrimination on the basis of gender identity.

122. The gender identity mandate prevents conversations between our members and their patients, and it casts a credible threat of government prosecution over those conversations.

123. The gender identity mandate chills the speech of a health care professional of ordinary firmness, and it chills the speech of our members from (1) full and frank conversations on alternatives to gender procedures and interventions; (2) from using proper descriptions of sex in coding and medical records according to biological sex; and (3) from the spoken and written use of biologically correct pronouns.

124. Our members' views also prohibit them from telling patients that they should have healthcare treatments based on gender identity, rather than on biological sex.

125. Our members' medical judgment is that, in general, it is harmful to encourage a patient to undergo gender transition procedures, and so referring for or providing information affirming medical transition procedures is contrary to our members' best medical and ethical judgment.

126. Our members wish to keep using their best medical, ethical, and religious judgments in speaking and giving information to patients, but the gender identity mandate does not allow this.

127. But for the gender identity mandate, our members would continue to speak freely on these matters in healthcare each day in each clinical situation as they deem appropriate, as they have done throughout their careers until this mandate.

128. The gender identity mandate forces our members to participate in facilities, programs, and other healthcare-related endeavors contrary to their religious beliefs and expressive identities and to associate with messages on these topics they disagree with.

129. The gender identity mandate chills the speech of all similarly situated healthcare providers who engage in private speech or religious expression through statements, notices, and other means in healthcare based on sex.

## IX.    Coercion of CMA Members' Freedom of Religion

130. Our members' sincerely held religious beliefs prohibit them providing, offering, facilitating, or referring for gender transition interventions and also from engaging in or facilitating the objectionable practices.

131. Our members exercise their religious beliefs through providing healthcare and through expressing messages during their healthcare practices.

132. Our members exercise their religious beliefs, consistent with Catholic social teaching, through providing healthcare to low-income and underserved populations in health programs and activities funded by HHS, such as Medicaid, Medicare, CHIP, and federally qualified health centers.

133. Our members' compliance with these beliefs is a religious exercise.

134. Our members' speech about these beliefs is a religious exercise.

135. The gender identity mandate exerts significant pressure on them to violate their beliefs to continue providing healthcare in federally funded health programs and activities or else face exclusion from those programs, loss of funding, loss of livelihood, and investigatory burdens.

136. Our members' provision of healthcare in accord with their religious beliefs prevents no one from obtaining gender transition interventions from other providers.

## X.    Cumulative Effect of the Gender Identity Mandate

137. Defendants' gender identity mandate, if not enjoined, would cause CMA members to violate their oaths, their conscience, and cause them to engage in a course of procedures and interventions which is manifestly not in the best interests of patients.

138. CMA's members are healthcare providers who object on grounds of science and medical ethics, as well as on religious grounds, to providing, offering, participating in, referring for, or paying for the objectionable practices.

139. Most of CMA's members treat patients within federal healthcare programs such as Medicare, Medicaid, and CHIP.

140. CMA has many members who will be subject to the gender identity mandate because they receive federal funds, provide medical services that may be used as part of a medical transition, and provide health coverage for employees.

141. CMA's members will be impacted by the gender identity mandate because it limits or prohibits their ability to engage in speech advising patients of their medical judgment about gender-transition procedures and it forces them to offer services or facilities to further gender transitions.

142. If our members do not comply with the gender identity mandate, they risk expulsion from participation in Medicaid, Medicare, and CHIP, and from receiving, or participating in other programs receiving, federal financial assistance.

143. Failure to comply with the gender identity mandate threatens our members with loss of income and employment.

144. CMA's members will be impacted by this agency action because it limits or prohibits their ability to continue to accurately refer to patient sex by speech or in writing, including accurately referring to a patient with biologically correct pronouns and accurately coding patient sex in medical records or charts. The government forces providers to inaccurately refer to sex, including with inaccurate pronouns and inaccurate medical records.

145. CMA has members who have treated or currently treat transgender individuals, and who would be liable for failure to provide, offer, or refer for medical transition procedures. Their ability to discuss their medical opinions with their patients and offer medical advice freely has been chilled by this agency action.

146. CMA has members who object to providing, offering, or participating in medical transitions and who provide services such as hysterectomies, breast reconstruction, and hormone administration for patients who need these services for

medical reasons. But these members would be required by HHS to provide, offer, and refer for those services as part of a medical transition procedure, despite their objections.

147. CMA's members share the non-religious medical and ethical positions described by ACPeds, and they also have overlapping religious objections to engaging in the objectionable practices.

148. CMA and its members believe that the gender identity mandate will harm those they are devoted to serving, as well as their ability as medical professionals to practice in conformity with their sound medical judgment and moral conscience. This agency action will violate the quality of healthcare provided to patients, as well as the conscience rights of healthcare professionals everywhere.

149. There are CMA members in each of these various situations who would suffer the harm identified if the HHS gender identity mandate is fully enforced.

150. There are CMA members who are self-censoring out of fear of enforcement of the HHS gender identity mandate.

151. There are CMA members continuing to practice consistent with their views and therefore face the danger of enforcement penalties as the result of the HHS gender identity mandate.

152. CMA thus seeks relief on behalf of its current and future members.

153. Seeking such relief is part of the mission of CMA as approved by its board of directors.

## XI.    Effects on Patients, Society, and the Medical Profession

154. The gender identity mandate will drive thousands of doctors out of the medical profession and out of the care of low-income and underserved patients, and it will dissuade students from choosing to practice medicine.

155. For our members, a career in health care is not just a job, but rather a sacred calling which involves putting their faith into practice. That result of the gender identity mandate is harmful in and of itself.

156. Driving our members out of the health care field by means of the gender identity mandate will place intense strain on the healthcare system in America, will exacerbate disparities of care among low-income and underserved populations, and will cause immense human suffering and higher medical costs for all. Among other things, the consequences of driving our members out of the health care profession include the following:

    a.  Patients will experience limited choices for future care, creating likely delays in care and reduced access to care, and all patients will no longer be able to receive care from doctors who share CMA's values;

    b.  Patients will be more likely to hesitate in seeking care because they feel that the doctor–will not have their best medical interests or personal religious values at heart, or because they fear putting their doctor in legal jeopardy;

    c.  This delay will strain the other providers and increase costs for providers, patients, and the healthcare system as a whole;

    d.  HHS will also cause widespread health disparities by those who share the government's position and those who have other medical opinions, conscientious objections, or religious beliefs;

    e.  This limited access to care will cause unavoidable human suffering, higher medical costs for everyone, and the inefficient use of medical talents and energy;

    f.  It will also lead to a cultural disrespect for those with differing medical and religious views, causing discriminatory effects for those doctors and patients who do not share the government's position out of their own

medical judgment, ethical positions, conscientious objections, or religious beliefs; and

157. At the same time, most healthcare providers in the profession are willing to comply with HHS's view of the law and policy, so this agency action will reduce overall access to care, unnecessarily creating many more health disparities than it will resolve.

## XII.    The Impact of the Delay of HHS's SUNSET Rule

158. The delay of the SUNSET Rule harms our members because it removes a procedural avenue for the repeal or modification of the gender identity mandate, and for our members' participation in that review process, including through CMA submitting comments.

159. If the Delay Rule itself were subject to notice and comment, CMA and our members would raise their concerns to the agency.

160. CMA would also submit comments on rules that HHS would review if subjected to the SUNSET Rule, such as the Section 1557 Rule, the HHS Grants rule, and rules concerning healthcare conscience rights at 45 CFR Part 88.

161. Our members include those who operate small entities, such as members who independently own medical practices organized for profit that are not dominant in their fields on a national basis.

162. CMA is itself a small entity.

163. The SUNSET Rule specifically calls for retrospective review of rules like the 2016 Rule which has a significant economic impact on a substantial number of small entities.

164. The delay of the SUNSET Rule also harms our members because it removes a procedural avenue for the repeal or modification of the gender identity mandate, and for our members' participation in that review process.

VERIFICATION

I, Mario Dickerson, a citizen of the United States, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing Declaration is true and correct based on my personal knowledge.

Executed this 4th day of November, 2021.

Mario R. Dickerson
Mario Dickerson
Executive Director, Catholic Medical
Association