UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| **Susan Neese, M.D** and **James Hurly, M.D.**, on behalf of themselves and others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**Xavier Becerra**, in his official capacity as Secretary of Health and Human Services; **United States of America**,<br><br>Defendants. | Case No. 2:21-cv-00163-Z |

**RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Table of contents ................................................................................................. i

Table of authorities ............................................................................................ ii

    I.   The plaintiffs have established Article III standing ........................................ 1

    II.  The plaintiffs are entitled to judgment as a matter of law ............................ 7

Conclusion ...................................................................................................... 10

Certificate of service ....................................................................................... 12

# TABLE OF AUTHORITIES

**Cases**

*Bear Creek Bible Church v. EEOC*,
    571 F. Supp. 3d 571 (N.D. Tex. 2021).................................................................. 8

*Biden v. Texas*, 142 S. Ct. 2528 (2022) ................................................................. 3

*Bostock v. Clayton County*, 140 S. Ct. 1731 (2020).......................................... 8, 9, 10

*Carney v. Adams*, 141 S. Ct. 493 (2020) ................................................................. 2

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986)....................... 4

*Data Marketing Partnership, LP v. United States Dep't of Labor*,
    45 F.4th 846 (5th Cir. 2022)................................................................................ 1

*Department of Homeland Security v. Regents of the University of
    California*, 140 S. Ct. 1891 (2020)..................................................................... 3

*Driftless Area Land Conservancy v. Valcq*,
    16 F.4th 508 (7th Cir. 2021)................................................................................ 1

*El Paso Electric Co. v. FERC*, 667 F.2d 462 (5th Cir. 1982) ................................... 2

*Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ............................................................................................ 2

*In re Gee*, 941 F.3d 153 (5th Cir. 2019) ................................................................. 7

*Justice v. Hosemann*, 771 F.3d 285 (5th Cir. 2014) ............................................... 7

*Nat'l Wildlife Federation v. EPA*, 286 F.3d 554 (D.C. Cir. 2002)............................ 4

*Public Citizen, Inc. v. U.S. Dep't of Health & Human Services*,
    332 F.3d 654 (D.C. Cir. 2003)............................................................................. 5

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ........................................ 7

*Williams Natural Gas Co. v. FERC*, 872 F.2d 438 (D.C. Cir. 1989) ....................... 4

**Statutes**

5 U.S.C. § 704 ........................................................................................................ 1

5 U.S.C. § 706 ........................................................................................................ 1

**Rules**

1 C.F.R. § 18.12 ..................................................................................................... 4

Dep't of Health & Human Services, *Nondiscrimination in Health
    Programs and Activities, Notice of Proposed Rulemaking*, 87 Fed.
    Reg. 47,824 (Aug. 4, 2022) .......................................................................... 3, 4

## I. The Plaintiffs Have Established Article III Standing

The plaintiffs are asking this Court to: (1) "hold unlawful and set aside" the Secretary's notification of May 10, 2021, under section 706 of the APA; (2) declare that section 1557's prohibition on "sex" discrimination does not prohibit *all* discrimination on account of "sexual orientation" and "gender identity," but only conduct in which the provider would have acted differently toward an identically situated member of the opposite biological sex; and (3) enjoin the Secretary from using or enforcing the interpretation of section 1557 that appears in the notification of May 10, 2021. *See* First Amended Complaint, ECF No. 11, at ¶¶ 44–50.

The defendants try to defeat standing by observing that the plaintiffs are uninjured by the portion of the notification that prohibits discrimination on account of "sexual orientation." *See* Defs.' Br., ECF No. 56, at 13–14. But judicial review under the APA requires courts to review the challenged agency *action*—and to "hold unlawful and set aside" the challenged action if it is "not in accordance with law." 5 U.S.C. § 706 ("The reviewing court shall—. . . (2) hold unlawful and set aside agency *action*, findings, and conclusions found to be—(A) . . . not in accordance with law" (emphasis added)); 5 U.S.C. § 704 ("[F]inal agency *action* for which there is no other adequate remedy in a court are subject to judicial review." (emphasis added)). The plaintiffs are challenging the Secretary's "action" in issuing the notification of May 10, 2021. The plaintiffs' injuries are "fairly traceable" to this action—even if they are not injured by every single word that appears in the notification. And the proper remedy under the APA, upon finding an agency action "not in accordance with law," is to formally revoke the "action," (*i.e.* the notification), rather than merely enjoin the enforcement of the disputed provisions. *See Data Marketing Partnership, LP v. United States Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022) ("The APA gives courts the power to 'hold unlawful and set aside agency action[s].' 5 U.S.C. § 706(2). . . . [Section] 706 'extends beyond the mere non-enforcement remedies available to courts that review the constitutionality of legislation, as it empowers courts to "set aside"—*i.e.*, formally nullify and revoke—an unlawful agency action.'" (citation omitted)); *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021) ("Vacatur [of an

agency action] retroactively undoes or expunges a past [agency] action. . . . Unlike an injunction, which merely blocks enforcement, vacatur unwinds the challenged agency action."). The plaintiffs have standing to seek this remedy, even if their injuries arise only from the gender-identity component of the rule.

The defendants also claim that the plaintiffs' injuries have been obviated by the Notice of Proposed Rulemaking, which (according to the defendants) disclaims any interpretation of section 1557 that would prohibit the conduct that the plaintiffs wish to engage in. *See* Defs.' Br., ECF No. 56, at 5–6; *id.* at 14–17. There are many problems with this argument. First, a plaintiff's standing is assessed at the moment the lawsuit is filed and is unaffected by post-filing developments. *See Carney v. Adams*, 141 S. Ct. 493, 499 (2020) ("[S]tanding is assessed 'at the time the action commences'" (citation omitted)). The Notice of Proposed Rulemaking was issued on August 4, 2022 — nearly one year *after* the plaintiffs filed their lawsuit — so it has no relevance to standing and concerns only whether the plaintiffs' claims have become moot. *See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189–90 (2000) (explaining distinction between standing and mootness). But the defendants are not making a mootness argument, and they cannot show that the Notice of Proposed Rulemaking moots the plaintiffs' claims when the rulemaking process is not complete and the contents of the proposed rule could change between now and when the rule becomes final. *See El Paso Electric Co. v. FERC*, 667 F.2d 462, 467 (5th Cir. 1982) ("A case is not rendered moot simply because there is a possibility, or even a probability, that the outcome of a separate administrative proceeding may provide the litigant with similar relief."); Defs.' Br., ECF No. 56, at 17 (acknowledging that the Notice of Proposed Rulemaking merely "sets forth a proposed rule, and HHS must consider any significant comments it receives before issuing a final rule.").

The second problem is that a Notice of Proposed Rulemaking has no legal force, and it does not withdraw or nullify the earlier agency "action" that the plaintiffs are challenging. The notice of proposed rulemaking will culminate in a separate and distinct final agency action that can be challenged under the APA, but the mere issuance of a Notice of Proposed Rulemaking

does nothing to affect the notification of May 10, 2021, or its contents. *See Biden v. Texas*, 142 S. Ct. 2528, 2544–45 (2022) (explaining how separate DHS memoranda that sought to terminate the Migrant Protection Protocol were distinct agency "actions"). The plaintiffs are challenging the legality of the agency "action" taken on May 10, 2021—and subsequent agency actions have no bearing on whether *that* agency action should be set aside as "not in accordance with law" under section 706(2)(A) of the APA. *See Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891, 1907 (2020) ("It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)); *id.* at 1909 ("An agency must defend its actions based on the reasons it gave when it acted.").

The final problem is that the proposed rule does nothing to alleviate the plaintiffs' objections to the Secretary notification of May 10, 2021. The proposed rule goes well beyond *Bostock* by interpreting section 1557's prohibition on "sex" discrimination to encompass "discrimination on the basis of sex stereotypes; sex characteristics, including intersex traits; pregnancy or related conditions; sexual orientation; and gender identity." Dep't of Health & Human Services, *Nondiscrimination in Health Programs and Activities, Notice of Proposed Rulemaking*, 87 Fed. Reg. 47,824, 47,916 (Aug. 4, 2022) (text of proposed 45 C.F.R. § 92.101). It also forbids covered entities to "[d]eny or limit health services, including those that are offered exclusively to individuals of one sex, to an individual based upon the individual's sex assigned at birth, gender identity, or gender otherwise recorded," a prohibition that would appear to compel providers to offer and provide prostate-cancer screenings to biological women who identify as men on the same terms that they would give them to biological men. *See id.* at 47,918 (text of proposed 45 C.F.R. § 92.206(b)(1)). And the supposed "safe harbors" in the proposed rule only reaffirm the legal jeopardy that the plaintiffs will face if they refuse to refer minors for puberty blockers or sex-change operations, or if they refuse to provide "gender-affirming care" to any patient with gender dysphoria. Consider the text of proposed 45 C.F.R. § 92.206(c):

> Nothing in this section requires the provision of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting that service, including where the covered entity typically declines to provide the health service to any individual or where the covered entity reasonably determines that such health service is not clinically appropriate for a particular individual. However, a provider's belief that gender transition or other gender-affirming care can never be beneficial for such individuals (or its compliance with a state or local law that reflects a similar judgment) is not a sufficient basis for a judgment that a health service is not clinically appropriate.

Dep't of Health & Human Services, *Nondiscrimination in Health Programs and Activities, Notice of Proposed Rulemaking*, 87 Fed. Reg. 47,824, 47,916 (Aug. 4, 2022). Terms like "legitimate" or "nondiscriminatory" are in the eye of the beholder—and a provider can only guess as to whether the powers that be at HHS will regard its refusal to provide puberty blockers to a minor (or "gender-affirming care" to a transgender patient) as "legitimate" or "nondiscriminatory."

The defendants nonetheless insist that Dr. Neese and Dr. Hurly have nothing to worry about, because they claim that the *preamble* to the proposed rule provides assurances that Dr. Neese and Dr. Hurly may continue practicing medicine in the manner described in their sworn declarations. *See* Defs.' Br., ECF No. 56, at 16–17; 1 C.F.R. § 18.12 (describing preamble and its contents). But a preamble has no binding authority even in a final rule,[1] and it certainly has no binding effect in a *proposed* rule that is still in the notice-and-comment process. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 845 (1986) ("It goes without saying that a proposed regulation does not represent an agency's considered interpretation of its statute and that an agency is entitled to consider alternative interpretations before settling on the view it considers most sound."); *Williams Natural Gas Co. v. FERC*, 872 F.2d 438, 446 (D.C. Cir. 1989) ("An NOPR is by definition the expression of an agency's *tentative* position. The whole point of notice-and-comment rulemaking, after all, is that the comments which the agency receives may induce it to abandon or modify its initial views. We therefore recognize that the issuance of an NOPR—even a strongly worded NOPR—in no way binds the Commission to

---

1. *See Nat'l Wildlife Federation v. EPA*, 286 F.3d 554, 569–70 (D.C. Cir. 2002)

promulgate the proposed regulation."); *Public Citizen, Inc. v. U.S. Dep't of Health & Human Services*, 332 F.3d 654, 669 (D.C. Cir. 2003) ("The interpretation contained in the agency's proposed rule does not, of course, bind it here.").

But the more serious problem is that there is *nothing* in the preamble that purports to shield the conduct described in the Neese and Hurly declarations. Dr. Neese claims that she is:

1. "[C]ategorically unwilling to prescribe puberty blockers or hormone therapy to minors, or to assist a minor with transitioning," because she "do[es] not believe that the brains of minors are fully mature or that they fully understand the ramifications of their actions," Neese Decl. ¶¶ 9–10, ECF No. 47-1.

2. "[R]eluctant to prescribe hormone therapy or assist a patient in a gender transition absent a longstanding relationship with that patient, because sometimes the appropriate response to gender dysphoria is a referral for counseling and psychological care rather than hormone therapy," *id.* at ¶ 11.

3. Unwilling to provide "gender-affirming care" to transgender patients when the patient's "denial of biological realities will endanger their life or safety," *id.* at ¶ 12; *see also id.* at ¶¶ 13–16.

4. Determined to urge her patients to seek and obtain preventive care consistent with their biological sex rather than accommodate the beliefs of a male-to-female transgender patient who refuses to acknowledge his or her need for prostate-cancer screening, *see id.* at ¶ 18; *see also* Hurly Decl. ¶¶ 7-9, ECF No. 47-2.

Yet the passages that the defendants cite do not purport to establish a safe harbor for any of this. The defendants tout a passage that says covered entities may "treat[ ] an individual for conditions that may be specific to their sex characteristics," such as treating a woman-to-man transgender patient for pregnancy. *See* 87 Fed. Reg. at 47,866. But Dr. Neese is asserting her right to *deny* "gender-affirming" care or treatment to transgender patients when doing so would endanger their health or safety, and to insist that transgender patients who deny biological realities seek and obtain preventive care in accordance with their biological sex. Neither the rule nor the preamble provides any protection for this. Indeed, both the rule and the preamble explicitly forbid any practice that "prevents an individual from participating in a health program

or activity consistent with the individual's gender identity,"[2] which does not leave any room for the practices described in Dr. Neese's (and Dr. Hurly's) declarations. And although the defendants observe that the preamble and the rule prohibit covered entities from denying or withholding preventive care that accords with a transgender patient's *biological* sex,[3] neither Dr. Neese nor Dr. Hurly is seeking to withhold preventive care of that sort. Quite the opposite: They want to *provide* preventive care that aligns with a transgender patient's biological sex—and insist that a transgender patient who refuses to acknowledge their biological sex to seek and obtain that care. There is nothing in the rule or the preamble that protects health-care providers who attempt to overcome the obstinance of a transgender patient rather than "affirm" a patient's delusional beliefs.

The defendants also claim that Dr. Neese has a "legitimate, nondiscriminatory reason" for refusing to provide puberty blockers or hormone therapy to minors, or to patients with whom she lacks a longstanding relationship, and that she would therefore be shielded under proposed 42 C.F.R. § 92.206(c):

> Nothing in this section requires the provision of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting that service, including where the covered entity typically declines to provide the health service to any individual or where the covered entity reasonably determines that such health service is not clinically appropriate for a particular individual. However, a provider's belief that gender transition or other gender-affirming care can never be beneficial for such individuals (or its compliance with a state or local

---

2. *See* 87 Fed. Reg. at 47,918 (quoting proposed 42 C.F.R. § 92.206(b)(3)); *see also id*. at 47,866 ("[T]his provision would prohibit the adoption of a policy, or engaging in a practice, that prevents any individual from participating in a covered entity's health program or activity consistent with their gender identity.")
3. *See* 87 Fed. Reg. at 47,918 (proposed 42 C.F.R. § 92.206(b)(1)); *id*. at 47,865–66 ("Under this provision, a covered entity that routinely provides gynecological or obstetric care could not deny an individual a pelvic exam or pregnancy-related care because the individual is a transgender man or nonbinary person assigned female at birth, if the entity otherwise provides that care to cisgender individuals. Similarly, a community clinic that receives funding from the Department could not refuse to provide a transgender woman a prostate cancer screening because her sex is listed female in her electronic health record, if the entity otherwise provides these screenings to cisgender individuals.").

  law that reflects a similar judgment) is not a sufficient basis for a judgment that a health service is not clinically appropriate.

87 Fed. Reg. at 47,918. But the last sentence in proposed 42 C.F.R. § 92.206(c) gives the game away. Dr. Neese believes that gender transitioning is categorically inappropriate for minors,[4] and the proposed rule specifically negates that belief as a "legitimate, nondiscriminatory reason" for denying puberty blockers or hormone therapy. There is also nothing in the rule (or the preamble) that indicates that a refusal to provide transitioning services absent a "longstanding relationship" qualifies as a legitimate, nondiscriminatory reason for withholding hormone therapy. In all events, it is clear that the proposed rule will prohibit Dr. Neese from denying transitioning services to minors based on her belief that gender transitioning is categorically inappropriate for "such individuals," and that is all that is needed to establish a "credible threat" of enforcement. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *see also Justice v. Hosemann*, 771 F.3d 285, 291–92 (5th Cir. 2014) ("Plaintiffs have thus shown that they have a legitimate fear of . . . penalties for failure to comply with Chapter 17."). *In re Gee*, 941 F.3d 153, 161 n.3 (5th Cir. 2019) ("A would-be plaintiff need not violate a criminal provision and risk prosecution to challenge it.").

## II. THE PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW

  The Secretary spends much of his brief arguing points that the plaintiffs do not dispute. The plaintiffs have acknowledged from the outset that the holding of *Bostock* applies to Title IX and section 1557; they contest only the Secretary's interpretation of *Bostock*'s holding. So the plaintiffs do not dispute the arguments in Sections II.A.1, II.A.2, and II.A.3 of the Secretary's brief. *Bostock*'s interpretation of Title VII applies to Title IX, and *Bostock*'s holding is binding on health-care providers that receive federal funds under section 1557.

---

4. Neese Decl. ¶¶ 9, ECF No. 47-1 ("I do not believe that the brains of minors are fully mature or that they fully understand the ramifications of their actions."); *id*. at ¶ 10 ("I am categorically unwilling to prescribe puberty blockers or hormone therapy to minors, or to assist a minor with transitioning.").

The Secretary is wrong, however, to claim that *Bostock* prohibits *all* forms of "discrimination on the basis of sexual orientation" and "discrimination on the basis of gender identity." *Bostock* prohibits only acts that discriminate on the basis of *sex*, which occurs when an individual would have acted differently toward an identically situated member of the opposite biological sex. *See Bostock v. Clayton County*, 140 S. Ct. 1731, 1741 (2020) ("[I]f changing the employee's sex would have yielded a different choice by the employer . . . a statutory violation has occurred."). If a health-care provider refuses to treat a man because he is sexually attracted to men, but would have no objection to treating a biological woman who is sexually attracted to men, then that clearly constitutes "sex" discrimination under *Bostock*. The same is true for a health-care provider that refuses to treat a man-to-woman transgender patient simply because the individual identifies as a woman, while remaining willing to treating biological women who identify as women. That is an act of "sex" discrimination under *Bostock* because changing the biological sex of the patient changes the outcome.[5]

Where the Secretary goes wrong is in claiming that *all* acts of discrimination on account of sexual orientation or gender identify qualify as "sex" discrimination under *Bostock*. That is assuredly not what *Bostock* held. Health-care providers may take discriminatory actions against homosexual or transgender patients if (and only if) the same action would have been taken against an identically situated member of the opposite biological sex. *See Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571, 622–23 (N.D. Tex. 2021); *see also id*. at 623 ("*Bostock* does not protect sexual conduct; it protects employees from being treated differently based on their biological sex, which is an immutable characteristic distinct from sexual conduct itself. Policies that enforce a sexual ethic that applies evenly to heterosexual and homosexual sexual activity do not discriminate 'because of' sex."). So if a health-care provider refuses to prescribe

---

5. We entirely agree with the Secretary that a hospital cannot "refuse[] to admit transgender patients because it disapproves of their gender identity." Defs.' Br., ECF No. 56, at 23. Conduct of that sort is prohibited by *Bostock* even in the absence of the Secretary's notification or proposed rulemaking.

testosterone hormones to a biological woman who wishes to appear more masculine, he cannot be guilty of "sex" discrimination unless he would willingly prescribe the same testosterone hormones to a biological man who wishes to appear more masculine. If a health-care provider denies this treatment equally across the sexes, then there is no "sex" discrimination under *Bostock*. *See Bostock*, 140 S. Ct. at 1742 ("Take an employer who fires a female employee for tardiness or incompetence or simply supporting the wrong sports team. Assuming the employer would not have tolerated the same trait in a man, Title VII stands silent."). The same is true for a health-care provider who refuses to refer a biological man for breast implants or breast-augmentation surgery. The provider is guilty of "sex" discrimination only if he would willingly provide an identical referral to a biological female. *See id.* at 1740 ("[F]iring [a] person for actions or attributes it would tolerate in an individual of another sex . . . discriminates against that person in violation of Title VII."). If a provider refuses to provide these referrals to members of both biological sexes, then there can be no "sex" discrimination under *Bostock*—even though the provider may very well be discriminating on account of "gender identity" by refusing to provide gender-affirming care to patients suffering from gender dysphoria.

The Secretary's objections to this argument have already been addressed in our previous briefing. The Secretary invokes the following passage from *Bostock*:

> But unlike any of these other traits or actions [i.e., tardiness, incompetence, or supporting the wrong sports team], homosexuality and transgender status are inextricably bound up with sex. Not because homosexuality or transgender status are related to sex in some vague sense or because discrimination on these bases has some disparate impact on one sex or another, but because to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex.

*Bostock*, 140 S. Ct. at 1742; Defs.' Br., ECF No. 56, at 25. But this passage is entirely consistent with our argument. A health-care provider who discriminates against someone for *being* homosexual or transgender is indisputably violating *Bostock* because the provider would have acted differently toward an identically situated member of the opposite biological sex. See *Bostock*, 140 S. Ct. at 1737; *see also supra* note 5. But that is a far cry from saying that a refusal to provide

transition services or gender-affirming care is "sex" discrimination—without knowing whether the provider would have responded similarly or differently to an identically situated member of the opposite biological sex.

The Secretary also observes that *Bostock* rejected the idea that employers could establish a sex-neutral rule of conduct by prohibiting "homosexual behavior" and extending that rule equally to men and women. *See Bostock*, 140 S. Ct. at 1741–42; *id.* at 1745–46; ECF No. 56, at 25–26. But we have already addressed this point: *Bostock* rejected this idea because it held that the relevant prohibition should not be defined at that level of abstraction, and insisted that one must instead look to the employee's precise behavior (sexual attraction to a particular person) and ask whether *that* exact situation would be tolerated in a member of the opposite biological sex. *See Bostock*, 140 S. Ct. at 1741 ("Consider, for example, an employer with two employees, both of whom are attracted to men. The two individuals are, to the employer's mind, materially identical in all respects, except that one is a man and the other a woman. If the employer fires the male employee for no reason other than the fact he is attracted to men, the employer discriminates against him for traits or actions it tolerates in his female colleague."). That is the same approach to be used in section 1557: Keep *everything* about the patient the same and change *only* his biological sex, and then ask whether the change in sex would change the provider's conduct. The Secretary has shunned this approach in favor of a crude and insufficiently nuanced rule that prohibits any discriminatory act based on sexual orientation or gender identity.

## CONCLUSION

The plaintiffs' motion for summary judgment should be granted, and the defendants' motion for summary judgment should be denied.

|  |  |
|---|---|
|  | Respectfully submitted. |
|  | /s/ Jonathan F. Mitchell |
| GENE P. HAMILTON | JONATHAN F. MITCHELL |
| Virginia Bar No. 80434 | Texas Bar No. 24075463 |
| Vice-President and General Counsel | Mitchell Law PLLC |
| America First Legal Foundation | 111 Congress Avenue, Suite 400 |
| 300 Independence Avenue SE | Austin, Texas 78701 |
| Washington, DC 20003 | (512) 686-3940 (phone) |
| (202) 964-3721 (phone) | (512) 686-3941 (fax) |
| gene.hamilton@aflegal.org | jonathan@mitchell.law |
|  | *Counsel for Plaintiffs and* |
| Dated: September 16, 2022 | *the Proposed Class* |

## CERTIFICATE OF SERVICE

I certify that on September 16, 2022, I served this document through CM/ECF upon:

JEREMY S.B. NEWMAN
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20005
(202) 532-3114 (phone)
(202) 616-8460 (fax)
jeremy.s.newman@usdoj.gov

*Counsel for Defendants*

                                                 /s/ Jonathan F. Mitchell
                                                 JONATHAN F. MITCHELL
                                                 *Counsel for Plaintiffs and*
                                                 *the Proposed Class*