IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION
_____

SUSAN NEESE, M.D., *et al.*,

     Plaintiffs,

v.

XAVIER BECERRA, *et al.*,

     Defendants.

Civil Action No. 2:21-cv-163-Z

## REPLY BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

CHAD E. MEACHAM
UNITED STATES ATTORNEY

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:    214-659-8626
Facsimile:     214-659-8807
brian.stoltz@usdoj.gov

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MICHELLE R. BENNETT
Assistant Branch Director

Jeremy S.B. Newman (Mass. Bar No. 688968)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20005
Tel: (202) 532-3114
Email: jeremy.s.newman@usdoj.gov

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................................1

ARGUMENT......................................................................................................................................2

I.     Plaintiffs Lack Article III Standing..................................................................................2

     A.     Plaintiffs Lack Standing to Seek Relief Applicable to the Notification's Interpretation Concerning Sexual Orientation Given Their Admitted Lack of Injury .......................................................................................................................2

     B.     Plaintiffs Lack Standing to Challenge the Notification's Interpretation that Section 1557 Prohibits Discrimination on the Basis of Gender Identity.......................5

II.    Defendants Are Entitled to Summary Judgment on the Merits.......................................10

     A.     Plaintiffs Concede that *Bostock*'s Reasoning Applies to Section 1557 ...................10

     B.     Plaintiffs' Interpretation of Section 1557 Is Incorrect ...........................................11

CONCLUSION.................................................................................................................................14

# TABLE OF AUTHORITIES

## Cases

*Am. Fed'n of Tchrs. v. DeVos*,
  484 F. Supp. 3d 731 (N.D. Cal. 2020) ..............................................................................4

*Bear Creek Bible Church v. Equal Employment Opportunity Commission*,
  571 F. Supp. 3d 571 (N.D. Tex. 2021), *appeal pending* No. 22-10145 (5th Cir.) ................13

*Bostock v. Clayton County, Georgia*,
  140 S. Ct. 1731 (2020)..........................................................................................*passim*

*California v. Texas*,
  141 S. Ct. 2104 (2021)...................................................................................................5

*Data Mktg. P'ship, LP v. United States Dep't of Lab.*,
  45 F.4th 846 (5th Cir. 2022)............................................................................................5

*Driftless Area Land Conservancy v. Valcq*,
  16 F.4th 508 (7th Cir. 2021)............................................................................................5

*Franciscan All., Inc. v. Azar*,
  414 F. Supp. 3d 928 (N.D. Tex. 2019) ..............................................................................4

*Georgia v. President of the United States*,
  46 F.4th 1283 (11th Cir. 2022) ......................................................................................14

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018)...................................................................................................4

*Lewis v. Casey*,
  518 U.S. 343 (1996) ...............................................................................................1, 3, 4

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) ......................................................................................................7

*Sierra Club v. Environmental Protection Agency*,
  873 F.3d 946 (D.C. Cir. 2017)........................................................................................4

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ......................................................................................................3

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ......................................................................................................5

*United Food & Commercial Workers Union, Local No. 663 v. United States Department of Agriculture*,
  451 F. Supp. 3d 1040 (D. Minn. 2020)..............................................................................4

**Statutes**

5 U.S.C. § 706(2) .................................................................................................................................3

**Federal Regulations**

Dep't of Health & Human Servs., Nondiscrimination in Health Programs and Activities,
   Notice of Proposed Rulemaking (NPRM),
   87 Fed. Reg. 47,824 (Aug. 4, 2022) .........................................................................................*passim*

**Other Authorities**

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*,
   104 Va. L. Rev. 933 (2018) ...................................................................................................4

## INTRODUCTION

Plaintiffs fail to counter Defendants' showing that they are entitled to summary judgment on standing and the merits.  As to standing, Plaintiffs admit that they were not injured by the interpretation contained in HHS's Notification[1] that Section 1557 prohibits discrimination on the basis of sexual orientation.  Plaintiffs argue that standing to challenge any aspect of the Notification would necessarily confer standing to challenge the Notification in its entirety.  But "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996), and Article III does not permit Plaintiffs to challenge the legality of parts of the Notification that they admit did not injure them.

Regarding Plaintiffs' purported standing to challenge the Notification's interpretation that Section 1557 prohibits discrimination on the basis of gender identity, Plaintiffs criticize Defendants for citing a proposed rule that HHS published after Plaintiffs filed their First Amended Complaint. But as Defendants have explained, Plaintiffs never had standing because HHS has never interpreted Section 1557 to prohibit Plaintiffs' anticipated conduct, and no substantial likelihood exists that HHS will do so in the future, a point that is merely underscored and confirmed by post-Complaint developments.

On the merits, Plaintiffs agree with much of Defendants' interpretation of Section 1557.  They agree that Section 1557's prohibition of discrimination on the basis of sex does not impose a different causation standard from Title VII's prohibition of discrimination because of sex, that the reasoning of *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020), applies to Section 1557, and that Section 1557 prohibits at least some discrimination on the basis of sexual orientation and gender identity.  Yet they ask this Court to impose a rigid rule that sex discrimination occurs "only . . . when an individual

---

[1] This brief uses the same naming conventions and abbreviations as Defendants' Brief in Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, ECF No. 56 ("Defs. SJ Br.").

would have acted differently toward an identically situated member of the opposite biological sex."
Pls.' Resp. to Defs.' Mot. for Summ. Judg. & Reply Br. in Supp. of Pls. Mot. for Summ. Judg., ECF
No. 62, at 8 ("Pls' SJ Opp. Br."). But the text of Section 1557 contains no such rule, and it is
inconsistent with *Bostock*'s reasoning. Because sexual orientation and gender identity "are inextricably
bound up with sex," *Bostock*, 140 S. Ct. at 1742, a health care provider necessarily discriminates on the
basis of sex when the provider discriminates on the basis of sexual orientation or gender identity. If
a provider refuses to provide a patient with a service on the basis of the patient's sexual orientation or
gender identity, that provider has engaged in sex discrimination, and Section 1557's text contains no
safe harbor if that provider also refuses to provide that service to a different patient of another sex.

## ARGUMENT

### I.      Plaintiffs Lack Article III Standing

#### A.      Plaintiffs Lack Standing to Seek Relief Applicable to the Notification's Interpretation Concerning Sexual Orientation Given Their Admitted Lack of Injury

The Notification challenged in this case indicates that HHS will interpret "Section 1557's
prohibition on discrimination on the basis of sex to include: (1) discrimination on the basis of sexual
orientation; and (2) discrimination on the basis of gender identity." Notification, ECF No. 11-1, at 1.
Defendants showed that Plaintiffs were not injured by the first part of this interpretation—that
Section 1557 prohibits discrimination on the basis of sexual orientation—because they aver that they
do not and would not discriminate on the basis of sexual orientation, and Plaintiffs admitted their lack
of injury. Defs. SJ Br. 13-14. Plaintiffs do not dispute that they "are uninjured by the portion of the
notification that prohibits discrimination on account of 'sexual orientation.'" Pls. SJ Opp. Br. 1.
Plaintiffs therefore lack standing to seek a declaratory judgment "that section 1557 does not prohibit
discrimination on account of sexual orientation," First Am. Compl. ¶ 48; *id.* Demand for Relief § d,
an order "set[ting] aside" the Notification insofar as it interprets Section 1557 to prohibit

discrimination on the basis of sexual orientation, *id.* Demand for Relief § b; *id.* ¶ 45, or an injunction "enjoin[ing] Secretary Becerra from using or enforcing the interpretation of section 1557 that appears in the Notification," insofar as the Notification interprets Section 1557 to prohibit discrimination on the basis of sexual orientation," *id.* Demand for Relief § c; *id.* ¶ 45.

  Plaintiffs' arguments for standing to challenge an agency interpretation that admittedly did not injure them fail. Plaintiffs claim that so long as they have standing to challenge HHS's interpretation in the Notification that Section 1557 prohibits discrimination on the basis of gender identity,[2] they have standing to challenge the Notification in its entirety, even the legal interpretations that did not injure them. Pls. SJ Opp. Br. 1-2. However, "standing is not dispensed in gross," and it "is of course not the law" that "the right to complain of *one* administrative deficiency automatically confer[s] the right to complain of *all* administrative deficiencies." *Lewis*, 518 U.S. at 358 n.6. Any claimed injury from the Notification's alleged administrative deficiency concerning gender identity does not confer on Plaintiffs the right to complain about another alleged administrative deficiency concerning sexual orientation.

  Plaintiffs argue that under the Administrative Procedure Act, which empowers courts to "hold unlawful and set aside agency action," 5 U.S.C. § 706(2), they can challenge the Notification in its entirety so long as they were injured by any portion of the Notification. Pls. SJ Opp. Br. 1. But the APA remedy of holding unlawful or setting aside an agency action need not apply to the entirety of a document published by an agency. As Plaintiffs' counsel explained in his academic scholarship: "It is important not to overstate the significance of a reviewing court's obligation to 'set aside' unlawful agency action under the APA. This power does not, for example, require or authorize courts to 'facially' invalidate an entire rule or order when only a subpart or discrete application of the agency's

---

[2] As explained below, Plaintiffs also lack standing to challenge HHS's interpretation as to gender identity. *See infra*, Part I.B.

action is unlawful." Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1013 (2018) (citation omitted); *see also, e.g., Franciscan All., Inc. v. Azar*, 414 F. Supp. 3d 928, 945 (N.D. Tex. 2019) (in APA challenge to prior HHS rule implementing Section 1557, vacating and remanding "the unlawful portions of the Rule" rather than setting aside rule in its entirety). The APA is therefore consistent with Article III's requirement that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). Even if the APA provided an automatic remedy of vacatur of an entire agency action (which it does not), the principle that standing is not dispensed in gross derives from Article III of the Constitution, and constitutional standing limitations cannot be superseded by statute. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016).

Courts regularly hold that standing to challenge one provision or aspect of a regulation or agency guidance document under the APA does not confer standing to challenge the entire regulation or document. Rather, a court must independently assess whether plaintiffs have standing to challenge each aspect of the document. For example, in *Sierra Club v. Environmental Protection Agency*, 873 F.3d 946, 951 (D.C. Cir. 2017), the court concluded that "[e]ven if we were to find that petitioners have standing to challenge" certain provisions of an agency guidance document, "that finding would not create standing to challenge" other provisions of that guidance document because "[s]tanding is not evaluated 'in gross.'" *Id.* (quoting *Lewis*, 518 U.S. at 358 n.6). Similarly, in *United Food & Commercial Workers Union, Local No. 663 v. United States Department of Agriculture*, 451 F. Supp. 3d 1040 (D. Minn. 2020), the court found that "Plaintiffs have established an injury" related to one provision of a regulation, "but have not established an injury related to" another provision of the same regulation. *Id.* at 1051. The court concluded: "Although Plaintiffs are challenging the Final Rule that contains both regulatory changes, the Court only has jurisdiction over the claims for which Plaintiffs have alleged an injury." *Id.*; *see also Am. Fed'n of Tchrs. v. DeVos*, 484 F. Supp. 3d 731, 743 (N.D. Cal. 2020) ("Plaintiffs contend that because they challenge various aspects of the Rescission Rule, *any* harm

caused by *any* aspect of the rule confers standing. Not so.").

The cases cited by Plaintiffs are inapposite. In one case, the government "ma[d]e[] no developed argument" against vacatur of an advisory opinion and therefore "forfeited the argument" that vacatur was an inappropriate remedy. *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 860 (5th Cir. 2022). That case also involved no argument that plaintiffs lacked standing to challenge part of the opinion. Another case cited by Plaintiffs, *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 521-22 (7th Cir. 2021), was not an APA case at all, but merely held that the remedy of vacatur of an agency action did not fall within the *Ex Parte Young* exception to sovereign immunity, an issue not relevant here.

Regardless of whether the Court holds that Plaintiffs have standing to challenge HHS's interpretation of Section 1557 concerning gender identity, Article III does not permit the Court to dispense standing to Plaintiffs in gross by allowing them to challenge HHS's legal interpretation concerning sexual orientation that Plaintiffs admit did not injure them.

**B.      Plaintiffs Lack Standing to Challenge the Notification's Interpretation that Section 1557 Prohibits Discrimination on the Basis of Gender Identity**

Plaintiffs do not dispute that to bring a pre-enforcement challenge to HHS's interpretation that Section 1557 prohibits discrimination on the basis of gender identity, Plaintiffs must show a "substantial" "likelihood," *California v. Texas*, 141 S. Ct. 2104, 2114 (2021), or "credible threat," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014), of future enforcement against them. *See* Defs. SJ Br. 12; Pls. SJ Opp. Br. 7. Plaintiffs have failed to make this showing because they have not shown that HHS has ever interpreted the conduct that Plaintiffs say they engage in to be discrimination on the basis of gender identity, or that it is plausible that HHS will do so in the future. Plaintiffs testified and averred in their depositions, interrogatory responses, and declarations that they wish to provide medically appropriate care based on their transgender patients' sex characteristics (e.g., caring for the prostate of a transgender patient assigned male at birth or for the cervix and ovaries of a transgender

patient assigned female at birth) and that they wish to decline to provide gender transition services that are outside their area of specialization. *See* Defs. SJ Br. 15; Neese Rog. Resp. 2-3, 8, A2-3, A8[3]; Neese Decl. ¶¶ 15-16; Neese Dep. Tr. 31:8-13, A122; Hurly Rog. Resp. 4, A51; Hurly Decl. ¶ 10; Hurly Dep. Tr. 28:14-29:13, A180-A181. But HHS has never interpreted such conduct to constitute discrimination on the basis of gender identity, and HHS' recently proposed rule would not treat such conduct as discriminatory. Dep't of Health & Human Servs., Nondiscrimination in Health Programs and Activities, Notice of Proposed Rulemaking, 87 Fed. Reg. 47,824 (Aug. 4, 2022) ("NPRM").

Plaintiffs attack Defendants' citations to the NPRM because the NPRM was issued after Plaintiffs filed the First Amended Complaint, and the NPRM is not a final rule. Defs. SJ Br. 2-3. Defendants do not dispute Plaintiffs' points that standing is assessed at the time a complaint is filed and that an NPRM is a proposed rule with no legal force, but Plaintiffs mischaracterize why Defendants cited the NPRM in disputing subject-matter jurisdiction. Defendants do not argue that any legal force of the NPRM deprived the Court of jurisdiction or extinguished any injuries that existed at the time of the filing of the First Amended Complaint. Rather, Defendants argue that Plaintiffs *never* had standing because there was never a credible threat that HHS would enforce Section 1557 against Plaintiffs with respect to the conduct Plaintiffs identify, a point that is underscored by the NPRM having proposed an interpretation of Section 1557 that would not prohibit Plaintiffs' anticipated conduct.

Plaintiffs have been unable to point to any statements or actions of HHS that led them to believe that HHS would enforce Section 1557 against them, beyond the statement in the Notification that HHS interprets Section 1557 to prohibit discrimination on the basis of gender identity. *See* Neese

---

[3] Citations to "A___" are to Defendants' Appendix for Brief in Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Class Certification, ECF Nos. 58-60.

Dep. Tr. 36:19-37:8, A127-A128; Hurly Dep. Tr. 27:9-28:1, A179-A180. But Plaintiffs have not identified any statements or actions by HHS that would suggest that HHS has ever interpreted Section 1557 to prohibit physicians from declining to perform procedures outside their specialization or providing or offering medically appropriate care based on transgender patients' sex characteristics. And for good reason: no such statements or actions exist. Moreover, the portions of the NPRM that propose to interpret Section 1557 to permit such conduct were not novel. They rested on longstanding principles of civil rights law, such as "the general principle in nondiscrimination law that covered entities facing allegations of discrimination have the opportunity to articulate a legitimate, nondiscriminatory basis for their challenged action or practice." NPRM, 87 Fed. Reg. at 47,867 & n.419 (citing *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802 (1973)). Therefore, even before HHS issued the NPRM, the fact that HHS interpreted Section 1557 to prohibit discrimination on the basis of gender identity did not indicate a substantial likelihood that HHS would enforce Section 1557 against anyone (let alone these specific Plaintiffs) for declining to perform services outside their specialization or providing medically appropriate care based on transgender patients' sex characteristics.

Plaintiffs also argue that their anticipated conduct would constitute discrimination even under the proposed interpretations set forth in the NPRM, but they either misinterpret the NPRM or mischaracterize their own anticipated conduct. Plaintiffs point out that Dr. Neese is "[c]ategorically unwilling to prescribe puberty blockers or hormone therapy to minors, or to assist a minor with transitioning." Pls. SJ Opp. Br. 5 (quoting Neese Decl. ¶ 9). But Dr. Neese also stated that providing such services to minors "is not my area of specialty." Neese Decl. ¶ 9; *see also* Neese Rog. Resp. 3, A3 ("I did not believe that I could appropriately manage the transition of a teenager. These are complex medical issues which I do not specialize in."); Neese Dep. Tr. 31:8-13, A122 (testifying that she is "not familiar" with the medical processes for a pubescent patient to transition genders). HHS has never

interpreted Section 1557 to require physicians to perform services outside their specialization, and HHS's proposed rule would "not require health care professionals to perform services outside of their normal specialty area; therefore a provider that declines to provide services outside its specialty area would have a legitimate, nondiscriminatory reason for its action." NPRM, 87 Fed. Reg. at 47,867. For example, as explained in the preamble to the proposed rule, an ophthalmologist whose medical practice is limited to treating the eyes would not be required to prescribe hormones for gender transition, and her refusal to do so would not constitute discrimination on the basis of gender identity, even if the ophthalmologist harbored animus toward transgender individuals or believed that "gender transition or other gender-affirming care can never be beneficial for such individuals." NPRM, 87 Fed. Reg. at 47,918.[4]

Plaintiffs also argue that Dr. Neese stated that she would refuse "to provide 'gender-affirming care' to transgender patients when the patient's 'denial of biological realities will endanger their life or safety.'" Pls. SJ Opp. Br. 5 (quoting Neese Decl. ¶¶ 12-16). But the quoted paragraphs of Dr. Neese's declaration do not describe refusal to provide gender-affirming care. Instead, Dr. Neese describes a situation in which she strongly recommended that a transgender male patient assigned female at birth undergo medically appropriate care consistent with his sex characteristics, specifically that the patient receive exams and screening for his breasts, uterus, and ovaries. Neese Decl. ¶¶ 12-15. She also states that she would similarly recommend to transgender female patients assigned male at birth that they undergo medically appropriate care consistent with their sex characteristics, such as prostate-cancer screening at the appropriate age. Id. ¶ 16. But as Plaintiffs acknowledge, in HHS's view, "covered entities may 'treat[] an individual for conditions that may be specific to their sex characteristics,' such as treating a woman-to-man transgender patient for pregnancy." Pls. SJ Opp. Br. 5 (quoting 87 Fed.

---

[4] However, an ophthalmologist's blanket refusal to treat transgender patients on the basis of their gender identity would constitute prohibited discrimination.

Reg. at 47,866).[5]

Plaintiffs also point out that Dr. Neese would decide whether to prescribe hormone therapy for adult transgender patients or to recommend some other form of gender-affirming care (such as "counseling and psychological care") in the context of a "longstanding relationship with that patient." Pls. SJ Opp. Br. 5 (quoting Neese Decl. ¶ 11). But HHS has never interpreted Section 1557 to prohibit such medical judgments. The NPRM states that under the proposed rule, HHS would not interpret Section 1557 to "compel a provider to prescribe a specific treatment that the provider decides not to offer after making a nondiscriminatory bona fide treatment decision," citing as an example a provider who recommends "social transition" rather than "hormone blockers." 87 Fed. Reg. at 47,867.

Dr. Hurly's lack of standing is even clearer. Plaintiffs' opposition focuses almost entirely on Dr. Neese and barely mentions Dr. Hurly. *See* Pls. SJ Opp. Br. 5-7. Dr. Hurly's stated concern is that HHS would deem him to have engaged in discrimination if he accurately diagnosed the medical conditions of transgender patients, such as diagnosing a transgender woman assigned male at birth with prostate cancer. Hurly Decl. ¶¶ 7-9. But Defendants showed that it is implausible that HHS would do so, Defs. SJ Br. 15-17, and Plaintiffs fail to respond to that point. Dr. Hurly has recounted an instance in which his secretary informed him that a transgender woman assigned male at birth disputed a prostate cancer diagnosis and insisted that she had a cervix and not a prostate. Hurly Rog. Resp. 3, A50; Hurly Dep. Tr. 24:4-25:4, A176-A177. Dr. Hurly purportedly fears that HHS would prohibit him from informing transgender women assigned male at birth "with prostate cancer of the fact that they have a prostate, and that they must seek treatment for prostate cancer," and suggests

---

[5] In the proposed rule, HHS specifically identified pelvic exams for transgender men identified female at birth and prostate cancer screening for transgender women assigned male at birth as care that providers could not refuse to provide on the basis of gender identity, 87 Fed. Reg. at 47,865, showing that no credible threat exists that HHS would deem a physician to have violated Section 1557 or bring an enforcement action for providing or recommending such care.

that HHS would require him to "play along" with such a patient's belief that she had a cervix and not a prostate, Hurly Decl. ¶¶ 9-11; *see also* Pls. SJ Opp. Br. 6.  Dr. Hurly fails to point to anything in Section 1557 or HHS' interpretation that led him to this conclusion.  And he cannot do so because nothing in HHS's interpretation of Section 1557 prohibits a physician from providing a patient with an accurate cancer diagnosis or requires a physician to inaccurately describe a patient's body parts.  For example, the NPRM indicates that under the proposed rule, "a covered entity would not be required to perform a cervical exam on an individual who does not have a cervix, or to perform a prostate exam on an individual who does not have a prostate."  87 Fed. Reg. at 47,867.

In sum, HHS has never interpreted Section 1557 to prohibit the conduct that Plaintiffs report that they engage in or anticipate engaging in.  Plaintiffs have failed to show that a credible threat exists that HHS will adopt such an interpretation in the future (which would be at odds with the proposed interpretation in the NPRM) and enforce Section 1557 against Plaintiffs.  Plaintiffs accordingly lack standing.

## II.    Defendants Are Entitled to Summary Judgment on the Merits

### A.    Plaintiffs Concede that *Bostock*'s Reasoning Applies to Section 1557

In its Motion to Dismiss ruling, the Court indicated that it would need "further briefing" and "argument" to determine whether the analysis of *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731 (2020), applies to Section 1557 (through its incorporation of Title IX's prohibition of sex discrimination).  Opinion and Order, ECF No. 30, at 27.  Now that such briefing and argument has occurred, the parties are in agreement: *Bostock*'s analysis applies to Section 1557.

In their opening summary judgment brief, Defendants showed Title IX's prohibition of discrimination "on the basis of sex" (as incorporated into Section 1557), like Title VII's prohibition of discrimination "because of . . . sex"; as with Title VII, may be satisfied by showing that sex was a but-for cause of the discriminatory action.  Defs. SJ Br. 19-21.  Defendants further showed that

Section 1557 and Title IX, like Title VII, prohibit discrimination against individuals.  Defs. SJ Br. 21-22.  Therefore, *Bostock*'s reasoning with respect to Title VII that "it is impossible to discriminate against a person for being [gay] or transgender without discriminating against that individual based on sex," *Bostock*, 140 S. Ct. at 1741, applies to Title IX and Section 1557.  Defs. SJ Br. 22.

Plaintiffs, for their part, "do not dispute" that "*Bostock*'s interpretation of Title VII applies to Title IX, and *Bostock*'s holding is binding on health-care providers that receive federal funds under section 1557."  Pls. SJ Opp. Br. 7.  Plaintiffs further acknowledge that under *Bostock*'s reasoning, Section 1557 prohibits a hospital that receives federal funding from "refus[ing] to admit transgender patients because it disapproves of their gender identity," *id.* 8 n.5, and that more generally, Section 1557 would prohibit a health-care provider from "discriminat[ing] against someone for *being* [gay] or transgender," *id.* 9.

Given Plaintiffs' concessions, this case provides no occasion to rule on any argument that *Bostock*'s reasoning does not apply to Section 1557, or to rule on any argument that Section 1557 and Title IX provide no protection at all with respect to sexual orientation or gender identity.

**B.      Plaintiffs' Interpretation of Section 1557 Is Incorrect**

Plaintiffs argue that Section 1557 "prohibits only acts . . . when an individual would have acted differently toward an identically situated member of the opposite biological sex," Pls. SJ Opp. Br. 8, which Plaintiffs explain elsewhere in their briefing would mean that "a healthcare provider cannot discriminate on the basis of sex when enforcing rules or policies that apply equally to men and women."  Pls. SJ Br. 11, ECF No. 47.  But Section 1557 contains no such safe harbor for practices that apply equally to men and women.  As *Bostock* reasoned, "it is impossible to discriminate against a person for being [gay] or transgender without discriminating against that individual based on sex," *Bostock*, 140 S. Ct. at 1741, because sexual orientation and gender identity "are inextricably bound up with sex. . . . [T]o discriminate on these grounds requires an employer to intentionally treat individual

employees differently because of their sex," *id.* at 1742. If a health care provider discriminates against a patient on the basis of the patient's sexual orientation, the provider necessarily discriminates on the basis of sex because the provider treats the patient worse on the basis of a characteristic (attraction to a particular sex) that the provider would tolerate in a patient of the opposite sex. *See id.* at 1741. Similarly, if a health care provider discriminates against a patient on the basis of the patient's gender identity, the provider necessarily discriminates on the basis of sex because the provider treats the patient worse on the basis of a characteristic (identifying as a particular gender) that the provider would tolerate in a patient assigned the opposite sex at birth. *See id.* at 1741-42. Under *Bostock*'s reasoning, which Plaintiffs concede applies here, the relevant inquiry is whether a provider has taken a discriminatory action based on a patient's sexual orientation or gender identity.

To be sure, in some circumstances, whether a provider would deny a treatment to all sexes is relevant to the question whether the provider is discriminating on the basis of gender identity. Consider again the example of an ophthalmologist, whose practice is limited to treating the eyes. The ophthalmologist may decline to prescribe testosterone to patients of any sex, and doing so would not be considered discriminatory, because the ophthalmologist has the legitimate, nondiscriminatory reason that such services are beyond her specialization. *See supra*, pp. 7-8; NPRM, 87 Fed. Reg. at 47,867.

But Plaintiffs' suggested absolute safe harbor that rules and policies applicable to all sexes cannot constitute discrimination is inconsistent with Section 1557's text and *Bostock*'s reasoning. A provider that refuses to provide a service to a patient because the patient is transgender has discriminated against that patient on the basis of sex. Yet Plaintiffs' argument incorrectly suggests that a patient could deny services to transgender patients because of their gender identity and then obtain a safe harbor by also denying those same services to other patients. For example, if prescribing hormones such as testosterone is within the specialization of an endocrinologist, then that

endocrinologist could not refuse to prescribe testosterone to transgender men assigned female at birth because the endocrinologist disapproved of their gender identity. Contrary to Plaintiffs' suggestion, Pls. SJ Opp. Br. 9, an endocrinologist adopting such a discriminatory policy could not shield himself from liability by adopting a policy of refusing to prescribe testosterone to cisgender males, even if testosterone was medically appropriate for those cisgender male patients. To use another example raised in Plaintiffs' briefing, Pls. SJ Br. 9-10, a provider could not refuse to treat all bisexual patients on the basis of their sexual orientation, even though such a policy would apply equally to men and women, because the provider would be committing sex discrimination against both men and women. *See Bostock*, 140 S. Ct. at 1741 (it is no "defense for an employer to say it discriminates against both men and women because of sex," and an employer who does so "doubles" exposure "[i]nstead of avoiding" it).

In support of their interpretation of Section 1557, Plaintiffs cite *Bear Creek Bible Church v. Equal Employment Opportunity Commission*, 571 F. Supp. 3d 571 (N.D. Tex. 2021), *appeal pending* No. 22-10145 (5th Cir.). The government respectfully disagrees with *Bear Creek* in many respects and has appealed that decision to the Fifth Circuit. But it is worth noting that *Bear Creek* rejected Plaintiffs' proposed rule that someone "cannot discriminate on the basis of sex when enforcing rules or policies that apply equally to men and women." Pls. SJ Br. 11. In particular, *Bear Creek* rejected Plaintiffs' argument that "a statutory prohibition on 'sex' discrimination does not prohibit discrimination against bisexuals, so long as the employer regards bisexual behavior or orientation as equally unacceptable in a man or a woman." Pls. SJ Br. 4-5. *Bear Creek* reasoned that even though "[a] policy against bisexual conduct does not favor one biological sex over the other, . . . a policy that prohibits *only* bisexual conduct also inherently targets sex and therefore violates Title VII." *Bear Creek*, 571 F. Supp. 3d at 621-22. Plaintiffs have cited no authority that supports their interpretation of Section 1557, nor have they responded to

the significant authority cited in Defendants' briefing holding that Section 1557 or Title IX prohibit discrimination on the basis of sexual orientation and gender identity.  *See* Defs. SJ Br. 23-24.[6]

The Notification correctly interprets Section 1557 to prohibit discrimination on the basis of sexual orientation and gender identity, and Plaintiffs' alternative interpretation is incorrect.  The Court should grant summary judgment to Defendants.

## CONCLUSION

The Court should grant Defendants' Motion for Summary Judgment and enter judgment for Defendants on all of Plaintiffs' claims.

---

[6] Plaintiffs did not respond to Defendants' argument that if the Court awards any relief, it should limit relief to the parties to the case.  *See* Defs. SJ Br. 31 n.12.  The same day Defendants filed their opening brief, the Eleventh Circuit issued a decision persuasively reasoning that "nationwide injunctions" are generally inappropriate because they "push against the boundaries of judicial power, and very often impede the proper functioning of our federal court system."  *Georgia v. President of the United States*, 46 F.4th 1283, 1303 (11th Cir. 2022).  "[N]ationwide injunctions frustrate[]" the "design" of the "federal court system," which "allows courts to reach multiple answers to the same legal question."  *Id.* at 1304.  That would certainly be the case here, where many courts have held, contrary to Plaintiffs' arguments in this case, that Title IX or Section 1557 prohibit discrimination on the basis of sexual orientation and gender identity.  *See* Defs. SJ Br. 23-24.  And Plaintiffs have never argued that "a nationwide injunction is necessary to offer full relief to the plaintiffs," *Georgia*, 46 F.4th at 1306, as required for a nationwide injunction.

Dated September 30, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MICHELLE BENNETT
Assistant Branch Director

/s/ Jeremy S.B. Newman
Jeremy S.B. Newman (Mass. Bar No. 688968)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street N.W.
Washington, DC 20005
Tel: (202) 532-3114
Email: jeremy.s.newman@usdoj.gov

CHAD E. MEACHAM
United States Attorney

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:      214-659-8626
Facsimile:       214-659-8807
brian.stoltz@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

On September 30, 2022, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Jeremy S.B. Newman
Jeremy S.B. Newman
Trial Attorney
United States Department of Justice