IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| SUSAN NEESE, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 2:21-CV-163-Z |
| | § | |
| XAVIER BECERRA, in his official | § | |
| capacity as the Secretary of the | § | |
| United States Department of Health and | § | |
| Human Services, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## OPINION AND ORDER

In his *Bostock* dissent, Justice Alito foresaw how litigants would *stretch* the majority opinion like an elastic blanket to cover categories, cases, and controversies expressly not decided. Justice Alito warned: "The entire Federal Judiciary will be mired for years in disputes about the reach of the Court's reasoning." 140 S. Ct. 1731, 1783 (2020) (Alito, J., dissenting); *see also id.* at 1781 (Alito, J., dissenting) ("Similar claims have been brought under the Affordable Care Act (ACA), which broadly prohibits sex discrimination in the provision of healthcare.").

And here we are . . . .

Before the Court is Plaintiffs Susan Neese and James Hurly's Motion for Summary Judgment ("Plaintiffs' Motion") (ECF No. 46) and Defendants' Motion for Summary Judgment ("Defendants' Motion") (ECF No. 55).[1] Having considered the pleadings and applicable law, the Court **GRANTS IN PART** Plaintiffs' Motion and **GRANTS IN PART** Defendants' Motion.

---

[1] Defendants are Xavier Becerra, in his official capacity as Secretary of the United States Department of Health and Human Services, and the United States of America.

**BACKGROUND**

Section 1557 of the Affordable Care Act prohibits discrimination "on the basis of sex." *See* 42 U.S.C. § 18116(a) (incorporating, among other things, Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1681(a), into Section 1557). In *Bostock*, the Supreme Court held Title VII's "because of . . . sex" terminology prohibits "sexual orientation" and "gender identity" discrimination in employment.[2] *See generally* 140 S. Ct. 1731. Citing *Bostock*, the United States Department of Health and Human Services ("HHS") announced it would "interpret and enforce" Section 1557's prohibition on discrimination "on the basis of sex" to include "on the basis of sexual orientation" and "on the basis of gender identity." *See generally* United States Department of Health and Human Services, Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972, 86 Fed. Reg. 27,984 (May 25, 2021) ("Notification").

Plaintiffs — two Texas-based physicians — allege Defendants misread *Bostock* and argue that healthcare providers may continue sex-specific medical decisions relevant to "gender identity" "so long as one does not engage in 'sex' discrimination when doing so." ECF No. 11 at 5. Specifically, Plaintiffs allege neither Section 1557 nor *Bostock* prohibits such discrimination, "as long as they would have acted in the exact same manner if the patient had been a member of the opposite biological sex." ECF No. 17 at 16. Plaintiffs "object only to the Secretary's claim that *Bostock* defined 'sex' discrimination to encompass all forms of discrimination on the basis of sexual orientation or gender identity." *Id.* Plaintiffs state they "fully intend to comply with *Bostock* and its interpretation of 'sex.'" *Id.*

---

[2] In this litigation, Plaintiffs and Defendants intermittently use the terms "homosexual," "bisexual," and "transgender" to refer to the disputed categories "sexual orientation" and "gender identity" referenced in *Bostock* and Notification. Though the terminology is potentially underinclusive, overinclusive, inexact, and inaccurate, this Court will refer to "sexual orientation" and "gender identity" as collective of the aforementioned categories — unless particularity is necessary for the Court's analysis.

Plaintiffs make sex-specific decisions relevant to "gender identity" in their medical practices — and both receive federal money subject to Section 1557. *See generally* ECF No. 11. Dr. Neese "has treated patients suffering from gender dysphoria in the past and has on occasion prescribed hormone therapy for them." *Id.* at 5–6. But Dr. Neese "does not believe that hormone therapy or sex-change operations are medically appropriate for everyone who asks for them, even if those individuals are suffering from gender dysphoria, and she will on occasion decline to prescribe hormone therapy or provide referrals for sex-change operations." *Id.* at 6. "Dr. Neese is categorically unwilling to prescribe hormone therapy to *minors* who are seeking to transition, and she is equally unwilling to provide referrals to minors seeking a sex-change operation." *Id.* She "believes that it is unethical to provide 'gender affirming' care to transgender patients in situations where a patient's denial of biological realities will endanger their life or safety." *Id.*

Plaintiffs allege "Dr. Neese has treated many transgender patients . . . in the past, and she expects to continue doing so in the future." *Id.* Dr. Neese claims she "is likely to encounter minor transgender patients who will request hormone therapy and referrals for sex-change operations that she is unwilling to provide, as well as adult transgender patients who will deny or dispute their need for preventive care that corresponds to their biological sex, and she intends to provide care to these individuals in a manner consistent with her ethical beliefs." *Id.*

Dr. Hurly "recognizes that some biological men may identify as women (and vice versa)." *Id.* at 7. In his practice, Dr. Hurly "has encountered situations . . . when he must insist that a patient acknowledge his biological sex rather than the gender identity that he asserts." *Id.* Plaintiffs provide an example: Dr. Hurly "once diagnosed a biological male patient with prostate cancer, but the patient refused to accept Dr. Hurly's diagnosis because he identified as a woman and insisted that he could not have a prostate." *Id.* Dr. Hurly "explain[ed] to this patient that he

was indeed a biological man with a prostate, and that he needed to seek urgent medical treatment for his prostate cancer." *Id.* Plaintiffs claim, "Dr. Hurly has treated transgender patients in the past, and he expects to continue doing so in the future." *Id.* They allege: "Dr. Hurly is likely to encounter transgender patients who will deny or dispute their need for health care that corresponds to their biological sex, and he intends to provide care to these individuals in a manner consistent with his ethical beliefs." *Id.*

Plaintiffs bring two causes of action: one under the Administrative Procedure Act ("APA") and one under the Declaratory Judgment Act ("DJA"). *Id.* at 10. Plaintiffs argue Section 1557 only prohibits "sex" discrimination, which means a provider would have acted differently towards an identically situated member of the opposite biological sex. *Id.* As for relief, Plaintiffs ask that the Court "hold unlawful and set aside" the Notification, "enjoin" Defendants "from using or enforcing the interpretation of [S]ection 1557 that appears in the Notification," "declare that [S]ection 1557 does not prohibit discrimination on account of sexual orientation and gender identity, . . . but that it prohibits only 'sex' discrimination, which means that provider would have acted differently toward an identically situated member of the opposite biological sex." ECF No. 11 at 10–11.

The Court previously denied Defendants' motion to dismiss and granted Plaintiffs' motion for class certification. *See generally* ECF Nos. 30, 65. The Court certified a class of all healthcare providers subject to Section 1557. Plaintiffs now move for summary judgment on each claim. *See generally* ECF No. 46. Defendants also seek summary judgment, asking that the Court render judgment in Defendants' favor on Plaintiffs' two claims and dismiss this action. *See generally* ECF No. 55.

**LEGAL STANDARD**

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if its existence or non-existence "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[T]he substantive law will identify which facts are material." *Id.* A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "'On cross-motions for summary judgment, [the Court] review[s] each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party.'" *Texas v. Rettig*, 987 F.3d 518, 526 (5th Cir. 2021) (quoting *Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 304 (5th Cir. 2010)).

When reviewing summary-judgment evidence, the court must resolve all reasonable doubts and draw all reasonable inferences in the light most favorable to the non-movant. *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). A court cannot make a credibility determination when considering conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. If some evidence supports a disputed allegation, so that "reasonable minds could differ as to the import of the evidence," the court must deny the motion. *Id.* at 250.

**ANALYSIS**

The issues raised in the motions for summary judgment are whether: (1) Plaintiffs possess standing; (2) the Notification is not in accordance with the law; and (3) Section 1557 prohibits discrimination on the basis of SOGI. The Court will address standing before proceeding to the two merits arguments.

### A. Plaintiffs Have Standing

The judicial power of federal courts is limited to certain "cases" and "controversies." U.S. CONST. art. III, § 2; *see also June Medical Servs. L.L.C. v. Russo*, 140 S. Ct. 2103, 2117 (2020). The case-or-controversy requirement requires a plaintiff to establish that he has standing to sue. *See Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018); *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013) ("Every party that comes before a federal court must establish that it has standing to pursue its claims."). Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To have standing, the party invoking federal jurisdiction must establish he suffered: (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) an injury that is "fairly . . . trace[able] to the challenged action of the defendant"; and (3) an injury that is "likely" rather than "speculative[ly]" to be "redressed by a favorable decision." *Id.* at 560–61 (internal marks omitted).

The Court previously found Plaintiffs have standing because they face a "credible threat of enforcement" that creates an "injury in fact" that is "concrete and particularized" and "actual or imminent." ECF No. 30 at 9 (internal marks omitted); *see also* ECF No. 65 at 5 (same). The Court will not once again adjudicate standing here.

### B. The Notification Is "Not in Accordance with the Law"

Congress enacted the Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act of 2010, collectively known as the Affordable Care Act ("ACA"), in March 2010. 111 Pub. L. No. 148 (March 23, 2010); 111 Pub. L. No. 152 (March 30, 2010). Under Section 1557 of the ACA:

> Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*) . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance.

42 U.S.C. § 18116(a). Title IX, in turn, prohibits discrimination "on the basis of sex," among other things. *See* 20 U.S.C. § 1681(a) ("No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, except [as provided throughout the statute].").

What does "on the basis of sex" mean as used in Title IX? Defendants offer a simple answer: apply *Bostock*. *Bostock* "proceed[ed] on the assumption that 'sex' . . . refer[s] only to biological distinctions between male and female." 140 S. Ct. at 1739. Notwithstanding this assumption, the Supreme Court devised a "but-for cause" test and determined Title VII's "because of sex" terminology should be read to prohibit "sexual orientation" and "gender identity" discrimination in employment. *See id.* Applying *Bostock*, Defendants ask the Court to implement a "but-for cause" test and interpret Title IX's "on the basis of sex" terminology identically to Title VII's "because of . . . sex" language. *See* ECF No. 56 at 26.

For the reasons explained below, however, *Bostock* does not apply to Section 1557 or Title IX. And the Court will not export *Bostock*'s reasoning to Section 1557 or Title IX. Instead, the Court analyzes "on the basis of sex," as used in Title IX (and incorporated into Section 1557), by giving the term its ordinary public meaning at the time of enactment and in the context of Title IX.

### 1. *Bostock* does not apply to Section 1557 or Title IX.

*Bostock* does not purport to interpret Section 1557, Title IX, or any other non-Title VII statute. As the majority opinion states:

> The employers worry that our decision will sweep beyond Title VII to other federal or state laws that prohibit sex discrimination. . . . But none of these other laws are before us; we have not had the benefit of adversarial testing about the meaning of their terms, and *we do not prejudge any such question today*. . . .

> The only question before us is whether an employer who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'

*Bostock*, 140 S. Ct. at 1753 (emphasis added).

*Bostock* decided only what *Bostock* decided: under Title VII, "[a]n employer who fires an individual merely for being gay or transgender defies the law." *Id.* at 1754; *see also Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) ("[T]he rule in *Bostock* extends no further than Title VII."); *Adams v. Sch. Bd. of St. James Cnty., Fla.*, 3 F.4th 1299, 1336 (11th Cir. 2021) (Pryor, C.J., dissenting) (stating *Bostock*'s reasoning applies to Title VII, not Title IX). One cannot rely on the words and reasoning of *Bostock* itself to explain why the Court prejudged what the Court expressly refused to prejudge. *See Pelcha*, 988 F.3d at 324 ("*Bostock* was clear on the narrow reach of its decision and how it was limited *only to Title VII itself*." (emphasis added)); *Washington v. U.S. Dep't of Health and Hum. Servs.*, 482 F. Supp. 3d 1104, 1115 (W.D. Wash. 2020) ("[I]t remains unclear whether, or to what extent, *Bostock*'s rationale will ultimately be applied to Title IX and Section 1557.").[3]

---

[3] Plaintiffs argue "the holding of *Bostock* applies to Title IX and [S]ection 1557." ECF No. 47 at 6. Plaintiffs, however, dispute Defendants' interpretation of *Bostock. See id.* at 6–7. Because the Court finds *Bostock* does not apply to Title IX or Section 1557, the Court will not adjudicate this debate. Accordingly, the Court stops addressing the substance of Plaintiffs' arguments here, as the Court disagrees with the premise of those arguments.

## 2. *Bostock*'s reasoning does not apply to Section 1557 or Title IX.

Defendants argue *Bostock* and its reasoning apply to Section 1557 and, accordingly, discrimination "on the basis of sex" includes discrimination on the basis of "sexual orientation" and "gender identity." *See* ECF No. 56 at 25 ("Section 1557's prohibition of discrimination 'on the basis of sex' can also be satisfied by showing but-for causation."). "Defendants do not argue that *Title IX* includes discrimination on the basis of sexual orientation and gender identity as distinct, additional grounds of prohibited discrimination." *Id.* at 25 n.5. They instead assert "Section 1557 prohibits discrimination on the basis of sexual orientation and discrimination on the basis of gender identity because discrimination on either of those grounds necessarily involves discrimination on the basis of sex." *Id.* Defendants support this proposition with three categories of case law: (1) Supreme Court; (2) Fifth Circuit; and (3) other circuits. None of the law Defendants cite persuades the Court to export *Bostock*'s reasoning into Section 1557 or Title IX.

### a.  No precedential authority exports *Bostock* to the Title IX context.

Defendants cite *Franklin v. Gwinnett County Public School* to argue the Supreme Court reads Title IX's "on the basis of" standard to be a "because of" standard. *See* ECF No. 56 at 26 (citing 503 U.S. 60, 75 (1992)). In *Franklin*, a case preceding *Bostock* by nearly three decades, the Supreme Court stated Title IX imposes "the duty not to discriminate on the basis of sex, and 'when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor discriminate[s] on the basis of sex.'" 503 U.S. at 75 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). Defendants' argument is unpersuasive for at least two reasons. First, in *Franklin*, the Supreme Court did not employ "but-for causation" analysis to find discrimination on the basis of sex. Because the discrimination at issue involved *biological* "sex," the Court need not and did not employ "but-for" causation analysis to find "sex" discrimination Second, "Title IX

does not use the word 'because.'" *Doe v. Manor Coll.*, 587 F. Supp. 3d 249, 255 (E.D. Pa. 2022). "The shorthand phrasing used in [*Franklin*] does not change the text of Title IX." *Id.* So, Defendants' argument centered on "statutory interpretation of the word 'because' [in *Bostock*] does not apply to Title IX." *Id.*

Defendants next cite two Fifth Circuit cases. *See* ECF No. 56 at 26–27 (citing *Lakoski v. James*, 66 F.3d 751, 757 (5th Cir. 1995), *and Pederson v. La. State Univ.*, 213 F.3d 858, 880 (5th Cir. 2000)). Defendants rely on these cases (which, again, pre-date *Bostock* by decades) for the proposition that "the prohibitions of discrimination on the basis of sex of Title IX and Title VII [are] the same." *Id.* at 26 (quoting *Lakoski*, 66 F.3d at 757). Because, as the cases suggest, "Title IX's proscription of sex discrimination . . . does not differ from Title VII's," Defendants assert the Court must interpret "on the basis of sex" under title IX to include discrimination because of "sexual orientation" and "gender identity." *Lakoski*, 66 F.3d at 757; *see also Pederson*, 213 F.3d at 880 (explaining Title IX violated when an "institution intended to treat women differently because of their sex").

The Court is not persuaded that these pre-*Bostock* cases have much force here. Notably, these cases consider only Title IX's application to biological sex. *See generally Lakoski*, 66 F.3d 751; *Pederson*, 213 F.3d 858. And although the opinions invoke "because of" terminology in relation to "sex," they do not *hold* Title IX protects "sexual orientation" and "gender identity" status — or adopt the "but-for causation" test. *See Manor Coll.*, 587 F. Supp. 3d at 255 (Once more, "Title IX does not use the word 'because.'"). In essence, Defendants seek to retroactively apply *Bostock*'s interpretation of Title VII to judicial opinions predating *Bostock* by two decades and related to Title IX by incidental wordplay. It strains credulity to aver that the Fifth Circuit preemptively applied *Bostock*'s "but-for" reasoning to Title IX because two words overlap.

Finally, Defendants cite two cases from the Fourth and Ninth Circuits. *See* ECF No. 56 at 27 (citing *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), *and Doe v. Snyder*, 28 F.4th 103 (9th Cir. 2022)). Again, these cases do not persuade the Court to export *Bostock*'s reasoning to the Title IX context. In *Grimm*, the Fourth Circuit stated with scant analysis: "Although *Bostock* interprets Title VII of the Civil Rights Act of 1964, it guides our evaluation of claims under Title IX." 972 F.3d at 616 (internal marks omitted). The Fourth Circuit simply cited *Jennings v. University of North Carolina* for this proposition but did not elaborate further. *See* 482 F.3d 686, 695 (4th Cir. 2007) ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX.").

Likewise, the Ninth Circuit adopted *Bostock*'s reasoning because that circuit "construe[s] Title IX's protections consistently with those of Title VII." *Snyder*, 28 F.4th at 114. The Ninth Circuit did so despite expressly acknowledging that the statutes employ different language, reasoning that *Bostock* interchangeably used "because of sex" and "on the "basis of sex" throughout the majority opinion. *See id.* True enough. Yet just because a *judicial opinion* employs two phrases interchangeably in one context does not mean *Congress* employed those same terms interchangeably in a different context.[4]

In the Fifth Circuit, however, all Title VII case law does not unquestionably apply to Title IX. *See, e.g.*, *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 655–56 (5th Cir. 1997); *Chance v. Rice Univ.*, 984 F.2d 151, 153 (5th Cir. 1993); *Beasley v. St. Tammany Par. Sch. Bd.*, No. 96-2333, 1997 WL 382056, at *3 (E.D. La. July 9, 1997) ("Unlike other circuits, this circuit

---

[4] Just as Section 1557 expressly references and employs Title IX's definition of "on the basis of sex," Congress could have expressly adopted and codified Title IX's definition of "because of . . . sex" when enacting Title IX. Congress, of course, refused to do so. Congress also could have also referenced Title VII in Title IX or Section 1557, just as Section 1557 references Title IX. Again, Congress refused to do so. *Cf. Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (Courts may "insist[] that Congress speak with a clear voice" when it imposes conditions on the receipt of federal funds.).

does not blindly apply Title VII standards to the Title IX context."). Although the Fifth Circuit has held "transgender discrimination is a form of sex discrimination under Title VII," it has not held as much with respect to Title IX or Section 1557. *Olivarez v. T-mobile USA, Inc.*, 997 F.3d 595, 603 (5th Cir. 2021). The Court will not reflexively apply new Title VII precedent in the Title IX context.[5] Accordingly, the Court finds non-precedential opinions of other federal judicial circuits to be unpersuasive here.

### b.  "Based on sex" does not mean "based on SOGI."

Title IX reads no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance [except as provided throughout the statute]." 20 U.S.C. § 1681(a). Because Title IX does not define "on the basis of sex," the Court must construe the phrase.[6]

---

[5] Several other federal courts have considered whether "Section 1557's nondiscrimination requirements encompass gender-identity discrimination." *Tovar v. Essential Health*, 342 F. Supp. 3d 947, 953 (D. Minn. 2018); *see also, e.g., Joganik v. E. Tex. Med. Ctr.*, No. 6:19-CV-517-JCB-KNM, 2021 WL 6694455, at *6 (E.D. Tex. Dec. 14 2021), *report and recommendation adopted*, 2022 WL 243886 (E.D. Tex. Jan. 25, 2022); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 949–50 (W.D. Wis. 2018); *Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1098–1100 (S.D. Cal. 2017) (holding Section 1557 extends to claims of gender identity based on its plain language). This Court, however, is not bound by those conclusions.

[6] Congress enacted Title IX in 1972. 20 U.S.C. § 1681. At that time, "sex" was commonly understood to refer to physiological differences between men and women — particularly with respect to reproductive functions. *See, e.g., Sex*, AMERICAN HERITAGE DICTIONARY 1187 (1976) ("The property or quality by which organisms are classified according to their reproductive functions."); *Sex*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2081 (1971) ("The sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change . . . ."); *Sex*, 9 OXFORD ENGLISH DICTIONARY 578 (1961) ("The sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these."). The Court relies on the same definition of "sex" in this case.

Both parties proceed with the assumption that "sex," as used in Title IX, means biological sex. *See, e.g.*, ECF No. 47 at 8, 13; ECF No. 56 at 25 & n.5 (But "Defendants do not concede that this interpretation of 'sex' is correct."); *cf. Bostock*, 140 S. Ct. at 1746–47 ("We agree that homosexuality and transgender status are distinct concepts from sex."); *Grimm*, 972 F.3d at 632 (Niemeyer, J., dissenting) ("As several sources make clear, the term 'sex' in this context must be understood as referring to the traditional biological indicators that distinguish a male from a female, not the person's internal sense of being male or female, or their outward presentation of that internally felt sense."). Parties only dispute whether Title IX's prohibition of discrimination "on the basis of sex" prohibits discrimination on the basis of SOGI.

The Court "begin[s] with the text." *United States v. Lauderdale County*, 914 F.3d 960, 961 (5th Cir. 2019). The Court construes statutory text to give effect to the ordinary public meaning conveyed when Congress enacted the statute. *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 69–92 (2012). When doing so, the Court "read[s] the statute as a *whole*, so as to give effect to each of its provisions without rendering any language superfluous." *Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 397 (5th Cir. 2006) (emphasis added). And the Court must abide by judicially accepted principles of linguistics in reading the whole — including compositionality. *See generally* James C. Phillips, *The Overlooked Evidence in the Title VII Cases: The Linguistic (and Therefore Textualist) Principle of Compositionality* (May 11, 2020) (unpublished manuscript); *see also Bostock*, 140 S. Ct. at 1769 n.22 (Alito, J., dissenting) (same).

"Title VII differs from Title IX in important respects." *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021). Title IX is not Title VII, and "on the basis of sex" is not "because of sex."[7] *See Manor Coll.*, 587 F. Supp. 3d at 255 ("Title IX does not use the word 'because.' . . . Thus, . . . statutory interpretation of the word 'because' does not apply to Title IX."). The Court must give full effect to the difference in word choice. Henry J. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes*, *in* BENCHMARKS 224 (1967) ("[W]hen

---

Notably, other federal entities — including the Department of Education — have proposed regulations redefining "sex" in Title IX to include "sexual orientation" and "gender identity." *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41390, 41391 (July 12, 2022). Those regulations are not at issue here and the Court does not opine on their validity or the correctness of their interpretation.

[7] *See* James C. Phillips, *The Overlooked Evidence in the Title VII Cases: The Linguistic (and Therefore Textualist) Principle of Compositionality* 1–2 (May 11, 2020) (unpublished manuscript) ("Compositionality is the notion that the meaning of a complex expression is a compositional function of the meaning of its semantic parts. Sometimes what you see is what you get: *apple pie* is a pie made from apples. But sometimes the combination of words has a meaning of its own that is not a reliable amalgamation of the components at all, such as for good or at all." (internal marks omitted)).

Congress employs the same word, it normally means the same thing, when it employs different words, it usually means different things."). By failing to acknowledge the different phrases Title VII and Title IX employ, the Court "would risk amending [the] statutes outside the legislative process reserved for the people's representatives." *Bostock*, 140 S. Ct. at 1738.

Because Title IX prohibits "on the basis of sex," the Court cannot reflexively adopt *Bostock*'s but-for causation analysis. 20 U.S.C. § 1681(a); *see also Meriwether*, 992 F.3d at 510 n.4 ("[I]t does not follow that principles announced in the Title VII context automatically apply in the Title IX context."); *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 772 n.8 (9th Cir. 1999) (Title VII "precedents are not relevant in the context of collegiate athletics. Unlike most employment settings, athletic teams are gender segregated."); *Cohen v. Brown Univ.*, 101 F.3d 155, 177 (1st Cir. 1996) ("It is imperative to recognize that athletics presents a distinctly different situation from . . . employment and requires a different analysis in order to determine the existence *vel non* of discrimination.").

Title IX presumes sexual dimorphism in section after section, requiring equal treatment for each "sex." *See, e.g.*, 20 U.S.C. §§ 1681(a)(2) (allowing schools in some cases to change "from being an institution which admits only students of one sex to being an institution which admits students of *both sexes*" (emphasis added)), 1681(a)(8) (stating if father-son or mother-daughter activities are provided for "one sex," reasonably comparable activities must be provided for "the *other sex*" (emphasis added)). And Courts have long interpreted Title IX to prohibit federally funded education programs from treating men better than women (or vice versa). *See, e.g.*, *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530 (1982); *Cannon v. Univ. of Chi.*, 441 U.S. 677, 680 (1979). As written and commonly construed, Title IX operates in binary terms — male and female — when it references "on the basis of sex."

Title IX's prohibition against discrimination "on the basis of sex" cannot be reduced to a literalist but-for test. For instance, although not at issue here, Section 1686 states: "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. The implementing regulations clarify educational institutions "may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33. It is doubtful Section 1686 *permits* educational institutions to maintain separate living institutions for each "sexual orientation" and "gender identity," while a stand-alone Section 1681(a) *prohibits* same. The implementing regulation highlights the sex binary by referencing "the other sex" — which speaks directly to *biological* sex. 34 C.F.R. § 106.33; *see also, e.g.*, 20 U.S.C. § 1681(a)(8) ("[I]f such activities are provided for students of *one sex*, opportunities for reasonably comparable activities shall be provided for students of *the other sex*." (emphasis added)). "[T]here is no canon against using common sense in construing laws as saying what they obviously mean." *Roschen v. Ward*, 279 U.S. 337, 339 (1929). If "on the basis of sex" included "sexual orientation" and "gender identity," as Defendants envision, Title IX and its regulations would be nonsensical.

As evidenced above, Title IX expressly allows sex distinctions and sometimes even *requires* them to promote equal opportunity. Defendants' theory actively "undermine[s] one of [Title IX's] major achievements, giving young women an equal opportunity to participate in sports." *Bostock*, 140 S. Ct. at 1779 (Alito, J., dissenting).[8] The effect of the Notification "may be

---

[8] *See Grimm*, 972 F.3d at 634 (Niemeyer, J., dissenting) ("[R]equiring the school to allow [the plaintiff], a biological female who identifies as male, to use the male restroom compromises the separation as explicitly authorized by Title IX."). Specific to athletics, Defendants' misapplication of the statute *inverts* the text, history, and purpose of Title IX while pretending to *expand* it: Title IX was enacted to promote and protect *women* in historically male-dominated sports, but Defendants misapply Title IX to promote and protect *men* who displace women.

to force young women to compete against students who have a very significant biological advantage, including students who have the size and strength of a male but identify as female and students who are taking male hormones in order to transition from female to male." *Id.* at 1779–80 (Alito, J., dissenting).[9]

Although courts start with the words themselves, the text should be "interpreted in its statutory and historical context and with appreciation for its importance to the [statute] as a whole." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001); *see also City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 468–69 (1985) (Marshall, J., concurring in part and dissenting in part) ("A sign that says 'men only' looks very different on a bathroom door than a courthouse door."). "[C]ontext always includes evident purpose." SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 63. And "evident purpose always includes effectiveness." *Id.*

Title IX's "overarching purpose," which is "evident in the text" itself, is to prohibit the discriminatory practice of treating women worse than men and denying opportunities to women because they are women (and vice versa). *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344

---

[9] In addition to promoting equal opportunity, Title IX also protects individuals' legitimate and important interest in bodily privacy implicated when a person is nude or partially nude and exposed to others. *See, e.g., West v. Radtke*, No. 20-1570, 2022 WL 4285722, at *10–11 (7th Cir. Sept. 16, 2022); *Harris v. Miller*, 818 F.3d 49, 59 (2d Cir. 2016) (per curiam); *Doe v. Luzerne County*, 660 F.3d 169, 176–77 (3d Cir. 2011) (recognizing individuals have "a constitutionally protected privacy interest in his or her partially clothed body" and this "reasonable expectation of privacy" exists "particularly while in the presence of members of the opposite sex"); *Byrd v. Maricopa Cnty. Sheriff's Dep't*, 629 F.3d 1135, 1141 (9th Cir. 2011) (stating "[t]he desire to shield one's unclothed figure from [the] view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity" (alterations in original) (quoting *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963))); *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2009) (explaining "the constitutional right to privacy . . . includes the right to shield one's body from exposure to viewing by the opposite sex"); *Sepulveda v. Ramirez*, 967 F.2d 1413, 1416 (9th Cir. 1992) (explaining "[t]he right to bodily privacy is fundamental" and "common sense, decency, and [state] regulations" require recognizing it in a parolee's right not to be overserved by an officer of the opposite sex while producing a urine sample); *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981) (recognizing, although prison inmates "surrender many rights of privacy," their "special sense of privacy in their genitals" should not be violated through exposure unless "reasonably necessary" and explaining "involuntary exposure of [genitals] in the presence of people of the other sex may be especially demeaning and humiliating"). An interest commonplace and universally accepted throughout history and across societies. *See Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993) (noting "society's undisputed approval of separate public rest rooms for men and women based on privacy concerns").

(2011). As many courts have recognized, "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities." *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 285 (2d Cir. 2004); *see also Cannon*, 441 U.S. at 704 & n.36.[10] "[I]t would require blinders to ignore that the motivation for promulgation of the regulation on athletics was the historic emphasis on boys' athletic programs to the exclusion of girls' athletic programs in high schools as well as colleges." *Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993).

Defendants' reinterpretation of Title IX through the Notification imperils the very opportunities for women Title IX was designed to promote and protect — categorically forcing biological women to compete against biological men.[11] "A community made up exclusively of one sex is different from a community composed of both." *United States v. Virginia (VMI)*, 518 U.S. 515, 533 (1996) (internal marks omitted). The "physical differences between men and women . . . are enduring: the two sexes are not fungible." *Id.* (internal marks omitted). Such "immutable" distinctions between the sexes are "determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). For example, "[m]en and women simply are not physiologically the same for the purposes of physical fitness programs," because "equally fit men and women demonstrate their fitness differently." *Bauer v. Lynch*, 812 F.3d 340, 350–51 (4th Cir. 2016); *see also Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) ("[D]ue to average physiological differences, males would displace females to a substantial extent if they were allowed to compete" for the same teams.).

---

[10] "[W]hatever approach" cases like *McCormick* or *Cannon* "may have used" to deduce Title IX's purpose, we may rely on them as "an integral part of our jurisprudence" on Title IX. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 286 n.17 (1983).

[11] Defendants argue the Court should not consider "the aspects of Title IX that Congress chose not to incorporate into Section 1557" when interpreting Title IX. ECF No. 56 at 33 n.10. However, the Court considers Title IX provisions not expressly incorporated into Section 1557 because context is highly relevant when interpreting a statute.

"'Inherent differences' between men and women, we have come to appreciate, remain cause for celebration, but not for denigration of the members of either sex or for artificial constraints on an individual's opportunity." *United States v. Virginia*, 518 U.S. 515, 533 (1996). Some "physical fitness standards suitable for men may not always be suitable for women, and accommodations addressing physiological differences between the sexes are not necessarily unlawful." *Bauer*, 812 F.3d at 350. Indeed, Title IX and its implementing regulations protect some such accommodations to promote equality of women. *See, e.g.*, 34 C.F.R. §§ 106.34(a)(1) (permitting "sex" separation in "physical education classes or activities during participation in wrestling, boxing, rugby, ice hockey, football, basketball, and other sports the purpose or major activity of which involves bodily contact"), 106.41(b) (allowing discrimination on the basis of "sex" when operating or sponsoring separate teams "where selection for such teams is based upon competitive skill or the activity involved is a contact sport"), 106.41(c) (requiring schools to "provide equal athletic opportunity for members of both sexes" to "effectively accommodate the interests and abilities of members of both sexes").

Ironically, Defendants' interpretation *invites* SOGI discrimination by excluding student-athletes from participating on the women's or men's teams based solely on gender identity. Presumably, this would force biological women who identify as men to compete against biological men, even if the biological women have the same physiological characteristics as a typical biological woman.[12] Such an interpretation makes little sense given Title IX's text, structure, history, and purpose. *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative

---

[12] And the opposite may be true. *See Doe 2 v. Shanahan*, 917 F.3d 694, 722 (D.C. Cir. 2019) (Williams, J., concurring) ("[T]he transgender community is not a monolith in which every person wants to take steps necessary to live in accord with his or her preferred gender (rather than his or her biological sex). Quite the opposite."); *see also id.* at 701 (Wilkins, J., concurring) (same).

interpretations consistent with the legislative purpose are available."). There are, of course, outlier individuals with physical attributes above or below their sex's average. Yet sex-separated sports only exist to accommodate the average physiological differences between the sexes. Title IX is not written for individual, case-by-case sex separation. The statute instead applies to each sex as a whole.

Moreover, Title IX says nothing about "sexual orientation" and "gender identity." And why would it? Title IX's protections center on differences between the two biological sexes — not SOGI status.[13] Sure enough, members of Congress have attempted to amend Title IX to shield such categories from discrimination. *See, e.g.*, H.R. 1652, 113th Cong. (2013); S. 439, 114th Cong. (2015). But those members have repeatedly failed. By contrast, Congress has enacted hate-crimes legislation with enhanced penalties for crimes motivated by "sexual orientation" or "gender identity." *See, e.g.*, 18 U.S.C. § 249(a)(2); 34 U.S.C. § 12291(b)(13)(A) (prohibiting discrimination based on "sexual orientation" and "gender identity" separately from "sex").

Indeed, under Defendants' interpretation, Title IX and its regulations would protect behavior Defendants likely find abhorrent. Title IX exempts institutions "traditionally" limited to "only students of one sex," "youth service organizations" traditionally "limited to persons of one sex," and "living facilities for the different sexes." 20 U.S.C. §§ 1681(a)(5), 1681(a)(6)(B), 1686. Title IX's regulations exempt "separation of students by sex within physical education classes" for sports chiefly involving bodily contact" as well as human sexuality classes and choirs separated by "sex." 34 C.F.R. § 106.34(a)(1), (3)–(4). If "on the basis of sex" included "sexual orientation," these regulations would permit heterosexual-only choirs. *See* 20 U.S.C. § 1686; 20 C.F.R.

---

[13] Indeed, "gender identity" was "a concept that was essentially unknown" fifty years ago. *Bostock*, 140 S. Ct. at 1755 (Alito, J., dissenting).

§ 106.34(a)(4). And if "on the basis of sex" included "gender identity," schools could not use a biology-based classification to separate physical education classes involving contact sports like boxing or rugby. 34 C.F.R. § 106.34(a)(1).

These contradictions and conflicts arise in the healthcare context to which Section 1557 applies. For example, a hospital could not tailor care to the biological differences between men and women. *See Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 674 & n.8 (N.D. Tex. 2016). Importing *Bostock*-style reasoning or similar "but-for cause" analysis to Title IX would presumptively criminalize sex-specific treatments that discriminate against patients "on the basis of sex." When adopting Section 1557, Congress could have included "sexual orientation" and "gender identity" in the statutory text. Congress chose not to do so. Instead, Congress limited Section 1557's protections to those afforded by other federal statutes — including Title IX. Because Title IX does not protect "sexual orientation" or "gender identity" status, neither does Section 1557.

Title IX's ordinary public meaning remains intact until changed by Congress, or perhaps the Supreme Court. *See Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, 139 S. Ct. 1507, 1512 (2019) ("In all but the most unusual situations, a single use of a statutory phrase must have a fixed meaning."). As noted above, the ordinary public meaning of "sex" turned on reproductive function when Congress enacted Title IX. For an action to occur "on the basis of sex," biological sex must be the motivating factor. "On the basis of sex" does not connote a derivative, "but-for causation" analysis like the Supreme Court reasoned "because of sex" does. *See Bostock*, 140 S. Ct. at 1739. Consequently, the Court will not judicially import *Bostock*'s "but-for causation" test into Title IX. *See* SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 101 (rejecting view that "when courts confront generally worded provisions, they should infer exceptions for situations

20

that the drafters never contemplated and did not intend their general language to resolve"). And because the Court finds Title IX's "on the basis of sex" language does not include "sexual orientation" or "gender identity" status, the Court holds the Secretary cannot alter the phrase by administrative fiat. *See Franciscan Alliance, Inc. v. Becerra*, 553 F. Supp. 3d 361, 371 n.7 (N.D. Tex. 2016). "After all, only the words on the page constitute the law." *Bostock*, 140 S. Ct. at 1738; *see also Grimm*, 972 F.3d at 628 (Niemeyer, J., dissenting) (Reading "sexual orientation" and "gender identity" into Title IX and Section 1557 would "do[] no more than express disagreement with Title IX and its underlying policies, which is not, of course, the role of courts tasked with deciding cases and controversies.").

### C. Section 1557 Does Not Prohibit Discrimination on the Basis of SOGI Status

Plaintiffs seek three primary remedies: (1) "hold unlawful and set aside Secretary Becerra's Notification"; (2) "enjoin Secretary Becerra from using or enforcing the interpretation of [S]ection 1557 that appears in the Notification"; and (3) issue "declaratory relief." ECF No. 11 at 11.

When a legal issue is "fit for judicial resolution" and a regulation "requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the Administrative Procedure Act and the Declaratory Judgment Act must be permitted, absent a statutory bar or some other unusual circumstance." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 153 (1967). "Judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Id.* at 140. Accordingly, the Court will assess the remedies Plaintiffs seek under the APA and DJA. The Court, however, will not assess the propriety of injunctive relief because Plaintiffs do not brief factors relevant to the appropriateness of injunctive relief. "It is not the court's job to divine the applicable law for the parties," nor is it the Court's job "to manufacture every possible argument [the parties] could conceivably make." *Spencer v.*

*Texaco, Inc.*, No. 96-0228, 1996 WL 363540, at *2 (E.D. La. June 28, 1996); *Holz v. United States*,

No. 3:09-CV-1568-P, 2009 WL 10704725, at *2 n.4 (N.D. Tex. Sept. 29, 2009); *see also eBay*

*Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (detailing injunction requirements).

The APA allows a litigant to seek judicial review of "final agency action for which there

is no other adequate remedy in a court." 5 U.S.C. § 704. As the Court previously determined, the

Notification constitutes "final agency action for which there is no other adequate remedy in court."

*See* ECF No. 30 at 21 (quoting 5 U.S.C. § 704); *see also Hinojosa v. Horn*, 896 F.3d 305, 310 (5th

Cir. 2018) (per curiam) (stating 5 U.S.C. § 704 "limits the APA to the review of those agency

actions which otherwise lack an 'adequate remedy in court'"). Under the APA, "[t]o the extent

necessary to decision and when presented, the reviewing court shall decide all relevant questions

of law, interpret constitutional and statutory provisions, and determine the meaning or applicability

of the terms of an agency action." 5 U.S.C. § 706. When doing so, "[t]he reviewing court

shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . not

in accordance with law." *Id.*

Under the DJA, "any court of the United States, upon the filing of an appropriate pleading,

may declare the rights and other legal relations of any interested party seeking such declaration,

whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "Any such declaration

shall have the force and effect of a final judgment or decree . . . ." *Id.* Section 2201(a) "allow[s]

potential defendants to resolve a dispute without waiting to be sued." *Sherwin-Williams Co. v.*

*Holmes County*, 343 F.3d 383, 397 (5th Cir. 2003). It is a defensive action "allowing prospective

defendants to sue to establish their nonliability." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500,

504 (1959); David P. Currie, *Misunderstanding Standing*, 1981 SUP. CT. REV. 41, 45–46 (1982).

When presented with a request to decide or dismiss a declaratory-judgment suit, a court must

decide whether: (1) "the declaratory action is justiciable"; (2) "the court has the authority to grant declaratory relief"; and (3) "to exercise its discretion to decide or dismiss the action." *Sherwin-Williams*, 343 F.3d at 387. This case satisfies all three factors.

### 1. This declaratory action is justiciable.

The DJA does not create an independent cause of action. *Harris County v. MERSCORP Inc.*, 791 F.3d 545, 552 (5th Cir. 2015). In a declaratory-judgment action, the relevant cause of action is the defendant's anticipated lawsuit against the plaintiff. *See Collin County v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 171 (5th Cir. 1990) ("Since it is the underlying cause of action of the defendant against the plaintiff that is actually litigated in a declaratory judgment action, a party bringing a declaratory judgment action must have been a proper party had the defendant brought suit on the underlying cause of action."); *Lowe v. Ingalls Shipbuilding, A Div. of Litton Sys., Inc.*, 723 F.2d 1173, 1179 (5th Cir. 1984) ("[T]he underlying cause of action which is thus actually litigated is the declaratory defendant's, not the declaratory plaintiff's . . . ."); *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 500 (5th Cir. 2020) (Oldham, J., concurring) ("[T]he Declaratory Judgment Act . . . does not create a standalone cause of action. Rather, . . . [i]t allows parties who would otherwise be defendants to seek relief as plaintiffs.").

Because Defendants threaten to enforce their interpretation "on the basis of sex" found in the Notification, Plaintiffs can bring this declaratory-judgment action without waiting to see if Defendants will make good on their threats. *See Collin County*, 915 F.2d at 170 ("The Declaratory Judgment Act is designed to afford parties, threatened with liability, but otherwise without a satisfactory remedy, an early adjudication of an actual controversy. . . . [A] party who has an interest in the outcome of future litigation can petition the court for a declaration of its rights and

liabilities."); *Tex. Employers' Ins. Assoc. v. Jackson*, 862 F.2d 491, 505 (5th Cir. 1988) (Litigants need not "be put to the Hobson's choice of foregoing their rights or acting at their peril; nor, if they had already acted, would they be forced to wait, for perhaps many years, until the statute of limitations expired, to know whether they had been subjected to some significant liability."). And even if the DJA does not supply Plaintiffs a cause of action, they possess an independent cause of action under 5 U.S.C. § 704, as Plaintiffs may seek declaratory relief as part of their APA claim. *See* 5 U.S.C. § 702 (permitting plaintiffs to seek "relief other than money damages" when challenging agency action under APA).

### 2. The Court has the authority to grant declaratory relief.

A district court lacks authority to grant declaratory relief and "may not consider the merits of [a] declaratory judgment action when:" (1) "a declaratory defendant has previously filed a cause of action in state court against the declaratory plaintiff"; (2) "the state case involves the same issues as those involved in the federal case"; and (3) "the district court is prohibited from enjoining the state proceedings under the Anti-Injunction Act." *Travelers Ins. Co. v. La. Farm Bureau Fed'n*, 996 F.2d 774, 776 (5th Cir. 1993) (emphasis removed). Nothing before the Court indicates there is a pending state-court proceeding between the parties whose existence divests this Court of its authority to grant declaratory relief.

In exercising its discretion to decide or dismiss a declaratory action, a district court should consider seven nonexclusive factors, including whether:

(1) there is a pending state action in which all of the matters in controversy may be fully litigated;

(2) the plaintiff filed suit in anticipation of a lawsuit filed by the defendant;

(3) the plaintiff engaged in forum-shopping in bringing the suit;

(4) possible inequities in allowing the declaratory plaintiff to gain precedence in time or to change forums exist;

24

(5) the federal court is a convenient forum for the parties and witnesses;

(6) retaining the lawsuit would serve the purposes of judicial economy; and

(7) the federal court is being called on to construe a state judicial decree involving the same parties and entered by the court before whom the parallel state suit between the same parties is pending.

*Sherwin-Williams*, 343 F.3d at 388 (quoting *St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 590–91 (5th Cir. 1994)).

The Court finds application of these factors favors exercise of the Court's discretion to grant declaratory relief. Regarding factor one, the Court is unaware of any pending state action involving the parties in which all the matters in controversy may be fully litigated. As to factor two, Plaintiffs admit they sued out of concern of future enforcement actions by Defendants. *See* ECF No. 47-1 at 3–6; ECF No. 42-2 at 3–4. For factors three and four, "[m]erely filing a declaratory judgment action in a federal court with jurisdiction to hear it . . . is not in itself improper anticipatory litigation or otherwise abusive 'forum shopping.'" *Sherwin-Williams*, 343 F.3d at 391. Because Plaintiffs are not "using the declaratory judgment process to gain access to a federal forum on improper or unfair grounds," these factors favor Plaintiffs. Factor five also favors Plaintiffs, as witnesses are not a large concern in this case and have not been from the inception of this lawsuit. *Id.* As for factor six, to the Court's knowledge, there are no pending state procedures involving these parties and this controversy, persuading the Court declaratory relief is inappropriate. Finally, pertaining to factor seven, the Court is not being asked to construe a state judicial decree involving the same parties and entered by a court adjudicating a parallel proceeding between the parties.

**CONCLUSION**

Based on the above, the Court **GRANTS IN PART** Plaintiffs' Motion. The Court awards Plaintiffs' requested relief under the APA and DJA, excluding injunctive relief. The Court **GRANTS IN PART** Defendants' Motion and **DENIES** Plaintiffs' request for injunctive relief. The Court **DENIES** all other relief not expressly stated herein. The Court **ORDERS** parties to submit competing proposed judgments **within 10 days** of the date of this Opinion and Order.

**SO ORDERED**.

November _11_, 2022

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE